6781

1                        - VOLUME 25 -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5    UNITED STATES OF AMERICA,      :   CRIMINAL ACTION
                                    :
6                    Plaintiff,     :
                                    :
7         vs.                       :
                                    :
8    DAVID R. GIBSON, ROBERT        :
     V.A. HARRA, WILLIAM            :
9    NORTH, and KEVYN RAKOWSKI,     :
                                    :
10                                  :
                     Defendants.    :   NO. 15-23-RGA
11

12                              - - -

13
                              Wilmington, Delaware
14                            Monday, April 23, 2018
                              8:40 o'clock, a.m.
15
                                - - -
16
     BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17   jury

18                              - - -
     APPEARANCES:
19

20            LESLEY F. WOLF, ESQ.,
              ROBERT F. KRAVETZ, ESQ. and
21            JAMIE M. McCALL, ESQ.
              Assistant United States Attorneys
22

23                Counsel for Plaintiff

24                            Valerie J. Gunning
                              Leonard A. Dibbs
25                            Official Court Reporters

```
1    APPEARANCES (Continued):

2

3              McCARTER & ENGLISH
               BY:  STEVEN P. WOOD, ESQ.

4

5                     -and-

6              ANDREW M. LAWLER P.C.
               BY:  ANDREW W. LAWLER, ESQ.

7

8                     Counsel for Defendant
                      Robert Harra

9

10

11             DALTON & ASSOCIATES
               BY:  BARTHOLOMEW DALTON, ESQ.

12

13                    -and-

14             KROVATIN KLINGEMAN LLC
               BY:  HENRY KLINGEMAN, ESQ.

15                    (Newark, New Jersey)

16

17                    Counsel for Defendant
                      Kevyn Rakowski

18

19

20

21

22

23

24

25
```

1    APPEARANCES (Continued):

2
                    WILKS LUKOFF & BRACEGIRDLE LLC
3                   BY:   DAVID W. WILKS, ESQ.,
                          THOMAS FOLEY, ESQ. and
4                         R. STOKES NOLTE, ESQ.

5
                          Counsel for Defendant
6                         William North

7

8                   PAUL HASTINGS LLP
                    BY: KENNETH M. BREEN, ESQ. and
9                        PHARA SERLE GUBERMAN, ESQ.

10
                          Counsel for Defendant
11                        David Gibson

12
                               -   -   -
13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4    beginning at 8:40 a.m.)

 5

 6              THE COURT:  All right.  Good morning, everyone.

 7    Please be seated.

 8              I just want to touch base on a couple things,

 9    one of which is the parties should file whatever objections,

10    the e-mail correspondence over the weekend, everybody ought

11    to make a record of whatever it is they want to make a

12    record of.

13              I'm also curious what the Government's thought

14    is, if they have any better estimate now than they did last

15    week as to how long they think their closing is going to

16    be.

17              MR. KRAVETZ:  It will take one break, I think.

18              THE COURT:  Okay.  Well --

19              MR. KRAVETZ:  So I think the estimate was three

20    hours.

21              THE COURT:  Yes.

22              MR. KRAVETZ:  Probably still around there.

23              THE COURT:  Okay.  All right.  Fine.  All right.

24    And so I will ask the jury to, even though I think they've

25    been pretty much sitting in the same seats these days, I
</pre>

08:41:25   1   will ask them to maintain their seats and I will provide a

08:41:34   2   list of who is sitting where, but maybe not until after --

08:41:39   3   not right away.

08:41:40   4          The other thing is, in terms of my jury charge,

08:41:44   5   I don't have a good sense as to how long it's going to take

08:41:47   6   me, but I figured it would take somewhere between

08:41:49   7   one-and-a-half and two hours, and it's very likely I might

08:41:53   8   take a break at the halfway mark because there's a limit to

08:41:58   9   how long I can talk, which actually I can talk for longer

08:42:01   10  than the jury can listen, so we'll probably take at least a

08:42:07   11  short break to give everyone a chance to wake up.

08:42:12   12         All right.  Are there any other issues to deal

08:42:14   13  with?

08:42:19   14         MS. WOLF:  Your Honor, we actually seem to have

08:42:21   15  resolved all issues relating to admitted documents.

08:42:25   16         THE COURT:  That's good.  Thank you.

08:42:26   17         MS. WOLF:  I have a slightly modified version of

08:42:29   18  the exhibit list, which just reflects redactions to

08:42:32   19  particular documents, and I will provide it to the clerk on

08:42:35   20  a break, Your Honor.

08:42:35   21         THE COURT:  All right.  That would be great.

08:42:38   22         MR. WOOD:  Your Honor, my understanding is the

08:42:43   23  Government is resting without putting on a rebuttal case.

08:42:46   24  That matters to us because the Third Circuit suggests that

08:42:49   25  we need to renew our motions for judgment of acquittal after

08:42:52   1    that happens.

08:42:52   2              THE COURT:  All right.  So why don't we -- and

08:42:55   3    I'm glad you mentioned that, because though I had asked

08:42:57   4    about that, I do think the Government ought to -- that's

08:43:04   5    actually the first thing we ought to do, is have them rest

08:43:07   6    in front of the jury, and I will just take it that you've

08:43:10   7    made, renewed all your motions.  And if you want to argue at

08:43:16   8    some later time, that's fine, but let's not do it --

08:43:19   9              MR. WOOD:  Yes.  All I was going to say is on

08:43:21   10   behalf of Harra, we do renew the motion and also ask the

08:43:24   11   Court to take into consideration any evidence after --

08:43:27   12             THE COURT:  I assume that is on behalf of all

08:43:29   13   the defendants.  If you want to put it on the record, that

08:43:31   14   would be good.

08:43:32   15             MR. NOWAK:  Yes.  That's on behalf of Mr. Gibson

08:43:32   16   as well, Your Honor.

08:43:36   17             MR. WILKS:  And on behalf on Mr. North.  Thank

08:43:39   18   you, Your Honor.

08:43:39   19             MR. KLINGEMAN:  Just to make it clear, on behalf

08:43:40   20   of Ms. Rakowski, we're preserving any issues we've raised up

08:43:45   21   to and through the defense case.

08:43:48   22             THE COURT:  Yes.  The record will reflect, as

08:43:52   23   far as I'm concerned, you've made these after the Government

08:43:54   24   rests rather than before so you don't have to make them

08:43:57   25   again.  What I expect is when the jury comes in, the

6787

08:44:00  1  Government will say, we rest, and then I will start charging

08:44:04  2  the jury.

08:44:04  3            MR. KRAVETZ:  And, Your Honor, I appreciated the

08:44:08  4  opportunity to confer with Mr. Klingeman over the weekend,

08:44:13  5  and I understand Mr. Klingeman is going to put this on the

08:44:15  6  record, but if you recall, we discussed at sidebar that

08:44:18  7  defendant Rakowski was not presenting the OTS Q&A evidence

08:44:24  8  and confirmed that with Mr. Klingeman.

08:44:26  9            THE COURT:  Okay.

08:44:27  10           MR. KRAVETZ:  Just because it might have

08:44:28  11 impacted whether we put a rebuttal case on or not or

08:44:31  12 requested to put on a rebuttal case.  And also, we conferred

08:44:36  13 relating to Government Exhibit 524, which is the e-mail from

08:44:41  14 the desk file with the handwriting on top.

08:44:44  15           THE COURT:  Right.

08:44:44  16           MR. KRAVETZ:  And we discussed how at sidebar

08:44:47  17 Mr. Klingeman made certain representations about what he was

08:44:51  18 not going to say in closing relating to that document.  It's

08:44:55  19 my understanding Mr. Klingeman is prepared to place that on

08:44:58  20 the record again just prior to us resting.

08:45:02  21           THE COURT:  If it's already on the record once,

08:45:04  22 why do we need to place it on again?

08:45:07  23           MR. KRAVETZ:  I'm content with that.

08:45:08  24           THE COURT:  Mr. Klingeman?

08:45:09  25           MR. KLINGEMAN:  I'm content with that as well.

08:45:11    1                THE COURT:  Okay.

08:45:12    2                MR. KRAVETZ:  Thank you, Your Honor.

08:45:13    3                THE COURT:  All right.  Anything else?

08:45:17    4                All right.  Well, then, I will come back in in

08:45:21    5       15 minutes.  Hopefully, the jury is all here, which I assume

08:45:24    6       they will be.

08:45:25    7                So you all can be seated.  I just want to check

08:45:27    8       out one or two things, so just ignore me.

08:45:30    9                MR. KRAVETZ:  Your Honor, will we get a copy of

08:45:32   10       the instructions to follow along with?

08:45:34   11                THE COURT:  I e-mailed them to you at 8:30, and

08:45:37   12       unfortunately, if you want to follow along other than on

08:45:41   13       your computers, you need to start printing.

08:45:43   14                MR. KRAVETZ:  Ms. Lotharp is all over it.  We

08:45:46   15       have it.

08:45:46   16                THE COURT:  Okay.  I'm trying to save paper

08:46:04   17       here.

08:46:05   18                (Short recess taken.)

08:51:30   19                       -  -  -

08:51:30   20                (Proceedings resumed after the short recess.)

09:02:31   21                THE COURT:  All right.  Good morning, again.

09:20:12   22       Please be seated.

09:20:13   23                I understand somebody wants to talk about the

09:20:14   24       jury instructions, so please tell me who and what it is your

09:20:17   25       problem is.

09:20:17   1          MS. WOLF:  Your Honor, it's a minor point, and

09:20:19   2    actually, the parties are in agreement.  On the bottom of

09:20:24   3    page 28, in the good faith instruction, at the bottom line,

09:20:28   4    the instruction originally read "and/or."

09:20:30   5          THE COURT:  Yes.

09:20:31   6          MS. WOLF:  It was changed just to read "or," but

09:20:34   7    the parties agree that it, that that line should

09:20:38   8    appropriately read "and/or."

09:20:40   9          THE COURT:  So I'm correct to think the

09:20:45   10   circumstance of events was, the Government did a thing, said

09:20:50   11   "and/or."  The defendant objected and said "or."  The

09:20:54   12   Government didn't respond to that point.

09:20:56   13          That's where we got to that point?

09:20:57   14          MS. WOLF:  And at the top, it was changed in two

09:20:58   15   places, and after talking to Mr. Nowak, at the top, it

09:21:02   16   appears not to alter the legal standard by just reading

09:21:05   17   "or," but as we read through it this morning in a final

09:21:09   18   run-through, it does appear, because certain of the counts

09:21:13   19   don't require a finding of willfullness, that it could

09:21:17   20   potentially create confusion.

09:21:18   21          THE COURT:  Okay.  Well, I am just going to read

09:21:21   22   in "and" there.  Page 28.

09:21:24   23          What else?

09:21:25   24          MS. WOLF:  That's it, Your Honor.

09:21:27   25          THE COURT:  Oh.

| | | |
|---|---|---|
| 09:21:29 | 1 | MS. WOLF:  Sorry to disappoint. |
| 09:21:30 | 2 | THE COURT:  I was led to believe there were more |
| 09:21:33 | 3 | percolating matters. |
| 09:21:36 | 4 | MS. WOLF:  No. |
| 09:21:37 | 5 | THE COURT:  All right.  Are we ready to go? |
| 09:21:40 | 6 | MR. KRAVETZ:  Yes, Your Honor. |
| 09:21:40 | 7 | THE COURT:  All right. |
| 09:22:40 | 8 | (The jury entered the courtroom.) |
| 09:23:35 | 9 | THE COURT:  All right.  Everyone may be seated. |
| 09:23:37 | 10 | Members of the jury, welcome back. |
| 09:23:38 | 11 | Have you followed my instructions since the last |
| 09:23:41 | 12 | time we saw you on Tuesday? |
| 09:23:42 | 13 | (The jury responds, "Yes.") |
| 09:23:45 | 14 | THE COURT:  All right.  Mr. Kravetz? |
| 09:23:46 | 15 | MR. KRAVETZ:  Your Honor, the United States |
| 09:23:47 | 16 | rests. |
| 09:23:47 | 17 | THE COURT:  All right.  Thank you. |
| 09:23:51 | 18 | So, members of the jury, I'm about to start the |
| 09:24:00 | 19 | closing instructions, which actually, I will ask right now |
| 09:24:05 | 20 | that we hand out. |
| 09:24:15 | 21 | (The clerk handed copies of the jury |
| 09:24:19 | 22 | instructions to the jury.) |
| 09:24:47 | 23 | THE COURT:  And before I start, I just want to |
| 09:24:51 | 24 | say that these instructions are really long, and I know |
| 09:25:00 | 25 | there are human limits to how long you can listen to me talk |

09:25:03   1   and continue to absorb the information.  So as you'll see,

09:25:09   2   you will be getting these, or you're going to have these

09:25:12   3   instructions in writing, and I expect that I will take a

09:25:18   4   break somewhere in the middle of this just to give you a

09:25:20   5   chance to become more alert.  All right?

09:25:31   6             Members of the jury, you just heard and have

09:25:41   7   seen all the evidence in this case.  Shortly, the parties

09:25:44   8   will have the opportunity to present their closing

09:25:46   9   arguments.  The Government will argue first, then the

09:25:48   10   defendants will present their closing arguments, and

09:25:51   11   finally, the Government may argue in response or in rebut to

09:25:56   12   the defendants' arguments.

09:25:58   13             Closing arguments are designed to present to you

09:26:00   14   the parties' theories about what the evidence has shown and

09:26:03   15   what conclusions may be drawn from the evidence.  Remember,

09:26:05   16   what is said in closing arguments is not evidence.  You have

09:26:07   17   already heard and seen all the evidence in this case.

09:26:10   18             Before the parties present their closing

09:26:12   19   arguments, I will give you my final instructions concerning

09:26:14   20   the law that you must apply to the evidence in reaching your

09:26:17   21   verdict.  Although the parties may mention points of law in

09:26:20   22   their closing arguments, the law that you must follow in

09:26:23   23   reaching your verdict is the law that I give you in my final

09:26:26   24   instructions.  If there is any difference between what the

09:26:29   25   parties say about the law and what I tell you in my final

09:26:32    1    instructions, you must follow my instructions.

09:26:35    2            Members of the jury, you have seen and heard all

09:26:44    3    the evidence and the arguments of the lawyers.  Now I will

09:26:47    4    instruct you on the law.

09:26:48    5            You have two duties as a jury.  Your first duty

09:26:52    6    is to decide the facts from the evidence that you have heard

09:26:54    7    and seen in court during this trial.  That is your job and

09:26:58    8    yours alone.  I play no party in finding the facts.  You

09:27:01    9    should not take anything I may have said or done during the

09:27:03   10    trial as indicating what I think of the evidence or what I

09:27:09   11    think about what your verdict should be.

09:27:12   12            Your second duty is to apply the law that I give

09:27:15   13    you to the facts.  My role now is to explain to you the

09:27:18   14    legal principles that must guide you in your decisions.  You

09:27:21   15    must apply my instructions carefully.  Each of the

09:27:24   16    instructions is important, and you must apply all of them.

09:27:27   17    You must not substitute or follow your own notion or opinion

09:27:30   18    about what the law is or ought to be.  You must apply the

09:27:35   19    law that I give to you, whether you agree with it or not.

09:27:38   20            Whatever your verdict, it will have to be

09:27:40   21    unanimous.  All of you will have to agree on it or there

09:27:45   22    will be no verdict.  In the jury room you will discuss the

09:27:47   23    case among yourselves, but ultimately each of you will have

09:27:50   24    to make up his or her own mind.  This is a responsibility

09:27:54   25    that each of you has and that you cannot avoid.

09:27:57    1              During your deliberations, you must not

09:27:59    2    communicate with, receive any information from, or provide

09:28:02    3    any information to anyone by any means about this case.  You

09:28:05    4    may not use any electronic device or media, such as the

09:28:08    5    telephone, a cellphone, smart phone, iPhone, Blackberry or

09:28:13    6    computer, the Internet, any Internet service, any text or

09:28:17    7    instant messaging service, any Internet chat room, blog, or

09:28:20    8    website such as Facebook, MySpace, LinkedIn, YouTube or

09:28:24    9    Twitter, to communicate to anyone any information about this

09:28:28   10    case, to receive any information about this case, or to

09:28:36   11    conduct any research about this case until I accept your

09:28:39   12    verdict.  In other words, you cannot talk to anyone on the

09:28:42   13    phone, correspond with anyone, or electronically communicate

09:28:46   14    with anyone about this case.  You can only discuss the case

09:28:49   15    in the jury room with your fellow jurors during

09:28:51   16    deliberations.

09:28:52   17              You may not use these electronic means to

09:28:55   18    investigate or communicate about the case because it is

09:28:57   19    important that you decide this case based solely on the

09:29:00   20    evidence presented in this courtroom.  You are only

09:29:02   21    permitted to discuss the case with your fellow jurors during

09:29:05   22    deliberations because they have seen and heard the same

09:29:08   23    evidence you have.  In our judicial system, it is important

09:29:11   24    that you are not influenced by anything or anyone outside of

09:29:16   25    this courtroom.

09:29:17  1    Perform these duties fairly and impartially.  Do

09:29:21  2  not allow sympathy, prejudice, fear, or public opinion to

09:29:25  3  influence you.  You should also not be influenced by

09:29:29  4  anyone's race, color, religion, national ancestry, or

09:29:36  5  gender, sexual orientation, profession, occupation,

09:29:40  6  celebrity, economic circumstances, or position in life or in

09:29:44  7  the community.  The fact that the prosecution is brought in

09:29:47  8  the name of the United States of America does not entitle

09:29:49  9  the Government to any greater consideration than that when

09:29:51  10  you give to Mr. Gibson, Mr. Harra, Mr. North and Ms.

09:29:56  11  Rakowski.

09:29:56  12    The defendants Mr. Gibson, Mr. Harra, Mr. North,

09:30:04  13  and Ms. Rakowski are all charged with more than one offense;

09:30:11  14  each offense is charged in a separate count of the

09:30:14  15  indictment.  I will explain to you in more detail shortly

09:30:16  16  which defendants are charged with which offenses.  Before I

09:30:20  17  do that, however, I want to emphasize several things.

09:30:24  18    The number of offenses charged is not evidence

09:30:26  19  of guilt, and this should not influence your decision in any

09:30:31  20  way.  Also, in our system of justice, guilt or innocence is

09:30:34  21  personal and individual.  You must separately consider the

09:30:37  22  evidence against each defendant on each offense charged, and

09:30:40  23  you must return a separate verdict for each defendant for

09:30:43  24  each count.  For each defendant and each count, you must

09:30:46  25  decide whether the Government has proven beyond a reasonable

09:30:49  1    doubt that a particular defendant is guilty of a particular

09:30:51  2    offense.

09:30:52  3          Your decision on any one defendant or any one

09:30:55  4    count, whether guilty or not guilty, should not influence

09:31:00  5    your decision on any of the other defendants or counts.

09:31:03  6    Each count and each defendant should be considered

09:31:05  7    separately.

09:31:06  8          The defendants Mr. Gibson, Mr. Harra, Mr. North,

09:31:13  9    and Ms. Rakowski have all pleaded not guilty to the offenses

09:31:18  10   charged.  Each defendant is presumed to be innocent.  Each

09:31:21  11   defendant started the trial with a clean slate, with no

09:31:23  12   evidence against him or her.  The presumption of innocence

09:31:26  13   stays with each defendant unless and until the Government

09:31:28  14   has presented evidence that overcomes that presumption by

09:31:31  15   convincing you that the defendant you are considering is

09:31:33  16   guilty of the offense charged beyond a reasonable doubt.

09:31:35  17   The presumption of innocence requires that you find each

09:31:38  18   defendant not guilty, unless you are satisfied that the

09:31:41  19   Government has proved guilt of that defendant on the count

09:31:43  20   you are considering beyond a reasonable doubt.

09:31:45  21          The presumption of innocence means that

09:31:49  22   Mr. Gibson, Mr. Harra, Mr. North, and Ms. Rakowski have no

09:31:53  23   burden or obligation to present any evidence at all or to

09:31:56  24   prove that they are not guilty.  The burden or obligation of

09:31:59  25   proof is on the Government to prove that the defendant is

09:32:01  1  guilty beyond a reasonable doubt, and this burden stays with

09:32:04  2  the Government throughout the trial.

09:32:05  3          In order for you to find Mr. Gibson, Mr. Harra,

09:32:09  4  Mr. North, and Ms. Rakowski guilty of any offense charged,

09:32:13  5  the Government must convince you that the defendant you are

09:32:15  6  considering is guilty beyond a reasonable doubt.  That means

09:32:18  7  that the Government must prove each and every element of

09:32:21  8  each offense charged beyond a reasonable doubt.  A defendant

09:32:23  9  may not be convicted based on suspicion or conjecture, but

09:32:28  10  only on evidence proving guilt beyond a reasonable doubt.

09:32:30  11          Proof beyond a reasonable doubt does not mean

09:32:34  12  proof beyond all possible doubt or to a mathematical

09:32:38  13  certainty.  Possible doubts or doubts based on conjecture,

09:32:41  14  speculation, or hunch are not reasonable doubts.  A

09:32:44  15  reasonable doubt is a fair doubt based on reason, logic,

09:32:48  16  common sense, or experience.  It is a doubt that an ordinary

09:32:51  17  reasonable person has after carefully weighing all of the

09:32:54  18  evidence, and is a doubt of the sort that would cause him or

09:32:58  19  her to hesitate to act in matters of importance in his or

09:33:09  20  her own life.  It may arise from the evidence, or from the

09:33:12  21  lack of evidence, or from the nature of the evidence.

09:33:14  22          If, having now heard all the evidence, you are

09:33:26  23  convinced that the Government proved each and every element

09:33:28  24  of an offense charged beyond a reasonable doubt with respect

09:33:31  25  to the defendant you are considering, you should return a

| | |
|---|---|
| 09:33:34 | 1 |
| 09:33:36 | 2 |
| 09:33:40 | 3 |
| 09:33:42 | 4 |
| 09:33:45 | 5 |
| 09:33:47 | 6 |
| 09:33:53 | 7 |
| 09:33:57 | 8 |
| 09:34:00 | 9 |
| 09:34:03 | 10 |
| 09:34:05 | 11 |
| 09:34:07 | 12 |
| 09:34:09 | 13 |
| 09:34:12 | 14 |
| 09:34:15 | 15 |
| 09:34:18 | 16 |
| 09:34:21 | 17 |
| 09:34:23 | 18 |
| 09:34:25 | 19 |
| 09:34:27 | 20 |
| 09:34:28 | 21 |
| 09:34:30 | 22 |
| 09:34:31 | 23 |
| 09:34:34 | 24 |
| 09:34:35 | 25 |

1  verdict of guilty for that defendant on that count.

2  However, if you have a reasonable doubt about one or more of

3  the elements of an offense charged with respect to the

4  defendant you are considering, then you must return a

5  verdict of not guilty for that defendant on that count.

6          You must make your decision in this case based

7  only on the evidence that you saw and heard in the

8  courtroom.  Do not let rumors, suspicions, or anything else

9  that you may have seen or heard outside of court influence

10  your decision in any way.

11          The evidence from which you are to find the

12  facts consist of the following:

13          The testimony of the witnesses.

14          Documents and other things received as exhibits.

15          And any fact or testimony that was stipulated;

16  that is, formally agreed to by the parties.

17          The following is not evidence:

18          The indictment.

19          Statements and arguments of the lawyers for the

20  parties in this case.

21          Questions by the lawyers and questions that I

22  might have asked.

23          Objections by lawyers, including objections in

24  which the lawyers stated facts.

25          Any testimony I struck or told you to disregard.

                        And anything you may have seen or heard about
this case outside the courtroom.

                        You should use your common sense in weighing the
evidence.  Consider it in light of your everyday experience
with people and events, and give it whatever weight you
believe it deserves.

                        As I told you in my preliminary instructions,
the Rules of Evidence control what can be received into
evidence.  During the trial the lawyers objected when they
thought that evidence was offered that was not permitted by
the Rules of Evidence.  These objections simply meant that
the lawyers were asking me to decide whether the evidence
should be allowed under the rules.

                        You should not be influenced by the fact that an
objection was made.  You should also not be influenced by my
rulings on objections or any sidebar conferences you may
have overheard.  When I overruled an objection, the question
was answered or the exhibit was received as evidence, and
you should treat that testimony or exhibit like any other.

                        When I sustained an objection, the question was
not answered or the exhibit was not received as evidence.
You must disregard the question or the exhibit entirely.
Do not think about or guess what the witness might have said
in answer to the question; do not think about or guess what
the exhibit might have shown.  Sometimes a witness may have

09:36:00   1   already answered before a lawyer objected or before I ruled

09:36:03   2   on the objection.  If that happened and if I sustained the

09:36:05   3   objection, you must disregard the answer that was given.

09:36:09   4        Also, if I ordered that some testimony or other

09:36:11   5   evidence be stricken or removed from the record, you must

09:36:14   6   disregard that evidence.  When you are deciding this case,

09:36:21   7   you must not consider or be influence in any way by the

09:36:28   8   testimony or other evidence that I told you to disregard.

09:36:30   9        Although the lawyers may have called, or may

09:36:45   10  call your attention to certain facts or factual conclusions

09:36:47   11  that they thought were important, what the lawyers say is

09:36:50   12  not evidence and is not binding on you.  It is your own

09:36:54   13  recollection and interpretation of the evidence that

09:36:55   14  controls your decision in this case.  Also, do not assume

09:36:58   15  that anything I may have done or said during the trial, that

09:37:01   16  I have any opinion about any of the issues in this case, or

09:37:05   17  about what your verdict should be.

09:37:06   18       Two types of evidence may be used in this trial,

09:37:17   19  direct evidence and circumstantial evidence (or indirect)

09:37:21   20  evidence.  You may use both types of evidence in reaching

09:37:25   21  your verdict.

09:37:26   22       Direct evidence is simply evidence which, if

09:37:28   23  believed, directly proves a fact.  An example of direct

09:37:31   24  evidence occurs when a witness testifies about something the

09:37:33   25  witness knows from his or her own senses -- something the

witness has seen, touched, heard, or smelled.

Circumstantial evidence is evidence which, if believed, indirectly proves a fact.  It is evidence that proves one or more facts from which you could reasonably find or infer the existence of some other fact or facts.  A reasonable inference is simply a deduction or conclusion that reason, experience, and common sense lead you to make from the evidence.  A reasonable inference is not a suspicion or a guess.  It is a reasoned, logical decision to find that a disputed fact exists on the basis of another fact.

For example, if someone walked into the courtroom wearing a wet raincoat and carrying a wet umbrella, that would be circumstantial or indirect evidence from which you could reasonably find or conclude that it was raining.  You would not have to find that it was raining, but you could.

Sometimes different inferences may be drawn from the same set of facts.  The Government may ask you to draw one inference, and the defense may ask you to draw another.  You, and you alone, must decide what reasonable inferences you will draw based on all the evidence and your reason, experience and common sense.

You should consider all the evidence that is presented in this trial, direct and circumstantial.  The law

| | |
|---|---|
| 09:38:44 | 1 |
| 09:38:47 | 2 |
| 09:38:49 | 3 |
| 09:38:57 | 4 |
| 09:39:00 | 5 |
| 09:39:01 | 6 |
| 09:39:05 | 7 |
| 09:39:08 | 8 |
| 09:39:11 | 9 |
| 09:39:13 | 10 |
| 09:39:16 | 11 |
| 09:39:19 | 12 |
| 09:39:22 | 13 |
| 09:39:25 | 14 |
| 09:39:28 | 15 |
| 09:39:32 | 16 |
| 09:39:35 | 17 |
| 09:39:36 | 18 |
| 09:39:39 | 19 |
| 09:39:42 | 20 |
| 09:39:43 | 21 |
| 09:39:51 | 22 |
| 09:39:53 | 23 |
| 09:39:56 | 24 |
| 09:39:59 | 25 |

makes no distinction between the weight that you should give to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

Many of you have taken notes during the course of the trial.

If you have taken notes, you may use your notes only as an aid to your own independent recollection of the evidence.  Your notes are not evidence, and they are not entitled to any greater weight than the actual recollection of each juror as to what the evidence actually is.  It is your recollection of the evidence, not your notes, which should control during your deliberations.  If you have not taken notes, you should rely upon your own independent recollection of the proceedings and not be unduly influenced by the notes of other jurors.  Similarly, none of you may use the mere fact that you took notes to try and influence any other juror.

I emphasize that notes are not entitled to any greater weight than the memory or impression of each juror as to what the testimony may have been.

It is the duty of an attorney to object when testimony or evidence is offered which the attorney believes is not properly admissible.  Counsel also have the right and duty to ask the Court to make rulings of law.  All of those questions of law must be decided by the Court.  You should

09:40:02  1   not show any prejudice against an attorney or his or her

09:40:06  2   client because the attorney objected to the admissibility

09:40:08  3   of evidence, or asked the Court for a ruling on the law.

09:40:11  4         My rulings on the admissibility of evidence

09:40:14  5   do not indicate any opinion about the weight or effect of

09:40:17  6   such evidence.  You are the sole judges of the credibility

09:40:19  7   of all witnesses and the weight and effect of all of the

09:40:22  8   evidence.

09:40:32  9         In certain instances evidence was admitted

09:40:39  10  only for a particular purpose and not generally for all

09:40:42  11  purposes.

09:40:42  12        For example, from time to time, I permitted a

09:40:44  13  witness to testify about what another person said out of

09:40:47  14  court, and at the time of such testimony I instructed you

09:40:50  15  that the out-of-court statements were being admitted for a

09:40:55  16  limited purpose.  Similarly, from time to time I admitted an

09:40:58  17  exhibit into evidence for a limited purpose.  For the

09:41:01  18  limited purpose for which the testimony or exhibit was

09:41:04  19  received, you may give it such weight as you feel it

09:41:07  20  deserves.  You may not, however, use such testimony or

09:41:13  21  exhibits for any other purpose other than the limited

09:41:15  22  purpose for which it was admit.

09:41:17  23        Although the Government is required to prove the

09:41:22  24  defendant guilty beyond a reasonable doubt, the Government

09:41:23  25  is not required to present all possible evidence related to

the case or to produce all possible witnesses that might have some knowledge about the facts of the case.

In this case, the defendants presented evidence and produced witnesses.  The defendants are not required to present all possible evidence related to the case or to produce all possible witnesses who might have some knowledge about the facts of the case.

The Government and the defendant have agreed that certain facts contained in a stipulation signed by the parties are true.  You should therefore treat these facts as having been proved.  You are not required to do so, however, since you are the sole judge of the facts.

As I stated in my preliminary instructions at the beginning of the trial, in deciding what the facts are, you must decide what testimony you believe and what testimony you do not believe.  You are the sole judges of the credibility of the witnesses.  Credibility refers to whether a witness is worthy of belief:  Was the witness truthful?  Was the witness' testimony accurate?  You may believe everything a witness says, or only part of it, or none of it.

You may decide whether to believe a witness based on his or her behavior and manner of testifying, the explanations the witness gave, and all the other evidence in the case, just as you would in any important matter where

09:42:49   1   you are trying to decide if a person is truthful,

09:42:52   2   straightforward, and accurate in his or her recollection.

09:42:54   3   In deciding the question of credibility, remember to use

09:42:56   4   your common sense, your good judgment, and your experience.

09:42:59   5           In deciding what to believe, you may consider a

09:43:01   6   number of factors:

09:43:06   7           The opportunity and ability of the witness to

09:43:09   8   see or hear or know the things about which the witness

09:43:14   9   testified.

09:43:14   10           The quality of the witness' knowledge,

09:43:15   11   understanding, and memory.

09:43:17   12           The witness' appearance, behavior, and manner

09:43:20   13   while testifying.

09:43:20   14           Whether the witness has an interest in the

09:43:22   15   outcome of the case or any motive, bias, or prejudice.

09:43:25   16           Any relation the witness may have with a party

09:43:27   17   in the case and any effect the verdict may have on the

09:43:30   18   witness.

09:43:30   19           Whether the witness said or wrote anything

09:43:33   20   before trial that was different from the witness' testimony

09:43:35   21   in court.

09:43:35   22           Whether the witness' testimony was consistent or

09:43:37   23   inconsistent with other evidence that you believe.

09:43:40   24           And other factors that bear on whether the

09:43:50   25   witness should be believed.

6805

09:43:51  1          Inconsistencies or discrepancies in a witness'
09:43:54  2  testimony or between the testimony of different witnesses
09:43:56  3  may or may not cause you to disbelieve a witness' testimony.
09:43:59  4  Two or more persons witnessing an event may simply see or
09:44:02  5  hear it differently.  Mistaken recollection, like failure to
09:44:13  6  recall, is a common human experience.  In weighing the
09:44:16  7  effect of an inconsistency, you should also consider whether
09:44:19  8  it was about a matter of importance or an insignificant
09:44:22  9  detail.  You should also consider whether the inconsistency
09:44:25  10  was innocent or intentional.
09:44:26  11          You are not required to accept testimony even if
09:44:30  12  the testimony was not contradicted and the witness was not
09:44:33  13  impeached.  You may decide that the witness is not worthy of
09:44:36  14  belief because of the witness' bearing and demeanor, or
09:44:39  15  because of the inherent improbability of the testimony, or
09:44:42  16  for other reasons that are sufficient to you.
09:44:45  17          Based on your own judgment about the
09:44:48  18  believability of a witness, you can attach to that witness'
09:44:51  19  testimony the importance or weight that you think it
09:44:54  20  deserves.
09:44:55  21          The weight of the evidence to prove a fact does
09:44:57  22  not necessarily depend on the number of witnesses who
09:44:59  23  testified or the quantity of evidence that was presented.
09:45:02  24  What is more important than numbers or quantity is how
09:45:05  25  believable the witnesses were, and how much weight you think

09:45:07  1    their testimony deserves.

09:45:09  2             You have heard the testimony of law enforcement

09:45:16  3    officers.   The fact that a witness is employed as a law

09:45:18  4    enforcement officer does not mean that his or her testimony

09:45:22  5    necessarily deserves more or less consideration or greater

09:45:25  6    or lesser weight than that of any other witness.   At the

09:45:29  7    same time, it is quite legitimate for defense counsel to try

09:45:31  8    to attack the believability of a law enforcement witness on

09:45:35  9    the ground that his or her testimony may be colored by a

09:45:38  10   personal or professional interest in the outcome of the

09:45:41  11   case.   You must decide, after reviewing all the evidence,

09:45:43  12   whether you believe the testimony of the law enforcement

09:45:46  13   witness and how much weight, if any, it deserves.

09:45:53  14            You have heard the testimony that Joseph

09:45:56  15   Terranova has made a plea agreement with the Government.

09:45:58  16            His testimony was received in evidence and may

09:46:01  17   be considered by you.   The Government is permitted to

09:46:03  18   present the testimony of someone who has reached a plea

09:46:06  19   agreement with the Government in exchange for his testimony,

09:46:09  20   but you should consider the testimony of Mr. Terranova with

09:46:11  21   great care and caution.

09:46:13  22            In evaluating Mr. Terranova's testimony, you

09:46:15  23   should consider this factor along with the others I have

09:46:18  24   called to your attention.   Whether or not Mr. Terranova's

09:46:22  25   testimony may have been influenced by the plea agreement is

09:46:25    1    for you to determine.  You may give his testimony such

09:46:27    2    weight as you think it deserves.

09:46:29    3             You must not consider Mr. Terranova's guilty

09:46:35    4    plea as any evidence of any defendant's guilt.  His decision

09:46:37    5    to plead guilty was a personal decision about his own guilt.

09:46:41    6    Such evidence is offered only to allow you to assess the

09:46:44    7    credibility of the witness.  You may consider

09:46:48    8    Mr. Terranova's guilty plea only for this purpose.

09:46:50    9             You have heard the testimony of certain

09:46:56   10    witnesses.  You have also heard that before this trial,

09:46:59   11    certain witnesses made statements that may be different from

09:47:02   12    other witness' testimony in this trial.  It is up to you to

09:47:07   13    determine whether these statements were made and whether

09:47:08   14    they were different from the witness' testimony in this

09:47:10   15    trial.  These earlier statements were brought to your

09:47:13   16    attention only to help you decide whether to believe the

09:47:16   17    witness' testimony here at trial.  You cannot use it as

09:47:19   18    proof of the truth of what the witness said in the earlier

09:47:24   19    statement.  You can only use it as one way of evaluating the

09:47:27   20    witness' testimony in this trial.

09:47:30   21             The Rules of Evidence ordinarily do not permit

09:47:37   22    witnesses to state their own opinions about important

09:47:39   23    questions in a trial, but there are exceptions to these

09:47:41   24    rules.

09:47:41   25             In this case, you heard from Donald Walker as an

expert in his field.  As such, Mr. Walker was permitted to offer opinions in that field and the reason for those opinions.

The opinions that this witness stated should receive whatever weight you think appropriate, given all the other evidence in the case.  In weighing the opinion testimony, you may consider the witness' qualifications, the reasons for the witness' opinions, and the reliability of information supporting the witness' testimony, as well as the other factors discussed in these instructions for weighing the testimony of witnesses.  You may disregard an opinion entirely if you decide that the opinion was not based on sufficient knowledge, skill, experience, training, or education.  You may also disregard an opinion if you conclude that the reasons given in support of the opinion are not sound, or if you conclude that the opinion is not supported by the facts shown by the evidence, or if you think that the opinion is outweighed by other evidence.

Defendants Harra, Gibson, North and Rakowski did not testify in this case.  A defendant has an absolute constitutional right not to testify.  The burden of proof remains with the prosecution throughout the entire trial and never shifts to the defendant.  A defendant is never required to prove that he or she is innocent.  You must not attach any significance to the fact that the defendant did

09:49:02  1    not testify.  You must not draw any adverse inference

09:49:05  2    against him or her because he or she did not take the

09:49:08  3    witness stand.  Do not consider, for any reason at all, the

09:49:10  4    fact that the defendant did not testify.  Do not discuss the

09:49:12  5    fact during your deliberations or let it influence your

09:49:15  6    decision in any way.

09:49:16  7              A defendant who is an officer, director, or

09:49:27  8    employee of a corporation is not criminally responsible for

09:49:29  9    the alleged acts of other employees or subordinates merely

09:49:33  10   because the defendant held a position or positions with the

09:49:35  11   bank.  Therefore, it is not enough for the Government to

09:49:38  12   prove that certain activity occurred at Wilmington Trust to

09:49:42  13   demonstrate that the defendant knew of the activity or was

09:49:44  14   responsible for that activity.  Nor is it enough for the

09:49:47  15   Government to prove that one or more of the alleged

09:49:49  16   wrong-doers reported to the defendant.  In addition, you may

09:49:55  17   not infer that the defendant, based solely on his or her

09:49:58  18   position at Wilmington Trust, had any knowledge of any

09:50:01  19   particular activity.

09:50:02  20             Furthermore, it is not enough for the Government

09:50:05  21   to prove that the defendant should have known about any

09:50:08  22   particular activity.  You have heard reference at times

09:50:26  23   during the trial to Wilmington Trust internal policies

09:50:27  24   and procedures.  While you should consider thoughtfully

09:50:30  25   evidence as to whether one or more of the defendants may

09:50:33    1    or may not have violated internal policies or procedures,

09:50:36    2    such a violation, by itself, is not a violation of criminal

09:50:38    3    law.

09:50:39    4              To the extent that the Government alleges

09:50:41    5    that one or more of the defendants may have violated a

09:50:43    6    bank policy or procedure, I instruct you that, whatever

09:50:46    7    you may determine from the evidence, a defendant who has

09:50:50    8    merely violated a bank policy or procedure or acted contrary

09:50:54    9    to a bank policy or procedure is not guilty of any federal

09:50:57   10    crime.

09:50:57   11              To convict a defendant of a crime, the

09:50:59   12    Government must prove beyond a reasonable doubt that each

09:51:02   13    element of the criminal statutes, which I will describe for

09:51:04   14    you, has been met.

09:51:05   15              You may, however, consider evidence of knowing

09:51:07   16    and intentional violations of internal policies and

09:51:09   17    procedures, as you would other evidence in determining

09:51:11   18    whether any of the defendants devised a scheme to defraud,

09:51:15   19    acted knowingly, willfully, or with the intent to defraud.

09:51:19   20    It is entirely up to you what weight to give this evidence.

09:51:22   21              You have heard reference at times during the

09:51:36   22    trial to regulations, regulatory guidance, and guidelines,

09:51:39   23    including SEC guidance, schedule RC-N instructions, and

09:51:43   24    generally accepted accounting principles (to as GAAP).

09:51:49   25    While you should consider thoughtfully evidence as to

whether one or more of the defendants may or may not have violated a regulation or GAAP, you are instructed that a violation of regulations, regulatory guidelines, and guidance, including SEC guidance, schedule RC-N instructions, and GAAP, is not, by itself, a violation of criminal law.

To the extent that the Government alleges that one or more of the defendants may have violated a regulation or GAAP, I instruct you that, whatever you may determine from the evidence, a defendant who has merely violated a regulation or GAAP or acted contrary to regulatory guidance or guidelines is not guilty of any federal crime.  To convict a defendant of a crime, the Government must prove beyond a reasonable doubt that each element of the criminal statutes, which I will describe for you, has been met.

You may, however, consider evidence of knowing and intentional violations of federal banking and securities laws, regulations and rules, as you would other evidence in determining whether any of the defendants devised a scheme to defraud, acted knowingly, willfully, or with the intent to defraud.  It is entirely up to you what weight to give this evidence.

You will note that the indictment charges that the offense was committed on or about or in or around a certain date.  The Government does not have to prove with

09:53:08   1   certainty the exact date of each alleged offense.  It is

09:53:11   2   sufficient if the Government proves beyond a reasonable

09:53:13   3   doubt that the offense was committed on a date reasonably

09:53:16   4   near the date alleged.

09:53:24   5          The offenses charged in the indictment require

09:53:32   6   that the Government proof beyond a reasonable doubt that the

09:53:38   7   defendant you are considering acted knowingly, willfully,

09:53:41   8   and/or with intent to defraud.

09:53:43   9          These mental states apply to the various

09:53:45  10   offenses I will define shortly.  I will define the mental

09:53:54  11   states for you now, and as I read through the elements of

09:53:57  12   the offenses, I will tell you when a particular mental state

09:54:00  13   applies.

09:54:00  14          To act knowingly means that the Government must

09:54:05  15   prove beyond a reasonable doubt that the defendant you are

09:54:07  16   considering was conscious and aware of the nature of his or

09:54:10  17   her actions and of the surrounding facts and circumstances,

09:54:13  18   as specified in the definition of the offenses charged.  In

09:54:17  19   deciding whether the defendant acted knowingly, you may

09:54:20  20   consider evidence about what the defendant said, what the

09:54:22  21   defendant did and failed to do, how the defendant acted, and

09:54:25  22   all the other facts and circumstances shown by the evidence

09:54:28  23   that may prove what was in the defendant's mind at that

09:54:32  24   time.

09:54:32  25          To act willfully means the Government must prove

09:54:39  1   beyond a reasonable doubt that the defendant you are

09:54:40  2   considering knew his or her conduct was unlawful and

09:54:43  3   intended to do something that the law forbids.  That is,

09:54:46  4   to find that the defendant acted willfully, you must find

09:54:49  5   that the evidence proved beyond a reasonable doubt that

09:54:51  6   the defendant acted with a purpose to disobey or disregard

09:54:54  7   the law.  Willfully does not, however, require proof that

09:54:58  8   the defendant had any evil motive or bad purpose other than

09:55:02  9   the purpose to disobey or disregard the law.  Willfully

09:55:06  10   does not require proof that the actor knew of the existence

09:55:09  11   and meaning of the statute making his or her conduct

09:55:12  12   criminal.

09:55:13  13          To act with an intent to defraud means to act

09:55:17  14   knowingly and with the intention or the purpose to deceive

09:55:19  15   or to cheat.  In considering whether a defendant acted with

09:55:21  16   an intent to defraud, you may consider, among other things,

09:55:32  17   whether the defendant acted with a desire or purpose to

09:55:34  18   bring about some gain or benefit to himself or herself or

09:55:38  19   someone else or with a desire or purpose to cause some loss

09:55:42  20   to someone.

09:55:42  21          You may consider both direct evidence and

09:55:45  22   circumstantial evidence, including a defendant's words or

09:55:47  23   conduct and other facts and circumstances, in deciding

09:55:49  24   whether the defendant you are considering had the required

09:55:52  25   knowledge and criminal intent.

| | |
|---|---|
| 09:55:53 | 1 |
| 09:56:14 | 2 |
| 09:56:16 | 3 |
| 09:56:20 | 4 |
| 09:56:23 | 5 |
| 09:56:25 | 6 |
| 09:56:28 | 7 |
| 09:56:37 | 8 |

As I just explained, the offenses charged in the indictment require proof that the defendant acted knowingly, willfully, and/or with intent to defraud.  If you find that a defendant acted in good faith, that would be a complete defense to the offense you are considering, because good faith on the part of the defendant would be inconsistent with his or her acting knowingly, willfully, or with that intent to defraud.

For example, a person acts in good faith when he or she has an honestly held belief, opinion, or understanding that not all matured loans had to be reported as past due, even though the belief, opinion, or understanding turns out to be inaccurate or incorrect. Thus, in this case if the defendant you are considering made an honest mistake or had an honest misunderstanding about whether all loans that were matured had to be reported as past due, then the defendant did not act knowingly, willfully, or with the intent to defraud.

In considering whether a defendant made an honest mistake or had an honest misunderstanding about whether mature loans had to be reported as past due loans, you may consider the defendant's actions and beliefs in relation to the term past due loan.

The defendants do not have the burden of proving good faith.  Good faith is a complete defense because it is

09:57:48  1    inconsistent with the requirement of the offenses charged,

09:57:52  2    that the defendant acted knowingly, willfully, and/or with

09:57:55  3    the intent to defraud.  As I have told you, it is the

09:57:58  4    Government's burden to prove beyond a reasonable doubt each

09:58:03  5    element of the offenses, including the mental state element.

09:58:06  6    In deciding whether the Government proved that the defendant

09:58:10  7    you are considering acted with the required intent or,

09:58:13  8    instead, whether the defendant acted in good faith, you

09:58:16  9    should consider all of the evidence presented in the that

09:58:19  10   may bear on the defendant's state of mind.

09:58:24  11          The next sentence I'm going to read, I'm going

09:58:26  12   to add in a word that is not in the written version, and try

09:58:31  13   to make a note of it, because the way I'm going to read it

09:58:34  14   is the correct way, not the way it's actually written.

09:58:37  15          If you find for any reason that the Government

09:58:39  16   has not proved beyond a reasonable doubt that the defendant

09:58:42  17   acted knowingly, willfully, and/or with the intent to

09:58:48  18   defraud, you must find the defendant not guilty of the

09:58:53  19   particular offense you are considering.  And just to be

09:58:55  20   clear, I said "and/or" instead of "or."

09:59:01  21          Motive is not an element of the offenses with

09:59:05  22   which the defendants are charged.  Proof of motive is not

09:59:09  23   required to convict.  Evidence of a defendant's motive may,

09:59:12  24   however, help you find that defendant's intent.

09:59:16  25          Intent and motive are different consents.

09:59:18  1   Motive is what prompts a person to act.   Intent refers

09:59:22  2   only to the state of mind with which the particular act is

09:59:25  3   done.

09:59:31  4          As I will explain in more detail, Counts 1, 7 to

09:59:37  5   10, 11 to 13 and 16 allege the defendants made or caused to

09:59:44  6   be made false statements of various call reports, or as to

09:59:49  7   Count 16, a monthly regulatory report, that Wilmington Trust

09:59:54  8   filed with the Federal Reserve.

09:59:57  9          The Government alleges that the defendants made

09:59:59  10   or caused to be made a false statement regarding the bank's

10:00:02  11   loans that were past due 90 days or more.   The specific

10:00:08  12   information that banks are required to report in call

10:00:11  13   reports are set forth in the document entitled "Instruction

10:00:15  14   For Preparation of Consolidated Reports of Condition and

10:00:19  15   Income," which I will now refer to as the call report

10:00:22  16   instructions.

10:00:24  17          Applicable to this case, the call report

10:00:28  18   instructions contain a section entitled general

10:00:32  19   instructions.   The general instructions state that banks are

10:00:36  20   required to prepare and file the call reports in accordance

10:00:39  21   with these instructions.   All reports shall be prepared in a

10:00:43  22   consistent manner.   The general instructions state further

10:00:47  23   that questions and requests for interpretations of matters

10:00:51  24   appearing in any part of these instructions should be

10:00:54  25   addressed to the bank's primary federal bank's supervisory

10:00:57  1    agency, i.e., the Federal Reserve Bank, the OCC, or the

10:01:03  2    FDIC.

10:01:05  3              According to the general instructions,

10:01:08  4    regardless of whether a bank requested interpretation of a

10:01:11  5    matter appearing in these instructions, when a bank's

10:01:14  6    primary federal bank supervisory agency's interpretation of

10:01:18  7    the instruction differs from the bank's interpretation, the

10:01:22  8    supervisory agency may require the bank to prepare its call

10:01:26  9    report in accordance with the agency's interpretation and to

10:01:30  10   amend previously submitted reports.

10:01:32  11             Although the call report instructions are

10:01:36  12   designed to conform to United States generally accepted

10:01:40  13   accounting principles, or GAAP, when a bank's supervisory

10:01:46  14   agency's interpretation of how GAAP should be applied to a

10:01:49  15   specified event or transaction or series of related events

10:01:53  16   or transactions differs from the bank's interpretation, the

10:01:57  17   supervisory agency may require the bank to reflect the

10:02:01  18   events or transactions in its call report in accordance with

10:02:05  19   the agency's interpretation and to amend previously

10:02:08  20   submitted reports.

10:02:09  21             The reporting of past due loans is considered by

10:02:13  22   the instructions listed in schedule RC-N, past due and

10:02:20  23   nonaccrual loans, leases, or other assets.  The schedule

10:02:23  24   RC-N instructions contain a definition of past due which

10:02:27  25   states, the past due status of a loan or other asset should

6818

| | |
|---|---|
| 10:02:31 | 1 |
| 10:02:37 | 2 |
| 10:02:39 | 3 |
| 10:02:43 | 4 |
| 10:02:46 | 5 |
| 10:02:49 | 6 |
| 10:02:52 | 7 |
| 10:02:55 | 8 |

1   be determined in accordance with its contractual repayment

2   terms.  The definition further states that grace periods

3   allowed by the bank after a loan or other asset technically

4   has become past due but before the imposition of late

5   charges are not to be taken into account in determining past

6   due status.  In addition, the definition states that loans

7   are to be reported as past due when either interest or

8   principal is unpaid under five circumstances.

9           The third and fourth circumstances outlined

10  under the definition relate to single payment notes and debt

11  securities.  The third circumstance states:  Single payment

12  and demand notes, debt securities, and other assets

13  providing for the payment of interest as stated intervals

14  are to be reported as past due after one interest payment is

15  due and unpaid for 30 days.

16          The fourth circumstance outlined under the

17  definition covers the past due status of loans that are past

18  due because they have matured; that is, the loans are

19  overdue for principal repayment under the terms of a

20  contractual loan agreement.  That circumstance states the

21  following:  Single payment notes, debt securities, and other

22  assets providing for the payment of interest at maturity are

23  to be reported as past due after maturity if interest or

24  principal remaining unpaid for third days or more.

25          You have heard testimony relating to certain

10:04:02  1  reports that Wilmington Trust Corporation filed with the

10:04:04  2  Securities and Exchange Commission or SEC.  These reports

10:04:08  3  include Form 10-Q and Form 10-K.  These reports are

10:04:11  4  documents that publicly traded companies, like Wilmington

10:04:16  5  Trust Corporation, must file with the SEC.  These reports

10:04:18  6  include financial statements that present a company's

10:04:20  7  operating results and cash flows for a particular financial

10:04:22  8  reporting period.  A Form 10-Q relates to a quarterly

10:04:26  9  financial reporting period.  A Form 10-K relates to an

10:04:29  10  annual financial reporting period.  A company's Form 10-Q

10:04:45  11  and Form 10-K cannot, and need not, provide all the material

10:04:50  12  information that is available about the company.  That is

10:04:53  13  not the function of a Form 10-Q or a Form 10-K.  These

10:04:56  14  reports, taken as a whole, must disclose the information

10:04:59  15  that is required under the securities laws.

10:05:01  16          Counts 1 through 6 and 11 through 13 allege that

10:05:11  17  the defendants falsely reported Wilmington Trust

10:05:15  18  Corporation's quantity of accruing loans that were past due

10:05:20  19  90 days or more in the bank's SEC forms 10-Q for the third

10:05:26  20  quarter of 2009 and first quarter of 2010 and in the bank's

10:05:29  21  Form 10-K for 2009.

10:05:32  22          During the period of the indictment, SEC

10:05:34  23  regulation S-K set forth the requirements applicable to

10:05:40  24  the content of the non-financial statement portions of

10:05:42  25  periodic reports filed with the Securities and Exchange

10:05:45  1   Commission.

10:05:45  2        Item 303 of regulation S-K set forth the

10:05:50  3   information that securities registrants were required to

10:05:53  4   discuss in the Management's discussion and analysis of

10:05:56  5   financial condition and results of operations section

10:05:58  6   of periodic filings.  Item 303 directs the attention of

10:06:03  7   bank holding companies, such as Wilmington Trust

10:06:05  8   Corporation, to the information called for in SEC industry

10:06:08  9   Guide three.

10:06:08  10        SEC Industry Guide 3 governs statistical

10:06:11  11   disclosures by bank holding companies.  Section 3 of Guide

10:06:15  12   3, entitled loan portfolio contains a subsection entitled

10:06:20  13   risk elements, which addresses the reporting of past due

10:06:23  14   loans in SEC management discussion and analysis disclosures.

10:06:26  15   The past due section states that bank holding companies

10:06:29  16   must, as of the end of each reported period, state

10:06:32  17   separately the aggregate of accruing loans which are

10:06:34  18   contractually past due 90 days or more as to principal or

10:06:38  19   interest payments.

10:06:39  20        During the period set forth in the indictment,

10:06:45  21   federal securities regulations required public companies to

10:06:49  22   file financial statements in accordance with generally

10:06:57  23   accepted accounting principles, or GAAP.  GAAP required

10:07:01  24   that a securities registrant such as Wilmington Trust

10:07:03  25   provide a summary of significant accounting policies in

10:07:07  1   its footnotes to financial statements contained in periodic

10:07:11  2   SEC filings.

10:07:12  3           GAAP further provided that an entity's summary

10:07:15  4   of significant accounting policies for financing receivable

10:07:20  5   shall include "the policy for determining past due or

10:07:39  6   delinquent status (that is, whether past due status is based

10:07:42  7   on how recently payments have been received or contractual

10:07:45  8   terms)."

10:07:48  9           The defendants are charged in the indictment

10:07:54  10  with committing the following offenses:

10:07:56  11          Conspiracy to defraud the United States, commit

10:07:58  12  securities fraud, and make false statements to regulators

10:08:04  13  (Count 1).

10:08:05  14          Securities fraud (Count 2).

10:08:08  15          Making false statements in documents required to

10:08:10  16  be filed with the Securities and Exchange Commission

10:08:12  17  (Counts 4 and 6).

10:08:14  18          Making false statements to the Securities and

10:08:16  19  Exchange Commission and the Federal Reserve (Counts 5 and 11

10:08:20  20  to 16).

10:08:21  21          And making false entries in banking records

10:08:25  22  (Counts 7 to 10).

10:08:28  23          In addition, Defendant David Gibson has been

10:08:33  24  charged with making false certifications in financial

10:08:35  25  reports (Counts 17 to 19).

10:08:38    1           By the way, just so you aren't wondering later

10:08:41    2  on, there is no Count 3.

10:08:45    3           As I explained at the beginning of trial, an

10:08:47    4  indictment is just the formal way of specifying the exact

10:08:51    5  crimes the defendants are accused of committing.  An

10:08:54    6  indictment is simply a description of the charges against a

10:08:57    7  defendant.  It is an accusation only.  An indictment is not

10:08:59    8  evidence of anything, and you should not give any weight to

10:09:02    9  the fact that anyone has been indicted in making your

10:09:05   10  decision in this case.

10:09:06   11           In order to find a defendant guilty of any of

10:09:09   12  the charged offenses, you must all find that the Government

10:09:12   13  proved each element of that offense beyond a reasonable

10:09:14   14  doubt, as I will explain in more detail shortly.

10:09:17   15           Count 1 of the indictment charges that from in

10:09:24   16  or around October 2009, through in or around November 2010,

10:09:29   17  in the District of Delaware, Defendants Robert Harra, David

10:09:32   18  Gibson, Kevyn Rakowski, and William North agreed or

10:09:37   19  conspired with one or more other persons, including Brian

10:09:44   20  Bailey and Joseph Terranova, to defraud the United States

10:09:47   21  and to commit offenses against the United States, namely

10:09:49   22  securities fraud, making false statements in quarterly and

10:09:53   23  annual reports filed with the Securities and Exchange

10:09:58   24  Commission, and making false statements to the Securities

10:10:05   25  and Exchange Commission and the Federal Reserve.

10:10:06   1          Count 1 further charges that, to further the

10:10:08   2   objective of the conspiracy, at least one member of the

10:10:10   3   conspiracy committed at least one overt act, as alleged in

10:10:14   4   the indictment.

10:10:14   5          It is a federal crime for two or more persons to

10:10:17   6   agree or conspire to defraud the United States or to commit

10:10:21   7   any offense against the United States, even if they never

10:10:23   8   actually achieve their objective.  A conspiracy is a kind of

10:10:26   9   criminal partnership.

10:10:27   10         In order for you to find the defendant you are

10:10:30   11  considering guilty of conspiracy to defraud the United

10:10:32   12  States or to commit an offense against the United States,

10:10:34   13  you must find that the Government proved beyond a reasonable

10:10:37   14  doubt each of the following four elements.

10:10:39   15         First:  That two or more persons agreed to

10:10:44   16  defraud the United States or to commit an offense against

10:10:47   17  the United States, as charged in the indictment.  Defraud

10:10:50   18  the United States means to obstruct or interfere with one of

10:10:55   19  the United States Government's lawful functions, by deceit,

10:11:01   20  craft, trickery, or dishonest means.  Because each of the

10:11:05   21  offenses against the United States alleged in the conspiracy

10:11:07   22  count are also alleged as separate offenses, I will explain

10:11:10   23  the elements of those alleged offenses against the United

10:11:17   24  States to you shortly.

10:11:18   25         Second:  That the defendant was a party to or

10:11:22  1   member of that agreement.

10:11:23  2           Third:  That the defendant you are considering

10:11:25  3   joined the agreement or conspiracy knowing of its objective

10:11:28  4   to defraud the United States or to commit an offense against

10:11:31  5   the United States and intending to join together with at

10:11:34  6   least one other alleged conspirator to achieve one of the

10:11:43  7   objectives; that is, that the defendant and at least one

10:11:48  8   other alleged conspirator shared a unity of purpose and the

10:11:52  9   intent to achieve a common goal or objective, to defraud the

10:11:55  10  United States or to commit an offense against the United

10:11:58  11  States.

10:11:58  12          And, fourth:  That at some time during the

10:12:02  13  existence of the agreement or conspiracy, at least one of

10:12:04  14  its members performed an overt act in order to further the

10:12:08  15  objective of the agreement.

10:12:09  16          I will explain each of these elements in more

10:12:13  17  detail.

10:12:13  18          The first element of the crime of conspiracy is

10:12:22  19  the existence of an agreement.  The Government must prove

10:12:24  20  beyond a reasonable doubt that two or more persons knowingly

10:12:27  21  and intentionally arrived at a mutual understanding or

10:12:30  22  agreement, either spoken or unspoken, to work together to

10:12:33  23  achieve an overall objective of the conspiracy, to defraud

10:12:37  24  the United States or to commit an offense against the United

10:12:40  25  States, to commit securities fraud, to make false statements

10:12:43  1    in quarterly and annual reports filed with the Securities

10:12:47  2    and Exchange Commission, and to make false statements to

10:12:49  3    the Securities and Exchange Commission and the Federal

10:12:53  4    Reserve.

10:12:53  5           The Government does not have to prove the

10:12:56  6    existence of a formal or written agreement, or an express

10:13:00  7    oral agreement spelling out the details of the

10:13:02  8    understanding.  The Government also does not have to prove

10:13:05  9    that all the members of the conspiracy directly met, or

10:13:07  10   discussed between themselves their unlawful objectives, or

10:13:10  11   agreed to all the details, or agreed to what the means were

10:13:16  12   by which the objectives would be accomplished.  The

10:13:19  13   Government is not required to prove that all people named in

10:13:22  14   the indictment were, in fact, parties to the agreement, or

10:13:24  15   that all members of the alleged conspiracy were named, or

10:13:27  16   that all members of the conspiracy are known.  What the

10:13:30  17   Government must proof beyond a reasonable doubt is that two

10:13:33  18   or more persons in some way or manner arrived at some type

10:13:36  19   of agreement, mutual understanding, or meeting of the minds

10:13:39  20   to try to accomplish a common and unlawful objective.

10:13:43  21          You may consider both direct evidence and

10:13:45  22   circumstantial evidence in deciding whether the Government

10:13:47  23   has proved beyond a reasonable doubt that an agreement or

10:13:49  24   mutual understanding existed.  You may find the existence of

10:13:52  25   a conspiracy based on reasonable inferences drawn from the

10:13:54  1   actions and statements of the alleged members of the

10:13:56  2   conspiracy, from the circumstances surrounding the scheme,

10:13:59  3   and from evidence of related facts and circumstances which

10:14:02  4   prove that the activities of the participants in a

10:14:04  5   criminal venture could not have been carried out except

10:14:10  6   as the result of a preconceived agreement, scheme, or

10:14:13  7   understanding.

10:14:14  8           The indictment charges a conspiracy to commit

10:14:16  9   several unlawful objectives, i.e., to defraud the United

10:14:20  10  States, to commit securities fraud, to make false statements

10:14:22  11  in reports filed with the SEC, and to make false statements

10:14:26  12  to the SEC and federal regulators.  The Government does

10:14:28  13  not have to prove that the alleged conspirators agreed to

10:14:31  14  commit all of these unlawful objectives.  The Government,

10:14:34  15  however, must prove that they agreed to commit at least

10:14:36  16  one of the unlawful objectives, and you must unanimously

10:14:40  17  agree on which unlawful objective.  You cannot find a

10:14:43  18  defendant guilty of conspiracy unless you unanimously agree

10:14:46  19  that the same federal crime was the objective of the

10:14:48  20  conspiracy.  It is not enough if some of you agreed that one

10:14:51  21  of the charged crimes was the objective of the conspiracy

10:14:54  22  and others agree that a different crime was the objective of

10:14:57  23  the conspiracy.

10:14:57  24          If you find that a criminal agreement or

10:15:04  25  conspiracy existed, then in order to find a defendant guilty

10:15:07   1   of conspiracy, you must also find that the Government proved

10:15:10   2   beyond a reasonable doubt that the defendant knowingly and

10:15:12   3   intentionally joined that agreement or conspiracy during its

10:15:15   4   existence.   The Government must prove that the defendant you

10:15:18   5   are considering knew the goal or objective of the agreement

10:15:20   6   or conspiracy and voluntarily joined it during its

10:15:25   7   existence, intending to achieve the common goal or objective

10:15:27   8   and to work together with the other alleged conspirators

10:15:31   9   toward that goal or objective.

10:15:33   10          The Government need not prove that the defendant

10:15:44   11   you are considering knew everything about the conspiracy or

10:15:46   12   that he or she knew everyone involved in it, or that he or

10:15:49   13   she was a member from the beginning.   The Government also

10:15:52   14   does not have to prove that the defendant played a major or

10:15:55   15   substantial role in the conspiracy.

10:15:56   16          You may consider both direct evidence and

10:15:59   17   circumstantial evidence in deciding whether the defendant

10:16:01   18   joined the conspiracy, knew of its criminal objective, and

10:16:03   19   intended to further the objective.   Evidence which shows

10:16:06   20   that the defendant only knew about the conspiracy, or only

10:16:09   21   associated with other members of the conspiracy, or was only

10:16:25   22   present when it was discussed or when a crime was committed,

10:16:29   23   is not sufficient to prove that the defendant was a member

10:16:32   24   of the conspiracy even if the defendant approved of what was

10:16:35   25   happening or did not object to it.   Likewise, evidence

10:16:39    1    showing that the defendant may have done something that

10:16:44    2    happened to help a conspiracy does not necessarily prove

10:16:46    3    that he or she joined the conspiracy.  You may, however,

10:16:49    4    consider this evidence, with all the other evidence, in

10:16:52    5    deciding whether the Government proved beyond a reasonable

10:16:54    6    doubt that the defendant joined the conspiracy.

10:16:55    7            In order to find the defendant you are

10:17:03    8    considering guilty of conspiracy, you must find that the

10:17:06    9    Government proved beyond a reasonable doubt that the

10:17:08   10    defendant joined the conspiracy knowing of one of its

10:17:10   11    objectives and intending to help further or achieve that

10:17:12   12    objective.

10:17:13   13            That is, the Government must prove, as to the

10:17:17   14    defendant you are considering:  One, that the defendant knew

10:17:21   15    of an objective or goal of the conspiracy; two, that the

10:17:26   16    defendant joined the conspiracy intending to help further or

10:17:29   17    achieve that goal or objective; and, three, that the

10:17:33   18    defendant and at least one other alleged conspirator shared

10:17:36   19    a unity of purpose toward that objective or goal.

10:17:39   20            To convict a defendant of conspiracy to defraud

10:17:41   21    the United States, the Government must prove that the

10:17:43   22    defendant acted with intent to defraud.  I have previously

10:17:46   23    instructed you on the definition of intent to defraud.

10:17:49   24            To convict a defendant of conspiracy for

10:17:51   25    committing an identified offense against the United States,

| | |
|---|---|
| 10:17:53 | 1 |
| 10:17:56 | 2 |
| 10:17:59 | 3 |
| 10:18:02 | 4 |
| 10:18:10 | 5 |
| 10:18:13 | 6 |
| 10:18:16 | 7 |
| 10:18:20 | 8 |
| 10:18:23 | 9 |
| 10:18:25 | 10 |
| 10:18:29 | 11 |
| 10:19:00 | 12 |
| 10:19:02 | 13 |
| 10:19:08 | 14 |
| 10:19:12 | 15 |
| 10:19:16 | 16 |
| 10:19:19 | 17 |
| 10:19:22 | 18 |
| 10:19:26 | 19 |
| 10:19:27 | 20 |
| 10:19:29 | 21 |
| 10:19:30 | 22 |
| 10:19:41 | 23 |
| 10:19:46 | 24 |
| 10:19:50 | 25 |

1  the Government must prove whatever mental state is required

2  for conviction of the underlying substantive offenses.   The

3  Government has alleged three possible underlying substantive

4  offenses in Count 1:   To commit securities fraud, to make

5  false statements in reports filed with the SEC, and to make

6  false statements to the SEC and federal regulators, which I

7  will explain in more detail.   Each of these offenses

8  requires that the Government proved beyond a reasonable

9  doubt that the defendant committed the offense knowingly,

10  willfully, and/or with intent to defraud, which I defined

11  for you earlier.   I will tell you which mental states apply

12  to the underlying substantive offenses.

13          With regard to the fourth element of

14  conspiracy -- over acts -- the Government must prove

15  beyond a reasonable doubt that during the existence of the

16  conspiracy, at least one member of the conspiracy performed

17  at least one of the overt acts described in the indictment,

18  for the purpose of furthering or helping to achieve the

19  objective of the conspiracy.

20          The indictment alleges the following overt acts

21  committed in furtherance of the conspiracy:

22          Wilmington Trust Corporation filed with the

23  SEC a Form 10-Q for the third quarter of 2009 and the first

24  and second quarters of 2010, as well as a Form 10-K for

25  2009, with each SEC report materially misrepresenting the

bank's quantity of loans that were past due for 90 or more days.

Mr. Gibson electronically signed Wilmington Trust's SEC Form 10-Q for the third quarter of 2009 and the first and second quarters of 2010, as well as a Form 10-K for 2009.

Mr. Harra and Ms. Rakowski electronically signed Wilmington Trust's 2009 Form 10-K.

Mr. Gibson also electronically signed a certification in Wilmington Trust's SEC Form 10-Q for the third quarter of 2009 and the first and second quarters of 2010, as well as a Form 10-K for 2009 stating that the information contained in each of the reports fairly presented in all material respects the financial condition and results of operation of Wilmington Trust.

Mr. Gibson and Mr. Harra further certified falsely in Wilmington Trust's 2009 Form 10-K that the bank's internal controls over financial reporting were effective, when each was aware that the bank had experienced significant issues with the tracking, proper extension, and reporting of matured loans.

Wilmington Trust Company filed call reports with the Federal Reserve for each of the third and fourth quarters of 2009, and the first and second quarters of 2010, which each materially misrepresented the bank's quantity of

10:21:31  1   loans that were past due for 90 days or more.

10:21:36  2        Mr. Gibson electronically signed Wilmington

10:21:39  3   Trust's call reports for each of the third and fourth

10:21:42  4   quarters of 2009 and the first and second quarters of

10:21:45  5   2010.

10:21:48  6        Wilmington Trust Corporation filed monthly

10:21:52  7   regulatory reports with the Federal Reserve for each monthly

10:21:55  8   period between September 2009 and March 2010, which, each

10:21:58  9   materially misrepresented the bank's quantity of loans that

10:22:02  10  were past due for 90 or more days.

10:22:05  11       Mr. North supervised the preparation and

10:22:07  12  approval of the past due loan amounts in the bank's monthly

10:22:10  13  delinquency report, knowing that such conduct would cause

10:22:13  14  the bank to materially misrepresent its quantity of loans

10:22:16  15  that were past due for 90 or more days in each of the public

10:22:19  16  reports filed in the following periods:  Wilmington Trust's

10:22:28  17  SEC reports for the third quarter of 2009, year-end 2009,

10:22:31  18  and the first quarter of 2010; WTC's call report for each of

10:22:39  19  the third and fourth quarters of 2009, and the first quarter

10:22:42  20  of 2010; and Wilmington Trust's monthly regulatory reports

10:22:47  21  for each monthly period between September 2009 and

10:22:50  22  March 2010.

10:22:51  23       Ms. Rakowski supervised the preparation and

10:22:55  24  approval of the past due reports knowing that the false past

10:22:59  25  due loan information included therein would cause the bank

| 10:23:03 | 1 | to materially misrepresent its quantity of loans that were |

to materially misrepresent its quantity of loans that were

past due for 90 or more days in each of the same following

periods:  Wilmington Trust's SEC reports for the third

quarter of 2009, year-end 2009, and the first quarter of

2010; WTC's call reports for each of the third and fourth

quarters of 2009, and the first quarter of 2010; and

Wilmington Trust's monthly regulatory reports for each

monthly period between September 2009 and March 2010.

Wilmington Trust Corporation submitted false

information regarding loans that were 90 days or more past

due to the Federal Reserve in advance of its targeted

examination in early 2010 (as of date of September 30,

2009), and full scope examination in 2010 (as of date

May 31st, 2010), and did not otherwise disclose the waiver

practice during the course of the Federal Reserve

examinations or while operating under the MOU.

The Government does not have to prove that all

of these acts were committed or any of these acts were

themselves illegal.  Also, the Government does not have to

prove that a defendant personally committed any of the overt

acts.  The Government must proof beyond a reasonable doubt

that at least one member of the conspiracy committed at

least one of the overt acts alleged in the indictment and

committed it during the time that the conspiracy existed,

for the purpose of furthering or helping to achieve an

objective of the conspiracy.  You must unanimously agree on
the overt act that was committed.

The Government is not required to prove that any
members of conspiracy were successful in achieving any or
all of the objectives in the conspiracy.

You may find a defendant guilty of conspiracy if
you find that the Government proved beyond a reasonable
doubt the elements I explained, even if you find that the
Government did not prove that any of the conspirators
actually committed any other offense.

Conspiracy is a criminal offense separate from
the offenses that were the objective of the conspiracy.
Conspiracy is complete without the commission of those
offenses in the

As I have instructed you, Count I charges the
alleged conspirators entered into an agreement to knowingly
accomplish four unlawful objectives.

The Government need not prove that the alleged
conspirators entered into an agreement to knowingly
accomplish all four unlawful objectives.

However, the Government must prove beyond a
reasonable doubt that the alleged conspirators entered into
an agreement to knowingly accomplish at least one of the
unlawful objectives charged in Count I.

All twelve of you must find the same unlawful

10:25:51  1   objective was agreed upon by the alleged co-conspirators.

10:25:55  2   It is not enough to convict that some of you find that the

10:25:58  3   Government has proven an agreement to knowingly accomplish

10:26:01  4   one unlawful objective, while others of you find that the

10:26:05  5   Government has proven to accomplish a different unlawful

10:26:08  6   objective.

10:26:08  7           If you do not all agree unanimously, that the

10:26:12  8   Government proven beyond a reasonable doubt an agreement to

10:26:18  9   knowingly accomplish the same unlawful objective, you must

10:26:18  10  return a verdict of not guilty for all defendants with

10:26:21  11  respect to Count I.

10:26:22  12          Members of the jury, I think we're about halfway

10:26:29  13  through the instructions.  We're going to take a five-minute

10:26:34  14  break so I can rest my throat.

10:26:38  15          And also so you all can walk to the jury room

10:26:44  16  and do whatever you may do to try to make yourself ELERT.

10:26:48  17  You all seem to be pretty ELERT.  It's a hard thing to do.

10:26:54  18          But in any event, we'll take a short break.

10:26:56  19          Take the jury out, please.

10:27:23  20          (Jury left the courtroom.)

10:27:25  21          THE COURT:  All right.

10:27:35  22          So it really will be a short break.  We'll be

10:27:39  23  back in an about five minutes.

10:27:41  24          (A break was held.)

10:34:09  25          THE COURT:  All right.

| | | |
|---|---|---|
| 10:34:11 | 1 | We're ready to continue.  Let's get the jury. |
| 10:34:17 | 2 | (At this time the jury entered the courtroom.) |
| 10:35:50 | 3 | THE COURT:  All right. |
| 10:35:51 | 4 | Members of the jury, welcome back, everyone. |
| 10:35:52 | 5 | You may be seated. |
| 10:35:53 | 6 | I have put in a request to try to lower the |
| 10:35:56 | 7 | temperature in here. |
| 10:35:58 | 8 | Members of the jury, I will now instruct you on |
| 10:36:01 | 9 | the substantive securities fraud count, Count II. |
| 10:36:04 | 10 | Count II of the Indictment alleges that from on |
| 10:36:07 | 11 | or about December 2009, up to on or about February 2010, Mr. |
| 10:36:13 | 12 | Gibson, Mr. Harra, Mr. North, and Ms. Rakowski committed |
| 10:36:16 | 13 | securities fraud. |
| 10:36:17 | 14 | As to each defendant you are considering, the |
| 10:36:20 | 15 | Government must prove each of the following elements beyond |
| 10:36:22 | 16 | a reasonable doubt: |
| 10:36:22 | 17 | One, that the defendant you are considering |
| 10:36:27 | 18 | executed, or attempted to execute, a scheme or artifice. |
| 10:36:31 | 19 | a, to defraud persons in connection with the |
| 10:36:33 | 20 | securities of Wilmington Trust Corporation or, |
| 10:36:36 | 21 | b, to obtain, by means of materially false and |
| 10:36:39 | 22 | fraudulent pretenses, representations, and promises, or by |
| 10:36:42 | 23 | statements containing material omissions, money and property |
| 10:36:45 | 24 | in connection with the purchase and sale of the securities |
| 10:36:47 | 25 | of Wilmington Trust Corporation. |

10:36:48   1      Two, that the defendant you are considering

10:36:51   2   acted knowingly and with the intent to defraud; and

10:36:55   3      Three, that Wilmington Trust Corporation is an

10:36:58   4   issuer of a class of securities registered under Section 12

10:37:01   5   of the Securities Exchange Act of 1934 (15 U.S.C. Section

10:37:09   6   78l) or that it is required to file a report under Section

10:37:12   7   15(d) of the Securities Exchange Act of 1934 (15 U.S.C.

10:37:12   8   Section 78o(d).

10:37:18   9      A scheme or artifice to defraud in the context

10:37:21  10   of Count II is any plan, device, or course of action to

10:37:25  11   obtain money or property by false or fraudulent pretenses.

10:37:30  12      The Government must prove beyond a reasonable

10:37:32  13   doubt that the scheme contemplated or intended some harm to

10:37:35  14   property rights of another.

10:37:36  15      The requirement is satisfied if you find either

10:37:41  16   the  Government proved beyond a reasonable doubt that the

10:37:43  17   defendant intended that other individuals would make

10:37:46  18   investment decisions based on materially fraudulent

10:37:49  19   misrepresentations.

10:37:50  20      You should ignore the word "either" there.

10:37:50  21      The first element that the Government must prove

10:38:01  22   beyond a reasonable doubt is that the defendant you are

10:38:03  23   considering executed a scheme to either:

10:38:04  24      One, defraud investors by making materially

10:38:09  25   false or fraudulent statements in connection with the

10:38:21   1   securities of Wilmington Trust Corporation, or

10:38:23   2             Two, fraudulently obtained money and property in

10:38:26   3   connection with the purchase and sale of the securities of

10:38:29   4   Wilmington Trust Corporation.

10:38:29   5             With respect to one, the Government must prove

10:38:32   6   beyond a reasonable doubt that the defendant you are

10:38:34   7   considering executed, or attempted to execute a scheme or

10:38:37   8   artifice to defraud investors by making materially false or

10:38:41   9   fraudulent statements in connection with the securities of

10:38:44   10  Wilmington Trust Corporation.

10:38:45   11            With respect to two, the Government must prove

10:38:49   12  beyond a reasonable doubt that the defendant you are

10:38:51   13  considering executed, or attempted to execute a scheme or

10:38:53   14  artifice to obtain money by means of materially false or

10:38:57   15  fraudulent pretenses, representations, or promises in

10:38:59   16  connection with the purchase of sales of the securities of

10:39:02   17  Wilmington Trust Corporation.

10:39:03   18            To find the that Government has proven the first

10:39:06   19  element of Count II beyond a reasonable doubt with respect

10:39:08   20  to the defendant you are considering, you must be unanimous

10:39:12   21  that the Government has proven beyond a reasonable doubt

10:39:15   22  that the defendant executed, or attempted to execute either

10:39:18   23  one, a scheme to defraud investors by making materially

10:39:22   24  false or fraudulent statements in connection with the

10:39:24   25  securities of Wilmington Trust Corporation, or, two, a

6838

10:39:27    1   scheme or artifice to obtain money by means of materially

10:39:30    2   false or fraudulent pretenses, representations, or promises

10:39:34    3   in connection with the purchase of sale of the securities of

10:39:36    4   Wilmington Trust Corporation, as discussed above.

10:39:44    5           It is not enough to convict if some of you find

10:39:47    6   that the Government has proven securities fraud under, one,

10:39:51    7   with respect to the defendant you are considering, while

10:39:53    8   others of you find that the Government has proven securities

10:39:56    9   fraud under, two, with respect to that defendant.

10:39:59   10           If you cannot unanimously agree, you must return

10:40:02   11   a verdict of not guilty on Count II for the defendant you

10:40:06   12   are considering.

10:40:06   13           To establish a scheme to defraud, the Government

10:40:21   14   must prove beyond a reasonable doubt that the defendant

10:40:24   15   knowingly devised or willfully participated in a scheme to

10:40:28   16   defraud any person in connection with the securities of

10:40:30   17   Wilmington Trust Corporation.

10:40:31   18           A scheme is merely a plan for accomplishing an

10:40:35   19   object.

10:40:35   20           Thus, a scheme to defraud is any plan, device,

10:40:39   21   or course of action to deprive another of money or property

10:40:42   22   by means of materially false or fraudulent pretenses,

10:40:46   23   representations, or promises reasonably calculated to

10:40:49   24   deceive persons of average prudence.

10:40:52   25           In this case, the indictment alleges that the

| | |
|---|---|
| 10:40:54 | 1 |
| 10:40:59 | 2 |
| 10:41:02 | 3 |
| 10:41:05 | 4 |
| 10:41:09 | 5 |
| 10:41:14 | 6 |
| 10:41:17 | 7 |
| 10:41:21 | 8 |
| 10:41:23 | 9 |
| 10:41:27 | 10 |
| 10:41:32 | 11 |
| 10:41:34 | 12 |
| 10:41:37 | 13 |
| 10:41:40 | 14 |
| 10:41:41 | 15 |
| 10:41:43 | 16 |
| 10:41:47 | 17 |
| 10:41:51 | 18 |
| 10:41:54 | 19 |
| 10:41:57 | 20 |
| 10:42:03 | 21 |
| 10:42:07 | 22 |
| 10:42:11 | 23 |
| 10:42:13 | 24 |
| 10:42:18 | 25 |

scheme to defraud was carried out by making materially false or fraudulently statements, representations, claims or documents.         The representations which the indictment charges were made as part of the scheme to defraud in Count II are contained in Wilmington Trust's SEC Form 10-K for 2009, Government Exhibit 1.

It is sufficient that the Government prove beyond a reasonable doubt that one or more of the false or fraudulent material misrepresentations in Wilmington Trust Corporation's SEC Form 10-K for 2009, were made in furtherance of the alleged scheme to defraud.

However, you cannot convict the defendant unless you all agree unanimously as to at least one of the material representations.

A statement, representation, claim, or document is false if it is untrue when made, and if the person making the statement, representations, claim or document or causing it to be made knew it was untrue at the time it was made.

A representation or statement is fraud if it was known to be false and was made with the intention to deceive.

In addition, deceitful statements and half-truths, or the expression of an opinion not honestly entertained may constitute false or fraudulent statements.

The arrangement of the words, or the

circumstances in which they are used, may convey a false and deceptive appearance.

The deception need not be premised upon spoken or written words alone.  If there is deception, the manner in which it was accomplished is immaterial.

The false or fraudulent representations must relate to a material fact or matter.

A fact is material if there is a substantial likelihood that a reasonable investor would have viewed the information as having significantly altered the total mix of information available.

This means that if you find that a particular statement of facts was false, you must determine whether there was a substantial likelihood that the statement was one that a reasonable investor would have viewed as having significantly altered the total mix of information available in making his or her decision to invest in Wilmington Trust Corporation securities.

In order to establish a scheme to defraud, or to fraudulently obtain money or property, the Government must also prove that the alleged scheme contemplated depriving another of money or property.

However, the Government is not required to prove that a particular defendant originated the scheme to defraud.

10:43:28  1          Furthermore, it is not necessary that the

10:43:32  2     Government prove that a defendant actually realized any gain

10:43:34  3     from the scheme or that any intended victim actually

10:43:38  4     suffered any loss.  Although, whether or not the scheme

10:43:41  5     actually succeeded is really not the question, you may

10:43:46  6     consider whether it succeeded in determining whether the

10:43:49  7     scheme exited.

10:43:50  8          If you find that the Government has proved

10:43:52  9     beyond a reasonable doubt that the scheme to defraud charged

10:43:54  10    in the indictment did exist and that the defendant knowingly

10:43:59  11    devised or participated in the overall scheme charged in the

10:44:05  12    indictment, you should then consider the second element.

10:44:07  13          I instruct you as a matter of law that the term

10:44:11  14    "security" includes stock.

10:44:18  15          I instruct you that Wilmington Trust Corporation

10:44:20  16    was an issuer with a class of securities registered under

10:44:23  17    Section 12 of the Securities Exchange Act 1934, or that was

10:44:28  18    required to file reports under Section 15(d) of the

10:44:31  19    Securities Exchange Act of 1934, during the period set forth

10:44:35  20    in the indictment.

10:44:38  21          A fraud scheme is employed in connection with

10:44:41  22    the purchase or sale of a security if the alleged false or

10:44:44  23    fraudulent statement coincides with the securities

10:44:47  24    transaction.  That is, there's a nexus between a materially

10:44:50  25    false or fraudulent statement and the purchase or sale of a

security.

A false or fraudulent statement is material to the purchase or sale of a security, if the there was a substantial likelihood that the truthful disclosure of the alleged false statements regarding past due loans would have been viewed by a reasonable investor as having significantly altered the total mix of information available to that investor.

The final element that the Government must prove beyond a reasonable doubt is that the defendant acted with intent to defraud.

I have previously instructed you on the definition of intent to defraud.

In considering whether a defendant acted with an intent to defraud, you may consider, among other things, whether that defendant acted with a desire to or purpose to bring about some gain or benefit to the himself or herself, or someone else with a purpose to cause some loss to someone.

You may also find an intent to defraud if you conclude that a defendant made or caused to be made a material misstatement of fact made with reckless disregard for the truth.

In order to establish that a defendant committed securities fraud by making any false or fraudulently

10:46:07  1    representations to obtain money or property in connection

10:46:10  2    with a security, the Government must prove beyond a

10:46:13  3    reasonable doubt the following elements:

10:46:14  4              First, the defendant employed a device, scheme,

10:46:17  5    or artifice:

10:46:18  6              Second, with the purpose to obtain, by means of

10:46:23  7    false or fraudulent pretenses, representations, or promises

10:46:26  8    any money or property:

10:46:28  9              Third, the false or fraudulent pretenses,

10:46:31  10   representations, or promises were made in connection with a

10:46:33  11   security:

10:46:33  12             Fourth, the security was registered under a

10:46:36  13   national exchange or required to file a report under the

10:46:39  14   Securities Exchange Act; and

10:46:41  15             Five, the defendant acted with an intent to

10:46:43  16   defraud.

10:46:43  17             I have previously instructed you as to what

10:46:46  18   constitutes a scheme, device, or artifice.  The definition

10:46:49  19   of a security, the definition of a false or fraudulent.  The

10:46:52  20   fact that the Wilmington Trust's securities were registered

10:46:55  21   under a national exchange are required to file reports under

10:47:00  22   the Securities Exchange Act.  Definition of a materiality in

10:47:03  23   the context of securities fraud and the definition of intent

10:47:05  24   to fraud.

10:47:06  25             Securities fraud by means of false or fraudulent

10:47:10    1    pretenses, representations, or promises requires that you

10:47:13    2    must agree that a defendant engaged in a specific fraud or

10:47:16    3    fraudulent pretenses, representations, or promises.

10:47:19    4         The Government is not required to prove that all

10:47:22    5    of the statements alleged are materially false.  Proof that

10:47:24    6    a single statement is materially false is sufficient to

10:47:27    7    prove a defendant's guilt as to Count II.

10:47:30    8         However, each of you must agree with each of the

10:47:34    9    other jurors that the same item is materially false.  Unless

10:47:39    10   you unanimously agree that the Government has proved the

10:47:42    11   same item was materially false beyond a reasonable doubt,

10:47:46    12   you must find the defendant is not guilty regarding that

10:47:50    13   count.

10:47:50    14        The only alleged false statements that you may

10:47:55    15   consider in connection with the securities fraud by means of

10:47:57    16   false or fraudulent pretenses, representations, or promises

10:48:01    17   with respect to Count II are the following statements on the

10:48:05    18   SEC Form 10-K for 2009, submitted by Wilmington Trust

10:48:10    19   Corporation, Government Exhibit 1.

10:48:11    20        The Government contends that the following

10:48:13    21   statements on page 55 of the SEC Form 10-K for 2009 were

10:48:17    22   false:

10:48:17    23        One, the table listing the amount of particular

10:48:20    24   categories of loans past due 90 days or more;

10:48:23    25        Two, the ratio of loans past due 90 days to

10:48:26  1    total loans outstanding;

10:48:27  2              And, three, the discussion of accruing loans

10:48:29  3    past due 90 days or more.

10:48:32  4              The three statements identified above on page 55

10:48:34  5    of the Wilmington Trust Corporation SEC Form 10-K for 2009,

10:48:38  6    are the only statements that you may consider with respect

10:48:41  7    to the alleged scheme to obtain money or property by means

10:48:45  8    of materially false or fraudulently pretenses,

10:48:48  9    representations, or promises.

10:48:48  10             The Government need not prove that each

10:48:51  11   statement was false.  However, the Government must prove

10:48:54  12   beyond a reasonable doubt that at least one of these

10:48:56  13   statement was materially false and that it was made in

10:48:58  14   furtherance of the alleged scheme to obtain money or

10:49:02  15   property by means of materially false or fraudulent

10:49:06  16   pretenses, representations, or promises.

10:49:07  17             Furthermore, all twelve of you must agree that

10:49:09  18   the statement was materially false.  It is not enough if

10:49:13  19   some of you find that the Government has proven one

10:49:15  20   materially false statement, while others of you find that

10:49:19  21   the Government has proven another false statement.

10:49:22  22             If you do not all agree unanimously that the

10:49:26  23   Government has proven the same specific materially false

10:49:33  24   statement beyond a reasonable doubt, you must return a

10:49:34  25   verdict of not guilty for all of the defendants with respect

10:49:36    1    to Count II.

10:49:37    2             Counts IV and VI the indictment charge one more

10:49:46    3    of the defendants with knowingly and willfully making or

10:49:50    4    causing the making of a false statement of material fact in

10:49:54    5    a report to be filed with the Securities and Exchange

10:49:57    6    Commission.

10:49:57    7             Count IV and VI allege that Mr. Gibson, Mr.

10:50:02    8    Harra, Mr. North, and Ms. Rakowski committed the alleged

10:50:04    9    offense.

10:50:05   10             You must consider each count and each defendant

10:50:08   11    individually.  As to each count and each defendant you are

10:50:12   12    considering, the Government must prove each of the following

10:50:15   13    elements beyond a reasonable doubt.

10:50:15   14             One, the SEC report at issue in the count you

10:50:20   15    are considering contained a false statement of fact;

10:50:22   16             Two, the statement was material;

10:50:24   17             Three, the defendant you are considering made or

10:50:27   18    caused the statement to be made;

10:50:28   19             And, four, the defendant you are considering

10:50:31   20    acted knowingly and willfully and with the intent deceive or

10:50:35   21    defraud.

10:50:35   22             You must be convinced that the Government has

10:50:38   23    proven all of these elements beyond a reasonable doubt in

10:50:42   24    order to find the defendant you are considering guilty of

10:50:45   25    the count at issue.

10:50:46   1      If you find that the Government has filed to

10:50:49   2   prove any of these elements beyond a reasonable doubt with

10:50:53   3   respect to the defendant you are considering on any count,

10:50:55   4   you must return a verdict of not guilty with respect to the

10:50:58   5   defendant on that count.

10:51:00   6      The first element that the Government must prove

10:51:05   7   beyond a reasonable doubt in Count IV and VI is that the SEC

10:51:10   8   report in the count you are considering contained a false

10:51:17   9   statement of fact.

10:51:18   10      A statement is false if it's untrue when made

10:51:22   11   and if the person making the statement or causing it to be

10:51:25   12   made knew it was untrue at the time it was made.

10:51:29   13      I will now instruct you on the alleged false

10:51:30   14   statements of fact that you must consider for each count.

10:51:33   15      The only statements that you may consider with

10:51:39   16   respect to Count I are the following statements on the SEC

10:51:42   17   Form 10-K for 2009, submitted by Wilmington Trust

10:51:46   18   Corporation, Government Exhibit 1.

10:51:47   19      The Government contends that the following

10:51:50   20   statements on page 55 of the SEC Form 10-K for 2009 were

10:51:54   21   false:

10:51:55   22      One, the table listing the amounts of particular

10:51:57   23   categories of loans past due 90 days or more;

10:52:00   24      Two, the ratio of loans past due 90 days to

10:52:05   25   total loans outstanding and;.

10:52:07  1       Three, the discussion of accruing loans past due

10:52:10  2  90 days or more.

10:52:11  3       The three statements above on the Wilmington

10:52:15  4  Trust Corporation SEC Form 10-K for 2009, are the only

10:52:19  5  statements that you may consider with respect to Count IV.

10:52:25  6       The only statements that you may consider with

10:52:28  7  respect to Count VI are the following statements on the

10:52:31  8  second Form 10-Q for the first quarter of 2010, submitted by

10:52:37  9  Wilmington Trust Corporation, Government Exhibit 5.

10:52:39  10       The Government contends that the following

10:52:42  11  statements on page 88 of the SEC Form 10-Q for the first

10:52:45  12  quarter of 2010 were false:

10:52:47  13       One, the table listing the amounts of particular

10:52:49  14  categories of loans past due 90 days or more;

10:52:52  15       Two, the past due loan ratio; and

10:52:55  16       Three, the discussion of accruing loans past due

10:52:57  17  90 days or more.

10:52:58  18       These three statements are the only statements

10:53:01  19  that you may consider with respect to Count VI.

10:53:04  20       Counts IV and VI of the indictment each allege a

10:53:11  21  number of false statements.  The Government is not required

10:53:14  22  to prove that all of the statements that are alleged as

10:53:17  23  false in each count are, in fact, false.

10:53:20  24       However, the Government must prove beyond a

10:53:22  25  reasonable doubt that at least one of the specific

statements in each count counsel was false.

With respect to each count, all twelve of you must agree beyond a reasonable doubt that the statement was false. It is not enough to convict if some of you find that the Government has proven one false statement charged in Count I, while others of you find that the Government has proven another false statement charged in that count.

If you do not all agree unanimously that the Government has proven the same specific false statement beyond a reasonable doubt with respect to count you are considering, you must return a verdict of not guilty on that count.

For the conducted charged in Counts IV and VI, the Government must prove beyond a reasonable doubt that the defendant's statements or representation was material.

A statement is material if there is a substantial likelihood that a reasonable investor would have viewed the information as having significantly altered the total mix of information available.

This means that if you find that a particular statement of fact was false, you must determine whether there was a substantial likelihood that the statement was one that a reasonable investor would have viewed as having significantly altered the total application of information available in making his or her decision to invest in

10:54:44  1    Wilmington Trust Corporation securities.

10:54:47  2          The third element of Count IV and VI that the

10:54:52  3    Government must prove beyond a reasonable doubt is that the

10:54:54  4    defendant you are considering made or caused the alleged

10:54:59  5    false statement to be made.

10:54:59  6          A defendant cannot be held responsible for any

10:55:01  7    false statement in the SEC report that he or she did not

10:55:05  8    make or cause to be made.

10:55:06  9          If the Government proves beyond a reasonable

10:55:08  10   doubt that the SEC report in the count you are considering

10:55:12  11   contained a materially false statement, but the Government

10:55:15  12   fails to prove beyond a reasonable doubt that the defendant

10:55:17  13   you are considering made that statement, or caused that

10:55:20  14   statement to be made in the SEC report, you must find that

10:55:23  15   defendant not guilty on that count.

10:55:24  16          I instruct you as a matter of law that the

10:55:28  17   following documents filed by the Wilmington Trust

10:55:31  18   Corporation with the Securities and Exchange Commission

10:55:33  19   constitute an application, report, or document required to

10:55:36  20   be filed with the Securities and Exchange Commission.

10:55:38  21          The offense of making a false statement in

10:55:42  22   documents required to be filed with the Securities and

10:55:46  23   Exchange Commission charged in the indictment requires that

10:55:48  24   the Government prove that a defendant acted knowingly and

10:55:50  25   willfully in making a false or fraudulent statement.

10:55:54    1          I have previously instructed you on the

10:56:04    2    definitions of knowingly and willfully.

10:56:04    3          I may have to get back to you what I mean by

10:56:18    4    that.

10:56:32    5          To convict on Counts IV and VI, the Government

10:56:35    6    must prove beyond a reasonable doubt that a defendant acted

10:56:40    7    with the intent to deceive or defraud.

10:56:41    8          I previously instructed you on the definition of

10:56:46    9    intent to defraud.

10:56:47   10          To act with the intent to defraud means to act

10:56:50   11    with intent to mislead or to cause a person to believe that

10:56:54   12    which is false.

10:56:55   13          In proving that a defendant acted with the

10:56:58   14    intent to deceive or defraud, the Government is not required

10:57:02   15    to prove that a defendant intended to cause harm to the

10:57:05   16    victim of the fraud.

10:57:06   17          Count V of the indictment alleges that Mr.

10:57:12   18    Gibson, Mr. Harra, Mr. North, and Ms. Rakowski, knowingly

10:57:16   19    and willfully made statements to the Securities and Exchange

10:57:16   20    Commission.

10:57:22   21          Counts XI and XVI of the indictment allege that

10:57:25   22    Mr. Gibson, Mr. Harra, Mr. North, and Ms. Rakowski knowingly

10:57:29   23    and willfully made false statement to the Federal Reserve or

10:57:33   24    the Securities and Exchange Commission.

10:57:34   25          As to each defendant and count you are

considering, in order to prove the defendant guilty of the charge charged, the Government must establish beyond a reasonable doubt:

First, that the report at issue contained a false, fictitious, or fraudulent statement of fact;

Second, that this statement was material;

Third, that the defendants made the statement;

Fourth, that the defendant you are considering acted knowingly and willfully; and

Five, that the statement was made in a matter within the jurisdiction of the Government of the United States.

As with all of the charges in the indictment, unless the Government proves each element beyond a reasonable doubt, you must find that the defendant you are considering not guilty on the count you are considering.

With respect to Counts V and XI through XVI, the first element that the Government must prove beyond a reasonable doubt is that the statement or representation until the count you are considering was false, fictitious, or fraudulent.

A statement or representation is false or fictitious if it was untrue when made, and known at the time to be untrue by the person making it or causing it to be made.

10:58:41    1          A statement is fraudulent if it was known to be

10:58:43    2    untrue when made and was made with the intent to deceive the

10:58:48    3    Government agency to which it was submitted.

10:58:49    4          I will now instruct you on the only statements

10:58:55    5    you may consider with respect to Counts V and XI through

10:58:58    6    XVI.

10:58:58    7          The Government contends that the following

10:59:03    8    statements on page 55 of the SEC Form 10-K for 2009 were

10:59:07    9    false:

10:59:08   10          One, that the table listing the amount of

10:59:10   11    particular categories of loan past due 90 days or more;

10:59:13   12          Two, the ratio of loans past due 90 days to

10:59:16   13    total loans outstanding; and

10:59:18   14          Three, the discussion of accruing loans past due

10:59:20   15    90 days or more.

10:59:21   16          The three statements identified above on the

10:59:24   17    Wilmington Trust Corporation SEC Form 10-K for 2009,

10:59:27   18    Government Exhibit 1, are the only statements that you may

10:59:30   19    considered with respect to Count V.

10:59:31   20          The only statements you may consider with

10:59:36   21    respect to Count XI are the following statements on the

10:59:40   22    Third Quarter 2009 Call Report, Government Exhibit 76.

10:59:42   23          The Government contends that the 90 day past due

10:59:46   24    amounts in line items, one, three, four, and six on page 43

10:59:50   25    of the Call Report are false.

It only statements you may consider with respect to Count XII are the following statements on the Four Quarter 2009 Call Report, Government Exhibit 77.

The Government contends that 90 day past due loan amounts in line items one, four, and six on page 43 are false.

The only statements you may consider with respect to Count XIII are the following statements on First Quarter 2010 Call Report, Government Exhibit 78.

The Government contends that the 90 day past due loan amounts in line items one, four, and six, on page 43 are false.

The only statements you may consider with respect to Count XIV are the following statements on the SEC Form 10-Q for the Third Quarter of 2009, submitted by Wilmington Trust Corporation, Government Exhibit 4.

The Government contends that the following statement on page 145 of the SEC Form 10-Q for the Third Quarter of 2009, were false:

One, the table listing the amounts of particular categories of loans past due 90 days or more;

Two, the past due loan ratio; and

Three, the discussion of loans past due 90 days or more.

The only statements that you may considered with

| | |
|---|---|
| 11:01:09 | 1 |
| 11:01:11 | 2 |
| 11:01:15 | 3 |
| 11:01:17 | 4 |
| 11:01:18 | 5 |
| 11:01:23 | 6 |
| 11:01:25 | 7 |
| 11:01:28 | 8 |
| 11:01:30 | 9 |
| 11:01:33 | 10 |
| 11:01:36 | 11 |
| 11:01:40 | 12 |
| 11:01:43 | 13 |
| 11:01:46 | 14 |
| 11:01:53 | 15 |
| 11:01:53 | 16 |
| 11:01:55 | 17 |
| 11:01:57 | 18 |
| 11:02:05 | 19 |
| 11:02:06 | 20 |
| 11:02:09 | 21 |
| 11:02:12 | 22 |
| 11:02:13 | 23 |
| 11:02:15 | 24 |
| 11:02:17 | 25 |

respect to Count XV are the following statements on the SEC Form 10-Q for the First Quarter of 2010, submitted by Wilmington Trust Corporation, Government Exhibit 5.

The Government contends that the following statements on page 88 of the SEC Form 10-Q for the First Quarter of 2010, were false:

One, the table listing the amounts of particular categories of loans past due 90 days or more;

Two, the past due loan ratio; and

Three, the discussion of accruing loans past due 90 days or more.

The only statements you may consider with respect to Count XVI are the following statements in the Monthly Regulatory Report for October 2009, Government Exhibit No. 243.

The Government contends that the 90 days or more past due loan information is false.

Counts V XI through XVI of the indictment each allege a number of false statements.

The Government is not required to prove that all of the statements that are alleged in a particular count as false are, in fact, false.

However, the Government must prove beyond a reasonable doubt that at least one of the specific statements in each count was false.

6856

11:02:19  1        With respect to each count, all twelve of you

11:02:24  2  must agree beyond a reasonable doubt that the same statement

11:02:25  3  was false.  It is not enough to convict if you find that the

11:02:29  4  Government has proven one false statement charged in a

11:02:31  5  count, while others of you find that the Government has

11:02:34  6  proven another false statement charged in that count.

11:02:37  7        If you do not all agree unanimously that the

11:02:41  8  Government has proven the same specific false statement

11:02:43  9  beyond a reasonable doubt with respect to the count you are

11:02:48  10  considering, you must return a verdict of not guilty on that

11:02:51  11  count.

11:02:51  12        For the conduct charged in Counts V and XI

11:02:59  13  through XVI, a fact is material if it had a natural tendency

11:03:04  14  to influence or was capable of influencing the action of the

11:03:07  15  decision-making body to which it is directed.

11:03:10  16        This means that if you find that a particular

11:03:12  17  statement of fact was false, you must determine whether that

11:03:15  18  statement was one that a reasonable person might have

11:03:18  19  considered important in making his or her decision.

11:03:21  20        The third element of the Counts V and XI through

11:03:28  21  XVI that the Government must prove beyond a reasonable doubt

11:03:31  22  is that a defendant you are considering made the materially

11:03:34  23  false statement.

11:03:34  24        A defendant cannot be held responsible for any

11:03:37  25  false statement that he or she did not make or cause to be

11:03:41  1    made.

11:03:41  2              If the Government proves beyond a reasonable

11:03:43  3    doubt that the report in the count you are considering

11:03:46  4    contained a materially false statement, but the Government

11:03:50  5    fails to prove beyond a reasonable doubt that the defendant

11:03:51  6    you are considering made that statement or caused it to be

11:03:55  7    made, you must find that defendant not guilty.

11:03:57  8              Counts V and XI to XVI require that the

11:04:03  9    Government prove that the defendants acted knowingly and

11:04:07  10   willfully.

11:04:07  11             I have previously instructed you on the

11:04:10  12   definitions of knowingly and willfully.

11:04:13  13             I hereby instruct you that the Securities and

11:04:18  14   Exchange Commission and the Federal Reserve are part of the

11:04:20  15   executive branch of the United States.

11:04:22  16             You may, therefore, finally fat alleged false

11:04:26  17   statements were made within the jurisdiction of those

11:04:27  18   agencies.  A statement is made within the jurisdiction of an

11:04:30  19   agency if it covers any matter confided to the authority of

11:04:34  20   that agency.

11:04:35  21             Counts VII through X of the indictment charge

11:04:40  22   that Mr. Gibson, Mr. Harra, Mr. North, and Ms. Rakowski made

11:04:44  23   false entries in Call Reports and a Monthly Regulatory

11:04:48  24   Report.

11:04:48  25             Count VII through X each correspond to different

report containing an alleged false entry.

In order to prove the defendant you are considering guilty of making a false entry into a bank record, the Government must prove each of the following statements beyond a reasonable doubt with respect to the count you are considering:

First, that the defendant made an entry or caused it to be made in the report of the bank as charged in the indictment;

Second, that the entry was false as to a material matter at the time that it was made; and

Three, that the defendant acted knowingly with the intent to deceive the Federal Reserve.

Unless the Government proves each element beyond a reasonable doubt, you must find the defendant you are considering not guilty on that count you are considering.

An entry is false if untrue when made.  An entry may be false if it records a transaction which did not occur, or fails to record a transaction which did not occur, and should have been accurately recorded, or inaccurately reports or records a transaction.

Counts VII through X require that the Government prove that the defendants knew the entry was made was false at the time of the entry.

This means that the Government must prove beyond

11:06:09    1    a reasonable doubt that the defendant was conscious and

11:06:11    2    aware of the nature of his or her actions and of the

11:06:15    3    surrounding facts and circumstances, as specified in the

11:06:18    4    definition of the offense charged, and knew that the

11:06:20    5    statement was false.

11:06:21    6            In deciding whether a defendant knew that a

11:06:24    7    particular entry was falsely made, you may consider evidence

11:06:27    8    that about what the defendant said, what the defendant did

11:06:30    9    and failed to do, how the defendant acted, and all the other

11:06:34   10    facts and circumstances shown by the evidence that may prove

11:06:38   11    what was in the defendant's mind at that time.

11:06:43   12            For purposes of Counts VII to X, a fact is

11:06:46   13    material if it had a natural tendency to influence, or was

11:06:51   14    capable of influencing the actions of the Federal Reserve to

11:06:53   15    which it is directed.

11:06:54   16            This means that if you find the particular

11:06:56   17    statement of fact was false, you must determine whether the

11:07:01   18    statement was one that a reasonable person might have

11:07:03   19    considered important in making his or her decision.

11:07:06   20            The first elements of Counts VII to X that the

11:07:13   21    Government must prove beyond a reasonable doubt is that the

11:07:14   22    defendant you are considering made or caused to be made the

11:07:18   23    entry in the report of the bank, as charged.

11:07:20   24            This does not mean that the Government must

11:07:22   25    prove that the defendant physically wrote the entries.  It

11:07:25    1    is sufficient to satisfy this element if the Government

11:07:28    2    establishes beyond a reasonable doubt that the defendant you

11:07:30    3    are considering caused the entry to be made.

11:07:32    4        If the Government fails to satisfy its burden of

11:07:35    5    proof on this element, you must enter a verdict of not

11:07:39    6    guilty for the defendant you are considering on the count

11:07:42    7    you are considering.

11:07:43    8        The only statements you may consider with

11:07:48    9    respect to Count VII are the following statements on the

11:07:54   10    Third Quarter 2009 Call Report, Government Exhibit 76.

11:07:54   11        The Government contends that the 90 day past due

11:07:57   12    loan amount in line items one, three, four and six on page

11:08:02   13    43 of the Call Report are false.

11:08:04   14        The only statements you may consider with

11:08:08   15    respect to Count VII are the following statements of the

11:08:12   16    Fourth Quarter 2009 Call Report, Government Exhibit 77.

11:08:14   17        The Government contends that the 90 day past due

11:08:17   18    loan amounts in line items, one, three, four and 6 on page

11:08:21   19    43 are false.

11:08:21   20        The only statements you may consider with

11:08:26   21    respect to Count VIII are the following statements in the

11:08:29   22    First Quarter 2010 Call Report, Government Exhibit 77.

11:08:32   23        The Government contends that the 90 day past due

11:08:35   24    loan amounts in line items one, four and six on page 43 are

11:08:39   25    false.

| | |
|---|---|
| 11:08:39 | 1 |
| 11:08:39 | 2 |
| 11:08:39 | 3 |
| 11:08:39 | 4 |
| 11:08:39 | 5 |
| 11:08:39 | 6 |
| 11:08:44 | 7 |
| 11:08:48 | 8 |
| 11:08:50 | 9 |
| 11:08:51 | 10 |
| 11:08:54 | 11 |
| 11:08:56 | 12 |
| 11:09:02 | 13 |
| 11:09:05 | 14 |
| 11:09:05 | 15 |
| 11:09:12 | 16 |
| 11:09:12 | 17 |
| 11:09:15 | 18 |
| 11:09:18 | 19 |
| 11:09:20 | 20 |
| 11:09:22 | 21 |
| 11:09:24 | 22 |
| 11:09:25 | 23 |
| 11:09:29 | 24 |
| 11:09:31 | 25 |

             The only statements you may consider with

respect to Count VIV are the following statements on the

First Quarter Call Report, Government Exhibit No. 78.

             The Government contends that the 90 day past due

loan amounts in line items one, four, and six are false.

             The only statements you may consider with

respect to Count X are the following statements in the

Monthly Regulatory Report for October 2009, Government

Exhibit No. 243.

             The Government contends that the 90 or more days

past due loan information is false.

             To act with intent to deceive means to act with

intent to mislead or to cause a person to believe that which

is false.

             Counts VII through X allege a number of false

entries.

             The Government is not required to prove that all

of the entries that are alleged in a particular count as

false are, in fact, false.

             However, the Government must prove beyond a

reasonable doubt that at least one of the specific entry in

each count was false.

             With respect to each count, all twelve of you

must agree beyond a reasonable doubt that the same entry was

false.  It is not enough to convict if some of you find that

11:09:35  1   the Government has proven one false entry charged in a count

11:09:38  2   while others of you find that the Government has proven

11:09:41  3   another false entry charged in that count.

11:09:43  4         If you do not all agree unanimously that the

11:09:46  5   Government has proven the same specific false entry made

11:09:49  6   beyond a reasonable doubt with respect to that count you are

11:09:56  7   considering, you must return a verdict of not guilty on that

11:10:00  8   count.

11:10:01  9         A person may be guilty of an offense because he

11:10:07  10  or she personally committed the offense himself or herself

11:10:09  11  or because he or she aided and abetted another person in

11:10:13  12  committing the offense.

11:10:14  13        A person who has aided and abetted another

11:10:17  14  person in committing an offense is often called an

11:10:19  15  accomplice.  The person whom the accomplice aids and abets

11:10:24  16  is known as the principal.

11:10:25  17        In this case, the Government alleges that

11:10:28  18  William North aided and abetted Wilmington Trust

11:10:30  19  Corporation, Robert Harra, and David Gibson in committing

11:10:36  20  Counts IV to XVI as charged in the indictment, and Kevyn

11:10:38  21  Rakowski aided and abetted Wilmington Trust Corporation,

11:10:42  22  Robert Harra and David Gibson in committing Counts VI to XI

11:10:44  23  and XIII to XVI.

11:10:45  24        For these specified offenses, I will refer to

11:10:48  25  Wilmington Trust Corporation, Robert Harra, and David Gibson

11:10:52  1   as to Counts II, IV and IV, and Ms. Rakowski, as principals.

11:10:56  2        In order to find William North or Kevyn Rakowski

11:10:59  3   guilty of these identified offenses because he or she aided

11:11:02  4   and an abetted one or more of the principals in committing

11:11:05  5   these offenses, you must find that the Government proved

11:11:08  6   beyond a reasonable doubt each of the following four

11:11:08  7   requirements:

11:11:11  8        First, that one or more of the principals

11:11:13  9   committed the offenses charged by committing the each of the

11:11:16  10  elements of the offenses charged, as I have explained these

11:11:19  11  elements to you in these instructions.  The principals need

11:11:22  12  not have been charged with or found guilty of the offenses.

11:11:25  13  However, as long as you find that the Government proved

11:11:27  14  beyond a reasonable doubt that he or she committed the

11:11:30  15  offense;

11:11:30  16       Second, that the defendant knew that the

11:11:33  17  offenses charged was going to be committed or was being

11:11:36  18  committed by the principal;

11:11:37  19       Third, that the defendant knowingly did some act

11:11:40  20  for the purpose of aiding, assisting, facilitating, or

11:11:45  21  encouraging the principal in committing the specific offense

11:11:47  22  charged and with the intent that the principal commit the

11:11:51  23  specific offenses; and

11:11:56  24       Fourth, that the defendant performed the act in

11:11:59  25  furtherance of the offense charged.

6864

1    The law, therefore, requires that the accomplice

2    must act with the same intent as required of a principal.

3    In deciding whether the defendant had the

4    required knowledge and intent to satisfy the third

5    requirement for aiding and abetting, you may consider both

6    direct and circumstantial evidence, including the

7    defendant's words and actions and the other facts and

8    circumstances.

9    However, evidence that the defendant merely

10   associated with persons involved in a criminal venture, or

11   was merely present, or was merely a knowing spectator during

12   the commission of the offense, is not enough for you to find

13   the defendant guilty as an aider and abettor.

14   If the evidence shows that the defendant knew

15   that the offense was being committed or was about to be

16   committed, but does not also prove beyond a reasonable doubt

17   that it was the defendants's intent and purpose to aid,

18   assist, encourage, facilitate, or otherwise associate

19   himself or herself with the offense, you may not find the

20   defendant guilty of the offense has an aider and abettor.

21   The Government must prove beyond a reasonable

22   doubt that the defendant in some way participated in the

23   offense committed by the principal as something the

24   defendant wished to bring about and to make succeed.

25   To show that the defendant performed an act in

11:13:15    1    **furtherance of the offense charged to satisfy the fourth**

11:13:18    2    **requirement, the Government needs to show some affirmative**

11:13:21    3    **participation by the defendant which at least encouraged the**

11:13:24    4    **principal to commit.**

11:13:25    5    **That is, you must find that the defendant's act**

11:13:28    6    **did, in some way, aid, assist, facilitate, or encourage the**

11:13:32    7    **principal to commit the offense.**

11:13:34    8    **The defendant's act need not further aid,**

11:13:38    9    **assist, facilitate, or encourage every part or phase or**

11:13:42   10    **element of the offense charged.  It is enough if the**

11:13:45   11    **defendant's act further aid, assist, facilitate, or**

11:13:50   12    **encourage only one part or phase or element of the offense.**

11:13:52   13    **Also, the defendant's acts need not themselves**

11:13:58   14    **be against the law.**

11:14:01   15    **Counts II through XVI of the indictment allege**

11:14:13   16    **that the defendants committed the following offense during**

11:14:16   17    **the course of the alleged conspiracy:**

11:14:17   18    **Securities fraud, Count II;**

11:14:20   19    **Making false statements in documents required to**

11:14:23   20    **be filed with the Securities and Exchange Commission, Counts**

11:14:26   21    **IV and VI;**

11:14:26   22    **Making false statements to the Securities**

11:14:29   23    **Exchange Commission and the Federal Reserve, Counts V and XI**

11:14:33   24    **to XVI;**

11:14:33   25    **Making false entries in banking reports, Count**

| | |
|---|---|
| 11:14:37 | 1 |

VII to X.

The Government may prove a defendant guilty of an offense charged in Counts II through XVI by proving that the defendant personally committed that offense.

I will instruct you on the elements of each offense momentarily.

The Government may also prove a defendant guilty of an offense charged in Counts II through XVI offenses based on the legal rule that each member of a conspiracy is responsible for crimes and other acts committed by the other members, as long as those crimes and acts were committed to help further or achieve the objective of the conspiracy and were reasonably foreseeable to the defendant as a necessary or natural consequence of the agreement.

In other words, under certain circumstances, the act of one conspirator may be treated as the act of all. This means that all the conspirators may be convicted of a crime committed by any one or more of them, even though they did not all personally participate in the crime themselves.

In order for you to find a defendant guilty of the offenses charged in Counts II through XVI based on this legal rule, you must find that the Government proved beyond a reasonable doubt each of the following four requirements:

First, that the defendant was a member of the conspiracy charged in the indictment;

11:15:56   1        Second, that while the defendant was still a

11:15:59   2   member of the conspiracy, one or more of the other members

11:16:03   3   of the conspiracy committed an offense charged in Counts II

11:16:05   4   through with XVI, by committing each of the elements of that

11:16:09   5   offense, as I had explained those elements to you in these

11:16:13   6   instructions.          However, the other members of the

11:16:15   7   conspiracy need not have been found guilty of, or even

11:16:18   8   charged with the offense, as long as you find the Government

11:16:21   9   proved beyond a reasonable doubt that the other members

11:16:24   10   committed the offense;

11:16:24   11        Third, that the other members of the conspiracy

11:16:27   12   committed the offense within the scope of the unlawful

11:16:29   13   agreement and to help further or achieve the objective of

11:16:33   14   the conspiracy; and

11:16:34   15        Fourth, that the offense was reasonably

11:16:39   16   foreseeable to or reasonably anticipated by the defendant as

11:16:40   17   a necessary or natural consequence of the unlawful

11:16:43   18   agreement.

11:16:43   19        The Government does not have to prove that a

11:16:45   20   defendant specifically agreed or knew that the offense would

11:16:49   21   be committed.

11:16:49   22        However, the Government must prove that the

11:16:51   23   offense was reasonably foreseeable to the defendant, as a

11:16:54   24   member of the conspiracy, and within the scope of the

11:16:57   25   agreement as the defendant understood it.

As I have instructed you, in order to prove that the defendant was a member of the conspiracy charged in the indictment, the Government must prove that the defendant knew of an objective of the conspiracy to defraud the United States or to commit an offense against the United States; namely, securities fraud, making false statements in quarterly or annual reports filed with the Securities and Exchange Commission, and making false statements to the Securities and Exchange Commission and the Federal Reserve.

The Government must further prove that the defendant intended to join together with at least one or other alleged conspirator to achieve one of these objectives.

However, for you to find a guilty defendant of an offense charged in Counts II through XVI based on the rule that each member of a conspiracy is responsible for crimes committed by other members, the Government does not have to prove that the defendant specifically agreed or knew that any specific offense would be committed, as long as the Government proves that the offense was reasonably foreseeable to the defendant, as a member of the conspiracy and within the scope of the agreement as the defendant understood it.

Counts XVII through XIV of the Third Superseding Indictment charge that Mr. Gibson knowingly certified

11:18:13   1      **falsely that certain periodic reports filed with the**

11:18:16   2      **Securities and Exchange Commission complied with Section**

11:18:21   3      **13(A) or 15(d) of the Securities Exchange Act, when Mr.**

11:18:24   4      **Gibson knew that information contained in the periodic**

11:18:27   5      **reports did not fairly present, in all material respects,**

11:18:31   6      **the financial condition of the bank.**

11:18:33   7      **The periodic reports allegedly containing the**

11:18:36   8      **false certification were Wilmington Trust's Form 10-Q for**

11:18:39   9      **the Third Quarter of 2009, Form 10-K for the 2009, and Form**

11:18:45  10      **10-Q for the First Quarter of 2010.**

11:18:45  11      **According to the Government, the reason why**

11:18:57  12      **these certificates were false is that the periodic reports**

11:18:59  13      **pertaining to each certification did not report certain**

11:19:04  14      **matured loans that were current for interest payments and in**

11:19:10  15      **the process of extension as past due, which allegedly**

11:19:11  16      **resulted in Wilmington Trust failing to fairly represent, in**

11:19:15  17      **all material respects, the financial condition of the Bank**

11:19:18  18      **in violation of 18 U.S.C. Section 1350.**

11:19:22  19      **Section 1350(a) of Tile 18 of the United States**

11:19:30  20      **Code required that each periodic report containing financial**

11:19:34  21      **statements filed by an issuer with the Securities and**

11:19:37  22      **Exchange Commission purchase pursuant to Section 13(a) or**

11:19:40  23      **15(d) of the Securities Exchange Act be accompanied by a**

11:19:44  24      **written statement by the chief executive officer and chief**

11:19:49  25      **financial officer of the issuer.**

Section 1350(b) of Title 18 of the United States Code provides that the written statement certify that it accompanying periodic report fully comply with the requirements of Section 13(a) or 13(d) of the Securities Exchange Act and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

Section 1350(c)(1) of Title 18 of the United States Code provides that whoever certifies the written statement knowingly that the accompanying periodic report does not comport in all the requirements set forth in this section shall be guilty of a crime.

Mr. Gibson is charged with more than one offense. Each offense is charged in a separate count of the Third Superseding Indictment.

The number of offenses charged is not evidence of guilt, and this should not influence your decision in any way. You must separately consider the evidence that relates to each offense, and you must return a separate verdict for each offense.

For each offense charged, you must decide whether the Government has proved beyond a reasonable doubt that Mr. Gibson is guilty of that particular offense, meaning that the Government has proved beyond a reasonable doubt each element of that particular evidence.

11:21:04  1          You verdict on one count should not control your

11:21:08  2   verdict on any other count.

11:21:10  3          Mr. Gibson is charged in Counts XVII through XIV

11:21:16  4   of the Third Superseding Indictment with knowingly making

11:21:20  5   materially false certifications in financial reports.

11:21:22  6          To meet its burden of proof on Counts XVII

11:21:26  7   through XIV, the Government must prove as to each count of

11:21:30  8   the following five essential elements beyond a reasonable

11:21:32  9   doubt.

11:21:32  10         If the Government fails to prove any essential

11:21:35  11  element beyond a reasonable doubt, you must return a verdict

11:21:37  12  of not guilty on that count you are considering.

11:21:41  13         The five essential elements are:

11:21:43  14         First, that Mr. Gibson was the chief executive

11:21:46  15  officer, chief financial officer, or the equivalent of

11:21:49  16  Wilmington Trust Corporation; and

11:21:51  17         Second, that Wilmington Trust Corporation was an

11:21:53  18  issuer of securities regulated by the Securities Exchange

11:21:57  19  Act; and

11:21:58  20         Third, that Mr. Gibson certified that the

11:22:01  21  information contained in the Wilmington Trust Corporation's

11:22:03  22  periodic report to which the count pertains, fully complied

11:22:07  23  with the requirements of Section 13(a) or 15(d) of the

11:22:13  24  Securities Exchange Act of 1934, and fairly presented, in

11:22:17  25  all material respects, the financial condition and results

| | | |
|---|---|---|
| 11:22:20 | 1 | of operations of Wilmington Trust Corporation; and |
| 11:22:22 | 2 | Fourth, that this certification was materially |
| 11:22:25 | 3 | false; and |
| 11:22:26 | 4 | Fifth, that Mr. Gibson knew at the time that the |
| 11:22:30 | 5 | certification was made that the certification was materially |
| 11:22:33 | 6 | false. |
| 11:22:33 | 7 | If the Government has failed to prove any of |
| 11:22:37 | 8 | these elements beyond a reasonable doubt, you must return a |
| 11:22:40 | 9 | verdict of not guilty on the count you are considering. |
| 11:22:43 | 10 | The first essential element of Counts XVII |
| 11:22:50 | 11 | through XIV is that the Government must prove beyond a |
| 11:22:52 | 12 | reasonable doubt that Mr. Gibson was the chief executive |
| 11:22:55 | 13 | officer, chief financial officer, or the equivalent, of |
| 11:22:59 | 14 | Wilmington Trust. |
| 11:22:59 | 15 | The second essential element of Counts XVII |
| 11:23:05 | 16 | through XIV that the Government must prove beyond a |
| 11:23:08 | 17 | reasonable doubt is that the Wilmington Trust Corporation |
| 11:23:09 | 18 | was an issuer of securities regulated by the Securities |
| 11:23:12 | 19 | Exchange Act. |
| 11:23:12 | 20 | I instruct you that the issuers of securities |
| 11:23:15 | 21 | includes every person, including a corporation, who issues |
| 11:23:18 | 22 | or proposes to issue any security. |
| 11:23:20 | 23 | The term security includes stock. |
| 11:23:22 | 24 | The third essential element of Counts XVII |
| 11:23:29 | 25 | through XIV that the Government must prove beyond a |

6873

1    reasonable doubt is that Mr. Gibson certified that the

2    information contained in the Wilmington Trust Corporation's

3    periodic report to which that count pertains, fully complied

4    with the requirements of Section 13(a) or 15(d) of the

5    Securities Exchange Act of 1934.

6              And, two, fairly presented, in all material

7    respects, the financial condition and results of operations

8    of Wilmington Trust Corporation.

9              The periodic reports at issue are as follows:

10             Count 17, Wilmington Trust Form 10-Q filed

11   11/09.

12             Count 18, Wilmington Trust Form 10-K filed

13   2/22/10.

14             Count 19, Wilmington Trust Form 10-Q filed

15   5/10/10.

16             I further instruct you that Section 1350 of

17   Title 18 of the United States Code requires that an issuer's

18   quarterly and annual reports, SEC Forms 10-Q and 10-K

19   respectively be accompanied by a written certification by

20   the issuer's chief financial officer, that to those reports

21   complied with Section 13(a) or 15(d) of the Securities

22   Exchange Act in all material respects.

23             The fourth essential element of Counts XVII

24   through XIV that the Government must prove beyond a

25   reasonable doubt is that the certification made by Mr.

Gibson was materially false.                Whether a

certification was materially false, must be determined at

the time it was made.

The Government contends that the certifications

in Counts XVII through XIV were false because loans that

were matured, current for interest payments, and in the

process of extensions, were past due and were required to be

reported as past due pursuant to either Section 13(a) or

15(d) of the Securities Exchange Act.

Whether a certification was materially false

must be determined at the time it was made; the

certification may not be considered false merely because

subsequent events prove it to be erroneous.

With respect to the phrase "in all material

respects," please use the definition of materiality that was

given in connection with Count II, i.e., information is

material only if there is a substantial likelihood that a

reasonable investor would have viewed the information as

having significantly altered the total mix of information

available.

This means that if you find that a particular

statement of fact was false, you must determine whether

there was a substantial likelihood that the statement was

one that a reasonable investor would have viewed as having

significantly altered the total mix of information available

11:26:21  1   in making his or her decision.

11:26:23  2          In fifth essential element of Counts XVII

11:26:34  3   through XIV that the Government must prove beyond a

11:26:36  4   reasonable doubt is that at the time the certification was

11:26:39  5   made, Mr. Gibson knew that the certification was false.

11:26:41  6          It also means that the Government must prove

11:26:43  7   beyond a reasonable doubt that Mr. Gibson was conscious and

11:26:46  8   aware that the periodic report to which that count pertains,

11:26:49  9   did not comply with the requirements of Section 13(a) or

11:26:52  10  15(d) of the Securities Exchange Act of 1934, and the

11:26:56  11  information contained in the periodic report did not fairly

11:26:59  12  present, in all material respects, the financial condition

11:27:01  13  and results of operations of f Wilmington Trust.

11:27:05  14         The Government must prove that Mr. Gibson made

11:27:08  15  the certification voluntarily and intentionally, conscious

11:27:11  16  and aware that the certification was false, and not because

11:27:13  17  of mistake or accident or any other innocent reason.

11:27:16  18         An honest or good faith belief by Mr. Gibson

11:27:20  19  that the certification was accurate, meaning an honest or

11:27:23  20  good faith belief by Mr. Gibson that loans that were

11:27:28  21  matured, interest- current, and in the process of extension

11:27:30  22  were not past due, and were not required to be reported as

11:27:33  23  past due, is a complete defense to this charge.

11:27:37  24         It is a complete defense to this charge even if

11:27:41  25  Mr. Gibson's good faith belief were mistaken or incorrect.

| | |
|---|---|
| 11:27:44 | 1 |

           The meaning of good faith is as I defined it

before.

           In deciding whether Mr. Gibson acted knowingly,

you may consider evidence about what Mr. Gibson said, what

Mr. Gibson did and failed to do, how Mr. Gibson acted, and

all other facts and circumstances shown by the evidence that

may prove what was in Mr. Gibson's mind at that time.

           Members of the jury, there are another four

pages.  I will read them to you after you hear the closing

arguments.  There is no reason to read ahead on what the

lawyers will be arguing.

           So we're going to take a 15 minute break.

           The plan is this.

           We're going to go until about 1:00 o'clock.

           On what the lawyers told me, I expect the

Government's argument, since they go first, is going to last

longer than before 1:00 o'clock.

           So they'll go to then.  We'll break an hour for

lunch.  We'll come back and they'll continue.

           That's the plan.

           Can we take the jury out and have a 15-minute

break here?

           (The jury was excused for a short recess.)

           THE COURT:  All right.  So it occurs to me

that -- you can be seated -- that on page 69, the following

| | | |
|---|---|---|
| 11:30:10 | 1 | documents, they're the 10-Q and the 10-K.  Right? |
| 11:30:13 | 2 | MR. NOWAK:  Right. |
| 11:30:14 | 3 | MR. KRAVETZ:  Yes, Your Honor. |
| 11:30:15 | 4 | THE COURT:  I think once upon a time the |
| 11:30:17 | 5 | instruction about the 10-Q and 10-K followed this |
| 11:30:19 | 6 | instruction and we moved it up front because I thought that |
| 11:30:23 | 7 | is logically more where it went.  So when they come back, I |
| 11:30:26 | 8 | will just tell them that that is what I meant there.  All |
| 11:30:30 | 9 | right? |
| 11:30:31 | 10 | MR. WOOD:  Yes. |
| 11:30:32 | 11 | THE COURT:  Anything else? |
| 11:30:33 | 12 | MR. KRAVETZ:  No, Your Honor. |
| 11:30:34 | 13 | MR. WOOD:  No Your Honor. |
| 11:30:34 | 14 | THE COURT:  All right.  We'll take a 15-minute |
| 11:30:36 | 15 | break. |
| 11:30:37 | 16 | (Short recess taken.) |
| 11:37:19 | 17 | - - - |
| 11:37:19 | 18 | (Proceedings resumed after the short recess.) |
| 11:45:49 | 19 | THE COURT:  All right.  Is everyone ready? |
| 11:45:51 | 20 | MR. KRAVETZ:  Yes, Your Honor. |
| 11:45:51 | 21 | THE COURT:  All right.  Let's get the jury. |
| 11:46:11 | 22 | Mr. Kravetz, so you choose the time like within |
| 11:46:28 | 23 | plus or minus five minutes of 1:00 o'clock.  Okay? |
| 11:46:31 | 24 | MR. KRAVETZ:  Yes, Your Honor. |
| 11:46:33 | 25 | (The jury entered the courtroom.) |

|          |    |                                                                |
|----------|----|----------------------------------------------------------------|
| 11:46:57 | 1  | THE COURT:  All right, members of the jury.                    |
| 11:47:27 | 2  | Welcome back.  Everyone, you may be seated.                    |
| 11:47:29 | 3  | Members of the jury, you may recall that there                 |
| 11:47:31 | 4  | was one instruction I stumbled over, which had to do with      |
| 11:47:35 | 5  | Counts 4 to 6, and it appears at page 69, where I was          |
| 11:47:40 | 6  | talking about some documents that constituted application,     |
| 11:47:44 | 7  | the documents required to be filed with the Securities and     |
| 11:47:47 | 8  | Exchange Commission.  It was supposed to say, "And those two   |
| 11:47:50 | 9  | documents are the 10-Q and the 10-K."  So that's what that     |
| 11:47:54 | 10 | was about.                                                     |
| 11:47:55 | 11 | All right.  Mr. Kravetz?                                        |
| 11:47:57 | 12 | MR. KRAVETZ:  Thank you, Your Honor.  May it                   |
| 11:47:59 | 13 | please the Court, counsel.  Good morning, ladies and           |
| 11:48:02 | 14 | gentlemen.                                                     |
| 11:48:04 | 15 | The evidence has shown beyond all reasonable                   |
| 11:48:07 | 16 | doubt that the defendants caused Wilmington Trust to lie       |
| 11:48:11 | 17 | about its past due loans, that the defendants knew what they   |
| 11:48:15 | 18 | were doing was wrong, and that the lie mattered.               |
| 11:48:20 | 19 | The lie mattered because it delayed the Federal                |
| 11:48:23 | 20 | Reserve from finding out the bank's true condition, and it     |
| 11:48:27 | 21 | mattered because the public invested over $280 million based   |
| 11:48:32 | 22 | on that lie.  And when it comes down to it, that's what this   |
| 11:48:37 | 23 | case is about.  It's not about complex banking theories.       |
| 11:48:40 | 24 | It's something much more simpler than that, the defendants'    |
| 11:48:44 | 25 | failure to tell the truth.                                     |

| | | |
|---|---|---|
| 11:48:47 | 1 | Now, we've been together for several weeks. |
| 11:48:50 | 2 | You've heard from a number of witnesses.  You've had a |
| 11:48:54 | 3 | chance to review a number of pieces of evidence, and the |
| 11:48:58 | 4 | goal today is to go through that witness testimony, to go |
| 11:49:02 | 5 | through the evidence, and to see how it relates to the |
| 11:49:05 | 6 | defendants, both individually and collectively. |
| 11:49:08 | 7 | And so where I would like to begin is, because |
| 11:49:11 | 8 | this is important with respect to all of the counts in the |
| 11:49:14 | 9 | indictment, is what was happening at Wilmington Trust in the |
| 11:49:18 | 10 | third quarter of 2009, which was the beginning of the |
| 11:49:22 | 11 | charged conduct. |
| 11:49:23 | 12 | We've heard from multiple witnesses, probably |
| 11:49:27 | 13 | every single witness, that the third quarter of 2009 was the |
| 11:49:32 | 14 | midst of the Great Recession.  We were also, the bank was |
| 11:49:37 | 15 | also in the aftermath, a very critical Federal Reserve |
| 11:49:42 | 16 | examination, and we'll talk about that and some of the very |
| 11:49:45 | 17 | relevant findings. |
| 11:49:47 | 18 | And, third, there was an entire group of |
| 11:49:50 | 19 | commercial loans that were made in 2004 to 2006 that were |
| 11:49:55 | 20 | coming due. |
| 11:49:59 | 21 | I will start first with certain relevant |
| 11:50:01 | 22 | statistics, and this is from the bank's Form 10-K for 2009. |
| 11:50:08 | 23 | You heard testimony about the growth of Wilmington Trust's |
| 11:50:13 | 24 | commercial loan portfolio, and that's reflected in its |
| 11:50:16 | 25 | public filings.  And you can see in 2005, Wilmington Trust's |

6880

11:50:20  1   total loans amounted to $7.4 billion.   That number went up

11:50:24  2   to $8.9 billion, or roughly 9 billion by 2009.   And there

11:50:32  3   was significant growth relating to commercial loans.   In the

11:50:37  4   three-year, or the two-year period between 2007 and 2009,

11:50:42  5   commercial loans grew from $5.6 billion to $6.7 billion.   So

11:50:48  6   $1.1 billion in growth in commercial loans during that time

11:50:53  7   period.   The bank was also making a lot of interest income

11:50:59  8   off of the loans that it made during the boom period.   And

11:51:02  9   you can see that reflected in the Form 10-K as well where

11:51:06  10   net interest income rises from $500 million in 2005 to

11:51:11  11   $720 million in 2007 before it starts declining.

11:51:17  12            What else do we know from the evidence?   That at

11:51:21  13   or around the period of the third quarter of 2009, home

11:51:24  14   builders were struggling and home sales were declining, and

11:51:29  15   that's borne out by the bank's over internal statistics.

11:51:34  16            We saw when Margery Stuart testified that there

11:51:37  17   was a document that was circulated throughout the bank

11:51:41  18   showing certain statistics relating to the housing market,

11:51:46  19   and this is just an example, and this is from Government's

11:51:49  20   Exhibit 937-A.   But as you can see in 2008, you have a

11:51:53  21   drastic decline in building permits.   There's just a

11:51:57  22   stalling in the market in terms of building homes.   And the

11:52:01  23   graph is particularly striking.   Look at the high point in

11:52:04  24   2005, 25,000-plus total permits within the area.   That goes

11:52:09  25   down to 8,200 in 2009.   The economy was stalled.   Home

6881

prices also declined.

Now, you can review the exhibit, but the particular enlargement here is showing in the first line the decline in the median sales price in New Castle County by approximately $43,000 from 2008 to 2009.  In Kent County, there was a decline of about 25,000.  And in Sussex and down by the beach area, almost $50,000.  So this is the information that is relevant at or around the third quarter of 2009.  Every relevant housing statistic is going in the wrong direction.  Units sold are down.  Units listed are down.  The sales price is down.  The days on the market is going up because it's much more difficult to sell a home. Active listings are going down, and the supply in months, because we have more houses that can't be sold, that's going up as well.

You also saw an exhibit that was originally sent by Mr. Terranova to Mr. Bailey talking about specifically the impact on the Delaware economy on residential home builders, and that was at Exhibit Number 405.  And if you recall the e-mail from Mr. Bailey back to Mr. Terranova, he indicated that the information they were getting back from appraisals had the "near term potential for catastrophic consequences."

Now, that particular document, particular e-mail, was forwarded by Mr. Bailey to Mr. Harra in the

6882

11:53:53   1   beginning part of April of 2009, where he writes, surprise,

11:53:57   2   surprise.  The values are coming back lower.  It's mark to

11:54:03   3   market where there is no market.  And that e-mail is

11:54:05   4   important because it's an early warning sign to defendant

11:54:08   5   Harra, the president of the bank, and at the time the person

11:54:12   6   in charge of all regional banking activities that the bank

11:54:17   7   would have difficulties properly extending loans because the

11:54:20   8   appraised values are coming back significantly lower.

11:54:28   9          The second item I mentioned was the highly

11:54:32   10   critical 2009 Federal Reserve examination.  This was a

11:54:36   11   seismic shift in the world of Wilmington Trust, and the

11:54:40   12   timing is interesting because it coincides with that last

11:54:44   13   e-mail that we saw from April of 2009.  As Mr. Corkery and

11:54:49   14   Mr. Fomunyam testified, the examination began in April of

11:54:54   15   2009 and concluded in August, and it was based on loan

11:54:59   16   information from March of 2009.

11:55:02   17          The examination did not go well for Wilmington

11:55:06   18   Trust.  The Federal Reserve rated the condition of

11:55:11   19   Wilmington Trust Corporation less than satisfactory, and

11:55:16   20   highlighted certain prominent supervisory concerns,

11:55:20   21   including management's failure to properly identify and

11:55:24   22   control asset quality problems in a timely manner, the

11:55:28   23   failure to identify problem loans, and the use of

11:55:32   24   inappropriate controls and reporting structures.

11:55:35   25          The Fed also rated Wilmington Trust Company,

11:55:39  1    which is the Delaware banking subsidiary, less than

11:55:42  2    satisfactory, and highlighted a significant deterioration in

11:55:48  3    the quality of the bank's loan and security portfolio, weak

11:55:52  4    credit administration, and noted that the current economic

11:55:57  5    environment, the Great Recession, that that brought to the

11:56:00  6    forefront inherently weak credit risk management processes

11:56:06  7    and noted that the bank had a considerably high risk

11:56:09  8    profile.

11:56:09  9         Specifically, the Federal Reserve found that the

11:56:17  10   bank's asset quality was less than satisfactory and provided

11:56:23  11   statistics of what had happened over the last

11:56:25  12   year-and-a-half period, noting that the rate in downgrades

11:56:30  13   within the portfolio over the past 15 months was "alarming,

11:56:36  14   and a key supervisory concern."  And they noted that with

11:56:40  15   respect to certain statistics, there was a good indication

11:56:44  16   that the level of problem loans will increase.  The bank and

11:56:49  17   the defendants were placed on notice that there was a

11:56:52  18   problem relating to certain loans within the portfolio.

11:56:56  19        The Federal Reserve also criticized credit risk

11:57:04  20   management practices at the bank, and in particular, there

11:57:11  21   were four deficiencies that were noted.

11:57:13  22        First, a credit culture that seeks to serve the

11:57:16  23   client first, rather than emphasizing loan quality.

11:57:19  24        And you heard some of that in the testimony of

11:57:23  25   Marty Infanti and Joseph Terranova, talking about how within

6884

11:57:27   1   the Delaware market, the bank was starting to reach for

11:57:32   2   other low tier borrowers in order to grow the loan

11:57:36   3   portfolio.

11:57:36   4          Second, a credit policy that is not commensurate

11:57:39   5   with the complexity of lending activities.

11:57:44   6          Third, a weak underwriting and ineffective

11:57:49   7   credit administration process.

11:57:51   8          That is also supported by testimony of certain

11:57:56   9   witnesses that you heard from, like Marty Infanti, who

11:58:00   10   talked about when he and others in his division were going

11:58:03   11   through and risk rating loans, that they were finding a

11:58:07   12   number of issues with respect to what they were reviewing in

11:58:11   13   terms of missing documents, stale appraisals, and improper

11:58:16   14   loan approvals.

11:58:16   15          If you recall the one e-mail from Mr. Infanti

11:58:19   16   where he said, the horse is not only out of the barn, but

11:58:24   17   running down the road, that was a specific e-mail that is

11:58:28   18   relating to problems with the credit administration process.

11:58:36   19          And finally, an understaffed loan review

11:58:39   20   function that lacks independence.

11:58:40   21          Now, there was testimony that following the

11:58:42   22   examination, that the bank hired more people, and was able

11:58:45   23   to get a better review of loans that they were risk rating

11:58:51   24   on the portfolio, but even those staffing changes weren't

11:58:55   25   enough to keep Mr. Infanti, who ultimately left is the bank.

11:58:59   1          The examination also highlighted problems with

11:59:04   2   working capital lines of credit and the use of interest

11:59:08   3   reserves.  And if you recall, Mr. Fomunyam testified about

11:59:15   4   this first specific finding, which was the tendency at the

11:59:22   5   bank to extend multiple working capital loans or lines of

11:59:25   6   credit and interest reserves.  And if you remember

11:59:27   7   Mr. Fomunyam gave an analogy to you of the use of credit

11:59:30   8   cards, where if you have one credit card and have trouble

11:59:34   9   paying and then get a second credit card to pay down the

11:59:37   10  first and then it snowballs into a third and a fourth, that

11:59:40   11  was the analogy that Mr. Fomunyam provided with the same

11:59:44   12  type of lending that was happening in the commercial

11:59:47   13  context.

11:59:47   14          The Fed also cited that there was falling home

11:59:54   15  prices and an oversupply of housing units, which should not

11:59:58   16  have been a surprise given that the internal information was

12:00:01   17  consistent.

12:00:04   18          The Fed also found that there were mothballed

12:00:08   19  projects that were highly dependent on a rebound in the

12:00:10   20  market.  And Mr. Fomunyam gave an example of the Harrington

12:00:15   21  lending relationship in Western Sussex County, where

12:00:20   22  properties were mothballed.  That is, no one could buy the

12:00:24   23  homes in the particular areas for the prices that they were

12:00:26   24  being sold for, and the only thing that could bring those

12:00:29   25  specific developments back would be if there was a rebound

12:00:32  1  in the housing market that had not happened during that time

12:00:35  2  period.  And all of this is linked to the potential to mask

12:00:45  3  delinquency levels in past due loans.

12:00:48  4      So the Federal Reserve in the summer of 2009 is

12:00:51  5  having -- making specific findings that these types of

12:00:56  6  lending practices, lending working capital lines of credit

12:01:01  7  to homebuilders, using loan proceeds from one loan to pay

12:01:04  8  off another, that they could mask delinquency levels and the

12:01:08  9  specific charged conduct in the indictment.

12:01:11  10      What the Federal Reserve found as part of its

12:01:19  11  examination should not have been a surprise to the

12:01:23  12  defendants.  And if you recall, in January of 2009,

12:01:28  13  Mr. Gibson sent an e-mail to all three of the defendants as

12:01:33  14  well as other bank employees with the subject, KPMG.  And it

12:01:39  15  states that, John just gave me the current status of their

12:01:42  16  review of the interest reserve issue.  He first said that he

12:01:44  17  looked for guidance and found nothing definitive other than

12:01:47  18  some references to be very cautious when capitalizing

12:01:50  19  interest.  Cut to the chase.

12:01:54  20      And then the second part that's enlarged states,

12:01:57  21  "He admitted he starts with the premise that capitalized

12:02:00  22  interest is not good, and any time a second extension is

12:02:02  23  made should be an immediate red flag."

12:02:05  24      So even prior to the Federal Reserve coming on

12:02:09  25  the scene in April of 2009, the bank's own auditor had

12:02:13  1    identified the use of second extensions as an immediate red

12:02:17  2    flag.

12:02:18  3              As a result, the bank was forced to change its

12:02:23  4    policies, and you saw an e-mail in or around April of 2009

12:02:29  5    that notes that the bank was making changes with respect to

12:02:33  6    certain lending practices.  And what's the response from

12:02:38  7    defendant Harra, who is the president of the bank and head

12:02:41  8    of regional banking?  He says, "So what I am referring to

12:02:45  9    here are the issues we debated with the Grand Inquisitors

12:02:48  10   during the Inquisition.  I thought we debated our points

12:02:52  11   with Depman and were going to set them out here.  What am I

12:02:56  12   missing here or did we decide to roll over and no one told

12:03:00  13   me?"

12:03:01  14             And then at the top, the response from Mr.

12:03:03  15   North, where he states that, open-ended, that is not

12:03:06  16   project-related lines to commercial real estate developers,

12:03:10  17   are not something that we're looking to push.

12:03:13  18             So it's an awareness that the defendants, two of

12:03:15  19   the leaders of the bank, are aware of specific problems with

12:03:20  20   the practice and that they had changed their policies

12:03:23  21   accordingly.

12:03:24  22             The Federal Reserve also made findings relating

12:03:28  23   to the ten percent rule.  And you've heard a lot of

12:03:32  24   testimony about the ten percent rule, which was a rule that

12:03:37  25   only applied to borrowers who had $5 million or more worth

6888

12:03:42   1    of loans at the bank.  It did not apply to everyone, only to

12:03:46   2    a unique category of borrowers.

12:03:49   3          And it was also used, as you heard through the

12:03:53   4    testimony, to support the riskiest types of loans within

12:03:56   5    the bank's portfolio, commercial real estate construction

12:03:59   6    loans.

12:04:01   7          And so what the Federal Reserve found was that

12:04:05   8    the use of the ten percent rule "created undue repayment

12:04:09   9    risk for the bank."  And there's an indication that

12:04:14   10   management indicated that the issue was addressed during the

12:04:18   11   examination.  We heard from Mr. Fomunyam, it was not.  When

12:04:22   12   the Federal Reserve came back in 2010, the ten percent rule

12:04:26   13   still existed, and it only ended when the Federal Reserve

12:04:30   14   required the bank to eliminate it.

12:04:32   15         Now, just like with issues relating to working

12:04:40   16   capital lines of credit, the identification of ten percent

12:04:45   17   rule loans as a problem should not have been a surprise to

12:04:48   18   the defendants.  In fact, other bank employees were talking

12:04:52   19   about abuses or potential abuses of the ten percent rule

12:04:56   20   many months earlier.

12:04:59   21         And so during trial, when Stephen Cummings

12:05:03   22   testified, he was shown an e-mail from September 2008, which

12:05:07   23   he sent to, among other people, Mr. North and Mr. Brewer,

12:05:12   24   where Mr. Cummings is specifically referencing an internal

12:05:17   25   report prepared by the bank that captures the list of all

12:05:21  1   the ten percent rule loans.

12:05:24  2          If you recall, Mr. Terranova testified that,

12:05:28  3   yes, he was making a number of ten percent rule loans.  Yes,

12:05:31  4   what he did was illegal, but that certainly, there was the

12:05:35  5   ability for other people within the bank to know about the

12:05:38  6   ten percent rule loans that were made.  And what this e-mail

12:05:43  7   demonstrates is, that's exactly right, because here, in

12:05:46  8   September of 2008, Mr. Cummings is writing about the ten

12:05:50  9   percent rule list, and he's noting specifically that there

12:05:55  10  were ten percent rule loans that were made very close to the

12:05:59  11  loan committee process.

12:06:00  12         If you remember, that's one of the reasons why

12:06:02  13  Mr. Terranova pled guilty, because he broke the law by using

12:06:06  14  the ten percent rule after he had represented different

12:06:11  15  things to the loan committee at the time that the loan was

12:06:14  16  approved.

12:06:15  17         So here, Mr. Cummings is looking into the issue

12:06:18  18  and sending an e-mail to Mr. North in September of 2008,

12:06:22  19  one year before the Federal Reserve examination report comes

12:06:26  20  out, and he notes that it is also uncertain whether the

12:06:30  21  rapid use of the approval methodology represent any

12:06:33  22  inappropriate activity, although a closer look at the

12:06:38  23  approvals done 24 hours after committee may warrant closer

12:06:41  24  inspection to ensure that they do not.

12:06:44  25         Now, as we make our way through all the various

| | |
|---|---|
| 12:06:50 | 1 |
| 12:06:53 | 2 |
| 12:06:59 | 3 |
| 12:07:04 | 4 |
| 12:07:08 | 5 |
| 12:07:09 | 6 |
| 12:07:11 | 7 |
| 12:07:14 | 8 |
| 12:07:19 | 9 |
| 12:07:22 | 10 |
| 12:07:28 | 11 |
| 12:07:31 | 12 |
| 12:07:34 | 13 |
| 12:07:38 | 14 |
| 12:07:40 | 15 |
| 12:07:44 | 16 |
| 12:07:47 | 17 |
| 12:07:50 | 18 |
| 12:07:55 | 19 |
| 12:08:05 | 20 |
| 12:08:08 | 21 |
| 12:08:14 | 22 |
| 12:08:18 | 23 |
| 12:08:24 | 24 |
| 12:08:29 | 25 |

arguments of counsel in closing arguments, you might hear a lot of blame placed on what happened at the bank on Mr. Terranova and Mr. Bailey, and certainly, Mr. Terranova deserves some of that blame, and he pled guilty and he told you all about it.

But keep in mind, ladies and gentlemen, when you hear that argument, that bank personnel had all the information about what Mr. Terranova was doing back in 2008 and 2009, and there were no complaints about Mr. Terranova in 2005 and 2006, when he was the golden boy at Wilmington Trust and had nearly $500 million worth of loans.

And so you can see when the ten percent approval list comes out, all of the various, and it's not just Bailey and Terranova, but there are other lenders that are using the ten percent rule as well. But important here is, this is information that is open and available as to what they are doing, the types of loans that they're making, and this is September of 2008, and Mr. Terranova isn't fired until May of '10, or asked to resign in May of '10.

I mentioned the horse is out of the barn e-mail earlier. It comes from this e-mail that is displayed, which is referencing a lending relationship known as Cabbage Corner. And Mr. Infanti testified about the relationship and went through the e-mail. But important here is Ms. Thuresson, who is Mr. Infante's boss, is writing about

| | |
|---|---|
| 12:08:32 | 1 |
| 12:08:36 | 2 |
| 12:08:39 | 3 |
| 12:08:44 | 4 |
| 12:08:47 | 5 |
| 12:08:51 | 6 |
| 12:08:54 | 7 |
| 12:09:00 | 8 |
| 12:09:03 | 9 |
| 12:09:05 | 10 |
| 12:09:10 | 11 |
| 12:09:17 | 12 |
| 12:09:23 | 13 |
| 12:09:27 | 14 |
| 12:09:32 | 15 |
| 12:09:35 | 16 |
| 12:09:39 | 17 |
| 12:09:45 | 18 |
| 12:09:49 | 19 |
| 12:09:52 | 20 |
| 12:09:55 | 21 |
| 12:09:56 | 22 |
| 12:10:01 | 23 |
| 12:10:04 | 24 |
| 12:10:08 | 25 |

Cabbage Corner in May of 2009 and talking about some very specific problems in the way that the loans were made with respect to this lending relationship.  And she notes, between this issue and the myriad ten percent rule issues being seen by my team, I'm beginning to have difficulty quashing concerns about the integrity of the lending process.  Again, this is all information that's available even before the Federal Reserve issues its findings relating to the ten percent rule.

The Fed also made findings relating to noncompliance with bank policies, practices, and procedures. And if you recall, Mr. Fomunyam talked about this finding as well during his testimony.  And if you look at the numbers, it's pretty amazing.  The Federal Reserve notes that in the first half of 2009, just the first six months of 2009, there were more than double the policy and practice violations than the entirety of 2008 combined, more than double just in the first six months.  And in that context, it makes sense given what was happening within the economy and the fact that a lot of loans were starting to come due within the portfolio.

And specifically, with respect to policies, if you recall, you heard from witnesses that bank policies are the roadmap for lending.  That's how Mr. Fomunyam described them.

| | |
|---|---|
| 12:10:09 | 1 |

Mr. Cummings, Steve Cummings, who was
essentially the keeper of the bank policies at Wilmington
Trust, testified the policies were supposed to be as strict
as federal lending regulations, and he said that bank
policies were important, because that is the expectation of
the regulators.  And so here, when the Fed comes in during
the 2009 examination, they are finding significant issues
relating to the bank's compliance with its own policies.

These issues are linked to past due loans and to
the question that you have before you, which is whether the
defendants caused the bank to lie about its amount of 90-day
past due loans.  And so the Federal Reserve writes that
while the bank's delinquency ratios are below peer group
averages, it was observed during the examination that an
inordinate number of loans have interest reserves and/or
working capital lines of credit that may be masking the
severity of the problem loans in the portfolio.

Mr. Fomunyam testified that all of these issues
that were identified in the asset quality portion of the
report, that he specifically addressed them during loan
discussions with the lenders and Mr. North.

You heard Mr. Corkery testify that all of the
examination findings were shared in an exit meeting with
Mr. Gibson, Mr. Harra, and other members of bank leadership,
and then they were enshrined in an examination report that

12:11:54  1    came out on September 4th of 2009.

12:11:58  2            We will also see it later, but if you recall,

12:12:05  3    near one of the last days of trial, we introduced a letter

12:12:11  4    from the Federal Reserve that was found in Ms. Rakowski's

12:12:14  5    desk files that highlighted many of the same issues that the

12:12:17  6    Federal Reserve found in connection with the 2009

12:12:20  7    examination, and that will be in the slide a little bit

12:12:23  8    later in the presentation.

12:12:24  9            So what happens as a result of the Federal

12:12:30  10   Reserve's 2009 full scope examination?  The Federal Reserve

12:12:35  11   mandates that the bank enters into a memorandum of

12:12:38  12   understanding, which is an informal enforcement action that

12:12:42  13   had a number of provisions.

12:12:47  14           Important for our purposes, one of those

12:12:49  15   provisions was the following, paragraph 15-C.  Within

12:12:54  16   20 days of the end of each month, Wilmington Trust and the

12:12:58  17   bank will provide to the reserve bank and the OSBC:

12:13:02  18           Month-end past due and nonaccrual loan reports.

12:13:09  19           So as you keep the timing of the certain

12:13:12  20   sequence of events in mind, that is important, and this is

12:13:17  21   October 21st of 2009, and for the very first time, the bank

12:13:20  22   is going to have to provide past due information on a

12:13:23  23   monthly, not a quarterly basis, and more importantly, it has

12:13:28  24   to go to the Federal Reserve, and it has to be truthful and

12:13:32  25   accurate.

12:13:37   1         That brings us to the waiver practice.  And the

12:13:40   2    way that you can think about the waiver practice based on

12:13:44   3    the context of the evidence that has come in throughout the

12:13:47   4    case is the waiver practice starts out as a little white

12:13:53   5    lie.  The waiver practice was always wrongful, and you'll

12:13:56   6    see certain slides about it.  And it was wrongful because it

12:13:59   7    didn't comport with the applicable regulations in terms of

12:14:05   8    reporting past due loans.

12:14:08   9         But early on, the numbers were much smaller, the

12:14:12  10    impact was much lower, and over time, the waiver practice

12:14:14  11    snowballs, and it turns from this little white lie into what

12:14:18  12    is later described by defendant North in an e-mail as the

12:14:23  13    matured loans beast.  Now, when I say the waiver practice

12:14:30  14    was always a problem, don't take my word for it.  That was

12:14:35  15    the defendants' understanding of it.

12:14:37  16         This is Government's 418, which you will see

12:14:40  17    quite a bit today, and you will see that three different

12:14:45  18    bank employees in January of 2010 referred to the waiver

12:14:50  19    practice as, first, a decades old issue.  That was Mr.

12:14:55  20    North.  Second, a decades old problem.  That is Mr. Conway.

12:15:01  21    And, third, a longstanding problem.  That is Ms. Thuresson.

12:15:06  22    Decades old, longstanding.  And these are bank employees who

12:15:12  23    are talking about the waiver practice at a time when they

12:15:15  24    probably don't think that someone is going to be looking at

12:15:17  25    their e-mails seven or eight years later.  That is how they

12:15:20   1   described the waiver practice.

12:15:22   2            We also heard testimony and saw an e-mail

12:15:28   3   relating to, what was the original basis for the waiver

12:15:31   4   practice?  And it's Government's Exhibit 417, and it's an

12:15:35   5   e-mail from Wayne Irwin to, among other people, Bill North.

12:15:42   6   And Wayne Irwin describes it to Mr. North as the original

12:15:45   7   concept of waiving loans is no longer an issue.  The

12:15:48   8   original process of waiving loans started due to the

12:15:50   9   nonpayment between Wilmington Trust and Wilmington Trust of

12:15:54   10   Pennsylvania and Wilmington Trust FSB participation banks,

12:16:03   11   participation loans.

12:16:04   12            And then Mr. Irwin notes, now we have the task

12:16:07   13   of taking away the crutch of waiving loans for the matured

12:16:11   14   loans.

12:16:12   15            Mr. Conway responds and indicates that this is

12:16:14   16   something that he's going to bring up at the Mid-Atlantic

12:16:17   17   market meeting the following week.  And we will see some

12:16:21   18   agenda items from Mid-Atlantic market meetings later, but

12:16:24   19   this was a meeting that Mr. Conway testified was always

12:16:27   20   chaired by Mr. Harra, because he was the head of regional

12:16:31   21   banking at Wilmington Trust.

12:16:32   22            Now, I said before that you can infer that when

12:16:37   23   the waiver practice began, it was like the little white lie

12:16:40   24   at the bank.  Evidence introduced by the defendants proves

12:16:44   25   that point.  And so the defendants introduced a version of

6896

12:16:51  1    the past due report from September of 1999, and it was for

12:16:58  2    the purpose of showing that the waiver practice had existed

12:17:01  3    for a long period, at least ten years before the charged

12:17:04  4    conduct.

12:17:05  5            But if you recall, we were able to sort that

12:17:09  6    information and demonstrate that in September 1999,

12:17:14  7    ten years before the conduct alleged in the indictment,

12:17:17  8    there was only one 90-day past due loan waived as current

12:17:21  9    for interest, extension in process, totaling $1.08 million.

12:17:28  10   You will see that that number.  The number of loans and the

12:17:32  11   amount gets much, much higher as time goes on.

12:17:38  12           Defendants also introduced a former past due

12:17:41  13   early warning report from June of 2006, so now we're about

12:17:47  14   seven years later.  Let's see what happened with respect to

12:17:51  15   the 90-day past due loans that were waived.  There were nine

12:17:53  16   of them.  That's it.  Nine loans that were past due for

12:17:57  17   90 days or more and waived as current for interest in the

12:18:02  18   process of extension, only $2.7 million.

12:18:11  19           But in terms of the waiver practice being a

12:18:13  20   problem even though the numbers weren't as high as they

12:18:17  21   eventually rose to at the end of 2009 and into 2010,

12:18:24  22   defendant North realized that the waiver practice was a

12:18:27  23   problem.  And you saw a number of e-mails that defendant

12:18:31  24   North would write at quarter end when the delinquency report

12:18:35  25   was being passed out to other people within the lending

12:18:39    1    function.

12:18:39    2              So the first example, an e-mail from Mr. North,

12:18:45    3    March of 2007, where he notes, the number of waived matured

12:18:48    4    loans has been too high over the last four quarters, going

12:18:51    5    back to March of 2006.

12:18:53    6              He notes further, in order to avoid that

12:18:56    7    becoming an issue with examiners, audit or executive

12:19:00    8    management, I like to think that we can help ourselves by

12:19:03    9    getting this under control.

12:19:07   10              Another example.  November of 2008, a few months

12:19:11   11    later, or actually, a year and a few months later, Mr. North

12:19:16   12    attaches a version of the past due report and he notes that

12:19:20   13    while this is an off quarter end month, the concern is that

12:19:23   14    such a level of matured facilities could be viewed as a

12:19:27   15    serious administrative weakness.  At many banks, you can't

12:19:33   16    advance under a matured facility.  If we move in that

12:19:35   17    direction, we'd have major issues based on how we've been

12:19:39   18    handling these historically.

12:19:40   19              And if you recall, you heard from Barbara Marley

12:19:44   20    and Terry Brewer, that eventually that practice of advancing

12:19:47   21    on a matured facility ended, but it wasn't until almost a

12:19:52   22    year later.  Mr. North was identifying this as a problem in

12:19:56   23    November of 2008.

12:19:59   24              The next example, from June of 2008, which is a

12:20:03   25    few months earlier.  Mr. North noting with respect to the

12:20:07  1    hundred plus or minus in matured interest current loans that

12:20:12  2    need to be addressed.  And he writes on the latter, if we've

12:20:16  3    completed our approval process on these.  But the

12:20:19  4    documentation has not gotten processed.  I'm okay with

12:20:23  5    waiving.  All other "I'm working on it" situations are not

12:20:27  6    ones that we should be waiving.

12:20:29  7            And he also ties his knowledge of the impact of

12:20:34  8    the waiver practice in the next paragraph.

12:20:38  9            Mr. North writes that getting this done is,

12:20:41  10   "extremely important as we report out our second quarter

12:20:46  11   numbers."  So when you are asked to consider the defendants'

12:20:48  12   knowledge that conduct was wrongful and unlawful, well,

12:20:53  13   here, there's a recognition from Mr. North where the

12:20:55  14   numbers are going.  They are going to be reported out

12:20:58  15   publicly, and he is aware of the impact of not reporting

12:21:01  16   the waived loans.

12:21:02  17           What was the standard in 2009?  Defendant

12:21:12  18   North's standard, and this came from the testimony of

12:21:15  19   Mr. Cummings in an e-mail that we'll see in a moment, was

12:21:18  20   only to waive bank errors or loans that were extended, but

12:21:21  21   not processed on the Shaw system in time.  Defendant North

12:21:28  22   disregarded his own standard, as the evidence has shown.

12:21:31  23           This is the initial e-mail, Government's

12:21:34  24   Exhibit 445, that Steve Cummings sent to Bill North in

12:21:39  25   January of 2009, that starts, Bill, for you to edit or

12:21:44   1   forward.   And the highlighted portion is what Mr. North

12:21:48   2   included in the e-mail.   And Mr. North notes in his edits

12:21:53   3   that, I had thought that for the last few quarters, that we

12:21:57   4   were trying to only waive bank errors or loans that made it

12:22:01   5   through the approval process.

12:22:03   6          He also notes at the very end, and this is the

12:22:05   7   section added by Mr. North, that in reference to a true past

12:22:12   8   due number, "Without a lot of adjustments, that could raise

12:22:16   9   issues for us at some point in the future."

12:22:18   10         And so again, as you're asked to determine

12:22:22   11   defendant North's knowledge, his mental state, his

12:22:27   12   willfulness in committing the conduct, there's an awareness

12:22:30   13   here of, the goal is to report a true past due number.   That

12:22:33   14   is, not to report or not to waive matured loans.

12:22:37   15         And ultimately, this is the e-mail that goes out

12:22:40   16   to members of the lending staff, the relationship managers,

12:22:45   17   who are -- who have responsibilities over the portfolio.

12:22:55   18         The evidence has shown that there's a reason why

12:23:01   19   this didn't happen, because in a bad economy, when no

12:23:08   20   developments are being built, it is really hard to extend a

12:23:11   21   commercial real estate loan.   That is because, as you heard

12:23:16   22   at trial, extending a matured loans requires the same level

12:23:21   23   of underwriting, if not more, than making the loan in the

12:23:25   24   first place, because something has happened along the way.

12:23:29   25   The expectation is the project will be complete in three

| | |
|---|---|
| 12:23:32 | 1 |
| 12:23:35 | 2 |
| 12:23:39 | 3 |
| 12:23:43 | 4 |
| 12:23:47 | 5 |
| 12:23:48 | 6 |
| 12:23:50 | 7 |
| 12:23:55 | 8 |
| 12:23:57 | 9 |
| 12:24:00 | 10 |
| 12:24:04 | 11 |
| 12:24:08 | 12 |
| 12:24:13 | 13 |
| 12:24:18 | 14 |
| 12:24:20 | 15 |
| 12:24:27 | 16 |
| 12:24:30 | 17 |
| 12:24:32 | 18 |
| 12:24:36 | 19 |
| 12:24:41 | 20 |
| 12:24:51 | 21 |
| 12:24:58 | 22 |
| 12:25:01 | 23 |
| 12:25:07 | 24 |
| 12:25:14 | 25 |

years.   That's the testimony that you heard.   But something
has happened along the way that that did not occur.

          And so Marty Infanti testified that loan
underwriting should be more robust when extending loans in a
bad economy.

          Rich Conway testified that the bank applied the
same considerations at the time of extension that they did
at loan origination.

          Terry Brewer explained that the maturity date is
the bank's chance to re-evaluate a matured loan and to
re-underwrite it, and that you want to understand why that
particular loan has not performed as contemplated at the
time of the original underwriting.

          And Mr. Fomunyam explained to you why it's so
important to underwrite matured loans in a bad economy, and
he noted that in the 2010 examination, he specifically
brought up the fact that he was seeing a lot of short-term
extensions as a problem, because it has the ability to
otherwise mask delinquent loans within the portfolio.

          So where are we by the summer of 2009?   Waived
loans are becoming overwhelming.   There's an e-mail from
Rich Conway to defendant North in June of 2009 where he
attaches a list that shows that there are 507 loans totaling
$708 million that have either matured or are going to mature
by quarter end.   And he notes that the reality today is the

12:25:20  1   number is overwhelming, and that's reflected in the next

12:25:26  2   chart.

12:25:28  3        If you recall, Mr. Hart testified about his

12:25:32  4   analysis of the waived loans going through the Shaw system

12:25:35  5   and the delinquency report, and the relevant waived loan

12:25:39  6   categories are reflected in yellow on the chart.  And look

12:25:43  7   at the steady growth of matured loans from, that were waived

12:25:48  8   from the first quarter of 2009 to the second quarter of 2009

12:25:54  9   and to the apex of the waiver practice, which is where the

12:25:58  10  charged conduct begins, in the third and fourth quarters of

12:26:01  11  2009.  And what the chart shows is that by 2009, loans that

12:26:08  12  were made during the boom time, they had now become past

12:26:12  13  due.  They weren't being extended.  They were just being

12:26:15  14  waived.  And so the little white lie that's referenced back

12:26:20  15  in September of 2009, now ten years later, that right there

12:26:24  16  is a matured loans beast.

12:26:27  17        And at the time of the charges, when the charged

12:26:31  18  conduct begins, we're not talking about $1.1 million in

12:26:35  19  waived loans.  We're not talking about $2.7 million in

12:26:39  20  waived loans.  We're not even talking about $41 million in

12:26:43  21  waived loans.  At the time that the charged conduct begins,

12:26:46  22  the number is almost $300 million.  It's a massive, massive

12:26:53  23  increase in matured loans that otherwise could not be

12:26:57  24  properly extended.

12:26:58  25        What else did we find out about the waiver

| | |
|---|---|
| 12:27:04 | 1 |
| 12:27:06 | 2 |
| 12:27:10 | 3 |
| 12:27:14 | 4 |
| 12:27:21 | 5 |
| 12:27:25 | 6 |
| 12:27:27 | 7 |
| 12:27:33 | 8 |
| 12:27:35 | 9 |
| 12:27:40 | 10 |
| 12:27:45 | 11 |
| 12:27:47 | 12 |
| 12:27:50 | 13 |
| 12:27:53 | 14 |
| 12:27:56 | 15 |
| 12:27:59 | 16 |
| 12:28:04 | 17 |
| 12:28:04 | 18 |
| 12:28:09 | 19 |
| 12:28:13 | 20 |
| 12:28:21 | 21 |
| 12:28:27 | 22 |
| 12:28:28 | 23 |
| 12:28:30 | 24 |
| 12:28:32 | 25 |

practice over the course of the trial?  The waiver practice applied to commercial borrowers, the riskiest type of borrowers within the portfolio.  Only commercial borrowers were eligible for waived loans with commercial real estate lending being the riskiest type of lending.

The defendants and the bank did not waive or fail to report past due retail loans.  If you recall from Dr. Simmons' testimony last week, that comprised about $2.2 billion in loans within the portfolio, and Dr. Simmons testified that with respect to delinquency report, there was no evidence that home mortgages were being waived.  There was no evidence that credit card, credit card payments were being waived.  There was no evidence that auto loans were being waived.  The waiver practice applied to commercial real estate loans and other types of commercial loans that were among the riskiest types of loans within the bank's portfolio.

We also saw evidence that the bank knew how to follow the standard in terms of extending loans the right way.  And if you remember, the demonstrative that's being shown on the screen right now came in through Larry Hart's testimony.

And what Mr. Hart testified was based on an analysis of the delinquency reports, the past due reports and the Shaw system, in 2008, almost nine out of every ten

12:28:38    1   times the bank was able to extend loans before they ever

12:28:42    2   became past due.  So nine out of ten times before a loan

12:28:46    3   ever hits its maturity date, the loan was extended.

12:28:50    4          Even as we get into 2009, a little bit more than

12:28:56    5   eight out of ten times, the bank was extending loans before

12:29:00    6   they reach their maturity date.

12:29:01    7          And what that shows is that the bank and its

12:29:06    8   employees knew how to extend loans the right way, but that

12:29:10    9   with respect to the loans that weren't extended, they either

12:29:14   10   could not or they chose not to do so.  Those were the loans

12:29:20   11   that weren't extended.  And they feed right into the chart

12:29:23   12   that you saw in terms of the massive growth of matured loans

12:29:27   13   that were waived.  Now, what was the justification that you

12:29:33   14   heard for the waiver practice?  It's that loans were current

12:29:37   15   for interest and "in the process of extension."

12:29:44   16          Let's talk about current for interest first.

12:29:47   17   You saw the Federal Reserve findings relating to working

12:29:51   18   capital lines of credit and the fact that those types of

12:29:54   19   lending practices could mask problem loans and delinquency

12:29:59   20   levels.

12:29:59   21          You saw the findings that the ten percent rule

12:30:02   22   could create undue repayment risk for the bank.

12:30:04   23          You saw that KPMG, the e-mail relating to KPMG,

12:30:09   24   the red flag and the subsequent e-mail about the Grand

12:30:13   25   Inquisitors.

12:30:13   1       You also heard evidence throughout the course of

12:30:16   2   the trial of supplemental financing that was keeping loans

12:30:20   3   current for interest.

12:30:24   4       And if you recall, this is Government's

12:30:28   5   Exhibit 1031-C, and it's a chart that came into evidence

12:30:32   6   that Mr. Hart prepared that just related to the third and

12:30:37   7   fourth quarters of 2009, situations where the bank

12:30:45   8   internally was making self-pays or cross-pays across

12:30:48   9   particular loans.

12:30:48  10       And what did Mr. Hart find?  That there were 51

12:30:53  11   total loans totaling 1.3 -- $103.5 million just during that

12:31:01  12   two-month time period.  Now, as Mr. Hart testified, that's

12:31:06  13   only based on his review of payment histories and batch

12:31:09  14   sheets and certain loan documents.  What doesn't it include?

12:31:13  15       It doesn't include other situations, anecdotal

12:31:18  16   situations like Mr. Fomunyam testified about, situations

12:31:20  17   where a working capital line of credit might have been made

12:31:24  18   to a real estate home builder and then that home builder was

12:31:27  19   sending in a check to make the payment.  But just this alone

12:31:31  20   in the last two quarters of 2009, 51 loans totaling $103.5

12:31:31  21   million.

12:31:41  22       The defendants put on their own summary witness,

12:31:42  23   Mr. Pelillo, who told you he only looked at one month of

12:31:46  24   batch sheets during the relevant time period, September of

12:31:49  25   2009, and that he was not told to look at payment histories

12:31:53  1    at all.  But even with Mr. Pelillo's analysis, he identified

12:32:03  2    approximately $55 million in loans that were supported by

12:32:04  3    supplemental financing.

12:32:10  4              In terms of process of extension, the evidence

12:32:12  5    has shown that there is zero due diligence in terms of

12:32:15  6    finding out whether or not loans were actually in the

12:32:19  7    process of extension.

12:32:21  8              Mr. Cummings testified that waivers were

12:32:24  9    automatic as long as loans were current for interest.

12:32:28  10             Mr. Conway testified about the walk-around, that

12:32:31  11   you heard a lot about the walk-around during the opening

12:32:36  12   statements of defense lawyers.  Your recollection controls,

12:32:38  13   but Mr. Conway testified that the walk-around only related

12:32:42  14   to payments and billing errors, and he also told you that

12:32:45  15   it only takes one month to six weeks to actually extend a

12:32:49  16   loan.

12:32:50  17             You also heard, I think if you recall back to

12:32:53  18   opening statements, a lot of promises about how long it took

12:32:56  19   to get an appraisal at Wilmington Trust.  Well, during

12:33:00  20   trial, Margery Stuart, who was in charge of the appraisal

12:33:06  21   group, testified it only took three to eight weeks even

12:33:09  22   during the bad point in the economy with the mean period of

12:33:11  23   about four to five weeks, not six months, not eight months,

12:33:14  24   not a year.

12:33:19  25             And, more importantly, the lack of due diligence

| 12:33:22 | 1 | is apparent when you review the delinquency reports.  And if |
| 12:33:26 | 2 | you recall, when Tosha Towe or Tosha Styles now testified |
| 12:33:31 | 3 | and there was all the sorting and the filtering and the use |
| 12:33:34 | 4 | of the spreadsheets, one of the things that happened during |
| 12:33:37 | 5 | her testimony was to show you how many days past due certain |
| 12:33:42 | 6 | loans were, where she went to the one column and clicked on |
| 12:33:46 | 7 | it, it went from Z to A, so it showed loans with the most |
| 12:33:54 | 8 | past due to the least. |
| 12:33:55 | 9 | And so it's a little difficult to see on the |
| 12:33:57 | 10 | screen, but this very first loan, 791 past due in the third |
| 12:34:01 | 11 | quarter of 2009.  The second one, 655.  The fourth one, |
| 12:34:05 | 12 | 456 days past due.  Every loan on the screen is more than |
| 12:34:11 | 13 | nine months past due, and it gets even worse in the fourth |
| 12:34:15 | 14 | quarter of 2009, where we have 67 loans that were waived |
| 12:34:22 | 15 | were more than nine months past due, 270 days or more past |
| 12:34:29 | 16 | due. |
| 12:34:36 | 17 | You heard from several bank employees who raised |
| 12:34:38 | 18 | concerns about the bank's use of waived loans to some of the |
| 12:34:42 | 19 | defendants.  Marty Infanti testified that he told Bill North |
| 12:34:48 | 20 | that the waiver practice was not an appropriate way to |
| 12:34:50 | 21 | handle past due loans, and that it could have the impact of |
| 12:34:54 | 22 | the bank overstating earnings.  Again, a recognition of |
| 12:34:58 | 23 | where the numbers are going to be reported and how they |
| 12:35:02 | 24 | would be relied upon. |
| 12:35:03 | 25 | Mr. Brewer testified that there were a number of |

12:35:06  1  issues relating to matured loans in terms of making

12:35:10  2  advancements on matured loans and seeing other issues

12:35:14  3  relating to the practice that we'll talk about in a few

12:35:16  4  minutes.

12:35:17  5           Tosha Styles raised issues with respect to

12:35:24  6  matured loans with Mr. Gibson and Mr. North, and you'll see

12:35:28  7  an e-mail in a moment of what her reaction was when the

12:35:31  8  waiver practice finally ended.

12:35:33  9           And Karen Thuresson, Marty Infante's boss, she's

12:35:38  10  sent an e-mail in September of 2009.  One of the recipients

12:35:43  11  is defendant North, and she notes, the level of loans which

12:35:46  12  have been matured 90 plus days needs to be better managed.

12:35:51  13  A maturity billing is a principal billing, and to the extent

12:35:54  14  the maturity is not addressed, principal is delinquent.

12:35:58  15  That delinquency grows until the loan is repaid or otherwise

12:36:01  16  extended.  And she notes, we really need to get ahead of the

12:36:06  17  maturity on these loans.

12:36:07  18           So if there's an argument that defendant North

12:36:12  19  didn't know what the standard was in terms of matured loans

12:36:16  20  equaling a past due loan, he receives an e-mail from Ms.

12:36:19  21  Thuresson right there in September of 2009, and that has a

12:36:22  22  bearing on his knowledge, his intent, and his willfulness to

12:36:26  23  commit the charged offenses.

12:36:29  24           I mentioned the e-mail from Tosha Styles that

12:36:34  25  came into evidence, where she learns in July of 2010 that

| | |
|---|---|
| 12:36:38 | 1 |
| 12:36:43 | 2 |
| 12:36:48 | 3 |
| 12:36:54 | 4 |
| 12:36:58 | 5 |
| 12:37:01 | 6 |
| 12:37:04 | 7 |
| 12:37:09 | 8 |
| 12:37:11 | 9 |
| 12:37:14 | 10 |
| 12:37:17 | 11 |
| 12:37:22 | 12 |
| 12:37:25 | 13 |
| 12:37:43 | 14 |
| 12:37:45 | 15 |
| 12:37:49 | 16 |
| 12:37:57 | 17 |
| 12:38:02 | 18 |
| 12:38:04 | 19 |
| 12:38:07 | 20 |
| 12:38:11 | 21 |
| 12:38:12 | 22 |
| 12:38:18 | 23 |
| 12:38:24 | 24 |
| 12:38:27 | 25 |

the waiver practice is no more.  The reaction is, I did it.
I did it.  I only took ten years, but I did it, yay, with a
bunch of exclamations.  And remember she raised concerns
about the waiver practice directly with Mr. North and
Mr. Gibson, relating to the fact that loan maturities were
staying on the list for such a long time period and that she
told him she thought that there should have been a renewal
period in a much more shorter time period.

But what happened?  Well, the waived loans are
approved anyway.  Steve Cummings testify that Bill North
would also approve the waiver of the loans either orally or
via e-mail, and here is an example of one of the e-mails
that came into evidence from March of 2010.

One of the issues that you are asked to decide
is whether the public reports excluding waived loans were
false, and the jury instructions note that an entry is false
if untrue when made.  An entry may be false if it records a
transaction which did not occur or fails to record a
transaction which did occur and should have been accurately
reported or inaccurately reports a record or records a
transaction.

The evidence has shown that waived loans, the
waived matured loans equals false reporting.  Several points
here.  The first is the Court's instructions regarding the
reporting standards, they control.

| | |
|---|---|
| 12:38:31 | 1 |
| 12:38:36 | 2 |
| 12:38:39 | 3 |
| 12:38:42 | 4 |
| 12:38:47 | 5 |
| 12:38:50 | 6 |
| 12:38:54 | 7 |
| 12:39:00 | 8 |
| 12:39:05 | 9 |
| 12:39:09 | 10 |
| 12:39:14 | 11 |
| 12:39:17 | 12 |
| 12:39:19 | 13 |
| 12:39:24 | 14 |
| 12:39:26 | 15 |
| 12:39:32 | 16 |
| 12:39:35 | 17 |
| 12:39:38 | 18 |
| 12:39:41 | 19 |
| 12:39:49 | 20 |
| 12:39:53 | 21 |
| 12:39:55 | 22 |
| 12:40:00 | 23 |
| 12:40:03 | 24 |
| 12:40:06 | 25 |

Second, matured equals late for principal equals past due, and we'll talk about loan contracts, the bank's accounting system, the bank's policies, and the course of conduct of the defendants and other bank employees in recognizing that a matured loan was a past due loan.

And, third, common sense.

Let's start with the instructions.  His Honor referenced the past due status of matured loans under the call report instructions for schedule RC-N.  This is Government's Exhibit 86-A, which was introduced into evidence.

And the circumstance four of the call report instruction states, the past due status of a loan or other asset should be determined in accordance with its contractual repayment terms.  For purposes of the schedule, grace periods allowed by the bank after a loan or other asset technically has become past due but before the imposition of late charges are not to be taken into account in determining past due status.  Remember we just saw a slide that showed 67 loans that were more than 270 days past due.  That's a pretty long grace period.

Third, furthermore, loans, leases, debt securities and other assets are to be reported as past due when either interest or principal is unpaid in the following circumstances.  And, ladies and gentlemen, you should look

| | |
|---|---|
| 12:40:09 | 1 |
| 12:40:12 | 2 |
| 12:40:15 | 3 |
| 12:40:19 | 4 |
| 12:40:23 | 5 |
| 12:40:26 | 6 |
| 12:40:28 | 7 |
| 12:40:33 | 8 |
| 12:40:37 | 9 |
| 12:40:39 | 10 |
| 12:40:43 | 11 |
| 12:40:50 | 12 |
| 12:40:53 | 13 |
| 12:40:57 | 14 |
| 12:41:01 | 15 |
| 12:41:05 | 16 |
| 12:41:08 | 17 |
| 12:41:08 | 18 |
| 12:41:11 | 19 |
| 12:41:14 | 20 |
| 12:41:18 | 21 |
| 12:41:23 | 22 |
| 12:41:27 | 23 |
| 12:41:35 | 24 |
| 12:41:41 | 25 |

at the actual instructions and see that the word "or" is underlined in the instruction.  It's underlined there and it's underlined in the next definition, and so compare that underlined language and see if anything else is underlined or emphasized in the rest of the instruction.  It's showing the emphasis that's being placed on the reporting.

Now, circumstance four states, single payment notes, debt securities, and other assets providing for the payment of interest at maturity are to be reported as past due after maturity if interest or principal remains unpaid for 30 days or more.  And, once again, the word "or" is underlined in the instruction.

Now, you'll have a chance to review Judge Andrews' instructions relating to past due on the call report.  Those instructions control your deliberations, but I've placed them on the screen, and they are on page 32.

And in the instruction it notes, the fourth circumstance outlined under the definition covers the past due status of loans that are past due because they have matured.  That is the loans are overdue for principal repayment under the terms of a contractual loan agreement.

There is also a standard in the Court's instruction that relates to past due for securities filings. And way back when Donald Walker testified on, like, the

12:41:45  1    second or third day of trial, this exhibit was introduced,

12:41:48  2    which is Government's Exhibit 12, SEC Industry Guide 3.  And

12:41:55  3    the industry guide notes, as of the end of each reported

12:42:00  4    period states separately, the aggregate of loans in each of

12:42:03  5    the following categories.  And with respect to B, it says to

12:42:09  6    state specifically "accruing loans which are contract

12:42:13  7    contractually past due 90 days or more as to principal or

12:42:18  8    interest payments."

12:42:21  9          That definition is tracked in the instructions

12:42:23  10   that His Honor read you before closing arguments, and it

12:42:28  11   states, the past due section states that bank holding

12:42:31  12   companies must, as of the end of each reported period, state

12:42:34  13   separately the aggregate of accruing loans which are

12:42:37  14   contractually past due 90 days or more as to principal or

12:42:41  15   interest payments.  It's virtually an identical standard to

12:42:46  16   what you saw in the call report.

12:42:49  17         And the last standard that applies that His

12:42:53  18   Honor instructed you on is the standard that applies to

12:42:56  19   financial statements within SEC filings, which boils down to

12:43:01  20   this.  Tell the public your past due policy.

12:43:05  21         Another exhibit that came in through Mr. Walker

12:43:08  22   was the GAAP or the generally accepted accounting principle

12:43:13  23   relating to past due loans.  And that evidence explained

12:43:18  24   that the summary under GAAP, the summary of significance

12:43:22  25   accounting policies shall include the following:  "The

12:43:27  1    policy for determining past due or delinquency status (that

12:43:32  2    is, whether past due status is based on how recently

12:43:35  3    payments have been received or contractual terms)."

12:43:39  4            And then 50-7, once you state your policy, it

12:43:43  5    indicates that there's a disclosure that must be given, it's

12:43:49  6    required, the reported investment in loans past due 90 days

12:43:52  7    or more and still accruing.

12:43:54  8            And so Judge Andrews instructed you in

12:43:59  9    accordance with that particular definition, and that is

12:44:02  10   that an entity's summary of significant accounting policies

12:44:07  11   shall include the policy for determining past due or

12:44:11  12   delinquent status (that is, whether past due status is

12:44:14  13   based on how recently payments have been received or

12:44:17  14   contractual terms).

12:44:21  15           The evidence has shown that Wilmington Trust's

12:44:27  16   call reports and SEC reports and the one monthly regulatory

12:44:31  17   report were false.  And so on the chart that we looked at

12:44:36  18   earlier, the yellow is all the waived matured loans.

12:44:41  19   Matured loan means past due for principal repayment.

12:44:45  20   Therefore, the non-inclusion of matured loans equals false

12:44:50  21   past due reporting.  It's that simple.

12:44:53  22           The standards as instructed by the Court are

12:44:58  23   tied to the contractual repayment terms of the loan

12:45:05  24   agreement.

12:45:07  25           Now, during opening statements, you heard from

12:45:09    1    one of the lawyers for the defendant, "The bank can do

12:45:12    2    whatever it wants," and you saw a promissory note.  In a

12:45:17    3    provision of the promissory note, in the general provisions

12:45:21    4    section and the argument is, a bank can extend a loan for

12:45:26    5    any reason it wants.  The bank can essentially do whatever

12:45:29    6    it wants to do.

12:45:30    7            Well, that is not the whole story and it just

12:45:33    8    isn't true.  That is only the promissory note.  As you heard

12:45:39    9    testimony about, the promissory note was part of a larger

12:45:44   10    packet of documents, and they all fell under the terms of

12:45:50   11    the loan agreements.  And every construction loan agreement,

12:45:54   12    commercial loan agreement at Wilmington Trust had a maturity

12:45:58   13    date, and it had a maturity date for a reason, because that

12:46:01   14    is the date when principal would be past due and owing.

12:46:06   15            And so on this example, which is a $1 million

12:46:09   16    loan for the Bale Group, you see that the principal amount

12:46:13   17    was $1 million, the loan date was April of 2006, and the

12:46:19   18    maturity date is April of 2009, which is consistent with the

12:46:22   19    testimony that you heard that most of the construction loans

12:46:24   20    were based on a three-year term.

12:46:30   21            Now, both parties would have to agree to the

12:46:34   22    essential terms of the construction loan agreement, and it's

12:46:40   23    not the easiest to see because of the small print within the

12:46:44   24    contract, but the loan agreement notes that it's made and

12:46:48   25    executed between the parties, the bank and the Bale Group,

| | |
|---|---|
| 12:46:52 | 1 |
| 12:46:57 | 2 |
| 12:47:00 | 3 |
| 12:47:03 | 4 |
| 12:47:07 | 5 |

1   and notes that it's made on certain terms and conditions.

2   It states that lender is willing to lend the loan amount to

3   borrower solely under the terms and conditions specified in

4   this agreement and the related documents.  And we'll see

5   that term related documents defined in a moment.

6           It notes that the agreement is effective as of

7   April 13, 2006, and shall continue in full force and effect

8   until such time as all of the borrower's loans in favor of

9   lender have been paid in full.

10          So under the clear language of the contract,

11   this loan agreement is going to continue in force until the

12   bank is repaid.

13          There's a miscellaneous provision that relates

14   to how this contract can be changed, and it's really

15   important.  And so in the amendment section it states, this

16   agreement with any related documents -- and, again, related

17   document is the note -- constitutes the entire understanding

18   and agreement of the parties as to the matters set forth in

19   this agreement.  No alteration or amendment to this

20   agreement shall be effective unless given in writing and

21   signed by the party or parties sought to be charged or

22   bound.

23          Let me read that again.  It states, no

24   alteration or amendment to this agreement shall be effective

25   unless given in writing and signed by the party or parties

```
12:48:22    1    sought to be charged or bound.
12:48:24    2           There is a note paragraph which states
12:48:30    3    specifically the word "note" means the promissory note, and
12:48:33    4    it references the $1 million original principal amount from
12:48:38    5    the borrower, which was the Bale Group, to the lender
12:48:43    6    "together with all renewals of, extensions of, modifications
12:48:47    7    of, refinancings of, considerations of, and substitutions
12:48:51    8    for the promissory note or the agreement, explaining that
12:48:57    9    the commercial loan agreement is going to continue to run
12:49:02   10    enforced with respect to any extensions or later
12:49:09   11    modifications."
12:49:09   12           In the next paragraph it states, the words
12:49:11   13    "related documents" means all promissory notes.
12:49:15   14           This is a legal binding document.  As you can
12:49:20   15    see, the commercial loan agreement is signed by both the
12:49:26   16    bank and the borrower.  That's different from the promissory
12:49:28   17    note, which we will see in a moment.
12:49:31   18           Government's Exhibit 1603-A was the promissory
12:49:36   19    note for the Bale Group loan, and you'll see the principal
12:49:40   20    amount of $1 million.  The loan date the same, April 13th of
12:49:47   21    2006.  The same maturity date as the commercial loan
12:49:50   22    agreement.  And contained therein is a promise to pay, and
12:49:53   23    the promise is that the Bale Group "promises to pay to
12:49:56   24    Wilmington Trust Company the principal amount of $1 million
12:50:00   25    or so much as may be outstanding together with interest on
```

| | |
|---|---|
| 12:50:04 | 1 |
| 12:50:09 | 2 |
| 12:50:11 | 3 |
| 12:50:14 | 4 |
| 12:50:20 | 5 |
| 12:50:22 | 6 |
| 12:50:27 | 7 |
| 12:50:30 | 8 |
| 12:50:33 | 9 |
| 12:50:36 | 10 |
| 12:50:39 | 11 |
| 12:50:42 | 12 |
| 12:50:46 | 13 |
| 12:50:50 | 14 |
| 12:50:55 | 15 |
| 12:50:58 | 16 |
| 12:51:02 | 17 |
| 12:51:05 | 18 |
| 12:51:09 | 19 |
| 12:51:12 | 20 |
| 12:51:15 | 21 |
| 12:51:22 | 22 |
| 12:51:24 | 23 |
| 12:51:26 | 24 |
| 12:51:29 | 25 |

the unpaid outstanding principal balance of each advance."

And in the next section in terms of payment, borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on a certain date.

Now, the promissory note indicates that the borrower is still going to have to make interest payments even after the maturity date.  I mean, that's because the bank is now out a million dollars to the Bale Group, and so unless that loan goes on nonaccrual status or is charged off, the bank is still going to charge interest.  And so the provision in the promissory note states, "Upon default, including failure to pay upon final maturity."  It's listed as default under the terms of the promissory note.  And, moreover, a default is defined as borrower fails to make any payment when due under this note.

As I mentioned, in connection with the loan agreement, only the borrower signs the promissory note, which is a related document to the loan agreement. Ultimately, the commercial loan agreement controls everything -- the loans, extensions or modifications to that loan and all the terms or conditions of the promissory note.

Those are the plain terms, the plain meaning of the contracts that govern all of the loans that are at issue

12:51:33   1    in this case.

12:51:36   2         The bank's course of conduct, how they

12:51:38   3    considered those loan contracts, it's equally important for

12:51:41   4    you in determining whether the loans were contractually past

12:51:44   5    due.

12:51:45   6         So we heard testimony that matured loans equal

12:51:48   7    past due under the Shaw system, which nearly every witness

12:51:52   8    testified was the bank's commercial loan accounting system.

12:51:57   9         And so here is a snapshot from Shaw.  It's

12:52:01   10   Exhibit 33.  It's a little bit difficult to see.  But the

12:52:05   11   next slide is an enlargement of a certain section of Shaw.

12:52:10   12   And you will see the very first loan that's on the

12:52:12   13   spreadsheet is the Bale Group.  It's the loan that we just

12:52:16   14   looked at.  It's a little bit more than a million dollars

12:52:18   15   past due for principal.

12:52:20   16        So under Shaw, every single one of the loans

12:52:24   17   that is listed in the enlarged section, they are all past

12:52:29   18   due.  They're listed as past due in the Shaw system because

12:52:31   19   they have matured.

12:52:33   20        If you look at the past due interest column, all

12:52:35   21   of these loans are current for interest.  And as I

12:52:39   22   mentioned, the very first loan is 5001, the Bale Group loan

12:52:43   23   that was originated April 13th of 2006 with a little bit

12:52:48   24   more than $1 million due and owing.

12:52:51   25        That is the same that we just saw, the same

12:52:56   1   commercial loan agreement, Government's Exhibits 1603 and

12:53:00   2   1603-A.  That loan was considered to be contractually past

12:53:04   3   due on the bank's internal loan accounting system.

12:53:08   4              Now, the very first witness that the Government

12:53:12   5   called in the case was Hickman Beckner.  He is the guy that

12:53:16   6   worked for the Shaw system.  And if you recall, Mr. Beckner

12:53:19   7   testified that the Shaw system could be customized.  The

12:53:23   8   bank was sold the system in a certain way back in the

12:53:26   9   eighties or nineties, or whenever it was.  It was well in

12:53:32   10  advance of this particular period.

12:53:33   11             And he testified the bank had the system for

12:53:36   12  years.  And no one called up Hickman Beckner or any of his

12:53:39   13  colleagues at the Shaw system and said, hey, Hickman, can we

12:53:43   14  modify the Shaw system because these loans aren't actually

12:53:47   15  past due, because you see, we have a general provision in

12:53:49   16  the promissory note and we don't think the notes are past

12:53:52   17  due, so can we change the Shaw system?  No.  No one ever did

12:53:56   18  that.

12:53:56   19             And so on the bank's commercial loan accounting

12:53:58   20  system, the subledger, the Shaw system, every single one of

12:54:02   21  these loans that have matured and are current for interest

12:54:06   22  are considered to be past due.

12:54:07   23             Special Agent LoPiccolo did the summary chart of

12:54:13   24  all the various loan agreements that came in on one of the

12:54:16   25  last days of trial.  It's Government's Exhibit 1038.  And

12:54:21  1    you can take a look at that exhibit and see that the terms

12:54:25  2    of the commercial loan agreements and the promissory notes

12:54:28  3    remain consistent across all of the loans that are at issue

12:54:37  4    in this case.

12:54:37  5         Another reason why the bank's course of conduct

12:54:41  6    demonstrates that they thought that loans were contractually

12:54:45  7    past due comes from the bank's own policies.  And so when

12:54:50  8    Marty Infanti testified, we introduced an exhibit that

12:54:54  9    related to the credit risk management policy at the bank,

12:54:59  10   and that required that there be signed documentation in

12:55:03  11   order to adjust loan information on the Shaw system.

12:55:06  12        And so it states, it references specifically

12:55:12  13   modifications to existing loans, and states, all required --

12:55:16  14   through this process, we confirm that proper approval was

12:55:20  15   obtained, conditions of the approval are met in the final

12:55:23  16   loan documents, all required documentation pertaining to the

12:55:26  17   transaction is received, documents are executed by the

12:55:31  18   appropriate parties, documents are properly dated, et

12:55:37  19   cetera.

12:55:37  20        Why even have a document review staff if you

12:55:42  21   don't have to review the signed documents?  If the documents

12:55:46  22   don't matter, signed documents don't matter, if you can just

12:55:49  23   do oral extensions, why is this even relevant?  Why do you

12:55:52  24   have to hire people to review documents to see if they've

12:55:55  25   actually been signed by the parties?  And that's why if you

12:55:59   1   hear arguments later during the closing arguments of defense

12:56:03   2   counsel that you can do oral extensions of loan agreements,

12:56:06   3   or it was consistent with the defendants' understanding of

12:56:08   4   contractually past due loans at the time, the evidence

12:56:11   5   doesn't show that.

12:56:13   6        Under the delinquency report, and you've seen a

12:56:18   7   bunch of delinquency reports, the waived loans were listed

12:56:21   8   as matured.  Specifically, they stated, matured in process

12:56:24   9   of renewal or for billing or collection errors.  They aren't

12:56:29  10   listed in the column as oral extension with borrower.  It

12:56:33  11   doesn't state in that last column, not past due per general

12:56:36  12   provision in the promissory note.

12:56:39  13        The loans were past due.  They were matured.

12:56:42  14   The bill was due and owing.  And there's an example of what

12:56:47  15   the comments were with respect to matured loans.

12:56:52  16        In addition, a waiver did not equal

12:57:00  17   "administrative issue under bank policy," and this is

12:57:03  18   another bank policy that came in through the testimony of

12:57:08  19   Martin Infanti, which notes that there were certain types of

12:57:12  20   past due loans that were excluded due to "administrative

12:57:16  21   issues."

12:57:17  22        And the only administrative issue that's listed

12:57:19  23   in the policy is internal misapplication of payments

12:57:23  24   received.  There's no mention in the policy about waived

12:57:27  25   loans, and there's also no mention in the policy which

12:57:30    1    relates to the monitoring of past due loans that certain

12:57:35    2    loans weren't past due because of the general provision of

12:57:38    3    the promissory note.  It's just not there.

12:57:41    4            You also saw evidence that the bank actually had

12:57:47    5    a temporary extension policy, and let's see what that said

12:57:51    6    in terms of signed documents.

12:57:54    7            The temporary extension policy can only be used

12:57:57    8    once, up to a total of 90 days from the maturity date, which

12:58:03    9    meant all of those 90-day past due loans, because they had

12:58:06   10    reached 90 days, none of them were eligible for the

12:58:09   11    temporary extension policy.

12:58:11   12            But importantly in terms of this concept of

12:58:15   13    whether documents have to be signed in order to extend a

12:58:18   14    matured loan, it notes that any extension to a matured loan

12:58:23   15    must be documented with a change in terms agreement signed

12:58:26   16    by the borrower.  Again, nothing in the temporary extension

12:58:31   17    policy about oral extensions of loan agreements at

12:58:36   18    Wilmington Trust.  And that's consistent with the testimony

12:58:39   19    of every single witness who was asked about it over the

12:58:43   20    course of trial.

12:58:44   21            In addition, when the bank reported past due

12:58:49   22    loans to the Federal Reserve, they actually included matured

12:58:53   23    loans.  You heard Mr. Fomunyam testify that in advance of

12:58:58   24    the 2009 full scope examination, that the Federal Reserve

12:59:03   25    specifically requested that the bank provide a list of loans

| | |
|---|---|
| 12:59:06 | 1 |

that were 90 days or more past due and accruing.  And what

did the bank provide?  A list of loans where one, two,

three, four, five, six of them out of 17 on the list were

listed as past due by the bank because they had matured, and

some of them specifically referenced extension in process.

And that's why Mr. Fomunyam testified that he thought that

Wilmington Trust was reporting past due loans, because that

is the document that had been provided to the Federal

Reserve.  All of this is consistent with the defendants' own

understanding of what was required to extend the loan.

What's on the screen right now is Government's

Exhibit 476-A, and it's a memorandum written by defendant

North in March of 2010, and you'll see this document quite a

bit today as well.

But importantly, for purposes now, where Mr.

North is talking about the bank having to go through another

round of short-term loan extensions, he writes, what will

also be imperative is that these extensions be followed up

by the full execution of any required documentation in order

to get these loans updated on Shaw.

And the followup e-mail between Mr. Harra and

Mr. North, where Mr. North describes, what we're talking

about, a change in terms for LaserPro deals were some sort

of modification.  So even the defendants' own course of

conduct or own understanding is that you have to get signed

13:00:49  1   documents in order to extend the loan.

13:00:56  2            And it's a common sense proposition.  Wilmington

13:01:01  3   Trust was an $11 billion bank.  It's not a lemonade stand.

13:01:06  4   It was a sophisticated entity where signed documents were

13:01:09  5   required.

13:01:10  6            And you also heard about uniformity across the

13:01:13  7   banking system why that was so important.  Mr. Fomunyam

13:01:19  8   talked about in advance of examinations pooling peer group

13:01:23  9   averages, to see how Wilmington Trust was performing against

13:01:25  10  other banks.

13:01:26  11            Mac Hodgson testified the information in the

13:01:29  12  call report was so important because everyone reported it

13:01:32  13  out the same way.  There wasn't any variation.  And that's

13:01:36  14  consistent with the call report instructions, which note

13:01:39  15  that banks are required to prepare and file the call reports

13:01:42  16  in accordance with the instructions.  And then if anyone has

13:01:48  17  any questions, just pick up the phone and call the Federal

13:01:50  18  Reserve and ask the question.

13:01:51  19            And, finally, before we take our lunch break,

13:01:55  20  one last slide.  Think about it, ladies and gentlemen.  No

13:01:59  21  written extensions would lead to chaos, because you would

13:02:03  22  have to have court proceedings with every single borrower to

13:02:08  23  determine, what is the maturity status?

13:02:10  24            And when Mr. Fomunyam and his fellow examiners

13:02:13  25  are in looking at a bank, remember, they're only in there

13:02:16    1    between a four to eight-week period.  Every time that

13:02:18    2    Mr. Fomunyam and the asset quality examiners are looking at

13:02:22    3    a loan relationship, they would have to bring in the

13:02:24    4    borrower and the relationship manager, sit them both down in

13:02:28    5    a room and say, hey, borrower for Acme Corporation, what's

13:02:32    6    the maturity date?  Hey, Mr. Terranova, what do you think

13:02:35    7    the maturity date is?

13:02:37    8              It just doesn't make any sense.  It would be

13:02:40    9    chaos.  Once again, it was an $11 billion bank, and the

13:02:45    10   course of conduct at the bank was to require written

13:02:47    11   documentation to extend the loan agreement, and that's

13:02:51    12   because all of these loans were past due once they hit

13:02:53    13   maturity.

13:02:55    14             THE COURT:  All right.  Thank you, Mr. Kravetz.

13:02:57    15             So we'll take our lunch break until

13:03:01    16   2:00 o'clock.

13:03:02    17             And if we can take the jury out, please.

13:03:05    18             (The jury was excused for a luncheon recess.)

13:03:40    19             THE COURT:  All right.  So the plan will be when

13:03:46    20   we come back that Mr. Kravetz will go for however long he

13:03:52    21   goes until he finishes.  That's when we take our afternoon

13:03:56    22   break.

13:03:56    23             Mr. Kelly, do I understand that you are first

13:03:58    24   after that?

13:03:59    25             MR. KELLY:  Yes, Your Honor.  I'm on deck.

6925

| | |
|---|---|
| 13:04:00 | 1 |

THE COURT:  And do you have a -- what's your

estimate right now of how long you'll be?

MR. KELLY:  Under 90 minutes.

THE COURT:  Okay.  The reason I ask is because

I'm trying to figure out a what will happen if Mr. Kravetz

goes on longer so that all things considered, not to have

your argument be broken up, part today, part tomorrow.

MR. KELLY:  Well, I don't know how much longer

Mr. Kravetz has, Your Honor.

MR. KRAVETZ:  I think I will be past 3:30.

THE COURT:  All right.  Well, thank you.

MR. KELLY:  A short break, that might do it.

THE COURT:  Well, I guess what I'm wondering is,

I would think I could ask the jury are they willing to stay

a little bit later, because I would like, if you are

starting at quarter of 4:00 or something, you think you're

going to be 90 minutes, my preference overall would be to go

to 5:15 and be done with you.

MR. KELLY:  I think I can do that, Your Honor.

THE COURT:  Okay.  All right.  All right.

Anything else?

MR. KRAVETZ:  No, Your Honor.

MR. BREEN:  No, Your Honor.

THE COURT:  Thank you.  We'll be in recess.

(Luncheon recess taken.)

| | | |
|---|---|---|
| 13:56:04 | 1 | - - - |
| 13:56:04 | 2 | Afternoon Session, 2:00 p.m. |
| 14:00:44 | 3 | THE COURT:  All right.  Everyone be seated. |
| 14:00:46 | 4 | Are you ready? |
| 14:00:47 | 5 | MR. KRAVETZ:  Yes, Your Honor.  If I'm watching |
| 14:00:50 | 6 | the clock, what is the afternoon timing for the break? |
| 14:00:52 | 7 | THE COURT:  Well, I was going to really just try |
| 14:00:55 | 8 | and do it whenever you reached an end. |
| 14:00:57 | 9 | MR. KRAVETZ:  Okay. |
| 14:00:58 | 10 | THE COURT:  But if it gets to be 3:30 and you've |
| 14:01:00 | 11 | got an hour in you -- |
| 14:01:01 | 12 | MR. KRAVETZ:  Okay. |
| 14:01:02 | 13 | THE COURT:  -- just declare your own break. |
| 14:01:04 | 14 | MR. KRAVETZ:  Okay.  Thank you. |
| 14:01:05 | 15 | THE COURT:  I will remember that. |
| 14:01:06 | 16 | MR. KRAVETZ:  Thank you, Your Honor. |
| 14:01:07 | 17 | THE COURT:  Mr. Kravetz, do you expect to go |
| 14:01:33 | 18 | much beyond 3:30? |
| 14:01:35 | 19 | MR. KRAVETZ:  A little bit. |
| 14:01:36 | 20 | THE COURT:  If we're talking like quarter of |
| 14:01:37 | 21 | 4:00, just go to quarter of 4. |
| 14:01:39 | 22 | MR. KRAVETZ:  If I know where I am, I will take |
| 14:01:41 | 23 | the break. |
| 14:01:41 | 24 | THE COURT:  All right.  Use your best judgment. |
| 14:01:43 | 25 | MR. KRAVETZ:  Thank you. |

| | |
|---|---|
| 14:03:48 | 1 |
| 14:03:50 | 2 |
| 14:04:45 | 3 |
| 14:04:48 | 4 |
| 14:04:49 | 5 |
| 14:04:51 | 6 |
| 14:04:51 | 7 |
| 14:04:56 | 8 |
| 14:05:00 | 9 |
| 14:05:03 | 10 |
| 14:05:08 | 11 |
| 14:05:13 | 12 |
| 14:05:17 | 13 |
| 14:05:20 | 14 |
| 14:05:22 | 15 |
| 14:05:25 | 16 |
| 14:05:31 | 17 |
| 14:05:33 | 18 |
| 14:05:39 | 19 |
| 14:05:44 | 20 |
| 14:05:49 | 21 |
| 14:05:53 | 22 |
| 14:05:56 | 23 |
| 14:05:58 | 24 |
| 14:06:02 | 25 |

1         (The jury entered the courtroom.)

2         THE COURT:  All right.  Members of the jury,

3    welcome back.  Everyone, you may be seated.

4         Mr. Kravetz, you may continue.

5         MR. KRAVETZ:  Thank you, Your Honor.  Good

6    afternoon.

7         We left off talking about the falsity standard

8    under which you'll evaluate whether past due loan reporting

9    was false under the call reports and the SEC reports, and

10   you may hear argument from the defense attorneys about a

11   document that was introduced on the last day of trial.  It

12   was a Q&A web page that came from the Office of Thrift

13   Supervision, an agency that doesn't exist anymore, that's

14   now part of a different federal agency.

15        Ladies and gentlemen, there is no evidence that

16   the defendants relied on or even knew about the OTS web

17   page, none.  Let's go over what we know about it.

18        The OTS web page that came into evidence, it's

19   Defense Exhibit 5541-A.  The date at the bottom right-hand

20   corner is February 13th, 2012.  It's at least a

21   year-and-a-half, almost two years after all of the conduct

22   at issue in this case.

23        You heard that this is not a document that came

24   from any of the defendant's desk files, like we saw with

25   some of the exhibits from Ms. Rakowski and Mr. Gibson.

14:06:07  1    Moreover, it wasn't a document that was produced by the bank

14:06:10  2    or Federal Reserve or KPMG because there's no Bates number

14:06:13  3    on the bottom right-hand corner.  We all know about Bates

14:06:18  4    numbers.  There aren't any markings on this particular

14:06:21  5    document.

14:06:21  6                How did this document become introduced into

14:06:24  7    evidence?  It was introduced by a lawyer who works with

14:06:27  8    Mr. Gibson's lawyers and testified that she received it from

14:06:30  9    those lawyers and then read that as well as the other

14:06:33  10   documents into the record.

14:06:35  11               There is no evidence that this document came

14:06:38  12   from any of the four defendants, that they knew about it, or

14:06:44  13   they relied on it.

14:06:45  14               Let's also look at the substance.  What does the

14:06:48  15   Q&A say?  Two really important points talking about

14:06:53  16   construction loans at maturity.  And in reference to

14:06:57  17   informal extensions, it talks about the extension should be

14:07:00  18   for a limited and reasonable length of time, and that the

14:07:04  19   bank should get the extension in writing.

14:07:08  20               Where have we seen that before?  The bank's own

14:07:11  21   temporary extension policy, which talked about only having a

14:07:14  22   temporary extension up to 90 days and the requirement that

14:07:18  23   any extension be documented with a change in terms agreement

14:07:22  24   signed by the borrower.

14:07:23  25               In addition, the date of the Q&A, not just the

14:07:28  1    2012 date as being relevant, the 2002 date is relevant

14:07:33  2    because you might hear, well, there's language in the Q&A

14:07:36  3    that looks pretty similar to language used in the waiver

14:07:38  4    practice.

14:07:39  5          Remember that defendants introduced a document

14:07:41  6    from 1999 that we saw earlier that had the waiver language

14:07:46  7    back then.  So unless someone traveled to the future, got

14:07:49  8    the OTS language and then went back in the past, no one

14:07:52  9    relied on this language for the waiver practice let alone

14:07:55  10   the defendants.  There is no evidence at all that any of the

14:08:00  11   defendants ever saw the Q&A let alone relied on it.

14:08:06  12          So we end the section on falsity and past due

14:08:10  13   loans with a few points to consider.  If the loans weren't

14:08:15  14   past due, why waive them?  There's no reason to waive a loan

14:08:19  15   if it's not past due.  If the loans weren't past due, why

14:08:23  16   stop waiving them, because at some point, the waiver

14:08:25  17   practice ends, finally, the second quarter of 2010.

14:08:29  18          And if the loans weren't past due, why

14:08:32  19   mass-extend them?  Why would you ever have to extend a loan

14:08:36  20   that wasn't past due?

14:08:38  21          And that brings us to Wilmington Trust's past

14:08:43  22   due reporting during the relevant time period.  As Ms. Wolf

14:08:48  23   indicated in her opening statement, Wilmington Trust

14:08:52  24   operated with two sets of books relating to past due loans,

14:08:56  25   and you saw evidence of that throughout the trial.

14:09:01    1          So the first enlargement on the screen is a

14:09:03    2     cutout of the bank's 2009 delinquency report.  It is

14:09:07    3     Government Exhibit 53.  And you will note in the top

14:09:12    4     portion, the waivers are blank, and as Ms. Towe testified,

14:09:16    5     this is one of the pivot tables that was created.  What's

14:09:20    6     shown on the screen right now does not include the waived

14:09:22    7     loans, because there is no "Y" in the waiver column.

14:09:25    8          In the bottom right of the screen now is the

14:09:28    9     September 2009 past due and nonperforming loan report,

14:09:33   10     which was prepared by the controller's group led by Ms.

14:09:36   11     Rakowski.

14:09:37   12          As you'll see, the delinquency report with the

14:09:41   13     waived loans blank fed directly into the past due and

14:09:47   14     nonperforming loans report.  And Mr. Hart testified how he

14:09:50   15     went through this process with respect to all of the

14:09:52   16     delinquency reports and the past due reports.

14:09:53   17          What is missing?  The waived loans are missing.

14:10:00   18     And you see the difference when the pivot changes from blank

14:10:03   19     to Y, and now instead of 17 million plus in waivers, the

14:10:08   20     number jumps up significantly, well over $300 million.

14:10:12   21          And then what happens?  The waived loans are not

14:10:18   22     reported in the SEC reports.  In the bottom right-hand

14:10:21   23     portion of your screen, you'll see management's discussion

14:10:23   24     and analysis.  It's the period ended September 30, 2009, and

14:10:30   25     what's reported in the SEC reports is information not

14:10:32  1   including the waived loans.

14:10:34  2        Similar to the call report.  You'll see on the

14:10:38  3   screen now the way that the information is filtered is,

14:10:40  4   waived blank in bank one, because bank one was the Delaware

14:10:44  5   bank, Wilmington Trust Company.

14:10:46  6        And so here, the blank with the bank one

14:10:51  7   compared to the internal call report reconciliation

14:10:54  8   document, they match.  The same question:  What is missing?

14:11:01  9   The waived loans.  And look at the difference when that

14:11:04  10  pivot table is filtered to include the loans that had

14:11:07  11  matured but were waived.  A significant amount, $369 million

14:11:12  12  total in terms of the call reporting.

14:11:17  13       Now, Mr. Hart testified about the chart, and

14:11:23  14  this is now the second or third time that we have seen it,

14:11:26  15  but the chart is showing from left to right the impact of

14:11:30  16  the waiver practice on public reporting in 2009.

14:11:34  17       So the blue bar chart is what was reported in

14:11:38  18  the SEC filings for the first, second and third quarters

14:11:41  19  of 2009, and the bank's annual report at the end of the

14:11:46  20  year.

14:11:46  21       And the yellow represents the relevant waived

14:11:48  22  loans, so these were loans that were waived as current for

14:11:52  23  interest, in the process of extension, and not including any

14:11:57  24  loans in loan recovery.

14:12:00  25       Once again, it shows the waiver practice goes

14:12:03  1    from the little white lie to the matured loans beast.  And

14:12:07  2    also importantly is, there's no evidence that there are any

14:12:09  3    steps to determine why these loans were current for

14:12:14  4    interest, or if some of the problems identified by the

14:12:16  5    Federal Reserve in the course of the 2009 examination have

14:12:21  6    been remedied or not.

14:12:22  7         Now, Mr. Hart also displayed another version of

14:12:25  8    the chart focusing just on the third and the fourth quarters

14:12:29  9    of 2009, and you can see from this particular chart that in

14:12:35  10   the third quarter of 2009, the bank reported $17.4 million

14:12:40  11   in past due loans in its SEC report.  A total of $297

14:12:48  12   million of relevant loans were waived.  Look at the numbers

14:12:51  13   though of loans that were six months or more past due,

14:12:55  14   $139.3 million.  $83 million worth of loans were nine months

14:13:01  15   or more past due.

14:13:02  16        And then going across to the next bar chart, the

14:13:05  17   bank reports $10.9 million in past due 90-day loans in its

14:13:11  18   10-K for 2009.  $303 million worth of relevant waived loans.

14:13:17  19   The number jumps now to $160 million in loans that are now

14:13:22  20   more than six months due and still waived, and $86 million

14:13:26  21   in loans that are nine months or more past due and waived.

14:13:31  22   And this is further evidence that there was no due diligence

14:13:35  23   with respect to whether these loans were actually in the

14:13:38  24   process of extension.  The evidence has shown it doesn't

14:13:40  25   take six months to extend a loan let alone nine months let

14:13:47   1    alone a year.  And you saw earlier, the call report

14:13:50   2    instructions, there is no grace period let alone six months

14:13:54   3    or six months.

14:13:55   4            The next chart shows the impact of the waiver

14:14:00   5    practice on the third and fourth quarter of 2009 call

14:14:04   6    reports, and for purposes of your determinations, the third

14:14:08   7    quarter 2009 call report, Counts 7 and 11 in the overall

14:14:14   8    conspiracy count, and the fourth quarter of '09, the counts

14:14:17   9    are Counts 8 and 12.

14:14:21   10           And look at the difference in terms of call

14:14:22   11   report reporting.  The blue represents what was reported

14:14:24   12   in the relevant line items for purposes of the call report.

14:14:29   13   17.1 million versus $296 million worth of relevant waivers.

14:14:36   14   And in the fourth quarter, a little bit over 8.5 million

14:14:40   15   versus 296 million of waived loans.

14:14:44   16           And then we look at the first quarter of 2010,

14:14:48   17   where in its Form 10-Q, the bank doesn't include

14:14:53   18   approximately $32 million worth of waived loans, and $31

14:14:57   19   million worth of waived loans in the call report.

14:15:00   20           Now, why is the number lower in the first

14:15:02   21   quarter of 2010?  Well, remember, and we'll get to this in a

14:15:08   22   few minutes, that's when you have a lot of short-term

14:15:10   23   extensions at year 2009, and the bank was still and the

14:15:15   24   defendants were still waiving loans.

14:15:17   25           And finally, the waived loans continued through

14:15:21   1   2010.   This is a defense exhibit showing that even at the

14:15:23   2   end of the second quarter of 2010, at a period in time when

14:15:27   3   the bank is going to be rated a five by the Federal Reserve

14:15:30   4   according to the chart that came in through the defense

14:15:33   5   witness, $83 million worth of loans were still waived then,

14:15:39   6   six months after year-end 2010.

14:15:42   7            That brings us to the mass extension process, or

14:15:52   8   as what's termed on the slide, extend and pretend.

14:15:57   9            In 2009, the evidence has shown that the waived

14:16:01   10   loans became overwhelming.  We saw the e-mail before from

14:16:05   11   Mr. Conway, reflecting that the reality today is the number

14:16:09   12   overwhelming given the time, resources and existing

14:16:14   13   processes for, the process for renewal.

14:16:17   14            Now, it's overwhelming as of June 11, 2009, but

14:16:24   15   we know from the record that the bank is required by the

14:16:27   16   Federal Reserve as of October 21st of 2009 to start

14:16:30   17   reporting past due loans on a monthly basis directly to the

14:16:35   18   Federal Reserve in the aftermath of a very critical

14:16:38   19   examination.

14:16:40   20            So what happens?  A group of bank employees are

14:16:43   21   tasked with getting together to discuss "the process and

14:16:47   22   strategy to eliminate matured loans by 12/31," and as it's

14:16:52   23   written in the calendar invite for Mr. Conway and Mr. North

14:16:56   24   and Mr. Bailey and Mr. Terranova are attendees.  It is

14:17:01   25   extremely important that we talk about matured loans and how

14:17:03  1    we can make them go away by 12/31.  This cannot be a quick

14:17:09  2    fix for 90 or 120 days as the problem will just return.

14:17:14  3              Now, remember that last slide.  It was

14:17:16  4    overwhelming in June with those numbers and back to the

14:17:22  5    chart as the number even grows higher in the third and

14:17:25  6    fourth quarters of 2009, but all of a sudden, the decision

14:17:28  7    point comes down that the loans have to be "eliminated" by

14:17:33  8    the end of the year.  And that's reflected in e-mails.  The

14:17:39  9    understanding was, try to extend all of the matured loans by

14:17:43  10   year-end 2009.

14:17:46  11             And so another e-mail that goes out relating to

14:17:49  12   the list of matured and maturing loans talks about, these

14:17:53  13   are the loans that have already matured and those maturing

14:17:56  14   by 12/31/09.  As of 12/31/09, we can no longer do that, so

14:18:04  15   we must take care of all of these by 12/31.

14:18:07  16             So the initial understanding, this all has to be

14:18:09  17   taken care of by 12/31 of '09.  On this list alone, 804

14:18:14  18   loans totaling $1.3 billion are going to have to be

14:18:20  19   "eliminated" in about a two-month time period.

14:18:23  20             Another e-mail, Exhibit 626 and 626-A.  This is

14:18:27  21   an e-mail that Mr. Terranova sends out to his lenders with

14:18:30  22   the same list that Mr. Conway sent, but it has been modified

14:18:35  23   to just include the Delaware CRE loans.  And the

14:18:38  24   understanding is, senior management is requiring that all

14:18:40  25   matured loans be acted upon prior to 12/31/09.  This will

14:18:46    1    include execution of CITAs, or change in terms agreements as

14:18:50    2    well.

14:18:50    3                And they note further, our goal should be to

14:18:55    4    extend most facilities for at least one year.  Senior

14:18:58    5    management does not want to see a flood of 90-day extensions

14:19:01    6    in December, which just pushes back the process.  Short-term

14:19:04    7    extensions should be the exception, not the norm.

14:19:12    8                That list contained 386 loans totaling

14:19:16    9    $570 million.  That's Delaware CRE loans, just Delaware CRE

14:19:24   10    alone, the riskiest types of loans within the portfolio and

14:19:27   11    the specific bank that has had the most criticism from the

14:19:34   12    Federal Reserve.

14:19:35   13                Now, the next e-mail is Defense Exhibit 3129,

14:19:39   14    and I would ask that you keep this e-mail in mind as

14:19:44   15    you consider the testimony of Terry Brewer and the

14:19:47   16    information that he provided to you over the course of

14:19:51   17    a day-and-a-half.

14:19:52   18                This is an e-mail from Mr. Brewer to Mr. North

14:19:55   19    in August of 2008.  So we're talking almost a

14:19:59   20    year-and-a-half before the mass extensions at year-end 2009.

14:20:06   21                And Mr. Brewer writes specifically about renewal

14:20:09   22    extensions.  "While I know Steve is working on changing the

14:20:13   23    form, I still can't understand how a renewal can occur or be

14:20:16   24    presented without a review of the current collateral and an

14:20:21   25    understanding of the borrower's/sponsor's cash flow.

14:20:26    1    Somehow this must start being included."

14:20:33    2             And keep this in mind, ladies and gentlemen, as

14:20:36    3    you see what actually happens at year-end 2009, because it

14:20:40    4    certainly isn't this.

14:20:42    5             Now, if Mr. Brewer couldn't understand how

14:20:44    6    that was the process that could occur in August of 2008,

14:20:48    7    fast-forward to November of 2009, where now there are a

14:20:53    8    number of matured loans that don't have updated appraisals.

14:20:58    9    And it's November 19th of 2009.  And the bank has no idea

14:21:03   10    what is the collateral values of these loans, a number

14:21:07   11    of which had not been updated via appraisals in several

14:21:11   12    years.

14:21:11   13             And so Mr. Brewer writes now, November of 2009,

14:21:15   14    on expired yields where we are waiting appraisals to

14:21:18   15    complete our credit underwriting for renewal, meaning, we

14:21:22   16    don't have the information going back to the standard from

14:21:25   17    August of 2008.  We will extend those loans until March 1st

14:21:28   18    of 2010.

14:21:31   19             So Mr. Brewer didn't understand how this is

14:21:37   20    something that was appropriate back in August of 2008,

14:21:42   21    but yet he gives in and decides to extend on a short-term

14:21:46   22    basis, on a mass basis, a number of loans any way at

14:21:49   23    year-end 2009.

14:21:51   24             And why is that?  Well, the evidence shows

14:21:53   25    that he gives in and the bank does it anyway because the

| | |
|---|---|
| 14:21:58 | 1 |

problem is just too big.  The task is impossible.  There's

no way that you can extend 386 of the riskiest loans in the

bank's lending portfolio in less than two months.  So we

moved from waivers into extend and pretend.

        And Mr. Brewer testified about what went into

the mass temporary extensions at year-end 2009, and as a

juror, you can evaluate the demeanor and the way that a

witness presented himself or herself on the stand, and you

can consider Mr. Brewer's testimony and how he had to be

shown a document for every single answer by Ms. Wolf as

compared to how he was answering questions that were posed

to him by defense counsel.  But even as uncomfortable as

Mr. Brewer was on the stand, he reluctantly acknowledged all

of the things on the slides.  That the waiver practice made

him uncomfortable.  That there was no robust underwriting

that went into underwriting decisions at year-end.  He

referred to it twice as a superficial review process.  He

called it a touch.  There's an e-mail that describes that

loans were mass extended to "allow for the proper needed

level of underwriting."

        And you can infer from the evidence that you

have received that there was no meaningful due diligence to

extend loans on a mass basis at year-end 2009.  Loans were

missing documents and appraisals.  Massive loan

relationships, like the Reybold relationship were extended

14:23:42   1   the same day or the next day.  $86 million.  You know, a lot

14:23:46   2   of questions were asked to Mr. Terranova about the Reybold

14:23:50   3   relationship.

14:23:51   4            Remember what Mr. Brewer testified.  He actually

14:23:53   5   went out and visited Meridian Crossing and some of the

14:23:56   6   Reybold projects.  He testified that he understood the state

14:23:59   7   of those projects, and I know that there was an argument to

14:24:06   8   put everything on that relationship on Mr. Terranova.  But

14:24:08   9   in one day, close to $100 million worth of that relationship

14:24:12   10   was mass extended, and we'll see an e-mail in a few minutes

14:24:15   11   about what the true state of the Reybold relationship was as

14:24:19   12   of early 2010.

14:24:21   13            So mass extensions are basically just a new

14:24:26   14   version of the waiver practice, but the defendants still

14:24:30   15   waived $303 million worth of matured loans at year-end

14:24:36   16   2009.

14:24:36   17            So mass extensions beg certain key questions.

14:24:42   18   First, if nothing was wrong with the waiver practice, why

14:24:46   19   change it?

14:24:48   20            Second, if you know how to properly extend

14:24:51   21   loans, why not do it the right way?

14:24:53   22            And, third, why not just tell the public that

14:24:58   23   these loans are past due?  I mean, wasn't that the plan to

14:25:01   24   begin with, with some of the initial e-mails that come out

14:25:04   25   in late October, early November?  We're going to do this by

14:25:07   1   12/31/09.  We don't want to have short-term extensions at

14:25:12   2   year-end.  That's the original plan, but the problem became

14:25:15   3   too big that the defendants did not follow it, and that's

14:25:22   4   because it was impossible to meaningfully extend that many

14:25:26   5   matured loans.

14:25:31   6          Mr. Brewer sends out an e-mail in which Mr.

14:25:34   7   North is copied on January 6th of 2010.  This is less than a

14:25:40   8   week after the start of a new year 2010, and this is what

14:25:45   9   Mr. Brewer talks about the loans that have been mass

14:25:47   10  extended.  We have a huge number of loans that have been

14:25:52   11  temporarily extended until 4/1/10.  The vast majority of

14:25:56   12  these loans need to be actively touched (evaluate and

14:25:59   13  negotiated for needed modifications), meaning they didn't do

14:26:02   14  anything meaningfully.  They just kicked the can down the

14:26:05   15  road.

14:26:06   16         And he states further that the economy has

14:26:10   17  adversely impacted the vast majority of our development

14:26:14   18  project, and we need to address material weaknesses.  In

14:26:19   19  my mind, this yet is to be the biggest and most important

14:26:23   20  task that we need to undertake in the Delaware real estate

14:26:26   21  world.

14:26:27   22         And then he notes that we have "huge loan

14:26:34   23  maturity issues," just less than a week after they mass

14:26:36   24  extended hundreds of millions of dollars worth of loans.

14:26:42   25         And Government's Exhibit 418, and you'll see

14:26:45   1   this is an e-mail that all four of the defendants are on

14:26:49   2   this particular e-mail.  And the bottom portion that is

14:26:53   3   called out is an e-mail, a portion of the e-mail written by

14:26:56   4   defendant North.  And he's writing about the extensions, and

14:26:59   5   he talks about, we did a lot of extensions until April 1st,

14:27:04   6   2010 "so as to allow for the proper/needed level of

14:27:09   7   underwriting required on the CRE credits."  They didn't do

14:27:14   8   what was required.  They just pushed the loan dates out by

14:27:18   9   three months.

14:27:19   10           And then Mr. North writes further, The goal is

14:27:22   11   that by April 30th, we will have gotten through all of

14:27:25   12   these, with any needed structural changes, "supported by

14:27:29   13   authority low analysis/underwriting in order to avoid an

14:27:34   14   annual tidal wave of maturities in the future."

14:27:39   15           Clearly, the understanding of the defendants --

14:27:41   16   and, again, this is an e-mail in early January of 2010.  All

14:27:47   17   of the defendants are on the e-mail, no idea that some day

14:27:51   18   this e-mail is going to be shown in the midst of a criminal

14:27:53   19   trial.  And it notes that the bank and the defendants did

14:27:56   20   not do the type of thorough analysis and underwriting that

14:27:59   21   was required to extend loans.

14:28:01   22           These were bad loans.  That's why.  They just

14:28:10   23   couldn't meaningfully extend them and there were problems

14:28:13   24   within the loan portfolio.

14:28:15   25           And, once again, don't take my word for it.

14:28:18    1    Look at the evidence.  An e-mail from Mr. North to

14:28:22    2    Mr. Harra, December 16, 2009, in which Mr. North refers to

14:28:26    3    loans that were extended as "credit turds."  Many of these

14:28:30    4    credit turds will simply take some time to make or get

14:28:33    5    better.

14:28:38    6            An e-mail from Mr. Brewer talking about certain

14:28:40    7    loan relationships that were extended.  Once again, this is

14:28:44    8    an e-mail from early January 2010, referring to the Reybold

14:28:48    9    relationship, which was signed one day after, received the

14:28:54   10    loan documents.  It notes, it had a negative monthly cash

14:28:57   11    flow of something north of $300,000.  And he noted during

14:29:00   12    his testimony, that would be pretty much losing $3.6 million

14:29:04   13    worth of cash throughout the calendar year.

14:29:08   14            P.J. Bale, that lending relationship we've heard

14:29:12   15    a lot about over the course of the trial.  It's referred to

14:29:14   16    by Mr. Brewer as "speculative development."

14:29:23   17            What else do we know from the evidence that all

14:29:28   18    of the defendants know?  And, again, all of the defendants

14:29:30   19    are copied on this e-mail.  It's an e-mail dated

14:29:34   20    January 25th of 2010.

14:29:37   21            If you recall, Mr. Brewer testified about the

14:29:40   22    surge, the "troop surge" where they brought lenders down

14:29:44   23    from Pennsylvania and up to Maryland because the Delaware

14:29:47   24    lenders didn't have the time, the resources or the

14:29:52   25    capabilities to get their arms around the lending portfolio.

14:29:54  1   And one of the goals of the surge process was to take a look

14:29:59  2   at loans that had been extended on a short-term basis at

14:30:01  3   year-end.

14:30:02  4          So here we are now, January 25th of 2010,

14:30:07  5   and now bank employees are starting to look at these

14:30:09  6   loans and talking about the impact of the surge on risk

14:30:13  7   rating.

14:30:14  8          And just 25 days into the month in January of

14:30:17  9   2010, the recommendation is from the first wave of the surge

14:30:23  10  results, that there are going to be $446 million worth of

14:30:28  11  loan downgrades just in the first 25 days of a month.  This

14:30:33  12  is the information that all of the defendants have and it's

14:30:37  13  in late January of 2010.

14:30:40  14         Count 2 of the indictment charges the defendants

14:30:49  15  with securities fraud, and His Honor instructed you as to

14:30:54  16  what the standard is in terms of the scheme to defraud.

14:30:58  17  That it's any plan, device, or course of action to deprive

14:31:02  18  another of money or property by means of materially false or

14:31:05  19  fraudulent pretenses, representations or promises reasonably

14:31:09  20  calculated to deceive persons of average prudence.

14:31:13  21         And there's an additional instruction in terms

14:31:17  22  of what can include a false statement.

14:31:20  23         Now, under the scheme to defraud instructions,

14:31:27  24  the Government is not required to prove that a particular

14:31:29  25  defendant originated the fraud scheme.  It's not necessary

that the Government prove that a defendant actually realized any gain from the scheme, or that any intended victim actually suffered any loss.

But you may consider whether the scheme succeeded in determining whether it actually existed.

And what was the scheme?  The scheme was to lie about the bank's past due loans and related disclosures in connection with the February of 2010 capital raise.

What was the purpose or benefit of the scheme? Essentially, at that time it was to keep the bank, which was in deep trouble, afloat.  It was to provide a benefit to the bank through the capital raise.

And you can infer from the evidence that as of February 22nd of 2010, the bank was in trouble, and the defendants -- the investors did not know the true condition, the true financial condition of the bank, particularly, focused particularly on its reporting of 90-day past due loans.  And the investors ultimately invest $287 million in a capital raise.

When is all of this happening?  Just to follow the timeline, we've just seen a number of e-mails from October, November, December of 2009, January of 2010.  Well, remember the Fed came back for a target exam in January of 2010.  It commenced on January 4th and concluded on January 29th of 2010.  And all of the information that we

14:33:04  1    have just discussed, all of the e-mail results, everything

14:33:07  2    relating to the surge process and mass extensions, that is

14:33:11  3    all information that the defendants knew at the time that

14:33:14  4    the Federal Reserve was onsite in January of 2010.  And the

14:33:17  5    testimony from Mr. Corkery, Mr. Fomunyam, is that none of

14:33:21  6    the defendants said a word about it.  In fact, the testimony

14:33:24  7    from Mr. Fomunyam is, he didn't realize that the bank had

14:33:27  8    engaged in a number of short-term extensions until he came

14:33:30  9    back in the summer of 2010 and noticed it in the course of

14:33:35  10   credit file reviews, and he told you how he raised it in a

14:33:38  11   meeting and said that it had the potential to mask the

14:33:42  12   reporting of past due loans.

14:33:44  13           Also focusing on the context, you'll see on the

14:33:50  14   screen Government's Exhibit 435.  This is the, one of the

14:33:54  15   offering documents from JP Morgan.  And you heard Michael

14:33:58  16   Schechter, who was the book runner from JP Morgan, who came

14:34:01  17   in and testified about the process of raising capital for

14:34:04  18   the bank, and that there was an organizational meeting on

14:34:07  19   February 1st of 2010, that Mr. Gibson and Ms. Rakowski

14:34:12  20   attended, and that there was a business due diligence

14:34:15  21   meeting on February 11th of 2010 that was attended by Mr.

14:34:19  22   North and Mr. Harra.

14:34:20  23           And this particular document listed all of the

14:34:25  24   due diligence questions that the underwriters asked in

14:34:28  25   connection with the process before the capital raise.  And

14:34:33   1   some are really important.

14:34:34   2           So there's a question, please discuss credit

14:34:38   3   under writing guidelines, any recent or contemplated

14:34:43   4   changes.  Please discuss loan modification programs.  That

14:34:47   5   would have would have been a nice time to tell the

14:34:50   6   underwrite what had happened with the short-term extensions.

14:34:52   7   Any improvements in 30-day delinquency by portfolio and what

14:35:00   8   percentage of your construction loans have interest reserves

14:35:02   9   and are currently servicing interest payments?

14:35:04   10          And if you recall during the trial when that

14:35:07   11  document was up on the screen, one of the counsel for

14:35:09   12  defendant Harra asked Mr. Schechter, well, mass extensions,

14:35:15   13  all the banks were doing it at the time, weren't they?  And

14:35:17   14  the answer was, never heard of that before.

14:35:19   15          And this is somebody who had been involved in

14:35:22   16  20-plus deals to raise money for banks all over the country

14:35:27   17  at the time.

14:35:30   18          We also saw through Mr. Schechter the documents

14:35:34   19  that were created to market the capital raise, and in

14:35:38   20  particular, on this slide, there's a discussion of the

14:35:42   21  bank's commercial loan portfolio or total loan portfolio was

14:35:49   22  of 12/31/2009.  This was the document that was used to

14:35:52   23  market the capital raise to investors.

14:35:54   24          And what does it say in terms of underwriting?

14:35:57   25  It says, "Strong credit culture and stringent underwriting

14:36:01  1    standards."  And ask yourselves as of that period in time at

14:36:06  2    the end of January of 2010 whether that statement was

14:36:10  3    correct.

14:36:11  4          Ultimately, the bank files its Form 10-K in

14:36:17  5    February of 2010, February 22nd of 2010, and there are a

14:36:22  6    number of statements within that document that are important

14:36:25  7    to your consideration.

14:36:26  8          But first to show the relationship between the

14:36:30  9    10-K and the capital raise, the relationship between the

14:36:37  10   10-K and the capital raise, introduced into evidence was a

14:36:45  11   document filed with the SEC called a prospective statement,

14:36:48  12   where it lists, what is the offering price going to be,

14:36:50  13   which is shown on the document as $13.25 per share, and that

14:36:57  14   Wilmington Trust would get proceeds of $12.62 per share out

14:37:01  15   of the public offering.

14:37:02  16          Now, the important point about the prospectus is

14:37:06  17   it incorporated everything from the Form 10-K.  So the

14:37:09  18   operative document for an investor looking to invest in the

14:37:13  19   capital raise would be to go to the bank's annual report and

14:37:16  20   to read it.

14:37:19  21          So here are some of the statements that were

14:37:21  22   made in the Form 10-K filed February 22nd of 2010.  To

14:37:27  23   mitigate credit risk, we employ rigorous loan underwriting

14:37:30  24   standards and apply them consistently.

14:37:34  25          Ladies and gentlemen, consider that statement

6948

14:37:36  1    against what the defendants knew at the time about

14:37:38  2    underwriting practices at Wilmington Trust.   Typically

14:37:44  3    obtain collateral and personal guarantees from commercial

14:37:47  4    borrowers.   And remember all the issues from the evidence

14:37:52  5    that the bank was having from getting updated appraisals

14:37:55  6    during the time period.

14:37:56  7         Regularly review all past due loans, loans not

14:38:00  8    being repaid according to contractual terms, and loans we

14:38:04  9    doubt will be paid on a timely basis.   That is the

14:38:08  10   representation to the public, somebody looking to invest in

14:38:12  11   Wilmington Trust stock in February of 2010.

14:38:14  12        What else is set forth in that document?   Well,

14:38:18  13   there's a representation about collateral valuations.   Our

14:38:23  14   lenders obtain updated valuations, regardless of loan size,

14:38:27  15   any time they believe there has been an obvious and material

14:38:29  16   deterioration in market conditions.

14:38:32  17        And ask yourself, ladies and gentlemen, if the

14:38:36  18   evidence has shown that that was actually what was occurring

14:38:39  19   as of February 22nd of 2010.

14:38:42  20        How do we know that the 90-day past due loan

14:38:45  21   number is important?   The bank told investors that it was.

14:38:50  22   And they state in the Form 10-K, this is a document signed

14:38:56  23   by Mr. Harra, signed by Mr. Gibson, and signed by Ms.

14:39:00  24   Rakowski.

14:39:00  25        And they talk about key credit risk metrics.

6949

14:39:03  1    The key measures we use to evaluate our exposure to credit

14:39:13  2    risk include levels of loans past due 90 days or more.  And

14:39:13  3    what does the disclosure state happened to 90 past due loans

14:39:18  4    in 2009?  They actually tell the public that the amount of

14:39:20  5    loans past due 90 days or more was lower at year-end 2009

14:39:25  6    than it was at year-end 2008.

14:39:30  7            Ladies and gentlemen, that is the false

14:39:33  8    statement for you to consider in terms of the second prong

14:39:37  9    of the securities fraud charge, which is Count 2.  This is

14:39:44  10   the alleged materially false statement, the statement which

14:39:48  11   has been proven through the evidence to be, in fact, a false

14:39:51  12   statement.

14:39:53  13           And just in terms of the volume, I mean,

14:39:57  14   remember all the charts that we've seen so far today and

14:40:01  15   over the course of the trial.  There's a representation that

14:40:03  16   the past due number is going down.  Look how high the past

14:40:07  17   due number was in terms of the relevant waived loans in

14:40:12  18   2009.

14:40:14  19           Another disclosure that's relevant in the 10-K

14:40:23  20   is one relating to generally accepted accounting principles,

14:40:28  21   but specifically the past due loans.  And so you will see

14:40:31  22   in the Form 10-K that there's a representation, our

14:40:34  23   critical accounting policies conform with U.S. Generally

14:40:37  24   Accepted Accounting Principles, or GAAP.  In the last line

14:40:43  25   it notes, for more information about our critical accounting

14:40:46  1    policies, read note two, summary of significant accounting

14:40:49  2    policies.

14:40:51  3            So if we go to that particular page, and just as

14:40:53  4    a reminder, this is the GAAP provision at issue that Judge

14:40:57  5    Andrews has instructed you would control the policy for

14:41:02  6    reporting past due loans.  And it states that the summary of

14:41:05  7    significant accounting policies shall include the policy for

14:41:13  8    determining past due or delinquent status.

14:41:17  9            And, ladies and gentlemen, take a look at this

14:41:19  10   page of the Form 10-K, Footnote 2, where the bank is

14:41:23  11   describing its significant accounting policies relating to

14:41:25  12   loans.  Every reference here is to contractual.

14:41:29  13   Contractualize the loan, contractual terms of the loan

14:41:32  14   agreement, all principal and interest delinquencies become

14:41:36  15   current, contractual payments will continue.

14:41:38  16           How would anyone reading this document know

14:41:43  17   about a waiver practice?  How would anyone reading this

14:41:47  18   document think that the bank was doing anything other than

14:41:52  19   reporting all loans as past due once they became

14:41:56  20   contractually past due?

14:41:58  21           And in accordance with GAAP, in the footnote

14:42:08  22   disclosed in the financial statement, the bank reported

14:42:10  23   the same 90-day past due number, $30.06 million in accruing

14:42:19  24   past due loans.

14:42:19  25           What happened?  The capital raise was a huge

14:42:21  1   success.  It was what they call oversubscribed.  There was

14:42:24  2   more of an interest in investors than originally the shares

14:42:28  3   that were allotted.  So you'll see there that originally,

14:42:32  4   there was a certain number of shares.  They added more

14:42:35  5   shares to it.  Ultimately raised $287 million total, and the

14:42:40  6   proceeds to go to the bank after all of the fees are

14:42:44  7   approximately $273.9 million.

14:42:53  8          The standard under the scheme to defraud is if

14:42:59  9   it's a false or fraudulent statement or representation that

14:43:04  10  could deceive persons of average prudence.  The evidence has

14:43:07  11  shown that no outsiders testified that they knew about the

14:43:11  12  bank's waivers or mass extensions.  Jim Corkery from the

14:43:15  13  Federal Reserve.  David Fomunyam from the Federal Reserve.

14:43:19  14  John Depman from KPMG.  Mac Hodgson from SunTrust, and

14:43:24  15  Michael Schechter from JP Morgan.  These were all

14:43:29  16  experienced professionals in the banking and accounting

14:43:32  17  industry, all whom testified and said they were unaware of

14:43:36  18  the waiver practice and they were unaware of the mass

14:43:38  19  extension of loans at year-end 2009 and the first quarter of

14:43:41  20  2010.

14:43:44  21          You heard testimony and saw evidence that the

14:43:51  22  Federal Reserve specifically requested past due loan

14:43:54  23  information, and they didn't get the waivers.  And so we saw

14:43:58  24  the first day letter from the Federal Reserve, and in

14:44:05  25  connection with the first day request, there was a request

14:44:07  1     to submit a list of commercial and commercial real estate

14:44:10  2     loans 90 days or more past due which are not on a nonaccrual

14:44:14  3     basis and provide the reason why they are not considered to

14:44:17  4     be nonaccrual.

14:44:18  5             And what did the Fed get in response?  And you

14:44:22  6     can see the L-6 designation at the top left.  These are

14:44:25  7     loans 90 days past due.  They got a list of loans that

14:44:28  8     included loans that were past due because they had matured

14:44:31  9     and were in the process of extension, and based on that

14:44:35  10    list, as you heard Mr. Fomunyam, the understanding from the

14:44:37  11    Federal Reserve was that the bank was reporting matured

14:44:40  12    loans as past due.

14:44:44  13            Mr. Fomunyam also talked about the loan

14:44:47  14    discussions and why this list was important.  The Federal

14:44:51  15    Reserve examiners sat down with Mr. North and the

14:44:54  16    relationship managers and they went through each and every

14:44:57  17    single loan on the list to determine if the loan should be

14:45:00  18    reported as past due or reported as nonaccrual.

14:45:04  19            It had to be something, either past due or

14:45:07  20    nonaccrual, and you see some of the handwriting that's on

14:45:10  21    the list showing that they did engage in that process and

14:45:13  22    that the Federal Reserve would have reviewed all of the

14:45:16  23    loans if they would have been -- the evidence shows they

14:45:21  24    would have reviewed all of the loans had they been provided.

14:45:24  25            In the first day letter, there was also a

| | |
|---|---|
| 14:45:26 | 1 |
| 14:45:31 | 2 |
| 14:45:39 | 3 |
| 14:45:42 | 4 |
| 14:45:46 | 5 |
| 14:45:51 | 6 |
| 14:45:55 | 7 |
| 14:45:59 | 8 |
| 14:46:02 | 9 |
| 14:46:06 | 10 |
| 14:46:09 | 11 |
| 14:46:14 | 12 |
| 14:46:18 | 13 |
| 14:46:21 | 14 |
| 14:46:25 | 15 |
| 14:46:29 | 16 |
| 14:46:33 | 17 |
| 14:46:35 | 18 |
| 14:46:39 | 19 |
| 14:46:47 | 20 |
| 14:46:52 | 21 |
| 14:46:56 | 22 |
| 14:47:02 | 23 |
| 14:47:04 | 24 |
| 14:47:09 | 25 |

specific request as of March 31st, 2009, for all delinquent loans.  And Government Exhibit 213, the bank provided that as well.  And it's a little bit difficult to see on the screen, but I can enlarge the last column a little bit. You'll see that this particular document ends with the file date column.  There is no waiver column.  There is no comments column.  This is the information that the Fed got and it did not include the waived loans.

When the Federal Reserve came back for the target examination, they requested past due loan information as of September 30th, 2009, one of the largest periods in which there were matured waived loans.

And what did the Fed specifically request?  A listing of all CRE loans or relationships as of September 30, 2009 that were past due 30 days or more, and specifically references to provide the amount of past due principal.

What was provided in response?  And this is Exhibit 2 59.  A report that had less than a page of 90-day past due loans.  There were no waived loans, and there were no waiver columns.  And this is a quarter in which the bank waived approximately $300 million in relevant waived loans.

Now, Mr. Corkery and Mr. Fomunyam were -- they were asked about this ALERT data that is sent out in advance

14:47:14   1   of commercial bank's examinations.  Both Mr. Corkery and

14:47:18   2   Mr. Fomunyam testified that ALERT is used for one purpose,

14:47:21   3   and that is to create line cards.  And we saw examples of

14:47:26   4   the various line cards with the handwriting of Mr. Fomunyam

14:47:29   5   and other examiners.

14:47:31   6            And in their collective years of experience,

14:47:34   7   Mr. Corkery and Mr. Fomunyam testified that they never used

14:47:37   8   the ALERT data for past due loan reporting.  In fact, they

14:47:41   9   testified they never saw the ALERT data.

14:47:43   10            And why is that relevant?  The Fed specifically

14:47:47   11   requested past due loan information, and so there's no

14:47:50   12   reason at that time to believe that the bank is being and

14:47:54   13   the individuals providing the information are being anything

14:47:56   14   other than truthful.

14:47:57   15            One of the things that was important about the

14:48:02   16   use of the ALERT data.  If you recall, that information

14:48:07   17   could not be reconciled back to the call report.  There were

14:48:11   18   82 fields of information on the ALERT data.  There was one

14:48:14   19   in particular that had FRB information, where normally, if

14:48:18   20   you had information in the call report, that is something

14:48:23   21   that theoretically could have been done.  Wilmington Trust

14:48:25   22   did not provide the FRB information, so there was no way to

14:48:29   23   meaningfully reconcile the information back to the call

14:48:31   24   report.

14:48:31   25            And the final point is, it's not easy to find

14:48:38   1   even if you are looking for it.  And think back to when

14:48:42   2   defense counsel was sorting through all the ALERT data to

14:48:44   3   try to show it to Mr. Corkery that day.  We took at least

14:48:47   4   two different breaks over technical difficulties and trying

14:48:50   5   to figure out which particular loan should be included in

14:48:53   6   the sorting sample and which one shouldn't and to figure out

14:48:56   7   the spreadsheet and to try to get it exactly right.  That

14:49:01   8   took a long time to do that with a couple breaks, and that's

14:49:04   9   when everyone knows what to look for.  Imagine how hard it

14:49:06   10  is to find if you have no idea what you are looking for, or

14:49:11   11  no reason to question the information that the bank was

14:49:16   12  provided.

14:49:17   13          You also might hear an argument that the Federal

14:49:20   14  Reserve was aware of past due loan reporting because of an

14:49:22   15  audit services report that was provided to Mr. Corkery in

14:49:25   16  connection with the target examination.

14:49:32   17          And Mr. Corkery testified that he did, in fact,

14:49:35   18  receive a copy of an audit services report in January 2010,

14:49:39   19  and he told you that he was evaluating it for form over

14:49:44   20  substance.  And let's take a look first at the substance and

14:49:51   21  we'll get back to the form and look at some additional

14:49:53   22  documents.

14:49:53   23          The substance of this document refers to two

14:49:56   24  different spreadsheets of loans and two different lists, one

14:50:00   25  list that is going to have maturity dates through

6956

14:50:03    1    January 1st of 2010, and a second list of loans that are

14:50:06    2    going to mature through April 30th of 2010.

14:50:11    3            If you recall during Mr. Corkery's testimony,

14:50:15    4    after the top document was shown to him by defense counsel,

14:50:20    5    Mr. Corkery was shown a copy of Government's Exhibit 418, a

14:50:25    6    January e-mail that all the defendants are on.

14:50:28    7            And here is the information that wasn't on the

14:50:31    8    audit services document.  What was the first list?  Well,

14:50:35    9    the first list was 803 matured/maturing loans totaling

14:50:41   10    $1.3 billion.

14:50:43   11            What was the second list?  450 loans maturing

14:50:46   12    between January 1st of 2010 and April 30th of 2010 totaling

14:50:50   13    $432 million, and also a reference at the top to decades

14:50:50   14    old problem.  None of that information is on the other

14:50:50   15    documents.

14:51:00   16            That is the substance though.  Let's get back to

14:51:02   17    the form.  That was Mr. Corkery's testimony, that he

14:51:06   18    reviewed the document for form over substance.  How do we

14:51:11   19    know that's correct?  It's corroborated by the bank's own

14:51:15   20    documents.

14:51:15   21            And so you saw, and this is Government's

14:51:18   22    Exhibit 740.  This is a copy of the audit services packet

14:51:21   23    with the agenda for the meeting in January of 2010.  It

14:51:25   24    indicates that Ronald Pendleton was going to provide certain

14:51:29   25    information at that meeting.

14:51:33    1          In a later document, you got to see the minutes

14:51:36    2    of the meeting.  This is Government's Exhibit 741-R.  And

14:51:41    3    what does that state?  When Mr. Pendleton is talking about

14:51:46    4    the Federal Reserve, he notes, the second recommendation

14:51:49    5    will be that audit services revise the format of its issues

14:51:53    6    priority report and not remove issues from that report until

14:51:57    7    they are completed, completely consistent with what

14:52:02    8    Mr. Corkery testified is the information in the bank's own

14:52:04    9    meeting minutes of the audit committee.

14:52:07   10          Furthermore, it notes that Mr. Pendleton

14:52:12   11    summarized the particular plan that is referred to as

14:52:15   12    detailed.  It doesn't list any particular issues, and notes

14:52:20   13    that in the future, the departments issue priority report

14:52:24   14    "will be in the format the Federal Reserve recommended,"

14:52:30   15    once again, completely consistent with Mr. Corkery and what

14:52:33   16    he testified about the manner in which he was reviewing that

14:52:36   17    particular information.

14:52:40   18          The defendants also showed Mr. Corkery a later

14:52:42   19    version of the audit services report, but just for your

14:52:46   20    purposes and from the record, you can see it.  It's Defense

14:52:50   21    Exhibit 441.  It's a total packet of 335 pages that include

14:52:55   22    not only the audit services report, but a number of other

14:53:04   23    responses to examination findings.

14:53:04   24          And there's issue 220.  But look at the date,

14:53:09   25    July 9th of 2010.  This is a letter sent to the Federal

14:53:14    1    Reserve in the third quarter of 2010, well after the capital

14:53:19    2    raise and well after all of the various false statements in

14:53:25    3    call reports, SEC reports, and the monthly regulatory

14:53:27    4    reports.

14:53:28    5            And, ladies and gentlemen, you had a chance to

14:53:31    6    listen to Mr. Corkery and Mr. Fomunyam.  You saw them

14:53:36    7    testify.  You can evaluate their demeanor, evaluate their

14:53:40    8    credibility, but what Mr. Corkery testified to about the

14:53:45    9    audit services report is corroborated by the bank's owns

14:53:48    10   documents themselves.  And ask yourself if Dave Fomunyam and

14:53:52    11   Jim Corkery would have any hesitation of writing up the bank

14:53:57    12   on a particular issue if they knew about it given the manner

14:54:00    13   of the reports and the findings that they provided to the

14:54:04    14   defendant.

14:54:10    15           As we heard from Mr. Corkery, the bank is

14:54:13    16   ultimately given a troubled condition letter by the Federal

14:54:17    17   Reserve in August of 2010.

14:54:18    18           You also heard testimony that KPMG tested past

14:54:26    19   due loan information, and there was a particular work paper

14:54:30    20   that was introduced through Mr. Depman.  It was work paper

14:54:36    21   A-60.  And you'll see in the upper left-hand corner, the

14:54:39    22   designation PBC, which Mr. Depman testified meant "prepared

14:54:44    23   by client."

14:54:46    24           This is a copy of the bank's past due and

14:54:49    25   nonperforming loans report as of 12/31/2009 that was

14:54:54   1   provided by the bank to KPMG in order to test the accuracy

14:54:58   2   and completeness of past due loans.

14:55:01   3          And what hand as a result of that test?  If you

14:55:04   4   recall, Mr. Corkery testified that KPMG tested 25 loans and

14:55:09   5   there were no exceptions noted, so KPMG performs all of the

14:55:14   6   sampling, all of the testing that was set forth under its

14:55:19   7   audit manual and the test passed.

14:55:22   8          And you heard about the ticking and tying and

14:55:26   9   how KPMG would look at particular disclosures and the

14:55:30   10   highlighted portion of Footnote 8 we saw earlier, what the

14:55:34   11   bank reported in 90-day past due loans in its SEC report,

14:55:39   12   $30.6 million.  That is the reference there that they

14:55:47   13   followed from this internal report all the way to the SEC

14:55:49   14   report.

14:55:50   15          And Mr. Depman further testified that part of

14:55:53   16   the test program was to get a printout from the Shaw system

14:55:57   17   from a bank employee, and, again, the PBC designated,

14:56:04   18   prepared by client.  So this would have been a screen shot

14:56:07   19   of the Shaw system as he testified provided by a bank

14:56:10   20   employee to verify that the information on the past due

14:56:12   21   report was accurate.

14:56:13   22          Now, you also saw an exhibit introduced by the

14:56:19   23   defendants relating to a Wilmington Trust e-mail account

14:56:24   24   that was set up for KPMG, a general inbox, and you saw two

14:56:29   25   different e-mails from January of 2010.

14:56:33   1        There is the designation of the KPMG at

14:56:37   2   WilmingtonTrust.com inbox.  This was a document that was not

14:56:45   3   in KPMG's work papers.  As you can see from the Bates stamp,

14:56:49   4   it was provided by Wilmington Trust Corporation.  This

14:56:53   5   particular office, consolidated office or statistics report,

14:57:00   6   Mr. Depman testified, never saw before, KPMG didn't test

14:57:04   7   before.  And the language that was highlighted by defense

14:57:07   8   counsel was something about an adjustment due to the waived

14:57:11   9   loans in the delinquency section of the report.

14:57:14   10        Again, Mr. Depman testified he had no idea what

14:57:17   11   was a waived loan.  He had frequent interaction with each of

14:57:23   12   the defendants, particularly defendants Gibson and Rakowski,

14:57:28   13   was never told about waived loans, was never told about mass

14:57:31   14   extensions.  And so when you look at that e-mail, sent to

14:57:36   15   the general inbox, no meaningful description of waived

14:57:40   16   loans.

14:57:40   17        They replaced an e-mail that was sent two days

14:57:43   18   earlier to the general inbox.  It was not in KPMG's work

14:57:47   19   papers.  It was not sent by the defendants.  And it wasn't

14:57:51   20   sent to John Depman, and certainly these four defendants

14:57:54   21   knew how to find him.  And you saw that we introduced

14:57:56   22   certain e-mails that were sent by the defendants to Mr.

14:58:01   23   Depman.

14:58:01   24        Something else you might hear about relating to

14:58:04   25   KPMG is whether they were aware of maturities based on a

14:58:08    1    letter that they sent to the bank in the early part of 2010.

14:58:12    2              As Mr. Depman testified, KPMG identified a

14:58:15    3    deficiency relating to loan maturities, but what he said

14:58:21    4    was, that was from a risk rating standpoint, and they did

14:58:24    5    further testing that passed.

14:58:26    6              And so we showed certain documents, and start

14:58:30    7    with one e-mail that you might see from the defense

14:58:31    8    attorneys in their closing.  And the e-mail from Jason

14:58:37    9    Delozier dated January 15, 2009, and relates to a number of

14:58:41   10    matured loans that are on the system.  It is doesn't explain

14:58:47   11    whether these loans are 30 to 89 days past due, or 90 days

14:58:50   12    due, or anything.  But Mr. Delozier, who Mr. Depman

14:58:52   13    testified was not involved in the past due reporting

14:58:55   14    process, writes specifically questions about whether the

14:58:57   15    loans were properly risk rated and whether or not a pass

14:59:02   16    rating would be appropriate.

14:59:04   17              And so this particular finding makes its way

14:59:07   18    into a letter that was sent to the bank in February of 2010.

14:59:14   19    And what does it say?  We noted certain loans on the system

14:59:17   20    with past due maturity dates.  We recommend loans past their

14:59:22   21    maturity date be reviewed by the company's credit review

14:59:25   22    section, that's Mr. Infanti and Ms. Thuresson.  Such loans,

14:59:31   23    if performing, should be considered for technical watch

14:59:33   24    status.

14:59:34   25              And so the issue identified by KPMG has nothing

14:59:38  1    to do with past due loan reporting.  They did a separate

14:59:41  2    test for that, which passed.  This relates to risk ratings.

14:59:45  3            And I mentioned a minute ago that KPMG did

14:59:48  4    further testing of the deficiency that they identified.

14:59:52  5    That's also reflected in the work papers, where Mr. Depman

14:59:57  6    testified every deficiency would be included in a chart to

15:00:01  7    see what they did with the information.

15:00:02  8            And so the description, as we noted certain

15:00:09  9    loans on the system with past due maturity dates that were

15:00:13  10   not being addressed by management.  And the same document

15:00:14  11   has what the further testing was.  They did what auditors

15:00:16  12   do.  They selected a sample and verified that they had

15:00:19  13   extension agreements in place.  No exceptions noted.

15:00:22  14           So even for that deficiency, KPMG just didn't

15:00:27  15   stop the process.  They did further testing, and the

15:00:29  16   testing passed.  And you heard from Mr. Depman that you

15:00:32  17   can't review every single piece of paper of a client.

15:00:35  18   You test to find if there are problems, and the past due

15:00:40  19   loan testing passed, and the matured loans that were

15:00:44  20   sampled passed as well.

15:00:45  21           Now, just as important relating to this issue is

15:00:50  22   what the defendants thought that KPMG knew.  And so one of

15:00:55  23   the exhibits shown to Mr. Depman was a memo to the audit

15:00:59  24   committee that was co-authored by defendant North and

15:01:03  25   defendant Rakowski in April of 2010, in which the subject is

15:01:09   1    response to KPMG comments.

15:01:13   2            And so that document includes the specific

15:01:17   3    comment that KPMG made about loan review, about certain

15:01:21   4    loans with past due maturity dates.  And look at what the

15:01:24   5    management response was to this document drafted by

15:01:27   6    defendant North and defendant Rakowski.  They note that

15:01:30   7    loans of past due maturity will be considered for review by

15:01:33   8    the credit review division and placement on technical watch

15:01:37   9    status.

15:01:39   10           So if there's an argument about intent or that

15:01:42   11   the defendants thought that KPMG knew about the matured

15:01:46   12   loans issue, two of the four defendants write a memo in

15:01:50   13   which they're expressing their knowledge and intent of

15:01:52   14   what the issue is.  And so this response doesn't mention

15:01:59   15   AS220.  It doesn't mention the two lists, or it doesn't

15:02:04   16   mention as of April of 2010, a new way of reporting past

15:02:09   17   due loans.  It's consistent with Mr. Depman's testimony that

15:02:13   18   everyone thought that this issue related to risk ratings,

15:02:16   19   and most importantly, that is what two of the defendants

15:02:18   20   thought.

15:02:19   21           Now, Mr. Depman was shown the document from

15:02:26   22   audit services which had the information about a new way of

15:02:29   23   reporting past due loans as of March 31st of 2010.  He

15:02:33   24   testified that he was unaware of it and had not -- was

15:02:37   25   unaware of that particular provision within the report.

6964

15:02:43   1          There's further corroboration for that as well,

15:02:46   2   and so there's a Defense Exhibit 706, which is the bank's

15:02:52   3   own meeting minutes of the audit committee that were

15:02:56   4   provided to KPMG, and this is the audit committee meeting

15:02:59   5   where that audit services 220 issue would have been

15:03:01   6   discussed.

15:03:02   7          And so what does it say?  That Mr. Pendleton

15:03:07   8   reviewed the issues priority report, that he summarized the

15:03:13   9   specific issues coded in red in the report.

15:03:17   10          If you recall, we walked through this with Mr.

15:03:20   11   Depman.  There were four red issues and they were all

15:03:24   12   Priority one audit issues.

15:03:27   13          And so going back to AS220, that was a Priority

15:03:32   14   2 issue.  So according to the bank's over documents in terms

15:03:35   15   of the meeting minutes of the audit committee, this specific

15:03:39   16   issue was not discussed.  It was not a red issue.

15:03:43   17          Now, what else did Mr. Depman testify about

15:03:49   18   internal audit?  Another exhibit that was introduced by

15:03:52   19   defendant Gibson's counsel, it's Defendants' Exhibit 395,

15:03:56   20   and it was the KPMG audit manual relating to, among other

15:04:00   21   things, the evaluation and testing of the work of the

15:04:06   22   client's internal audit services.

15:04:08   23          And it notes in the audit manual, when we intend

15:04:15   24   to use specific work of internal auditing, we should

15:04:17   25   evaluate and perform audit procedures on that work to

1    confirm its adequacy for our purposes.  And furthermore, we

2    should compare the results of our work with that done by

3    internal audit.  The extent of this work will depend on the

4    circumstances and should allow for us to make an evaluation

5    of the overall quality and effectiveness of the internal

6    auditor's work being considered by us.

7            And so the defendants introduced another exhibit

8    which came from KPMG's work papers relating to how they

9    evaluated internal audit during the course of the 2009

10   audit.  And it states specifically, we would not plan to use

11   the work of audit services except in a direct assistance

12   capacity.  And all that meant is, they sent out letters to

13   clients and borrowers to confirm information.

14           So that's an important context for you all to

15   consider in terms of how KPMG considered internal audit  in

16   connection with the 2009 examination, how KPMG used internal

17   audit.

18           Mr. Depman testified that they did not test the

19   audit services report and they did not substantively rely on

20   internal audit in any way.  And that is, ladies and

21   gentlemen, reflected in their own work papers in an exhibit

22   that was introduced by the defense.

23           What did Mr. Depman rely on?  He relied upon

24   representations of the defendants.  And so we introduced the

25   management letter that would be sent to KPMG from Wilmington

Trust personnel in making certain representations, signed by
defendant Gibson and defendant Rakowski.  A second
representation sent March 1st, 2010, in connection with the
capital raise, making certain representations, again, signed
by defendant Gibson and defendant Rakowski.

      Mr. Depman testified he met pretty frequently
with each of the defendants.  He met most frequently with
defendant Gibson and defendant Rakowski, would ask
particular questions, and we'll see in a bit some of the
specific questions that were asked on a quarterly basis.

      Stock analysts like Mac Hodgson also would ask
questions about the commercial loan portfolio.

      So Government's Exhibit 427 is a question from
Mr. Hodgson where he's talking about the fact that the loan
portfolio is not declining.  It's an e-mail that was
addressed, among others, to Mr. Gibson, Mr. North.

      And he states, "Investors assume that banks are
kicking the can down the curb and will have to realize
greater losses in future quarters."  This is an outside
analyst asking specific ever questions relevant to past due
loans and loan extensions.

      You also saw during Mr. Hodgson's testimony that
he asked a specific question of defendant North in the
course of the earnings call for the first quarter of 2010,
where initially there was a question about, specifically

15:07:21     1     about 90-day past due loans.

15:07:23     2          And Mr. Hodgson asked:  You mentioned that the

15:07:29     3     90-day past due loans was driven by real estate construction

15:07:32     4     loans that matured, that hadn't paid off and you guys are

15:07:35     5     obviously working on extensions.

15:07:37     6          Then he asked the question:  The response from

15:07:41     7     Mr. North is, the profiles of these credits aren't

15:07:44     8     necessarily credits with issues or problems when four months

15:07:46     9     earlier, there was a reference to some of these same exact

15:07:49    10     loans as credit turds.  They were extended year-end 2009,

15:07:54    11     and once again, extended on the last week end in March in

15:07:59    12     2010.

15:08:03    13          And, finally, the underwriters asked specific

15:08:06    14     questions about the loan portfolio.

15:08:08    15          And you've seen now several times the business

15:08:10    16     due diligence and the certain questions that were asked

15:08:13    17     about credit underwriting guidelines, loan modification,

15:08:17    18     delinquencies, and the chart that was prepared for the

15:08:20    19     underwriters in order to market the capital raise.

15:08:27    20          Now, each of the counts of 1, 2 and 4 to 16 of

15:08:41    21     the indictment have certain elements that are common to

15:08:45    22     them, such as the defendant must act knowingly, and

15:08:50    23     depending on the offense either with an intent to defraud or

15:08:53    24     to deceive.

15:08:55    25          For certain counts, there's a requirement of

|  |  |  |
|--|--|--|
| 15:08:57 | 1 | willfulness.  There's also for certain counts a requirement |
| 15:09:00 | 2 | of materiality. |
| 15:09:02 | 3 | And you can review the specific instructions |
| 15:09:06 | 4 | provided by the Court for knowingly, willfully, intent to |
| 15:09:12 | 5 | defraud and intent to deceive, but one thing of importance |
| 15:09:15 | 6 | with respect to the willfully instruction, and that is at |
| 15:09:21 | 7 | the bottom, the last paragraph, last sentence.  Willfulness |
| 15:09:26 | 8 | requires an awareness that conducts was unlawful.  It does |
| 15:09:29 | 9 | not require proof that the actor knew of the existence and |
| 15:09:33 | 10 | meaning of the specific statute or regulation making his or |
| 15:09:37 | 11 | her conduct criminal.  It's awareness in the general sense |
| 15:09:41 | 12 | that the conduct is unlawful. |
| 15:09:44 | 13 | MR. BREEN:  Objection. |
| 15:09:44 | 14 | THE COURT:  Overruled. |
| 15:09:46 | 15 | MR. KRAVETZ:  And so ultimately, the Court's |
| 15:09:50 | 16 | instruction will control in that area. |
| 15:09:53 | 17 | Now, certain counts do not require proof of |
| 15:09:58 | 18 | willful conduct, and it's important that you consider |
| 15:10:01 | 19 | those counts under the standard that doesn't require |
| 15:10:03 | 20 | willfulness. |
| 15:10:05 | 21 | And those counts are 7 to 10, false entries in |
| 15:10:08 | 22 | banking records, and that is a charge that's against all the |
| 15:10:11 | 23 | defendants. |
| 15:10:12 | 24 | And Count 17 to 19, which is making false |
| 15:10:15 | 25 | certifications in financial reports, and that relates to |

15:10:19   1   defendant Gibson.

15:10:20   2          Now, the Court also provided an instruction on

15:10:25   3   intent to defraud, which means to act knowingly and with the

15:10:30   4   intention or purpose to deceive or to cheat.  In considering

15:10:33   5   whether a defendant acted with an intent to defraud, you may

15:10:36   6   consider, among other things, whether the defendant acted

15:10:38   7   with a desire or purpose to bring about some gain or benefit

15:10:42   8   to himself or herself or someone else, or with a desire or

15:10:47   9   purpose to cause loss to someone else.

15:10:51   10         And, again, when you are thinking about the

15:10:53   11   intent to defraud at issue here, certainly, the bank is

15:10:57   12   receiving a benefit by the false past due loan reporting,

15:11:02   13   and that applies to all of the call report information as

15:11:09   14   well as the securities filing in which investors invested

15:11:13   15   $287 million in the capital raise.

15:11:17   16         Another mental state is intent to deceive, and

15:11:22   17   that relates to Counts 4 and 6 and 7 to 10.  And as the

15:11:25   18   Court has instructed you, to act with an intent to deceive

15:11:29   19   means to act with intent to deceive or to cause a person to

15:11:35   20   believe that which is false.  So it is a different -- again,

15:11:36   21   the Court's instruction controls, but it's a different

15:11:38   22   standard than intent to defraud.  Unlike in intent to

15:11:41   23   defraud, there's no requirement to bring about a gain or for

15:11:44   24   benefit or to cause a loss.  It's simply to act with an

15:11:48   25   intent to deceive, to mislead someone to believe that which

is false.

The Court also provided an instruction on accomplice liability, and this instruction is important to the counts relating to defendant North, who did not actually sign the call report, the call reports, the SEC reports, or the monthly regulatory reports.  And it's also relevant to certain counts relating to defendant Rakowski, where she did not sign the specific document.

So as the Court has instructed you, it's a four-part test.  One or more of the principals committed the offense.

Two, the defendant knew that the offense charged was going to be committed or was being committed by the principal.

Three, the defendant knowingly did some act for the purpose of aiding, assisting, facilitating, or encouraging the principal in committing the specific offense charged, and with the intent that the principal commit that specific offense.

And, four, that defendant performed an act in furtherance of the offenses charged.

We are going to talk about Mr. North's conduct in a minute.  It's important to understand the standard as I do so.

As I mentioned, the principals are listed as the

15:13:13   1   Wilmington Trust Corporation, defendant Harra, defendant

15:13:15   2   Gibson as to all the counts.  Defendant Rakowski is a

15:13:18   3   principal as to particular counts, counts where she signed

15:13:22   4   the documents, and there's a listing of the counts where

15:13:26   5   accomplice liability applies.

15:13:29   6          Now, the Court also instructed on the standard

15:13:38   7   for materiality, and His Honor gave you two different

15:13:40   8   standards, depending on the type of document at issue.

15:13:43   9          The first is a substantial likelihood that a

15:13:45   10   reasonable investor would have viewed the information as

15:13:48   11   having significantly altered the total mix of information

15:13:51   12   available, and that relates primarily to the

15:13:55   13   securities-related offenses.

15:13:56   14          And the second is a natural tendency to

15:14:01   15   influence, or was capable of influencing the actions of the

15:14:04   16   decision-making body to which it is directed.  That's

15:14:07   17   Counts 5 and then 7 to 16.  Most of those counts relate to

15:14:13   18   where the false statement is made to a federal agency.  It's

15:14:16   19   not relating to an investor, but the issue relates to the

15:14:22   20   governmental entity.

15:14:25   21          Now, you will have the opportunity to review a

15:14:28   22   stipulation that the parties entered into.  It's marked as

15:14:31   23   Exhibit S-6.  And essentially, the defendants and the

15:14:35   24   Government agreed that the amount of 90 days past due loans

15:14:40   25   was material for purposes of how His Honor instructed you on

15:14:45    1    that standard.

15:14:45    2            And in particular, I will just read from Count

15:14:51    3    1, but you'll see there's similar language for the other

15:14:53    4    counts.  That the Government is required to prove with

15:15:00    5    respect to Count 1 that the quantity of loans that were past

15:15:03    6    due for 90 days or more were material.  The Court will

15:15:06    7    define material and materiality in its final instructions.

15:15:10    8    The parties stipulate and agree that those statements are

15:15:13    9    material and the Government does not need to produce any

15:15:16   10    additional evidence beyond this stipulation to establish

15:15:19   11    materiality to Count 1.  And you'll see that there are

15:15:24   12    similar representations to each of the counts in the

15:15:26   13    indictment.

15:15:27   14            That brings us to a discussion of the individual

15:15:36   15    defendants, and we'll start with defendant North.

15:15:41   16            Defendant North was the individual at Wilmington

15:15:47   17    Trust who approved waived loans.  You heard the testimony

15:15:50   18    from Mr. Cummings that Mr. North approved the waived loans,

15:15:54   19    would do so either orally or in person or in writing via

15:15:58   20    e-mail.  And it was the waiver decision and the sign-off to

15:16:02   21    Mr. North that would ultimately go to the finance

15:16:06   22    department, the controller's group, and be incorporated into

15:16:08   23    the past due and nonperforming loan report.

15:16:11   24            In terms of mental state, we talked about some

15:16:16   25    of the e-mails earlier that have bearing on Mr. North's

15:16:20   1   knowledge, intent, and willful conduct.   The example of the

15:16:24   2   one from June of 2008, noting his awareness that matured

15:16:29   3   loans were something that were extremely important and that

15:16:33   4   they would have an impact on the second quarter numbers,

15:16:37   5   what was being reported publicly.

15:16:41   6          We saw Government Exhibit 445 and 446,

15:16:46   7   describing what the standard was and the ultimate goal,

15:16:49   8   which was to report a true past due number that would not

15:16:52   9   contain any matured loan.

15:16:55   10          And another e-mail from Mr. Cummings that he

15:17:01   11   sent to Mr. North, and this is Government Exhibit 448,

15:17:04   12   October of 2009, where Mr. Cummings is sending information

15:17:09   13   to Marian Fean from internal audit, and at the bottom notes,

15:17:15   14   I am choosing to intentionally not discuss the waiving of

15:17:21   15   the reporting for regulatory and financial purposes.   Any

15:17:24   16   comments would be appreciated.

15:17:26   17          Mr. North made certain adjustments to the e-mail

15:17:31   18   before it went out, and that's reflected in bold, but

15:17:35   19   nothing with respect to that specific comment.

15:17:37   20          And if you recall, Mr. Cummings testified that

15:17:39   21   he sent that e-mail to Mr. North to cover himself.

15:17:45   22          Mr. North was also aware of the monthly

15:17:47   23   regulatory reports and the requirement to report past due

15:17:52   24   loans to the Fed on a monthly basis.   If you recall through

15:17:55   25   the testimony of Mr. Brewer, there was a big enforcement

15:17:58   1    binder that Mr. North left for Mr. Brewer when he took over

15:18:03   2    defendant North's job functions, and contained within that

15:18:08   3    binder was a letter, a draft of a letter from November of

15:18:11   4    2009 that ultimately went to the Federal Reserve, reporting

15:18:16   5    out the monthly regulatory report for October of 2009.

15:18:20   6         We saw earlier the technical deficiencies that

15:18:29   7    were identified by the Federal Reserve.  Mr. North was the

15:18:33   8    chief credit officer of the bank, and although you certainly

15:18:36   9    cannot consider bank policies, violation of bank policy as

15:18:41   10   to whether someone committed a crime or evidence of

15:18:43   11   violation of bank policy is not alone criminal activity, you

15:18:48   12   can certainly Mr. North's knowledge of the level of

15:18:52   13   noncompliance with bank policies when you are considering

15:18:56   14   his knowledge, his intent, and whether he acted willfully

15:19:00   15   with respect to the reporting of past due loans.

15:19:05   16        We also have evidence that Mr. North received a

15:19:12   17   copy of and provided edits to the specific disclosure

15:19:16   18   relating to past due loans in the SEC report, and this was a

15:19:20   19   document that came in through Ellen Roberts.  As you can

15:19:23   20   see, the subject is credit risk section, and it was the

15:19:29   21   specific section in the Form 10-K that related to past due

15:19:33   22   loans.  And Ms. Roberts noted that it was a pre-draft, that

15:19:39   23   she was including Mr. North on the distribution.  And Mr.

15:19:43   24   North provided certain comments, and I believe you saw

15:19:45   25   through the evidence what those comments were.

| | |
|---|---|
| 15:19:47 | 1 |
| 15:19:50 | 2 |
| 15:19:56 | 3 |
| 15:19:59 | 4 |
| 15:20:04 | 5 |
| 15:20:09 | 6 |
| 15:20:11 | 7 |
| 15:20:15 | 8 |
| 15:20:18 | 9 |
| 15:20:18 | 10 |
| 15:20:27 | 11 |
| 15:20:31 | 12 |
| 15:20:34 | 13 |
| 15:20:40 | 14 |
| 15:20:44 | 15 |
| 15:20:50 | 16 |
| 15:20:55 | 17 |
| 15:20:58 | 18 |
| 15:21:01 | 19 |
| 15:21:06 | 20 |
| 15:21:10 | 21 |
| 15:21:15 | 22 |
| 15:21:17 | 23 |
| 15:21:21 | 24 |
| 15:21:26 | 25 |

But the important thing is, Mr. North received a copy of the MD&A section.  He was aware of the information that was contained within the MD&A section that had the specific disclosures relating to 90-day past due loans, and he took the time to read it and to provide comments.

We also know that Mr. North was involved in the business due diligence for the underwriting process, and, once again, the specific questions that were asked during that process.

An e-mail, Government Exhibit 543.  This is the last weekend in March of 2010, an e-mail from Mr. North to defendant Harra and several other bank employees, talking about the extension of 176 loans on the last weekend in March of 2010, and he refers to what they are dealing with as the matured loans beast and also a fire drill.

And we note from the evidence that Mr. North is also someone who would talk to investors.  Once again, the e-mail from Mac Hodgson asking specific questions about relevant loan information.  And we previously saw the Q&A from the transcript of the earnings call where Mr. North is someone who is answering questions from investors during the call at the end of the first quarter of 2010.

And the last document with respect to Mr. North in this section.  If you recall, he wrote a memo in March of 2010 that was entitled "Tomorrow's meeting," and

15:21:29    1    specifically, it was a memo relating to matured loans.

15:21:34    2            And that memorandum referenced the issues that

15:21:39    3    the bank was experiencing, continuing to experience relating

15:21:43    4    to matured loans in the first quarter of 2010.  And he notes

15:21:49    5    the lack of information and the overall magnitude of the

15:21:52    6    undertaking, and states near the end of March, there is

15:21:56    7    simply no way that the lenders will be able to complete

15:22:00    8    full reviews and analyses of all of these matured/maturing

15:22:04    9    loans in Delaware commercial real estate to match the pace

15:22:07   10    of maturities over the next couple months.

15:22:12   11            And says in the end, in addition to it's

15:22:15   12    imperative that these extensions be followed up by the

15:22:18   13    full execution of any required document, I would also

15:22:21   14    suggest that we share this game plan with Jim Corkery at

15:22:25   15    the Fed.  And the evidence introduced at trial is that he

15:22:29   16    never did.

15:22:29   17            And the follow-up e-mail to Mr. Harra saying,

15:22:39   18    What we don't want are the Feds seeing a skew of matured

15:22:47   19    loans on Shaw.  They're never commented on the matured in

15:22:49   20    the past.  I want to give them no opportunity in the future.

15:22:49   21    Again in considering the good faith of defendant North, in

15:22:52   22    considering his intent, whether he thought that the Federal

15:22:55   23    Reserve was aware of all of these issues, the e-mail is

15:22:58   24    really important.  It's dated March 25th of 2010.

15:23:03   25            Next is defendant Rakowski.  Defendant Rakowski

15:23:12    1    was the bank's controller.  You've seen information and

15:23:16    2    documents that defendant Rakowski was proficient in

15:23:19    3    accounting guidance.  This particular document, Government's

15:23:26    4    exhibit, discusses an agenda of a disclosure committee

15:23:29    5    meeting where Ms. Rakowski was talking about Guide 3.

15:23:34    6    Remember Guide 3 is the industry guide that contains the

15:23:38    7    specific disclosure relating to past due loans.

15:23:41    8            We also saw introduced through Mr. Depman that

15:23:45    9    Ms. Rakowski would write detailed accounting and regulatory

15:23:50    10   memoranda on a quarterly basis that would discuss changes in

15:23:56    11   GAAP or regulatory reporting or income tax reporting over

15:24:00    12   the quarter, and would list how the bank was going to deal

15:24:05    13   with those changes going further.

15:24:07    14           Ms. Rakowski was also the relevant person.

15:24:12    15   She was the main point of contact for KPMG when KPMG would

15:24:17    16   have requests relating to how accounting policies were

15:24:20    17   applied at Wilmington Trust.

15:24:22    18           And you saw two examples of these inquiry

15:24:25    19   documents that Mr. Depman testified there were specific

15:24:29    20   questions that would be asked of Ms. Rakowski and/or

15:24:33    21   Mr. Gibson every quarter, such as whether there are any

15:24:36    22   new accounting policies, any new or changes to non-GAAP

15:24:40    23   policies, any changes in accounting policy, all information

15:24:45    24   that Ms. Rakowski was inquired of by KPMG during the

15:24:50    25   relevant time period.  And the testimony was that she never

15:24:53   1   disclosed the waiver practice or any of the iterations in

15:24:56   2   the policy of the waiver practice or the fact that there

15:25:01   3   were extensions.

15:25:02   4           Ms. Rakowski was aware of the findings of the

15:25:06   5   Federal Reserve in September of 2009.  If you recall, one of

15:25:10   6   the documents in her desk file was a letter dated

15:25:14   7   September 26th of 2009 that had some of the same specific

15:25:19   8   findings that were contained in the exam report relating to

15:25:24   9   use of interest reserves and extensions, working capital

15:25:27  10   lines of credit.  And that's the same information that we

15:25:32  11   saw earlier that was in Government's Exhibit 221-R.

15:25:37  12           In addition, Ms. Rakowski was aware of the

15:25:42  13   requirement for the bank to report matured loans on a

15:25:47  14   monthly basis to the Fed after the 2009 examination.

15:25:53  15           If you recall, there's a really important

15:25:55  16   e-mail, Government Exhibit 524, and you're going to have a

15:25:59  17   chance to see the actual version of the document.  This is

15:26:02  18   the document that came from, was introduced through the

15:26:05  19   records custodian of the bank.  It came in through, it was

15:26:09  20   represented that it came in through Ms. Rakowski's desk

15:26:11  21   files, and there was the handwriting at the top of the

15:26:14  22   document.

15:26:15  23           This is the document displayed on the screen.

15:26:18  24   And it starts with a question sent by Mico Slijepcevic,

15:26:23  25   where it states specifically, the regulators have asked

1    that we provide the past due report to them on a monthly

2    basis.

3                And near the bottom it states, Kevyn Rakowski

4    has asked if you could break down the waivers that were made

5    in September by category for the 30 to 89 and the over 90

6    bucket separately.  The two waiver categories she is asking

7    for are dollar amount of waivers related to matured loans,

8    dollar amount of waivers for other reasons.

9                So there's no question that the individual at

10   the bank responsible for accounting policies is the bank's

11   controller, is aware at the end of September of 2009 that

12   the bank is engaged in a waiver practice relating to matured

13   loans.

14               And what's is the response?  The response is

15   effectively that there are $338 million worth of waived

16   loans in that category in the third quarter of 2009.

17               And that particular e-mail is so important that

18   it's printed out from Ms. Rakowski's Outlook inbox.  You can

19   see Kevyn N. Rakowski in the upper left, signifying exactly

20   that it was actually printed out.  It was retained in Ms.

21   Rakowski's desk file, and the handwriting on top

22   specifically relates to the following.  "Regulators asked

23   for past due in call report.  That is everything."  And

24   there's emphasis on the word "past due."  It's underlined.

25               In addition, Ms. Rakowski is on Government

15:28:07    1    Exhibit 418, where there is the discussion of the mass

15:28:11    2    extensions and the fact that loans that were extended at

15:28:14    3    year-end 2009 did not have the proper needed level of

15:28:21    4    underwriting required, that they weren't supported by

15:28:25    5    thorough analysis in underwriting.

15:28:30    6         And Ms. Rakowski was aware at year-end 2009 that

15:28:35    7    there were significant problems with the bank's commercial

15:28:37    8    real estate and construction portfolio.  This is an e-mail

15:28:40    9    from defendant Gibson to Ms. Rakowski dated Monday,

15:28:44   10    December 28th, 2009, where it's referring to the poor

15:28:48   11    results for the loan portfolio for this quarter, and the

15:28:51   12    fact that Mr. Gibson wanted to initiate a very deep dive

15:28:56   13    into the details and performance characteristics of the

15:29:00   14    CRE/construction book.

15:29:01   15         And he writes further, we have a credibility

15:29:04   16    GAAP if we can't provide a better picture of the portfolio

15:29:07   17    given the large provision we expect in the rise in NPAs, or

15:29:13   18    nonperforming assets.  So, again, information, relevant

15:29:18   19    information that Ms. Rakowski has relating to that specific

15:29:21   20    segment of the loan portfolio at year-end 2009.

15:29:24   21         And Ms. Rakowski is also aware of information

15:29:28   22    coming out of the surge process, and the fact that in the

15:29:32   23    first month of January alone, there's a reduction of

15:29:36   24    $446 million in loans that had been rated pass.

15:29:42   25         There's evidence that Ms. Rakowski was involved

15:29:45   1   in meetings relating to the capital raise, and that Ms.

15:29:53   2   Rakowski received copies of the MD&A credit risk section,

15:29:57   3   the specific section of the Form 10-K that contained the

15:30:01   4   90-day past due loan information.

15:30:02   5          Ms. Rakowski signed the Form 10-K in her

15:30:09   6   position as senior vice president and controller, and she

15:30:14   7   wasn't surprised by the different findings from internal

15:30:18   8   audit relating to that audit services 220 issue.

15:30:22   9          Ms. Rakowski receives a copy of the document,

15:30:24   10   forwards it to Mr. Gibson and says, don't think that this is

15:30:27   11   a surprise, but did not see either of you on the

15:30:30   12   distribution list.

15:30:32   13          And for the amount of time that defense counsel

15:30:36   14   spent on audit services issue 220 in this particular case,

15:30:40   15   look at the individual at the bank who is responsible for

15:30:44   16   AS220 from finance.  It's not Marty McDonough, it's not

15:30:50   17   Mico Slijepcevic.  It's one person and it's Kevyn Rakowski,

15:30:53   18   the controller, and that's the bank's own documents.

15:30:57   19          Your Honor, I see I'm at 3:30, if it's time for

15:31:00   20   a break.

15:31:00   21          THE COURT:  All right.  Thank you, Mr. Kravetz.

15:31:03   22          Ladies and gentlemen, we'll take an afternoon

15:31:06   23   break for 15 minutes until quarter of four.

15:31:08   24          (The jury was excused for a short recess.)

15:31:43   25          THE COURT:  All right.  Everyone may be seated.

| | | |
|---|---|---|
| 15:31:44 | 1 | Mr. Kravetz, what's your estimate now? |
| 15:31:48 | 2 | MR. KRAVETZ:  I run through the last two |
| 15:31:49 | 3 | defendants, then talk about conspiracy, then that's the end, |
| 15:31:52 | 4 | Your Honor. |
| 15:31:52 | 5 | THE COURT:  All right.  So that's not very |
| 15:31:54 | 6 | helpful. |
| 15:31:54 | 7 | MR. KRAVETZ:  I realize that. |
| 15:31:56 | 8 | THE COURT:  Okay.  Well, so, Mr. -- |
| 15:32:00 | 9 | MR. KELLY:  What did you say? |
| 15:32:02 | 10 | MR. KRAVETZ:  I said I realize it's not helpful. |
| 15:32:06 | 11 | MR. DALTON:  I didn't hear it.  I'm sorry. |
| 15:32:08 | 12 | MR. KRAVETZ:  I think it's likely 4:30. |
| 15:32:09 | 13 | THE COURT:  Okay.  So, Mr. Kelly, the jury has |
| 15:32:13 | 14 | indicated that they really can't stay past 5:00, so I'm |
| 15:32:18 | 15 | perfectly happy if you want to just adjourn for the day when |
| 15:32:21 | 16 | Mr. Kravetz is finished, or -- I'm happy to do whatever you |
| 15:32:25 | 17 | want, but if you start talking and you are not finished at |
| 15:32:29 | 18 | 5:00, we're going to break and continue again tomorrow |
| 15:32:31 | 19 | morning.  And if you want to think about that, you can tell |
| 15:32:35 | 20 | me in ten minutes, that would be fine, too. |
| 15:32:37 | 21 | MR. KELLY:  That would be great, Your Honor. |
| 15:32:38 | 22 | Let me think about it. |
| 15:32:40 | 23 | THE COURT:  Okay. |
| 15:32:45 | 24 | (Short recess taken.) |
| 15:36:15 | 25 | -  -  - |

| | |
|---|---|
| 15:36:15 | 1 |

```
15:36:15    1              (Proceedings resumed after the short recess.)

15:45:55    2              THE COURT:  Mr. Foley?

15:46:01    3              MR. FOLEY:  Your Honor, piggybackying off of

15:46:05    4    Mr. Breen's objection, we're asking for a curative

15:46:07    5    instruction regarding the -- when the Government was talking

15:46:12    6    about willfully, they added in that it simply requires that

15:46:17    7    the defendant have a general sense of wrongdoing, and in the

15:46:22    8    prayer discussion, that phrase was discussed, it was

15:46:26    9    removed, but the jury then heard it anyway.

15:46:29   10              THE COURT:  Well, I removed it because I didn't

15:46:32   11    think it was necessary.  I didn't think it was wrong.  It's

15:46:36   12    a Court of Appeals opinion.

15:46:37   13              MR. FOLEY:  Well, it dilutes the standard

15:46:39   14    because it does, we think, require that they knew that the

15:46:42   15    conduct was unlawful, and when you give this sort of just

15:46:44   16    general sense of wrongdoing, it's diluting it.

15:46:47   17              So I think it was a misstatement.  It was taken

15:46:49   18    out of the instruction during the prayer conference, and I

15:46:53   19    think it's a pretty critical remark.

15:46:55   20              THE COURT:  Well, I'm not going to do anything

15:46:57   21    right now.  I will get the transcript and see what the

15:47:00   22    context was, but the fact that it's said in a general sense

15:47:08   23    by itself to me gets you nowhere, and if it was said with

15:47:14   24    wrong words around it, that would be something else.

15:47:17   25              MR. NOWAK:  In addition, Your Honor, was
```

6984

| | |
|---|---|
| 15:47:18 | 1 |
| 15:47:21 | 2 |
| 15:47:26 | 3 |
| 15:47:27 | 4 |
| 15:47:29 | 5 |
| 15:47:33 | 6 |
| 15:47:36 | 7 |
| 15:47:40 | 8 |
| 15:47:42 | 9 |
| 15:47:46 | 10 |
| 15:47:49 | 11 |
| 15:47:50 | 12 |
| 15:47:50 | 13 |
| 15:47:51 | 14 |
| 15:47:54 | 15 |
| 15:47:54 | 16 |
| 15:47:56 | 17 |
| 15:47:58 | 18 |
| 15:48:01 | 19 |
| 15:48:03 | 20 |
| 15:48:04 | 21 |
| 15:48:07 | 22 |
| 15:48:10 | 23 |
| 15:48:14 | 24 |
| 15:48:22 | 25 |

1  displayed for the jury was what was a purported jury

2  instruction concerning the statement of half-truths.  As you

3  might recall --

4  THE COURT:  No.  That I recall perfectly well,

5  Mr. Nowak.  You are right.  And I took it that there was a

6  prepared slide.  Mr. Kravetz didn't say anything about it.

7  It was not up there very long.  No juror could possibly have

8  said, hey, wait a second, there are four extra words there,

9  so I propose to do nothing about it.

10  There's nothing I can do about it that would,

11  like, help you.

12  MR. NOWAK:  Okay.

13  THE COURT:  Right?

14  MR. NOWAK:  We may do something about it in our

15  closing.

16  THE COURT:  Well, if you choose, you choose, but

17  I mean, you are perfectly right.

18  And I don't think -- Mr. Kravetz, I take it you

19  just had that prepared.

20  MR. KRAVETZ:  I didn't read that and talk

21  specifically about the other prong of Count 2.

22  THE COURT:  No, and I know you didn't read it,

23  and you did read -- it had two bullet points on the same

24  slide, so, yes.  Just an unfortunate thing, but nothing that

25  makes an a material impact on anything.

15:48:24    1            But if you want to bring it up in your closing

15:48:26    2    to say it's not concealment, yes, sure, go ahead, or

15:48:29    3    something.

15:48:30    4            MR. NOWAK:  It's not in the instructions.

15:48:32    5            THE COURT:  It's not in the instructions, right.

15:48:34    6            MR. NOWAK:  What you are shown by the Government

15:48:36    7    is not one of the instructions.

15:48:37    8            THE COURT:  I'm sorry.  What?

15:48:39    9            MR. NOWAK:  What you are shown by the Government

15:48:41   10    is not one of the instructions.

15:48:42   11            THE COURT:  All right.

15:48:44   12            MR. NOWAK:  I'm not -- I'm just considering it.

15:48:47   13            THE COURT:  All right.  Well, why don't you just

15:48:49   14    let me know what you are planning on doing.  But, you know,

15:48:52   15    it was shown to them.

15:48:53   16            MR. KRAVETZ:  Your Honor, page 52, you

15:48:54   17    instructed the jury, in addition, deceitful statements of

15:48:58   18    half-truths for the expression of opinion may constitute

15:49:01   19    false --

15:49:01   20            THE COURT:  Right.  But you had the words

15:49:04   21    concealment of something or other.

15:49:06   22            MR. NOWAK:  Material fact.

15:49:08   23            THE COURT:  Four words that I took out.

15:49:09   24            MR. KRAVETZ:  Oh.

15:49:10   25            THE COURT:  I mean, I think you corrected it,

15:49:17    1    even though I took it out until just now, but it was taken

15:49:21    2    out.

15:49:21    3         MR. NOWAK:  Additionally, the instruction is

15:49:23    4    knowledge of the statute giving rise to criminal conduct

15:49:25    5    does not need to be shown.  It doesn't say anything about

15:49:28    6    regulation, knowledge as a regulation.

15:49:30    7         THE COURT:  I'm sorry, Mr. Nowak.  I'm not sure

15:49:33    8    what you are talking about now.

15:49:34    9         MR. NOWAK:  Okay.

15:49:35   10         MR. FOLEY:  I know, Your Honor.  That was under

15:49:37   11    willfully, is the Government correctly read the sentence

15:49:41   12    that says, willfully does not require proof that the actor

15:49:44   13    knew of the existence and meaning of the statute of making

15:49:48   14    his or her conduct criminal.  That's Third Circuit.  But

15:49:52   15    what the Government did, they said statute or regulation.

15:49:54   16    They threw that in there, and that's a misstatement of the

15:49:59   17    law.  That takes it another whole step.

15:50:01   18         MR. NOWAK:  That's contrary to the other

15:50:02   19    instruction you gave the jury about violations of

15:50:05   20    regulation, not --

15:50:06   21         THE COURT:  I'm not going to do anything right

15:50:09   22    now.  What I heard did not offend me, so to speak.  I will

15:50:15   23    get a transcript tonight and look at it.  We can deal with

15:50:19   24    it tomorrow morning.

15:50:20   25         I'm not going to do anything right now.  Based

| | |
|---|---|
| 15:50:22 | 1 |
| 15:50:27 | 2 |
| 15:50:29 | 3 |
| 15:50:31 | 4 |
| 15:50:32 | 5 |
| 15:50:34 | 6 |
| 15:50:35 | 7 |
| 15:50:38 | 8 |
| 15:50:40 | 9 |
| 15:50:41 | 10 |
| 15:50:42 | 11 |
| 15:50:44 | 12 |
| 15:50:49 | 13 |
| 15:50:50 | 14 |
| 15:50:53 | 15 |
| 15:50:53 | 16 |
| 15:52:50 | 17 |
| 15:52:51 | 18 |
| 15:52:53 | 19 |
| 15:52:55 | 20 |
| 15:52:56 | 21 |
| 15:53:02 | 22 |
| 15:53:08 | 23 |
| 15:53:13 | 24 |
| 15:53:15 | 25 |

1  on what seemed to me just listening to it, would be fine.  I
2  do appreciate maybe I didn't catch everything.
3           MR. FOLEY:  Thank you, Your Honor.
4           MR. NOWAK:  Thank you.
5           THE COURT:  Are we ready to proceed?  Mr. Kelly?
6           MR. KELLY:  Depending on when Mr. Kravetz
7  finishes, I personally do the no mind starting and then
8  finishing, if that's okay with Your Honor.
9           THE COURT:  It's okay with me.
10          MR. KELLY:  All right.
11          THE COURT:  I want to do whatever you want to
12  do.  You can make a game time decision.
13          MR. KELLY:  Thank you, Your Honor.
14          THE COURT:  All right.  Go ahead.  Let's get the
15  jury.
16              (The jury entered the courtroom.)
17          THE COURT:  All right, members of the jury.
18  Welcome back.  Everyone, you may be seated.
19          Mr. Kravetz, you may proceed.
20          MR. KRAVETZ:  Thank you.  Good afternoon again.
21          Let's talk next about defendant Gibson.
22  Defendant Gibson was the CFO at Wilmington Trust.  He served
23  Wilmington Trust for more than 20 years, was the CFO, named
24  the CFO in 1996.
25          Mr. Gibson had degrees from two of the top

15:53:17  1    universities in the country, the University of Delaware, and

15:53:20  2    an MBNA in finance and accounting from Vanderbilt.   The

15:53:26  3    evidence shows that Mr. Gibson was a very experienced banker

15:53:29  4    and CFO.

15:53:30  5         Now, the evidence has also shown that Mr. Gibson

15:53:33  6    was aware of all of the findings that were presented by the

15:53:36  7    Federal Reserve.  Mr. Gibson was in the exit meeting, the

15:53:41  8    2009 full scope examination, the 2010 target examination,

15:53:45  9    and was aware of what was happening in connection with the

15:53:48  10   2010 full scope examination.  So all of the findings from

15:53:55  11   the Federal Reserve we looked at this morning, that was all

15:53:58  12   information that was shared with Mr. Gibson.

15:54:00  13        Mr. Gibson was also the principal person at

15:54:03  14   Wilmington Trust who signed the call reports, and in

15:54:06  15   particular, an attestation on the call report that states,

15:54:12  16   I, the undersigned CFO of the named bank, attest that the

15:54:16  17   reports of the condition and income, including the

15:54:19  18   supporting schedules, Schedule RC-N, for this report date

15:54:23  19   have been prepared in conformance with the instructions

15:54:26  20   issued by the appropriate federal regulatory authority and

15:54:29  21   are true to the best of my knowledge and belief.

15:54:32  22        And you've seen the evidence relating to

15:54:35  23   schedule RC-N in the reporting instructions, and His Honor

15:54:40  24   instructed you as to what those reporting requirements

15:54:43  25   mean.

15:54:43    1          In addition, Mr. Gibson signed the Form 10-K.

15:54:47    2   He also signed a number of other certifications, including a

15:54:51    3   certification relating to management's report on internal

15:54:54    4   controls over financial reporting, a document or a piece of

15:54:58    5   the Form 10-K also signed by Mr. Harra.

15:55:02    6          Mr. Gibson also signed the Section 1350

15:55:06    7   certification, and we'll see the specifics of that in a few

15:55:13    8   moments.

15:55:14    9          And there was an additional Rule 13(a)

15:55:19   10   certification signed by Mr. Gibson in connection with the

15:55:22   11   10-K, and it states, and I quote, "Based on my knowledge,

15:55:26   12   this report does not contain any untrue statement of a

15:55:29   13   material fact or omit to state a material fact necessary to

15:55:33   14   make the statements made in light of the circumstances under

15:55:36   15   which such statements were made, not misleading with respect

15:55:40   16   to the period covered by the report."  And that's the period

15:55:44   17   of 2009.

15:55:45   18          In addition, Mr. Gibson is aware not only of the

15:55:50   19   waiver practice, but the magnitude of waived loans.  This is

15:55:54   20   an e-mail dated November 16th, 2009.  It was sent by

15:55:58   21   defendant Rakowski to defendant Gibson, contained the

15:56:01   22   attachment for the October 31st, 2009, delinquency report,

15:56:07   23   the report that was approved by Mr. North.  And that portion

15:56:10   24   of the e-mail states, we did pull the waived loans from the

15:56:13   25   past due report.

15:56:16  1        So not only does Mr. Gibson have the attachment

15:56:20  2   forwarded to him which has all the information contained

15:56:23  3   therein, but the controller, the person who works directly

15:56:26  4   for him, is telling him, we did pull the waived loans.

15:56:29  5   They are not included in what we are reporting to the

15:56:32  6   public.

15:56:32  7        Mr. Gibson also spoke on behalf of the bank, and

15:56:40  8   not only did he speak on behalf of the bank, he made certain

15:56:42  9   statements relating to past due loans.

15:56:45  10        This is an important exhibit, Government

15:56:47  11   Exhibit 544, and it goes to Mr. Gibson's knowledge of

15:56:51  12   whether matured loans are past due.

15:56:54  13        And so you see at the bottom of the document,

15:56:56  14   it's an e-mail from Mr. Gibson to Mr. North and Ms. Towe on

15:57:01  15   July 7th of 2010.  The subject is matured loan affecting

15:57:04  16   delinquency and Fed pledged loans.

15:57:07  17        Mr. Gibson writes:  What does approved but not

15:57:11  18   documented mean?  Don't we document the approval?  Clearly

15:57:14  19   just matured and current does not cut it.

15:57:17  20        And so Mr. North responds.  I mean that we've

15:57:20  21   approved it internally, in the normal channel, but any

15:57:25  22   needed loan documentation has not been drafted and executed.

15:57:28  23        And what is Mr. Gibson's response?  Those are

15:57:32  24   past due.  We need those loans where we have executed

15:57:36  25   agreements.

| | |
|---|---|
| 15:57:37 | 1 |
| 15:57:40 | 2 |
| 15:57:42 | 3 |
| 15:57:46 | 4 |
| 15:57:49 | 5 |
| 15:57:55 | 6 |
| 15:57:56 | 7 |
| 15:57:58 | 8 |
| 15:58:03 | 9 |
| 15:58:06 | 10 |
| 15:58:10 | 11 |
| 15:58:14 | 12 |
| 15:58:17 | 13 |
| 15:58:20 | 14 |
| 15:58:23 | 15 |
| 15:58:27 | 16 |
| 15:58:29 | 17 |
| 15:58:32 | 18 |
| 15:58:35 | 19 |
| 15:58:39 | 20 |
| 15:58:42 | 21 |
| 15:58:45 | 22 |
| 15:58:50 | 23 |
| 15:58:54 | 24 |
| 15:58:58 | 25 |

It gets back to some of the concepts that we talked about this morning, the falsity of the past due loan reporting, and the fact that everyone within the bank, at least the four defendants, were aware that documents were required, executed documents in order to validate, extend loans.

I mention that Mr. Gibson spoke on behalf of the bank as the CFO.  He would spoke in roadshows.  He would spoke during the course of earnings calls.  This is an earnings call as of July 23rd of 2010, where the bank is reporting its results for the second quarter of 2010.

Mr. Gibson is asked a very specific question: Could you provide some color on why you determined that the 90-day delinquency loans should not go into nonaccrual status because, again, it has to be one or the other.  It's either past due or nonaccrual.

And the answer to Mr. Gibson is, there was a group of loans that for a variety of reasons, the renewal process is taking longer than expected.  They are current on interest, but technically, because they have matured, they are past due their principal.

And he notes, as a technical matter, a matured loan is past due principal.  That's the understanding of the Chief Financial Officer of Wilmington Trust in terms of when loans should be reported as past due.  None of this matured,

15:59:02     1    in process of extension.  It's past due unless you have the

15:59:06     2    documents executed.

15:59:09     3              And imagine, ladies and gentlemen, if this

15:59:11     4    standard was applied in the third quarter or fourth quarter

15:59:14     5    of 2009, or the first quarter of 2010, when we saw the

15:59:18     6    volume of waived loans, the relevant waived loans that

15:59:21     7    weren't matured, and ask yourselves how the numbers would

15:59:25     8    have looked if Wilmington Trust would have reported past due

15:59:28     9    loans, as Mr. Gibson described in the 2010 second quarter

15:59:34    10    earnings call.

15:59:35    11              There is evidence, and we've seen certain

15:59:38    12    documents and e-mails, and Mr. Gibson received a copy of the

15:59:42    13    credit risk section of the MD&A for the Form 10-K.  Here is

15:59:47    14    an exhibit that was introduced through Ellen Roberts in the

15:59:52    15    second quarter of 2010, where Mr. Gibson is suggesting

15:59:55    16    deleting the paragraph on the increase in past due 90-day

15:59:59    17    loans, and notes that the amount nearly tripled, which could

16:00:05    18    be viewed as a leading indicator.  Shouldn't we address

16:00:07    19    this?

16:00:07    20              We saw in the Form 10-K, the bank tells the

16:00:09    21    public, the defendants who signed the report tell the public

16:00:12    22    the 90-day past due loan information is one of their most

16:00:17    23    important metrics, and here there is a suggestion to remove

16:00:19    24    that metric, to not address the increase in the 90-day past

16:00:23    25    due loan information.

16:00:24   1          Mr. Gibson also met with Mr. Depman frequently.

16:00:28   2   He was the CFO.  Mr. Depman would have been his counterpart

16:00:32   3   as the lead audit engagement partner.  Just like with Ms.

16:00:35   4   Rakowski, there were certain inquiries that were made with

16:00:38   5   Mr. Gibson, and here is a specific inquiry that was made of

16:00:43   6   both Ms. Rakowski and Mr. Gibson.

16:00:47   7          And the request is, there's a question:  Are

16:00:49   8   there any new estimates or significant changes to existing

16:00:52   9   estimates made during the interim period, which would be the

16:00:54   10   second quarter of 2010?  If so, how have such estimates been

16:00:58   11   reported in the interim financial information?

16:01:00   12          And you'll see there, there is a reference to

16:01:05   13   deterioration in credit quality reflected in risk ratings

16:01:10   14   downgrade and increases in loans delinquent 90 plus days.

16:01:13   15          So there's a response to Mr. Depman about 90-day

16:01:18   16   past due loans in the context of risk ratings, but there's

16:01:23   17   no indication that this is a new way that the bank's

16:01:26   18   reporting for past due loans or that they had reported that

16:01:29   19   way in prior quarters.

16:01:29   20          Defendant Harra.  Defendant Harra is the

16:01:36   21   president of Wilmington Trust Corporation.  According to the

16:01:41   22   bio, and this is from Government's Exhibit 435, joined the

16:01:45   23   company in 1971, held many key positions.  Notes that he has

16:01:52   24   specialized in all aspects of commercial and personal

16:01:54   25   financial services.

| | |
|---|---|
| 16:01:55 | 1 |
| 16:01:58 | 2 |
| 16:02:04 | 3 |
| 16:02:07 | 4 |
| 16:02:12 | 5 |
| 16:02:16 | 6 |
| 16:02:19 | 7 |
| 16:02:21 | 8 |
| 16:02:24 | 9 |
| 16:02:29 | 10 |
| 16:02:32 | 11 |
| 16:02:35 | 12 |
| 16:02:39 | 13 |
| 16:02:41 | 14 |
| 16:02:44 | 15 |
| 16:02:49 | 16 |
| 16:02:50 | 17 |
| 16:02:56 | 18 |
| 16:03:01 | 19 |
| 16:03:08 | 20 |
| 16:03:10 | 21 |
| 16:03:14 | 22 |
| 16:03:14 | 23 |
| 16:03:16 | 24 |
| 16:03:19 | 25 |

Mr. Harra had been the President and Chief Operating Officer of the bank since 1996, so 13 or 14 years at the time of the charged conduct.  And it notes that in addition to his responsibilities as President and COO, "Mr. Harra also oversees all banking activities for the company."

And the testimony from the witnesses was, during the period 2009, Mr. Harra was the individual in charge of regional banking, was Mr. Bailey's supervisor, Mr. Conway's supervisor, and the direct supervisor of the leaders of the expansion market.

Mr. Harra, like Mr. Gibson, was also present at all of the exit meetings for the Federal Reserve examinations, the full scope examination, the target examination, and also was there in 2010, when the Fed came back for the full scope examination.

And there was a reference to Mr. Harra not being a numbers guy.  Once again, Mr. Harra is president and in charge of banking for a bank that has $9.2 billion in loans. He's in charge of regional banking.  People report directly to him who are the leaders of the bank relating to the banking.

And, ladies and gentlemen, you can't have it both ways.  You can't have the position and then make the argument, well, he didn't have the responsibility that went

16:03:23    1   with that position.   This is an $11 billion bank, a $9

16:03:28    2   billion loan portfolio, $50 billion in assets under

16:03:31    3   management.

16:03:31    4          Mr. Harra is the president and the COO.   So

16:03:34    5   consider that when you hear the argument, or if you hear the

16:03:37    6   argument from counsel that Mr. Harra was not a numbers guy.

16:03:41    7   Mr. Harra signed the MOU.   He was certainly aware of its

16:03:45    8   terms.   We've talked about the specific terms in paragraph

16:03:47    9   15, and there's Mr. Harra's signature along with the other

16:03:50   10   members of the Board of Directors.

16:03:52   11          There's certainly evidence in the record that

16:03:54   12   Mr. Harra was concerned about delinquencies.   The e-mail

16:03:58   13   from September of 2009, where Mr. Harra receives a copy of

16:04:02   14   the August 2009 past due report.   He forwards it to his

16:04:07   15   direct report, Mr. Bailey, who is in charge of the Delaware

16:04:10   16   bank.   He writes, Brian, delinquencies are headed in the

16:04:14   17   wrong direction.   Before you head out today, I hope you can

16:04:16   18   fire up the troops to work on this in view of the pending

16:04:20   19   quarter end.

16:04:21   20          It's important to him.   He is the president of

16:04:23   21   the bank.   The numbers are going to matter to the market and

16:04:26   22   he's telling his direct report to do something about it.

16:04:29   23          We heard from Mr. Conway that Mr. Harra would

16:04:35   24   share the Mid-Atlantic market meeting, and this is the

16:04:38   25   banking meeting where all of the top personnel, Mr. Conway

16:04:41     1     and Mr. Bailey would be present, and they would talk about

16:04:45     2     issues facing the bank.

16:04:46     3              And this is the agenda from December 9th --

16:04:50     4     December 8th of 2009, where Mr. Gibson also made a cameo

16:04:54     5     appearance and talked about capital generation and the

16:04:57     6     general economic view as of year-end 2009.

16:05:01     7              But look at what was specifically discussed at

16:05:04     8     that meeting.  Commercial real estate concentration.

16:05:08     9     Everyone is talking about what is happening with CRE at the

16:05:11    10     time.  And specifically, matured/maturing loans and past due

16:05:16    11     loans.  So all the leaders within the banking function are

16:05:20    12     talking about this issue during a period of time when the

16:05:24    13     bank is engaged in short-term extensions on a mass scale,

16:05:29    14     and also the loan approval process discussed by Mr. North

16:05:32    15     and Mr. Brewer.

16:05:33    16              Like the other defendants, there's evidence that

16:05:38    17     Mr. Harra received a copy of the draft of the MD&A section,

16:05:44    18     the credit risk section.  And this e-mail noted:  Dave, left

16:05:47    19     a few comments on your chair early this morning on the paper

16:05:50    20     copy.  RVAH.

16:05:53    21              If you recall, Ellen Roberts introduced the

16:05:56    22     actual exhibit that have the initials RVAH 2/8, so this is a

16:06:02    23     version of the document, one of the drafts that contained

16:06:07    24     the past due loan information, the rigorous loan

16:06:09    25     underwriting information, the appraisal information that you

16:06:11   1   saw earlier today.

16:06:13   2           Mr. Harra, as we saw earlier, would sign the

16:06:17   3   certification relating to management's report on internal

16:06:20   4   controls over financial reporting.  He also signed the Form

16:06:26   5   10-K as president, COO, and the director of the bank.  In

16:06:31   6   addition, Mr. Harra signed the call report, and there's a

16:06:34   7   similar attestation that Mr. Gibson made where, by his

16:06:38   8   signature, Mr. Harra declared that the reports of condition

16:06:41   9   and income have been examined by us, and to the best of our

16:06:44   10  knowledge and belief, have been prepared in conformance with

16:06:49   11  the instructions issued by the appropriate federal

16:06:51   12  regulatory authority and are true and correct, and the

16:06:54   13  evidence has shown that it was not.

16:06:59   14          Mr. Harra was also aware of the additional

16:07:05   15  short-term extensions of a bunch of loans on the last

16:07:08   16  week end in March of 2010.  And so, in this particular

16:07:12   17  e-mail, Government's Exhibit 543, there is a reference to

16:07:15   18  people coming in and pulling documents on Friday evening

16:07:19   19  and Saturday to get change in terms agreements for 176

16:07:25   20  deals.

16:07:26   21          So think about that.  The date of this e-mail is

16:07:29   22  Sunday, March 28th.  All of these people are at the bank.

16:07:33   23  They are pulling documents together.  It is, in fact, what

16:07:35   24  Mr. North described it as a fire drill, trying to get all of

16:07:40   25  this information pulled together to extend 176 different

16:07:45    1    lending relationships.

16:07:46    2            And that is information that Mr. Harra is aware

16:07:49    3    of.  You've seen the matured loan beast e-mail before and

16:07:52    4    the reference to the fire drill from Mr. North.  That is an

16:07:56    5    e-mail that goes to Mr. Harra, and then he makes a response

16:07:59    6    thanking the people that came in over the weekend to extend

16:08:04    7    all of those loans.

16:08:04    8            Now, the timing on this is important, because as

16:08:09    9    Mr. Corkery testified, defendant Harra met with the Federal

16:08:11   10    Reserve two days later in Philadelphia and did not mention

16:08:15   11    the second mass extension push let alone the first.

16:08:19   12            He also met in the exit meeting for the target

16:08:26   13    exam on April 6th, so less than a week after all of the

16:08:30   14    loans were extended.  Mr. Harra is there, Mr. Gibson is

16:08:33   15    there, meeting with Mr. Corkery and the other examiners and,

16:08:38   16    once again, neither defendant Harra nor defendant Gibson

16:08:41   17    mentions the mass extensions at that meeting either.

16:08:43   18            There are three counts that relate only to

16:08:50   19    defendant Gibson, and that's making false certifications in

16:08:53   20    financial reports.  And the Court has provided the

16:08:56   21    instructions in your packet.  But as we roll through them,

16:09:01   22    the first is that defendant Gibson was the CFO at Wilmington

16:09:04   23    Trust.  There has certainly been evidence introduced into

16:09:08   24    the record about Mr. Gibson's position, and you have seen

16:09:11   25    that reference in documents.

6999

| 16:09:12 | 1 | The second is that Wilmington Trust Corporation |
| 16:09:14 | 2 | was an issuer of securities regulated by the Securities |
| 16:09:18 | 3 | Exchange Act.  And you'll see in your packet of |
| 16:09:20 | 4 | instructions, the Court instructed you as a matter of |
| 16:09:22 | 5 | law relating to Wilmington Trust being an issuer of |
| 16:09:27 | 6 | securities. |
| 16:09:27 | 7 | The third is that Mr. Gibson certified that the |
| 16:09:31 | 8 | information complied with certain securities requirements, |
| 16:09:35 | 9 | and that "fairly presented in all material respects the |
| 16:09:39 | 10 | financial condition, the results of operations of Wilmington |
| 16:09:45 | 11 | Trust Corporation."  You'll see in parentheses references to |
| 16:09:47 | 12 | the certifications introduced into evidence, which are |
| 16:09:51 | 13 | Government's Exhibit 1-A, 4-A, 5-A, and Defense |
| 16:09:55 | 14 | Exhibit 4006. |
| 16:09:57 | 15 | The next is that the certification was |
| 16:10:00 | 16 | materially false. |
| 16:10:03 | 17 | And the final is that the defendant knew at the |
| 16:10:05 | 18 | time that the certification was materially false. |
| 16:10:08 | 19 | And with respect to that last element, I would |
| 16:10:10 | 20 | just ask that you take a look at the stipulation marked S-6, |
| 16:10:14 | 21 | which has a specific stipulation relating to the materiality |
| 16:10:18 | 22 | of a false statement. |
| 16:10:20 | 23 | The Section 1350 certifications, this is 1-A, |
| 16:10:27 | 24 | which I just mentioned.  This is essentially the charge that |
| 16:10:31 | 25 | Mr. Gibson made a certification that was false and complied |

16:10:34   1   with the elements, as the Court read them to you, but the

16:10:38   2   certification here is that what Mr. Gibson is signing fully

16:10:44   3   complied with all of the relevant requirements of the

16:10:47   4   securities and Exchange Act.

16:10:50   5          And this is Defendants' Exhibit 4006, which is

16:10:55   6   the document that I showed a few minutes ago, where

16:11:00   7   Mr. Gibson made certain certifications.  And you'll see in

16:11:03   8   paragraph 4 that there's a specific reference to Exchange

16:11:06   9   Act Rules 13-A, and 13-A and 15-D.

16:11:12   10          What didn't the reports fairly present?  They

16:11:15   11   did not fairly present accurate 90-day past due loan

16:11:20   12   information.

16:11:21   13          Now, you might hear from counsel for Mr. Gibson

16:11:26   14   a lot of talk about certifications or sub-certifications or

16:11:30   15   sub-sub-certifications or sub-sub-sub-certifications.  All

16:11:35   16   of the evidence shows that Mr. Gibson knew the information

16:11:39   17   was false.  He didn't need a sub-certification or a

16:11:42   18   sub-sub-certification from another employee to rely upon,

16:11:46   19   something that he could wash his hands of information that

16:11:48   20   he knew about.

16:11:49   21          So ask yourselves, ladies and gentlemen, if that

16:11:51   22   argument is presented to you about sub-certifications and

16:11:54   23   sub-sub-certifications, what did Mr.  Mr. Gibson know at the

16:11:59   24   time that he signed these documents?  What statements did he

16:12:02   25   make about past due loans and matured loans and when loans

16:12:05    1    were supposed to be reported, and evaluate that against the

16:12:08    2    arguments of down relating to certifications and

16:12:11    3    sub-certifications.

16:12:12    4         The last area to talk about today is conspiracy.

16:12:20    5    And, again, the Court's instructions are going to control,

16:12:23    6    but essentially, conspiracy is an agreement between two or

16:12:27    7    more people to knowingly defraud the United States or commit

16:12:31    8    a specific offense against the United States, and one overt

16:12:34    9    act in furtherance.

16:12:35   10         And the Court read in a number of overt acts

16:12:39   11    that are listed in your jury charge, and those are the

16:12:42   12    specific acts, and the only acts that you can consider

16:12:45   13    relating to the conspiracy.

16:12:48   14         So what is the conspiracy here?  It's as simple

16:12:52   15    as this.  It's an agreement to keep the reported past due

16:12:55   16    number down.

16:12:57   17         And as the Court instructed you, the Government

16:13:03   18    does not have to prove a formal agreement, that all of the

16:13:07   19    defendants agreed.  As you'll see in the instruction, it

16:13:11   20    requires two or more participants.  That it was a good plan,

16:13:14   21    or that it was a secret.

16:13:15   22         You heard a lot of talk in opening statements

16:13:19   23    about a requirement that a conspiracy be a secret.  What the

16:13:23   24    Court instructs you at the end of the day, that is what

16:13:26   25    controls.

16:13:27  1          Evidence of a conspiracy can be from reasonable

16:13:30  2    inferences from actions and statements.  And the Court also

16:13:34  3    I instructed you that evidence of related facts or

16:13:36  4    circumstances can be considered, and in terms of whether

16:13:40  5    there's a preconceived agreement, scheme, or understanding.

16:13:43  6          And, finally, joining the conspiracy.  The

16:13:48  7    Government need not prove that the defendant you are

16:13:50  8    considering knew everything about the agreement, about the

16:13:54  9    conspiracy, or that he or she knew everyone involved in it,

16:13:58  10   or that he or she was a member from the beginning.

16:14:01  11         The Government also does not have to prove that

16:14:03  12   the defendant played a major or substantial role in the

16:14:06  13   conspiracy.

16:14:08  14         Now, I talked a few slides ago that the

16:14:12  15   conspiracy was to keep, it was an agreement to keep the

16:14:17  16   reported past due number down.  That's the common scheme or

16:14:20  17   plan that you have to consider, the concealment of the

16:14:25  18   bank's true 90-day number, the true past due number from

16:14:29  19   regulators and investors outside the bank.

16:14:33  20         And here the evidence has shown that each of the

16:14:36  21   defendants possessed common knowledge about mounting

16:14:40  22   maturity issues at the bank, the bad economy and its impact

16:14:43  23   on getting loans extended, and internal problems with the

16:14:47  24   bank's practices and risk management.

16:14:50  25         All of the defendants were aware of the new

| | |
|---|---|
| 16:14:53 | 1 |

monthly reporting requirements to report past due loan

information under the MOU, and the heightened scrutiny that

the Federal Reserve was going to apply given the results of

the 2009 examination.

And by October and November of 2009, there is

evidence that each of the defendants was aware that

something had to be done about it, and you've seen exhibits,

and you've heard testimony that all four of the defendants

were doing, undertaking certain activity relating to

matured past due loans beginning in September and October

of 2009.

Each of the defendants had an important role to

play in the process.  That they were from different areas of

the bank is really of no consequence, or the fact that they

might not have had continual contact.  They were the

decision-makers relating to past due loans.  What they knew,

what they did with the information, all four of the

defendants were essential to keeping the reported past due

number down.

Mr. North was responsible for the initial

waivers.  Ms. Rakowski and controller's group was

responsible for the past due and nonperforming loan report.

Mr. Gibson and Mr. Harra signed the call report, attesting

that the information was true and correct to their best of

their knowledge and belief.  Ms. Rakowski, Mr. Gibson and

16:16:22  1      Mr. Harra signed the Form 10-K.

16:16:24  2             Somehow the evidence has shown that all four

16:16:26  3      defendants are aware that the information is going to be

16:16:28  4      reported publicly.  All four defendants are aware of the

16:16:33  5      magnitude of waived loans and the problems relating to

16:16:37  6      extending loans at the end of the fourth quarter of 2009,

16:16:43  7      and without each of the defendants, this doesn't happen.

16:16:46  8             If Mr. North doesn't approve the waivers, the

16:16:50  9      loans don't get waived.  If the controller's group doesn't

16:16:53  10     approve the past due nonperforming loan report, the

16:16:56  11     information isn't submitted publicly.  If defendants Harra,

16:16:59  12     Gibson or Rakowski don't sign the documents, the information

16:17:03  13     is not transmitted.

16:17:05  14            So by their knowledge, by their conduct, and by

16:17:10  15     their action, you can infer that the defendants were part of

16:17:13  16     an agreement to keep the reported past due number down.

16:17:18  17     Certainly, Mr. Gibson, Ms. Rakowski had more direct

16:17:21  18     interaction with each other.  Mr. North had more direct

16:17:25  19     interaction with Mr. Harra, that there are common meetings,

16:17:28  20     common e-mails, common other documents where they come

16:17:31  21     together.  And, again, each of the four is a decision-maker

16:17:34  22     in the process and this doesn't happen without them.

16:17:37  23            I want to end with the conspiracy to defraud the

16:17:46  24     Federal Reserve and talk a little bit about the one false

16:17:50  25     monthly regulatory report that was submitted to the Fed in

November of 2009.   It related to past due loan information

from October of 2009.

Now, the Court has given a specific instruction

that controls relating to defrauding the United States, and

the instruction indicates that to defraud the United States

means to obstruct or interfere with one of the United

States' Government's lawful functions, by deceit, craft,

trickery, or dishonest means.

And so here, the action of defrauding the United

States relates to providing false past due loan information

to the Federal Reserve in connection with call reports,

monthly regulatory reports and in advance of the target

examination.

The evidence has shown beyond a reasonable doubt

that the October monthly regulatory report was false.   We

have seen this now several times, the requirement to report

past due loan information within 20 days at the end of the

month.

Remember just a level set on timing.   The MOU

comes out October 21st of 2009.   Five days later, Mr. Harra

writes the e-mail relating to matured loans being critical

issues and overemphasizing the importance of the company.

The evidence didn't -- the evidence doesn't show

that Mr. Harra just decided to get up and do this one day.

This is five days after the MOU.   The bank is being forced

16:19:19    1    to do this.  This is the information that's being pushed out

16:19:22    2    to all of the chief lending officers at the bank.  This is

16:19:26    3    what's now required by the Federal Reserve who is asking for

16:19:29    4    information on a monthly basis.

16:19:32    5            And so we saw the e-mail from Ms. Rakowski, and

16:19:36    6    the date of that e-mail is October 28th of 2009, two days

16:19:40    7    after the Harra e-mail goes out to the lenders.  Once again,

16:19:45    8    the unity of purpose, where everyone is now dealing with a

16:19:48    9    new mandate that comes down from the Fed.  Where Ms.

16:19:51    10   Rakowski learns specifically about waived loans, Mr. North

16:19:55    11   knew the volume beforehand, the evidence has shown, but he's

16:19:58    12   on this e-mail as well, and this is the e-mail that again,

16:20:00    13   you want to take a look at.  It's the desk file,

16:20:04    14   Exhibit 524, that has handwriting on it relating to past due

16:20:07    15   and call reports.

16:20:09    16           The first MOU submission, and this is

16:20:14    17   Government's Exhibit 247, was the September 2009 past due

16:20:20    18   report, and it was sent to the Federal Reserve on

16:20:23    19   October 30th of 2009, where essentially, the document is

16:20:30    20   showing $17 million in commercial loans.  This is the

16:20:33    21   information that is going to the Fed in the very first

16:20:40    22   report after the Fed mandates the MOU.

16:20:42    23           And as we saw in the slide before, that

16:20:44    24   information was false.  It did not include the waived loans.

16:20:50    25   And you can see the significant difference when the number

16:20:52   1    jumps.   There it's 369 million.   When you exclude certain

16:20:58   2    information, it's around 296 million.

16:21:01   3          So the very first report that goes to the Fed

16:21:04   4    after the very critical examination process in the MOU is

16:21:09   5    false.

16:21:10   6          Fast-forward to the next month, November 16th of

16:21:13   7    2009, where Steve Cummings does what he always did, sends a

16:21:18   8    final delinquency report to the controller's group after it

16:21:20   9    was approved by Mr. North.   He says, attached is the final

16:21:24   10   list.   That report goes to Ms. Rakowski from Faye Loh, and

16:21:31   11   says, Kevyn, attached is the report from Steve.   Loans with

16:21:34   12   "Y" in the waived column is not included in our final

16:21:38   13   numbers.

16:21:39   14         Ms. Rakowski forwards that information to

16:21:44   15   Mr. Gibson, and you can see it actually contains the

16:21:48   16   spreadsheet with the Excel label, xslx for October 31st of

16:21:54   17   2009.   And she says, we did pull the waived loans from the

16:21:57   18   past due report, and references in the next-to-the-last

16:22:03   19   sentence, and this is an important statement, "Have not had

16:22:05   20   time to look at this or go back and do a comparative.

16:22:10   21   Numbers for October still seem to be higher than I would

16:22:13   22   have expected."

16:22:15   23         And that word "comparative" becomes important

16:22:17   24   when you evaluate what was actually sent to the Fed in

16:22:20   25   connection with the monthly regulatory report.

16:22:24   1          So on November 25th of 2009, a letter goes to

16:22:27   2     the Fed, and it contains the October past due and

16:22:30   3     nonperforming loan report.  And there's a particular

16:22:32   4     paragraph in that letter that relates to how Wilmington

16:22:36   5     Trust is reporting past due loans.  And ask yourselves,

16:22:39   6     ladies and gentlemen, based on all of the evidence and all

16:22:41   7     the testimony that you've heard in this case whether that

16:22:44   8     information is truthful or not.

16:22:46   9          It notes that you -- you will note in the

16:22:49   10    October 2009 past due and nonperforming loan report a rise

16:22:54   11    in the past due balances for October when compared to the

16:22:56   12    past due balances for September, the end of a calendar

16:22:59   13    quarter.  This rise in past due balances for months other

16:23:02   14    than the end of a calendar quarter are not unusual, as we

16:23:05   15    have historically ensured that loan payments are collected

16:23:08   16    quarterly.

16:23:08   17         I have also enclosed calendar quarter end past

16:23:12   18    due and nonperforming loan reports for the past five

16:23:15   19    quarters.  A comparison of these quarter-end reports better

16:23:19   20    reflects the payment history and capacity of our borrowers.

16:23:24   21    We have recently implemented changes in our billing and

16:23:26   22    collection practices so that in 2010 we expect to see more

16:23:29   23    normalized monthly balances and trends for past dues in

16:23:34   24    these reports.

16:23:34   25         This is the information that's going to the Fed.

16:23:38    1    Remember, none of the information contains any waived

16:23:41    2    matured loans, and the representation is, we're going to

16:23:45    3    compare what is in October to what comes from other months,

16:23:49    4    and you are going to see in a moment, the other months

16:23:51    5    didn't contain waived loans either.

16:23:53    6                    And what is the representation here?  That the

16:23:56    7    bank is changing its billing and collection practices.

16:24:00    8    Well, what's happening on November 25th of 2009?  They are

16:24:05    9    starting to go through the mass extension practice.

16:24:07   10                    So there's no reference in this letter to

16:24:09   11    anything having to do with the waiver practice or a mass

16:24:13   12    extension practice.  It's attributing a rise in past due

16:24:16   13    loans in October to billing and collection issues.

16:24:20   14                    Here is what was reported.  So as you can see,

16:24:24   15    the report, November 20th, 2009, if you remember from the

16:24:28   16    MOU, it had to be submitted, or printed out 20 days at the

16:24:32   17    end of the quarter.  And there's certain loan information

16:24:35   18    reported as of October 31st of 2009.

16:24:40   19                    As Mr. Hart testified, that that amount equaled

16:24:46   20    64.4 million in the relevant commercial loans, but look at

16:24:50   21    what wasn't included, $300.1 million.  These were loans

16:24:56   22    that, you know, they weren't excluded because of billing or

16:24:59   23    collection issues.  These are matured loans.  November 25th

16:25:03   24    of 2009, a time that everyone realizes there's a big

16:25:08   25    problem, that matured loans are overwhelming, and this is

16:25:11    1    the information that's provided to the Federal Reserve, and

16:25:13    2    that relates to Counts 10 and 16 of the indictment.

16:25:16    3                Now, that comparison that we saw, if you're able

16:25:22    4    to take a look at Government's Exhibit 243, which is the

16:25:27    5    actual report, you can see that someone from Wilmington

16:25:30    6    Trust prints out the past due report for September of 2008

16:25:33    7    on November 20th, for December of 2008 on November 24th,

16:25:40    8    June of '08 on November 2009, and September of 2009 on

16:25:46    9    November of 2009.

16:25:49   10                So three of the four reports are printed out the

16:25:51   11    same day as the October monthly regulatory report and all of

16:25:55   12    this is sent to the Federal Reserve to be part of the

16:25:58   13    comparison.  None of this information, ladies and gentlemen,

16:26:02   14    none of the prior reports contain any waived loan data.

16:26:09   15                And earlier you saw that that letter, the

16:26:13   16    November 25th, 2009 letter that went to the Federal Reserve,

16:26:16   17    Mr. North had an earlier copy of the letter in his

16:26:19   18    enforcement binder that was ultimately provided to

16:26:23   19    Mr. Brewer.

16:26:24   20                The other monthly submissions were also false.

16:26:29   21    So in the large packet, Government Exhibit 247, it is like

16:26:35   22    200-plus pages of past due information submitted under the

16:26:39   23    MOU.  Here is the version submitted December 31st of 2009.

16:26:44   24    It reports about $7.8 million of past due loans.  If you

16:26:49   25    recall, the actual number from the charts was close to 300

16:26:52  1    million that was waived.  March of 2010, $20.5 million

16:26:57  2    reported.  A little bit over $31 million in waived.

16:27:01  3         So the relevant monthly regulatory reports

16:27:05  4    during the conspiracy period that are important to the

16:27:08  5    Federal Reserve at the time period, they're all false.

16:27:12  6         We've also seen that waived loans were not

16:27:15  7    included in the target examination and you saw this exhibit

16:27:18  8    before.  This is L-3.  This is the first day request that

16:27:22  9    the Fed made in connection with the target exam.  If you

16:27:25  10   recall, this is September of 2009, not even a page full of

16:27:30  11   over 90-day loans and none of the waivers.

16:27:33  12        And, finally, consider this in mind when, or

16:27:43  13   when or if any of defense counsel makes an argument about

16:27:45  14   the Federal Reserve knowing about the waiver practice.

16:27:50  15   Once again, this is the memorandum that is sent out by Mr.

16:27:58  16   North to Mr. Harra.  Mr. Gibson was present at the meeting

16:28:00  17   where matured loans were being discussed, and Mr. North

16:28:04  18   notes, I would also suggest that we share this game plan

16:28:07  19   with Jim Corkery at the Fed, and the evidence has shown that

16:28:10  20   that did not happen.

16:28:11  21        Last legal point.  There's an instruction

16:28:16  22   relating to responsibility for offenses committed by

16:28:19  23   co-conspirators.  It's under the heading Pinkerton.  It's

16:28:23  24   important that, ladies and gentlemen, that you review that

16:28:27  25   specific instruction, which is going to control, but it

16:28:30    1    talks about liability for substantive offenses, so we have

16:28:34    2    the conspiracy offense, which is Count 1.

16:28:37    3            The remainder of the offenses are called

16:28:39    4    substantive offenses.  And so for each of those offenses,

16:28:42    5    the Court has given you specific instructions that if you

16:28:45    6    find that a defendant was a member of the conspiracy and

16:28:49    7    that the acts of the other was reasonably foreseeable to him

16:28:52    8    or her, that they can also be responsible for the underlying

16:28:56    9    offenses, so we would ask that you carefully consider that

16:29:00   10    instruction in discharging your responsibilities.

16:29:04   11            So I think there's only one thing that probably

16:29:13   12    all of us agree upon, and that's just to thank you for your

16:29:17   13    service.  This has been a tremendous undertaking, a

16:29:19   14    tremendous public service that you've performed over the

16:29:22   15    last seven to eight weeks, and you certainly have some more

16:29:25   16    work to do.

16:29:26   17            You are going to hear from counsel for each of

16:29:29   18    the defendants and then you'll hear at the end of the case

16:29:33   19    one last time from Mr. McCall.  And at the end of

16:29:36   20    everything, we're going to ask that you return the only

16:29:38   21    verdict consistent with the evidence, and that's a verdict

16:29:40   22    of guilty as against all the defendants as to each of the

16:29:43   23    charges.

16:29:44   24            Thank you for your time.

16:29:45   25            THE COURT:  Thank you, Mr. Kravetz.

16:29:50    1          All right.  So, members of the jury, I believe

16:29:57    2  that Mr. Kelly is going to start on Mr. Harra's behalf,

16:30:01    3  though we know we're going to finish at 5:00 today, and the

16:30:09    4  expectation is not that Mr. Kelly will finish in a

16:30:13    5  half-an-hour, so he will continue tomorrow morning.

16:30:15    6          Right?

16:30:16    7          MR. KELLY:  Yes, Your Honor.  I'm not going to

16:30:21    8  keep the jury past 5:00 o'clock.  I will try to get as much

16:30:23    9  as I can and finish up tomorrow if that's okay with Your

16:30:26   10  Honor.

16:30:31   11          May I proceed, Your Honor?

16:30:32   12          THE COURT:  Yes.

16:30:32   13          MR. KELLY:  Mike Kelly.  I represent Bob Harra,

16:30:37   14  and I join Mr. Kravetz's thanks.  I know it has been a long

16:30:42   15  time, and on behalf of Mr. Harra and my team, thank you so

16:30:45   16  much.  It's how the system works and we need people like you

16:30:49   17  to put in the time.

16:30:50   18          We didn't put in a -- the defense hasn't put in

16:30:57   19  a long case for one reason, and Judge Andrews, His Honor

16:31:02   20  explained to you, the Government, the Government alone has

16:31:06   21  the burden of proof here, and they have to prove a lot of

16:31:10   22  things for each element, but one of the most important is

16:31:14   23  they have to prove beyond a reasonable doubt that each of

16:31:17   24  the defendants, in my case, Bob Harra, had what they call

16:31:22   25  criminal intent, that he knew what he was doing was wrong

16:31:30      1      and he said, I'm going to do it anyway.

16:31:31      2              And I didn't hear anything in the five weeks of

16:31:37      3      the Government testimony.  I heard about concern and the

16:31:41      4      numbers were rising and the Great Recession, but I didn't

16:31:44      5      hear anything about -- and I didn't hear anything just now

16:31:48      6      about, hey, don't do this.  It's wrong.  Don't do this.

16:31:53      7      It's the wrong way to report.  This is not the way to do it.

16:31:58      8      In fact, I didn't hear any evidence that Mr. Harra even knew

16:32:05      9      what the regulations are.  In fact, the only evidence that

16:32:09     10      came in was Mr. Depman.

16:32:11     11              Remember I asked him, is Bob Harra the kind of

16:32:14     12      guy that knows regulations?  And he chuckled and he laughed.

16:32:18     13      And I want to spend some time on that, but I'm also going to

16:32:21     14      spend some time on evidence, and not just documents.

16:32:28     15              I frankly was waiting all along after five weeks

16:32:35     16      of testimony.  It's like the person who is telling you -- I

16:32:40     17      don't know if you had this experience, telling you a long

16:32:42     18      story.  I get this with my kids.  When are you going to get

16:32:45     19      to the point, dad, or a joke, when is the punchline?  When

16:32:49     20      is the punchline?  I kept waiting and waiting.  All right.

16:32:52     21      You know, they say it's wrong, they say this is the right

16:32:56     22      number, but where is the evidence that somebody else says,

16:33:00     23      this is the wrong way to report?  They were reporting these

16:33:04     24      loans the same way for 28 years, 28 years, and you saw the

16:33:13     25      e-mails, and I will get to them probably tomorrow.

16:33:15   1   Everybody knows about it and they're disclosing it.   They

16:33:19   2   are not hiding it.   You know, 72 people.

16:33:22   3            I want to talk about what was disclosed in

16:33:24   4   writing to KPMG.   I want to talk about what was disclosed in

16:33:28   5   writing to the Fed.   And I kept waiting for it.   My

16:33:33   6   goodness, where is the evidence, any of it, that these four

16:33:40   7   and my client, Bob Harra, said, oh, my gosh.   I know this is

16:33:44   8   not the right way to report this.   Oh, my goodness.   You

16:33:49   9   didn't hear it.

16:33:51   10            And all this testimony from 22 witnesses, let me

16:33:56   11   read to you testimony.   Again, we heard a lot about, and,

16:34:02   12   you know, I was waiting for the punchline.   How long were we

16:34:05   13   here?   Risk rating, supplemental financing, ten percent rule

16:34:11   14   and all of these things.   And remember when I said in the

16:34:14   15   opening, this case centers around the reporting of matured

16:34:18   16   loans that were current for interest in the process of

16:34:22   17   extension.   I kept waiting to say, what does all of this

16:34:26   18   stuff have to do with that?

16:34:27   19            This case centers around the allegation that

16:34:31   20   this man right here intentionally concealed from the

16:34:37   21   Government, concealed from the Government how they were

16:34:41   22   reporting these loans as if some point, after 28 years, you

16:34:45   23   know, he woke up and said, you know what, I'm going to --

16:34:50   24   you know, they've been doing it for 28 years, as long as

16:34:53   25   I've been here.   I'm going to commit a crime and I know what

16:34:56    1    I'm doing is wrong.

16:34:57    2              Come on.  Let me read you the testimony and

16:35:02    3    paraphrase.  This is Mr. Corkery.  The case centers around

16:35:07    4    concealing this reporting of matured loans, and everybody

16:35:13    5    calls it the waiver practice.  Okay.  Supposed to say the

16:35:16    6    waiver practice.

16:35:16    7              And Mr. Corkery was told that the matured loans

16:35:20    8    were not considered to be past due, interest was current,

16:35:24    9    and progress was being made toward renew and extension?

16:35:29   10              And he said yes.

16:35:29   11              And this document was given by the bank to the

16:35:31   12    Fed during the 2010 full scope exam, was it not?

16:35:36   13              Yes.

16:35:37   14              These are the federal work papers?

16:35:40   15              Correct.

16:35:41   16              And they are the federal work papers.

16:35:45   17              "This document describes the bank's waiver

16:35:47   18    practice, doesn't it, Mr. Corkery?

16:35:50   19              "Answer:  It doesn't say waiver, but, yes.

16:35:55   20              "Question:  It doesn't talk about the bank's

16:35:57   21    treatment of its matured loans though, does it?

16:36:02   22              "Answer:  It does.

16:36:04   23              "Question:  This document describes the bank's

16:36:07   24    waiver practice, doesn't it, Mr. Corkery?

16:36:11   25              "Answer:  Yes."

| | |
|---|---|
| 16:36:13 | 1 |
| 16:36:19 | 2 |
| 16:36:22 | 3 |
| 16:36:25 | 4 |
| 16:36:27 | 5 |
| 16:36:33 | 6 |
| 16:36:39 | 7 |
| 16:36:43 | 8 |

1    Conceal the waiver practice?  When this guy -- I

2  didn't hear much about testimony here.  Mr. Kravetz is a

3  great lawyer, he's a good man.  This team, they're good

4  people, they are doing their job, but the stakes are high

5  here, and concealing the waiver practice from the Fed when

6  this guy under oath says it wasn't concealed?  I submit to

7  you the case should be over on that alone, on that alone.

8  Criminal intent?

9    Now, let me display to you a document.  I don't

10 know if you can read this.  This is the issue.  They yelled

11 at me for turning around during my opening.  Look, I've got

12 a screen here.  I'm going to look at it.  Can you see it?

13    All right.  And this is April 13th, 2010.  Look

14 at the lower right.  Federal Reserve, BP.  That's from the

15 Federal Reserve files.  Look at the top.  Issue 220.

16 Properly process and account matured loans.  Short-term

17 extensions approved.  Comprehensive portfolio review

18 progressing.

19    And look.  In the past, the level of matured

20 loans was problematic.  However, these matured loans were

21 not considered to be past due if interest was current and

22 progress was being made towards renewal/extension.

23    All right.  This was disclosed to the Feds.  I

24 just read you the testimony.  Here's the documentation here.

25 Disclosed in writing, in writing.

16:38:05  1      Conceal the waiver practice?  Their burden of

16:38:12  2  proof.  We have no burden of proof, none.  As you heard His

16:38:18  3  Honor say, we don't have to come up with any evidence,

16:38:22  4  nothing.  It's all their burden of proof, and they're saying

16:38:26  5  it's conceal the waiver practice.

16:38:30  6      You know, I was looking at all of these things

16:38:35  7  that, this other stuff that I said I kept waiting for the

16:38:39  8  punchline, and, you know, the risk rating, interest

16:38:44  9  reserves, the appraisals.  Right.  And in closing, I can

16:38:49  10  come up with an analogy; right?  And because I played

16:38:55  11  football and boxed all my life, I'm going to try to avoid

16:38:59  12  all of those.

16:39:00  13      But how about a shotgun?  Let's hear about all

16:39:02  14  of this stuff.  Let's hear about how bad the bank was.

16:39:06  15  Let's hear about the risk rating, the supplemental

16:39:09  16  financing.  And how long did we talk about that stuff?  That

16:39:11  17  was most of the testimony, concealing the waiver practice

16:39:17  18  and the intent to conceal the waiver practice.

16:39:23  19      And how much of the stuff was about the bank?

16:39:28  20  Right?  We're talking about these four people right here.

16:39:32  21  You know, the bank did this, the bank did that.  How much

16:39:35  22  did we hear that Bob Harra, said, oh, I know this is wrong

16:39:40  23  and I'm going to do it anyway.  You didn't hear anything

16:39:42  24  about that.  How is that?  You didn't hear anything about

16:39:45  25  that.

16:39:46   1      You didn't hear anything that he ever thought

16:39:48   2   that anything he was doing was illegal.  You didn't hear

16:39:51   3   anything about anything he thought he was doing and

16:39:55   4   following along 28 years was a crime.

16:39:59   5      All right.  Risk rating, supplemental financing.

16:40:04   6   Bob is not charged with any crime of having bad appraisals,

16:40:11   7   abusing the ten percent rule.  By the way, the bank changed

16:40:14   8   that rule, changed that rule in 2008, and Joe Terranova

16:40:19   9   stopped it in the fall of 2009.  Supplemental financing.

16:40:24   10  The bank changed that rule in April of 2009.

16:40:27   11     And where is the evidence that Bob abused the

16:40:30   12  ten percent rule, abused the interest reserve, that Bob

16:40:34   13  abused supplemental financing?  Guess who did abuse?  Take a

16:40:38   14  wild guess.  Joe Terranova and Brian Bailey.

16:40:42   15     And what did the bank do?  What did the bank do

16:40:46   16  with them?  Oh, they fired them.  They fired them.

16:40:52   17     So this document, you know, the Feds have it in

16:40:56   18  their possession.  There is the number, and look at the

16:41:01   19  date.  It's all there.  It's all there.

16:41:07   20     Now, let me just say something, because I am

16:41:14   21  going to be back tomorrow and hopefully not too long.  But,

16:41:21   22  Your Honor, may I leave the podium?

16:41:23   23     This man is not a liar.  This man did not

16:41:30   24  defraud the Government.  This man -- the evidence has not

16:41:33   25  shown that this man has done any of that.  The evidence has

16:41:40    1    shown to the contrary.  That he's an honest man, that he's a

16:41:46    2    truthful man.  And I ask you, look, I didn't keep them on

16:41:52    3    very long, but the Government put his truthfulness and

16:41:54    4    honesty at issue, and I ask you, and I ask you to think

16:41:58    5    about this.  Would the Reverend take an oath in this

16:42:04    6    courtroom and lie about what he thought about Bob Harra's

16:42:08    7    truthfulness?  And I ask you, would Brother Ronald come in

16:42:11    8    here and take an oath, and when you say, what's the

16:42:15    9    truthfulness and honesty on a 1 to 10?  He said 13.  Think

16:42:19    10   about that.  Think about that.  Think about what evidence

16:42:22    11   the Government came up with will to show this guy would lie

16:42:30    12   to anybody.

16:42:33    13           This guy would lie to the Government?  Worked

16:42:38    14   his way up in the bank, trainee.  This guy is going to lie

16:42:45    15   to the Government?  Risk everything he worked for?  Risk his

16:42:51    16   family's name?  Do you really think beyond a reasonable

16:42:59    17   doubt?

16:43:00    18           The Government called 22 witnesses, 22.  Not one

16:43:09    19   of them, not one of them that was asked -- not all were

16:43:13    20   asked, but not one that was asked said Bob told them to lie

16:43:18    21   to the Government.  This is a fraud case.  This is a conceal

16:43:23    22   from the Government case.

16:43:25    23           Did any of them say Bob told them to conceal

16:43:29    24   anything?  Not one.  In fact, they said to the contrary.

16:43:34    25   Mr. Brewer said, Mr. Harra never asked him to conceal

16:43:37    1    anything from the auditors, regulators, anyone else.

16:43:40    2            Mr. Conway, he started the same day.  Remember

16:43:44    3    they started 40 years.  They worked alongside.  Said never

16:43:48    4    asked him to conceal or lie to the Government, and he said

16:43:52    5    never.  And I agree with my friend, Mr. Kravetz.  You do

16:43:55    6    look at how the witness presents himself or herself

16:43:59    7    remember when we asked him, did he ever do that?  Never,

16:44:03    8    never.

16:44:05    9            And the list goes on.  Their witnesses,

16:44:09   10    Mr. Infanti, Tosha Styles, Ellen Roberts, Mitch Slijepcevic.

16:44:18   11    All I remember he gives the Mitchapalooza.  That's all I

16:44:22   12    remember, but I don't know if I pronounced his name right.

16:44:26   13    Barbara Marley.  John Depman.  Even John Depman, KPMG.

16:44:33   14    Steve Cummings.  None of these people.  They all said that

16:44:39   15    neither Bob nor anybody else told them to lie about what

16:44:45   16    was in the report, all of these people in the Wilmington

16:44:52   17    Trust.

16:44:52   18            I will talk to you tomorrow about the burden of

16:44:54   19    proof, beyond a reasonable doubt.  Beyond a reasonable doubt

16:44:56   20    means you can't speculate.  If there are holes in their

16:45:01   21    case, you can't say, I'm going to fill in those holes, I'm

16:45:05   22    going to speculate.  And you heard His Honor say, if it's a

16:45:09   23    possible doubt, that's not enough.  All of these people,

16:45:13   24    where is the evidence this guy lied or tried to conceal

16:45:20   25    something from the Government?

16:45:21    1          Just because they say it's wrong doesn't mean

16:45:24    2    it's wrong.  28 years.  All of these people.  They've got

16:45:31    3    accountants, they've got lawyers.  They've got other people

16:45:35    4    onsite in the bank.  They've got KPMG looking at this,

16:45:40    5    certifying.  Right?

16:45:44    6          I will get to Mr. Depman.  Remember he was the

16:45:46    7    guy that couldn't even -- remember I said, how about a

16:45:48    8    ballpark of what you make, how much they paid you?  Oh, I

16:45:52    9    don't even know.  Come on.  Can you estimate?  No.  Remember

16:45:55    10   it was $2 million a year?

16:45:56    11         Now, these guys come in, they say they don't

16:45:59    12   know and they're there since 2001.  Thirteen, fifteen,

16:46:04    13   whatever the people was onsite and they're certifying, and

16:46:09    14   they say they don't know?  I will show you later how they

16:46:12    15   know in writing.

16:46:17    16         You know, I mentioned the witnesses and I will

16:46:21    17   get to those in a second.  But wouldn't you think in this

16:46:26    18   case where they are charging my client with 15 felonies,

16:46:30    19   that they would come up with one document that says, hey,

16:46:34    20   Bob, you know, this is the wrong way to report these loans.

16:46:41    21   Did you see that?  No, ma'am.  No, sir.

16:46:45    22         Was there concern about the rising number of

16:46:48    23   matured loans?  Yes.  Was there concern about a lot of

16:46:53    24   rising numbers during the Great Recession?  Yes.  Sure,

16:46:58    25   there was concern.

16:47:01    1           And what is the evidence?  Remember Mr. Brewer,
16:47:03    2   Mr. Conway said, we had a problem.  We're trying to do our
16:47:07    3   best to get around and come forward with a plan.  There was
16:47:12    4   concern, but where is the evidence that, aha, that's the
16:47:16    5   wrong way to do it.  Let's change it.
16:47:21    6           Where is the evidence that somebody said, hey,
16:47:24    7   Bob, this is the regulations that say this and it's wrong.
16:47:30    8   I know he doesn't have to be aware of the regulations.
16:47:34    9           Mr. Kravetz, remember, he pointed to the TFR and
16:47:37   10   he said, there's no evidence that anybody saw that.  Well,
16:47:41   11   guess what?  What he didn't tell you was, there's no
16:47:44   12   evidence that Mr. Harra or these other three saw the RC-N
16:47:47   13   either.
16:47:50   14           So the only evidence, is Bob not aware of how
16:47:56   15   these things are reported?  Sure, he's not, you know, a
16:48:03   16   numbers guy, but, come on, he's not acting as an accountant.
16:48:06   17           Remember when I asked John Depman?  I said, is
16:48:09   18   Bob Harra the guy you go to to verify these numbers?  He
16:48:12   19   laughed.  Remember when I asked Ellen Roberts, and I said,
16:48:15   20   Ms. Roberts, did you ever go to Bob Harra to verify the
16:48:20   21   numbers reported?  No.
16:48:22   22           Who was the final word?  Ted Cecala.  And, by
16:48:26   23   the way, you know, about all these people that report to
16:48:28   24   Mr. Harra.  Please don't forget this.  Mr. Kravetz alluded
16:48:31   25   to this.  During 2009 and '10, during this conspiracy,

16:48:35  1    everybody, Mr. Harra and Mr. Gibson and Mr. North reported

16:48:41  2    to Ted Cecala.  They did not report to Bob Harra.  So I hope

16:48:47  3    that you don't say, gosh, well, he's the president, and

16:48:51  4    Mr. Kravetz said, oh, you know, he's the top dog, you know,

16:48:55  5    how can he not know?

16:48:57  6              Mr. North, Mr. Gibson did not report to Bob.

16:49:05  7    They reported to Mr. Cecala.  And guess who Bob reported to?

16:49:09  8    Mr. Cecala, the final word on numbers.  There's no evidence

16:49:16  9    that Bob was down there knowing what the regulations are.

16:49:27  10             Let me show you another document.  All right.

16:49:36  11   This is the first document I showed, but this is during the

16:49:42  12   target exam.  So look at the date.  Do you remember the

16:49:45  13   first one was April 13, 2010.  Now I'm looking at the

16:49:53  14   July 9, 2010.  So it's said again.  Right?  So don't tell me

16:49:58  15   I just saw some document once, I didn't read it.  Look.

16:50:01  16   Look at -- I'm zooming in.  I'm turning around.  I should be

16:50:05  17   looking at you.

16:50:05  18             Look at the bottom.  It's the Federal Reserve

16:50:11  19   document.  It's Bates stamped.  They have that.  They have

16:50:15  20   it again.  It's in their files.

16:50:19  21             Now, you know, I want to read to you, I just

16:50:31  22   mentioned that there's not one document that says don't do

16:50:37  23   this, it's the wrong way to report it.  All right?  Because

16:50:43  24   you've got to have that criminal intent to say what I know

16:50:46  25   I'm doing is wrong, and it's not one witness that says that.

16:50:52  1    Not one.

16:50:55  2            Let me read you another quote from Mr. Corkery.

16:51:01  3    The bank provided the Fed with notice in writing of its

16:51:05  4    waiver practice, did it not?

16:51:07  5            Yes.

16:51:10  6            That's another quote.   Conceal the waiver

16:51:13  7    practice.   That's his testimony.   That's the bank examiner's

16:51:20  8    testimony.   Are we here to talk about concealing the waiver

16:51:23  9    practice?   They provided notice.

16:51:26  10           That's the Government's witness.   And

16:51:29  11   Mr. Corkery is a good man.   Nobody is here to cast

16:51:33  12   aspersions, but the stakes are high here to say, oh, my

16:51:38  13   gosh, you concealed this?   How can they say they concealed

16:51:40  14   it when the Fed had it in their files, and then you've got

16:51:44  15   Mr. Corkery up here saying, it wasn't concealed.

16:51:47  16           Now, the Government said in their opening some

16:51:53  17   things that I just want to challenge them on, and I'm not

16:51:57  18   going to -- a guy whom I loved, represented for years, and

16:52:04  19   I'm not going to mention his name, but he was a famous boxer

16:52:07  20   who used to say, Mike, if you are going to talk the talk,

16:52:12  21   you'd better walk the walk.   A lot of people say that, but

16:52:16  22   he said it all the time.

16:52:17  23           And in the opening, the Government said that the

16:52:23  24   defendants came up with the waiver practice to hide loans.

16:52:29  25   They said also, they made up their own rules.   They came up

16:52:33   1   with a new scheme.

16:52:37   2          We didn't come up with a waiver practice.  Is

16:52:45   3   28 years coming up with something new?  You're the

16:52:47   4   decision-maker.  I say not.

16:52:49   5          Rich Conway said 28 years in good times and in

16:52:53   6   bad, and it was a decades old -- they showed you a couple

16:53:00   7   e-mails saying, yes, a decades old problem.  You've got all

16:53:03   8   of those matured loans.  What do you do with this?  Tosha

16:53:05   9   Styles said it was a longstanding practice.  That's her

16:53:08   10  word, practice.

16:53:08   11         She also said the process stays the same.  Steve

16:53:13   12  Cummings said the same thing.  But I hope you remember this,

16:53:17   13  that that practice was in effect from the testimony

16:53:23   14  28 years.

16:53:23   15         Now, let me ask you this:  If you want to

16:53:26   16  conceal something, do you keep doing it the same way you've

16:53:32   17  been or do you change it?  I want to talk tomorrow about,

16:53:37   18  you know, the bank gave the Fed this issue 220 document.

16:53:44   19  That's the audit committee of the board, high level.  Gave

16:53:48   20  it to the Fed.  They got it.  That went to the audit

16:53:51   21  committee of the board.

16:53:53   22         They also gave the Fed, you will hear about

16:53:58   23  tomorrow, loan files that the Fed actually picked up, and

16:54:03   24  you're going to hear tomorrow about Mr. Fomunyam and

16:54:06   25  Mr. Corkery, the loan files that they actually reviewed, and

| | |
|---|---|
| 16:54:10 | 1 |

they admitted that they reviewed.  Right?  And those showed

| | |
|---|---|
| 16:54:13 | 2 |

the maturity date and they showed it was like thirty-some

| | |
|---|---|
| 16:54:16 | 3 |

million.  And then they are reporting eight million, like,

| | |
|---|---|
| 16:54:20 | 4 |

aha, okay.

| | |
|---|---|
| 16:54:21 | 5 |

But I'm also going to talk about this ALERT

| | |
|---|---|
| 16:54:23 | 6 |

data, this spreadsheet that had all the details of like

| | |
|---|---|
| 16:54:27 | 7 |

8,000-some loans.  Had it all there.  You know, I heard

| | |
|---|---|
| 16:54:32 | 8 |

Mr. Kravetz say, yes, well, Mr. Corkery didn't read it and,

| | |
|---|---|
| 16:54:35 | 9 |

you know, too cumbersome or whatever it was.  I reviewed it

| | |
|---|---|
| 16:54:41 | 10 |

for form, not substance.  But guess what?  They had it.

| | |
|---|---|
| 16:54:45 | 11 |

So I want you to remember those three things,

| | |
|---|---|
| 16:54:49 | 12 |

the issue 220, the loan files that they had and the

| | |
|---|---|
| 16:54:52 | 13 |

spreadsheet.

| | |
|---|---|
| 16:54:52 | 14 |

But here's my point, and maybe I will end on

| | |
|---|---|
| 16:54:55 | 15 |

this point if it's okay with Your Honor.  If you wanted to

| | |
|---|---|
| 16:54:58 | 16 |

conceal something, when the Government asked for those

| | |
|---|---|
| 16:55:02 | 17 |

spreadsheets, and, you know, oh, well, we don't look at that

| | |
|---|---|
| 16:55:07 | 18 |

stuff.  Why did you ask for it?  They asked for it.  If you

| | |
|---|---|
| 16:55:10 | 19 |

wanted to conceal something, you would have gone in there

| | |
|---|---|
| 16:55:13 | 20 |

and you would have said, oh, let me change this.  Let me

| | |
|---|---|
| 16:55:17 | 21 |

change that.  They gave it to them.  They gave it to them.

| | |
|---|---|
| 16:55:22 | 22 |

Is that concealment?  Is that concealment?

| | |
|---|---|
| 16:55:26 | 23 |

So I will come back tomorrow and I won't keep

| | |
|---|---|
| 16:55:29 | 24 |

you that much longer, and I hope you are not mad at me for

| | |
|---|---|
| 16:55:34 | 25 |

keeping me close to the end.  It's high stakes here.

16:55:43  1   Fifteen, I hate to say it, 15 felonies against this man, but

16:55:47  2   I will finish up pretty quickly tomorrow.  And at the end of

16:55:52  3   tomorrow I will show you that the Government has failed in

16:55:57  4   their proof, in their burden of proving that this man ever

16:56:03  5   for an instant intended to do something wrong.

16:56:08  6            Thank you very much, and don't leave, because

16:56:11  7   I will be back tomorrow.  I want you in the same seats.

16:56:13  8   Okay?

16:56:17  9            THE COURT:  All right.  Thank you, Mr. Kelly.

16:56:21  10           So, members of the jury, I will let you go in

16:56:23  11  just a moment.

16:56:24  12           One thing that I am -- can you just hold on a

16:56:27  13  second?

16:56:34  14           So what I would like to do is tomorrow, because

16:56:38  15  I really would like to make sure we get all the closing

16:56:42  16  arguments and the end of my charge in and so that the case

16:56:44  17  is given to you tomorrow -- it may be given to you too late

16:56:48  18  in the day for you to do anything about it, but to make sure

16:56:50  19  that we aren't still arguing on Wednesday morning, I'm going

16:56:53  20  to cut the lunch hour down to a half-an-hour, but the

16:56:59  21  Government will provide you with the lunch.  And so my

16:57:06  22  assistants, who you all know, will have some menus from one

16:57:10  23  of our favorite local places and lunch, you'll have a chance

16:57:13  24  to order whatever it is.  And so we're still going to start

16:57:20  25  at 9:00 o'clock.

16:57:27   1        And I guess the other thing is, in terms of once

16:57:32   2   you do get the case to deliberate, how late you're going to

16:57:35   3   stay, that is going to be up to you.  The basic rule is as

16:57:39   4   today, if one of you have -- you know, it's whoever -- I

16:57:46   5   mean, you kind of set your own schedule once you start

16:57:49   6   deliberating, but if you want to go beyond 5:00 o'clock and

16:57:52   7   it's agreeable to all of you, you can do that.  If it's not

16:57:54   8   agreeable to all of you, then you will finish at

16:57:57   9   5:00 o'clock.

16:57:57  10        So two things between now and tomorrow morning,

16:58:02  11   which is, don't talk to each other about the case.  Don't

16:58:07  12   talk to anyone else about the case.  Don't let anyone talk

16:58:09  13   to you about the case.

16:58:11  14        You'll have it to deliberate amongst yourselves

16:58:14  15   soon enough, but no deliberation until the lawyers have

16:58:19  16   finished arguing, I've finished charging, and you have the

16:58:21  17   case, which hopefully will be towards the end of the day

16:58:25  18   tomorrow.

16:58:25  19        The second thing is, still, don't use electronic

16:58:30  20   resources or anything else to look up anything about the

16:58:33  21   case.  Make sure that in terms of evidence, it's closed.

16:58:40  22   You have all the evidence you're going to have.  In terms of

16:58:42  23   argument, I'm going to keep an open mind.  Do listen to

16:58:50  24   whatever you are told tomorrow, but don't do any research

16:58:53  25   to try to find out something that you have a curiosity

16:59:00  1  about.

16:59:01  2              All right.  I think that's it.  Make sure you

16:59:03  3  are here and ready to go at 9:00 o'clock.  Thank you very

16:59:05  4  much.

16:59:05  5              (The jury was excused for the evening recess.)

16:59:29  6              THE COURT:  All right.  So we'll meet tomorrow

16:59:42  7  morning at 8:30 to see whatever it is we've learned about

16:59:49  8  what Mr. Kravetz said, and if when you get the transcript

16:59:53  9  tonight you think there's something that, that there's some

16:59:58  10  curative instruction that I need to make, I would certainly

17:00:01  11  consider it to be a good thing if somebody e-mailed me the

17:00:07  12  proposed curative instruction before 8:30 a.m. tomorrow

17:00:09  13  morning.  I don't really care whether it's 8:00 a.m.

17:00:13  14  tomorrow morning or sometime tonight, but let me know what

17:00:17  15  you have in mind and let the Government know, too.  All

17:00:19  16  right?

17:00:20  17              MR. NOWAK:  Yes, Your Honor.

17:00:21  18              MR. KRAVETZ:  Your Honor, another application

17:00:23  19  for tomorrow going forward.

17:00:24  20              We would request that counsel be precluded from

17:00:27  21  referencing the high stakes of what's at issue here.  It

17:00:32  22  comes very close to referencing punishment.  If it happened

17:00:37  23  once, it wouldn't be as much, but it happened three times

17:00:40  24  during the closing.

17:00:41  25              THE COURT:  Well, I think this was in

17:00:43   1    permissible bounds, so I'm going to deny that.

17:00:47   2              All right.  Is there anything else?

17:00:49   3              MR. KRAVETZ:  No, Your Honor.

17:00:49   4              MR. DALTON:  No, Your Honor.

17:00:50   5              THE COURT:  Okay.  See you all tomorrow morning

17:00:52   6    at 8:30.

17:00:55   7              Actually, yes.  See you tomorrow morning at

17:01:00   8    8:30.

17:01:10   9              Actually, I knew there was something else.  I

17:01:14  10    sent out a verdict form over the weekend.  I'm going to put

17:01:17  11    that in production tomorrow because I'm going to hand it to

17:01:20  12    the jury whenever I get to the end of my charge.

17:01:23  13              I take it if there's somebody who has seen

17:01:25  14    anything on the verdict form they want to bring to my

17:01:27  15    attention, at least mention it tomorrow morning at 8:30.

17:01:31  16    Okay?  Otherwise, it's going as it is.

17:01:33  17              MR. KRAVETZ:  Yes, Your Honor.

17:01:34  18              THE COURT:  All right.

17:02:13  19              (Court recessed 5:02 p.m.)

17:02:13  20                           -   -   -

          21

          22

          23

          24

          25