## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:15-23-RGA |
| | ) | |
| DAVID R. GIBSON, | ) | |
| ROBERT V.A. HARRA, | ) | |
| WILLIAM NORTH, and | ) | |
| KEVYN RAKOWSKI, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT ROBERT V.A. HARRA JR.'S OPENING BRIEF IN SUPPORT OF HIS
RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29
AND IN SUPPORT OF HIS MOTION FOR A NEW TRIAL PURSUANT TO RULE 33**

Dated: June 8, 2018

OF COUNSEL:

Andrew M. Lawler, Esquire
ANDREW M. LAWLER, P.C.
641 Lexington Avenue
New York, NY
(212) 832-3160
*alawler@amlpc.com*

Michael P. Kelly (#2295)
Steve P. Wood (#2309)
McCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
*mkelly@mccarter.com*
*swood@mccarter.com*

*Attorneys for Defendant Robert V.A. Harra, Jr.*

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................1

I.    THE GOVERNMENT FAILED TO PRESENT EVIDENCE SUFFICIENT TO
SUSTAIN THE CONVICTION, AND MR. HARRA SHOULD BE ACQUITTED OF
ALL CHARGES PURSUANT TO RULE 29 ..................................................................1

II.   THE GOVERNMENT DID NOT PROVE BEYOND A REASONABLE DOUBT THAT
MR. HARRA KNOWINGLY MADE A FALSE STATEMENT .....................................1

III.  THE GOVERNMENT DID NOT PROVE BEYOND A REASONABLE DOUBT THAT
TWO OR MORE PEOPLE INTENTIONALLY AGREED TO FALSELY REPORT
PAST DUE NUMBERS TO THE FEDERAL RESERVE, TO THE SEC, AND TO THE
PUBLIC .....................................................................................................................10

IV.  THE GOVERNMENT DID NOT PROVE BEYOND A REASONABLE DOUBT THAT
MR. HARRA JOINED ANY CONSPIRACY WITH KNOWLEDGE OF ITS ILLEGAL
OBJECTIVE ..............................................................................................................18

V.   ALTERNATIVELY, MR. HARRA SHOULD BE GRANTED A NEW TRIAL IN THE
INTEREST OF JUSTICE PURSUANT TO FED. R. CRIM. P. 33 ...............................20

CONCLUSION ...............................................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Tibbs v. Fla.,*
    457 U.S. 31 (1982) ............................................................................................21

*United States v. Ashworth,*
    836 F.2d 260 (6th Cir. 1988) ...........................................................................21

*United States v. Boria*
    592 F.3d 476  (3d Cir. 2010) ............................................................................18

*United States v. Brodie,*
    403 F.3d 123 (3d Cir. 2005) .........................................................................1, 10

*United States v. Curran,*
    20 F.3d 560 (3d Cir. 1994) ............................................................................2, 7

*United States v. Davis,*
    183 F.3d 231 (3d Cir.), *amended*, 197 F.3d 662 (3d Cir. 1999) ....................10, 11

*United States v. Fernandez,*
    892 F.2d 976 (11th Cir. 1989) ..........................................................................11

*United States v. Iannelli,*
    528 F.2d 1290 (3d Cir. 1976)............................................................................20

*United States v. John-Baptiste,*
    747 F.3d 186 (3d Cir. 2014) .............................................................................11

*United States v. Johnson,*
    302 F.3d 139 (3d Cir. 2002) .............................................................................21

*United States v. Kapp,*
    781 F.2d 1008 (3d Cir. 1986)......................................................................10, 18

*United States v. Kates,*
    508 F.2d 308 (3d Cir. 1975) .............................................................................19

*United States v. Lacey,*
    219 F.3d 779 (8th Cir. 2000) ............................................................................21

*United States v. McKee,*
    506 F.3d 225 (3d Cir. 2007) .............................................................................18

ME1 27445632v.1

*United States v. Migliaccio,*
    34 F.3d 1517 (10th Cir. 1994) ........................................................................................11

*United States v. Moyer*,
    674 F.3d 192 (3d Cir. 2012) .............................................................................................2

*United States v. Salahuddin*,
    765 F.3d 329 (3d Cir. 2014) ...........................................................................................21

*United States v. Smith*,
    294 F.3d 473 (3d Cir. 2002) .............................................................................................1

*United States v. Starnes,*
    583 F.3d 196 (3d Cir. 2009) .............................................................................................2

*United States v. Zimmerman,*
    943 F.2d 1204 (10th Cir. 1991).......................................................................................11

**FEDERAL STATUTES**

18 U.S.C. § 371.....................................................................................................................10

18 U.S.C. § 1001...............................................................................................................2, 7

**RULES**

Fed. R. Crim P. 29................................................................................................*passim*

Fed. R. Crim P. 33................................................................................................*passim*

Defendant Robert V.A. Harra Jr. ("Mr. Harra"), through undersigned counsel, hereby respectfully moves this Honorable Court to enter a judgment acquitting him of all charges pursuant to Federal Rule of Criminal Procedure 29, or alternately to grant him a new trial pursuant to Federal Rule of Criminal Procedure 33.  Mr. Harra previously moved this Court pursuant to Rule 29 (D.I. 745) ("Harra Motion for Judgment of Acquittal"), and again pursuant to Rule 29 and Rule 33 (D.I. 816) ("Defendants' Motion Pursuant to Rule 29 and Rule 33") and herein incorporates any objections, motions, or other requests for relief asserted therein, whether by Mr. Harra or by his co-defendants.

## ARGUMENT

**I.    THE GOVERNMENT FAILED TO PRESENT EVIDENCE SUFFICIENT TO SUSTAIN THE CONVICTION, AND MR. HARRA SHOULD BE ACQUITTED OF ALL CHARGES PURSUANT TO RULE 29.**

In ruling on a motion for judgment of acquittal, the Court is required to "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'"  *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)).   Here, "'where the prosecution's failure is clear,'" a judgment of acquittal is warranted.  *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

**II.   THE GOVERNMENT DID NOT PROVE BEYOND A REASONABLE DOUBT THAT MR. HARRA KNOWINGLY MADE A FALSE STATEMENT.**

The lynchpin of the government's case against Mr. Harra was the notion that he and his co-defendants joined together in a "scheme" to knowingly "lie" to the Federal Reserve, and to

1

the public, about the "true" amount of the Bank's past due loans.  (Tr. 3/12/18 1087:3-10).[1]  The government began its closing argument by telling the jury that "…the defendants caused Wilmington Trust to lie about its past due loans, [and] that the defendants knew what they were doing was wrong…"  (Tr. 4/23/18 6878:15-25).  It is axiomatic that in order to knowingly lie about something, one must first be aware of the truth of the matter.  In this case, determination of the truth of the matter *sub judice* – the "true" amount of the Bank's past due loans – is impossible absent either familiarity with the pertinent regulations defining the term or, at least, a warning from someone with the requisite familiarity that the Bank was not following those regulations.  Because the government failed to produce *any* evidence against Mr. Harra as to either of those issues, no rational jury could have convicted him of any of the indicted charges.

It is well-settled that "[t]o establish knowing and willful conduct in the making of a false statement [under § 1001], the government must show that a defendant 'acted deliberately and with knowledge that the representation was false.' ... [T]he government must prove not only that the statement was false, but that the accused knew it to be false."  *United States v. Starnes*, 583 F.3d 196, 211 (3d Cir. 2009) (quoting *United States v. Curran*, 20 F.3d 560, 567 (2d Cir. 1994)).  *See also United States v. Moyer*, 674 F.3d 192, 213 (3d Cir. 2012).  "But that showing, while a necessary one, may not always be sufficient to satisfy § 1001's 'knowingly and willfully' requirement; thus, we also stressed in *Curran* that "the government is required to show that the misrepresentation was not made innocently or inadvertently."  *Starnes*, 583 F.3d at 211 (citing *Bryan v. United States*, 524 U.S. 184 (1998)).

Because the false statements at the heart of the § 1001 false statement charges formed the basis of both Count 1 (Conspiracy) and Count 2 (Securities Fraud), the jury was properly

---

[1] Excerpts from the trial transcripts cited herein are attached hereto as Exhibit A.

2

instructed that this same principle applied to the false statements that formed the basis of those charges as well.   (Tr. 4/23/18 6826:8-12; 6835:25–6836:6).  But the government failed to introduce *any* evidence that Mr. Harra knew that the Bank's reported past due loan amounts were false.   The government did not introduce any evidence that even so much as hinted at Mr. Harra's concern that the Bank's long-standing method of defining and reporting its past due loans was in any way improper, nor was any evidence presented that anyone ever shared such a concern with Mr. Harra.   Consequently, no rational jury could have found proof of guilt beyond a reasonable doubt as to this indispensable element of each of the indicted charges.   A judgment of acquittal is thus required as to all of the indicted charges.

Fundamental to the government's failure to prove Mr. Harra's knowledge of the alleged falsity of the Bank's past due numbers is that the term "past due" is not, for the purposes of the public reporting of the amount of a Bank's past due loans, a self-defining term.  To the contrary: not even the profession of accountancy attempts to promulgate a universal definition of the term. The government's own witnesses readily conceded that there was no definition of "past due" set forth by GAAP.  (Tr. 3/13/18 1364:12-1).  Instead, the term is defined by the regulations and guidelines promulgated by the various Federal regulators with authority over Wilmington Trust, and by the SEC.[2]  There was absolutely no evidence introduced by the government that even so much as hinted at Mr. Harra's personal familiarity with the relevant regulations, and there was absolutely no evidence introduced suggesting that anyone, ever, opined or implied to Mr. Harra that the Bank's long-standing method of calculating (and thus reporting) its past due loan amounts was contrary to those regulations.  Indeed, the only evidence introduced pertaining to

---

[2] During the dates relevant to the instant matter, those regulators included the Federal Reserve and the Office of Thrift Supervision (OTS).  (*E.g.*, Tr. 3/13/18 1672:20-1673:6; 3/20/18  2472:9-2478:10).

3

Mr. Harra's general familiarity with the data that was publicly reported by the Bank and the relevant regulations was that Mr. Harra was not involved in the preparation of that data and was not considered to be a resource for that purpose by those responsible for doing so.  (Tr. 3/28/18 3651:14–3652:19).  Mr. Harra was viewed as not having any skill in the interpretation of the various reporting regulations.  (Tr. 4/9/18 5582:17-25).  Consequently, no rational jury could have found beyond a reasonable doubt that Mr. Harra "acted deliberately and with knowledge" that the Bank's past due representations were false.[3]

In his earlier Motion for Judgment of Acquittal, filed at the conclusion of the government's case-in-chief (D.I. 745), Mr. Harra forcefully argued, *inter alia*, that

> …there is no evidence in the record from which a rational trier of fact could conclude that Mr. Harra knew that the Bank's reported past due amounts were false. There is no evidence whatsoever that Mr. Harra was aware of any arguably-applicable statute, regulation or guideline that defined the term "past due," and there is no evidence that anyone ever discussed with him or in any way implied that the Bank's practices did not comport with any such standard.

(D.I. 745, p. 14).[4]  During oral argument before the Court on his Motion, counsel for Mr. Harra again asserted that the trial record was devoid of any such evidence, and informed the Court that the government's written reply to the Motion was similarly bereft of citations to such evidence. (Tr. 4/16/18 6259:10-6263:14).  The Court then challenged counsel for the government to explain why Mr. Harra's claim that there was "no evidence Mr. Harra knew what was supposed

---

[3]  Even if Mr. Harra had been familiar with those regulations, their confusing, ambiguous and contradictory nature was such that their failure to adequately define the standard of falsity relevant to this matter would prevent a rational jury from finding beyond a reasonable doubt that Mr. Harra knowingly made any false statements about the Bank's past due loan amounts.  Mr. Harra thus hereby joins in those portions of the contemporaneous Motions for a Judgment of Acquittal under Rule 29 and a New Trial under Rule 33 made by his co-defendants that are relevant to this argument, and which are pertinent to him.

[4]  The arguments and authorities set forth in Mr. Harra's first Motion for a Judgment of Acquittal are incorporated herein by reference.

4

to be reported on the past due [reports] as a past due loan….[was] wrong." (Tr. 4/16/18 6299:3 – 8).

Despite Mr. Harra's assertion which, if accepted by this Court, would perforce mean the end of the government's case against Mr. Harra, and despite the Court's direct question in response to the assertion, the only evidence cited to by the government in reply was GX 76 (Exhibit B), which was a certification appurtenant to the September 30, 2009 Call Report that was signed by Mr. Harra (as a director of the Wilmington Trust Corporation) and two other directors (including Ted Cecala), which reads in pertinent part:

> We, the undersigned directors (trustees), attest to the correctness of the Reports of Condition and income (including the supporting schedules) for this report date and declare that the Reports of Condition and income have been examined by us and to the best of our knowledge and belief have been prepared in conformance with the instructions issued by the appropriate regulatory authority and are true and correct.[5]

(Tr. 4/16/18 6299:7-22). The following colloquy between the Court and counsel for the government then occurred:

> THE COURT: So I take it your position is, yes, maybe his lawyer can argue he didn't know what the instructions said, but you're entitled to say he did because he signed his name saying he did?
>
> MR. KRAVETZ: Absolutely, Your Honor.

(Tr. 4/16/18 6299:23–6300:2). No additional evidence bearing on the outcome-determinative issue of Mr. Harra's knowledge was cited to by the government during the Rule 29 Motions hearing.

During its closing and rebuttal arguments, the government once again failed to cite to any specific evidence, in the form of documents or testimony from any of its witnesses, and apart

---

[5] This certification is identical to the certifications signed by Mr. Harra that were submitted with each of the Call Reports that were the subject of one of the Counts in the instant indictment.

5

from the aforedescribed Call Report certification, that Mr. Harra had any awareness whatsoever that the Bank's well-established method of defining and reporting past due loans was contrary to any relevant regulation. (Tr. 4/23/18 6993:20 – 6998:17).  The government did argue, impliedly, that because Mr. Harra was President and Chief Operating Officer of the Bank he must have known about the applicable regulatory requirements.  (Tr. 4/23/18 6993:1-6).[6]

  Upon that thin reed, the government's proof of Mr. Harra's knowledge of falsity, and hence its entire case, must rest.  But when both the Call Report certification and the argument that Mr. Harra must have known because he was President of the Bank are appropriately examined, it is clear that no rational jury could use either or both types of evidence to conclude beyond a reasonable doubt that Mr. Harra had the requisite knowledge of falsity.  The plain text of the Call Report certifications conclusively rebuts any argument that the certification has relevance whatsoever to the task of assessing Mr. Harra's knowledge of falsity.  The certification says merely that "to the best of [Mr. Harra's] *knowledge and belief* [the reports] have been prepared in conformance with the instructions issued by the appropriate regulatory authority and

---

[6]  The government also argued both to the jury and this Court (during the April 16, 2018 hearing on Defendants' Rule 29 Motion for Judgment of Acquittal) that the Defendants' awareness of the deteriorating condition of the state of the economy and the Bank's commercial real estate loan portfolio and the Federal Reserve's criticisms of the Bank's lending practices was somehow evidence of Mr. Harra's knowledge of the requisite standards for the public reporting of past due loans.  (*E.g.*, Tr. 4/16/18 6305:19 – 6312:3; 4/23/18 6879:12-20).  Whatever one might think of the probative value of the voluminous "bad bank" evidence introduced by the government, there is no logical relationship between it and Mr. Harra's knowledge of the applicable definition of "past due" for the purposes of publicly reporting the amount of the Bank's past due commercial real estate loans.  It is beyond dispute that the Bank's definition of "past due" as applied to commercial real estate loans was used when the economy was good as well as when it was bad.  It is unreasonable to assume that it would occur to Mr. Harra, or to anyone, that the regulatory definitions would change depending upon the state of the economy, or the amount of the Bank's past due loans.  Certainly, the specific definitions of "past due" cited to by the government are not written in a way that suggest that they might vary depending upon the condition of a reporting bank's loan portfolio.  While the amount of the Bank's past due loans might be relevant to a determination of materiality, they have no bearing at all on the definition of the term "past due."

are true and correct." (Emphasis added). The certification begs the question as to specifically which regulations, and issued by what agency, are to be referenced. Moreover, it would be wholly unreasonable to expect that Mr. Harra and the other signers of the certification, all of whom did so in their capacity as members of the Bank's Board of Directors, were themselves possessed of the financial, informational and technical "knowledge and belief" to which they were attesting absent their reliance upon Bank employees who were responsible for understanding the regulations and preparing financial reports in compliance with them.

The certification is thus properly read as a statement that those who signed it reasonably believed that those who compiled the voluminous financial data in the attached reports did so accurately, competently, and with integrity. It is not, nor can it be, proof of actual knowledge of falsity. If the government's argument to the contrary is given any weight by this Court, that would open *any* member of the Board of Directors of *any* publicly-traded company to indictment and prosecution if *any* material statement in a 10K or 10Q that they certified was later found to be false, regardless of whether he or she had actual knowledge of the falsity of the statement. This view is untenable in light of the Third Circuit's long-standing admonition that "[i]ntent, or *mens rea*, is a vital component of a Section 1001 violation, and the government must prove that prohibited conduct was performed 'knowingly and willfully.'" *Curran*, 20 F.3d at 567. In the absence of any other evidence that Mr. Harra was aware of the falsity of the Bank's reported past due numbers, reliance upon the certifications by the government – and by the jury – makes a mockery out of the holding of *Curran* and its progeny.

Obviously, the senior executives and Board members who serve in a corporation the size of Wilmington Trust must depend upon other employees to provide them with accurate financial data, as well as with pertinent and appropriate regulatory and accounting guidance. At

7

Wilmington Trust, those employees who were tasked with the responsibility of providing such guidance were in the Bank's Finance Department, and they reported ultimately to Mr. Cecala – and *not at all* to Mr. Harra.  (DX 2793 (Exhibit C), DX 2898 (Exhibit D)).  Moreover, the primary responsibility for ensuring that the Bank's public financial disclosures, including those made in its 10Ks and 10Qs, were made in compliance with the relevant standards was vested in the Bank's Disclosure Committee.  (Tr. 3/27/18 3513:3-16; 3/28/18 3608:18-3609:20).  Mr. Harra was not a member of that Committee.  (Tr. 3/27/18 3514:17-21; 3/28/18 3608:4-9).  Mr. Harra played no role in the collection of the publicly-reported financial data, but Mr. Cecala had the final sign-off as to all of the publicly-reported financial data.  (Tr. 3/28/18 3651:14 – 3652:19).  In light of those facts, and the plain wording of the certifications relied upon by the government, it is unreasonable to assume that they could properly be found to play any role whatsoever in a finding that, beyond a reasonable doubt, Mr. Harra was aware of the applicable regulatory definitions of "past due."

The government also impliedly argued to the jury that because Mr. Harra was the Bank's President and Chief Operating Officer, and because he "oversaw all banking operations," he must have known that the Bank was falsely reporting its past due loan amounts.  The government further argued that Mr. Harra could not claim that he didn't "have the responsibility that went with that position."  (Tr. 4/23/18 6994:1-22-6995:1).  To begin with, the statement that Mr. Harra "oversaw all banking operations" is only accurate if one includes the qualifier (omitted by the government) that "banking operations" do not include the compiling and public reporting of financial data, including the amount of past due loans.  As noted above, the Bank's Finance Department was in charge of those functions, and the employees assigned to that department reported ultimately to Mr. Cecala – not Mr. Harra.  But of greater importance is the troubling

conflation of the concepts of corporate supervisory authority and criminal *mens rea* that is inherent in the government's argument.  However, the Court specifically cautioned the jury that

> [a] defendant who is an officer, director, or employee of a corporation is not criminally responsible for the alleged acts of other employees or subordinates merely because the defendant held a position or positions with the bank. Therefore, it is not enough for the Government to prove that certain activity occurred at Wilmington Trust to demonstrate that the defendant knew of the activity or was responsible for that activity… In addition, you may not infer that the defendant, based solely on his or her position at Wilmington Trust, had any knowledge of any particular activity.  Furthermore, it is not enough for the Government to prove that the defendant should have known about any particular activity.

(Tr. 4/23/18 6809:7-22).  It is thus beyond dispute that the mere fact that Mr. Harra was President of the Bank cannot substitute for the complete absence of evidence that he was aware of the regulatory definitions of "past due," and therefore the falsity of the Bank's publicly-reported past due numbers.   The government cannot use Mr. Harra's position on an organizational chart as a substitute for evidence.

There is absolutely no direct evidence cited by the government in the form of documents or testimony, or indeed to be found elsewhere in the record, to buttress their argument that Mr. Harra had even an inkling as to the salient definitions or the potentiality falsity of the Bank's public reports of its past due loans.  The absence of such evidence is remarkable, given the five-year-long investigation in this case, which was followed by a six-week-long government case that involved nearly two dozen witnesses.  More importantly, the absence of such evidence must be the end of the government's case, as without it the government cannot prove beyond a reasonable doubt that Mr. Harra knowingly made any false statements about the Bank's past due loans.  Consequently, and for this reason alone, this Court must grant a Judgment of Acquittal as to all of the indicted charges.

9

III.   **THE GOVERNMENT DID NOT PROVE BEYOND A REASONABLE DOUBT THAT TWO OR MORE PEOPLE INTENTIONALLY AGREED TO FALSELY REPORT PAST DUE NUMBERS TO THE FEDERAL RESERVE, TO THE SEC, AND TO THE PUBLIC.**

Count I of the Indictment alleges a conspiracy to Defraud the United States, Commit Securities Fraud and Make False Statements to Regulators, all in violation of 18 U.S.C. § 371. As alleged by the government, and as the jury was instructed by the Court, the heart of the alleged conspiracy was an agreement among Mr. Harra, the other Defendants, Brian Bailey, and Joe Terranova to falsely report the amount of the Bank's past due loans to the Federal Reserve, the SEC, and the investing public. (Tr. 4/23/18 6824:18–6828:23). In order to satisfy the elements of the offense as indicted, the government was obliged to prove beyond a reasonable doubt, among other things, that at least two of the Defendants agreed to commit a crime in furtherance of the illegal object of the conspiracy. "A conspiracy requires agreement between at least two people to the illegal object of the conspiracy…." *United States v. Davis*, 183 F.3d 231, 244 (3d Cir.), *amended*, 197 F.3d 662 (3d Cir. 1999). Because the government failed to prove beyond a reasonable doubt that any of the Defendants intentionally agreed to commit an act which they knew to be unlawful, no reasonable jury could find any of the Defendants guilty of Conspiracy. (Tr. 4/23/18 6825:16-20). *See also United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). No rational jury could thus find Mr. Harra guilty beyond a reasonable doubt of this essential element of the indicted conspiracy.

This Court properly instructed the jury that in order for it to convict Mr. Harra of conspiracy, it must first find, beyond a reasonable doubt, that "two or more persons agreed to defraud the United States or to commit an offense against the United States…" (Tr. 4/23/18 6823:15-17). "The essence of criminal conspiracy … is an agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit an unlawful act…." *United States v.*

10

*Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986).  It is not enough for the government to prove that alleged co-conspirators worked together to achieve a particular common purpose.  A mere agreement among business associates to achieve what they believe to be a lawful objective cannot support a conspiracy charge, "for it is fundamental to the law of conspiracy that the government show an agreement between two or more persons to commit *a crime*."  *United States v. Fernandez*, 892 F.2d 976, 987 (11th Cir. 1989) (emphasis in original).  *See also Davis*, 183 F.3d at 244.  Indeed, this bedrock principle of the law of conspiracy was recognized by the Court during oral argument on Defendant Harra's Rule 29 Motion.  (Tr. 4/16/18 6256:9 – 6257:17).

In the context of the instant case, it is not enough for the government to prove that the four indicted Defendants worked together (along with dozens and dozens of their coworkers), as they had for many years, to compile and publicly report a past due number that produced a "low number" because it did not include loans that were "waived" from those reports because they were current for interest and in the process of extension.  Those facts were never in dispute.  Of course, compiling and publicly reporting the Bank's past due number was, in and of itself, a legitimate business practice.  After all, the theoretical or aspirational goal for any bank's past due amount would be zero.  And the way the Bank had been reporting the loans at issue for many years was never questioned by any of the Bank's regulators or auditors.  The point is this: merely engaging in a routine business practice, absent other evidence of intent to commit a crime while doing so, does not constitute conspiratorial agreement.  *United States v. Migliaccio*, 34 F.3d 1517, 1521 (10th Cir. 1994); *United States v. Zimmerman*, 943 F.2d 1204, 1210 (10th Cir. 1991).  *Cf. United States v. John-Baptiste*, 747 F.3d 186, 203 (3d Cir. 2014) (mere presence of alleged co-conspirators insufficient to establish conspiratorial agreement).  It is the complete absence of

11

such evidence – evidence of criminal intent – that is fatal to the government's conspiracy allegation.

Despite being challenged to do so, the government has repeatedly failed to describe *any* direct evidence that it presented to the jury in the form of documents or testimony that *any* of the Defendants were directly aware of the regulations defining past due loans by which it now insists the falsity of the Bank's reported past due numbers must be judged.  And, of course, unless the government proved beyond a reasonable doubt that *at least two* of the Defendants were aware of those regulations, either directly or through someone's expressed opinion, there can be no proof as required that two or more of them intended to make false statements about the Bank's past due numbers.  No rational jury could thus find proof of conspiratorial agreement beyond a reasonable doubt.[7]

The undisputed evidence introduced through the government's own witnesses established that the Bank's method of defining its "past due" commercial real estate loans through the use of the waiver practice was decades old: Richard Conway pinpointed that the practice was in place for 28 years.  (Tr. 3/29/18 3927:15-22).  In fact, during the portion of the alleged conspiracy period during which the Bank employed the waiver practice to calculate its publicly-reported past due number, dozens and dozens of people – more than 70 – were involved in the process every single month.  (Tr. 3/14/18 1713:7–1714:11; 3/19/18 2211:23–2213:19; 4/3/18 4532:9-

---

[7]  As noted above, assuming arguendo that one or more of the Defendants was actually familiar with those regulations, their confusing, ambiguous and contradictory nature was such that their failure to adequately define the standard of falsity relevant to this matter would prevent a rational jury of finding beyond a reasonable doubt that any of the Defendants knowingly made any false statements about the Bank's past due loan amounts.  Mr. Harra thus hereby joins in those portions of the contemporaneous Motions for a Judgment of Acquittal under Rule 29 and a New Trial under Rule 33 made by his co-defendants that are relevant to this argument, and which are pertinent to him.

4533:14).  The existence of the waiver practice and the processes used to compile the Bank's "past due numbers" were known to nearly "everyone" in the Bank with a work-related reason to know about them.  (Tr. 4/3/18 4533:6-12).  All of the Defendants, and many dozens of their co-workers over the years, and in any given month, had a legitimate business reason to work together to produce what the Court described as a "low past due number."  (Tr. 4/16/18 6256:9-25).

The long-standing and routine nature of the waiver practice, which was always conducted openly, is powerful evidence in support of the lack of an agreement between any of the Defendants to commit a crime through or by its use.  Though concealment of the manner and means of a conspiracy is not a required element of proof, it is a common-sense and practical measure of whether those involved in a business practice intended it to facilitate an act which they *knew* to be unlawful.  As noted above, the compiling of the Bank's past due numbers, which were then adjusted by removing loans that were current for interest and in the process of extension, required the participation of dozens and dozens of workers in the Bank every month. Every month, a spreadsheet containing a list of the Bank's matured loans would be prepared by Tosha (Towe) Styles, who worked in the Bank's Finance Department.  (Tr. 3/16/18 1832:1-7; 1850:24-1851:19).  She would then forward those reports to Wayne Irwin, and later Steve Cummings, both of whom were assigned to the Bank's Credit Department.  (Tr. 3/16/18 1851:11-24).  Mr. Irwin or Mr. Cummings would then ask the relationship manager assigned to each loan on the list about the status of the loan, and if he was told that the loan was current for interest and in the process of extension, the loan would be marked on the spreadsheet with a "Y," indicating that it would be "waived" from the Bank's publicly reported past due loans.  (Tr. 3/16/18 2047:1-2051:17; 3/19/18 2214:9-2215:10).  When the information was received from the

13

relationship managers, the report containing the loans that were designated as "waived" was then sent by Mr. Cummings to a group of approximately 10 people.  (Tr. 3/19/18 2243:17-2244:18). Though the Bank publicly reported its past due numbers quarterly, this process occurred every single month.  (Tr. 3/19/18 2223:1-2224:1).  Two of those individuals – either Faye Loh or Kim Strohmeier – would take the information about the matured loans on the spread sheet received from Mr. Cummings and prepare a past due report that was distributed to dozens of people in various departments throughout the Bank.  (Tr. 3/22/18 2836:3-2841:19; GX 64 (Exhibit E)). The open and thoroughly routine nature of the Bank's method of employing the waiver practice to calculate and ultimately report the final amount of the Bank's past due loans is consistent with the Defendants' belief that it was nothing more than a legitimate business practice.  And those circumstances are profoundly inconsistent with the notion that any of the Defendants participated in the process with any intent to commit a criminal act.

So, too, is the uncontroverted evidence that the Bank disclosed the existence of the waiver practice, as well as the raw data that could have easily been used to discover it, to both the Federal Reserve and KPMG during the conspiracy period.  James Corkery, the Federal Reserve's examiner in chief during its 2009 and 2010 examinations of the Bank, admitted during cross-examination that "the Bank provided the Fed with notice in writing of its waiver practice." (Tr. 3/22/18 2692-2694; 2825-2826).  This exchange that occurred during the cross-examination of Mr. Corkery is unambiguous:

> Q:  Mr. Corkery, this second sentence that you just read starting with "However, these matured loans were not considered to be past due if interest is current and progress was being made towards renewal and extension."   Did I read that accurately?
> A.   That's what it says, yes.
> Q.   This document was given by the bank to the Fed during the 2010 full scope examination, was it not?
> A.   Yes.

> Q.    And this is a copy of the March 2010 audit services report from the Federal Reserve work papers during that examination?
> A.    Correct.
> Q.    These are the Fed's work papers?
> A.    Correct.
> Q.    The bank did not conceal this document from the Fed, did it, Mr. Corkery?
> A.    No, it did not.
> Q.    This document describes the bank's waiver practice, doesn't it, Mr. Corkery?
> A.    It doesn't say "waiver," but, yes.

(Tr. 3/22/18 2673:4-24).  The Fed was also supplied with electronic data that was sortable pursuant to its instructions that would have plainly showed that the amount of the Bank's publicly-reported past due loans was significantly less than the total amount of its loans that were more than 90 days past maturity.[8]

Similarly, John Depman, KPMG's lead auditor responsible for that firm's audits of Wilmington Trust during the relevant time period, also admitted that the Bank provided documents to his firm that plainly and unequivocally stated that the Bank did not consider matured commercial real estate loans that were current for interest to be past due.  (Tr. 4/9/18 5537).  The Bank also provided KPMG with an email which also described "adjustments" to the "waived loans" in the delinquency reports which, when read in context with documents attached to the email, showed a drop in the amount of past due loans for the relevant quarter from more than $300 million to about $15 million.  (Tr. 4/9/18 5580-5581).  The lack of intent to conceal the existence of the waiver practice from the Federal Reserve and KPMG is underscored by the testimony of the many current and former employees of the Bank called as government witnesses, all of whom testified that neither the Defendants nor anyone else ever told them to conceal anything from the Bank's external auditors.

---

[8]  Although the Federal Reserve examiners testified that they did not use this electronic data for the purposes of reconciling the Bank's publicly reported financial information, they never told the Bank that the data would not be used for that purpose.  (Tr. 3/19/18 2285:3-12).  Nonetheless, the Bank provided the information willingly.

Whether the Federal Reserve examiners or KPMG auditors ever realized the significance of the information about the waiver practice that was provided to them is irrelevant.  The point is that the information was, in fact, provided.  The fact that there is absolutely no evidence that the Defendants made any attempt whatsoever to conceal the existence of the waiver practice from the Bank's external auditors is yet another circumstance that is irrevocably at odds with the notion that that the Defendants were possessed of criminal intent.

The government failed to prove that the Defendants utilized the waiver practice with intent to commit a criminal act or as part of an attempt to further the alleged conspiratorial objective – the false reporting of the Bank's past due numbers.  The routine implementation of the waiver practice belies that assertion.  Simply put, the government's own evidence proved that the waiver practice was administered month after month, over many years, by dozens of people scattered throughout several departments of the Bank.  There were no significant changes to its procedures, assumptions, and definitions from at least 1999 through the middle of 2010, until the process of discontinuing the practice began.   And the decision in March of 2010 to finally end the waiver practice, was, according to the government's witness, made by Ted Cecala.  (Tr. 3/29/18 3975:5-10).  All of this refutes the notion that the Defendants somehow agreed to use the waiver practice to falsify the Bank's publicly-reported past due loan totals.

The operation of the waiver practice over time, and without regard to the condition of the Delaware real estate economy (and thus the quality of the Bank's loan portfolio), is inconsistent with the government's argument that the Defendants used the waiver practice to produce and publicly report a false past due number.  The government's own witnesses testified that in 2005 and 2006 the commercial real estate economy in Delaware was "about as good as it can get."  (Tr. 3/14/18 1601:1-11).  Yet, when the economy deteriorated in 2009 and 2010, the only thing that

16

changed about the administration of the waiver practice was that the Bank ended it.  (Tr. 3/29/18 3990:21-3993:5).  In good times, and in bad times, the Bank was consistent in that it treated commercial real estate loans that were mature, current for interest and in the process of renewal as not past due.  (Tr. 3/29/18 3993:1-5).  In other words, the Bank used the waiver practice to calculate the total amount of its past due loans when, by all accounts, it had no reason to artificially suppress that number.  This undisputed fact, proved by the government through its own witnesses, is fundamentally inconsistent with the notion that the Defendants somehow used the waiver practice to produce a "false" past due number.

The government argued to the jury that the Defendants used the waiver practice to conceal the Bank's deteriorating financial condition from potential investors and the public.  (Tr. 4/23/18 6944:6-19; 4/25/18 7299:23-24).  But this argument is disingenuous because it falsely implies that the Bank did nothing to warn potential investors about the significant deterioration in the quality of its credit portfolio.  In documents provided to the investing public at the time of the 2010 capital raise, the Bank *did* tell its potential investors that the amount of its non-performing loans – loans that the Bank no longer believed would ever be fully repaid – had increased by approximately 500% between 2007 and 2009.  That trend clearly disclosed a deteriorating credit portfolio.  (Tr. 4/10/10 5864:21-5867:6).  The Bank also reported two consecutive years of operating losses during the same time period.  (Tr. 4/10/10 5861:1-24).  The Bank also took care to tell potential investors in more general terms that its credit portfolio was "deteriorating" and "getting worse."  (Tr. 4/10/10 5862:22-5864:18).  The public disclosure of this information is directly and conclusively inconsistent with the government's claim that the Defendants were using the waiver practice to conceal the deterioration in the Bank's loan portfolio, and with criminal intent.

17

The government's own evidence proved that the waiver practice – which it described as the "manner and means" of the conspiracy – was in fact a routine business practice that operated openly, and without active direction from Mr. Harra. This evidence militates decisively against any notion that the Defendants were circumstantially aware of the falsity of the past due numbers that it produced. And the lack of circumstantial evidence of the Defendants' criminal intent is fatal in light of the complete lack of direct evidence that any of the Defendants were aware of the Federal Reserve and SEC regulations defining "past due" for reporting purposes. The failure of the government to produce the necessary evidence requires this Court to grant a judgment of acquittal as to all charges.

## IV. THE GOVERNMENT DID NOT PROVE BEYOND A REASONABLE DOUBT THAT MR. HARRA JOINED ANY CONSPIRACY WITH KNOWLEDGE OF ITS ILLEGAL OBJECTIVE

As shown above, the government failed to prove beyond a reasonable doubt that two or more persons were joined together in an agreement to "commit an unlawful act, combined with intent to commit an unlawful act…" *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986). There was no conspiracy because there was no such agreement. But assuming *arguendo* that an agreement existed, that argument alone would not be enough to support a guilty verdict against Mr. Harra on the indicted Conspiracy charge. Proof of a conspiracy charge also requires proof beyond a reasonable doubt that a given defendant joined in the conspiracy with the requisite knowledge of its "specific illegal objective." *See United States v. Boria* 592 F.3d 476, 481 (3d Cir. 2010). In other words, the government must prove beyond a reasonable doubt that a given defendant knew of the conspiratorial agreement and intended both to join it and to accomplish its illegal objects. *United States v. McKee*, 506 F.3d 225, 241 (3d Cir. 2007). Without knowledge of some improper purpose, the agreement, which is the heart of any conspiracy indictment,

18

cannot be inferred from acts, even acts which further the purpose of the conspiracy. *See United States v. Kates*, 508 F.2d 308 (3d Cir. 1975).

 In accord with this well-settled principle, the Court instructed the jury that "in order to find a defendant guilty of conspiracy, you must also find that the Government proved beyond a reasonable doubt that the defendant knowingly and intentionally joined that agreement or conspiracy during its existence…[and] that…the defendant you are considering knew the goal or objective of the agreement or conspiracy…and voluntarily joined it during its existence, intending to achieve the common goal or objective…." (Tr. 4/23/18 6827:1-9).

No reasonable jury could find that the government proved beyond a reasonable doubt that Mr. Harra knew of the alleged illegal goal of the alleged conspiracy and then joined the conspiracy intending to achieve it. As previously explained, the government failed to prove beyond a reasonable doubt that Mr. Harra was aware of the applicable regulatory definitions of "past due." Indeed, the government failed to introduce *any* evidence whatsoever to prove that point. In order to know that the goal of the conspiracy was to produce a false past due loan amount, Mr. Harra would have to be aware that the waiver practice – the alleged "manner and means of the conspiracy" – was contrary to the applicable regulations. But there is no evidence whatsoever that Mr. Harra was possessed of such awareness. There is thus no evidence in the record upon which a rational jury could have concluded that Mr. Harra knew that the Bank's publicly reported past due numbers were false. Without such evidence, he could not have been aware of the "specific illegal objective" of the conspiracy, which the government asserts was to publicly report a false amount of past due loans.

The circumstances of the use of the waiver practice during the conspiracy period also are inconsistent with the idea that Mr. Harra viewed its use as a means to further the alleged object

of the conspiracy.  The government failed to introduce any evidence that Mr. Harra actually played any role in the active administration of the process.[9]  While it is true that he was aware of the past due loan totals produced, in part, by the use of the waiver practice, it is also true that the waiver practice was employed in the same way in 2005 and 2006, when the economy was strong. The mere fact that Mr. Harra was aware of the existence of the waiver practice, its routine use by the Bank for many years, and the past due loan totals it produced is a far cry from evidence proving his awareness of  the "specific illegal objective" of the alleged conspiracy.

## V. ALTERNATIVELY, MR. HARRA SHOULD BE GRANTED A NEW TRIAL IN THE INTEREST OF JUSTICE PURSUANT TO FED. R. CRIM. P. 33.

Even if the Court finds that the evidence, when viewed in the light most favorable to the government, is legally sufficient to sustain the jury's verdict, it should grant Mr. Harra a new trial pursuant to Rule 33 of Federal Rules of Criminal Procedure.  Rule 33 provides that upon the defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).   Rule 33 motions are "directed to the trial court's discretion."  *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976).   The Court should exercise its sound discretion in this case and grant a new trial because the jury's verdict is so patently contrary to the weight of the evidence.[10]

---

[9]  Lest the government argue that the 4Q 2009 temporary extensions somehow constituted Mr. Harra's involvement in changes to the waiver practice, there is no evidence that he conceived or directed those extensions.  The government's witnesses testified that Mr. Harra did not do so, and that those extensions had an entirely legitimate purpose.  (Tr. 3/29/18  4010:17-4011:17; Tr. 4/5/18 5194:10 – 5196:6).

[10]  Mr. Harra also moves for a judgment of acquittal under Rule 29 and a new trial under Rule 33 because, as set forth in the motions filed by co-defendants David Gibson, William North, and Kevyn Rakowski, the Defendants lacked fair warning that Wilmington's practice with respect to the reporting of past due loans was criminal; and because the government failed to articulate a theory of falsity, and because of the government's shifting theories of criminality and conspiracy, the prosecution of the case constituted a constructive amendment and prejudicial variance.  Mr.

20

Third Circuit law is clear that the Court can order a new trial on the ground that the verdict is contrary to the weight of the evidence if it "'believes that there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted.'" *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150 (relying on *United States v. Lacey*, 219 F.3d 779, 783-84 (8th Cir. 2000); *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988)). It is said that the trial judge sits as a "thirteenth juror." *Ashworth*, 836 F.2d at 266. As the Supreme Court has agreed, the "'weight of the evidence' refers to a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.'" *Tibbs v. Fla.*, 457 U.S. 31 (1982). When a motion for a new trial is made on the ground that the verdict is contrary to the weight of the evidence, "'[t]he district court need not view the evidence in the light most favorable to the verdict.'" *Id.* at 38 n. 11 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

> "[I]t may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury."

*Id.*

---

Harra joins in and incorporates by reference herein the Rule 29 and Rule 33 motions and arguments made by his co-defendants to the extent they are applicable to him.

21

As amply demonstrated in support of Mr. Harra's Rule 29 motion, the evidence in this case "preponderates" heavily against the jury's verdict.  The government failed to produce any evidence that Mr. Harra knew or was warned that the Bank's reported past due numbers were false or that he or any of the other Defendants knowingly and intentionally agreed with anyone to commit an act that he knew was unlawful.  As explained above, all the government did prove is that, in good times and bad, dozens and dozens of people throughout the Bank openly used the waiver practice to define, calculate and publicly report the Bank's past due numbers.  When the evidence is weighed pursuant to the broad standard of Rule 33, the scale tips decidedly toward the conclusion that an innocent person has been convicted.

## **CONCLUSION**

In light of the foregoing authorities and argument, and those authorities and arguments set forth in Mr. Harra's earlier Motion for Judgment of Acquittal (D.I. 745), it is respectfully requested that this Court enter a Judgment of Acquittal on all charges pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or alternatively grant a new trial on all charges pursuant to Rule 33 of Federal Rules of Criminal Procedure.

Dated:  June 8, 2018

McCARTER & ENGLISH, LLP

/s/ Steve P. Wood
Michael P. Kelly (#2295)
Steve P. Wood (#2309)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
*mkelly@mccarter.com*
*swood@mccarter.com*

Andrew M. Lawler, Esquire
ANDREW M. LAWLER, P.C.
641 Lexington Avenue
New York, NY
(212) 832-3160
*alawler@amlpc.com*

22

ME1 27445632v.1