# EXHIBIT A

921

1                        -  VOLUME 4 -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                        -  -  -

5
     UNITED STATES OF AMERICA,      :   CRIMINAL ACTION
6                                   :
                    Plaintiff,      :
7                                   :
          vs.                       :
8                                   :
     DAVID R. GIBSON, ROBERT        :
9    V.A. HARRA, WILLIAM            :
     NORTH, and KEVYN RAKOWSKI,     :
10                                  :
                                    :
11                  Defendants.  :   NO. 15-23-RGA

12

13                        -  -  -

14                        Wilmington, Delaware
                          Monday, March 12, 2018
15                        8:30 o'clock, a.m.

16                        -  -  -

17   BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
     jury
18                        -  -  -

19
     APPEARANCES:
20

21              LESLEY F. WOLF, ESQ. and
                JAMIE M. McCALL, ESQ.
22              Assistant United States Attorneys

23
                        Counsel for Plaintiff
24
                             Valerie J. Gunning
25                           Leonard A. Dibbs
                             Official Court Reporters

1086

1 when a bank makes a loan, when a bank gives a borrower
2 money, whether it's to buy a house, buy a new car, or build
3 a residential community, that is not their own money they're
4 lending, that is other people's money.
5          You will hear that it's their customers, their
6 depositors' money. It's the dollars that the customers
7 bring to the bank, their paychecks from their first job,
8 their birthday money from their grandmother, their pension
9 payments after a lifetime of work.
10         And the evidence will show that with this
11 privilege of lending other people's money comes
12 responsibility and the legal requirement to fully disclose
13 the bank's books and records and to tell the public what is
14 going on with the bank, whether it is good news or bad news.
15 That is so the people who insure the bank's deposits, the
16 customers who give the bank their money to take care of, and
17 investors who buy stock in the bank know exactly what the
18 banks are doing with that money, that they fully understand
19 what the risks to their money are, that they understand the
20 direction those risks may be headed, and that they can
21 fairly judge the bank and the people who run it.
22         But here, the evidence will show that
23 defendants, Robert Harra, the bank's president, David
24 Gibson, its Chief Financial Officer, William North, the
25 chief credit officer, and Kevyn Rakowski, the corporate

1087

1 controller, chose instead to lie repeatedly about the bank's
2 books and records.
3          Together, they decided to hide from their
4 customers, their regulators, and their investors a growing
5 wave of past due commercial loans, hundreds of millions of
6 dollars in loans that were at least three months behind in
7 their payments, loans that had been made using other
8 people's money. And the evidence will show that in February
9 2010, the defendants went to the stock market and raised
10 $287 million off of that lie. They didn't tell the public
11 everything they knew, how much of the commercial real estate
12 portfolio was in real trouble. They didn't tell the public
13 that they had been warned by people inside and outside of
14 the bank about these looming problems. And they didn't tell
15 the public what they had done to hide these problems, to
16 erase many of them from their public reporting. The public
17 wasn't given the information it needed and information it is
18 legally entitled to properly evaluate the bank and its
19 management.
20         Good afternoon, ladies and gentlemen. My name
21 is Lesley Wolf, and I am an Assistant United States
22 Attorney. Along with my colleagues, Robert Kravetz and
23 Jamie McCall, I represent the United States of America.
24 Assisting us throughout this trial is Barbara Lotharp, and
25 also seated at counsel table is FBI special agent Greg

1088

1 Mrozek.
2          The defendants in this case, four senior bank
3 executives, are charged with the commission of crimes,
4 including, securities fraud, and making false statements to
5 the Federal Reserve and Securities and Exchange Commission,
6 the SEC. In addition, defendant Gibson, the bank's Chief
7 Financial Officer, the CFO, is charged with falsely
8 certifying financial reports.
9          In 2009, Wilmington Trust, due to its loan
10 growth policy, had created a growing waive of construction
11 loans up and down the State of Delaware that were coming
12 due. You will hear construction loans are the riskiest type
13 of loan a bank can make, and you will hear why.
14         A construction loan is typically a three-year
15 loan, so a developer can take a piece of land and turn it
16 into a community of homes or a shopping center. And over
17 those years, a lot of things can go wrong. It can take
18 longer to get the permits to start the building. There
19 might be environmental complications. The economy might
20 turn and the houses you finance the building of aren't being
21 sold, which means the money to repay the loans, the money
22 from selling those houses, is delayed. And this happened
23 across the State of Delaware from Wilmington to Dover to the
24 beaches. The projects stalled completely. They weren't
25 being finished.

1089

1          So you will hear that with a construction loan,
2 the bank takes steps to minimize that risk. The bank
3 underwrites the loan. The bank wants to analyze the
4 borrower, the project, and the market. The bank monitors
5 the loan. The bank checks up on it and makes sure the
6 borrower is building the houses on time and in budget, and
7 as it gets near the end of the term of the loan, the bank
8 expects to get the money back.
9          During the term of the loan, many of the
10 payments you will hear, a lot of the money that the bank
11 seized are for interest on those loans. That interest is
12 the bank's profit on the loan. But the end of the term of a
13 loan, both interest and principal, the original amount lent
14 by the bank, the depositors' money, is also due.
15         However, if that project is stalled, like many
16 were in 2009 to '10, then the bank has a decision to make.
17 You will hear during this case about something called a
18 matured loan. All it means for a loan to be matured is that
19 the term, the length of the time written into the loan
20 agreement, has ended, and it's time for the bank to be
21 repaid. As a result, something has to happen. It's a
22 decision point.
23         You will hear Wilmington Trust had several
24 options. Option one, insist that the loan, principal and
25 interest, be repaid.

```
 1                  -  VOLUME 5 -

 2            IN THE UNITED STATES DISTRICT COURT

 3            IN AND FOR THE DISTRICT OF DELAWARE

 4                      - - -

 5
     UNITED STATES OF AMERICA,    :   CRIMINAL ACTION
 6                                :
                    Plaintiff,    :
 7                                :
          vs.                     :
 8                                :
     DAVID R. GIBSON, ROBERT      :
 9   V.A. HARRA, WILLIAM          :
     NORTH, and KEVYN RAKOWSKI,   :
10                                :
                                  :
11             Defendants.    :   NO. 15-23-RGA

12

13                      - - -

14                      Wilmington, Delaware
                        Tuesday, March 13, 2018
15                      8:32 o'clock, a.m.

16                      - - -

17   BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
     jury
18                      - - -

19
     APPEARANCES:
20

21             LESLEY F. WOLF, ESQ. and
               JAMIE M. McCALL, ESQ.
22             Assistant United States Attorneys

23
                    Counsel for Plaintiff
24
                        Valerie J. Gunning
25                      Leonard A. Dibbs
                        Official Court Reporters
```

Walker - direct

1  Q.    Sir, you would agree that industry guides are not
2  rules of the SEC?
3  A.    Yes.
4  Q.    You would also admit that they are not regulations of
5  the SEC?
6  A.    Yes.
7  Q.    And they are not statements of the SEC or the
8  Securities and Exchange Commission; is that correct?
9  A.    That is correct.
10  Q.    Isn't it also true that the commission has neither
11  approved nor disapproved the views of the staff of
12  corporation finance as expressed in Guide 3?
13  A.    I can't speak to the -- what the commission has or has
14  not done.  If you are quoting from something --
15  Q.    Sure.  Yes.  Tab 36 in your binder, sir.
16  A.    Thank you.  I'm on tab 36.
17  Q.    Okay.  Page 4, Footnote 2.
18           MR. KRAVETZ:  May I just ask what exhibit that
19  is, Your Honor?
20           MR. NOWAK:  Oh, I'm sorry.  I'm sorry.
21           (Pause while counsel conferred.)
22           MR. NOWAK:  For identification purposes, Your
23  Honor, it has been marked as DX-6324.
24           A JUROR:  Your Honor, is there something for us
25  to see?

Walker - direct

1           THE COURT:  If there is something, Mr. Nowak
2  will have it shown.
3           A JUROR:  Okay.
4           THE COURT:  But I guess not right at this point.
5           MR. NOWAK:  May I confer, Your Honor?
6           THE COURT:  Sure.
7           (Pause while counsel conferred.)
8  BY MR. NOWAK:
9  Q.    So having looked at that section, Mr. Walker, and that
10  footnote, did you agree that the commission has neither
11  approved nor disapproved the views of the staff expressed in
12  Guide 3?
13  A.    Yes.
14  Q.    Is it also true that -- well, strike that.
15           Now, let's take a look at industry Guide 3.  I
16  believe it's Government Exhibit 12.  It's at tab 2 in your
17  binder, sir.  And specifically, I believe you read sections
18  that appear on page 7 under the heading of loan portfolio,
19  subsection risk elements, which is 3(c).
20           If you look at 3(c)1(a), which states, loans
21  accounted for on a non-accrual basis.
22           Do you see that?
23  A.    Yes, sir.
24  Q.    The term non-accrual, isn't it true that the SEC has
25  publicly stated that the term non-accrual is not defined in

Walker - direct

1  U.S. GAAP or commission rules?
2  A.    What is the source that you --
3  Q.    I'm asking you, sir.
4  A.    To my knowledge, no.
5  Q.    They have not; is that correct?
6  A.    I can't, I can't answer that that is true, of course.
7  Q.    You don't know one way or the other?
8  A.    I am not aware that the commission has defined
9  nonaccrual loans.
10  Q.    Let's take a look -- actually, if you go back to tab
11  36, which is the same document we've been looking at, page
12  38, footnote 120.
13  A.    Page -- I'm sorry?
14  Q.    I'm sorry.  Page 30, footnote 120.  You just need to
15  read the first sentence.
16  A.    I'm fine with that.
17  Q.    You're fine with that?
18  A.    Yes, sir.
19  Q.    So you would agree that the SEC has stated publicly
20  that the term nonaccrual is not defined in U.S. GAAP or
21  commission rules?
22  A.    Yes.
23  Q.    Yes?
24  A.    Yes.
25  Q.    Going back to Government Exhibit 12, if we could, page

Walker - direct

1  7.
2           There's a term underneath C1(b) that says,
3  contractually past due.
4           Do you see that?
5  A.    Yes, I do.
6  Q.    And that term is not defined in this exhibit, is it?
7  A.    No.
8  Q.    And this exhibit also does not define past due loans,
9  does it?
10  A.    No.
11  Q.    All right.  We talked about financial statement,
12  financial statement disclosures, and I believe you
13  referenced regulation S-X in connection with financial
14  statement disclosures; is that correct?
15  A.    Yes.
16  Q.    And is it true that financial statement, or financial
17  statements that may a company filings to the SEC contain
18  information that is guided by GAAP?
19  A.    Could you try that again, please?
20  Q.    Sure?
21  A.    I'm sorry.
22  Q.    My fault.  Isn't it true that financial statement
23  disclosures contained in filings with the SEC are guided by
24  GAAP?
25  A.    Yes.

1364

Walker - direct

1  Q.    At least certain provisions or certain sections of
2  financial statement disclosures; is that correct?
3  A.    Yes.
4  Q.    Now --
5             THE COURT: Can everyone speak up? There's some
6  difficulty in hearing what's going on here.
7             MR. NOWAK: I'm sorry, Judge.
8             THE COURT: You've got a mike. I suggest
9  staying next to it and I will watch Mr. Walker.
10            MR. NOWAK: Yes, Judge.
11 BY MR. NOWAK:
12 Q.    Would you agree, Mr. Walker, that the term past due
13 loan is not defined in GAAP or by GAAP?
14 A.    Yes.
15 Q.    And let's take a look at Government Exhibit 989.
16 Actually, if we could pull that down for a second.
17            All right.
18            MR. NOWAK: I will introduce Government Exhibit
19 989, hopefully without objection.
20            MR. KRAVETZ: No objection Your Honor.
21            THE COURT: Can someone tell me what it is?
22            MR. NOWAK: I will let Mr. Walker describe what
23 it is.
24            THE COURT: All right.
25            (Government Exhibit No. 989 was admitted into

1365

Walker - direct

1  evidence.)
2  BY MR. NOWAK:
3  Q.    Mr. Walker, tab 31 in your binder or on the screen.
4  A.    Yes.
5  Q.    You're familiar with that?
6  A.    I am.
7  Q.    All right. And what is it? Can you tell by the face
8  of the document?
9  A.    This is a part of the codification of GAAP, or general
10 accepted accounting principles, that has to do with
11 receivables. To clarify, it says accounting standards
12 update, and what that means is that there's further updating
13 taking place within the codification from time to time, and
14 when this is effective, it becomes part of GAAP.
15 Q.    Okay. And turning to the inside cover of that page,
16 the top portion, can you read that? Maybe we can enlarge it
17 for you.
18            Can you read that, please?
19 A.    Certainly. The FASB accounting standards codification
20 is the source of authoritative generally accepted accounting
21 principles recognized by the FASB to be applied by
22 non-governmental entities. An accounting standards update
23 is not authoritative; rather, it is a document that
24 communicates how the accounting standards codification is
25 being amended. It also provides other information to help a

1366

Walker - direct

1  user of GAAP understand how and why GAAP is changing and
2  when the changes will be effective.
3  Q.    Okay. And then if we could turn to page one. There's
4  a real page 1. Maybe the next page. That's perfect.
5             So underneath the question where it says, why is
6  the FASB issuing this accounting standards update, could you
7  please read the first two sentences of that response.
8  A.    The main objective in developing this update is to
9  provide financial statement users with greater transparency
10 about an entity's allowance for credit losses and the credit
11 quality of its financing receivables. In the aftermath of
12 the global economic crisis, effective financial reporting
13 has become the subject of worldwide attention, with a focus
14 on the urgent need for improved accounting standards in a
15 number of areas, including financial instruments.
16 Q.    Thank you.
17            And if you turn to page 46 of this document,
18 under the heading of overall approach, where it reads BC9,
19 could you read that paragraph as well as the five subpoints,
20 please?
21 A.    Yes. "In developing the amendments in this update,
22 the board considered all existing information about credit
23 quality and the allowance for credit losses that is required
24 to be disclosed by accounting standard setters and
25 regulators as the foundation for the disclosures to be

1367

Walker - direct

1  required by the amendments in this update. Specifically,
2  the board considered the following information:
3             "A, current U.S. GAAP requirements.
4             B, current guidelines from the Securities and
5  Exchange Commission (SEC) staff.
6             C, current IFRS requirements."
7             And just as a comment, IFRS is international
8  financial reporting standards.
9             "D, federal financial institutions examination
10 council regulatory reports, including reports of condition
11 and income (FFIEC call reports), Thrift Financial Report for
12 Office of Thrift Supervision regulated institutions, and
13 Form 5300 call reports for credit unions.
14            "Item E, issuers's SEC filings, earnings
15 releases, and presentation material."
16 Q.    Is there reference there to thrift financial report?
17 Are you aware that that is referred to sometimes as TFR?
18 A.    I am.
19 Q.    All right. Now, let's go to Exhibit 993, which was
20 admitted this morning, I believe, and that is tab 35 in your
21 binder, sir.
22            Turning to page, what is -- actually, let me
23 take a step back.
24            Sir, if you turn the cover in your binder, turn
25 the cover of the first page, and then you see -- are you

1368

Walker - direct

1   okay?
2   A.    You mean the cover?
3   Q.    Yes.  Yes, Mr. Walker.
4   A.    Fine.
5   Q.    Yes.  Just turn the page once.
6   A.    Okay.
7   Q.    And then in the lower left -- yes, lower left hand
8   portion of the page, on the right-hand side of the binder,
9   do you see the number 46?
10  A.    Yes.
11  Q.    Okay.  That's page 46; is that right?
12  A.    Okay.
13  Q.    Would you agree?
14  A.    Yes.
15  Q.    Okay.  So the first 45 pages are not here; is that
16  correct?  Is that right?  Sorry.  I can't hear you?
17  A.    Yes.  I'm sorry.
18  Q.    So if you turn to page 48 of this document, which is
19  three pages in, and you look at 50-6 --
20  A.    Yes.
21  Q.    -- there's a reference there in subsection E to
22  contractual terms.
23        Do you see that?
24  A.    Yes, I do.
25  Q.    Is that term defined anywhere in this document?

1369

Walker - direct

1   A.    Contractual terms?
2   Q.    Defined anywhere in this document?
3   A.    No.
4   Q.    Let's turn to Government Exhibit 145.  You testified
5   about this earlier this morning, about potential outcomes
6   for the filing review; is that correct?
7   A.    Yes.
8   Q.    And these are a list of potential outcomes that might
9   occur if the Division of Corporation Finance reviews
10  particular filings of a company.
11        Would you agree with that?
12  A.    Yes.
13  Q.    So we have a list of five potential outcomes here; is
14  that right?
15  A.    Yes.
16  Q.    Isn't it also true that at times, the SEC's Division
17  of Corporation Finance sends a comment letter to an issuer,
18  receives the response from the issuer, and has no further
19  follow up?  Isn't that also true?  Doesn't that happen?
20  A.    It does.
21  Q.    That's not listed here, is it?
22  A.    No.
23  Q.    So there should actually be six bullets here,
24  shouldn't there be?  I mean, to be fair, shouldn't there be
25  six bullets, sir?

1370

Walker - direct

1   A.    I would be glad to add that to the exhibit.
2   Q.    Okay.  So maybe we can do that.  We can add that to
3   the exhibit.  But these aren't in evidence anyway; right?
4   They're just for the jury?
5   A.    Fine.
6   Q.    If they are used in the future, we'll make certain to
7   add that sixth point.  You would agree with that, sir?
8   A.    I would.
9         MR. NOWAK:  May I confer, Your Honor?
10        THE COURT:  Yes.
11        (Pause while counsel conferred.)
12        MR. NOWAK:  No further questions, Judge.
13        THE WITNESS:  Sir, I would like to clarify, if I
14  may?
15        MR. NOWAK:  There's no pending question, sir.
16        THE COURT:  Mr. Walker, why don't you wait.  The
17  Government, if they want some clarification, will ask you a
18  question.  All right?
19        THE WITNESS:  Okay.
20        THE COURT:  Anybody else?  Any other defendants?
21        MR. DALTON:  Excuse me, Your Honor.  I
22  apologize.  I was going to be next and I have no questions,
23  Your Honor.
24        THE COURT:  All right.
25        MR. KELLY:  And I have no questions on behalf of

1371

Walker - direct

1   Harra, Your Honor.
2         THE COURT:  All right.
3         MS. BROOKS:  No questions on behalf of defendant
4   North.
5         THE COURT:  All right.  Any redirect,
6   Mr. Kravetz?
7         MR. KRAVETZ:  Very briefly, Your Honor.
8         REDIRECT EXAMINATION.
9   BY MR. KRAVETZ:
10  Q.    Mr. Walker, just briefly, Mr. Nowak referenced that
11  there are a bunch of different items that are listed in Reg
12  S-K; is that correct?
13  A.    Yes.
14  Q.    And one of the ones he showed you is paragraph 13,
15  which draws attention to industry, the industry guides?
16  A.    Yes.
17  Q.    Did that have a particular reference to bank holding
18  companies?
19  A.    The language itself?
20  Q.    Correct?
21  A.    I assume it did, yes.
22  Q.    Now, Mr. Nowak asked you about a lot of whether
23  this -- how many different provisions there were, but just
24  to be clear, is there a provision within industry Guide 3
25  that relates directly to past due loans?

1372

Walker - direct

1  A.   Yes.

2  Q.   If I could?

3        MR. KRAVETZ:  If I could ask Ms. Lotharp to

4  display Government's Exhibit 12, page 7.

5  BY MR. KRAVETZ:

6  Q.   Mr. Nowak also asked you questions about which types

7  of disclosures are required or not; is that right?

8  A.   Yes.

9  Q.   Now, to the extent that a bank would decide to include

10 a Guide 3 disclosure in its MD&A section, what expectations

11 would Corp Fin have during the filing review process as to

12 whether that information would be accurate or not?

13 A.   It would expect that that information should be

14 accurate.

15       MR. KRAVETZ:  If I could ask Ms. Lotharp to

16 enlarge Section C, please.

17 BY MR. KRAVETZ:

18 Q.   Mr. Nowak asked you specifically if the word "define"

19 was in Exhibit 12.

20       Do you remember that?

21       MR. NOWAK:  Objection, Judge.

22       THE COURT:  I think you misspoke there,

23 Mr. Kravetz.

24       MR. KRAVETZ:  I thought I heard the word

25 "define" or definition that was asked by Mr. Nowak.  I'm

1373

Walker - direct

1  just going to ask what the specific --

2        THE COURT:  I'm sorry.  Maybe I misheard what

3  you said.  Can you ask your question again?

4        MR. KRAVETZ:  I thought that Mr. Nowak asked a

5  question about defining past due in terms of that particular

6  section.

7        THE COURT:  You didn't say all of that in your

8  question.  Just ask it again, please.

9  BY MR. KRAVETZ:

10 Q.   Mr. Walker, just to be clear, does the guidance in

11 industry Guide 3 in Section C1 use the word "state"?

12 A.   State on the first line of C1.

13 Q.   And in terms of what is required to be stated, is

14 there a reference to contractually past due 90 days or more

15 as to principal or interest payments?

16 A.   Yes, in 1(b).

17 Q.   There was -- Mr. Nowak also made mention to

18 Government's Exhibit 989, which I believe is in your binder.

19 I'm not sure exactly which tab, but I think, Ms. Lotharp, if

20 you could please bring that one up for us.

21       And, Ms. Lotharp, if you could just enlarge the

22 top of that document.  That's actually fine.

23       Is there a date that's on the update?

24 A.   There is.

25 Q.   What's that date?

1374

Walker - direct

1  A.   July 2010.

2  Q.   Which quarter would that have been in in 2010?

3  A.   Are you asking about the effective date of the update?

4  Q.   Well, I was going to ask you about that next, but just

5  in terms of --

6  A.   That was the date of issuance, July.

7  Q.   July of 2010?

8  A.   2010.

9  Q.   And in terms of the periodic reports that companies

10 file with the SEC, in which quarter would the month July

11 be?

12 A.   We would have to read the effective date of the update

13 to make that determination.

14 Q.   But in general, is July in the third quarter of a

15 year?

16 A.   July is in the third quarter of the year.

17 Q.   And so to be clear, this isn't actually a document

18 that has just made it through the codification process?  Is

19 that your testimony, it's an update?

20 A.   That's correct.  As of its effective date, it becomes

21 part of the codification.

22       MR. KRAVETZ:  And, finally, if Ms. Lotharp can

23 please display Government's Exhibit 993.  I believe, Ms.

24 Lotharp, page 5.

25       And if you can enlarge 50-6 and 50-7.

1375

Walker - direct

1  BY MR. KRAVETZ:

2  Q.   Now, you were asked whether this section defines the

3  term past due or contractual; is that correct?

4  A.   That's right.

5  Q.   In the beginning part of 50-6, does it state, "Shall

6  include"?

7  A.   It does.

8  Q.   And can you read that sentence once again?

9  A.   "The summary of significant accounting policies shall

10 include the following:"

11 Q.   And down to 50-7, is there the word "required"?

12 A.   Yes, there is.

13 Q.   And, once again, can you read that sentence into the

14 record?

15 A.   "The following disclosures related to nonaccrual and

16 past due loans and trade receivables are also required:"

17       MR. KRAVETZ:  May I have one moment, Your Honor.

18       (Pause while counsel conferred.)

19       MR. KRAVETZ:  No further questions, Your Honor.

20       MR. NOWAK:  Nothing further, Judge.

21       THE COURT:  All right.  Mr. Walker, thank you.

22 You may step down.  Be careful.

23       (Witness excused.)

24       THE COURT:  Members of the jury, there's

25 something I have to take up with the lawyers.  I don't think

1476

1     - VOLUME 6 -

2          IN THE UNITED STATES DISTRICT COURT

3          IN AND FOR THE DISTRICT OF DELAWARE

4                    - - -

5
     UNITED STATES OF AMERICA,     :    CRIMINAL ACTION
6                                   :
                    Plaintiff,      :
7                                   :
          vs.                       :
8                                   :
     DAVID R. GIBSON, ROBERT        :
9     V.A. HARRA, WILLIAM           :
     NORTH, and KEVYN RAKOWSKI,     :
10                                  :
                                    :
11                  Defendants.     :    NO. 15-23-RGA

12

13                    - - -

14                         Wilmington, Delaware
                          Wednesday, March 14, 2018
15                         8:32 o'clock, a.m.

16                    - - -

17   BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

18                    - - -

19   APPEARANCES:

20
               LESLEY F. WOLF, ESQ. and
21             JAMIE M. McCALL, ESQ.,
               Assistant United States Attorneys
22

23                  Counsel for Plaintiff

24                         Valerie J. Gunning
                          Leonard A. Dibbs
25                         Official Court Reporters

1597

Infanti - direct

1 right?
2 A.    So they would understand it, yes.
3 Q.    And you gave a series of trainings and follow-on
4 trainings for relationship managers on how to use this new
5 system; is that right?
6 A.    I did.
7 Q.    And that was all very much encouraged by Mr. North and
8 by everybody else; right?
9 A.    No one discouraged it.
10 Q.    All right.  So would you say, sir, in your opinion,
11 that a borrower's character is the most important factor
12 when you're considering what risk rating to assign?
13 A.    I would say it's important, but as the loan review
14 person, you don't need the borrower, you are not sitting
15 across from the borrower.
16 Q.    Right.  Okay.  Another aspect of risk rating analysis
17 is support from guarantors; right?
18 A.    That's correct.
19 Q.    What's a guarantor?
20 A.    It's someone other than the borrower who signs
21 promises the borrower doesn't or can't pay, I, or we will.
22 Q.    Okay.  So the wherewithal and the character of the
23 guarantor, would that be an important factor in setting a
24 risk rating?
25 A.    It is helpful, but it is not the overriding concern.

1598

Infanti - direct

1 Q.    Sure.  But is it important?
2 A.    Important, but it's lower on the list.
3 Q.    Okay.  Would you say that in the absence of a personal
4 guarantee, that that would be inconsistent with Wilmington
5 Trust's policies?
6 A.    I'm not going to call it policies.  I will call it
7 practices.
8 Q.    You don't think that was written anywhere?
9 A.    Well, certainly, one of the exhibits that Mr. McCall
10 presented earlier, yes, it was.
11 Q.    Okay.  So it is a policy, not a practice, not just a
12 practice?
13 A.    Certainly, in commercial real estate, it was a policy.
14 Q.    Let's limit my question to that.  Thank you.
15 A.    Yes.
16 Q.    So would you agree with me --
17 A.    Yes.
18 Q.    Okay.  Very good.
19       We talked about the fact that two people within
20 the same bank can disagree on risk rating of a single loan.
21 Is it also the case that an outside auditor like KPMG might
22 disagree with the risk rating that you or someone else at
23 Wilmington Trust assigned?
24 A.    Yes.
25 Q.    Is that unusual -- was that unusual just to Wilmington

1599

Infanti - direct

1 Trust?
2             MR. McCALL:  Objection.  Relevance.
3             THE COURT:  I'm not sure it's relevant, so I
4 will sustain the objection.
5             MR. WILKS:  Very well.
6 BY MR. WILKS:
7 Q.    What about with regulators?  Was it unusual in your
8 experience at Wilmington Trust that one of the regulators,
9 be it from the Federal Reserve or the OTS or the state
10 banking commissioner, that they would come in and do a risk
11 rating that disagreed with one that you or one of your folks
12 at Wilmington Trust had set?
13             MR. McCALL:  Relevance.
14             THE COURT:  I'm going to overrule that
15 objection.
16             THE WITNESS:  I believe you asked me if it was
17 unusual that the regulator would disagree with the rating.
18 BY MR. WILKS:
19 Q.    It was unusual for the regulator to disagree with the
20 rating.  Is that what you said?
21 A.    I was asking for a clarification.
22 Q.    Okay.  Okay.  Was it that -- now see what you did?
23 All right.
24             Was it common, all right.  Let's use the
25 positive, not the negative.  Was it common when you were at

1600

Infanti - direct

1 Wilmington Trust that regulators would come in and disagree
2 with the risk rating that you set or somebody on your staff
3 had set for a loan?
4 A.    I will say there were instances during the exam when
5 they disagreed with the rating.
6 Q.    Okay.  I'm going to go for it again.
7       So it was not -- was it, it was not uncommon?
8 That's a stupid question.
9             MR. WILKS:  Your Honor, I apologize for that
10 question.  I'm going to withdraw it.
11             THE COURT:  All right.
12 BY MR. WILKS:
13 Q.    Now, in those circumstances, Mr. Infanti --
14 A.    Yes.
15 Q.    -- when a regulator would come in and they would say,
16 we disagree with this risk rating, who wins?
17 A.    Unless the bank can convince them otherwise, they
18 win.
19 Q.    The regulator always wins?
20 A.    I didn't say they always win.
21 Q.    All right.
22 A.    I said if the bank can't convince them.
23 Q.    If the regulator isn't convinced --
24 A.    They are going to win.
25 Q.    The regulator wins.  All right.

1601

Infanti - direct

1      Sir, let's talk about the general economy.
2  Okay?  In 2005 and 2006, would you agree -- you were in
3  banking at that time?  Yes?
4  A.    I was.
5  Q.    And you were involved in commercial lending at that
6  time?
7  A.    I was.
8  Q.    All right.  Would you agree with me that 2005 and 2006
9  in Delaware and in the United States of America, that was
10  about as good as it can get if you're in the commercial real
11  estate business?
12  A.    I would agree with that.
13  Q.    All right.  Would you agree with me that that is about
14  as good as it can get if you are a bank that makes loans to
15  people in a commercial reeling estate business?
16  A.    I would agree with that as well.
17  Q.    Okay.  Those times changed pretty quickly, didn't
18  they?
19  A.    They did.
20  Q.    Between 2008 and 2010, let's say, that's a pretty
21  difficult economic environment, wasn't it?
22  A.    I would agree with that.
23  Q.    Worst you had ever seen in your career?
24  A.    Yes.  Certainly as to commercial real estate.
25  Q.    All right.  You started at Wilmington Trust in

1602

Infanti - direct

1  September of 2008; is that correct?
2  A.    That's correct.
3  Q.    All right.  That same month the Federal Government
4  took control of two organizations called Fannie Mae and
5  Freddie Mac.
6      Do you remember that?
7  A.    I do.
8  Q.    That was a big deal?
9  A.    Yes, it was.
10  Q.    Bank of America kind of had to by Merrill Lynch?
11      MR. McCALL:  Objection.  Relevance.
12      MR. WILKS:  Setting the stage, Your Honor.
13      THE COURT:  Well, why don't you get to the
14  stage.
15  BY MR. WILKS:
16  Q.    Congress approved two of the biggest bailouts in our
17  country's history in October of 2008, didn't it?
18  A.    They did.
19  Q.    It was a period of panic or near panic in the national
20  economy?
21      MR. McCALL:  Objection.
22      THE COURT:  I'm going to overrule that
23  objection.
24  BY MR. WILKS:
25  Q.    Was it a period of panic or near panic in our national

1603

Infanti - direct

1  economy?
2  A.    High concern, yes.
3  Q.    All right.  And the Delaware economy actually
4  continued to get worse in 2009 and into 2010; is that
5  correct?
6  A.    That's my recollection.
7  Q.    All right.  In fact, this national economic downturn
8  actually hit Delaware later than it hit the rest of the
9  country, didn't it?
10  A.    I believe that is what the economic statistics show,
11  yes.
12  Q.    Tough time to be working in the financial industry?
13  A.    Yes.
14  Q.    Tumultuous?
15  A.    To say the least.
16  Q.    Stressful?
17  A.    Yes.
18  Q.    Stressful time to be working in risk rating review
19  work?
20  A.    Yes.
21  Q.    Because things kept changing so fast; right?
22  A.    Yes.
23  Q.    The regulators were exerting a lot more scrutiny on
24  banks at that time, were they not?
25      MR. McCALL:  Objection.  Foundation.  Relevance.

1604

Infanti - direct

1      THE COURT:  I am not sure, do you want to ask
2  him about regulators at Wilmington Trust, go ahead.
3      MR. WILKS:  Good.  Okay.  Thank you, Your Honor.
4  BY MR. WILKS:
5  Q.    So when you were at Wilmington Trust in that window of
6  time, were the regulators exerting greater scrutiny on
7  Wilmington Trust than it had previously?
8  A.    I was only there for 2009 exam.
9  Q.    So you can't answer that, you don't know?
10  A.    No.
11  Q.    Okay.
12      Were you -- Wilmington Trust had an e-mail system,
13  right?
14  A.    It did.
15  Q.    And you had an e-mail account at Wilmington Trust?
16  A.    I did.
17  Q.    Those aren't all your e-mails.  Don't worry.
18      There were certain groups that you could just put in
19  the name of a group, and boom it goes out to a whole bunch
20  of different people who are members of that group, is that
21  right?  Do you remember that?
22  A.    I am aware of that technology in the e-mail.  I don't
23  know I ever used it at Wilmington Trust.
24  Q.    My question for you is, do you know if you were part
25  of mid-Atlantic e-mail group at Wilmington Trust?

1709

Infanti - cross

1   middle.

2          Do you see where it says, all such parties agree

3   that lender may renew or extend -- thank you -- repeatedly,

4   and for any length of time, this loan or release any party

5   or guarantor or collateral?

6   A.   I do.

7   Q.   And I'm going to skip the next clause there.  And it

8   finally ends by saying, and take any other action deemed

9   necessary by lender without the consent of or notice to

10  anyone.

11         Right?

12  A.   Yes.

13  Q.   That's part of the loan agreement; is that right?

14  A.   Part of the note.

15  Q.   Right.  And that's part of the contract that binds the

16  parties together; is that right?

17  A.   That the note is one part of the contract that binds

18  the parties together.

19  Q.   Right.  So the answer to my question was yes; is that

20  correct?

21  A.   Yes.

22  Q.   All right.  And then the first sentence says, after

23  general provisions, lender may delay or forego enforcing any

24  of its rights or remedies under this note without losing

25  them.

1710

Infanti - cross

1          Right?

2   A.   Correct.

3   Q.   And that provides a degree of flexibility to the

4   lender in at least establishing the timing of the bank, the

5   lender exercising its right to enforce the note?

6          MR. McCALL:  Objection.  Foundation.  It calls

7   for opinion.

8          THE COURT:  Mr. Wood?

9          MR. WOOD:  Your Honor, this witness has

10  testified just a minute ago that this is part of the legal

11  documents that bind the parties together, and he has been

12  offering his opinion about promissory notes and the bank's

13  other records the last day-and-a-half.

14         THE COURT:  All right.  Well, that's different

15  than interpreting the language that you showed him, so I'm

16  going to sustain the objection.

17         MR. WOOD:  All right.  We can take this down.

18  BY MR. WOOD:

19  Q.   I think we've established that the waiver practice,

20  the practice of not reporting loans as past due that were

21  matured, current for interest, and that the bank wanted to

22  extend and were in that process as one that was in place

23  when you started at Wilmington Trust in 2008; is that

24  right?

25  A.   Yes.

1711

Infanti - cross

1   Q.   And there was some testimony -- Mr. Wilks showed you

2   an e-mail earlier today, and from that you are of the

3   opinion that that waiver practice was in existence long

4   before you got there; is that right?

5   A.   Based on that e-mail, yes.

6   Q.   Okay.  And you asked -- and you were asked some

7   questions about the State of Delaware's economy and the

8   national economy in 2005 and 2006 and all the way up to

9   2010; is that right?

10  A.   Correct.

11  Q.   And in 2005 and '06, the economy was pretty good?

12  A.   It was.

13  Q.   And the business of commercial real estate, whether it

14  was from the developers' point of view, the builders' or the

15  banks' was excellent; right?

16  A.   That's correct.

17  Q.   And the waiver practice existed at a time when that

18  business was excellent; is that right?

19  A.   I wasn't at the bank in 2005 to 2006, but I'm led to

20  believe that it did exist, yes.

21  Q.   Okay.  And some of this was discussed with Mr. Wilks,

22  but I want to make sure I understand it before I get to some

23  questions.

24         The way things worked were every month,

25  somebody, sometimes Wayne Irwin, sometimes Steve Cummings,

1712

Infanti - cross

1   would send the report around by e-mail that would list all

2   of the matured loans; is that right?

3   A.   I don't ever recall receiving that report.

4   Q.   Well --

5   A.   I said I don't recall.

6   Q.   Yes.  I got you.

7   A.   Okay.

8   Q.   Look in your binder at tab DX-1222.

9   A.   I've got it.

10  Q.   Okay.  Take a look at that closely and look at the

11  folks that it's addressed to, and tell me if you see your

12  name on there.

13  A.   I do.

14  Q.   Okay.  Now, flip to the second page.  Look at the

15  subject line.

16         MR. WOOD:  May I confer with counsel, Your

17  Honor?

18         THE COURT:  Sure, yes.

19         (Pause while counsel conferred.)

20  BY MR. WOOD:

21  Q.   All right.  Now that you've had a chance to see this,

22  do you know what this is?

23  A.   I believe I do.

24  Q.   Okay.  It's one of those e-mails circulating the

25  waiver report around monthly; right?

1713

Infanti - cross

1   A.   Okay.
2   Q.   Yes?
3   A.   Yes.
4   Q.   Okay.  And your name is on it?
5   A.   It is.
6   Q.   Okay.
7        MR. WOOD:  Your Honor, move for the introduction
8   into evidence of Defense Exhibit 1222.
9        MR. McCALL:  No objection, Your Honor.
10       THE COURT:  It's admitted without objection.
11       (Defendants' Exhibit No. 1222 was admitted into
12   evidence.)
13       MR. WOOD:  Permission to publish?
14       THE COURT:  Sure.
15       MR. WOOD:  Thank you.  Brian, if you would.
16   BY MR. WOOD:
17   Q.   Okay.  That is almost impossible to see, at least for
18   me.  How about you?  Okay.
19        Would you agree with me that that is a list of
20   the people that got the past due report on December 29th,
21   2009?
22   A.   It would appear to be that, yes.
23   Q.   Okay.  As they say, wait, there's more.  Can we see
24   the second page, please?
25        The second page, even more addressees; is that

1714

Infanti - cross

1   right?
2   A.   Yes.
3   Q.   Okay.  We could do two things.  I can ask you to count
4   them, or I could suggest a number to you and see if you
5   agree with it.  Which would you prefer, sir?
6   A.   I would prefer you suggest a number.
7   Q.   Okay.  If I told you that the past due report on
8   December 29th, 2009, was addressed to more than -- to about
9   70 people, let's fudge it a bit, would you quarrel with that
10  assertion, sir?
11  A.   No.
12  Q.   Okay.
13       MR. WOOD:  We can take that down, please.  Thank
14  you.
15  BY MR. WOOD:
16  Q.   So there was nothing at all hidden about the waiver
17  practice within the bank; is that right?
18  A.   Correct.
19  Q.   And it was something the bank did every single month
20  that you were there; is that right?
21  A.   Yes.
22  Q.   And as far as you knew, it was something the bank had
23  been doing every single month for a long time before you got
24  there?
25  A.   Yes.

1715

Infanti - cross

1   Q.   You never did anything to try to hide the existence of
2   the waiver practice from anybody; right?
3   A.   I believe I've answered that question before.
4   Q.   And the answer is no, of course not?
5   A.   Correct.
6   Q.   By the way, when loans were waived, that didn't mean
7   that they were no longer subject to credit review; right?
8   A.   That's correct.
9   Q.   You still had the right -- I will go farther.  You had
10  the obligation, it was your job to look at loans, all of
11  them; right?
12  A.   All of them, yes.
13  Q.   Sure.  Not saying you could look at all of them, but
14  any one you could get to?
15  A.   That's correct.
16  Q.   There was no rule that said, don't look at the files
17  that had the waived loans there; right?
18  A.   I think during Mr. Wilks' questioning, we looked at
19  several.
20  Q.   Right.  And I want to understand a little bit more
21  about the waiver practice and how it was reflected in the
22  bank's written policies.
23       You would agree with me that when we're talking
24  about the bank's policies, that every word in the policy is
25  important; is that right?

1716

Infanti - cross

1   A.   Yes.
2   Q.   Okay.  And you would agree with me that when a policy
3   says gives an example and then says, such as, that is the
4   writer's way of saying, here's an example, and there are
5   more?  Fair enough?
6   A.   Yes.
7   Q.   Okay.  So let's look at Exhibit 372, please.
8        MR. WOOD:  Permission to publish.  This is in
9   evidence already.
10       THE COURT:  All right.  You don't need to ask
11  for permission to publish if they're in evidence.
12       MR. WOOD:  Thank you.
13       Okay.  And we need to go to the page -- it has
14  the first paragraph of Policy 7.1, please.
15       Okay.  If we could, Brian, please blow up that
16  first paragraph of 7.1.
17  BY MR. WOOD:
18  Q.   All right.  And please read along with it; right?
19  I'm going to start with the parenthetical there.
20       And it says, external reports may be adjusted to
21  exclude loans which are past due as a result of
22  administrative issues, and then it says, such as internal
23  miss application of payments received.
24       Right?
25  A.   Yes.

```
 1                      - PORTION UNDER SEAL -

 2                         - VOLUME 7 -

 3              IN THE UNITED STATES DISTRICT COURT

 4              IN AND FOR THE DISTRICT OF DELAWARE

 5                            - - -
        UNITED STATES OF AMERICA,      :   CRIMINAL ACTION
 6                                     :
                     Plaintiff,        :
 7                                     :
              vs.                      :
 8                                     :
        DAVID R. GIBSON, ROBERT        :
 9      V.A. HARRA, WILLIAM            :
        NORTH, and KEVYN RAKOWSKI,     :
10                                     :
                                       :
11                   Defendants.   :   NO. 15-23-RGA

12

13                            - - -

14                                Wilmington, Delaware
                                  Friday, March 16, 2018
15                                8:32 o'clock, a.m.

16                            - - -

17      BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

18                            - - -

19      APPEARANCES:

20
                     LESLEY F. WOLF, ESQ.,
21                   ROBERT F. KRAVETZ, ESQ. and
                     JAMIE M. McCALL, ESQ.,
22                   Assistant United States Attorneys

23
                          Counsel for Plaintiff
24
                                  Valerie J. Gunning
25                                Leonard A. Dibbs
                                  Official Court Reporters
```

1830

Styles - direct

1    Members of the jury, have you followed my
2    instructions at the end of Wednesday?
3        (The jury responded "Yes.")
4        THE COURT:  All right.  Ms. Wolf?
5        MS. WOLF:  Thank you, your Honor.
6    The Government calls Tosha Styles
7            ... TOSHA STYLES, having been duly
8    sworn as a witness, was examined and testified as
9    follows...
10       MS. WOLF:  May I proceed, your Honor?
11       THE COURT:  Yes.
12   BY MS. WOLF:
13   Q.   Good morning, Ms. Styles.
14       Could you tell the jury where you currently work?
15   A.   I work for M&T Bank?
16   Q.   And what your job title at M&T Bank?
17   A.   My actual title is -- I work in --
18   Q.   Do you work in a particular area?
19   A.   I work in regulatory reporting.
20   Q.   And before M&T Bank, were you employed by the
21   Wilmington Trust Company?
22   A.   Yes.
23   Q.   When did you begin working at Wilmington Trust?
24   A.   I began as a secretary in the commercial lending area.
25   Q.   And when was that?

1831

Styles - direct

1    A.   1989.
2    Q.   Okay.
3        You said your first job was as a secretary in the
4    commercial lending area?
5    A.   Yes.
6    Q.   Okay.
7        At some point did you change jobs --
8    A.   Yes.
9    Q.   -- at Wilmington Trust?
10   A.   Yes, about a year later I worked in the commercial
11   real estate group.
12   Q.   What did you do in the commercial real estate group?
13   A.   I was a secretary there as well.
14   Q.   And, again, did you later change jobs and leave your
15   position as a secretary in the commercial real estate
16   division?
17   A.   Yes, I went to work in the finance department in asset
18   review.
19   Q.   And did you do another shift at some point in time?
20   A.   Yes, a few more.
21       I then worked in profitability reporting dealing
22   with commercial loans.  And then again went to the credit
23   policy as a manager of reporting and analysis.
24   Q.   Would that last change be in or around 2004?
25   A.   Yes.

1832

Styles - direct

1    Q.   In 2009 to 2010, during that period of time, what was
2    your particular job at Wilmington Trust, Ms. Styles?
3    A.   I was still the reporting manager in our asset review.
4    Q.   And who did you report to in that capacity?
5    A.   Karen Thuresson.
6    Q.   Okay.  Were you part of a particular department at
7    Wilmington Trust?
8    A.   We moved from credit policy to the finance department.
9    And then later I reported to the Audit Committee.
10   Q.   Who was the head of the Credit Policy Department?
11   A.   Bill North.
12   Q.   What was the head of the Finance Department?
13   A.   Gave Gibson.
14   Q.   And the Audit Committee that -- could you tell this
15   jury what an Audit Committee is, just generally, just very
16   generally who they are?
17   A.   They are an independent area that doesn't report to
18   any of those individuals in management.
19   Q.   Is that a subsection of the board of directors?
20   A.   Yes.
21   Q.   Now, during 2008 to 2010, did you use a different last
22   name at the bank?
23   A.   I did.  It was Towe.
24   Q.   Could you spell that?
25   A.   T-o-w-e.

1833

Styles - direct

1    Q.   I promise to try to remember that this morning, but I
2    apologize in advance if I refer to you by your former name.
3        Okay.
4    Q.   As as a Section Manager for reporting and analysis,
5    Ms. Styles, did you have people that reported to you?
6    A.   Yes, I did.
7    Q.   And who were those people?
8    A.   Lisa Ashton, Tracy Johnson, Ed Pierce, Jim Mahoney.
9    And when he left, then Ryan Hekls.
10   Q.   What, in particular, were your job responsibilities as
11   the reporting manager in the asset review area?
12   A.   We did multiple reports and the slicing and dicing on
13   the loan portfolios.
14   Q.   And you said the loan portfolios.
15       Did that include the commercial loan portfolios?
16   A.   Yes.
17   Q.   Could you just tell the jury, and give some examples
18   of the type of reports that you would do in the course of
19   your work?
20   A.   Yes, we had reports such as the relationships over ten
21   million, geographic reports for the loan portfolio by state
22   and areas of the bank.  And then past due reporting.
23   Q.   Anything else that comes to mind?
24   A.   All kinds of stuff.
25   Q.   Okay.

1846

Styles - direct

1   change information like that.

2        So it's just a group that's trained to do so.

3   Q.   And what would those individuals require or want to

4   see before they would go in and make a change on the system?

5        MR. BREEN:  Objection.  Foundation.

6        THE COURT:  I'm going to overrule it.

7        Go ahead.

8        THE WITNESS:  They were required some sort of

9   change request form and/or documentation requesting, you

10  know, what to change.

11  BY MS. WOLF:

12  Q.   Ms. Styles, did you use information from Shaw to

13  generate a past due report at Wilmington Trust?

14  A.   Yes.

15  Q.   Do you recall when you became responsible for that?

16  A.   A few years before the acquisition.  Maybe 2006/7.

17  Q.   Are you sure that it was as early as 2006/2007 or

18  could it have been a little later?

19  A.   It could have been a couple years later.

20  Q.   Do you want to take a look, just in your binder, the

21  date binder this time, at the document that is Government

22  Exhibit 651?

23       (Pause)

24  A.   I have it.

25  Q.   Take a look at that document.  Don't read it out loud.

1847

Styles - direct

1        (Pause)

2   A.   Okay.

3   Q.   I'm going to ask you to go ahead and close your binder

4   again.

5        Do you now remember when you became responsible for

6   generating this report?  Does that refresh your

7   recollection?

8   A.   Yes, at the end of 2008.

9   Q.   So prior to you assuming responsibility for that job,

10  was someone else -- did someone else have that task?

11  A.   Yes, our loan recovery area.

12  Q.   Were there particular individuals within the loan

13  recovery area that had responsibility when you assumed the

14  job?

15  A.   Yes, Anthony D'Imperio was the manager and Wayne

16  Irwin.

17  Q.   You said "loan recovery."

18       Is that referred to in sort of common terms as work

19  out?

20  A.   Yes.

21  Q.   Now, why does the responsibility shift from the loan

22  recovery area to you, if you know?

23  A.   Since I had data coming from the system, I was able to

24  put that report together more quickly.

25  Q.   You said you had data coming from the system.

1848

Styles - direct

1   Q.   What types of data did you receive when you had access

2   to?

3   A.   Our information technology area was able to get the

4   information from that system and put it into tables, text

5   files that we would be able to get out of the system.

6   Q.   Did you have any understanding of who or why they

7   wanted the  information more quickly?

8   A.   Yes.

9   Q.   And what was that?  What did you understand that -

10       MR. BREEN:  Objection.  Foundation.

11       It's hearsay, your Honor.

12       THE COURT:  The question is what was her

13  understanding.     I'm going to allow that.

14       THE WITNESS:  My understanding of who or why?

15  BY MS. WOLF:

16  Q.   Why did they -- let me break that down.  Actually,

17  it's a compound question, so let me break it out first.

18  A.   Okay.

19  Q.   Why did Wilmington Trust want the information faster?

20  A.   It was part of our reporting, so they wouldn't want

21  that information.

22  Q.   And did you have any understanding of who wanted the

23  information more quickly?

24  A.   Yeah, our chief financial officer, you know, the

25  controller, even Division Managers to try and collect from

1849

Styles - direct

1   the past due amounts as soon as possible.

2   Q.   And the chief financial officer was who?

3   A.   Dave Gibson.

4   Q.   And the controller?

5   A.   Kevyn Rakowski.

6   Q.   Now, we're going to go through this in a lot more

7   detail in a moment.

8        But in very general terms, could you please describe

9   for the jury, Ms. Styles, the general process you used to

10  create your reports?

11  A.   I would get those -- the files that our information

12  technology area provided.  And I would put them into an

13  access database, which is where I would pull information for

14  different reporting.

15  Q.   And I just want to stop you right there.

16  A.   Okay.

17  Q.   Again, an access database, what is that?

18  A.   Okay.

19       Access is a program from Microsoft, similar to Word

20  and Excel.  It handles large amounts of data that you can

21  then query upon to see exactly what you want to pull.

22  Certain fields and certain information.

23  Q.   And you pulled the data out of an access database,

24  then what did you do next?

25  A.   I would query upon whichever field the report --

1850

Styles - direct

1   require a field that the report requires and generally I
2   would put that Excel where I could then, you know, make
3   reports, summarizing the report.
4   Q.      After you created your Excel spreadsheet -- again,
5   we're still in general terms here -- would you send the
6   Excel spreadsheet to somebody else or another area of the
7   bank?
8   A.      Depending on what it was.  It could be used for
9   someone else  then to do something with or create a report.
10  If I created a report, it would have been went somewhere.
11  Q.      And I'm referring here -- and I should have been more
12  precise, I apologize -- I'm talking about the past due loan
13  reports.
14          Did you send that past due loan report to somebody
15  else at the bank?
16          MR. BREEN:  Objection.  She didn't generate a
17  past due report.
18          THE COURT:  Well, did you generate a past due
19  reports?
20          THE WITNESS:  Yes.
21          THE COURT:  All right.
22          Go ahead.
23  BY MS. WOLF:
24  Q.      You created -- I think you created an Excel
25  spreadsheet, correct?

1851

Styles - direct

1   A.      Yes.
2   Q.      Okay.
3           And that's with the past due of -- that included a
4   list of past due loans?
5   A.      It included a list of loans that the days past due
6   field on Shaw was 30 days or greater, or nonaccrual.
7   Q.      So it was a loan that the Shaw system would calculate
8   as past due?
9   A.      Yeah, the number of days past due.
10  Q.      Okay.
11          And after you created that spreadsheet, what did you
12  do with it?
13  A.      That particular form would then go to the loan
14  recovery area, you know, to Wayne Irwin or whoever worked
15  there.  It was numerous people that it went to.
16  Q.      At some point in time, did the reports stop going to
17  the loan recovery section and go to somebody in the credit
18  policy section of the bank?
19  A.      Yes, Steve Cummings.
20  Q.      Okay.
21          And both loan recovery and credit policy, were they
22  part of a particular group at Wilmington Trust or a
23  particular division?
24  A.      They reported to the Credit Department.
25  Q.      And who was the head of the Credit Department?

1852

Styles - direct

1   A.      Bill North.
2   Q.      Now, when you were preparing your Excel spreadsheet
3   from the Shaw data, did you just export those fields and
4   send it directly to other areas of bank, or prior to sending
5   it along, did you add any information or field?
6   A.      The only fields I would add would be some way to
7   summarize the data.
8           For example, rather than seeing every single day past
9   due, 20, 31, 32, I would group those into the bucket we
10  discussed, so visually we could see exactly what buckets are
11  in and total the amount.
12  Q.      And did you add any columns or any room for comment at
13  a particular area of your spreadsheet as well?
14  A.      Yes, at the end of the spreadsheet there was a section
15  for comments.
16  Q.      Okay.
17          And was there also a column to indicate whether or not
18  a loan should be waived?
19  A.      There was a field called "Waive," where you could put
20  a check mark or an X, so that we could summarize that as
21  well.
22  Q.      And when you sent that out -- those fields -- you had
23  created the fields, but were those field completed?
24  A.      No, they were blank for someone else to complete.
25  Q.      After you sent it to Mr. Cummings, at some point did

1853

Styles - direct

1   that past due report come back to you?
2   A.      Yes, it came back with any of the comments put on it.
3   Q.      And when you received it back, did you anything with
4   the report?
5   A.      First I would double check to make sure the same
6   amount of rows came back to me, the same balances, you know,
7   as part of the reconciliation or validation, if you will.
8   And then I would summarize the data and put separate tabs on
9   that Excel spreadsheet.
10          Then I would send that out to our finance area who
11  prepared the reports from that data.
12  Q.      Now, you talked a couple of times about summarizing
13  the data.
14          Was there a particular method or technique you used to
15  summarize the data?
16  A.      Yes, there's a pivot table function in Excel.
17  Q.      And I think you've been trying to do this, but if you
18  could just, again, explain for us who are not Excel experts,
19  what a pivot table is?
20  A.      Yeah, a pivot table is a function within Excel that
21  allows you to summarize and group data based on any of those
22  fields that you have there.
23          I don't know how specific you want it?
24  Q.      That's fine.  Thank you.
25          You said that you would send the report along after

2046

Cummings - direct

1  that this practice could raise issues for us at some point
2  in the future?
3  A.    Correct.
4  Q.    Understood.  Did you send this e-mail out to various
5  individuals?
6  A.    I believe I did.
7         MR. KRAVETZ:  And if I can ask Ms. Lotharp to
8  please display Government's Exhibit 446 and enlarge the
9  bottom portion of the of the e-mail.
10  BY MR. KRAVETZ:
11  Q.    Did you, in fact, send this e-mail out on January 16th
12  of 2009?
13  A.    Yes.
14  Q.    And to whom did you send the e-mail?
15  A.    To Bill, to Terry Brewer, Joe Terranova, Joseph
16  Bailey, Brian Conway, Richard Culp, Katie Wilkinson and Jim
17  Burke.
18  Q.    And is this e-mail -- and you can take the time to
19  review it -- is this e-mail what you sent out, in fact, the
20  edited version that Mr. North had provided to you?
21  A.    It is.
22         MR. KRAVETZ:  Take that down, please, Ms.
23  Lotharp.
24  BY MR. KRAVETZ:
25  Q.    At some points in the process when you were involved

2047

Cummings - direct

1  with the past due report, did you begin receiving an initial
2  copy of the delinquency report from a particular person?
3  A.    You mean the source of the report?
4  Q.    Yes.
5  A.    Yes.
6  Q.    Who did you receive that from?
7  A.    At first, it was from Jerry Zerpa (phonetic), and then
8  a couple months in I think it started to come from Tosha
9  Towe.
10  Q.    Where did Ms. Towe work?
11  A.    Credit risk management.
12  Q.    And are you aware whether she downloaded the
13  underlying information from a particular system at the
14  bank?
15  A.    I believe she downloaded it from the loan system.
16  Q.    What was the name of the loan system?
17  A.    I think it was Shaw.
18  Q.    I'd ask if you can look at your binder, please, at
19  Government's Exhibit 300 and 300A.
20  A.    Okay.
21  Q.    Do you recognize that e-mail and the attachment?
22  A.    Yes.
23  Q.    How do you recognize them?
24  A.    This would have been the final report and I was
25  sending it down to a controller's area.

2048

Cummings - direct

1         MR. KRAVETZ:  Your Honor, we move for the
2  admission of Government's Exhibits 300 and 300A.
3         MR. WILKS:  No objection, Your Honor.
4         THE COURT:  All right.  Admitted without
5  objection.
6         (Government Exhibit No. 300 and 300A were
7  admitted into evidence.)
8         MR. KRAVETZ:  Ms. Lotharp, can you please
9  display Government's Exhibit 300?
10  BY MR. KRAVETZ:
11  Q.    On what date did you send this e-mail, sir?
12  A.    April 6th, 2009.
13  Q.    And how many days would that have been after the first
14  quarter of 2009 ended?
15  A.    Six.
16  Q.    Was that pretty typical in terms of the turn around
17  response?
18  A.    Yes.  I think so.
19  Q.    And you mentioned that there were individuals from the
20  controller's group who were on the e-mail?
21  A.    Yes.
22  Q.    All right.  What was the controllers group at
23  Wilmington Trust?
24  A.    The accounting function.
25  Q.    And do you recall who was the controller for

2049

Cummings - direct

1  Wilmington Trust?
2  A.    I think it was Dave Gibson.
3  Q.    Do you recall whether Mr. Gibson might have been the
4  Chief Financial Officer?
5  A.    Yes.
6  Q.    And do you remember Kevyn Rakowski?
7  A.    Yes.
8         MR. KLINGEMAN:  Objection, Your Honor.  Leading.
9         THE COURT:  All right.  Well, so I'm going to
10  overrule that.
11  BY MR. KRAVETZ:
12  Q.    Who is Ms. Rakowski?
13  A.    I can't remember her exact title.
14  Q.    Do you know who she worked for?
15  A.    I don't know who she directly reported to, no.
16  Q.    Okay.  Now, the subject of this e-mail is what?
17  A.    The delinquency from 3/31/09.
18  Q.    The subject actually?
19  A.    I'm sorry.  Past dues.
20  Q.    And there was an attachment?
21  A.    Yes.
22  Q.    Is it an Excel file?
23  A.    It is.
24  Q.    How do you know that?
25  A.    It says point XLXX.

2050

Cummings - direct

1    MR. KRAVETZ:  I'd ask, Ms. Hill, if we can
2    display the native version of Government's Exhibit 300A.
3    BY MR. KRAVETZ:
4    Q.    Is there a particular file date on this document?
5    A.    Yes.
6    Q.    What is that file date?
7    A.    3/31/09.
8    Q.    All right.  Now, when you would have received, I think
9    you testified that you initially received a version of this
10   report from Ms. Towe; is that correct?
11   A.    Yes.
12   Q.    Were there certain columns that would not have been
13   filled in at the time that you received them?
14   A.    Typically, columns Y and Z would be blank.
15   Q.    What is column Y?
16   A.    Waived.
17   Q.    What is column Z?
18   A.    Common.
19   Q.    All right.  Why would those particular columns be
20   blank?
21   A.    Because that information wasn't contained on the loan
22   system.
23   Q.    Whose responsibility was it to input the information
24   in column Y and column Z?
25   A.    Mine.

2051

Cummings - direct

1    Q.    All right.  And in terms of inputting the information,
2    I know we saw the earlier e-mails from December 2008 and
3    January 2009, but what was your understanding as of the
4    first quarter of 2009 in terms of the criteria for waiving
5    matured loans from past due reporting?
6    A.    If a loan was, was matured but current for payment, it
7    could be waived if I got some type of feedback back from the
8    RM that it was being worked on.
9    Q.    You personally were getting feedback from the RMs?
10   A.    Yes.
11   Q.    You weren't automatically waiving loans as long as
12   they were current for interest?
13   A.    No.
14   Q.    And your testimony here today is that you were, in
15   fact, getting feedback from the relationship managers; is
16   that correct?
17   A.    Correct.
18   Q.    All right.  Sir, have you previously testified in
19   another matter outside -- have you previously testified in
20   connection with this matter?
21   A.    Testified?
22   Q.    Have you previously testified before a Federal Grand
23   Jury?
24   A.    Yes.
25   Q.    All right.  And do you recall when that was?

2052

Cummings - direct

1    A.    I do not.
2    Q.    All right.  It was a few years ago?
3    A.    Yes.
4    Q.    All right.  And it was before the events of today?
5    A.    Yes.
6    Q.    And it would have been closer to the events that we're
7    discussing here today in terms of the waiving of matured
8    loans?
9    A.    Correct.
10   Q.    Sir, you have a binder next to you, I believe, on the
11   floor.
12          Sir, prior to testifying before the grand jury,
13   did you take an oath to testify truthfully?
14   A.    Yes.
15   Q.    And did you understand the need to testify truthfully?
16   A.    Yes.
17   Q.    And did you, in fact, testify truthfully at that
18   appearance?
19   A.    I believe I did.
20   Q.    I would ask if you can open, open your binder to the
21   grand jury tab to pages 30 and 31, please.
22   A.    Okay.
23   Q.    And on the top portion of page 31, do you see the
24   question at the top?
25   A.    It starts, and are you aware?

2053

Cummings - direct

1    Q.    No, sir.  There are two tabs.  One states civil
2    deposition transcript and one states grand jury transcript.
3    A.    I'm sorry.  I had the wrong tab.  The top of page 31?
4    Q.    Yes, sir.
5    A.    The question starts:  Correct.  You said that?
6    Q.    Yes.  Do you see that the question was posed:
7    Correct.  You said that, but on your comments section in
8    column D, it says matured, renewal in process.
9          Do you see that?
10   A.    Yes.
11   Q.    What was your answer?
12   A.    It was considered to be -- I'm sorry.  They
13   considered, they considered them to be matured and in
14   process of renewal.
15   Q.    And the next question from me was:  Automatically.
16          Do you see that?
17   A.    Yes.
18   Q.    What was your response?
19   A.    Yes.
20   Q.    And my next question was:  So as long as it was
21   current for interest automatically, it was considered to be
22   in the process of renewal?
23   A.    Yes.
24   Q.    And what was your response?
25   A.    Yes.

```
 1                    - PORTION UNDER SEAL -

 2                      - VOLUME 8 -

 3              IN THE UNITED STATES DISTRICT COURT

 4              IN AND FOR THE DISTRICT OF DELAWARE

 5                         - - -

 6    UNITED STATES OF AMERICA,    :   CRIMINAL ACTION
                                   :
 7                  Plaintiff,     :
                                   :
 8        vs.                      :
                                   :
 9    DAVID R. GIBSON, ROBERT      :
      V.A. HARRA, WILLIAM          :
10    NORTH, and KEVYN RAKOWSKI,   :
                                   :
11                                 :
                  Defendants.  :   NO. 15-23-RGA
12

13                             - - -

14
                           Wilmington, Delaware
15                         Monday, March 19, 2018
                           8:37 o'clock, a.m.
16                             - - -

17    BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
      jury
18                             - - -

19    APPEARANCES:

20
              LESLEY F. WOLF, ESQ.,
21            ROBERT F. KRAVETZ, ESQ. and
              JAMIE M. McCALL, ESQ.,
22            Assistant United States Attorneys

23
                   Counsel for Plaintiff
24
                           Valerie J. Gunning
25                         Leonard A. Dibbs
                           Official Court Reporters
```

2209

Cummings - cross

1   A.   Yes.
2   Q.   One of your roles was that of a dealer sales credit
3   officer?
4   A.   Right.
5   Q.   Could you remind us again what dealer sales means?
6   A.   Dealer sales was the providing of wholesale credit
7   needs, which are a floor plan, commercial mortgages, that
8   type of thing, to commercial, to automobile, truck, boat
9   dealers.
10  Q.   You're lending to car dealers and boat dealers?
11  A.   Yes.
12  Q.   And so forth.  But you weren't doing the lending.  You
13  were a credit officer?
14  A.   Correct.
15  Q.   What's the difference between a lender and a credit
16  officer?
17  A.   A lender is out on the street, identifying
18  opportunities, bringing them back.  A credit officer is
19  pretty much the yes or no, whether or not we can approve the
20  loan.
21  Q.   Did the lenders, the relationship managers, work for
22  you?
23  A.   No.
24  Q.   Totally different area of the bank; is that right?
25  A.   Yes.

2210

Cummings - cross

1   Q.   Okay.  Now, you also had responsibilities regarding
2   credit policies?
3   A.   Correct.
4   Q.   Now, the credit policies that you worked with, they
5   all had to be approved by the Board of Directors.  Am I
6   right about that?
7   A.   I don't remember all of them having to go to the Board
8   of Directors, but some of them did.
9   Q.   All right.  The sort of policies that you were
10  responsible for, that you worked on, those didn't have
11  anything to do with financial reporting to the outside
12  world.  Am I right about that?
13  A.   Correct.
14  Q.   And it had nothing to do with reporting to the SEC?
15  A.   No, sir.
16  Q.   Nothing to do with reporting on the call reports to
17  the Federal Reserve?
18  A.   No, sir.
19  Q.   Some of the policies that Mr. Kravetz had you read on
20  Friday afternoon mentioned responsibilities of the credit
21  risk management division.
22           Do you recall that?
23  A.   Yes.
24  Q.   Okay.  Now, that's not your group either?
25  A.   Correct.

2211

Cummings - cross

1   Q.   Right?
2   A.   Correct.
3   Q.   Those people did not report to Mr. North, did they?
4   A.   No, sir.
5   Q.   Now, you were also involved in the monthly process of
6   preparing the delinquency report.
7   A.   Yes.
8   Q.   And you began to get involved in that in late 2008,
9   early 2009.  Did I get that right?
10  A.   Yes.
11  Q.   That delinquency report, that process of preparing the
12  delinquency report, had been in place a long time before you
13  got involved.  Am I right about that?
14  A.   Well, I don't know how long.  It was in place when I
15  got involved.
16  Q.   So at least 2007?
17  A.   Yes.
18  Q.   All right.  Would you agree with me that the purpose
19  of the bank's waiver practice was to separate true past due
20  loans from those that the bank had administratively waived
21  over the years?
22  A.   I don't know if I could say what the original purpose
23  was since I picked it up in process.
24  Q.   Fair enough.  When you -- well, I will ask that of
25  another witness.

2212

Cummings - cross

1           In the process of your working on this
2   delinquency report, did anybody ever tell you to lie about
3   that, what is in that report?
4   A.   No, sir.
5   Q.   Did Mr. North ever tell you to lie to anybody?
6   A.   No, sir.
7   Q.   Ever?
8   A.   No.
9   Q.   And you were never asked to conceal information, were
10  you?
11  A.   No, sir.
12  Q.   You never attempted to mislead anyone in connection
13  with the waiver practice, did you?
14  A.   No, sir.
15  Q.   Did you ever attempt to hide the waiver practice from
16  anybody?
17  A.   No, sir.
18  Q.   You never thought there was anything dishonest about
19  the waiver practice, did you?
20           MR. KRAVETZ:  Objection, Your Honor.
21           THE COURT:  Sustained.
22  BY MR. WILKS:
23  Q.   Now, you worked on this delinquency report every
24  single month once you started.  Am I right?
25  A.   Yes.  There was a brief period where someone else had

2213

Cummings - cross

1   it.
2   Q.    Was that someone else Wayne Irwin?
3   A.    No.
4   Q.    Who was it?
5   A.    Joe Hardy?
6   Q.    Joe Hardy?  Now, Wayne Irwin was responsible for this
7   process -- strike that.
8          Mr. Irwin was responsible for your part of that
9   process before you took it over.  Am I right about that?
10  A.    Correct.
11  Q.    All right.  Now, Mr. Irwin kind of stayed involved in
12  the preparation of the delinquency report after you became
13  involved, did he not?
14  A.    Yes.
15  Q.    A lot of people knew about the waiver practice?
16  A.    Yes.
17  Q.    A lot of people are involved every month in putting
18  together this delinquency report?
19  A.    Yes.
20  Q.    Now, a lot of the loans that you dealt with on the
21  delinquency report were commercial real estate loans; is
22  that correct?
23  A.    Correct.
24  Q.    And on many of those loans that you had to deal with
25  every single month, some had matured; is that right?

2214

Cummings - cross

1   A.    Correct.
2   Q.    They had passed their maturity date?
3   A.    Correct.
4   Q.    And many of those, relationship managers did not
5   expect the principal to be repaid at maturity; right?
6          MR. KRAVETZ:  Objection, foundation.
7          THE COURT:  Sustained.
8   BY MR. WILKS:
9   Q.    Part of the process of putting together this
10  delinquency report was gathering information from
11  relationship managers; is that correct?
12  A.    Yes.
13  Q.    And on those loans, the relationship managers
14  indicated to you or to the other people working on it that
15  they were working on an extension.  Those were marked a
16  certain way; is that correct?
17  A.    Yes.
18  Q.    Okay.  That was a wordy question.  Did you understand
19  where I was going?
20  A.    I believe I did.
21  Q.    All right.  So if a relationship manager said, I'm
22  working on an extension there, you would designate that with
23  a Y in a certain column on the delinquency report; is that
24  correct?
25  A.    Correct.

2215

Cummings - cross

1   Q.    All right.  And you would give the reason for that
2   waiver that the RM had provided; is that right?
3   A.    I think I summarized it, they all had the same reason.
4   I don't think I used -- I used to say, like in process of
5   extension.
6   Q.    Yes.  And that information came from the relationship
7   manager?
8   A.    Correct.
9   Q.    You didn't make that up?
10  A.    No, sir.
11  Q.    No.  Now, on occasion, sir, a bill would go out to the
12  borrower at maturity that would ask, that would say that the
13  principal was due.  Are you aware of that?
14  A.    Yes.
15  Q.    And the system, if that principal wasn't paid right
16  away, would show that a late fee should be charged on that
17  principal.  Are you aware of that?
18  A.    I didn't get involved in late fees.
19  Q.    I'm sorry?
20  A.    I didn't get involved in late fees.  I wasn't
21  responsible for the loan accounting.
22  Q.    Okay.  Take a look in your binder there at Defense
23  Exhibit 1710, 1710.  And do you see this?  Do you see your
24  name on this?
25  A.    Yes, sir.

2216

Cummings - cross

1   Q.    What is this, sir?
2   A.    It's an e-mail from Phil Hough to Ryan heckle (check)
3   that that I was copied on.
4   Q.    All right.  Why don't you go to the second page at the
5   very end, which would be the first chronological e-mail in
6   this exchange.  Would you agree with me?
7   A.    Yes.  It starts with an e-mail from Ryan to me.
8          MR. WILKS:  Your Honor, we would move the
9   admission of Defendants' Exhibit 1710.
10         MR. KRAVETZ:  Objection.  Hearsay.
11         MR. WILKS:  It's not being offered for the truth
12  of the matter asserted, Your Honor.
13         THE COURT:  What is it being offered for?
14         MR. WILKS:  It's being offered for the bank's
15  practice of how these principal invoices were handled, and
16  it's not being offered for the truth of any of the
17  out-of-court statements that are recorded here.
18         MR. KRAVETZ:  That's, in fact, the very
19  definition of being offered for its truth here, Your Honor.
20         THE COURT:  All right.
21         MR. WILKS:  I can address the objection, but I'm
22  afraid to do so not at sidebar, Your Honor.
23         THE COURT:  All right.  Come over to sidebar.
24         MR. WILKS:  Thank you.
25         (The following sidebar conference was held out

2221

Cummings - cross

1   Q.   Okay.  Mr. Cummings, let's talk about this delinquency
2   report in a little more detail.
3        Your job in the preparation of this report was
4   to, as we said, help gather information from relationship
5   managers; is that correct?
6   A.   Correct.
7   Q.   Okay.  And you were gathering information on which
8   loans fit the parameters for waivers that somebody had set
9   long ago; is that correct?
10  A.   Correct.
11  Q.   Shaw.  Are you familiar with something called Shaw?
12  A.   I've heard of it.
13  Q.   Okay.  It was a bank's loan database; is that right?
14  A.   Correct.
15  Q.   All right.  And Shaw required manual adjustments,
16  didn't it?
17  A.   I never did any input to Shaw, so I knew about the
18  output, and that's about it.
19  Q.   Okay.  You're aware though that it had to be adjusted
20  by human beings?
21  A.   Correct.
22  Q.   Okay.  And in order to get an accurate past due
23  number, when a loan was extended, somebody would have to go
24  into Shaw and make a manual adjustment; is that correct?
25  A.   Correct.

2222

Cummings - cross

1   Q.   And Shaw would not accurately reflect a status of the
2   bank's loans without those manual adjustments being made; is
3   that correct?
4        MR. KRAVETZ:  Objection, Your Honor.  Foundation
5   in terms of accurately.
6        THE COURT:  I'm going to sustain the objection
7   because I think the point that Shaw only reflected what was
8   put into it has already been made.
9        MR. WILKS:  That's the whole point.  Okay.
10  Thanks, Your Honor.
11  BY MR. WILKS:
12  Q.   Now, as the list of matured loans grew at Wilmington
13  Trust, more and more adjustments had to be made to Shaw; is
14  that correct?
15  A.   Correct.
16  Q.   Okay.  And sometimes that could be pretty tedious and
17  frustrating?
18  A.   Again, I didn't make those adjustments.
19  Q.   I understand you didn't make those adjustments, but
20  did the fact that Shaw had to be continually updated affect
21  the efficiency of how you were able to go about your job?
22       MR. KRAVETZ:  Objection.  Foundation.
23       MR. WILKS:  I'm asking about how he went about
24  his job, Your Honor.
25       THE COURT:  Well, so ask him how he went about

2223

Cummings - cross

1   his job.
2   BY MR. WILKS:
3   Q.   Well, was your job affected, sir, by this manual
4   process that people went through to update Shaw?
5   A.   The past due process that I, I had that I did only
6   involved a report from Shaw.  It didn't -- it didn't involve
7   Shaw itself.
8   Q.   Somebody else would drum information from Shaw and
9   give it to you?
10  A.   Correct.
11  Q.   All right.  That's a problem we're having.  I see.
12       And that would have to happen over and over
13  through the month as you prepared, as you gathered your
14  information?
15  A.   We collected periodic reports.
16  Q.   And someone else would collect that for you?
17  A.   Correct.
18  Q.   All right.  Now, every -- are you aware, sir, that
19  every March, June, September and December, the bank would
20  report its numbers, its performance to the outside world?
21  A.   Yes.
22  Q.   Quarterly?
23  A.   Yes.
24  Q.   But every single month you were required to go through
25  this process with a delinquency report; is that correct?

2224

Cummings - cross

1   A.   Yes.
2   Q.   All right.  So let's go through how that works.
3        MR. WILKS:  Could you please put up that flow
4   chart, please.  Okay.
5   BY MR. WILKS:
6   Q.   So it all begins with Shaw.  Shaw is where all the
7   information on every single loan of the bank --
8        MR. KRAVETZ:  Your Honor, objection.  I have
9   no idea what this document is.  I think it was used in
10  opening.
11       MR. WILKS:  Yes, sir.
12       MR. KRAVETZ:  It's not evidence.  It's part of
13  counsel's opening statement.
14       MR. WILKS:  Well, it's a demonstrative, Your
15  Honor, to assist with the presentation of the witness'
16  testimony.
17       MR. KRAVETZ:  One question of foundation has
18  been laid, Your Honor.
19       THE COURT:  So far there's also nothing on the
20  screen, so why don't you ask, as you were doing, Mr. Wilks,
21  ask a question.
22       MR. WILKS:  Yes.
23  BY MR. WILKS:
24  Q.   The preparation of the delinquency report, your
25  work on the delinquency report begins with Shaw; is that

2241

Cummings - cross

1   and make a notation on the Delinquency Report, right?
2   A.    Yes.
3   Q.    And Mr. Irwin you mentioned -- who is Wayne Irwin?
4   I'm not sure we covered that very well.
5   A.    Well, Wayne Irwin worked in our special assets group.
6   Q.    All right.
7         Do you know how long he had been at the bank?
8   A.    I don't.
9   Q.    Who was Rich Conway?
10  A.    Rich Conway was part of the management team for the
11  lenders.
12  Q.    All right.
13        Do you know how long he had been at the bank?
14  A.    I don't.
15  Q.    They would do something they called walk-around.
16        Do you remember that?
17  A.    Yes, I remember that term.
18  Q.    What was a walk-around?
19  A.    They would basically walk around people that had not
20  responded to the request for information and just elicited
21  the information they hadn't provided.
22  Q.    Okay.
23        Information on the status of these matured loans?
24  A.    Yes.
25  Q.    And then after their walk-around they would give that

2242

Cummings - cross

1   information to you?
2   A.    Yes.
3   Q.    And you would then make notations, designations on
4   your report?
5   A.    Correct.
6   Q.    All right.
7         Those walk-arounds didn't happen automatically, did
8   they?
9   A.    No, I don't think so.
10  Q.    No.
11        This seems like a labor-intensive task, is it or was
12  it?
13  A.    It was.
14  Q.    All right.
15        Did you enjoy doing it?
16  A.    Not at all.
17  Q.    Why not?
18  A.    It was labor intensive.
19  Q.    It took you away from your other duties?
20  A.    Yes.
21  Q.    Okay.
22        So now, at some point, whether it's at the beginning,
23  or the middle, or at the end, or whatever, Ms. Towe would
24  send and you formatted file.
25        Am I right about that?

2243

Cummings - cross

1   A.    Yes?
2   Q.    Okay.
3         And you would add the information that you, and Mr.
4   Irwin, and Mr. Conway had gathered, correct?
5   A.    Correct.
6   Q.    So after you added in the information from the
7   letters, the delinquency report was completed, wasn't it?
8   A.    Yes.
9   Q.    Okay.
10        And it contained every single loan that was on the
11  list that you originally received, correct?
12  A.    Yes.
13  Q.    And it had designations for bank errors?
14  A.    Yes.
15  Q.    Where appropriate?
16  A.    Correct.
17  Q.    And it had designations for matured loans that were
18  current for interest where a RM told you, or told you, or
19  Mr. Irwin, or Mr. Conway that an extension was in process,
20  right?
21  A.    Correct.
22  Q.    Sir, when the report was done, you would then send
23  that to a group of people, right?
24  A.    When it was first done?
25  Q.    Well, let's look at -- do you have GX -- Government

2244

Cummings - cross

1   Exhibit 313 in front of you, sir?
2   A.    Yes.
3   Q.    What is that, sir?
4   A.    That is -- this is a distribution of the final report.
5   Q.    All right.
6         Who did you distribute that report to?
7   Q.    Do you want me to read their names?
8   Q.    Please.
9   A.    Lisa Ashton, Rich Conway, Wayne Irwin, Faye Loh, Jim
10  Mahoney, Martin McDonough, Bill North, Kim Strohmeier, and
11  Tasha Towe.
12  Q.    All right.
13        And when sent that to those folks, was that the
14  last that you ever saw of that delinquency report?
15  A.    For that month, yes.
16  Q.    Yes.
17        Until the next month came around when you had to start
18  that whole process again, right?
19  A.    Yes.
20  Q.    And what other people did with that report, whatever
21  their jobs required them to do, it's not something that you
22  followed or kept up with, right?
23  A.    That's correct.
24  Q.    There came a time, sir, isn't there, when folks in the
25  banks internal audit department asked you about this

2245

Cummings - cross

1  process?
2  A.    Yes.
3  Q.    Okay.
4        MR. WILKS:  Could you please put up Government Exhibit
5  448 that has already been admitted?
6        You can get it, if you want to, sir.  I think
7  it's probably in your binder.
8        (Pause)
9  BY MR. WILKS:
10 Q.    Do you see that there, sir?
11 A.    Yes, sir.
12 Q.    Okay.
13       Let's start on the second page, which are how
14 e-mails are printed, of course.
15       Let's start with Marian Fean's e-mail to you.
16       But before we kind of get into what she wrote to
17 you, tell us, sir, what is your understanding of what an
18 internal audit was?
19 A.    An internal audit is an oversight function part of the
20 bank.  They examine -- like it's all the processes that
21 belong within the bank.
22 Q.    Who is Marian Fean?
23 A.    She was in internal audit.
24 Q.    All right.
25       You had periodic contact with Ms. Fean?

2246

Cummings - cross

1  A.    Yes.
2  Q.    All right.
3        You never lied to her, did you?
4  A.    No, sir.
5  Q.    You never concealed anything from her, did you?
6  A.    No, sir.
7  Q.    Now, could you read, please, sir for us what Ms. Fean
8  asked you here, or wrote to you on October 8th, 2009?
9  A.    Sure.
10       "We are wrapping up the credit risk management project
11 and have asked Karen Thuresson about the sales risk ratings
12 matured loans.  As far as the matured loans, Karen indicated
13 that matured loans are reviewed monthly by you in
14 conjunction with the past due reporting process.  Would you
15 please give me some information on your process?  Are you
16 only looking at matured loans that are past due or are you
17 reviewing all matured loans?  What do you do with the
18 information you gather on the matured loans?  Do you notify
19 the RM that the loan is matured?  Any information you give
20 me on this would be helpful in supporting that matured loans
21 are being reviewed and worked, and are not just forgotten.
22 Q.    Okay.
23       And you drafted a response to her, of course, did you
24 not?
25 A.    Yes.

2247

Cummings - cross

1  Q.    It wasn't your practice to ignore her or anybody else
2  in internal audit, was it?
3  A.    Excuse me?
4  Q.    You wouldn't ignore someone in internal audit if they
5  asked you a question like that, would you?
6  A.    No, sir.
7  Q.    No.  Okay.
8        So let's look at your response, please.
9        So the very same day you wrote a response, right,
10 October 8th, 2009?
11 A.    Well, yes, this is a draft response that I sent to
12 Bill.
13 Q.    Exactly.  And you drafted the response and asked Mr.
14 North to look it over, right?
15 A.    Correct?
16 Q.    Was it your practice?  Mr. North is your boss,
17 correct?
18 A.    Yes.
19 Q.    You worked for him?
20 A.    Yes.
21 Q.    All right.
22       Was it your practice to have Mr. North look over your
23 work?
24 A.    For some things, yes.
25 Q.    I mean, you felt more comfortable if he looked at

2248

Cummings - cross

1  things for you before you passed it along to other areas in
2  the bank, right?
3  A.    Yes.
4  Q.    Because if there was ever a problem, or any questions,
5  you wanted to be sure your boss had seen your work before
6  you passed it on, right?
7  A.    Correct.
8  Q.    Just to cover yourself?
9  A.    Correct.
10 Q.    Okay.
11       And Bill was the kind of boss for whom that was okay?
12 A.    Yes.
13 Q.    All right.
14       He's do that for you?  He would let you cover yourself
15 that way?
16 A.    Yes.  I mean, a response to an internal audit, yes.
17 Q.    Okay.
18       So your first line here, Before I send a response to
19 Marian and have it held against me forever and a day, I
20 thought it would be best to float it past you."
21       You told all of us, I guess on Friday, that was sort
22 of a joke between you and Bill?
23 A.    Yes.
24 Q.    Because this you kind of like, hey, Bill, I'm just
25 going to run this past you for my purposes?

2425

1                       - VOLUME 9 -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5     UNITED STATES OF AMERICA,      :    CRIMINAL ACTION
                                     :
6                    Plaintiff,      :
                                     :
7          vs.                       :
                                     :
8     DAVID R. GIBSON, ROBERT        :
      V.A. HARRA, WILLIAM            :
9     NORTH, and KEVYN RAKOWSKI,     :
                                     :
10                                   :
                     Defendants.     :    NO. 15-23-RGA
11

12
                                  - - -
13
                              Wilmington, Delaware
14                            Tuesday, March 20, 2018
                              8:30 o'clock, a.m.
15
                                  - - -
16
      BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17    jury

18                          - - -

      APPEARANCES:
19

20             LESLEY F. WOLF, ESQ.,
               ROBERT F. KRAVETZ, ESQ. and
21             JAMIE M. McCALL, ESQ.,
               Assistant United States Attorneys
22

23                   Counsel for Plaintiff

24                            Valerie J. Gunning
                              Leonard A. Dibbs
25                            Official Court Reporters

2470

Corkery - direct

1    MR. ROSAMOND:  Thank you, Judge.
2    MR. KELLY:  Can we pause for a second?
3    MR. ROSAMOND:  We have a lot of binders.
4    THE COURT:  Yes, yes.
5    MR. ROSAMOND:  Thank you, Judge.
6  BY MR. ROSAMOND:
7  Q.    You testified that yesterday you were both the EIC and
8  the central point of contact for the bank during the 2009
9  and 2010 period, correct?
10  A.    Yes.
11  Q.    And as EIC, you were in charge of what you really
12  classified as three different examinations.  The 2009 full
13  scope exam, the 2009 target exam, and 2010 full scope exam,
14  correct?
15  A.    Yes.
16  Q.    And as TPC, you're responsible for ongoing monitoring
17  of the bank in between those exams?
18  A.    Yes.
19  Q.    You spent a lot of time at the bank?
20  A.    Yes.
21  Q.    You first examined Wilmington Trust in 2008, isn't
22  that's correct?
23  A.    I'm sorry?
24  Q.    You first examined Wilmington Trust Company, the PA
25  branch in 28th, correct?

2471

Corkery - direct

1  A.    I wasn't the Examiner in charge with 2008.
2  Q.    You but you participated in that exam?
3  A.    I did.
4  Q.    Okay.
5    And in 2008, the FDIC was the primary regulator for
6  the bank at that point?
7  A.    No, I don't think that it was the FDIC in 2008.
8  Q.    In 2008?
9  A.    It became a state member bank and we participated in
10  the OBSC exam.
11  Q.    Okay.
12    My question is, was the FDIC the primary regulator in
13  208?
14  A.    For the Wilmington Trust Company?
15  Q.    Yes.
16  A.    No, I didn't think we were.  I think they had switch
17  membership from -- undertaken Fed membership and became a
18  state member bank in 2008.
19  Q.    Would you take a look at tab A in your binder.
20    Does that refresh your recollection as to what the
21  FDIC's role was in 2008?
22    I believe it's in your white binder.
23    (Pause)
24  A.    Okay.
25  Q.    If you specifically to -- I'll refer you by the Bates

2472

Corkery - direct

1  stamp number -- 1817?
2  A.    What page?
3  Q.    1817.  That is the last page.
4    Would you take a look at that very last sentence?
5  A.    Okay.
6  Q.    So they were the present regulator, the FDIC?
7  A.    In 2008?
8  Q.    Yes.
9  A.    We took over as bank regulators in 2008.  It may have
10  been some time during 2008.  I don't remember.
11  Q.    All right.
12    And you testified yesterday the Wilmington Trust
13  Company was the bank?
14  A.    Yes.
15  Q.    All right.
16    And there was the Wilmington Trust Corporation, which
17  was the holding company, correct?
18  Q.    You mentioned Wilmington Trust FSB yesterday.
19    Can you explain what Wilmington Trust FSB is?
20  A.    That was the Thrift Bank that Wilmington Trust
21  Corporation also owned.
22  Q.    And the OTS, or the office of Thrift supervision, was
23  the primary regulator during 2009 and 2010, for Wilmington
24  Trust FSB, correct?
25

2473

Corkery - direct

1  A.    Yes.
2  Q.    Are you aware that the OTS merged with the OCC in
3  2011?
4  A.    Yes.
5  Q.    Now, as EIC and TPC during that 2009 and 2010 time
6  period, you attended board meetings at the bank, correct?
7  A.    Yes.
8  Q.    And you presented at those board meetings?
9  A.    Yes.
10  Q.    And the OTS appeared at those board meetings?
11  A.    They did.  It was jointly held.
12  Q.    Right.
13    And they presented at those board meetings as well?
14  A.    Yes.
15  Q.    Now, when the Fed conducts an examination, it prepares
16  a report of examination?
17  A.    Yes.
18  Q.    And that's your responsibility as Examiner in charge?
19  A.    Yes.
20  Q.    And this report summarizes the findings and
21  conclusions of Fed Examiners?
22  A.    Yes.
23  Q.    Now, Examiners receive and review materials provided
24  by a bank during the exam, is that correct?
25  A.    Yes.

2474

Corkery - direct

1  Q.      And Examiners also generate documents and notes of
2  their own analysis?
3  A.      Yes.
4  Q.      And these documents are called the examination work
5  papers, is that correct?
6  A.      At the end we pull together all the work papers that
7  support the findings in the examination.
8  Q.      Who decides to pull those -- who pulls those together
9  on behalf of the Fed?  Who's responsible for that?
10  A.     It would be the individual team members responsible
11  for creating their own work papers --
12  Q.     Thank you.  I'm sorry for interrupting.
13         We will talk about some of those work papers in a bit.
14         You mentioned yesterday that Ted Cecala was the
15  CEO, Director, and Chairman of the Bank, correct?
16  A.     Yes.
17  Q.     You also testified that you were aware that Ted was
18  appointed to serve as the Director for the Federal Reserve
19  Bank of Philadelphia, correct?
20  A.     I knew he was on our board, yes.
21  Q.     Are you aware that he was appointed as a Director in
22  2008?
23  A.     No, I wasn't aware.
24  Q.     Okay.
25         Are you aware that Ted was on the Fed through 2010?

2475

Corkery - direct

1  A.      Yes, I was aware he was on the board.
2  Q.      Were you also aware that he served on the advisory
3  council presenting the Federal Reserve Bank of Philadelphia
4  of the Third Circuit in both 2006 and 2007?
5  A.      No, I was not aware.
6  Q.      Okay.
7          Now, in conducting the examinations of the bank from
8  2008 through 2010, you worked with other regulators, didn't
9  you?
10  A.     From the Federal Reserve?
11  Q.     The Federal Reserve, from the OTS, correct?
12  A.     Yes.
13  Q.     From the OSBC?
14  A.     Yes.
15  Q.     And examination responsibility is divided among these
16  regulators, correct?
17  A.     Yes, but not the OTS.  It's not --
18  Q.     We'll talk about the OTS in a little bit, but thank
19  you.
20         As the EIC you encouraged Examiners from these
21  different agencies to share findings and information with
22  each other, didn't you?
23  A.     From the OSBC and the Federal Reserve, we would have
24  shared our findings with each other.
25  Q.     How about the OTS?

2476

Corkery - direct

1  A.      Not necessarily.
2  Q.      Okay.
3          MR. ROSAMOND:  If we could display -- it's tab 1
4  in your book.  It's GX 200.
5          I'm sorry, 201.  If we could display that.
6          It's already in evidence, your Honor.
7          Permission to display that?
8          THE COURT:  Sure.
9          MR. ROSAMOND:  Thank you.
10  BY MR. ROSAMOND:
11  Q.     Now, this is the scope memorandum that you prepared in
12  2009, correct?
13  A.     (No response.)
14  Q.     Take your time.  I don't mean to rush you.
15  A.     I'm sorry.
16         What was the section again?
17  Q.     We're going to display it for you.
18         This is your scope memo?
19  A.     Yes.
20  Q.     Okay.
21         It lists your name as the EIC?
22  A.     Yes.
23         MR. ROSAMOND:  If we can go to FRBP011090?  I
24  think it's the next page.
25         (Pause)

2477

Corkery - direct

1          And if we can call out that second paragraph?
2          (Pause)
3  BY MR. ROSAMOND:
4  Q.      Would you please read that paragraph to the ladies and
5  gentlemen and of the jury, Mr. Corkery?
6  A.      Yes.
7          "The majority" -- do you want the entire one or just
8  the highlighted part?
9  A.      The highlighted language is terrific.
10  A.     "The majority of corporate services, loan review, ALLL
11  calculation, BSA/AML, compliance, internal audit are
12  centralized and Examiners are encouraged to work closely,
13  attend interviews, share findings with their counterparts at
14  the Office of the State Bank Commissioner of Delaware and
15  the Office of Thrift Supervision where possible."
16  Q.     You encouraged the Examiners from the Fed, the OSBC,
17  and the OTS to make sure regulators were essentially
18  evaluating the same information, correct?
19  A.     And this relates to the corporate services for
20  Wilmington Trust Corporation, where we do the holding
21  company inspection.  That where we do -- would be most
22  interested in.
23  Q.     Okay.
24         You did mention loan review as well?
25  A.     Yes.

2478

Corkery - direct

1   Q.      Now, you wanted to make sure that everybody is on the
2   same page.  You're working collaboratively.
3           That's the point of writing that in 2009, the scope
4   memo?
5   A.      So that we understand what each entity is doing.
6   Q.      Okay.
7           And working closely, as you wrote in the scope memo,
8   including sharing findings with the OTS, sharing findings
9   with the OSBC?
10  A.      Attend interviews and share findings, yes.
11  Q.      Okay.
12          I would like to direct your attention to tab B in your
13  book, which is DX-5676.
14          MR. ROSAMOND:  Could we give copies of that to
15  the Government?
16          (Pause)
17  BY MR. ROSAMOND:
18  Q.      Please let me know when you've located it.  I know you
19  have a bunch of binders.  I promise you we're not going to
20  go through all those documents.
21  A.      Yes, I do have it.
22  Q.      All right.
23          I want to direct your attention to the your e-mail
24  dated June 12th, 2010.
25  A.      The one at the bottom, yes.

2479

Corkery - direct

1   Q.      Do you recognize that e-mail?
2   A.      Yes.
3   Q.      You wrote that e-mail?
4   A.      Yes.
5   Q.      You sent that e-mail to several individuals at the
6   bank?
7   A.      To Calvin Jaber?
8   Q.      Yes.
9   A.      Yes.
10          MR. ROSAMOND:  Defense moves the admission of
11  DX-5676 at this time.
12          MS. WOLFE:  Your Honor, we oppose its admission
13  as hearsay.
14          Mr. Rosamond is welcome to ask questions about
15  it, but the document itself is --
16          THE COURT:  All right.
17          Well, apparently, I got three volumes here
18  and --
19          MR. ROSAMOND:  Judge, my response to that is --
20          THE COURT:  Wait, wait, wait.
21          MR. ROSAMOND:  All right.
22          I'll give you a chance to review it.
23          (Pause)
24          THE COURT:  Well, I don't think the -- I don't
25  know what it's being offered for.  At least the e-mail from

2480

Corkery - direct

1   Mr. Corkery to Mr. Jaber, it doesn't seem to have too many
2   important facts to me, so I'm not going to admit it.
3           MR. ROSAMOND:  Thank you your Honor.
4           We're just going to focus on the very first
5   sentence.
6           If we could, with permission from the Court, I'd
7   like to display DX-5676?
8           Can you highlight that first sentence?
9           Thank you.
10  BY MR. ROSAMOND:
11  Q.      Would you read that, please, Mr. Corkery?
12  A.      It says, "We'll work with the OTS to generate line
13  sheets this year, too, if you so wish."
14  Q.      What are line sheets?
15  A.      Line parts.
16  Q.      Line parts.
17  A.      It's the same thing I spoke about yesterday.  The part
18  that is containing information such as name, address,
19  interest rate.  And those are the line cards, line sheets
20  that were used to document our analysis of the loan.
21  Q.      Okay.
22          So line cards, loan, lead sheets, that's another
23  document that Examiners use?
24  A.      Right.
25          The lead sheet would list all the line sheets?

2481

Corkery - direct

1   Q.      Understood.
2           Now, you stated in that first sentence, "this year,
3   too."
4           Does that mean that you also assisted the OTS in
5   previous examinations?
6   A.      We probably did, yes.
7   Q.      This e-mail is dated 2010?
8   A.      Yes.
9   Q.      You did this in 2009 as well?
10  A.      We generated -- it sounds like we generated line
11  sheets the year before as well.  They don't have ELERT.
12  They don't use ELERT.
13          We were basically doing it as a courtesy to them.
14  It's not usual to do it for the State of Pennsylvania.
15  Q.      We'll talk about that in a little bit.
16          Let's continue with this e-mail.
17          The next sentence says, "I will work with Chris
18  Middleton on that."
19  A.      Yes.
20  Q.      Chris Middleton was an OTS Examiner, right?
21  A.      He was the EIC for appeals.
22  Q.      The next sentence --
23          MR. ROSAMOND:  If we could highlight that.
24  BY MR. ROSAMOND:
25  Q.      -- it refers to FSB loans.

2635

```
 1                      - VOLUME 10 -

 2              IN THE UNITED STATES DISTRICT COURT

 3              IN AND FOR THE DISTRICT OF DELAWARE

 4                         - - -

 5    UNITED STATES OF AMERICA,      :    CRIMINAL ACTION
                                     :
 6              Plaintiff,           :
                                     :
 7        vs.                        :
                                     :
 8    DAVID R. GIBSON, ROBERT        :
      V.A. HARRA, WILLIAM            :
 9    NORTH, and KEVYN RAKOWSKI,     :
                                     :
10                                   :
                Defendants.    :    NO. 15-23-RGA
11

12                              - - -

13                         Wilmington, Delaware
                           Thursday, March 22, 2018
14                         11:00 o'clock, a.m.

15                              - - -

16
      BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17    jury

18                              - - -
      APPEARANCES:
19

20              LESLEY F. WOLF, ESQ.,
                ROBERT F. KRAVETZ, ESQ. and
21              JAMIE M. McCALL, ESQ.,
                Assistant United States Attorneys
22

23                   Counsel for Plaintiff

24                        Valerie J. Gunning
                          Leonard A. Dibbs
25                        Official Court Reporters
```

2672

Corkery - cross

1   referred to here as short-term extensions?

2   A.      Okay.

3           "Approved a series of short-term extensions via

4   streamlined underwriting format."

5   Q.      Who was the chief credit officer?

6   A.      That was Bill North.

7   Q.      Okay.

8           Senior Real Estate credit Officer?

9   A.      I don't recall.

10  Q.      Mid-Atlantic Real Estate Manager?

11  A.      I don't recall.

12  Q.      Okay.

13          Well, let's continue reading.

14          MR. ROSAMOND:  And at this point, Brian, I would

15  like you to highlight the next two sentences for M E.

16          (Pause)

17  BY MR. ROSAMOND:

18  Q.      Mr. Corkery, can you please read these two sentences

19  for the ladies and gentlemen of the jury?

20  A.      "In the past, the level of matured loans was

21  problematic especially in the Delaware real estate

22  portfolio.  However, these matured loans were not considered

23  to be past due if interest was current and progress was

24  being made towards renewal/extension."

25  BY MR. ROSAMOND:

---

2673

Corkery - cross

1   Q.      Do you see the Bates stamp highlighted on the

2   right-hand side?

3   A.      Yes.

4   Q.      Mr. Corkery, this second sentence that you just read

5   starting with "However, these matured loans were not

6   considered to be past due if interest is current and

7   progress was being made towards renewal and extension."

8           Did I read that accurately?

9   A.      That's what it says, yes.

10  Q.      This document was given by the bank to the Fed during

11  the 2010 full scope examination, was it not?

12  A.      Yes.

13  Q.      And this is a copy of the March 2010 audit services

14  report from the Federal Reserve work papers during that

15  examination?

16  A.      Correct.

17  Q.      These are the Fed's work papers?

18  A.      Correct.

19  Q.      The bank did not conceal this document from the Fed,

20  did it, Mr. Corkery?

21  A.      No, it did not.

22  Q.      This document describes the bank's waiver practice,

23  doesn't it, Mr. Corkery?

24  A.      It doesn't say "waiver," but, yes.

25  Q.      It does talk about the bank's treatment of its matured

---

2674

Corkery - cross

1   loans, though, does it not?

2   A.      It does.

3   Q.      And the bank's treatment of the loans, according to

4   that sentence starting with "However," was that the bank did

5   not consider matured loans to be past due if interest was

6   current and progress was made towards extension and renewal,

7   am I right?

8   A.      Yes.

9   Q.      Okay.

10          Go ahead and please read the next sentence for M E?

11  A.      "As of 3-31-2010, all matured loans are considered

12  past due unless interest is current and an extension has

13  been approved and the change in the terms or modification

14  has been executed and returned to the bank by the borrower."

15  Q.      So that statement -- and correct M E if I'm wrong, Mr.

16  Corkery -- says that as of March 31st, 2010, the bank was

17  changing its practice as to how it treated its matured

18  loans, right?

19  A.      Yes.

20  Q.      According to this document?

21  A.      It sound that way, yes.

22  Q.      I mean, we saw how the bank was treating those loans

23  by the sentence that starts with "However," correct?

24  A.      Correct.

25  Q.      And that treatment was the bank did not consider those

---

2675

Corkery - cross

1   loans to be past due if interest was current and in the

2   process of renewal and extension, correct?

3   A.      Correct.

4   Q.      So as of March 31st, the bank policy, according to

5   this document, required three things, did it not?

6           And we'll go through those three things.

7   A.      Yes.

8   Q.      First, interest was current.

9           Number one, correct?

10  A.      Correct.

11  Q.      Number 2, an extension had been approved?

12  A.      Correct.

13  Q.      And, number three, a change in terms or modification

14  had been executed and returned to the bank by the borrower?

15  A.      Correct.

16          MR. ROSAMOND:  Brian, if we now switch gears for

17  a second and go to GX-261, which is in evidence?  And if we

18  can go to 35737?

19          (Pause)

20  BY MR. ROSAMOND:

21  Q.      This was the December 2009 audit services report that

22  we review previously, correct?

23  A.      Correct.

24  Q.      It's tab 29 in your binder.  Feel free to follow along

25  on the screen as well.

2688

Corkery - cross

BY MR. ROSAMOND:

1  BY MR. ROSAMOND:

2  Q.    Again, if we look at the top hand right corner, we see

3  the Fed Bates stamp, right?

4  A.    Yes.

5  Q.    Again, this was given to the Fed by the bank?

6  A.    Yes.

7  Q.    And the Fed provided it back to the bank as part of

8  its work papers?

9  A.    Yes.

10        MR. ROSAMOND:  Come out of that, Brian?

11        If we can go to the very top, you'll see some

12  writing.

13  BY MR. ROSAMOND:

14  Q.    Would you please read that into the record, Mr.

15  Corkery?

16  A.    "Targeted examination response AND exhibits, letter to

17  ROSAMOND Lang, Federal Reserve Bank of Philadelphia."

18        MR. ROSAMOND:  Come out of that, please?

19        And if we could just take a look at Mr. Lang,

20  his name, and title, and his address?  If we can just call

21  that out?        Thank you, Brian.

22  BY MR. ROSAMOND:

23  Q.    And can you please read his title into the record?

24  A.    Senior Vice President and Chief Examination Officer.

25  Q.    And he worked for the Federal Reserve Bank of

2689

Corkery - cross

1  Philadelphia?

2  A.    At that time he did, yes.

3        MR. ROSAMOND:  If we can go to 115048, we can

4  see who this letter is authored by?

5        Oh, the page right before it.  I'm sorry.

6        (Pause)

7  BY MR. ROSAMOND:

8  Q.    And who is Don Foley?

9  A.    At that point, he was the Chief Executive Officer of

10  the Wilmington Trust Company.

11  Q.    And by that point, you mean the date of the letter,

12  July 9th, 2010?

13  A.    Yes.

14        MR. ROSAMOND:  And, again, if you can come out

15  of that Brian?

16  BY MR. ROSAMOND:

17  Q.    We see the Bates stamp from the Fed again, the top

18  hand right?

19  A.    Yes.

20  Q.    Let's go to the next page.

21        MR. ROSAMOND:  Can we call out those CCs?

22  BY MR. ROSAMOND:

23  Q.    So this letter from Mr. Foley of Wilmington Trust to

24  the Federal Reserve copied a bunch of people on this letter,

25  did they not?

2690

Corkery - cross

1  A.    Yes.

2  Q.    Could you read to us the names of those individuals or

3  groups?

4  A.    Board of Directors of the Wilmington Trust Company,

5  Commission Robert A. Glen, Office of the State Bank

6  Commissioner, State of Delaware, Donald E. Fry, Acting

7  Regional Director FDIC, James Price, Regional Director of

8  Office of Thrift Supervision.

9  Q.    So the Office of the State Bank Commission, that is

10  the OSBC that we've been talking about over the last couple

11  of days, not yesterday, but the last couple of days?

12  A.    Yes.

13  Q.    Regulator of the bank?

14  A.    Yes.

15  Q.    And FDIC.

16        What does FDIC stand for?

17  A.    Federal Deposit Insurance Corporation.

18  Q.    And I believe you testified on Tuesday that the FDIC

19  was a prior regulator of Wilmington Trust, correct?

20  A.    Yes.

21  Q.    And the last entity listed there, the Office of Thrift

22  Supervision, correct?

23  A.    Yes.

24  Q.    And they were responsible for Wilmington Trust FSB?

25  A.    Yes.

2691

Corkery - cross

1  Q.    So this document was not only sent to the Federal

2  Reserve, but it was sent to every other regulator of the

3  bank, correct?

4  A.    Yes.

5  Q.    Now, Brian, let's just show a couple, and I know it's

6  a long document, and let's just show a couple of those

7  following pages, and we see that same heading at the top;

8  right?  Targeted exam response?

9  A.    Correct.

10  Q.    All right.  Hold it right there.  Targeted exam

11  response and exhibit, letter to Mr. Lang, Federal Reserve of

12  Philadelphia?

13  A.    Correct.

14  Q.    I think you testified a few minutes ago that this

15  document was the bank's response to concerns that the Fed

16  raised in the target exam; right?

17  A.    Yes.

18  Q.    That's a long document, isn't it?

19  A.    Yes.

20  Q.    Over a hundred pages?

21  A.    I have 335.

22  Q.    Does the fact that it was 335 pages mean that it was

23  not, wouldn't be reviewed by the Fed?

24  A.    No.  It would be reviewed, yes.

25  Q.    Thank you.

2692

Corkery - cross

1    And if we can now display DX-441 at 115215.
2 Please take a look at the document of this document, Mr.
3 Corkery.
4    We reviewed this document just a few moments
5 ago, haven't we?
6 A.    Yes.
7 Q.    This is the audit services issue priority report dated
8 March 31st, 2010?
9 A.    Yes.
10 Q.    Do you see issue 220 on the left?
11 A.    Yes.
12 Q.    The issued description states, need to properly
13 process and account for matured loans?
14 A.    Yes.
15 Q.    And if we can go down to Q1, management update.  Take
16 a moment just to read that to confirm that that is the same
17 document that we reviewed before.
18 A.    It does look the same, yes.
19 Q.    But unlike the prior document we reviewed before, this
20 document was provided to the Fed in connection with the
21 2009, late 2009, early 2010 target exam; is that right?
22 A.    Yes.
23 Q.    And you testified the previous audit services issue
24 report that the bank provided to the Fed, that was provided
25 in connection with the 2010 full scope examination; is that

2693

Corkery - cross

1 correct?
2 A.    Yes.
3 Q.    Now, you've had an opportunity to review this.  Are
4 you familiar with it?
5 A.    Yes.
6 Q.    So this document again describes the catchup
7 extensions that the bank conducted in late 2009, early 2010,
8 did it not?
9 A.    Yes.
10 Q.    It also discusses relationship managers being brought
11 from branch offices outside of Delaware to conduct a
12 comprehensive review of the bank's matured commercial loan
13 portfolio.
14 A.    Correct.
15 Q.    One sentence I am going to ask you to read, Mr.
16 Corkery, and if we can call that out and highlight it.  In
17 the past, those two sentences, please.  Right there, in the
18 past.  If we can, yes, highlight that, and the following
19 sentence as well.
20 A.    In the past, the level of matured loans was
21 problematic, especially in the Delaware real estate
22 portfolio.  However, these matured loans were not considered
23 to be past due if interest was current and progress was
24 being made towards renewal/extension.
25 Q.    Thank you, Mr. Corkery.

2694

Corkery - cross

1    Again, the bank provided the Fed with notice in
2 writing of its waiver practice, did it not?
3 A.    In this regard?
4 Q.    Yes.
5 A.    Yes.
6 Q.    Thank you?
7    MR. ROSAMOND:  I have no further questions.
8    THE COURT:  All right.  Mr. Breen?
9    MR. BREEN:  Thank you, Your Honor.  We have some
10 binders.
11 BY MR. BREEN:
12 Q.    Good afternoon, Mr. Corkery.
13 A.    Good afternoon.
14 Q.    I'm Ken Breen.  I represent David Gibson.
15    Mr. Corkery, the last phrase that you read on
16 the screen, I believe you agreed before that that phrase,
17 which is in DX-808, page 61, focusing on the two sentences
18 that Mr. Corkery just testified about, starting with, in
19 the past and continuing through the end of the next
20 sentence.
21    I believe you acknowledged that that is a
22 description of what has been referred to as the waiver
23 practice.
24 A.    It doesn't say waiver, but that is what it sounds
25 like.

2695

Corkery - cross

1 Q.    Okay.  It doesn't say waiver, but that is a
2 description of the waiver practice; is that correct?
3 A.    It sounds like it, yes.
4 Q.    Well, sounds like it, or it is?
5 A.    Well, like I say, it doesn't say waiver, but that's
6 what it sounds like.
7 Q.    Okay.  It sounds like, it sounds like you mean, you
8 know, that is how you took it.
9 A.    No.  I mean, that's not how I took it.
10 Q.    Well, that's how you take it here today; is that
11 correct?
12 A.    Okay.
13 Q.    Is that true?
14 A.    I will agree, yes.
15 Q.    Thank you.
16    MS. WOLF:  Objection, Your Honor.  Relevance.
17    THE COURT:  Overruled.
18 BY MR. BREEN:
19 Q.    So the context for this disclosure, the waiver
20 practice, was an audit committee meeting; is that correct?
21 A.    Correct.
22 Q.    And so this disclosure was made in connection with and
23 in that audit committee meeting; is that correct?
24 A.    Yes.  Well, I don't know for sure in the audit
25 committee, but it was in the audit report to the audit

2824

Corkery - recross

1  examination; is that correct?
2  A.    I believe that was it, yes.
3  Q.    And in 2010, it was over 8800 commercial loans
4  provided; is that correct?
5  A.    Yes.
6  Q.    Including maturity dates; is that correct?
7  A.    Yes.
8  Q.    The dates of maturity?
9  A.    Yes.
10  Q.    Now, you supervised a team of examiners, I think you
11  said it was about 10 to 15 examiners in both examinations;
12  is that correct?
13  A.    Yes.
14  Q.    You had no firsthand knowledge of what those 10 to 15
15  examiners did with that ALERT data, did you?
16  A.    I'm sorry.  Could you repeat that?
17  Q.    You have no firsthand knowledge of what those 10 to 15
18  examiners working for the Fed in the 2009 and the 2010
19  examination did with that ALERT data; is that correct?
20  A.    No.
21  Q.    And I think in your redirect you suggested that it was
22  only used to create line cards; is that right?
23  A.    Yes.
24  Q.    Did you tell anybody at the bank that the only reason
25  that you used the ALERT data was to create line cards?

2825

Corkery - recross

1  A.    Yes, I believe that was asked, what do I use it for.
2  That's what I use it for.
3  Q.    Did you tell anybody at the bank that the only use of
4  ALERT data that the Fed -- let me rephrase that.
5        Did you tell anyone at the bank that the Fed
6  only used the ALERT data that the bank provided to the Fed
7  and that the Fed asked for was to create line cards?
8  A.    I don't recall specifically, no.
9  Q.    They provided it to you, didn't they?
10  A.    To the Fed?
11  Q.    Yes.
12  A.    Yes.
13        MR. ROSAMOND:  Brian, if you could briefly just
14  display DX-808.  And if we can go to -- okay.
15        Would you please highlight, Brian, in the past
16  language.  Middle paragraph.  Thank you.
17  BY MR. ROSAMOND:
18  Q.    Can you read that into the record again, Mr. Corkery?
19  A.    In the past, the level of matured loans was
20  problematic, especially in the Delaware real estate
21  portfolio.  However, these matured loans were not considered
22  to be past due if interest was current and progress was
23  being made towards renewal/extension.
24  Q.    Now, it doesn't say waiver, does it?
25  A.    No, it does not.

2826

Corkery - recross

1  Q.    But it does say that the bank was treating matured
2  loans not to be past due if interest was current and was in
3  the process of extension; is that correct?
4  A.    Yes.
5  Q.    Now, did you review that, those two sentences for form
6  over substance?
7  A.    I don't recall that I did, no.  I mean, I looked at
8  the report itself in totality.
9  Q.    Did you -- you understood what the bank was saying
10  when they said, they did not consider matured loans to be
11  past due if interest was current and progress was being made
12  towards renewal and extension; is that correct?
13  A.    I don't recall specifically.
14  Q.    This document has a Fed date stamp on it, doesn't it?
15  A.    Yes, it does.
16  Q.    The bank provided this to the Fed, didn't it?
17  A.    Yes.
18        MR. ROSAMOND:  I have no further questions.
19        THE COURT:  All right.  Anyone else?  Mr. Breen?
20        MR. BREEN:  Yes, Your Honor.  Thank you.
21  BY MR. BREEN:
22  Q.    Good afternoon again, Mr. Corkery.
23  A.    Good afternoon.
24        MR. BREEN:  Mr. Cooper, if I could have GX-261
25  on the screen, please?

2827

Corkery - recross

1  BY MR. BREEN:
2  Q.    So you testified on redirect that your review of this
3  document and others was a review for form, not substance; is
4  that correct?
5  A.    Yes.
6  Q.    Also, you reviewed for form rather than substance; is
7  that correct?
8  A.    I believe that's what I said, yes.
9  Q.    How exactly were you able to separate the two?
10  A.    Well, actually, I mean, one of the recommendation I
11  gave to the internal auditor --
12  Q.    I am asking you how you separated it in your head,
13  sir.
14  A.    Oh.
15  Q.    How were you able to review something for form without
16  reviewing it for substance?
17  A.    I was looking to get an understanding of what was
18  being reported to the audit committee.
19  Q.    Right?
20  A.    I wanted to understand, what is the reporting
21  mechanism that they are using to get the audit committee
22  members aware of what the issues and the situations and how
23  audit is being managed, how is that being related to the
24  audit committee.
25  Q.    I understand that part, right, the form.  I just don't

2832

Corkery - recross

1  A.   Correct.

2  Q.   And you're with the Federal Reserve Bank; is that

3  correct?

4  A.   Of Philadelphia, yes.

5  Q.   You're an examiner?

6  A.   Yes.

7  Q.   And you bring a whole team of examiners to the bank;

8  is that correct?

9  A.   Yes.

10 Q.   And this team had access to Shaw; is that correct?

11 A.   Yes.

12 Q.   And it had training in Shaw; is that correct?

13 A.   Yes.

14 Q.   It was given a commercial download of every loan in

15 the portfolio; is that correct?

16 A.   Yes.

17 Q.   And you're there to look under the hood of the bank

18 that you are doing the examination for; is that correct?

19 A.   Yes.

20 Q.   And you're a thorough guy, aren't you?

21 A.   As thorough as I can be with the resources and time I

22 have.

23 Q.   You're no pushover, are you?

24 A.   I don't think so, no.

25 Q.   And you don't need anyone to tell you that $33 million

2833

1  is a bigger fish than $10 million, do you, sir?

2  A.   No.

3         MR. FOLEY:  No further questions.

4         THE COURT:  All right.  Mr. Klingeman?

5         MR. KLINGEMAN:  Same answer, Your Honor.  No

6  questions for Ms. Rakowski.

7         THE COURT:  All right.  And we are done, Ms.

8  Wolf?

9         MS. WOLF:  We are, Your Honor.

10        THE COURT:  All right.  You may step down, Mr.

11 Corkery.  May he be excused?

12        MR. ROSAMOND:  Yes.

13        THE COURT:  All right.  Mr. Corkery, thank you.

14 You are free to go.

15        THE WITNESS:  Thank you.

16        (Witness excused.)

17        MS. WOLF:  Your Honor, if we could have just a

18 moment to switch binders?

19        THE COURT:  Yes.

20        MS. WOLF:  The Government is going to call

21 Kimberly Strohmeier.

22        THE COURT:  All right.

23        (Pause.)

24        ... KIMBERLY STROHMEIER, having been

25        duly sworn as a witness, was examined and

2834

Strohmeier - direct

1         testified as follows ...

2         DIRECT EXAMINATION

3  BY MS. WOLF:

4  Q.   Good afternoon, Ms. Strohmeier.

5  A.   Good afternoon.

6  Q.   Before we get started, I'm just going to ask you,

7  there's a microphone in front of you, and if you could just

8  make an effort to keep your voice up.  That way we can avoid

9  having to re-ask questions, if we could.

10        Where do you currently work?

11 A.   University of Delaware.

12 Q.   And what do you do at the University of Delaware?

13 A.   I'm a senior accountant.

14 Q.   How long have you been at the University of Delaware?

15 A.   Since 2012.

16 Q.   Prior to the University of Delaware, did you work at

17 Wilmington Trust?

18 A.   I did.

19 Q.   When did you begin at Wilmington Trust?

20 A.   In 1998.

21 Q.   And when did you leave Wilmington Trust?

22 A.   2011.

23 Q.   Between 2009 and 2010, what was your position at

24 Wilmington Trust?

25 A.   Senior accountant/financial.

2835

Strohmeier - direct

1  Q.   Were you related with a particular department at the

2  bank?

3  A.   I was in the financial reporting section in the

4  controller's division.

5  Q.   Was that part of the larger finance division as well?

6  A.   Yes.

7  Q.   Who were your supervisors?

8  A.   Dan Roberts was my supervisor.

9  Q.   And who did Mr. Roberts report to?

10 A.   Marty McDonough.

11 Q.   Who did Mr. McDonough report to?

12 A.   Kevin Rakowski.

13 Q.   Ms. Strohmeier, what did your job responsibilities

14 include in 2009 and 2010?

15 A.   I was responsible for the consolidated reporting.

16 Q.   When you say "consolidated reporting," could you tell

17 the jury what that means, please?

18 A.   It's basically preparing the financial statements for

19 the corporation and all of its subsidiaries.

20 Q.   Does that include things like annual reports?

21 A.   Correct.

22 Q.   Did it include information that was filed with the

23 Securities and Exchange Commission?

24 A.   Correct.

25 Q.   And did it include certain reporting that went to the

2836

Strohmeier - direct

1  Board of Directors at the bank as well?
2  A.    Yes.
3  Q.    At some point in 2009, did you assume responsibility
4  for a report at the bank that was known as the past due and
5  nonperforming loans report?
6  A.    Yes.
7  Q.    Do you recall when approximately in 2009 you took that
8  on?
9  A.    It was sometime before November.
10  Q.    Was there a person in your department or in your group
11  that had handled it prior to you?
12  A.    Yes.  Faye Loh.
13  Q.    Why was there the change from Ms. Loh to you for that
14  report?
15  A.    I believe it was just reorganizing duties within our
16  department.
17  Q.    Now, once you assumed the responsibility at some
18  point in 2009, did you maintain that responsibility through
19  2010?
20  A.    I believe so.
21  Q.    Was there a brief period of time when you were out of
22  the office in late 2009 or early 2010?
23  A.    Yes.  I was on maternity leave.
24  Q.    Do you recall approximately when that was?
25  A.    I believe it was -- so it was end of November through

2837

Strohmeier - direct

1  I think March of 2010.
2  Q.    And while you were out on leave, did Ms. Loh assume
3  responsibility back for the report for that period of
4  time?
5  A.    Yes.
6  Q.    But once you came back, it went back to you again?
7  A.    Yes.
8  Q.    Now, when Ms. Loh handed off the responsibility for
9  the report to you, did you receive any particular training
10  or instruction on how to prepare the report?
11  A.    Yes.  I was trained by Faye.
12  Q.    And just generally, if you could describe for the jury
13  what she told you at that point?
14  A.    Generally, I would sit with her and she would walk me
15  through the process of how to prepare it.
16  Q.    Okay.  So it was like you sat over her shoulder for a
17  couple months and watched what she did?
18  A.    Correct.
19  Q.    So she didn't give you a written document or anything
20  else.  It was just on-the-job sort of training?
21  A.    Yes.
22  Q.    I'm going to ask you, and it's going to pop up on the
23  screen.  If you prefer paper, you can look at it in the
24  binder.
25         Take a look at Government Exhibit 64.  And if

2838

Strohmeier - direct

1  we could first take a look at the PDF version of the
2  document.
3         Do you recognize this document?
4  A.    Yes.
5  Q.    What is it?
6  A.    It's the September 2009 past due report.
7  Q.    And if you take a look in the bottom left-hand corner,
8  do you know who prepared this report?
9  A.    Yes.  I did.
10  Q.    Now, Ms. Strohmeier, in order to prepare this
11  document, did you receive information from somebody else at
12  Wilmington Trust?
13  A.    Yes.
14  Q.    Who did you get information from to enable you to
15  prepare this report?
16  A.    Steve Cummings would send me a report that was used.
17  Q.    Now, when you prepared your report, was it originally
18  completed in the Excel form?
19  A.    Yes.
20  Q.    All right.  If we could just shift to the Excel
21  version of the document, please.
22         Does this look like the Excel format of the past
23  due and nonperforming loan report?
24  A.    Yes.
25  Q.    And do one of the -- there are a series of tabs that

2839

Strohmeier - direct

1  appear across the bottom.  Are you able to see that?
2  A.    Yes.
3  Q.    Does one of those tabs reflect the information that
4  you, in fact, received from Mr. Cummings?
5  A.    I don't remember which tab.  It may be original.
6  Q.    Okay.  If we take a look -- actually, if I showed you
7  the tab, would you recognize it?
8  A.    Yes.
9  Q.    If we could click on the commercial delinquency tab,
10  please, and scroll over to the side.
11  Q.    Does that refresh your recollection as to the tab --
12  A.    Yes.
13  Q.    -- you received?
14  A.    Yes.
15  Q.    And that reflects the information you received from
16  Mr. Cummings?
17  A.    Correct.
18  Q.    Now, does this tab reflect all of the information you
19  got when you received the document from Mr. Cummings, or did
20  you make any changes before using it to prepare the past due
21  and nonperforming loan report?
22  A.    It does reflect the change.
23  Q.    What was that change?
24  A.    We would exclude all the waived loans from this

2840

Strohmeier - direct

1  report.
2  Q.    Now, once you did that -- and by exclude, does that
3  mean you would delete them, or how would you go about doing
4  that?
5  A.    I don't remember if we sorted them and then excluded
6  them or deleted them, but we just were not to include them.
7  Q.    Okay.  Now, once you did that, did the remaining
8  report work through a concept called pivot tables for the
9  most part?
10 A.    Yes.
11 Q.    Could you explain to the jury then what the process
12 was that you used to create the report?
13 A.    So when I received the report, we would dump the data
14 into this tab, and then we would click update all pivots,
15 and each tab following that would update with the current
16 information.
17 Q.    Now, I want to take a look -- actually, if you could
18 just take a couple of moments to go through the tabs that
19 appear on the bottom.
20        I'm going to come back to the cover tab, but if
21 we could first go to the September summary.
22        Does this page reflect the pivot table or was
23 this manual entry of data?
24 A.    That's manual entry.
25 Q.    Okay.  And you would go back -- how would you know

2841

Strohmeier - direct

1  what to put in these blocks?
2  A.    The summary tab included all the totals from the
3  various tabs in the report.
4  Q.    And you would type those in and those would
5  autopopulate?
6  A.    Correct.
7  Q.    If we could just scroll down on this document.
8        Is there a distribution list included in the
9  September summary?
10 A.    Yes.
11 Q.    All right.  And did the distribution include
12 Mr. Gibson?
13 A.    Yes.
14 Q.    And did it include Mr. Harra?
15 A.    Yes.
16 Q.    And did it include Ms. Rakowski?
17 A.    Yes.
18 Q.    And did it include Mr. North?
19 A.    Yes.
20 Q.    Now, if we move along the next tab at the bottom of
21 the page, the balance sheet tab, is that a pivot table?
22 A.    Yes.
23 Q.    And, again, the information then would be drawn from
24 whatever information Mr. Cummings had sent?
25 A.    Correct.

2842

Strohmeier - direct

1  Q.    Minus the waived loans?
2  A.    Correct.
3  Q.    Okay.  And then the original tab?
4  A.    Correct.
5  Q.    Is this also a pivot table?
6  A.    Yes.
7  Q.    And, again, the same information.  Mr. Cummings'
8  information minus the waived loans populated that
9  automatically?
10 A.    Correct.
11 Q.    FRB is the next tab.  Same thing?
12 A.    Mm-hmm.
13 Q.    We already talked about the commercial delinquency
14 tab.  That wasn't a pivot table; is that correct?
15 A.    Correct.
16 Q.    And then CF&A, 30 to 89, what does that refer to, if
17 you know?
18 A.    I can't remember the category.  Commercial -- I don't
19 remember.
20 Q.    It was a particular category of loans at Wilmington
21 Trust?
22 A.    Yes.
23 Q.    Okay.  And that's the list of those that were 30 to
24 89 days past due?
25 A.    Correct.

2843

Strohmeier - direct

1  Q.    And is that also a pivot table?
2  A.    Correct.
3  Q.    Okay.  And the same, the next tab, CF&A over 90?
4  A.    Yes.
5  Q.    When it says "over 90," is that over 90 days past due?
6  A.    Correct.
7  Q.    And then the third tab, CF&A, nonaccrual.
8  A.    Yes.
9  Q.    All of those are pivot tables that autopopulate?
10 A.    Yes.
11 Q.    As we continue along the bottom, is there another tab
12 for construction, 30 to 89?
13 A.    Yes.
14 Q.    And construction over 90?
15 A.    Correct.
16 Q.    And if we keep going, construction nonaccrual?
17 A.    Yes.
18 Q.    Construction is a different category of loans?
19 A.    Yes.
20 Q.    And would this also autopopulate these three tables?
21 A.    Yes.
22 Q.    From the information?
23 A.    Yes.
24 Q.    And then if we can continue along the bottom, there
25 is mortgage, 30 to 89.  Mortgage over 90.  Mortgage

3182

16:13:42    1                       - VOLUME 12 -

2                IN THE UNITED STATES DISTRICT COURT

3                IN AND FOR THE DISTRICT OF DELAWARE

4                            - - -

5    UNITED STATES OF AMERICA,     :   CRIMINAL ACTION
                                    :
6                   Plaintiff,      :
                                    :
7         vs.                       :
                                    :
8    DAVID R. GIBSON, ROBERT        :
     V.A. HARRA, WILLIAM            :
9    NORTH, and KEVYN RAKOWSKI,     :
                                    :
10                                  :
                    Defendants.     :   NO. 15-23-RGA
11

12                                      - - -

13

                               Wilmington, Delaware
14                             Tuesday, March 27, 2018
                               8:30 o'clock, a.m.
15
                                    - - -
16
     BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17   jury

18                            - - -
     APPEARANCES:
19

20            LESLEY F. WOLF, ESQ.,
              ROBERT F. KRAVETZ, ESQ. and
21            JAMIE M. McCALL, ESQ.,
              Assistant United States Attorneys
22

23                 Counsel for Plaintiff

24                       Valerie J. Gunning
                         Leonard A. Dibbs
25                       Official Court Reporters

3511

Roberts - direct

1    of the form 10-K?

2    A.    To the best of my knowledge, he would have been a

3    signer.  As a member of the Board of Directors, they all

4    signed.

5    Q.    Okay.  Do you recall if Mr. Gibson signed the 10-K?

6    A.    Yes, he did.

7    Q.    And do you recall if for a form 10-K, Ms. Rakowski

8    also signed the 10-K?

9    A.    That I do not recall.  Sorry.

10   Q.    Okay.  If you took a look at a document?

11   A.    Then I would remember.

12          MS. WOLF:  Okay.  I'm going to ask Ms. Lotharp

13   if she could pull up Government Exhibit 1, and I believe

14   it's the last page.

15   BY MS. WOLF:

16   Q.    If you could go ahead and take a look at that for a

17   moment?

18   A.    Yes, she did sign it.

19   Q.    And that confirmed also.

20          Did Mr. Harra sign?  You indicated he signed as

21   a director.  Did he also sign in his capacity as a

22   president?

23   A.    Yes.

24   Q.    Now, did Mr. Harra have an opportunity to review the

25   form 10-K before it was filed?

3512

Roberts - direct

1    A.    To the best of my knowledge, yes.

2    Q.    And you sent him the document to review; is that

3    correct?

4    A.    Yes.

5    Q.    And he returned edits to you?

6    A.    Yes.

7    Q.    And did Mr. Gibson have an opportunity to review the

8    form 10-K before it was filed?

9    A.    Most definitely.

10   Q.    Did Ms. Rakowski also have an opportunity to review

11   the document before it was filed?

12   A.    Yes.

13   Q.    Now, we talked briefly, and you mentioned that there

14   was a capital raise that was going to relate somehow to the

15   securities filing.

16          Did the offering document for the capital raise

17   actually incorporate that form 10-K for the year 2009?

18   A.    I believe so.

19   Q.    Now, Ms. Roberts, are you familiar with something

20   called the disclosure committee at Wilmington Trust?

21   A.    Yes.

22   Q.    Were you a part of the disclosure committee?

23   A.    Yes, I was.

24   Q.    Was Mr. Gibson a part of the disclosure committee?

3513

Roberts - direct

1    Q.    Was Ms. Rakowski a part of the disclosure committee?

2    A.    Yes.

3    Q.    Could you tell the jury what was the disclosure

4    committee?

5    A.    The disclosure committee was a group of mostly senior

6    managers who met at least quarterly to review the documents

7    that we were about to file with the SEC to ensure that we

8    were adequately meeting all required disclosure

9    requirements.

10   Q.    And you said it met at least quarterly.

11   A.    Yes.

12   Q.    Did it meet at other times or was it a regularly

13   scheduled quarterly meeting?

14   A.    My recollection is that it was at least quarterly.

15   Sometimes there might have been a meeting to discuss the

16   earnings release versus the subsequent 10-Q or 10-K filing.

17   Q.    Now, I'm going to ask you in your binder to take a

18   look at Exhibit 839 and 839-A and B.

19   A.    Yes.

20   Q.    And once you're there, do you recognize these

21   documents?

22   A.    I do.

23   Q.    And what are they?

24   A.    They are a cover e-mail circulating drafts of

25   disclosure committee meetings, two separate meetings.

3514

Roberts - direct

1          MS. WOLF:  Your Honor, at this time we'd move

2    for the admission of Government Exhibit 839, 839-A and

3    839-B.

4          MR. KLINGEMAN:  No objection.

5          MR. KELLY:  No objection.

6          MS. GUBERMAN:  No objection.

7          THE COURT:  All right.  Admitted without

8    objection.

9          (Government Exhibit No. 839, 839-A and 839-B

10   were admitted into evidence.)

11          MS. WOLF:  Ms. Lotharp, if you could pull up

12   839, please.  If we could take a look at the top.

13   BY MS. WOLF:

14   Q.    Who does this e-mail come from?

15   A.    This e-mail comes from Ms. Edsel Bittle.

16   Q.    And who does this e-mail go to?

17   A.    It goes to members of the disclosure committee.

18   Q.    Who does that include?

19   A.    It includes Mr. Cecala, Mr. Chamberlain,

20   Mr. DiGregorio, Walter Doggett, Mr. Gibson, Marty McDonough,

21   Ms. Rakowski, myself, Mitch Slijepcevic and Ms. Thuresson.

22   Q.    What is the date of this e-mail?

23   A.    It's August 17th, 2009.

24   Q.    And I will ask you to draw your attention and if Ms.

25   Lotharp could please pull up 839-B.

3515

Roberts - direct

1    Were those drafts of the disclosure committee
2  meeting from August 3rd, 2009?
3  A.    Yes.
4  Q.    Okay.  And after it listed who was present at the
5  meeting, what does the first paragraph say?
6  A.    The committee members discussed the serious doubt
7  table in the form 10-Q.  Kevyn, Ms. Rakowski, noted that
8  Guide 3 requires that this table be included in the 10-Q.
9  Q.    Do you know what Guide 3 is?
10  A.    I do not.
11  Q.    Do you happen to know if Ms. Rakowski is a Certified
12  Public Accountant?
13  A.    I'm sorry.  I don't remember.
14  Q.    Now, looking down at the third paragraph, it appears
15  to be a discussion of the form 10-Q; is that correct?
16  A.    Yes.
17  Q.    And that's a quarterly SEC filing?
18  A.    Yes.
19  Q.    All right.  Just before the sentence that shows
20  redacted, there's a sentence that begins, Dave.  Is that
21  Mr. Gibson?
22  A.    Yes.
23  Q.    Could you just go ahead and read what that sentence
24  states?
25  A.    It says, Dave noted that there have been no changes to

3516

Roberts - direct

1  the company's credit quality.
2  Q.    Now, Ms. Roberts, in addition to working on SEC
3  filings, form 10-Ks and 10-Qs, did you have responsibility
4  for drafting quarterly earnings releases?
5  A.    Yes.
6  Q.    Could you describe to the jury what an earnings
7  release is?
8  A.    The earnings release is a summary of the company's
9  financial performance for a quarter, or half a year, or a
10  period of time.  That generally compares, explains the main
11  factors and what drove the company's financial results to
12  that quarter and compares it to prior periods.
13  Q.    Okay.  And how does it relate to a form 10-K or form
14  10-Q?
15  A.    I guess you could consider it almost a summary or
16  precursor, precursory document.  It is a simpler document.
17  The earnings release is much simpler than a 10-K or 10-Q.
18  It is not governed by the same regulatory requirements that
19  those other documents are governed by, and it is for many
20  companies produced more quickly after the period ends as
21  opposed to taking longer to produce the 10-K, the 10-Qs and
22  the 10-K.
23  Q.    Why is that?  What's the advantage of putting out an
24  earnings release more quickly?
25  A.    Well, you want, especially if it's good news, you want

3517

Roberts - direct

1  to make sure you share that news with in investors and
2  shareholders as quickly as possible.
3  Q.    Now, did you maintain responsibility for drafting the
4  earnings releases during the period October 2009 to November
5  of 2010?
6  A.    Yes.
7  Q.    Okay.  I'm going to ask you to take a look in your
8  binder at Exhibits 109, 111, 106, 108, and 110.
9  A.    9, 11, 6, 10 and 11?
10  A.    9, 111, 6, 8.
11  A.    Eight.
12  Q.    And ten.
13  A.    Got it.
14  Q.    Actually, maybe we'll just take them one at a time.
15  Looking at Government Exhibit 109, do you recognize this
16  document?
17  A.    Yes.
18  Q.    What is it?
19  A.    Wilmington Trust's third quarter earnings release for
20  the 2009 third quarter.
21  Q.    Okay.  And if you could take a look at Exhibit 111.
22  Do you recognize this document?
23  A.    Yes.
24  Q.    What is it?
25  A.    It is the earnings release for the 2009 fourth

3518

Roberts - direct

1  quarter.
2  Q.    Okay.  And I'm going to ask you now to move to
3  Exhibit 106.
4  A.    Yes.
5  Q.    What is this document?
6  A.    This is the earnings release for the 2010 first
7  quarter.
8  Q.    And draw your attention to Exhibit 108.  Why don't you
9  get there.
10  A.    Yes.
11  Q.    Do you recognize this document?
12  A.    I do.
13  Q.    And what is this?
14  A.    This is the earnings announcement for the 2010 second
15  quarter.
16  Q.    And, finally, if you could take a look at Exhibit 110,
17  do you recognize this document?
18  A.    I do.
19  Q.    What is this?
20  A.    This is the earnings announcement for the 2010 third
21  quarter.
22  Q.    Okay.
23        MS. WOLF:  Your Honor, at this time we'd move
24  for the admission of Exhibits 109, 111, 106, 108 and 110.
25        MS. GUBERMAN:  We object, Your Honor, to the

3531

16:13:42

1                          - VOLUME 13 -

2               IN THE UNITED STATES DISTRICT COURT

3               IN AND FOR THE DISTRICT OF DELAWARE

4                             - - -

5     UNITED STATES OF AMERICA,     :   CRIMINAL ACTION
                                    :
6                    Plaintiff,     :
                                    :
7          vs.                      :
                                    :
8     DAVID R. GIBSON, ROBERT       :
      V.A. HARRA, WILLIAM           :
9     NORTH, and KEVYN RAKOWSKI,    :
                                    :
10                                  :
                     Defendants.    :   NO. 15-23-RGA
11

12                                       - - -

13
                              Wilmington, Delaware
14                            Wednesday, March 28, 2018
                              8:32 o'clock, a.m.
15
                                  - - -
16
      BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17    jury

18                            - - -
      APPEARANCES:
19

20            LESLEY F. WOLF, ESQ.,
              ROBERT F. KRAVETZ, ESQ. and
21            JAMIE M. McCALL, ESQ.,
              Assistant United States Attorneys
22

23                    Counsel for Plaintiff

24                            Valerie J. Gunning
                              Leonard A. Dibbs
25                            Official Court Reporters

3604

Roberts - direct

1    (Government Exhibit No. 637 was admitted into
2  evidence.)
3    MS. WOLF:  And if Ms. Lotharp could pull that up
4  and enlarge the text of the e-mail.
5  BY MS. WOLF:
6  Q.    Could you please read for the jury what Mr. Hodgson
7  wrote in this e-mail?
8  A.    He's writing to myself, Mr. Gibson and Mr. North.
9  Thanks for the time tonight.  I appreciate you making
10 yourselves available.  Jonah can be tough but he asks good
11 questions and is a nice guy.
12 Q.    Just stopping there, was Jonah one of Mr. Hodgson's
13 clients?
14 A.    Yes.
15 Q.    Okay.  And if you could continue, please.
16 A.    Something that may be helpful if you have the
17 granularity is inflows and outflows in the construction
18 book.  The fact that balances aren't declining is a question
19 that comes up a lot, and I don't really have an answer for
20 it.  Investors assume that banks are kicking the can down
21 the curb and will have no realize greater losses in future
22 quarters.
23    If you can show that you had X paydowns in the
24 construction book but funded X amount on good projects, that
25 might help to explain the issue since paydowns of the

3605

Roberts - direct

1  construction portfolio comes up a lot.  If the plus or minus
2  one billion of one to four constructions in three
3  years, then technically it should be declining by, give or
4  take, $330 million a year less any funding.  The same goes
5  for the development book at two years, I guess.
6  Q.    Ms. Roberts, do you recall any response to this e-mail
7  or during the phone call from Mr. North?
8  A.    I do not.
9  Q.    And do you recall any response either to the e-mail or
10 during the phone call from Mr. Gibson?
11 A.    I don't recall.  Sorry.
12    THE COURT:  So, members of the jury, this
13 Government Exhibit 637 is being admitted for the limited
14 purpose of essentially showing that certain information was
15 given to Mr. North and Mr. Gibson through this e-mail, and
16 so it's being offered for what that might show about their
17 knowledge, any relevant issue in the case.  It's not being
18 offered to prove what Mr. Hodgson actually says in the
19 e-mail as being factually correct.  So for the limited
20 purpose of how the recipient of the e-mail would have taken
21 what was being said.  All right?  That's the limited purpose
22 you can use it for.
23    MS. WOLF:  And I have nothing further, Your
24 Honor.
25    THE COURT:  All right.  Cross-examination.  Ms.

3606

Roberts - cross

1  Guberman?
2    MS. GUBERMAN:  Yes, Your Honor.
3    CROSS-EXAMINATION
4  BY MS. GUBERMAN:
5  Q.    Hello, Ms. Roberts.
6  A.    Hello.
7  Q.    I'm Phara Guberman.
8    Ms. Roberts, your background is in
9  communications; is that correct?
10 A.    Correct.
11 Q.    What did you study in college?
12 A.    My degree is in broadcasting, which was a combination
13 of basically two years technical and some liberal arts and
14 some business courses.
15 Q.    So you didn't study finance or accounting?
16 A.    I did have a year of accounting and a year of
17 statistics and economics.
18 Q.    But you're not a CPA?
19 A.    No, ma'am.
20 Q.    And no accounting certifications; right?
21 A.    Correct.
22 Q.    Your role at the bank was to help or translate the
23 financial disclosures into understandable English; is that
24 right?
25 A.    Correct.

3607

Roberts - cross

1  Q.    Because I think as you said, the legalese and
2  accounting terms can be difficult to understand; is that
3  right?
4  A.    Correct.
5  Q.    In fact, you even said there was some difficulty for
6  you; right?
7  A.    Yes.
8  Q.    So when you were preparing these public filings, the
9  10-Ks and Qs, is it fair to say that you sought input
10 from a lot of people in different business lines at the
11 bank?
12 A.    Well, it depends on what you mean by a lot.  There
13 were -- certainly the people I sought input from the most
14 were Mr. Gibson and other members of his staff or Ms.
15 Rakowski's staff.
16 Q.    Did you also seek input from other business lines?
17 A.    Yes.
18 Q.    Like who?
19 A.    I'm sorry?
20 Q.    Like which business lines?
21 A.    I would have talked directly to the finance liaisons
22 in the wealth advisory business and the corporate client
23 business as well as the banking business.
24 Q.    And you worked on preparing the MD&A and other
25 sections.  Just not the numbers; right?

3608

Roberts - cross

1  A.  Right.
2  Q.  And would you say there were a few people involved at
3  least in the drafting, editing and reviewing of these
4  disclosures?
5  A.  Yes.
6  Q.  And, in fact, it was typical to have someone involved
7  in preparing a portion of the filing that related to their
8  specific work area; right?
9  A.  Yes.
10  Q.  And that made sense because the different departments
11  did that work and were in the best position to provide that
12  information; is that right?
13  A.  Yes.
14  Q.  And then you would sometimes prepare drafts and get
15  handwritten and electronic comments back from different
16  people as part of this process?
17  A.  Correct.
18  Q.  And then, in fact, there was an entire disclosure
19  committee that met regularly or at least every quarter to
20  discuss the filings and its contents?
21  A.  Correct.
22  Q.  Ms. Wolf, in fact, went through some of those
23  disclosure committee minutes with you.
24       Do you remember?
25  A.  Yes.

3609

Roberts - cross

1       MS. GUBERMAN: Mr. Cooper, can you please put up
2  Government Exhibit 839-A.
3  By MS. GUBERMAN:
4  Q.  So, Ms. Roberts, who was on the disclosure committee?
5  A.  Do you want me to read the names?
6  Q.  Yes, please.
7  A.  The James are Ted Cecala, Gerry Chamberlain, Walter
8  Doggett, David Gibson, Martin McDonough, Kevyn Rakowski,
9  myself, Mitch Slijepcevic, Karen Thuresson.
10  Q.  Who is Mr. Cecala?
11  A.  Mr. Cecala is the chairman and CEO.
12  Q.  And who was Mr. Chamberlain?
13  A.  Mr. Chamberlain was one of the attorneys, and the lead
14  attorney on SEC filings.
15  Q.  And who was Mr. McDonough?
16  A.  Mr. McDonough worked for Ms. Rakowski, and he and
17  Mr. Slijepcevic were responsible for producing the financial
18  reports and statements.
19  Q.  Do you know if he was a CPA?
20  A.  I do not remember.  I'm sorry.
21  Q.  No problem.  A long time ago.  And who was Mr.
22  Slijepcevic?
23  A.  Slijepcevic.  It took me a couple of years, too.  I
24  think the best way to describe him would have been as Ms.
25  Rakowski's number two person in the controller's area.

3610

Roberts - cross

1  Q.  Do you remember if he was a CPA?
2  A.  I do not recall.  I'm sorry.
3  Q.  No problem.  Understandable.
4       And then Ms. Thuresson, do you remember what her
5  role is?
6  A.  Ms. Thuresson was part of credit review and risk
7  management.
8  Q.  Okay.
9       MS. GUBERMAN: Mr. Cooper, can you please put up
10  839-B, Government Exhibit 839-B.
11  BY MS. GUBERMAN:
12  Q.  This is another disclosure committee minutes.  Were
13  the attendees basically the same?
14  A.  Basically, yes.
15  Q.  We're not going to go through every set of these
16  minutes, but the disclosure committee met at least every
17  quarter; right?
18  A.  To the best of my recollection, yes.
19  Q.  It wasn't something that was new in 2009, was it?
20  A.  No.  Not that I recall.
21  Q.  So it met earlier than 2009?
22  A.  It did.
23  Q.  2007 probably?
24  A.  That I don't know.  I don't remember.  I know that my
25  involvement was not a whole lot before this time period.

3611

Roberts - cross

1  Q.  So when you were involved with the disclosure
2  committee, was there a lawyer on the committee?
3  A.  Yes.
4  Q.  And the purpose of the disclosure committee was to
5  review the disclosures; is that correct?
6  A.  Yes.
7  Q.  To discuss what was going into the regulatory filings;
8  is that correct?
9  A.  Correct.
10  Q.  And ensure that what was being disclosed was adequate;
11  is that right?
12  A.  Correct.
13  Q.  Do you know if KPMG would also review these
14  disclosures?
15  A.  My understanding is they would.
16  Q.  Do you know if they would provide input?
17  A.  Yes.
18  Q.  Ms. Wolf also reviewed the 2009 10-K with you.
19       MS. GUBERMAN: Mr. Cooper, would you put GX-1 up
20  and go to the last page.
21  BY MR. GUBERMAN:
22  Q.  This was a signature page that you reviewed with Ms.
23  Wolf.
24       Mr. Harra and Mr. Gibson and Ms. Rakowski are
25  not the only signers; is that correct?

3648

Roberts - cross

1  Q.    How about your floor, was it open?
2  A.    Our floor was open.
3        MR. FOLEY:  All right.  Ms. Roberts, thanks so
4  much for your indulgence.
5        Nothing further, Your Honor.
6        THE COURT:  All right.
7        MR. KELLY:  Briefly, Your Honor?
8        THE COURT:  Yes, Mr. Kelly.
9        MR. KELLY:  I have some binders to hand up.
10       THE COURT:  Sure.
11       MR. KELLY:  I have give one to the Government.
12  May I approach, Your Honor?
13       THE COURT:  Yes.
14       (Mr. Kelly handed binders to the witness and to
15  the Court.)
16       MR. KELLY:  A small one.
17  BY MR. KELLY:
18  Q.    Good morning, Ms. Roberts.
19  A.    Good morning.
20  Q.    I'm Mike Kelly and I represent Bob Harra.
21       So you reported to Mr. Cecala and then
22  Mr. Gibson; is that correct?
23  A.    Correct.
24  Q.    You've never reported to Mr. Harra?
25  A.    Correct.

3649

Roberts - cross

1  Q.    And Mr. Harra was not on the disclosure committee; is
2  that correct?
3  A.    I'd have to go back and look at the minutes, but --
4  Q.    Let's just go look quickly.  839-A and 839-B.
5  A.    I'm sorry.
6  Q.    This is --
7        MR. KELLY:  Brian, if you can display 839-A,
8  please.
9        THE WITNESS:  Yes.  I see his name is not on the
10  list.
11       MR. KELLY:  Okay.  Can we just quickly, Brian,
12  flash to 839-B.
13       THE WITNESS:  I see Mr. Harra's name is not on
14  this list either.
15  BY MR. KELLY:
16  Q.    Okay.  Thank you, ma'am.
17       You mentioned road shows that you would go on
18  with Mr. Gibson and Mr. Cecala?
19  A.    Yes.
20  Q.    Mr. Harra never went on those road shows, did he?
21  A.    No, sir, he did not.
22  Q.    And can I ask you to please go to Government --
23       MR. KELLY:  Brian, it's already in evidence.
24  GX-103.
25  BY MR. KELLY:

3650

Roberts - cross

1  Q.    And this is the transcript of the earnings call,
2  April 23, 2010.  I just want to go through it.  And I don't
3  see Mr. Harra's name as a participant.
4        Do you see that?
5  A.    Yes, but you --
6  Q.    He is mentioned though as being present.
7  A.    Yes.
8  Q.    What I want to ask you without reading the whole
9  document is:  I didn't see any statement of Mr. Harra at all
10  in that call.  Would you have any reason to doubt that he's
11  not recorded as not saying anything on that call?
12  A.    No, I have no reason to doubt that.
13  Q.    Okay.  And going to GX-104, ma'am, you agree with me
14  that Mr. Harra did not participate in that call either?
15  A.    I'm looking at my own comments.  The thing about these
16  transcripts, they were produced by the vendor.  We did not
17  review them.  You know, we did not see them in advance of
18  them being issued, so there was no opportunity to make
19  corrections.
20       But I'm looking at my comments at the bottom of
21  this page to see who I'm introducing, and maybe if you could
22  flip to the next page, because the part that I read earlier,
23  I mentioned people who were in the room.
24  Q.    Yes.
25  A.    And on this one, I'm saying specifically that the only

3651

Roberts - cross

1  other people who are prepared to comment are Mr. Foley and
2  Mr. Gibson.
3        MR. KELLY:  And on the prior page, Brian -- I
4  will make you earn your money.  You see participants.
5  BY MR. KELLY:
6  Q.    Mr. Harra is not listed?
7  A.    Correct.
8  Q.    Correct?
9  A.    Correct.
10  Q.    By the way, this July 23, 2010 earnings call, were you
11  aware by July 23, 2010 of any changes the bank had made with
12  respect to its reporting of matured loans?
13  A.    Not specifically, no.
14  Q.    Okay.  You mentioned you would get help preparing the
15  10-Qs and the 10-Ks?
16  A.    Yes.
17  Q.    But you never would go to Bob Harra for data in
18  connection with those, would you?
19  A.    No.
20  Q.    You would never ask Bob Harra to review any data that
21  was reported; is that correct?
22  A.    Well, as a matter of courtesy, drafts were circulated
23  to him.  But data, if you mean the numbers in the financial
24  report, no, I had no conversation with him about that.
25  Q.    You would never say, hey, Bob -- did you call him

3652

Roberts - cross

1  Bob?
2  A.     Most of the time I called him Mr. President.
3  Q.     Well, I'm just Mike if you want to talk to me.
4         But you would never go to him and say, hey,
5  look, are these numbers correct?
6  A.     No.  No, sir, I did not.
7  Q.     So your understanding is Mr. Harra was not involved
8  with preparation of data on these reports.  Is that fair?
9  A.     Not that I saw, not that I had any direct exposure to.
10 Q.     In fact, is it fair to say Mr. Cecala was much more
11 hands-on with respect to what data was reported?
12 A.     That certainly was my impression.
13 Q.     In fact, was it your impression Mr. Cecala signed off
14 on every piece of data that is reported publicly as far as
15 the bank's finances?
16 A.     Absolutely.
17 Q.     All right.  Mr. Harra never asked you to lie to the
18 SEC?
19 A.     No, sir.
20 Q.     Mr. Harra never asked you to conceal anything from the
21 SEC, did he?
22 A.     No, sir.
23 Q.     And Mr. Harra never asked you to conceal anything from
24 any regulator, did he?
25 A.     No, sir.

3653

Roberts - cross

1  Q.     And Mr. Harra never asked you to conceal anything from
2  the bank's auditors; is that correct?
3  A.     Correct.
4  Q.     All right.  KPMG was the bank's auditors in 2009/2010;
5  is that correct?
6  A.     Yes.
7  Q.     And they signed off on the 10-Ks and 10-Qs?
8  A.     That's my understanding.
9  Q.     And they also signed off on the prospective issued by
10 the bank in connection with the capital raise; is that
11 correct?
12 A.     As far as I know, yes.
13 Q.     And in connection with that capital raise and the
14 issuance of a prospectus, is it fair to say that there were
15 more lawyers involved in reviewing the bank's financial
16 data?
17 A.     Yes, it would be accurate and fair to say that.
18 Q.     In effect, didn't the public offering involve review
19 by the investment banker as well?
20 A.     Yes, sir.
21 Q.     And the capital raise, let me ask you to turn to
22 GX-426, please.
23 A.     Do I have that?
24 Q.     It's a Government exhibit.  I want to display it
25 because it's already in evidence.

3654

Roberts - cross

1  A.     Okay.
2  Q.     All right, ma'am.  Just a few questions on this
3  document.  I'm going to ask you to focus on, you know, at
4  the top it says "Ellen Roberts"?
5  A.     Yes.
6         MR. BREEN:  Excuse me.  We had a discussion
7  about redacting this particular document.
8         MR. KELLY:  Oh, I was not privy to what is being
9  redacted.
10        THE COURT:  Come over to sidebar.
11        (Sidebar conference held out of the hearing of
12 the jury as follows.)
13
14
15
16
17
18
19
20
21
22
23        (End of sidebar conference.)
24 BY MR. KELLY:
25 Q.     Sorry.  I feel like I'm at home.  The last to know.

3655

Roberts - cross

1  You mentioned a Wall Street Journal article.
2         Do you remember that?
3  A.     Yes.
4  Q.     When Ms. Wolf was questioning you?
5  A.     Yes.
6  Q.     But you also, in September, and correct me if I'm
7  wrong, in September of '09, you forwarded to Todd Glandon a
8  Wall Street Journal article mentioning that many U.S. banks
9  adopted a policy of extending loans when they matured even
10 if the bank would not make the loan now, and in some cases
11 where values were below the underlying property.
12        Do you remember that?
13 A.     I --
14        MS. WOLF:  Objection, Your Honor.  The question
15 really essentially states the testimony that Mr. Kelly is
16 hoping -- the degree of specificity is hearsay contained in
17 the question, Your Honor.
18        MR. KELLY:  Well, Your Honor, it's
19 cross-examination.  I'm allowed.  Latitude --
20        THE COURT:  This is an e-mail.  You are asking
21 her if she e-mailed Mr. Glandon?
22        MR. KELLY:  Yes, Your Honor.
23        THE COURT:  All right.  I will allow it.
24        MR. KELLY:  Thank you.
25 BY MR. KELLY:

3852

16:13:42

1                          - VOLUME 14 -

2                  IN THE UNITED STATES DISTRICT COURT

3                  IN AND FOR THE DISTRICT OF DELAWARE

4                            - - -

5       UNITED STATES OF AMERICA,      :   CRIMINAL ACTION
                                       :
6                      Plaintiff,      :
                                       :
7            vs.                       :
                                       :
8       DAVID R. GIBSON, ROBERT        :
        V.A. HARRA, WILLIAM            :
9       NORTH, and KEVYN RAKOWSKI,     :
                                       :
10                                     :
                       Defendants.   :   NO. 15-23-RGA
11

12
                                    - - -
13
                              Wilmington, Delaware
14                            Thursday, March 29, 2018
                              9:08 o'clock, a.m.
15
                                    - - -
16
        BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17      jury

18                            - - -
        APPEARANCES:
19

20              LESLEY F. WOLF, ESQ.,
                ROBERT F. KRAVETZ, ESQ. and
21              JAMIE M. McCALL, ESQ.,
                Assistant United States Attorneys
22

23                      Counsel for Plaintiff

24                              Valerie J. Gunning
                                Leonard A. Dibbs
25                              Official Court Reporters

3925

Conway - direct

1   The bottom list in darker yellow are loans that are fully

2   eligible to waive.  I ask that you all give this your full

3   attention as if it were quarter end.  Thanks.

4          MR. McCALL:  And then if you could back out, Ms.

5   Lotharp, and pull up 493-A.

6   BY MR. McCALL:

7   Q.     And have you had a chance to look at it in your

8   binder, Mr. Conway?

9   A.     Yes.

10  Q.     Okay.  And this appears to be the attachment; is that

11  correct?

12  A.     I think so, yes.

13  Q.     And the columns at the top, going from left to right,

14  the first column is, past due loans days; is that correct?

15  A.     Yes.

16  Q.     And then office person_name; is that right?

17  A.     It just went away.  Oh, I see.  Okay.  Yes, yes.

18         MR. McCALL:  Ms. Lotharp, can you actually back

19  out?  Thank you.

20  BY MR. McCALL:

21  Q.     And then file date_comp; is that correct?

22  A.     Say it again.  Say it again.

23  Q.     Sure.  No, no problem.  After office person_name, file

24  date_comp, do you see that?

25  A.     Yes.

3926

Conway - direct

1   Q.     Again, there's a series of columns going over to the

2   right, loan, loan amount, WTC share; is that right?

3   A.     Yes.

4   Q.     There is a column that indicates Prin_P_Due.

5   A.     Yes.

6   Q.     Do you remember what that stood for?

7   A.     Principal past due.

8   Q.     The column next to that Int_P_Due.

9   A.     Interest past due.

10  Q.     And then the next column Mat_Dt.  What does that stand

11  for?

12  A.     Maturity date.

13  Q.     Do you know what the last column indicates?

14  A.     Well, interest past due date.  As I read that, that is

15  the date.  I'm not -- the date the interest -

16  Q.     If you don't know --

17  A.     I'm not sure.

18  Q.     Okay.  If you go back, if I could just draw your

19  attention back to the first column.

20         MR. McCALL:  And, Ms. Lotharp, if you can just

21  scroll up and down the document, please, the days past

22  due.

23         If you can just stop there, Ms. Lotharp.

24  BY MR. McCALL:

25  Q.     And, again, we're looking at Pete Hayes.  He's a

3927

Conway - direct

1   relationship manager; is that right?

2   A.     Yes.

3   Q.     And so some of his dates past due, if you could just

4   read off the numbers?

5   A.     26 days, 148 days, 118, 209, 209, 134.

6   Q.     Okay.

7   A.     179.

8   Q.     Okay.

9   A.     56, 26.

10  Q.     That's good, sir.

11         MR. McCALL:  And you can back out, Ms. Lotharp.

12  And if you can keep scrolling down.  Please stop there.

13  BY MR. McCALL:

14  Q.     And do you see Mr. Terranova's name; is that right?

15  A.     I do.

16         MR. McCALL:  And if you could expand.  Yes.

17  BY MR. McCALL:

18  Q.     And, again, some of the days past due for Mr.

19  Terranova.  Just start at the blowup that Ms. Lotharp has

20  put on your screen.  Read the first three.

21  A.     360, 330.

22  Q.     That's fine.  Okay.

23         MR. McCALL:  You can back out, Ms. Lotharp.

24         All right.  And then if you can go back to 493,

25  and if you could expand the top half of the e-mail.  All of

3928

Conway - direct

1   it.  Thank you.

2   BY MR. McCALL:

3   Q.     All right.  Now, the top half of this e-mail chain,

4   the e-mail is from you; is that correct, Mr. Conway?

5   A.     Yes.

6   Q.     To -- who is listed in the to line?  Could you tell

7   us?

8   A.     That's the world.  That's everybody at the bank.

9   Q.     At the bank; right?

10  A.     In the commercial side of the bank, yes.

11  Q.     At the commercial side of the bank?

12  A.     Yes.  Pennsylvania, Princeton, Baltimore.

13  Q.     All right.  It's cc'd to Mr. North; is that correct?

14  A.     Yes.

15  Q.     What is the date?

16  A.     October 29th.

17  Q.     2009; is that correct?

18  A.     Yes.

19  Q.     Subject line is:  Forward:  Past dues 10/31; right?

20  A.     Yes.

21  Q.     Attachments:  Past due loans_10/27-09.xls; correct?

22  A.     Yes.

23  Q.     Could you please read the text into the record?

24  A.     To all, as most of you know, the usual

25  end-of-the-quarter past due cleanup must now be done

3973

Conway - direct

1   process that was occurring at the surge?

2   A.   Yes.

3   Q.   And what was, what was the -- what was the outcome?

4   A.   This -- this reminds me that from time to time, Terry

5   must have given us an update on how the surge was going at

6   the Mid-Atlantic meeting monthly, and as a result of the

7   review by the, the lenders from out of the market, they

8   determined that some of the credits needed to be downgraded,

9   and there were more downgrades than upgrades.

10  Q.   Now, the surge you indicated started in January of

11  2010. Is that right, Mr. Conway?

12  A.   I don't remember the exact date. I will -- I'm

13  assuming you're correct.

14  Q.   Well, I don't want you to assume.

15  A.   I don't know exactly when it started.

16  Q.   Okay. Do you recall when the -- were you aware the

17  capital raise occurred at the bank in February of 2010?

18  A.   I don't recall that.

19  Q.   Do you recall -- did you know about it after the

20  fact?

21  A.   I remember talk of the capital raise. I didn't

22  remember much beyond that.

23  Q.   If a loan is downgraded, how does that impact the

24  ability to get an extension in place for the loan?

25  A.   Well, if a loan is downgraded, presumably, it has been

3974

Conway - direct

1   turned over to loan recovery, and at that point it's up to

2   them to manage the process. In most cases, those loans are

3   not extended because for whatever reason, and I -- those

4   loans are better off left alone because they're easier to

5   collect from what I remember.

6   Q.   When you say they're easier to collect, what do you

7   mean by that, sir?

8   A.   Well, if it goes to loan recovery, they're going to

9   make an effort to -- they are going to sell collateral, sell

10  equipment or something to generate funds in order to pay the

11  loan down. That's the whole idea. Once the loan gets to

12  loan recovery, they want to pay off the debt. So in many

13  cases, they leave everything in place. They don't want to

14  extend it. They want to go to court and try to collect the

15  debt.

16  Q.   The loans that had been extended to April 1st, 2010,

17  that we've been talking about?

18  A.   Yes?

19  Q.   Do you know what happened to them around that

20  April 1st time frame when they reached their, the maturity

21  of their short-term extension?

22  A.   I don't necessarily recall. Maybe some were extended

23  further. I'm not sure.

24  Q.   Do you know if there were more short-term extensions

25  in place for those loans?

3975

Conway - direct

1   A.   I don't recall.

2   Q.   Did the bank -- did the bank at some point change the

3   practice of waiving loans that were current for interest and

4   in process of extension?

5   A.   What I recall the most was at the end of March 2010,

6   2010, Mr. Cecala put out word that unless a matured loan,

7   whether it be -- well, current for interest, if it -- unless

8   it was approved, had been through the approval process,

9   documentation issued, signed and booked, they were not going

10  to be waived.

11  Q.   Now, were you part of -- were you part of the

12  discussion to change the policy at the bank?

13  A.   Not that I recall.

14  Q.   If I show you a document, would that maybe refresh

15  your memory, Mr. Conway?

16  A.   I guess.

17  Q.   Could you go to the first tab of your binder, sir.

18           All right. Could you turn to page 205. And if

19  you could look at line 10 and then read through page 206,

20  10.

21           (Pause while witness reviewed transcript.)

22  BY MR. McCALL:

23  Q.   Does that refresh your memory?

24  A.   Well, it does. Maybe I misunderstood your question.

25  When you said -- we had been talking about changing this

3976

Conway - direct

1   policy for the previous six, eight months.

2   Q.   Okay.

3   A.   I guess when you said to me, was I -- was I part of

4   the discussion that led to Mr. Cecala towards the end of

5   March 2010 saying, no more, we're not going to do this

6   anymore, I mean, I wasn't in a discussion with him.

7   Q.   Understood. Who were you talking about it with?

8   A.   Well, we had been talking among ourselves, Mr. North

9   and others, in the previous six, eight months. I think we

10  looked at some e-mails talking about, we're not going to do

11  this anymore. We have a plan. So I guess I misunderstood

12  your question.

13  Q.   It probably wasn't a great question.

14  A.   Okay.

15  Q.   So you were talking about this, you say, amongst

16  yourselves with people like Mr. North; is that right?

17  A.   Sure.

18  Q.   And why the need for the policy change?

19  A.   It seemed to me someone had to make a decision so that

20  you had a definitive set of policies to say, okay. Unless

21  it's done, it has been to committee, or whatever the

22  approval process is, it's ready to go, documents have been

23  signed, change in terms have been signed therein and they've

24  been given to loan accounting, until it's booked.

25  Q.   But why, why change it? If that's how it had been

3989

Conway - cross

1   A.   Correct.

2   Q.   And so it was not surprising that in some of those

3   instances, it was taking a significant amount of time to put

4   together all of that material.  Is that a fair statement?

5            MR. McCALL:  Objection.  Speculation.

6            THE COURT:  Overruled.

7            THE WITNESS:  Yes, it is.

8   BY MR. LAWLER:

9   Q.   And you also had been asked a number of questions

10  about the Officer Portfolio?

11  A.   Yes.

12  Q.   Now, that was something that was provided by the bank

13  to assist the relationship managers; is that correct?

14  A.   Yes.

15  Q.   The idea was, give them the information early so they

16  can get started on renewing the loan, and so they had, would

17  have information available as to what loans were coming up

18  on their maturity date?

19  A.   Yes.  If they used the product, they would look out

20  six months and they could see what loans were maturing in

21  their portfolio.

22  Q.   And I've read a fair number of your e-mails over the

23  course of time, and is that something you were particularly

24  in favor of, getting the relationship managers to focus on

25  the Officer Portfolio?

3990

Conway - cross

1   A.   Yes.

2   Q.   And for the very reason that they would get a head

3   start?

4   A.   Yes.

5   Q.   You also described the monthly reports that were

6   produced that contain the information on matured and

7   maturing loans?

8   A.   Yes.

9   Q.   And when did you first become involved in that

10  process?

11  A.   Probably -- I'm trying to remember when I became chief

12  operations officer of the Mid-Atlantic market:  I'm thinking

13  it was '07/08.  So right around that time I would start to

14  try to look at those numbers, yes.

15  Q.   I can show you a document that shows you cc'd as of

16  2005.  Would that refresh your recollection or will you

17  accept that?

18  A.   I will accept that.

19  Q.   Then I will save time by not showing it to refresh

20  your recollection.

21           And directing your attention to 2006, that was a

22  good year for the bank, a good year for the economy

23  generally?

24  A.   Yes.

25  Q.   And things were good at the bank?

3991

Conway - cross

1   A.   Yes.

2   Q.   You made a lot of loans during that period of time

3   because the economy and the housing market were doing very

4   well?

5   A.   They were, yes.

6   Q.   And the bank was doing very well during that period of

7   time?

8   A.   We were.

9   Q.   And isn't it a fact that in 2006, every month the bank

10  did the same thing with respect to the delinquency report

11  and the waiver of matured loans that were current for

12  interest and in the process of renewal?

13  A.   That had always been our policy, so I assume we, we

14  did that in 2006.

15  Q.   Well, let me show you a document.  Would you look in

16  your binder at DX- 1499.

17           (Pause while witness reviewed exhibit.)

18  BY MR. LAWLER:

19  Q.   Would you hold off a minute?  Have you found it?

20  A.   I did.

21  Q.   Good.

22           (Pause.)

23           MR. LAWLER:  Your Honor, I move this into

24  evidence.

25           MR. McCALL:  No objection.

3992

Conway - cross

1            THE COURT:  All right.  Admitted without

2   objection.

3            (DX-1499 was admitted into evidence.)

4            MR. LAWLER:  May we publish it, please?

5            THE COURT:  Yes.

6   BY MR. LAWLER:

7   Q.   Mr. Conway, can you see that you are listed there?

8   You may be listed twice.

9   A.   Yes.

10  Q.   And this is the type of e-mail we've been discussing

11  from Mr. Irwin sending around?

12  A.   Correct.

13  Q.   And they're talking about potential waivers, are they

14  not?

15  A.   Yes.

16  Q.   And so even in 2006 -- not even.  In 2006, when the

17  economy was good, the bank was doing well, we still had the

18  issue of loans that were mature, interest current, but the

19  paperwork wasn't done yet; is that correct?

20  A.   That's correct.

21  Q.   In 2009 things were bad, weren't they?

22  A.   Yes, they were.

23  Q.   For all the reasons that you have described

24  previously?

25  A.   Yes.

3993

Conway - cross

1   Q.    So would it be a fair statement to say in good times
2   or in bad times, the bank was consistent in that it treated
3   loans that were mature, interest current, in the process of
4   renewal as not past due?
5   A.    That's correct.
6   Q.    Thank you.
7           You've described your role with respect to the
8   process, the waiver process?
9   A.    I didn't actually do the waivers.
10  Q.    No. I understand.
11  A.    I was a scorekeeper.
12  Q.    Let me -- would I be correct -- we're talking about
13  waivers, and I would like to sort of clarify it for the
14  jury.
15          A report is prepared and it contains a lot of
16  information and it shows certain loans that have matured.
17  They may be matured 30 days, 90 days.  And they're going
18  to -- they go out, they're sent out to the relationship
19  managers because they say we're preparing the past due
20  report.  And the relationship manager looks at it and says,
21  no, no, no.  This doesn't belong here because he's current
22  for interest and we're in the process of having discussions.
23  He's getting materials to me.  He's giving me updated
24  finances.  We're about to renew the loan.  We're going to
25  renew the loan.  Is that correct?

3994

Conway - cross

1   A.    That's correct.
2   Q.    So it doesn't belong on this list, and therefore, take
3   it off the list, and that became known as a waiver?
4   A.    That's correct.
5   Q.    It's a waiver from an internal document of the bank;
6   is that correct?
7   A.    Right.
8   Q.    Now that we're talking about the same thing, I will
9   continue.
10  A.    Okay.
11  Q.    You described yourself as a scorekeeper?
12  A.    Yes.
13  Q.    And in what sense did you view yourself as a
14  scorekeeper?
15  A.    As I, as I mentioned, the Shaw download at the end of
16  each month was reworked by Wayne Irwin, producing the Excel
17  spreadsheet that listed the past due loans and so forth.  So
18  in that sense -- and I took that information and I pushed it
19  out to the various people that needed to see it, the
20  lenders, the market presidents and so forth.  And it's from
21  that decisions were made identifying the matured loans that
22  were current for interest that could be, that could be
23  waived off the system.
24          So I was just providing the information, so I
25  was just keeping score.  I didn't -- I didn't actually waive

3995

Conway - cross

1   the loans.  I just provided the information with which to
2   make those decisions.
3   Q.    And you periodically obtained information though; is
4   that correct?  You talked about the walk-around?
5   A.    Well, that was the end of each quarter.
6   Q.    And that related to payments.  It didn't relate to
7   loans that were matured?
8   A.    No.
9   Q.    Current for interest?
10  A.    No.
11  Q.    That was --
12  A.    They were actually past due loans that we were working
13  on to get paid by the end of the quarter.
14  Q.    So you are talking about actual past due loans?
15  A.    Yes.
16  Q.    And the idea was to find out whether the information
17  on the sheet was correct or whether a payment had been made?
18  A.    That --
19  Q.    Had been made.  Excuse me.
20  A.    That could be.  There were a variety of reasons why
21  they were on that list.  They were actually past due.  It's
22  possible payment was made and misapplied.  It's possible a
23  payment was made in the branch system, which took two days
24  to post, and if you were looking at that at the very last
25  day of the month, they would show as past due, but when

3996

Conway - cross

1   posted, it would come off the list.
2           So there were a lot of different reasons why,
3   and that's the walk around list that we walked our way
4   through.
5   Q.    And the idea was to get the information as quickly as
6   possible so you could correct the report?
7   A.    Correct.
8   Q.    And report an accurate number?
9   A.    Exactly right.
10  Q.    And did you follow up with respect to what the
11  relationship managers told you, or did you accept what they
12  told you and pass that on?
13  A.    We accepted what they said.
14  Q.    And --
15  A.    Yes.
16  Q.    In a certain sense you had to rely on the relationship
17  managers; right?
18  A.    Correct.
19  Q.    Now, do you remember as you approached 2009, the
20  number of matured loans was growing?
21  A.    Yes.
22  Q.    And I think you've already said this, but let me just
23  cover it briefly again.  A lot of loans had been written
24  during the good times, 2005, 2006, three years, four years,
25  and now they were coming due.

4009

Conway - cross

1   A.   Get them off and they would come off the system and go
2   away.
3   Q.   And let me direct your attention to the next-to-last I
4   think two sentences of it, where you say, this has the
5   attention of all the wrong people.  You were asked questions
6   about the examiners and the auditors.  You also say Ted, Bob
7   and Dave.
8        For the record, would you make clear who you are
9   referring to?
10  A.   Ted Cecala, Bob Harra and Dave Gibson, members of
11  senior management.
12  Q.   And you were suggesting, were you not, that it was
13  important that these people, relationship managers and their
14  supervisors, start getting these loans renewed, start
15  getting paperwork done; is that correct?
16  A.   That's correct.
17  Q.   And in doing that, you say, this has the attention of
18  all the wrong people, meaning if they don't do that, there
19  may be trouble for them.  Is that a fair statement?
20  A.   I think that's fair.
21  Q.   And you were trying to get their attention.  That is,
22  the relationship managers?
23  A.   Ultimately, yes.
24  Q.   Through their supervisors?
25  A.   Yes.

4010

Conway - cross

1   Q.   Hopefully, it would have some effect in bringing about
2   the result you wanted; is that correct?
3   A.   Correct.
4   Q.   Now, in this effort to renew loans by year-end, was
5   there a plan as to how to do that?  Let me rephrase the
6   question.
7        Did you put together, or did -- were you part of
8   a group that put together a plan to get additional personnel
9   to focus on these loans that had to be renewed by the
10  year-end?
11  A.   I wasn't part of the group that put that together.
12  The real estate group pretty much on their own, Mr. Brewer,
13  Terry Brewer and so forth were the ones who spearheaded the
14  surge, which I guess is what you are referring to.
15  Q.   No, I'm not referring to the surge.
16  A.   Oh.
17  Q.   I'm talking about the extensions, the short-term
18  extensions at the end of the year.  It has been referred to
19  as the catch-up extensions?
20  A.   Was I part of that plan?
21  Q.   Were you present when that was discussed?
22  A.   I don't think so.  I don't recall being present when
23  they talked about that.
24  Q.   And were you advised of the results of some
25  conversations?

4011

Conway - cross

1   A.   Yes.
2   Q.   Because we saw a document earlier where two separate
3   lists were presented to you; is that correct?
4   A.   Yes, that's correct.
5   Q.   And you didn't put those together because you didn't
6   have the computer skills to do that?
7   A.   Right.  That's correct.
8   Q.   But you distributed those lists?
9   A.   Right.
10  Q.   So in that sense, you played a role in the process?
11  A.   Okay.  Yes.
12  Q.   And did you understand that Mr. Brewer was running
13  this?
14  A.   For the most part, yes.
15  Q.   With respect to the, this process or this plan, am I
16  correct that Mr. Harra didn't tell you to do that?
17  A.   He did not.
18  Q.   And did you put in a lot of time in terms of trying to
19  get these loans renewed over the next three months?
20  A.   I did not.  I did not personally put in a lot of time
21  or whatever.  It had been pushed out to the market managers,
22  the market presidents and so forth.  It was up to them to
23  encourage their -- the lenders to get it done.
24  Q.   And are you aware whether they put in a lot of time?
25  A.   I am not.

4012

Conway - cross

1   Q.   Did you send out a message or e-mail asking the
2   relationship managers or their supervisors to keep you
3   informed as to the progress?
4   A.   Generally, no, but I think there was one, I think
5   there was one e-mail in there that we asked them to keep
6   three or four of us apprised.  I forget which -- I think it
7   was the Baltimore market.  We asked them to keep myself,
8   Bill North -- there were two or three names on that e-mail,
9   to keep us apprised.
10  Q.   Let me try and refresh your recollection.  Would you
11  look at DX-1778.
12  A.   Apparently, I did.
13  Q.   Does that refresh your recollection --
14  A.   Yes.
15  Q.   -- that you asked people to get back to you?
16  A.   Yes.
17  Q.   And does it refresh your recollection that people,
18  relationship managers and others, did get back to you?
19  A.   I don't recall getting a long list of information on
20  accounts that were renewed or extended.  I don't recall
21  that.
22  Q.   You don't recall that?
23  A.   No.
24  Q.   How about people getting back to you saying, this is
25  the status of the renewal.  We have a signed CITA.

4443

1               - PORTIONS UNDER SEAL -

2                  - VOLUME 16 -

3          IN THE UNITED STATES DISTRICT COURT

4          IN AND FOR THE DISTRICT OF DELAWARE

5                      - - -

6   UNITED STATES OF AMERICA,      :   CRIMINAL ACTION
                                   :
7                Plaintiff,        :
                                   :
8      vs.                         :
                                   :
9   DAVID R. GIBSON, ROBERT        :
    V.A. HARRA, WILLIAM            :
10  NORTH, and KEVYN RAKOWSKI,     :
                                   :
11                                 :
                 Defendants.   :   NO. 15-23-RGA
12

13                              - - -

14

                    Wilmington, Delaware
15                  Tuesday, April 3, 2018
                    8:34 o'clock, a.m.
16
                               - - -
17
    BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
18  jury

19                              - - -

    APPEARANCES:
20

21           LESLEY F. WOLF, ESQ.,
             ROBERT F. KRAVETZ, ESQ. and
22           JAMIE M. McCALL, ESQ.
             Assistant United States Attorneys
23

24           Counsel for Plaintiff

25                   Valerie J. Gunning
                     Leonard A. Dibbs

4528

Terranova - cross

1   A.   Yes.

2   Q.   Took your word for it?

3   A.   Yes.

4   Q.   And that was true throughout the entire period; is

5   that right?

6   A.   That's correct.

7   Q.   Okay.  Let's take a look at some documents here.

8   Please, I think Government Exhibit 6409 is in evidence,

9   and I'm asking for direction as to whether I need to move

10  it.

11          MR. WOOD:  All right.  I'm going to assume that

12  it isn't, Your Honor.  It will only take a minute, if it

13  pleases the Court.

14          THE COURT:  Well, you might as well work on that

15  principle because that will probably get there faster than

16  trying to keep track of all of these things.

17          MR. WOOD:  That was my thought.

18  BY MR. WOOD:

19  Q.   In that same black binder, Mr. Terranova, look at

20  GX-649, please.

21  A.   649?

22  Q.   Yes, sir.

23  A.   I don't have it in the same black binder.

24  Q.   Okay.  All right.

25  A.   Oh, wait.  I'm sorry.  I do have it.  I apologize.

4529

Terranova - cross

1   Q.   Okay.  Well, you're one step ahead of me then.

2   A.   Okay.  I've got it now.

3   Q.   All right.  Take a look at that, please.  And that is

4   an e-mail; right?  You recognize it as such from Wayne

5   Irwin?

6   A.   I do.

7   Q.   Okay.  And your name is on it; right?

8   A.   Yes.

9   Q.   Okay.

10          MR. WOOD:  Your Honor, move for the introduction

11  into evidence of GX-649.

12          MR. McCALL:  No objection.

13          THE COURT:  All right.  Admitted without

14  objection.

15          (GX-649 was admitted into evidence.)

16          MR. WOOD:  Thank you.

17          Brian, if we can take a look at the e-mail, and

18  if you can start with what is at the bottom of the e-mail,

19  starting with the icon indicating, attached file.  That's

20  perfect.  Thank you.

21  BY MR. WOOD:

22  Q.   All right.  Now, what Wayne Irwin is communicating

23  is:  Attached, or enclosed, Your Honor, is the final past

24  due report for August 2005.

25          Right?

4530

Terranova - cross

1   A.   Yes.

2   Q.   Please e-mail me if you have any loans that should be

3   waived from this report due to administrative issues.

4          And then the first one says, loans

5   matured/interest current/extension in process.

6          Right?

7   A.   That's correct.

8   Q.   And then he wants to know if there's some problem with

9   participation payments; right?

10  A.   That's correct.

11  Q.   And a participation payment occurs when Wilmington

12  Trust FSB (interest current) is sharing the total amount of

13  the loan with Wilmington Trust Corporation in Delaware;

14  right?

15  A.   That's one participation scenario.

16  Q.   Okay.  Good.  But it's when the various corporate

17  chunks of Wilmington Trust are sharing a loan; right?

18  A.   It could be another bank.

19  Q.   I was going to get to that.  It could be another bank,

20  but that's what that is.

21          And then billing issues in general.  Is that

22  right?

23  A.   That's correct.

24  Q.   And that's because sometimes customers would pay loans

25  on time, and this is back in 2005, when people still wrote

4531

Terranova - cross

1   checks?

2   A.   That's right.

3   Q.   So the check would wind up in the wrong place

4   sometimes; right?

5   A.   Correct.

6   Q.   Or it might take a couple of days to physically go

7   from whatever branch they dropped it at to come here to

8   Wilmington to be recorded; right?

9   A.   That's correct.

10  Q.   Things like that would happen.  Okay.

11          MR. WOOD:  Now, Brian, if we could look at the

12  top.

13  BY MR. WOOD:

14  Q.   Every one of those lines has one or two or three

15  people that the past due report went to every single month.

16  Agreed?

17  A.   Agreed.

18  Q.   You're in there somewhere; right?

19  A.   I am.

20  Q.   You've been gracious in accepting representation, so

21  let me make one now to save time.

22          Would you agree with me there are about 60 or 70

23  people on that e-mail?

24  A.   That looks about right.

25  Q.   Okay.  Ish; right?  Okay.

4532

Terranova - cross

1    MR. WOOD:  Thank you, Brian.

2    BY MR. WOOD:

3    Q.    So it certainly wasn't a secret in 2005 that Wayne

4    Irwin was saying to folks, let me know if a loan is mature,

5    current for interest, and in the process of extension,

6    because if it is, it's not past due; right?

7    A.    That's correct.

8    Q.    All right.

9          MR. WOOD:  Now, Brian, if we can see DX-1222,

10   this is admitted.

11         Okay.  The bottom, please.  I guess it's the

12   next page.  All the way down.  There we go.

13         Start with the icon, please.  There we go.

14   BY MR. WOOD:

15   Q.    All right.  This is another past due report e-mail

16   from Wayne Irwin -- I'm sorry, Brian.  I gave you bad

17   directions.  Would you mind scrolling up so we can see the

18   date.

19         Okay.  December 29th, 2009; is that right?

20   A.    Yes.

21   Q.    Okay.  Now, can we see all of the folks it was sent

22   to?

23         If I told you there were 72 people on that

24   e-mail, would you accept that representation, sir?

25   A.    Yes.

4533

Terranova - cross

1    Q.    Okay.  So in December of 2009, there was nothing

2    secret about the bank waiving mature, current for interest

3    real estate loans in the process of extension from the past

4    due report, was there?

5    A.    Will you repeat that question, please?

6    Q.    Yes.  In December of 2009 -- I will ask it this way.

7    In December of 2009, the bank was making no secret of the

8    fact that a mature, current for interest real estate loan in

9    the process of extension would not be recorded as past due.

10   And when I say "making no secret," everybody in the bank

11   knew what was going on; right?

12   A.    That's correct.

13   Q.    And it never occurred to you back then that there was

14   anything secret about this at all; is that right?

15   A.    No.

16   Q.    Take a look, please, in your binder at DX-1282.

17         MR. WOOD:  And we can take that down.  Thank

18   you, Brian.

19         THE WITNESS:  I'm sorry.  "B" or "D"?

20   BY MR. WOOD:

21   Q.    "D" David, 1282.

22   A.    Sir, can you give me the number again?

23   Q.    Sure.  DX, "D" David, 1282.  It should be in the black

24   binder that says Joe Terranova B.

25   A.    I have it.

4534

Terranova - cross

1    Q.    Thank you, sir.

2          All right.  It's an e-mail chain; right?

3    A.    Yes.

4    Q.    The bottom of it is an e-mail from Karen Thuresson to

5    you, and then you turn around and forward that e-mail to the

6    folks who worked for you; right?

7    A.    That's correct.

8    Q.    Okay.

9          MR. WOOD:  Your Honor, I move for the

10   introduction into evidence of Defense Exhibit 1282.

11         MR. McCALL:  May I have one moment, Your Honor,

12   please?

13         THE COURT:  Yes.

14         (Pause.)

15         MR. McCALL:  Judge, may we come to sidebar,

16   please?

17         THE COURT:  All right.

18         (Sidebar conference held out of the hearing of

19   the jury as follows.)

20

21

22

23

24

25

4535

Terranova - cross

4981

1                    - VOLUME 18 -

2           IN THE UNITED STATES DISTRICT COURT

3           IN AND FOR THE DISTRICT OF DELAWARE

4                       - - -

5     UNITED STATES OF AMERICA,      :   CRIMINAL ACTION
                                     :
6                   Plaintiff,       :
                                     :
7          vs.                       :
                                     :
8     DAVID R. GIBSON, ROBERT        :
      V.A. HARRA, WILLIAM            :
9     NORTH, and KEVYN RAKOWSKI,     :
                                     :
10                                   :
                    Defendants.   :   NO. 15-23-RGA
11

12
                            - - -
13
                          Wilmington, Delaware
14                        Thursday, April 5, 2018
                          8:17 o'clock, a.m.
15
                            - - -
16
      BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17    jury

18                          - - -
      APPEARANCES:
19

20           LESLEY F. WOLF, ESQ.,
             ROBERT F. KRAVETZ, ESQ. and
21           JAMIE M. McCALL, ESQ.
             Assistant United States Attorneys
22

23               Counsel for Plaintiff

24                       Valerie J. Gunning
                         Leonard A. Dibbs
25                       Official Court Reporters

5190

Brewer - cross

1   A.   Every one that was presented in front of me, yes.
2   Q.   And you relied on what was written on all of those
3   LADS and in all of those write-ups, didn't you?
4   A.   That is correct.
5   Q.   All right.  And you believed that the RMs who filled
6   those out and handed them to you were telling the truth?
7   A.   Absolutely.
8   Q.   All right.  And if somebody said that you knew that
9   the LADS contained lies, you would disagree with that,
10  wouldn't you?
11  A.   At that point in time?
12  Q.   Yes.
13  A.   If somebody came to me and said, there's various lies
14  in those term sheets, would I disagree with them?
15  Q.   Yes.
16  A.   It depends on who the source was.  Who is telling me
17  there was lies in there?  If Karen Thuresson told me there
18  were lies in there, I would have taken that seriously.
19  Q.   Did that happen?
20  A.   I don't recall.  I'm using that as an example.
21  Q.   Sure.
22  A.   I can't use a generalization saying, somebody came up
23  off the street to me and said there are lies in there.
24  Probably not a credible source.  But if a credible source
25  came up to me, I probably would take them seriously.

5191

Brewer - cross

1   Q.   Did you approve any short-term extensions in 2009
2   on the basis of a LADS or a write-up that you knew was
3   false?
4   A.   No.
5   Q.   Now, when you were satisfied with the LADS, you were
6   satisfied that this loan did not slap you in the face and
7   say, holy cow, this thing is on fire?
8   A.   Yes.
9   Q.   Right.  What would you do with that?
10  A.   I would initial it and put it in a package to submit
11  to Bill North to go over with Bill North.
12  Q.   Okay.  And maybe that would go to work out or
13  something else?
14  A.   I don't recall what step was after that, after that.
15  Q.   All right.  But if a loan had a glaring problem, you
16  would not sign off on a short-term extension; is that
17  correct?
18  A.   That's correct.
19  Q.   All right.  But if you thought, no, this thing is
20  okay, there's enough here, let's get our arms around the
21  rest of it, you would say, let's give it a short-term
22  extension?
23  A.   Yes.
24  Q.   And then you would pass that on to Mr. North?
25  A.   Yes.

5192

Brewer - cross

1   Q.   And what would he do?
2   A.   Well, as I recall, I tried to discuss each one of them
3   with Mr. North as well.
4   Q.   Okay.
5   A.   And then he would submit them to present to the loan
6   committee.
7   Q.   All right.  You were Mr. North's commercial real
8   estate specialist, weren't you?
9   A.   Yes.
10  Q.   You had the expertise that he didn't have?
11  A.   Okay.
12  Q.   Am I right?
13  A.   The experience he didn't have.
14  Q.   Okay.  From your impression, did he rely upon your
15  experience?
16  A.   Absolutely.
17  Q.   So after the two of you did what you did, these went
18  to loan committee?
19  A.   Yes.
20  Q.   And loan committee then ratified the short-term
21  extensions?
22  A.   Yes.
23  Q.   And, in fact, there were times in December of 2009
24  where you actually chaired the loan committee because Mr.
25  North could not be there?

5193

Brewer - cross

1   A.   That is correct.
2   Q.   Now, when you -- we talked this morning.  Maybe I went
3   on too long on it, but you did spend time getting familiar
4   with the commercial real estate relationships throughout
5   2008 and 2009; is that right?
6   A.   Yes.
7   Q.   Did you draw upon the knowledge and your feel that you
8   got from those, from that work when you were doing these
9   approvals and the short-term extensions?
10  A.   Yes.  I would say certainly.
11  Q.   Okay.  Ultimately, these extensions were judgment
12  calls, weren't they, to a degree?
13  A.   Oh, yes, absolutely.
14  Q.   Just like any other credit decision?
15  A.   Yes.
16  Q.   Yes.  Now, not every loan that was considered in this
17  time period was actually extended, was it?
18  A.   No.
19  Q.   Some were sent to workout?
20  A.   Yes.
21  Q.   Some borrowers were kind of shown the door?  They paid
22  it off, they got another loan at another bank and off they
23  went; is that right?
24  A.   I don't recall.
25  Q.   Okay.

5194

Brewer - cross

1       MS. WOLF:  Your Honor, can we just pinpoint a
2   time frame for that question?
3       MR. WILKS:  The short-term extension process is
4   December of 2009.
5       THE WITNESS:  Okay.
6   BY MR. WILKS:
7   Q.    Did you understand that to be my question?
8   A.    I think you were referring to 2009 into the first
9   quarter of 2010; right?
10  Q.    Well, these short-term extensions that Ms. Wolf talked
11  to you about --
12  A.    Yes.
13  Q.    -- the idea was, let's get these extensions done by
14  the ends of the year 2009?
15  A.    Yes.
16  Q.    Are you saying they continued on into 2010?
17  A.    I understand the time frame.
18  Q.    Or no?
19  A.    We just went through an exercise where we are looking
20  at March 1st dates again, too.
21  Q.    We'll get to that.
22  A.    I'm just making sure I'm talking to the right, the
23  right time frame.
24  Q.    I got it.  Okay.
25       Was this process a secret?

5195

Brewer - cross

1   A.    Oh, no.  No.  I think we saw some prior documents
2   where it was communicated to others.
3   Q.    Communicated pretty widely been the bank, wasn't it?
4   A.    Yes.
5   Q.    And your primary concern through this process was to
6   avoid exposing Wilmington Trust to additional risk.  Is that
7   fair to say?
8   A.    Yes.  Trying to protect the bank and make things
9   transparent.  There was immediate concern.
10  Q.    All right.  You didn't just rubber stamp these
11  extensions?
12  A.    No.
13  Q.    You didn't take any steps to hide these extensions,
14  did you?
15  A.    I did not.
16  Q.    All right.  From the point of view in 2009, was this
17  short-term extension project some sort of a tricky,
18  deliberate plot to hide matured loans?
19       MS. WOLF:  Objection, Your Honor.
20       THE COURT:  I'm going to overrule the objection.
21       THE WITNESS:  I'm sorry.  I'm sorry.  I didn't
22  hear what the Judge said.
23  BY MR. WILKS:
24  Q.    I'm happy to ask it again.
25       From Your point of view, sir, was this project

5196

Brewer - cross

1   that we talked about for hours, I suppose, this project of
2   extending these matured loans for short-term basis in
3   December of 2009, was that a deliberate, tricky plot to hide
4   matured loans?
5   A.    Absolutely not.
6   Q.    Did you actually -- did you actually work hard on
7   that?
8   A.    I worked very hard.
9   Q.    Touch all the loans?
10  A.    Every one of those loans I signed an extension on
11  them.  I touched a little bit, yes.
12  Q.    Every loan that had a short-term extension in December
13  of 2009, you touched it?
14  A.    That I signed off on.
15  Q.    That you signed off on.  You touched it?
16  A.    Yes.
17  Q.    You didn't wave the magic wand?
18  A.    No.
19  Q.    I think you've made it pretty clear.  You understood
20  that RMs, relationship managers, were getting signed change
21  in terms agreements on these short-term extensions.  You
22  understood that, didn't you?
23  A.    Yes.
24  Q.    And the way that would work, that would happen after
25  you signed -- Mr. North signed and after loan committee

5197

Brewer - cross

1   wrapped on it; right?
2   A.    Yes.
3   Q.    You would never get the borrower to sign a change in
4   terms agreement before it was ever -- before the bank ever
5   approved it, did you?
6   A.    Terry Brewer would not.
7   Q.    Well, there were some Joe Terranovas of the world.
8   They did stuff like that?
9   A.    Yes, they did.
10  Q.    And they got caught for it and et cetera?
11  A.    That is correct.
12  Q.    All right.  But you didn't understand that to be
13  happening in this short-term extension project?
14  A.    When that was -- that time frame, we're being relative
15  to that time frame; right?
16  Q.    Yes, sir?
17  A.    Back in 2009 when this was happening, I did not
18  believe that that was a blame we were legitimately getting
19  things signed as the plan outlined.
20  Q.    All right.
21       MR. WILKS:  Could we see Government Exhibit 908
22  that was introduced earlier today.
23  BY MR. WILKS:
24  Q.    It's not in the blue one.  I'm sorry, Mr. Brewer.
25       I'm not sure the climb is worth the view.  If

5301

```
 1                        - VOLUME 19 -

 2              IN THE UNITED STATES DISTRICT COURT

 3              IN AND FOR THE DISTRICT OF DELAWARE

 4                          - - -

 5   UNITED STATES OF AMERICA,      :    CRIMINAL ACTION
                                    :
 6                 Plaintiff,       :
                                    :
 7        vs.                       :
                                    :
 8   DAVID R. GIBSON, ROBERT        :
     V.A. HARRA, WILLIAM            :
 9   NORTH, and KEVYN RAKOWSKI,     :
                                    :
10                                  :
                   Defendants.      :    NO. 15-23-RGA
11

12                                  - - -

13
                            Wilmington, Delaware
14                          Monday, April 9, 2018
                            9:05 o'clock, a.m.
15
                                  - - -
16
     BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17   jury

18                          - - -
     APPEARANCES:
19

20           LESLEY F. WOLF, ESQ.,
             ROBERT F. KRAVETZ, ESQ. and
21           JAMIE M. McCALL, ESQ.
             Assistant United States Attorneys
22

23               Counsel for Plaintiff

24                       Valerie J. Gunning
                         Leonard A. Dibbs
25                       Official Court Reporters
```

5534

Depman - cross

1    If you go to the last page, Mr. Cooper.

2    BY MR. BREEN:

3    Q.    Take a look at this document, if you would.  It's 799.

4    A.    On your -- in your book?

5    Q.    Yes.  And this is different from the work papers I've

6    been looking at, which were the work papers for KPMG?

7    A.    Right.  This appears to be Wilmington Trust services

8    work paper.

9         MR. BREEN:  Right.  Move to admit.

10        MR. KRAVETZ:  Objection, Your Honor.  No

11   foundation that this witness has reviewed the particular

12   Wilmington Trust internal work papers.

13        MR. BREEN:  It's stipulated that the work papers

14   are business records.  I'm moving to admit it.  It's

15   relevant to the discussion, Your Honor, and I would like to

16   ask questions about it.

17        THE COURT:  All right.  So the objection is not

18   going to admissibility, it's going to its use with this

19   witness?

20        MR. KRAVETZ:  Correct, Your Honor.

21        THE COURT:  All right.  Well, I'm going to admit

22   it.  And, Mr. Breen, you can try.

23        MR. BREEN:  Thank you.

24        (Government Exhibit No 814 was admitted into

25   evidence.)

5535

Depman - cross

1    BY MR. BREEN:

2    Q.    All right.  So with this one, you've already said

3    you're aware that internal audit maintained work papers,

4    which it appears to be; is that correct?

5    A.    This would be normal, yes.

6    Q.    Is that something KPMG reviews in the course of, you

7    know, evaluating direct assistance?

8    A.    Not necessarily.  Any work papers that they might

9    prepare to support our work, yes, but not necessarily their

10   own internal documents.  I have not seen this before.

11   Q.    Okay.  So if you just look at the top there, it's

12   project summary; right?

13   A.    Yes.

14   Q.    And it has that number I referenced before, the one

15   that, you know --

16   A.    Corp-2009-028?

17   Q.    Yes.  Do you recognize that as the one I asked you

18   about before?

19   A.    Yes.

20   Q.    The name, confirmations.  You have talked about the

21   confirmation project?

22   A.    Yes.

23   Q.    Direct assistance.

24        And down under summary of work and testing, you

25   see, down below, Mr. Cooper, right there, the description of

5536

Depman - cross

1    the tests that they performed in connection with the

2    procedures; is that right?

3    A.    Yes.

4    Q.    Go to the second page, please, and the paragraph right

5    under the bullet points.

6         Now, that kind of lines up with some of the

7    documents you were looking at before that consulted with

8    KPMG as necessary throughout the confirmation process

9    regarding the exceptions identified and the adequacy of

10   procedures performed.

11        So is that something that happened?

12   A.    I believe it was, yes.

13   Q.    And then it says, per discussion with KPMG, their

14   disposition of the issues noted by audit services is as

15   follows:

16        And if you go down to, it's the third issue.

17   It's issue 220.

18        Could you read that out loud?

19   A.    Management needs to properly process and account for

20   matured loans.

21   Q.    Keep going, please.

22   A.    KPMG disposition:  This was included in KPMG's

23   deficiency letter to Ted Cecala.  This letter is included in

24   the KPMG's year-end audit committee package.

25   Q.    So I think we saw that letter, right, during the

5537

Depman - cross

1    direct testimony?

2    A.    Yes.

3    Q.    Was that the mature loans deficiency that was --

4    A.    Right.

5    Q.    -- referenced?

6         So because it was an exception, it was provided

7    in connection with the work, that would have been something

8    that KPMG would have focused on; right?

9    A.    Right.

10   Q.    Could have dug down into the issue and decide what

11   kind of, you know, deficiency is it?  Is it a significant

12   deficiency or is it just a deficiency; right?

13   A.    Right.

14   Q.    Did that happen?  Was that something that you and

15   others thought about in putting together the management

16   letter?

17   A.    We thought about what we wrote in the management

18   letter, yes.

19   Q.    And this exception having to do with mature loans,

20   needing to extend them was something that was considered and

21   included in the management letter?

22   A.    I believe that the testimony this morning had a focus

23   on the impact that that could have on the risk rating of the

24   loans and that they should be considered for technical

25   watch.

5538

Depman - cross

1  Q.    I believe you're correct.  But my question is:  This
2  was an issue that has been raised; right?  It has been
3  elevated.  KPMG and internal audit have consulted about it;
4  right?
5  A.    Mm-hmm.
6  Q.    There has been communication of a continuing auditing
7  memo that describes a process for extending the loans;
8  right?
9          And this says that that discussion led to the
10  matured loan comment in the management letter; right?
11  A.    Yes, and other steps happened along the way, such as
12  the test work that was discussed this morning.
13  Q.    I would like to look at another exhibit.
14  A.    Okay.
15          MR. BREEN:  Don't put it up yet, please,
16  Mr. Cooper, but it's DX-4007.
17  BY MR. BREEN:
18  Q.    Do you see that this is an e-mail from Marian Fean to
19  the same guys as before, Jeffrey Donovan and Jeffrey
20  Delozier; right?
21  A.    Yes.
22  Q.    And it also relates to commercial loans, and with it
23  is sent the continuing audit memo regarding the exception
24  noted; right?  The one we referred to before?
25  A.    Okay.

5539

Depman - cross

1  Q.    And --
2  A.    The same one.  It's not attached this time.
3  Q.    It's not attached, but the context makes that clear;
4  right?
5          MR. KRAVETZ:  Objection, Your Honor.  I don't
6  think it does.
7          MR. BREEN:  Well, he can say no.
8          THE COURT:  Well, first off, is this letter
9  actually in evidence?
10          MR. BREEN:  I'm about to ask to admit it.
11          THE COURT:  Okay.
12          MR. BREEN:  I move to admit it as a business
13  record.
14          MR. KRAVETZ:  Objection, since I don't know what
15  the attachment is, Your Honor, and it's unclear whether this
16  is relevant to the same issue, particularly given the
17  information in the first paragraph.
18          MR. BREEN:  It's within seven days of
19  communicating the other continuing audit memo.
20          THE COURT:  Okay.  All right.  So the objection
21  is relevance, so I'm going to admit it.
22          (Defense Exhibit No. 4007 was admitted into
23  evidence.)
24          MR. BREEN:  Okay.  If we could put that up,
25  please, Mr. Cooper, 4007.  And if we can just focus on the

5540

Depman - cross

1  to/from in the first paragraph.
2  BY MR. BREEN:
3  Q.    So will were there any other continuing audit memos
4  that Marian Fean was sending to the same two people as the
5  other one?
6  A.    I really have no idea.  They were continuing.
7  Q.    Yes.
8  A.    That was the nature of these memos.
9  Q.    Hence the name.
10  A.    They continued.
11  Q.    I mean, do you remember getting multiple continuing
12  audit memos from Marian Fean?
13  A.    I don't remember.
14  Q.    The first two weeks in December?
15  A.    I don't remember getting any from Marian Fean.
16  Q.    Okay.  But you see there in the first sentence that
17  they're consulting like they are supposed to, right, about
18  the exception?
19  A.    Yes.  The exceptions.  I don't know what the
20  exceptions are, but, yes, they are.
21  Q.    Well, we talked about the exception in the previous
22  exhibit.  It had to do with mature loans and needing to
23  account for them and extend; right?  That was the exception
24  that was mentioned in the same time period that they're
25  focused on this; right?

5541

Depman - cross

1  A.    Yes, but in the confirmation process, there's all
2  kinds of exceptions that sometimes come up during the
3  reconciliation, you know, change in address, interest rate
4  that got changed and the wrong index was used, and those are
5  things that an internal audit would regularly help us track
6  down and reconcile or correct.
7  Q.    Okay.
8  A.    I'm not sure exactly what this is.
9  Q.    Well --
10  A.    It could be the same thing.  I will say that.
11  Q.    All right.  Can we go down to the next paragraph,
12  please.  That's the continuing audit memo that I referred
13  to; right?
14  A.    No.  It says, I have also attached a continuous
15  auditing memo regarding an exception noted.  I'm not sure
16  which this particular memo related to and I will forward
17  additional CA memos as they are completed.
18          So they did like to write these memos.
19  Q.    Could you go back to Defense Exhibit 79.  The second
20  page, please.
21          Again, audit services consulted with KPMG.  Per
22  discussion with KPMG, their disposition of the issues, which
23  are the exceptions; right?  That's what it says?
24  A.    I'm sorry.  Where are you reading from?
25  Q.    Page 2.

5578

Depman - cross

1   already in evidence as Defendants' Exhibit 1256, please,
2   Brian.
3           All right.  This is already in evidence.
4           And, Brian, could you highlight about ten lines
5   down to KPMG.
6           Do you see that?  And the next line, KPMG.
7           Do you see that, Brian?  All right.
8           And could you go to the next page, Brian, so we
9   can show the whole document.  All right.
10          Let's go back to the first page.  Thank you,
11  Brian.  It makes it easier.  All right.
12  BY MR. KELLY:
13  Q.      This is already in evidence, Mr. Depman, and it's --
14  can you go to the top, Brian, please?  It's dated
15  January 20, 2010, from Jim Mahoney.
16          Do you see that?
17  A.      I see that.
18  Q.      Do you know who Jim Mahoney is?
19  A.      No.
20  Q.      All right.  Can you go to the second page?
21          It says, attached are the fourth quarter 2009
22  commercial officer statistics reports.  The individual
23  officer sheets will be sent to the respective department and
24  division managers under separate e-mail/cover.
25          Do you see that?

5579

Depman - cross

1   A.      I do.
2   Q.      All right.  And this is the kind stuff that you would
3   expect to receive for Wilmington Trust?
4   A.      I'm not sure what this particular report was.
5   Q.      All right.
6   A.      We received many reports from Wilmington Trust.
7   Q.      Well, let's go to the attachment, which is already in
8   evidence, which is 1256-A.
9           Do you see that?  Quarterly commercial loan,
10  quality statistics.
11          Do you see that?
12  A.      Yes.
13  Q.      All right.
14          MR. KELLY:  And, Brian, could you show the
15  document?  And I want you to focus on under delinquency
16  percentages.  There you go.
17  BY MR. KELLY:
18  Q.      Now, I showed you that KPMG was copied on this e-mail;
19  is that correct?
20  A.      Yes, I saw that highlight.
21  Q.      All right.  And could you read to me what the number
22  is for 90 and over days past due?
23  A.      It looks like $343.3 million.
24  Q.      Right.
25          MR. KELLY:  I quickly want you, Brian, to move

5580

Depman - cross

1   to 3357.  It's in evidence.
2   BY MR. KELLY:
3   Q.      This is from Mr. Mahoney two days later.
4           Do you see that, Mr. Depman?
5   A.      Yes.
6   Q.      And I want you to -- and Brian is ahead of me.  He's
7   highlighting the KPMG.
8           Do you see that?  Copied on this?
9   A.      Yes.
10  Q.      This is the point I asked you.  KPMG had a -- I'm not
11  the most tech savvy person in the world, but would you call
12  that a group e-mail to KPMG there?
13  A.      We had an e-mail address at the company.
14  Q.      Right.
15  A.      So that they didn't have to send documents out over
16  the Internet.
17  Q.      Right.  Okay.
18          MR. KELLY:  Could you, Brian, go to the next
19  page, please.
20  BY MR. KELLY:
21  Q.      Do you see that, Mr. Depman?  It says, two days later,
22  and I'm going to read to you.  Tell me if I'm reading
23  accurately.
24          Good afternoon, All.  The attached is the
25  revised version of the fourth quarter 2009 officer

5581

Depman - cross

1   statistics, with changes made due to post-closing entries as
2   well as adjustments due to the waived loans in the
3   delinquency section of the report.
4           Do you see that?
5   A.      I see that.
6   Q.      All right?
7           MR. KELLY:  And, Brian, please go to the
8   attachment.  It's already in evidence.  This is PX-3357-A.
9           And, Brian, please highlight 90 and over past
10  due.
11  BY MR. KELLY:
12  Q.      Could you read that number?
13  A.      Now it says $15.5 million.
14  Q.      You agree with me that this is now after adjusted for
15  waived loans, it went 300-and-some million to 15 million;
16  correct?
17  A.      In these documents.
18  Q.      Yes.  KPMG was copied on these two documents?
19  A.      KPMG at Wilmington Trust was copied on those two,
20  yes.
21  Q.      Right.  KPMG had it?
22  A.      We monitored that e-mail address.  There were lots of
23  documents that came into that.
24          MR. KELLY:  Just go back to the text of that
25  document, Brian.  Page 2 of that document.  I mean the prior

5582

Depman - cross

1    document. There you go.
2    BY MR. KELLY:
3    Q.     Do you see it says, changes made due to post closing
4    entries as well as adjustments due to the waived loans?
5           Do you see that?
6    A.     I see that.
7    Q.     Could it be any more clearer that what was being
8    represented as opposed to two days before?
9           It says, adjustments due to the waived loans; is
10   that right?
11   A.     That is what it says.
12   Q.     All right. All right. So you told me you knew
13   Mr. Harra. Not to be informal, but did you call him Bob?
14   A.     I did.
15   Q.     And he called you John?
16   A.     Right.
17   Q.     You agree with me Bob is not a numbers person; is that
18   correct? I mean, let me rephrase that. You never went to
19   Bob and said, hey, verify these are the numbers that I
20   should report; is that correct?
21   A.     Correct.
22   Q.     All right. He's not an accountant?
23   A.     Correct.
24   Q.     All right. Nor is he a lawyer skilled, to your
25   knowledge, in reporting regulations. That's fair?

5583

Depman - cross

1    A.     Fair.
2    Q.     Did you ever see any document indicating -- by the
3    way, so over 2001 to 2010, that's ten years, you looked at a
4    lot of documents, KPMG; is that right?
5    A.     Correct.
6    Q.     Did you ever see any document indicating that
7    Bob Harra concealed from Government regulators how
8    Wilmington Trust was reporting matured construction real
9    estate loans?
10   A.     No.
11   Q.     All right. And did you -- you and your colleagues at
12   KPMG interviewed lot of people at Wilmington Trust during
13   those ten years; correct?
14   A.     Correct.
15   Q.     Did you ever hear any evidence that Bob Harra
16   concealed from regulators how Wilmington Trust was reporting
17   matured commercial real estate loans?
18   A.     No.
19   Q.     Did you ever hear or see any evidence that either
20   Mr. Harra or Mr. Gibson, Mr. North or Ms. Rakowski ever
21   concealed anything from the regulators?
22   A.     No.
23   Q.     Or KPMG?
24   A.     No.
25   Q.     Thank you.

5584

Depman - cross

1    A.     All right. You said, I believe, that you didn't
2    have access to Shaw. Was that your testimony?
3    A.     Correct.
4    Q.     All right. I want you to look at binder C, the white
5    binder. Don't read it aloud.
6           And I want you to look at DX-5057. And I want
7    you to turn to page 15 of 19M, and I don't want you to read
8    it aloud. I want you to read to yourself, Mr. Depman, the
9    second paragraph. It starts with, "Depman believes."
10          Do you see that?
11   A.     Yes.
12   Q.     Having read that, didn't you tell the FBI in October
13   of 2012 that there was a terminal that Wilmington Trust, a
14   Shaw terminal Wilmington Trust permitted KPMG to access?
15   A.     I've never seen this document before.
16   Q.     But didn't you --
17   A.     But the first page of it says that I was interviewed
18   by the FBI.
19   Q.     But --
20   A.     What notes they took and committed to this, I --
21   Q.     My question though is simple: Did you remember
22   telling the FBI that?
23   A.     No.
24   Q.     That Wilmington Trust --
25   A.     No, I don't recall whether I said that or not.

5585

Depman - cross

1    Q.     Having looked at this, does it refresh your memory?
2    A.     No. I know we had a computer in our room, and that's
3    how we accessed that e-mail, that KPMG e-mail.
4    Q.     But just so your clear, your testimony under oath, are
5    you saying you didn't have access to Shaw system at the
6    bank?
7    A.     Not that I'm aware of.
8    Q.     You don't know whether any of your other 15 to 20
9    people had access though, do you?
10   A.     I'm not aware of any of them having it.
11   Q.     Weren't they trained on Shaw by the bank?
12   A.     No. We did our test work outside of their systems.
13   We did not go into their system.
14   Q.     All right. You did have access to Documentum though;
15   is that correct?
16   A.     You know, I'm not sure what was provided to us versus
17   what we went in to look at.
18   Q.     All right. Well, let's display, it's in evidence,
19   GX-723.
20          And this is my last. I'm going to stop here, Your
21   Honor. Is that okay?
22          THE COURT: Yes.
23          MR. KELLY: Brian, are you with me? And I want
24   you to go to page 3 of that document. This is GX-723.
25   BY MR. KELLY:

5596

1                        - VOLUME 20 -

2            IN THE UNITED STATES DISTRICT COURT

3            IN AND FOR THE DISTRICT OF DELAWARE

4                        - - -

5    UNITED STATES OF AMERICA,    :   CRIMINAL ACTION
                                  :
6                  Plaintiff,     :
                                  :
7        vs.                      :
                                  :
8    DAVID R. GIBSON, ROBERT      :
     V.A. HARRA, WILLIAM          :
9    NORTH, and KEVYN RAKOWSKI,   :
                                  :
10                                :
                    Defendants.   :   NO. 15-23-RGA
11

12                                    - - -

13                               Wilmington, Delaware
14                               Tuesday, April 10, 2018
                                 8:33 o'clock, a.m.
15                                    - - -

16
     BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17   jury

18                        - - -
     APPEARANCES:
19

20           LESLEY F. WOLF, ESQ.,
             ROBERT F. KRAVETZ, ESQ. and
21           JAMIE M. McCALL, ESQ.
             Assistant United States Attorneys
22

23               Counsel for Plaintiff

24                       Valerie J. Gunning
                         Leonard A. Dibbs
25                       Official Court Reporters

5857

Schechter - cross

1  pretty basic reason, right, which is that lending money to
2  other people is inherently risky.  Fair?
3  A.     Yes.
4  Q.     And that was never more true than it was in 2009 and
5  2010?
6  A.     It was -- there was certainly high risk in 2009 and
7  2010.
8  Q.     Well, is it fair to say it was the worst economy you
9  have seen in your lifetime?
10  A.     Yes.
11  Q.     And particularly as someone involved in finance, the
12  foundations of the economic world in this country were
13  shaking, weren't they?
14  A.     It was -- it was -- the financial crisis was a very
15  difficult economic period.
16  Q.     Okay.  Lehman Brothers had gone under?
17  A.     Yes.
18  Q.     The Government had to take over AIG, which I think was
19  the largest insurance company in the country; right?
20  A.     I don't recall the relative size, but, yes, it was a
21  large insurance company that the Government had to take a
22  very large financial stake in.
23  Q.     One of the biggest in the country.  Fair?
24  A.     Yes.
25  Q.     The Government had to spend, both President Bush and

5858

Schechter - cross

1  then President Obama had to spend hundreds of billions of
2  dollars to keep GM and Chrysler from going bankrupt; is that
3  right?
4  A.     Yes.
5  Q.     And banks were in trouble all across the United
6  States?
7  A.     Yes.
8  Q.     And you knew that, so you rolled up your sleeves and
9  you got to work?
10  A.     Yes.
11  Q.     All right.  And you knew that Wilmington Trust had
12  some credit issues, significant credit issues with its loan
13  portfolio?
14  A.     Yes.  We knew about credit issues with the loan
15  portfolio from the financial statements.
16  Q.     Right.  And looking at those financial statements
17  told you that the problems in the credit portfolio,
18  especially starting in say 2007, were getting worse and
19  getting worse -- they were getting worse; right?
20  A.     Yes.
21  Q.     And they were getting worse quickly?
22  A.     I don't recall the speed to which they were getting
23  worse, but it was getting worse throughout 2008 and 2009.
24  Q.     Right.  My problem.  Balanced question.  I don't even
25  know what that means.  But things were continues go to get

5859

Schechter - cross

1  worse.
2  A.     Yes.
3  Q.     Right?
4  A.     Yes.
5  Q.     And there was a particular concern that you had at the
6  time about Wilmington Trust's credit portfolio because it
7  was so heavily concentrated in one market.  Here, Delaware;
8  right?
9  A.     Yes.
10  Q.     And in general, banks that are spread out in terms of
11  their product offerings are sometimes more able to withstand
12  economic storms because they have not put a greater personal
13  of their eggs in one basket; is that right?
14  A.     There's a -- different people have different
15  perspectives on this.  Sometimes people think diversity is
16  better because you're less prone to one specific market.
17         People also view being concentrated in one place
18  as a good thing because then you can be an expert in that
19  market and know that market really well, and Wilmington
20  Trust had the latter.
21  Q.     And both things could be true at the same time?
22  A.     Correct.
23  Q.     Know your market really well.  Your market is really
24  bad?
25  A.     Yes.

5860

Schechter - cross

1  Q.     That's a problem.  And in any case, you were aware
2  of those two perspectives on that issue amongst investors?
3  A.     Yes.
4  Q.     And you felt it necessary to point out that Wilmington
5  Trust had a big chunk of its commercial real estate
6  portfolio in one place?
7  A.     Yes.
8  Q.     That has three counties; right?  Here, Delaware?
9  A.     Yes.
10  Q.     Right?
11  A.     Yes, sir.
12  Q.     Okay.  And you put together a -- what you called a
13  roadshow to help educate people about the risks and
14  opportunities in Wilmington Trust.  Is that fair?
15  A.     Yes.  I was involved in the team that helped put that
16  together.
17         MR. WOOD:  Okay.  And that's Government
18  Exhibit 690.  If we can see that, please, Brian.
19         All right.  Let me try calling something up here
20  by Bates number.  390.  See if that works.  8390.  May I see
21  690-A?  Sorry, Your Honor.
22  BY MR. WOOD:
23  Q.     All right.  Now, before we talk about the bank's loan
24  portfolio a bit, let's take a look at the page that you
25  included that was called summary financials; all right?

5861

Schechter - cross

1    MR. WOOD:  And if you would, Brian, please
2  enlarge the bottom half in bold where it says, net income
3  losses.  I think it says attributable to Wilmington Trust.
4  Sort of the bottom half there.  Okay.
5          There are numbers in parentheses under net
6  income losses attributable to Wilmington Trust.
7          Keep going over, Brian, if you would.  Thank
8  you.
9  BY MR. WOOD:
10  Q.    Those numbers in parentheses indicate losses; is that
11  right?
12  A.    Yes.
13  Q.    So that means that your roadshow included the fact
14  that in 2008 and 2009, Wilmington Trust was actually losing
15  money.
16  A.    Yes.
17  Q.    Okay.  And that is one of many ways you can measure
18  the value of an ongoing concern; right?
19  A.    Yes.
20  Q.    But you with agree with me that when you're talking
21  about a bank that is a hundred years old that is losing
22  money for the first time since who knows when, that's a sign
23  of trouble; is that right?
24  A.    Potentially.
25  Q.    Potentially?

5862

Schechter - cross

1  A.    Yes.
2  Q.    That's why I said one of many metrics.  None of them
3  mean anything by themselves; is that correct?
4  A.    Correct.
5  Q.    But that's one that would say, pay attention?
6  A.    Yes.
7  Q.    Okay.  Good.
8          If we can see 408, please, Brian.  And if we
9  just enlarge the whole thing, maybe that's easiest.  We're
10  going to need the words below it.  I'm sorry.
11          Okay.  I think we can almost read that, but
12  you'll look at the third bullet point down.
13  A.    In the slide or the words --
14  Q.    I'm sorry.  That's an excellent question.  Thanks.
15  Sorry.  Right where Brian's cursor is?
16  A.    Thank you.
17          Deterioration in credit quality experience in
18  Q-4 2009 was driven by downturn in the Delaware housing
19  market.
20  Q.    Okay.  Q-4 2009 ended December 31st, 2009?
21  A.    Yes.
22  Q.    You are showing this to investors in the early spring
23  of 2010?
24  A.    And late winter.
25  Q.    I guess it would be, wouldn't it?

5863

Schechter - cross

1  A.    Yes.
2  Q.    Let's try it this way.  A couple months later?
3  A.    Yes.
4  Q.    So this is recent information?
5  A.    Yes.
6  Q.    And when it says, deterioration in credit quality and
7  experienced in Q-4 2009, what you are saying is, things are
8  still getting worse in Q-42009; right?
9  A.    Credit quality continued to worsen, yes.
10  Q.    Okay.  And that's why at the bottom in the bullet
11  points, the second one down, you said, acknowledge credit
12  issues.  That's to remind the presenter, I guess, to say,
13  look.  These guys have some problems; right?
14  A.    Yes.
15  Q.    Okay.
16          MR. WOOD:  409, please, which is hopefully the
17  next page.
18  BY MR. WOOD:
19  Q.    All right.  And this is another slide that is talking
20  about problems in the credit portfolio; is that right?
21  A.    Yes.
22  Q.    And when you say taking aggressive actions to shore up
23  reserves and curb NPAs, as you do in the top of that slide,
24  that's another way of saying, taking aggressive actions to
25  make things better?

5864

Schechter - cross

1  A.    Yes.
2  Q.    Because we have a problem?
3  A.    Yes.
4  Q.    And, again, that's why you remind the presenter at the
5  bottom of the slide, acknowledge credit losses,
6  concentration in Delaware construction.
7  A.    So I think these are the same bottom bullets as to the
8  prior page.
9  Q.    Right.
10  A.    I think, I don't know for sure, that the first two
11  bullets really are for the prior slide, and the third bullet
12  is for this slide.
13  Q.    Well, either way, the point of those bullets is to say
14  to the presenter, make sure you acknowledge that the bank
15  has problems in its credit portfolio?
16  A.    Yes.
17  Q.    Okay.  Now, they were certainly not a secret?
18  A.    Correct.
19  Q.    All right.  If we can look at 410, please.  Yes.
20  Perfect.
21          This is a slide that gives us some metrics about
22  what is happening in the bank's credit portfolio; is that
23  right?
24  A.    Yes, although it's very hard to see any of the --
25  Q.    Yes.

Schechter - cross

1          MR. WOOD:  Brian, can you just enlarge, yes,
2    what's in that box there?
3          THE WITNESS:  Thank you.
4          MR. WOOD:  Slightly better.  Okay.
5    BY MR. WOOD:
6    Q.    And on the left it says, net charge-off history, by
7    loan category?
8    A.    Got it.
9    Q.    And when a bank charges off a loan -- I am about to
10   tread out into deep water here, so if I get this wrong,
11   tell me.  But if a bank charges off a loan, that's a bank's
12   way of saying for accounting purposes, we think it's a
13   pretty good shot we're not getting our money back for this
14   loan?
15   A.    Yes.
16   Q.    And if you don't like the way I said that, tell me the
17   right way to say that.
18   A.    It's effectively the bank saying, we're not getting
19   our money as to the loan.  They are writing it off, not
20   expecting to get our money back.
21   Q.    Okay.  Hang on one second, please.
22         And what that graphic shows us is -- so you
23   would agree that, again, there are many ways you can
24   evaluate a bank's, the health of a bank's portfolio or not;
25   right?

Schechter - cross

1    A.    Yes.
2    Q.    And a number that you can look at is what's happening
3    with the bank's nonperforming loans; right?
4    A.    This is our net charge-offs on the left.
5    Q.    Yes.
6    A.    Net charge-offs --
7    Q.    Right.  And charge-offs, that is a metric by which you
8    can measure how a bank is doing?
9    A.    Yes.
10   Q.    Fair enough?
11   A.    It is a measure, yes.
12   Q.    Okay.  Please forgive me.  I'm fumbling.
13         MR. WOOD:  May I?
14         THE COURT:  Yes, yes.
15         (Pause while counsel conferred.)
16         MR. WOOD:  Thank you, Your Honor.  Excuse me,
17   Your Honor.
18         THE COURT:  It's all right, Mr. Wood.  Take your
19   time.
20         (Pause.)
21         MR. WOOD:  I've got it.  Okay.  Sorry about
22   that.
23   BY MR. WOOD:
24   Q.    Well, the point I was trying to make without trying to
25   do math on the fly, which is a disaster when I try it, is

Schechter - cross

1    that there is a huge increase in charge-offs between 2007
2    and 2009; is that right?
3    A.    Yes.
4    Q.    Can you guesstimate for us the percentage increase
5    that you see there between 2007 and 2009?
6    A.    It's about 500 percent.
7          MR. WOOD:  And that's all we need from this.
8    Thank you.
9    BY MR. WOOD:
10   Q.    And is that suggestive of credit, a credit portfolio
11   that is deteriorating; right?
12   A.    Yes.
13   Q.    Okay.  And that information was included in the
14   roadshow?
15   A.    Yes.
16         MR. WOOD:  If I might just have a moment, Your
17   Honor.
18         THE COURT:  Yes.
19         (Pause while counsel conferred.)
20   BY MR. WOOD:
21   Q.    On direct examination when Ms. Wolf was asking you
22   questions, she asked you some questions about whether the
23   bank told you that at the end of 2009, it extended a
24   significant part of its loan portfolio on the short-term
25   basis; is that right?

Schechter - cross

1    A.    Yes, she asked me that.
2    Q.    Paraphrasing the question, but you recall the
3    question?
4    A.    Yes.
5    Q.    Okay.  And that, too, was something that other banks
6    were doing at that period of time; is that correct?
7    A.    I'm not aware of a bank having done that.
8    Q.    All right.  Let me see if I can help you with your
9    memory.  I understand these are things that we're talking
10   about that were a while ago.
11   A.    Yes, sir.
12         MS. WOLF:  Your Honor, can we go to sidebar on
13   this, please?
14         THE COURT:  All right.  See you at sidebar.
15         (Sidebar conference held out of the hearing of
16   the jury as follows.)
17
18
19
20
21
22
23
24
25

6130

1                        - VOLUME 22 -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5      UNITED STATES OF AMERICA,      :   CRIMINAL ACTION
                                       :
6                    Plaintiff,        :
                                       :
7          vs.                         :
                                       :
8      DAVID R. GIBSON, ROBERT         :
       V.A. HARRA, WILLIAM             :
9      NORTH, and KEVYN RAKOWSKI,      :
                                       :
10                                     :
                     Defendants.   :   NO. 15-23-RGA
11

12
                                    - - -
13
                              Wilmington, Delaware
14                            Monday, April 16, 2018
                              9:32 o'clock, a.m.
15
                                    - - -
16
       BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
17
                                    - - -
18     APPEARANCES:

19
                 LESLEY F. WOLF, ESQ.,
20               ROBERT F. KRAVETZ, ESQ. and
                 JAMIE M. McCALL, ESQ.
21               Assistant United States Attorneys

22
                 Counsel for Plaintiff
23
                         Valerie J. Gunning
24                       Leonard A. Dibbs
                         Official Court Reporters
25

1  appreciation of wrongfulness, existed in this case.  The
2  fact that we gave the Federal Reserve within the conspiracy
3  period electronic data, which I can describe without
4  hyperbole whatsoever, as everything the bank knew about its
5  commercial loan portfolio rebuts any motion of an intent to
6  conceal.
7          Now, the Federal Reserve regulators who
8  testified told the jury, well, we don't sort the ALERT data.
9          There is no evidence, Your Honor, that when the
10  Federal Reserve asked for that ALERT data, that it advised
11  the bank --
12          THE COURT:  I get your point.
13          MR. WOOD:  Right.  It's all about what we
14  thought could and would likely happen with that.
15          All right.  Now, why does all of this matter?
16  Because of what has to be proved beyond a reasonable doubt
17  by the Government in order to sustain a conspiracy
18  conviction and our firm conviction that no reasonable jury
19  can find these facts.
20          First, there has to be an agreement among two or
21  more persons to accomplish an illegal purpose, and the
22  Third Circuit has clarified in United States versus Boria,
23  it's cited in our motion, that the Government has to prove
24  beyond a reasonable doubt that Mr. Harra joined that
25  conspiracy with knowledge of the specific illegal objective.

1  And the Third Circuit has been careful to say in the Inigo
2  case, also cited in our papers, that, I'm paraphrasing,
3  the holding, but simply doing business with someone, even if
4  that someone is engaged in an illegal purpose, does not
5  satisfy the element of knowledge of specific illegality.
6          Now, let me hasten to add, no one at the bank
7  was engaged in illegal purpose, but I meant to demonstrate
8  how high that threshold is in a case like this one.
9          THE COURT:  So, Mr. Wood, you are saying here an
10  agreement to accomplish an illegal purpose.  If you throw
11  out that illegal purpose part of that and just think about
12  whether the defendants had an understanding that they were
13  working to report a low past due loan number, they were all
14  working together to that end.  Right?
15          MR. WOOD:  No.  And here's why I said no, Your
16  Honor.  You said they had an agreement that they were
17  working together to report a "low" past due number, and
18  that's where I take issue with the Court's formulation.
19          They were working together to report a past due
20  number, which each of them believe, and certainly my client
21  believed, was absolutely in accord with what they were
22  required.
23          THE COURT:  But the point is, even if you frame
24  it like that, there is an agreement to accomplish a common
25  end.  Right?  It's just, in your view, not something the

1  Government has shown was an illegal end.
2          MR. WOOD:  Yes.
3          THE COURT:  Or that they appreciated that it was
4  an illegal end.
5          MR. WOOD:  Yes, Your Honor.  But for the purpose
6  of this Rule 29 motion, as Your Honor well knows, a charge
7  has to be dismissed if no rational jury could find guilt
8  beyond a reasonable doubt as to each element.  And one of
9  the elements of the conspiracy charge, and the Third Circuit
10  has been plain on this, is that the co-conspirators
11  absolutely must appreciate the illegality of their conduct.
12          THE COURT:  Well, no.  I'm not arguing with you
13  about that.  What I'm pointing out that, it's really the
14  focus of your argument, I think, is not so much about
15  whether or not there was the agreement part of it, but
16  whether or not there was, you know, to accomplish an end
17  that they knew was illegal or that sort of thing.
18          MR. WOOD:  That is the focus of this portion of
19  my argument with this caveat, Your Honor.  To the extent
20  the Government in its indictment specified that the waiver
21  practice was the "manner and means of the conspiracy,"
22  they are bound to that, or obviously, there's a variance
23  problem.
24          There is no evidence in the record about the
25  waiver practice itself and where it came from or why.  It's

1  one of those things, if I can use the ancient phrase that
2  exists, till the memory of man runneth not to the contrary.
3  And there was no agreement, and there is literally no
4  evidence that the four defendants said, let's come up with a
5  routine practice whereby we go to relationship managers and
6  say, is this loan current for interest and in the process of
7  extension?  And if so, we will not report it as past due.
8  That's not in the case.
9          THE COURT:  But they don't have to be the
10  inventors of the practice.
11          MR. WOOD:  No.  I concede that's true.  But they
12  can't agree about the illegality of the practice or even be
13  charged with moving the practice forward if we don't know
14  who started it or why, and we don't.
15          And what I'm trying to point out, Your Honor, in
16  that regard, is how unusual this conspiracy is when compared
17  to the typical conspiracy, which --
18          THE COURT:  And we could agree it's unusual, I
19  think it is unusual, but that doesn't necessarily, doesn't
20  get you very far, I don't think.
21          MR. WOOD:  Well, and I agree with that, Your
22  Honor.  But I would also say that a prosecution that is
23  predicated on an agreement of four people to do something in
24  the absence of evidence that any of them had any inkling it
25  was illegal is not a conspiracy.  There might be another

6259

1   name for it, but it's certainly not a conspiracy as defined
2   by the laws of the United States.
3           THE COURT:  And so it boils down to, I think,
4   what the other two defendants before you have said in
5   greater or lesser degree is, it has to do with the mental
6   element.
7           MR. WOOD:  Well, that's right, and that works
8   its way into the analysis that Your Honor has to engage in
9   now in a couple of different ways.
10          Each of the defendants can speak for himself or
11  herself about their own mental state, and I have said that
12  what we know from the Third Circuit is that for Mr. Harra to
13  be guilty of a conspiracy, somebody in the conspiracy had to
14  be intending to commit a crime, or engage in illegal
15  conduct, and Mr. Harra then had to join that grouping with
16  an understanding of the illegal objective of the conspiracy.
17          And here is the key point for Mr. Harra.  There
18  is -- and when I say no evidence, I don't mean some, I mean
19  no evidence that Mr. Harra knew that.  The record is wholly
20  devoid of any evidence from which a rational jury could
21  conclude that Mr. Harra was aware of any of -- of what they
22  say are the controlling definitions of a past due loan for
23  the call reports or for SEC purposes.  And there is no
24  evidence whatsoever that Mr. Harra was aware that the
25  definition that he learned at Wilmington Trust beginning in

6260

1   1971, as testified to by Mr. Conway, to wit, past due loans
2   do not include loans that have matured, that are current for
3   interest in the process of extension, was an incorrect
4   definition.
5           There's no evidence anybody told him that.  We
6   don't see anything that could even remotely be inferred
7   as his own words, suggesting that he might think that's
8   true.  There aren't any documents at all, not one document
9   that says Mr. Harra had that state of mind.  We can't even
10  infer it from the attendant circumstances, Your Honor.
11          The bank had a committee of individuals whose
12  job it was to make sure that all of the various disclosure
13  requirements to which the bank was subjected were being
14  complied with.
15          Mr. Harra was not on the disclosure committee.
16  The low level, and I don't mean to minimize their functions,
17  but the people like Tosha Towe and Mico Slijepcevic and
18  Karen Strohmeier, who were engaged in the monthly compiling
19  of the past due reports worked in the finance department.
20  The folks in the finance department reported to Ted Cecala,
21  not Mr. Harra.
22          There is simply no evidence in the record, and I
23  underscore my use of the word "none," that Mr. Harra was
24  aware of a contrary definition, and that is of vital
25  importance, because if you take that away, no one can say

6261

1   that the bank's, especially not based on Mr. Harra's state
2   of mind, that the way the bank was reporting past due loans
3   was somehow inherently wrong, the nature of a malum in se.
4   It's just not true.
5           I should note, by the way, in passing, as I
6   speak of this, that though we once heard differently from
7   the Government beginning with the times of the motion
8   hearings back in September and even extending through
9   opening statement here, that various misdeeds of the
10  relationship managers, particularly Mr. Harra -- Mr. Bailey
11  and Mr. Terranova would be imputed to Mr. Harra.  For the
12  purposes of conspiracy, we all know that's not true.
13          Mr. Bailey didn't testify, and Mr. Terranova
14  testified in a way that was such that what he was doing that
15  was wrong, he took active steps to conceal from management,
16  which, of course, includes Mr. Harra, and he conceded he was
17  ultimately fired for doing those things.  There's no
18  evidence that he was a conspirator.
19          I take Mr. Klingeman's point, in a conspiracy
20  involving those two individuals, it's remarkable that the
21  Government never once sought to admit one of their one of
22  their statements under the co-conspirator exception of the
23  hearsay rule, and that should speak volumes.
24          So the false statement charge really lies at the
25  root of all of the indicted offenses, because if the

6262

1   Government can't prove beyond a reasonable doubt that
2   Mr. Harra knew that the bank was defining its past due loans
3   falsely, falsely defined as how the Government would now
4   have those loans defined, the rest of it falls, because he
5   had no appreciation of illegality for the conspiracy charge,
6   and there can be no intent to defraud for the securities
7   fraud count.
8           Now, the Government cited to the case that
9   Mr. Foley just cited to, the Starnes case, in its papers at
10  page 23, and it is one of the things about which the
11  Government and Mr. Harra agreed.
12          Starnes is an important case, and it's at 583
13  F.3d, 196.  And I want to read from what Starnes said at 211
14  and 212, because while the Government points out correctly
15  that Starnes says that you don't have to be aware that
16  you're violating a particular statute, Starnes also tells us
17  that the generally understood meaning of knowingly and the
18  intermediate level of interpretation of willfully, and I'm
19  going to quote now, "articulated by the Supreme Court in
20  Bryan, that is, knowledge of the general unlawfulness of the
21  conduct at issue, which we believe adequately demarcates the
22  boundary between innocent and unlawful conduct in this
23  context."
24          There's then a cite to Bryan, a United States
25  Supreme Court case, and this cite appears at 118 Supreme

6263

1   Court, 1939.
2         And Starnes says, citing to the United States
3   Supreme Court, "Requiring only knowledge that the conduct is
4   unlawful as opposed to specific knowledge of the law."
5         So what that means is, Mr. Harra doesn't have to
6   know that the definition of past due loan at the bank held
7   to for nearly three decades, or which he himself believed
8   was correct, violates, as Your Honor might think, RC-N
9   sub 4, but he has to know that it's violating something.
10  And if he doesn't, he simply can't be guilty of the false
11  statement charge, and then by implication of either the
12  conspiracy or the securities fraud charge.  There is no
13  evidence that suggests he was aware of controlling
14  authority.  To the contrary.
15        Now I would like to cite Your Honor to a couple
16  pages of the Government's brief, because I think it's
17  important.
18        THE COURT:  All right.
19        MR. WOOD:  We can begin at page 25 of the brief,
20  and there is at the top of the paragraph, there is a lengthy
21  exposition of the evidence suggesting that Mr. Harra knew
22  about the waiver practice and the legal requirements to
23  report all past due loans.
24        Now, before I start, let me note that that is a
25  little bit circular, because everybody agrees, including the

6264

1   defendants, that the bank had an obligation to report its
2   past due loans.  The question is:  What does that mean?
3         All of the evidence cited by the Government in
4   the first paragraph on page 25 relates to Mr. Harra's
5   knowledge that the bank had to report past due loans,
6   period.  And, again, that's not at issue here.  The question
7   is:  What does it mean?
8         Well, as Your Honor doubtless knows from our
9   motion, I took some pains at the beginning of our motion to
10  cite things that the Government hadn't proved, and at page
11  27 of their brief with some bullet points, they take issue
12  with those findings, and I would like to go through that, if
13  I can.
14        The first bullet point is that the Government
15  has introduced evidence demonstrating that Mr. Harra knew a
16  contrary view existed, meaning about his definition of past
17  due loans.
18        Judge, I don't know what that evidence is
19  because I sure didn't see it, and my assertion is that I am
20  unaware of any such evidence.  The only caveat I can offer
21  is that if the Government argues that the Shaw system itself
22  required manual adjustment to accomplish the bank's view, A,
23  there's no evidence Mr. Harra knew that; and, B, so what?
24  That's not evidence of wrongfulness.
25        Shaw --

6265

1         THE COURT:  I don't think the Government argued
2   that.
3         MR. WOOD:  Well, I don't know what they are
4   arguing, Judge.  I'm sure that Mr. Kravetz will tell us, but
5   I am unaware of any evidence to that point.
6         The Government then goes on to say, the fact
7   that Wilmington Trust waived mature loans for a long time
8   prior to the charged conspiracy also fails to support our
9   motion.  And with that, I strongly disagree.  The longevity
10  of the practice is evidence of a lack of intent to conceal,
11  which is circumstantial evidence of the absence of any
12  perception whatsoever of the wrongfulness of its conduct.
13        Go back to what I said at the outset.  Usually
14  in a conspiracy, people start doing something differently.
15  This is a conspiracy where they just kept doing what they
16  had been doing for as long as anybody at the bank can
17  remember.
18        THE COURT:  Well, you say that.  I seem to
19  recall there was some e-mail written by somebody that was
20  introduced into evidence that said in so many words, this is
21  a practice that started to deal with administrative issues,
22  and has now grown into a different beast.  I'm sure they
23  didn't use the word "beast."
24        MR. WOOD:  I don't recall an e-mail that says
25  that, but I think the fact that you just asserted is

6266

1   correct.  That the waiver practice went beyond what the
2   defendants believed was appropriate as a business practice,
3   but it is Kafkaesque in the extreme to say that the
4   Government looking backward can criminalize a business
5   practice unless they can point to specific sections of the
6   United States Code that say, what you were doing was always
7   a crime, and that's the quarrel here.
8         THE COURT:  Well, I mean, you say that, but part
9   of it is, there's two different things there, one of which
10  is, for most, if not all of these, there is a requirement of
11  materiality.  So you could do something on a small scale
12  that may or may not be a crime.  Right?  And then when it
13  gets onto a big scale --
14        MR. WOOD:  I was going to get to that.  Of
15  course, that's true, but as Your Honor knows from sitting
16  through the evidence, by 2007 and 2008, and surely early
17  2009, the variance between what the bank was reporting past
18  due and what the Government says is the true number was
19  material, and yet there's this arbitrary --
20        THE COURT:  Well, right.  But part of it is,
21  you're saying they've done this for 28 years.  Maybe
22  Mr. Conway said something that I didn't catch, but I don't
23  think he said, yes, we were waiving, I'm not sure the
24  Government said this, waiving hundreds of millions of
25  dollars 28 years ago, because.  They weren't.

6295

1  discussion how we manage problem loans. And, again, the
2  same elements of 1348 apply. You have to prove intent to
3  defraud and you have to prove that the individual knew that
4  they were making materially false statements, and that
5  hasn't been proven.
6      So just in closing, Your Honor, we filed a
7  detailed Rule 29 brief.
8      THE COURT: You did.
9      MR. NOWAK: Going through the elements, going
10  through the evidence, demonstrating no conspiracy, no intent
11  to defraud or deceive and failure to demonstrate section, or
12  Count 17 through 19, among other things. In response,
13  essentially, we got a whole bunch of information about what
14  the bank did.
15      THE COURT: I'm sorry? What was that?
16      MR. NOWAK: A whole bunch of information about
17  what the bank did, the bank. The bank, the bank, the bank,
18  as if that's all attributable to Mr. Gibson's state of mind
19  and his knowledge, and it's not.
20      And also the inferences to be drawn, there's not
21  one clear piece of evidence that the Government can point to
22  and say, there's evidence of intent to defraud. There it is
23  right there. The jury can convict beyond a reasonable doubt
24  on that.
25      They're stringing things together. They're

6296

1  stringing inferences together that we're really appealing to
2  you to do the right and just thing, and that is not let the
3  jury decide that, the inferences, when there's not enough
4  evidence to prove beyond a reasonable doubt that a rational
5  juror, or any rational juror could conclude that all of the
6  elements have been met.
7      Thank you.
8      THE COURT: Thank you, Mr. Nowak.
9      All right. Mr. Kravetz, do you have something
10  you want to say?
11      MR. KRAVETZ: I do, although I wonder whether it
12  would be more helpful if Your Honor had any specific
13  questions that you would like to resolve, and obviously, we
14  would incorporate our papers that we filed in all of the
15  arguments this morning as we went through a number of the
16  assertions that were set forth in our brief.
17      THE COURT: Hold on a minute. I was thinking
18  that Mr. Nowak ended with their securities fraud and what he
19  called, probably fairly, the deemed liability.
20      What is it that you believe that the minimum
21  amount the Government needs to prove to get a conviction
22  there?
23      MR. KRAVETZ: Well, if I can look at the
24  elements.
25      So I think, as Your Honor is aware, there are

6297

1  two different pathways under 1348, which is the more recent
2  adaptation of securities fraud, the older ones. But first
3  would be that there was a scheme or artifice to defraud any
4  person.
5      The second --
6      THE COURT: So, I'm sorry. Go ahead. And the
7  second is?
8      MR. KRAVETZ: Well, the second is to make a
9  false, materially false representation. So our position
10  there is that that is tied exclusively to the 90-day past
11  due loan number.
12      THE COURT: The second part?
13      MR. KRAVETZ: The second part.
14      THE COURT: Right. So the first part is what
15  I'm curious about here.
16      MR. KRAVETZ: And so the time frame that we
17  charged a two-month time frame where the
18  defendants are discussing raising capital. They are aware
19  of information that has been brought to their attention as a
20  result of the surge process, as a result of information
21  learned relating to the short-term loan extensions. Various
22  activities that occur during the course of the due diligence
23  process with JPMorgan, the underwriters, and all of that
24  goes together as part of the scheme to defraud investors by
25  not presenting accurate information in the form 10-K about

6298

1  the state of the bank's loan portfolio. In particular, past
2  due loans.
3      THE COURT: Well, so if the scheme -- if, for
4  whatever reason, the past due loans were out, would you have
5  anything left on the securities fraud or even the scheme to
6  defraud dependent upon the past due loans?
7      MR. KRAVETZ: I think it's also dependent upon
8  the past due loans. I mean, the scheme based liability is
9  going to bring in more than just the number, and that's why
10  the context is important, and that's why all of the factual
11  information that the defendants are made aware of,
12  particularly in January of 2010 and into February of 2010,
13  is important.
14      And we have not taken a position that other
15  factual statements are independently actionable, that
16  they're all part of the construct of the scheme to defraud.
17  And so that's why all of the various statements that are
18  contained within the 10-K, which we noted in our bill of
19  particulars that there were additional false statements in
20  the 10-K, but we didn't tie it specifically to the material
21  misstatement prong.
22      Those statements come in, number one, to give
23  context to the false statement charge, particularly to rebut
24  the transparency argument, but also they're all part of the
25  mosaic of information going into a disclosure.

6299

1       THE COURT:  All right.  So one of the other
2   things that I heard at some point say that I was curious
3   about was that the argument that there is no evidence
4   Mr. Harra knew what was supposed to be reported on the past
5   due loans as a past due loan.
6       MR. KRAVETZ:  Yes, Your Honor.
7       THE COURT:  Right?  So tell me why that is
8   wrong.
9       MR. KRAVETZ:  For the record, I'm placing on the
10  screen Government's Exhibit 76, which is the signed call
11  report by Mr. Harra.  This is for the period ending
12  September 30th, 2009.  There are similar certifications for
13  the other reporting period.
14      Mr. Harra signs the certification, which states,
15  "We, the undersigned directors (trustees), attest to the
16  correctness of the reports of condition and income
17  (including the supporting schedules) for this report date
18  and declare that the reports of condition and income have
19  been examined by us, and to the best of our knowledge and
20  belief have been prepared in conformance with the
21  instructions issued by the appropriate Federal regulatory
22  authority and are true and correct."
23      THE COURT:  So I take it your position is, yes,
24  maybe his lawyer can argue he didn't know what the
25  instructions said, but you're entitled to say he did because

6300

1   he signed his name saying he did?
2       MR. KRAVETZ:  Absolutely, Your Honor.
3       THE COURT:  All right.  That's an answer.  Let
4   me think for a minute.
5       MR. KRAVETZ:  I can answer the Count 17 to 19
6   question while you're thinking.
7       THE COURT:  Sure.  Remind me what the question
8   is before you tell me the answer.
9       MR. KRAVETZ:  There was the question at the
10  outset about the reporting requirement for purposes of the
11  three Mr. Gibson specific counts.
12      THE COURT:  You mean the 13(a) and 15?  That
13  thing?
14      MR. KRAVETZ:  That's correct, Your Honor.  So a
15  couple responses.
16      First, in terms of the form 10-K, there's a
17  checkmark in the third paragraph down.  Indicate by
18  checkmark whether the registrant has filed all reports
19  required to be filed by Section 13 or 15(d) of the
20  Securities and Exchange Act of 1934 during the preceding
21  12 months.  And, two, has been subject to such filing
22  requirements for the past 90 days.  And that box is marked
23  yes.
24      THE COURT:  I see it.
25      MR. KRAVETZ:  And then there's also a specific

6301

1   certification.  I believe we're checking to see if it was
2   formally admitted or not.  I believe Mr. Breen showed this
3   to Mr. Depman.
4       Exhibit 31, 31(i) and (ii) is the Rule
5   13(a)/15(d) certification, which is part of the form 10-K.
6   And I do have it here.  It was admitted as Defense
7   Exhibit 4006.  And that certification, Your Honor, was
8   signed by Mr. Gibson for the 2009 form 10-K.  So I wanted to
9   make sure that I responded to that.
10      THE COURT:  And I'm sorry, because I thought
11  part of what Mr. Nowak was arguing was the -- what does
12  13(a) and 15(d) or whatever it is, what do they actually
13  require you to file?
14      MR. KRAVETZ:  I know we have it in the jury
15  instructions, and we're requesting that the Court instruct
16  as a matter of law, but the certification that was admitted
17  by the defense indicates that Mr. Gibson reviewed the 10-K.
18      The second paragraph, based on my knowledge,
19  this report does not contain any untrue statement of a
20  material fact or omit the stated material fact necessary to
21  make the statement made in light of the circumstances under
22  which such statements were made not misleading with respect
23  to the period covered by the report.
24      And there are specific certifications in
25  paragraph 4 that relate to Exchange Act Rules 13(a) and

6302

1   15(d), citing back to the statute, and that was signed by
2   Mr. Gibson on or about February 22nd, 2010.
3       THE COURT:  And you think they track whatever
4   the statute requires?
5       MR. KRAVETZ:  Yes, Your Honor.  Certainly, the
6   certification is there.  There's a certification of
7   compliance with the statute.
8       I believe in our jury instructions we've listed
9   what the requirements are, and our position is that's a
10  matter of law to instruct the jury.
11      THE COURT:  All right.  So one of the other
12  things that was raised, I think maybe by Mr. Nowak, was:  Do
13  you think the Government has offered sufficient evidence to
14  prove that Mr. Terranova and Mr. Bailey were part of the
15  conspiracy that they are charged in, and does it make any
16  difference?
17      MR. KRAVETZ:  I will take the latter first.  It
18  doesn't.  I think in terms of the argument that we're going
19  to make to the jury, we're going to focus on the four
20  individuals who are at trial.  We're not going to seek, as
21  we view the conspiracy, these are the four individuals who
22  are decision-makers over past due reporting within the hub
23  of the conspiracy.  View Mr. Terranova and Mr. Bailey more
24  as part of the spokes of the conspiracy.
25      And in terms of what we intend to say in our

6303

1    closing argument, we're not looking to introduce any one-off
2    statements of Mr. Terranova or Mr. Bailey as co-conspirator
3    statements.  I think the only type of co-conspirator
4    statement that we would offer to the jury is one where at
5    least two of the defendants are on the e-mail or on the memo
6    or on the report, and we've identified some of those, some
7    of those here today.
8            In terms of statements actually admitted to
9    date, there's the April 2009 catastrophic consequences
10   e-mail that came in as to knowledge to Mr. Harra about
11   appraisals, but that predated the conspiracy, and so it
12   wouldn't be a co-conspirator statement made in furtherance,
13   in any event.
14           And then there was the September 2009 e-mail
15   from Mr. Harra to Mr. Bailey after he received a copy of the
16   past due report, and said that delinquencies are headed in
17   the wrong direction.  That's also outside of the period, so
18   that wouldn't be a statement that would be made in
19   furtherance thereof.
20           And I think the other statement was Mr.
21   Terranova provided certain information to Mr. Gibson in the
22   summer of 2009.  Again, a period that predates the
23   conspiracy, and we're not, we're not going to argue to the
24   jury that those are co-conspirator statements.
25           THE COURT:  Well, when you say you are not going

6304

1    to argue to the jury, I mean, you would not normally -- I'm
2    not sure what you mean, you are not going to argue they're
3    co-conspirator statements.
4            MR. KRAVETZ:  Well, just getting to your point
5    as to whether it matters, I think it matters the way that
6    the evidence is used, whether it's notice, whether it's a
7    statement made by one defendant.  In particular, whether
8    it's a co-conspirator statement.
9            So as we look across the evidence that has been
10   introduced at trial, we only intend to ask the jury to
11   consider one-off statements by Mr. Terranova or Mr. Bailey,
12   where there aren't at least two defendants on the e-mail
13   chain to consider, to consider those statements
14   substantively against the members of the conspiracy.
15           THE COURT:  All right.  So let me just think
16   about this again for another minute.
17           All right.  Well, why don't you address what you
18   think is important to address.
19           MR. KRAVETZ:  So in terms of when the
20   criminality begins, I mean, we charged the criminality
21   starting in the third quarter of 2009, and that's by design,
22   because at that point, certainly, to the extent that the
23   waiver practice wasn't wrongful before, I think it goes to
24   what Your Honor said in some of the questioning, that from
25   that point forward, there's an inference that there isn't

6305

1    any good faith anymore because of the materiality of the
2    numbers, and also the notice and the knowledge that each of
3    the defendants had during the time period.
4            As we've noted in our papers, each defendant was
5    aware not only of the waiver practice, but the growing
6    magnitude of waived loans in 2009.  And we think that
7    reference to the waiver practice as a longstanding practice
8    is somewhat of a misnomer.  The e-mails introduced at trial,
9    we've talked a lot today about Exhibit 418.  It doesn't
10   refer to it as a decades long practice.  The reference is a
11   decade long problem.
12           There's another e-mail from Mr. North to
13   Mr. Harra and all the people that came into work on the last
14   weekend of March 2010, where there's a reference to the
15   matured loans beast.  So it's not saying, oh, hey, we've had
16   this practice for a long time.  It's, it's the matured loans
17   beast, and this has been a fire drill every quarter to
18   extend these loans.
19           Each of the defendants is aware of the state of
20   the economy as of the third quarter of 2009, the first
21   reporting period charged.  We've talked a lot about that
22   today during the morning session.
23           THE COURT:  I don't think that's in dispute.
24           MR. KRAVETZ:  I don't think so either.  I don't
25   think it's in dispute that each defendant was aware of that

6306

1    the Federal Reserve made specific criticisms of the bank's
2    lending practices, including tying to it the potential to
3    mask delinquency and nonaccrual reporting.
4            There's evidence --
5            THE COURT:  But how does the criticism that
6    interest reserves and supplemental interest financing could
7    mask deficiencies in loan portfolio, how does that factor
8    into proving that they knew the past due number was
9    underreported?
10           MR. KRAVETZ:  Well, I didn't say deficiencies.
11   I said delinquencies, Your Honor, and that was the specific
12   finding that was in the Fed report.  I think it was either
13   at 4-7 --
14           THE COURT:  Maybe I missed what you said.  Tell
15   me again.
16           MR. KRAVETZ:  So there were specific findings
17   about the use of supplemental financing, working capital
18   lines of credit, but what we introduced at trial was tied to
19   delinquencies and nonaccrual reporting.  And so within the
20   Fed report and the information also that was provided to
21   defendants during, certain defendants during loan discussion
22   and the exit meetings was that these were practices that had
23   a tendency to mask delinquency reporting and nonaccrual
24   reporting.
25           So with those findings, the defendants were on

6307

1    notice that these are practices that have been observed and
2    here is the potential that they have in order to mask the
3    specific past due reporting.
4            THE COURT:  Can you just show me that, because
5    that's not the way I remember those paragraphs being
6    written.
7            MR. KRAVETZ:  Ms. Lotharp, can you pull 221-R,
8    please?  Can you try page 22, and then keep going down.
9    Next page.  And so if you can enlarge the past due and
10   nonaccrual loan section.
11           So in the report, there is a reference to the
12   inordinate number of loans that have interest reserves
13   and/or working capital lines of credit that may be masking
14   the severity of the problem loans in the portfolio.
15           THE COURT:  Yes.  That's what I remember.
16           MR. KRAVETZ:  Yes.  And then on the next page,
17   there is a specific finding.  Next page.  Where there's
18   reference to working capital lines of credit and the ten
19   percent rule.
20           THE COURT:  Okay.  Hold on a minute.  Prevent
21   the masking of problem loans and delinquency levels, the
22   very last line?
23           MR. KRAVETZ:  Yes, Your Honor.  And Mr. Fomunyam
24   testified how that could be occurring and specific
25   information that was conveyed in the loan section.

6308

1            THE COURT:  Hold on just a minute.
2            (Pause.)
3            THE COURT:  So the upshot of this paragraph is
4    that it, in relevant part, is that it says working capital
5    lines and interest reserves can lead to situations where
6    there is masking of problem loans and delinquency levels.
7    But that's -- and how does that relate to the 90 days past
8    due loans?
9            MR. KRAVETZ:  Well, it absolutely relates to,
10   because it's talking in here about the masking of
11   delinquency levels.  And Mr. Fomunyam testified about these
12   specific paragraphs as well as the provision earlier and
13   talked about specific lending relationships where this was
14   being observed in the information that he was conveying to
15   bank personnel as a result.  And this is also information
16   that was conveyed in the course of the exit meeting by Mr.
17   Corkery, where Mr. Harra, Mr. Gibson and Mr. North were
18   present.
19           So you have a specific finding relating to
20   certain lending practices that lend themselves to keeping
21   loans current for interest.
22           We've had evidence of how loans were kept
23   current for interest in the third quarter and the fourth
24   quarters of 2009.  And all of that is wrapping together --
25   also with the one KPMG e-mail that Your Honor introduced,

6309

1    which was from January of 2009, where Mr. Depman had
2    informed the defendants that capitalizing interest by making
3    a second loan was a, quote unquote, "red flag," and that
4    came from the 2008 audit, and as a result, there was a
5    change to the bank's lending practices to --
6            THE COURT:  So I guess what I'm having trouble
7    seeing, Mr. Kravetz, is how the working capital lines of
8    credit, multiple interest reserves, how that relates to the
9    defendants' knowledge or something else about whether the
10   particular loans were past due or not.
11           MR. KRAVETZ:  Well, because it relates to
12   precondition for the waiver practices that loans are current
13   for interest.  And so through the testimony of Mr. Hart,
14   there is evidence that $103 million worth of loans that were
15   waived in the third and fourth quarter of 2009 were kept
16   current for interest because they were paid from some other
17   lending source.  So precondition of waiver practice, loans
18   are current for interest.
19           There's the Hart testimony.  There's also the
20   additional testimony from Mr. Fomunyam that he saw other
21   examples of that and shared it with defendant.
22           THE COURT:  But so let's assume that some of the
23   loans that are waived are kept current for interest
24   because of cross-payments or additional loans.  How does
25   that -- where does that lead you?

6310

1            MR. KRAVETZ:  Well, because it's shown that
2    there's no due diligence at all with respect to the waiver
3    practice.  It's an automatic waiver as long as the loan is
4    current for interest.  And defendants are placed on notice
5    that there are certain lending practices that might have
6    that particular impact, and the testimony from Steve
7    Cummings was the waiver decision was automatic, no due
8    diligence.
9            The testimony from Rich Conway in terms of the
10   walk-around was that there wasn't any due diligence other
11   than asking whether payments had actually been received or
12   somebody had gone out to the branch.  I know that defendants
13   disagree with that, and there was some additional evidence
14   on cross-examination, but that was the evidence that came
15   in.
16           So defendants are placed on notice of the
17   practice.  The practice has the impact of keeping a material
18   amount of loans current for interest.  It's certainly
19   probative in terms of --
20           THE COURT:  Isn't the argument here that the
21   defendants couldn't possibly have believed the current for
22   interest extension in progress was a, and I don't normally
23   talk like this, but a valid metric for extending the loan or
24   for taking it off the list?
25           MR. KRAVETZ:  Can you repeat that, Your Honor?

6311

1    THE COURT:  No.
2        MR. KRAVETZ:  Ms. Wolf is telling me yes,
3    because I think she heard you better than I did.
4        THE COURT:  So let me try again, because it's
5    important that we have a meeting of the minds here.
6        So the point about the working capital lines of
7    credit is to say that the interest payments being current
8    was a fairly meaningless thing.  That the walk-arounds,
9    taking the evidence in the light's most favorable view,
10   that the walk-arounds led to automatic -- there's a process
11   for extending with automatic without any actual analysis,
12   and therefore this relates to whether or not the defendants
13   in good faith thought that they could do what they were
14   doing?
15       MR. KRAVETZ:  Right.  There's the absence of
16   good faith because there's no diligence as to what's
17   happening with the loans, and the loans did not get waived,
18   because the loans wouldn't otherwise be current for interest
19   but for being supported by the additional supplemental
20   financing.
21       That's the connection.  If it's an automatic
22   practice, if there's no due diligence, these are loans that
23   wouldn't otherwise get waived unless they were current for
24   interest, and everyone has been placed on notice by the
25   Federal Reserve that this particular practice has the

6312

1    potential impact of masking delinquencies, and that's
2    exactly what happened.  That's the linkage, Your Honor.
3        THE COURT:  All right.
4        MR. KRAVETZ:  I think there was a reference to
5    whether the Federal Reserve knew or whether KPMG knew.
6    You know, we discussed that quite a bit this morning.
7        There was testimony from at least five outside
8    parties or five outside witnesses that they were unaware of
9    the waiver practice or unaware of mass extensions.
10       Jim Corkery, David Fomunyam, John Depman, Max
11   Hodgson and Michael Schechter, so five individuals from four
12   different outside organizations, they all testified under
13   oath that they were unaware of the waiver practice, unaware
14   of mass extensions.
15       On cross-examination, Mr. Corkery indicated that
16   he had never heard of such a practice before.  A couple days
17   ago on cross-examination, Mr. Schechter, in response to a
18   question from Mr. Wood about whether all the other banks
19   were doing it, said he had never heard of such a practice
20   before either.
21       So all five of the witnesses testified that they
22   were unaware of the waiver practice or mass extension.  And
23   when you start with the Federal Reserve, Your Honor, the
24   Federal Reserve specifically requested past due loan
25   information in advance of each, in advance of each

6313

1    examination.  And we saw the initial information provided to
2    the Federal Reserve, which was response L-6 in connection
3    with the 2009 exam.  And if Your Honor recalls, information
4    on that chart as to the reason why the loans were past due
5    was because some were matured, current for interest in the
6    process of extension, but they're on the list.
7        So Mr. Fomunyam testified, well, my
8    understanding is, this is how the bank is treating past due
9    loans, and it's the specific request that the Federal
10   Reserve makes.
11       I understand the defendants are going to make,
12   ask the jury to draw an inference based on the ALERT data.
13   We heard testimony from the Federal Reserve examiners that
14   that wasn't the purpose of ALERT.
15       THE COURT:  Right.  But, you know, I mean, I
16   don't think really either side should spend a lot of time
17   arguing about whether or not the Federal Reserve Board
18   should or should not have figured this out, because I think
19   whoever was making the argument, I think the relevance,
20   because I presume there's not going to be any testimony
21   of -- I mean, it just seems like, yes, there was -- it's
22   always easy to find something -- not always, but it's often
23   easy to find something if you know it's there.
24       If you are not looking for it --
25       MR. KRAVETZ:  I think that's the inference we'll

6314

1    ask the jury to draw, and I understand the defense will ask
2    the jury to draw a different inference, but that is my only
3    point with respect to whether third parties were aware.  I
4    know that I think that each of the defendants referenced
5    that --
6        THE COURT:  Yes.  Okay.
7        MR. KRAVETZ:  -- in their arguments.
8        THE COURT:  And I take it that you don't
9    disagree with the defendants, who all have said pretty much
10   there was no attempt to keep this a secret within the bank.
11       MR. KRAVETZ:  Well, there certainly were
12   individuals who were on e-mails in the bank who were aware
13   of the practice.  I think what's critically important is who
14   outside the bank didn't know.
15       THE COURT:  So I understand.  But just stick
16   with me for a minute.
17       MR. KRAVETZ:  Yes.
18       THE COURT:  Inside the bank, there's no attempt
19   to hide this from anyone.  Right?
20       MR. KRAVETZ:  Not inside the bank in terms of
21   the e-mails we've seen.  No, Your Honor.
22       THE COURT:  Okay.  Or since all I'm dealing with
23   is -- is there something else that is in the record that is
24   to the contrary?
25       MR. KRAVETZ:  I don't believe so, Your Honor,

6781

1                          - VOLUME 25 -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                          - - -

5     UNITED STATES OF AMERICA,     :   CRIMINAL ACTION
                                    :
6                     Plaintiff,    :
                                    :
7          vs.                      :
                                    :
8     DAVID R. GIBSON, ROBERT       :
      V.A. HARRA, WILLIAM           :
9     NORTH, and KEVYN RAKOWSKI,    :
                                    :
10                                  :
                      Defendants.   :   NO. 15-23-RGA
11

12
                                  - - -
13
                            Wilmington, Delaware
14                          Monday, April 23, 2018
                            8:40 o'clock, a.m.
15
                                  - - -
16
      BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17    jury

18                          - - -
      APPEARANCES:
19

20              LESLEY F. WOLF, ESQ.,
                ROBERT F. KRAVETZ, ESQ. and
21              JAMIE M. McCALL, ESQ.
                Assistant United States Attorneys
22

23                   Counsel for Plaintiff

24                          Valerie J. Gunning
                            Leonard A. Dibbs
25                          Official Court Reporters

6806

1  their testimony deserves.
2          You have heard the testimony of law enforcement
3  officers.  The fact that a witness is employed as a law
4  enforcement officer does not mean that his or her testimony
5  necessarily deserves more or less consideration or greater
6  or lesser weight than that of any other witness.  At the
7  same time, it is quite legitimate for defense counsel to try
8  to attack the believability of a law enforcement witness on
9  the ground that his or her testimony may be colored by a
10  personal or professional interest in the outcome of the
11  case.  You must decide, after reviewing all the evidence,
12  whether you believe the testimony of the law enforcement
13  witness and how much weight, if any, it deserves.
14          You have heard the testimony that Joseph
15  Terranova has made a plea agreement with the Government.
16          His testimony was received in evidence and may
17  be considered by you.  The Government is permitted to
18  present the testimony of someone who has reached a plea
19  agreement with the Government in exchange for his testimony,
20  but you should consider the testimony of Mr. Terranova with
21  great care and caution.
22          In evaluating Mr. Terranova's testimony, you
23  should consider this factor along with the others I have
24  called to your attention.  Whether or not Mr. Terranova's
25  testimony may have been influenced by the plea agreement is

6807

1  for you to determine.  You may give his testimony such
2  weight as you think it deserves.
3          You must not consider Mr. Terranova's guilty
4  plea as any evidence of any defendant's guilt.  His decision
5  to plead guilty was a personal decision about his own guilt.
6  Such evidence is offered only to allow you to assess the
7  credibility of the witness.  You may consider
8  Mr. Terranova's guilty plea only for this purpose.
9          You have heard the testimony of certain
10  witnesses.  You have also heard that before this trial,
11  certain witnesses made statements that may be different from
12  other witness' testimony in this trial.  It is up to you to
13  determine whether these statements were made and whether
14  they were different from the witness' testimony in this
15  trial.  These earlier statements were brought to your
16  attention only to help you decide whether to believe the
17  witness' testimony here at trial.  You cannot use it as
18  proof of the truth of what the witness said in the earlier
19  statement.  You can only use it as one way of evaluating the
20  witness' testimony in this trial.
21          The Rules of Evidence ordinarily do not permit
22  witnesses to state their own opinions about important
23  questions in a trial, but there are exceptions to these
24  rules.
25          In this case, you heard from Donald Walker as an

6808

1  expert in his field.  As such, Mr. Walker was permitted to
2  offer opinions in that field and the reason for those
3  opinions.
4          The opinions that this witness stated should
5  receive whatever weight you think appropriate, given all the
6  other evidence in the case.  In weighing the opinion
7  testimony, you may consider the witness' qualifications, the
8  reasons for the witness' opinions, and the reliability of
9  information supporting the witness' testimony, as well as
10  the other factors discussed in these instructions for
11  weighing the testimony of witnesses.  You may disregard an
12  opinion entirely if you decide that the opinion was not
13  based on sufficient knowledge, skill, experience, training,
14  or education.  You may also disregard an opinion if you
15  conclude that the reasons given in support of the opinion
16  are not sound, or if you conclude that the opinion is not
17  supported by the facts shown by the evidence, or if you
18  think that the opinion is outweighed by other evidence.
19          Defendants Harra, Gibson, North and Rakowski did
20  not testify in this case.  A defendant has an absolute
21  constitutional right not to testify.  The burden of proof
22  remains with the prosecution throughout the entire trial and
23  never shifts to the defendant.  A defendant is never
24  required to prove that he or she is innocent.  You must not
25  attach any significance to the fact that the defendant did

6809

1  not testify.  You must not draw any adverse inference
2  against him or her because he or she did not take the
3  witness stand.  Do not consider, for any reason at all, the
4  fact that the defendant did not testify.  Do not discuss the
5  fact during your deliberations or let it influence your
6  decision in any way.
7          A defendant who is an officer, director, or
8  employee of a corporation is not criminally responsible for
9  the alleged acts of other employees or subordinates merely
10  because the defendant held a position or positions with the
11  bank.  Therefore, it is not enough for the Government to
12  prove that certain activity occurred at Wilmington Trust to
13  demonstrate that the defendant knew of the activity or was
14  responsible for that activity.  Nor is it enough for the
15  Government to prove that one or more of the alleged
16  wrong-doers reported to the defendant.  In addition, you may
17  not infer that the defendant, based solely on his or her
18  position at Wilmington Trust, had any knowledge of any
19  particular activity.
20          Furthermore, it is not enough for the Government
21  to prove that the defendant could have known about any
22  particular activity.  You have heard reference at times
23  during the trial to Wilmington Trust internal policies
24  and procedures.  While you should consider thoughtfully
25  evidence as to whether one or more of the defendants may

6810

1    or may not have violated internal policies or procedures,
2    such a violation, by itself, is not a violation of criminal
3    law.
4         To the extent that the Government alleges
5    that one or more of the defendants may have violated a
6    bank policy or procedure, I instruct you that, whatever
7    you may determine from the evidence, a defendant who has
8    merely violated a bank policy or procedure or acted contrary
9    to a bank policy or procedure is not guilty of any federal
10   crime.
11        To convict a defendant of a crime, the
12   Government must prove beyond a reasonable doubt that each
13   element of the criminal statutes, which I will describe for
14   you, has been met.
15        You may, however, consider evidence of knowing
16   and intentional violations of internal policies and
17   procedures, as you would other evidence in determining
18   whether any of the defendants devised a scheme to defraud,
19   acted knowingly, willfully, or with the intent to defraud.
20   It is entirely up to you what weight to give this evidence.
21        You have heard reference at times during the
22   trial to regulations, regulatory guidance, and guidelines,
23   including SEC guidance, schedule RC-N instructions, and
24   generally accepted accounting principles (to as GAAP).
25   While you should consider thoughtfully evidence as to

6811

1    whether one or more of the defendants may or may not have
2    violated a regulation or GAAP, you are instructed that a
3    violation of regulations, regulatory guidelines, and
4    guidance, including SEC guidance, schedule RC-N
5    instructions, and GAAP, is not, by itself, a violation of
6    criminal law.
7         To the extent that the Government alleges that
8    one or more of the defendants may have violated a regulation
9    or GAAP, I instruct you that, whatever you may determine
10   from the evidence, a defendant who has merely violated a
11   regulation or GAAP or acted contrary to regulatory guidance
12   or guidelines is not guilty of any federal crime.  To
13   convict a defendant of a crime, the Government must prove
14   beyond a reasonable doubt that each element of the criminal
15   statutes, which I will describe for you, has been met.
16        You may, however, consider evidence of knowing
17   and intentional violations of federal banking and securities
18   laws, regulations and rules, as you would other evidence in
19   determining whether any of the defendants devised a scheme
20   to defraud, acted knowingly, willfully, or with the intent
21   to defraud.  It is entirely up to you what weight to give
22   this evidence.
23        You will note that the indictment charges that
24   the offense was committed on or about or in or around a
25   certain date.  The Government does not have to prove with

6812

1    certainty the exact date of each alleged offense.  It is
2    sufficient if the Government proves beyond a reasonable
3    doubt that the offense was committed on a date reasonably
4    near the date alleged.
5         The offenses charged in the indictment require
6    that the Government proof beyond a reasonable doubt that the
7    defendant you are considering acted knowingly, willfully,
8    and/or with intent to defraud.
9         These mental states apply to the various
10   offenses I will define shortly.  I will define the mental
11   states for you now, and as I read through the elements of
12   the offenses, I will tell you when a particular mental state
13   applies.
14        To act knowingly means that the Government must
15   prove beyond a reasonable doubt that the defendant you are
16   considering was conscious and aware of the nature of his or
17   her actions and of the surrounding facts and circumstances,
18   as specified in the definition of the offenses charged.  In
19   deciding whether the defendant acted knowingly, you may
20   consider evidence about what the defendant said, what the
21   defendant did and failed to do, how the defendant acted, and
22   all the other facts and circumstances shown by the evidence
23   that may prove what was in the defendant's mind at that
24   time.
25        To act willfully means the Government must prove

6813

1    beyond a reasonable doubt that the defendant you are
2    considering knew his or her conduct was unlawful and
3    intended to do something that the law forbids.  That is,
4    to find that the defendant acted willfully, you must find
5    that the evidence proved beyond a reasonable doubt that
6    the defendant acted with a purpose to disobey or disregard
7    the law.  Willfully does not, however, require proof that
8    the defendant had any evil motive or bad purpose other than
9    the purpose to disobey or disregard the law.  Willfully
10   does not require proof that the actor knew of the existence
11   and meaning of the statute making his or her conduct
12   criminal.
13        To act with an intent to defraud means to act
14   knowingly and with the intention or the purpose to deceive
15   or to cheat.  In considering whether a defendant acted with
16   an intent to defraud, you may consider, among other things,
17   whether the defendant acted with a desire or purpose to
18   bring about some gain or benefit to himself or herself or
19   someone else or with a desire or purpose to cause some loss
20   to someone.
21        You may consider both direct evidence and
22   circumstantial evidence, including a defendant's words or
23   conduct and other facts and circumstances, in deciding
24   whether the defendant you are considering had the required
25   knowledge and criminal intent.

6822

1      By the way, just so you aren't wondering later
2  on, there is no Count 3.
3      As I explained at the beginning of trial, an
4  indictment is just the formal way of specifying the exact
5  crimes the defendants are accused of committing.  An
6  indictment is simply a description of the charges against a
7  defendant.  It is an accusation only.  An indictment is not
8  evidence of anything, and you should not give any weight to
9  the fact that anyone has been indicted in making your
10  decision in this case.
11      In order to find a defendant guilty of any of
12  the charged offenses, you must all find that the Government
13  proved each element of that offense beyond a reasonable
14  doubt, as I will explain in more detail shortly.
15      Count 1 of the indictment charges that from in
16  or around October 2009, through in or around November 2010,
17  in the District of Delaware, Defendants Robert Harra, David
18  Gibson, Kevyn Rakowski, and William North agreed or
19  conspired with one or more other persons, including Brian
20  Bailey and Joseph Terranova, to defraud the United States
21  and to commit offenses against the United States, namely
22  securities fraud, making false statements in quarterly and
23  annual reports filed with the Securities and Exchange
24  Commission, and making false statements to the Securities
25  and Exchange Commission and the Federal Reserve.

6823

1      Count 1 further charges that, to further the
2  objective of the conspiracy, at least one member of the
3  conspiracy committed at least one overt act, as alleged in
4  the indictment.
5      It is a federal crime for two or more persons to
6  agree or conspire to defraud the United States or to commit
7  any offense against the United States, even if they never
8  actually achieve their objective.  A conspiracy is a kind of
9  criminal partnership.
10      In order for you to find the defendant you are
11  considering guilty of conspiracy to defraud the United
12  States or to commit an offense against the United States,
13  you must find that the Government proved beyond a reasonable
14  doubt each of the following four elements.
15      First:  That two or more persons agreed to
16  defraud the United States or to commit an offense against
17  the United States, as charged in the indictment.  Defraud
18  the United States means to obstruct or interfere with one of
19  the United States Government's lawful functions, by deceit,
20  craft, trickery, or dishonest means.  Because each of the
21  offenses against the United States alleged in the conspiracy
22  count are also alleged as separate offenses, I will explain
23  the elements of those alleged offenses against the United
24  States to you shortly.
25      Second:  That the defendant was a party to or

6824

1  member of that agreement.
2      Third:  That the defendant you are considering
3  joined the agreement or conspiracy knowing of its objective
4  to defraud the United States or to commit an offense against
5  the United States and intending to join together with at
6  least one other alleged conspirator to achieve one of the
7  objectives; that is, that the defendant and at least one
8  other alleged conspirator shared a unity of purpose and the
9  intent to achieve a common goal or objective, to defraud the
10  United States or to commit an offense against the United
11  States.
12      And, fourth:  That at some time during the
13  existence of the agreement or conspiracy, at least one of
14  its members performed an overt act in order to further the
15  objective of the agreement.
16      I will explain each of these elements in more
17  detail.
18      The first element of the crime of conspiracy is
19  the existence of an agreement.  The Government must prove
20  beyond a reasonable doubt that two or more persons knowingly
21  and intentionally arrived at a mutual understanding or
22  agreement, either spoken or unspoken, to work together to
23  achieve an overall objective of the conspiracy, to defraud
24  the United States or to commit an offense against the United
25  States, to commit securities fraud, to make false statements

6825

1  in quarterly and annual reports filed with the Securities
2  and Exchange Commission, and to make false statements to
3  the Securities and Exchange Commission and the Federal
4  Reserve.
5      The Government does not have to prove the
6  existence of a formal or written agreement, or an express
7  oral agreement spelling out the details of the
8  understanding.  The Government also does not have to prove
9  that all the members of the conspiracy directly met, or
10  discussed between themselves their unlawful objectives, or
11  agreed to all the details, or agreed to what the means were
12  by which the objectives would be accomplished.  The
13  Government is not required to prove that all people named in
14  the indictment were, in fact, parties to the agreement, or
15  that all members of the alleged conspiracy were named, or
16  that all members of the conspiracy are known.  What the
17  Government must proof beyond a reasonable doubt is that two
18  or more persons in some way or manner arrived at some type
19  of agreement, mutual understanding, or meeting of the minds
20  to try to accomplish a common and unlawful objective.
21      You may consider both direct evidence and
22  circumstantial evidence in deciding whether the Government
23  has proved beyond a reasonable doubt that an agreement or
24  mutual understanding existed.  You may find the existence of
25  a conspiracy based on reasonable inferences drawn from the

6826

1  actions and statements of the alleged members of the
2  conspiracy, from the circumstances surrounding the scheme,
3  and from evidence of related facts and circumstances which
4  prove that the activities of the participants in a
5  criminal venture could not have been carried out except
6  as the result of a preconceived agreement, scheme, or
7  understanding.
8         The indictment charges a conspiracy to commit
9  several unlawful objectives, i.e., to defraud the United
10 States, to commit securities fraud, to make false statements
11 in reports filed with the SEC, and to make false statements
12 to the SEC and federal regulators.  The Government does
13 not have to prove that the alleged conspirators agreed to
14 commit all of these unlawful objectives.  The Government,
15 however, must prove that they agreed to commit at least
16 one of the unlawful objectives, and you must unanimously
17 agree on which unlawful objective.  You cannot find a
18 defendant guilty of conspiracy unless you unanimously agree
19 that the same federal crime was the objective of the
20 conspiracy.  It is not enough if some of you agreed that one
21 of the charged crimes was the objective of the conspiracy
22 and others agree that a different crime was the objective of
23 the conspiracy.
24        If you find that a criminal agreement or
25 conspiracy existed, then in order to find a defendant guilty

6827

1  of conspiracy, you must also find that the Government proved
2  beyond a reasonable doubt that the defendant knowingly and
3  intentionally joined that agreement or conspiracy during its
4  existence.  The Government must prove that the defendant you
5  are considering knew the goal or objective of the agreement
6  or conspiracy and voluntarily joined it during its
7  existence, intending to achieve the common goal or objective
8  and to work together with the other alleged conspirators
9  toward that goal or objective.
10        The Government need not prove that the defendant
11 you are considering knew everything about the conspiracy or
12 that he or she knew everyone involved in it, or that he or
13 she was a member from the beginning.  The Government also
14 does not have to prove that the defendant played a major or
15 substantial role in the conspiracy.
16        You may consider both direct evidence and
17 circumstantial evidence in deciding whether the defendant
18 joined the conspiracy, knew of its criminal objective, and
19 intended to further the objective.  Evidence which shows
20 that the defendant only knew about the conspiracy, or only
21 associated with other members of the conspiracy, or was only
22 present when it was discussed or when a crime was committed,
23 is not sufficient to prove that the defendant was a member
24 of the conspiracy even if the defendant approved of what was
25 happening or did not object to it.  Likewise, evidence

6828

1  showing that the defendant may have done something that
2  happened to help a conspiracy does not necessarily prove
3  that he or she joined the conspiracy.  You may, however,
4  consider this evidence, with all the other evidence, in
5  deciding whether the Government proved beyond a reasonable
6  doubt that the defendant joined the conspiracy.
7         In order to find the defendant you are
8  considering guilty of conspiracy, you must find that the
9  Government proved beyond a reasonable doubt that the
10 defendant joined the conspiracy knowing of one of its
11 objectives and intending to help further or achieve that
12 objective.
13        That is, the Government must prove, as to the
14 defendant you are considering:  One, that the defendant knew
15 of an objective or goal of the conspiracy; two, that the
16 defendant joined the conspiracy intending to help further or
17 achieve that goal or objective; and, three, that the
18 defendant and at least one other alleged conspirator shared
19 a unity of purpose toward that objective or goal.
20        To convict a defendant of conspiracy to defraud
21 the United States, the Government must prove that the
22 defendant acted with intent to defraud.  I have previously
23 instructed you on the definition of intent to defraud.
24        To convict a defendant of conspiracy for
25 committing an identified offense against the United States,

6829

1  the Government must prove whatever mental state is required
2  for conviction of the underlying substantive offenses.  The
3  Government has alleged three possible underlying substantive
4  offenses in Count 1:  To commit securities fraud, to make
5  false statements in reports filed with the SEC, and to make
6  false statements to the SEC and federal regulators, which I
7  will explain in more detail.  Each of these offenses
8  requires that the Government proved beyond a reasonable
9  doubt that the defendant committed the offense knowingly,
10 willfully, and/or with intent to defraud, which I defined
11 for you earlier.  I will tell you which mental states apply
12 to the underlying substantive offenses.
13        With regard to the fourth element of
14 conspiracy -- over acts -- the Government must prove
15 beyond a reasonable doubt that during the existence of the
16 conspiracy, at least one member of the conspiracy performed
17 at least one of the overt acts described in the indictment,
18 for the purpose of furthering or helping to achieve the
19 objective of the conspiracy.
20        The indictment alleges the following overt acts
21 committed in furtherance of the conspiracy:
22        Wilmington Trust Corporation filed with the
23 SEC a Form 10-Q for the third quarter of 2009 and the first
24 and second quarters of 2010, as well as a Form 10-K for
25 2009, with each SEC report materially misrepresenting the

6834

1   objective was agreed upon by the alleged co-conspirators.
2   It is not enough to convict that some of you find that the
3   Government has proven an agreement to knowingly accomplish
4   one unlawful objective, while others of you find that the
5   Government has proven to accomplish a different unlawful
6   objective.
7           If you do not all agree unanimously, that the
8   Government proven beyond a reasonable doubt an agreement to
9   knowingly accomplish the same unlawful objective, you must
10  return a verdict of not guilty for all defendants with
11  respect to Count I.
12          Members of the jury, I think we're about halfway
13  through the instructions. We're going to take a five-minute
14  break so I can rest my throat.
15          And also so you all can walk to the jury room
16  and do whatever you may do to try to make yourself ELERT.
17  You all seem to be pretty ELERT. It's a hard thing to do.
18          But in any event, we'll take a short break.
19          Take the jury out, please.
20          (Jury left the courtroom.)
21          THE COURT: All right.
22          So it really will be a short break. We'll be
23  back in an about five minutes.
24          (A break was held.)
25          THE COURT: All right.

6835

1           We're ready to continue. Let's get the jury.
2           (At this time the jury entered the courtroom.)
3           THE COURT: All right.
4           Members of the jury, welcome back, everyone.
5   You may be seated.
6           I have put in a request to try to lower the
7   temperature in here.
8           Members of the jury, I will now instruct you on
9   the substantive securities fraud count, Count II.
10          Count II of the Indictment alleges that from on
11  or about December 2009, up to on or about February 2010, Mr.
12  Gibson, Mr. Harra, Mr. North, and Ms. Rakowski committed
13  securities fraud.
14          As to each defendant you are considering, the
15  Government must prove each of the following elements beyond
16  a reasonable doubt:
17          One, that the defendant you are considering
18  executed, or attempted to execute, a scheme or artifice.
19          a, to defraud persons in connection with the
20  securities of Wilmington Trust Corporation or,
21          b, to obtain, by means of materially false and
22  fraudulent pretences, representations, and promises, or by
23  statements containing material omissions, money and property
24  in connection with the purchase and sale of the securities
25  of Wilmington Trust Corporation.

6836

1           Two, that the defendant you are considering
2   acted knowingly and with the intent to defraud; and
3           Three, that Wilmington Trust Corporation is an
4   issuer of a class of securities registered under Section 12
5   of the Securities Exchange Act of 1934 (15 U.S.C. Section
6   781) or that it is required to file a report under Section
7   15(d) of the Securities Exchange Act of 1934 (15 U.S.C.
8   Section 78o(d).
9           A scheme or artifice to defraud in the context
10  of Count II is any plan, device, or course of action to
11  obtain money or property by false or fraudulent pretenses.
12          The Government must prove beyond a reasonable
13  doubt that the scheme contemplated or intended some harm to
14  property rights of another.
15          The requirement is satisfied if you find either
16  the Government proved beyond a reasonable doubt that the
17  defendant intended that other individuals would make
18  investment decisions based on materially fraudulent
19  misrepresentations.
20          You should ignore the word "either" there.
21          The first element that the Government must prove
22  beyond a reasonable doubt is that the defendant you are
23  considering executed a scheme to either:
24          One, defraud investors by making materially
25  false or fraudulent statements in connection with the

6837

1   securities of Wilmington Trust Corporation, or
2           Two, fraudulently obtained money and property in
3   connection with the purchase and sale of the securities of
4   Wilmington Trust Corporation.
5           With respect to one, the Government must prove
6   beyond a reasonable doubt that the defendant you are
7   considering executed, or attempted to execute a scheme or
8   artifice to defraud investors by making materially false or
9   fraudulent statements in connection with the securities of
10  Wilmington Trust Corporation.
11          With respect to two, the Government must prove
12  beyond a reasonable doubt that the defendant you are
13  considering executed, or attempted to execute a scheme or
14  artifice to obtain money by means of materially false or
15  fraudulent pretenses, representations, or promises in
16  connection with the purchase of sales of the securities of
17  Wilmington Trust Corporation.
18          To find the that Government has proven the first
19  element of Count II beyond a reasonable doubt with respect
20  to the defendant you are considering, you must be unanimous
21  that the Government has proven beyond a reasonable doubt
22  that the defendant executed, or attempted to execute either
23  one, a scheme to defraud investors by making materially
24  false or fraudulent statements in connection with the
25  securities of Wilmington Trust Corporation, or, two, a

6874

1    Gibson was materially false.                Whether a
2    certification was materially false, must be determined at
3    the time it was made.
4              The Government contends that the certifications
5    in Counts XVII through XIV were false because loans that
6    were matured, current for interest payments, and in the
7    process of extensions, were past due and were required to be
8    reported as past due pursuant to either Section 13(a) or
9    15(d) of the Securities Exchange Act.
10             Whether a certification was materially false
11   must be determined at the time it was made; the
12   certification may not be considered false merely because
13   subsequent events prove it to be erroneous.
14             With respect to the phrase "in all material
15   respects," please use the definition of materiality that was
16   given in connection with Count II, i.e., information is
17   material only if there is a substantial likelihood that a
18   reasonable investor would have viewed the information as
19   having significantly altered the total mix of information
20   available.
21             This means that if you find that a particular
22   statement of fact was false, you must determine whether
23   there was a substantial likelihood that the statement was
24   one that a reasonable investor would have viewed as having
25   significantly altered the total mix of information available

6875

1    in making his or her decision.
2              In fifth essential element of Counts XVII
3    through XIV that the Government must prove beyond a
4    reasonable doubt is that at the time the certification was
5    made, Mr. Gibson knew that the certification was false.
6              It also means that the Government must prove
7    beyond a reasonable doubt that Mr. Gibson was conscious and
8    aware that the periodic report to which that count pertains,
9    did not comply with the requirements of Section 13(a) or
10   15(d) of the Securities Exchange Act of 1934, and the
11   information contained in the periodic report did not fairly
12   present, in all material respects, the financial condition
13   and results of operations of f Wilmington Trust.
14             The Government must prove that Mr. Gibson made
15   the certification voluntarily and intentionally, conscious
16   and aware that the certification was false, and not because
17   of mistake or accident or any other innocent reason.
18             An honest or good faith belief by Mr. Gibson
19   that the certification was accurate, meaning an honest or
20   good faith belief by Mr. Gibson that loans that were
21   matured, interest- current, and in the process of extension
22   were not past due, and were not required to be reported as
23   past due, is a complete defense to this charge.
24             It is a complete defense to this charge even if
25   Mr. Gibson's good faith belief were mistaken or incorrect.

6876

1              The meaning of good faith is as I defined it
2    before.
3              In deciding whether Mr. Gibson acted knowingly,
4    you may consider evidence about what Mr. Gibson said, what
5    Mr. Gibson did and failed to do, how Mr. Gibson acted, and
6    all other facts and circumstances shown by the evidence that
7    may prove what was in Mr. Gibson's mind at that time.
8              Members of the jury, there are another four
9    pages.  I will read them to you after you hear the closing
10   arguments.  There is no reason to read ahead on what the
11   lawyers will be arguing.
12             So we're going to take a 15 minute break.
13             The plan is this.
14             We're going to go until about 1:00 o'clock.
15             On what the lawyers told me, I expect the
16   Government's argument, since they go first, is going to last
17   longer than before 1:00 o'clock.
18             So they'll go to then.  We'll break an hour for
19   lunch.  We'll come back and they'll continue.
20             That's the plan.
21             Can we take the jury out and have a 15-minute
22   break here?
23             (The jury was excused for a short recess.)
24             THE COURT:  All right.  So it occurs to me
25   that -- you can be seated -- that on page 69, the following

6877

1    documents, they're the 10-Q and the 10-K.  Right?
2              MR. NOWAK:  Right.
3              MR. KRAVETZ:  Yes, Your Honor.
4              THE COURT:  I think once upon a time the
5    instruction about the 10-Q and 10-K followed this
6    instruction and we moved it up front because I thought that
7    is logically more where it went.  So when they come back, I
8    will just tell them that that is what I meant there.  All
9    right?
10             MR. WOOD:  Yes.
11             THE COURT:  Anything else?
12             MR. KRAVETZ:  No, Your Honor.
13             MR. WOOD:  No Your Honor.
14             THE COURT:  All right.  We'll take a 15-minute
15   break.
16             (Short recess taken.)
17                  -  -  -
18             (Proceedings resumed after the short recess.)
19             THE COURT:  All right.  Is everyone ready?
20             MR. KRAVETZ:  Yes, Your Honor.
21             THE COURT:  All right.  Let's get the jury.
22             Mr. Kravetz, so you choose the time like within
23   plus or minus five minutes of 1:00 o'clock.  Okay?
24             MR. KRAVETZ:  Yes, Your Honor.
25             (The jury entered the courtroom.)

6878

1    THE COURT: All right, members of the jury.
2  Welcome back. Everyone, you may be seated.
3         Members of the jury, you may recall that there
4  was one instruction I stumbled over, which had to do with
5  Counts 4 to 6, and it appears at page 69, where I was
6  talking about some documents that constituted application,
7  the documents required to be filed with the Securities and
8  Exchange Commission. It was supposed to say, "And those two
9  documents are the 10-Q and the 10-K." So that's what that
10 was about.
11        All right. Mr. Kravetz?
12        MR. KRAVETZ: Thank you, Your Honor. May it
13 please the Court, counsel. Good morning, ladies and
14 gentlemen.
15        The evidence has shown beyond all reasonable
16 doubt that the defendants caused Wilmington Trust to lie
17 about its past due loans, that the defendants knew what they
18 were doing was wrong, and that the lie mattered.
19        The lie mattered because it delayed the Federal
20 Reserve from finding out the bank's true condition, and it
21 mattered because the public invested over $280 million based
22 on that lie. And when it comes down to it, that's what this
23 case is about. It's not about complex banking theories.
24 It's something much more simpler than that, the defendants'
25 failure to tell the truth.

6879

1         Now, we've been together for several weeks.
2  You've heard from a number of witnesses. You've had a
3  chance to review a number of pieces of evidence, and the
4  goal today is to go through that witness testimony, to go
5  through the evidence, and to see how it relates to the
6  defendants, both individually and collectively.
7         And so where I would like to begin is, because
8  this is important with respect to all of the counts in the
9  indictment, is what is happening at Wilmington Trust in the
10 third quarter of 2009, which was the beginning of the
11 charged conduct.
12        We've heard from multiple witnesses, probably
13 every single witness, that the third quarter of 2009 was the
14 midst of the Great Recession. We were also, the bank was
15 also in the aftermath, a very critical Federal Reserve
16 examination, and we'll talk about that and some of the very
17 relevant findings.
18        And, third, there was an entire group of
19 commercial loans that were made in 2004 to 2006 that were
20 coming due.
21        I will start first with certain relevant
22 statistics, and this is from the bank's Form 10-K for 2009.
23 You heard testimony about the growth of Wilmington Trust's
24 commercial loan portfolio, and that's reflected in its
25 public filings. And you can see in 2005, Wilmington Trust's

6880

1  total loans amounted to $7.4 billion. That number went up
2  to $8.9 billion, or roughly 9 billion by 2009. And there
3  was significant growth relating to commercial loans. In the
4  three-year, or the two-year period between 2007 and 2009,
5  commercial loans grew from $5.6 billion to $6.7 billion. So
6  $1.1 billion in growth in commercial loans during that time
7  period. The bank was also making a lot of interest income
8  off of the loans that it made during the boom period. And
9  you can see that reflected in the Form 10-K as well where
10 net interest income rises from $500 million in 2005 to
11 $720 million in 2007 before it starts declining.
12        What else do we know from the evidence? That at
13 or around the period of the third quarter of 2009, home
14 builders were struggling and home sales were declining, and
15 that's borne out by the bank's over internal statistics.
16        We saw when Margery Stuart testified that there
17 was a document that was circulated throughout the bank
18 showing certain statistics relating to the housing market,
19 and this is just an example, and this is from Government's
20 Exhibit 937-A. But as you can see in 2008, you have a
21 drastic decline in building permits. There's just a
22 stalling in the market in terms of building homes. And the
23 graph is particularly striking. Look at the high point in
24 2005, 25,000-plus total permits within the area. That goes
25 down to 8,200 in 2009. The economy was stalled. Home

6881

1  prices also declined.
2         Now, you can review the exhibit, but the
3  particular enlargement here is showing in the first line
4  decline in the median sales price in New Castle County by
5  approximately $43,000 from 2008 to 2009. In Kent County,
6  there was a decline of about 25,000. And in Sussex and down
7  by the beach area, almost $50,000. So this is the
8  information that is relevant at or around the third quarter
9  of 2009. Every relevant housing statistic is going in the
10 wrong direction. Units sold are down. Units listed are
11 down. The sales price is down. The days on the market is
12 going up because it's much more difficult to sell a home.
13 Active listings are going down, and the supply in months,
14 because we have more houses that can't be sold, that's going
15 up as well.
16        You also saw an exhibit that was originally sent
17 by Mr. Terranova to Mr. Bailey talking about specifically
18 the impact on the Delaware economy on residential home
19 builders, and that was at Exhibit Number 405. And if you
20 recall the e-mail from Mr. Bailey back to Mr. Terranova, he
21 indicated that the information they were getting back from
22 appraisals had the "near term potential for catastrophic
23 consequences."
24        Now, that particular document, particular
25 e-mail, was forwarded by Mr. Bailey to Mr. Harra in the

6942

1  Look at the evidence.  An e-mail from Mr. North to
2  Mr. Harra, December 16, 2009, in which Mr. North refers to
3  loans that were extended as "credit turds."  Many of these
4  credit turds will simply take some time to make or get
5  better.
6         An e-mail from Mr. Brewer talking about certain
7  loan relationships that were extended.  Once again, this is
8  an e-mail from early January 2010, referring to the Reybold
9  relationship, which was signed one day after, received the
10  loan documents.  It notes, it had a negative monthly cash
11  flow of something north of $300,000.  And he noted during
12  his testimony, that would be pretty much losing $3.6 million
13  worth of cash throughout the calendar year.
14         P.J. Bale, that lending relationship we've heard
15  a lot about over the course of the trial.  It's referred to
16  by Mr. Brewer as "speculative development."
17         What else do we know from the evidence that all
18  of the defendants know?  And, again, all of the defendants
19  are copied on this e-mail.  It's an e-mail dated
20  January 25th of 2010.
21         If you recall, Mr. Brewer testified about the
22  surge, the "troop surge" where they brought lenders down
23  from Pennsylvania and up to Maryland because the Delaware
24  lenders didn't have the time, the resources or the
25  capabilities to get their arms around the lending portfolio.

6943

1  And one of the goals of the surge process was to take a look
2  at loans that had been extended on a short-term basis at
3  year-end.
4         So here we are now, January 25th of 2010,
5  and now bank employees are starting to look at these
6  loans and talking about the impact of the surge on risk
7  rating.
8         And just 25 days into the month in January of
9  2010, the recommendation is from the first wave of the surge
10  results, that there are going to be $446 million worth of
11  loan downgrades just in the first 25 days of a month.  This
12  is the information that all of the defendants have and it's
13  in late January of 2010.
14         Count 2 of the indictment charges the defendants
15  with securities fraud, and His Honor instructed you as to
16  what the standard is in terms of the scheme to defraud.
17  That it's any plan, device, or course of action to deprive
18  another of money or property by means of materially false or
19  fraudulent pretenses, representations or promises reasonably
20  calculated to deceive persons of average prudence.
21         And there's an additional instruction in terms
22  of what can include a false statement.
23         Now, under the scheme to defraud instructions,
24  the Government is not required to prove that a particular
25  defendant originated the fraud scheme.  It's not necessary

6944

1  that the Government prove that a defendant actually realized
2  any gain from the scheme, or that any intended victim
3  actually suffered any loss.
4         But you may consider whether the scheme
5  succeeded in determining whether it actually existed.
6         And what was the scheme?  The scheme was to lie
7  about the bank's past due loans and related disclosures in
8  connection with the February of 2010 capital raise.
9         What was the purpose or benefit of the scheme?
10  Essentially, at that time it was to keep the bank, which was
11  in deep trouble, afloat.  It was to provide a benefit to the
12  bank through the capital raise.
13         And you can infer from the evidence that as of
14  February 22nd of 2010, the bank was in trouble, and the
15  defendants -- the investors did not know the true condition,
16  the true financial condition of the bank, particularly,
17  focused particularly on its reporting of 90-day past due
18  loans.  And the investors ultimately invest $287 million in
19  a capital raise.
20         When is all of this happening?  Just to follow
21  the timeline, we've just seen a number of e-mails from
22  October, November, December of 2009, January of 2010.  Well,
23  remember the Fed came back for a target exam in January of
24  2010.  It commenced on January 4th and concluded on
25  January 29th of 2010.  And all of the information that we

6945

1  have just discussed, all of the e-mail results, everything
2  relating to the surge process and mass extensions, that is
3  all information that the defendants knew at the time that
4  the Federal Reserve was onsite in January of 2010.  And the
5  testimony from Mr. Corkery, Mr. Fomunyam, is that none of
6  the defendants said a word about it.  In fact, the testimony
7  from Mr. Fomunyam is, he didn't realize that the bank had
8  engaged in a number of short-term extensions until he came
9  back in the summer of 2010 and noticed it in the course of
10  credit file reviews, and he told you how he raised it in a
11  meeting and said that it had the potential to mask the
12  reporting of past due loans.
13         Also focusing on the context, you'll see on the
14  screen Government's Exhibit 435.  This is the, one of the
15  offering documents from JP Morgan.  And you heard Michael
16  Schechter, who was the book runner from JP Morgan, who came
17  in and testified about the process of raising capital for
18  the bank, and that there was an organizational meeting on
19  February 1st of 2010, that Mr. Gibson and Ms. Rakowski
20  attended, and that there was a business due diligence
21  meeting on February 11th of 2010 that was attended by Mr.
22  North and Mr. Harra.
23         And this particular document listed all of the
24  due diligence questions that the underwriters asked in
25  connection with the process before the capital raise.  And

6990

1    So not only does Mr. Gibson have the attachment
2  forwarded to him which has all the information contained
3  therein, but the controller, the person who works directly
4  for him, is telling him, we did pull the waived loans.
5  They are not included in what we are reporting to the
6  public.
7    Mr. Gibson also spoke on behalf of the bank, and
8  not only did he speak on behalf of the bank, he made certain
9  statements relating to past due loans.
10    This is an important exhibit, Government
11  Exhibit 544, and it goes to Mr. Gibson's knowledge of
12  whether matured loans are past due.
13    And so you see at the bottom of the document,
14  it's an e-mail from Mr. Gibson to Mr. North and Ms. Towe on
15  July 7th of 2010.  The subject is matured loan affecting
16  delinquency and Fed pledged loans.
17    Mr. Gibson writes:  What does approved but not
18  documented mean?  Don't we document the approval?  Clearly
19  just matured and current does not cut it.
20    And so Mr. North responds.  I mean that we've
21  approved it internally, in the normal channel, but any
22  needed loan documentation has not been drafted and executed.
23    And what is Mr. Gibson's response?  Those are
24  past due.  We need those loans where we have executed
25  agreements.

6991

1    It gets back to some of the concepts that we
2  talked about this morning, the falsity of the past due loan
3  reporting, and the fact that everyone within the bank, at
4  least the four defendants, were aware that documents were
5  required, executed documents in order to validate, extend
6  loans.
7    I mention that Mr. Gibson spoke on behalf of the
8  bank as the CFO.  He would spoke in roadshows.  He would
9  spoke during the course of earnings calls.  This is an
10  earnings call as of July 23rd of 2010, where the bank is
11  reporting its results for the second quarter of 2010.
12    Mr. Gibson is asked a very specific question:
13  Could you provide some color on why they understood that the
14  90-day delinquency loans should not go into nonaccrual
15  status because, again, it has to be one or the other.  It's
16  either past due or nonaccrual.
17    And the answer to Mr. Gibson is, there was a
18  group of loans that for a variety of reasons, the renewal
19  process is taking longer than expected.  They are current on
20  interest, but technically, because they have matured, they
21  are past due principal.
22    And he notes, as a technical matter, a matured
23  loan is past due principal.  That's the understanding of the
24  Chief Financial Officer of Wilmington Trust in terms of when
25  loans should be reported as past due.  None of this matured,

6992

1  in process of extension.  It's past due unless you have the
2  documents executed.
3    And imagine, ladies and gentlemen, if this
4  standard was applied in the third quarter or fourth quarter
5  of 2009, or the first quarter of 2010, when we saw the
6  volume of waived loans, the relevant waived loans that
7  weren't matured, and ask yourselves how the numbers would
8  have looked if Wilmington Trust would have reported past due
9  loans, as Mr. Gibson described in the 2010 second quarter
10  earnings call.
11    There is evidence, and we've seen certain
12  documents and e-mails, and Mr. Gibson received a copy of the
13  credit risk section of the MD&A for the Form 10-K.  Here is
14  an exhibit that was introduced through Ellen Roberts in the
15  second quarter of 2010, where Mr. Gibson is suggesting
16  deleting the paragraph on the increase in past due 90-day
17  loans, and notes that the amount nearly tripled, which could
18  be viewed as a leading indicator.  Shouldn't we address
19  this?
20    We saw in the Form 10-K, the bank tells the
21  public, the defendants who signed the report tell the public
22  the 90-day past due loan information is one of their most
23  important metrics, and here there is a suggestion to remove
24  that metric, to not address the increase in the 90-day past
25  due loan information.

6993

1    Mr. Gibson also met with Mr. Depman frequently.
2  He was the CFO.  Mr. Depman would have been his counterpart
3  as the lead audit engagement partner.  Just like with Ms.
4  Rakowski, there were certain inquiries that were made with
5  Mr. Gibson, and here is a specific inquiry that was made of
6  both Ms. Rakowski and Mr. Gibson.
7    And the request is, there's a question:  Are
8  there any new estimates or significant changes to existing
9  estimates made during the interim period, which would be the
10  second quarter of 2010?  If so, how have such estimates been
11  reported in the interim financial information?
12    And you'll see there, there is a reference to
13  deterioration in credit quality reflected in risk ratings
14  downgrade and increases in loans delinquent 90 plus days.
15    So there's a response to Mr. Depman about 90-day
16  past due loans in the context of risk ratings, but there's
17  no indication that this is a new way that the bank's
18  reporting for past due loans or that they had reported that
19  way in prior quarters.
20    Defendant Harra.  Defendant Harra is the
21  president of Wilmington Trust Corporation.  According to the
22  bio, and this is from Government's Exhibit 435, joined the
23  company in 1971, held many key positions.  Notes that he has
24  specialized in all aspects of commercial and personal
25  financial services.

6994

1      Mr. Harra had been the President and Chief
2  Operating Officer of the bank since 1996, so 13 or 14 years
3  at the time of the charged conduct.  And it notes that in
4  addition to his responsibilities as President and COO,
5  "Mr. Harra also oversees all banking activities for the
6  company."
7      And the testimony from the witnesses was, during
8  the period 2009, Mr. Harra was the individual in charge of
9  regional banking, was Mr. Bailey's supervisor, Mr. Conway's
10  supervisor, and the direct supervisor of the leaders of the
11  expansion market.
12      Mr. Harra, like Mr. Gibson, was also present at
13  all of the exit meetings for the Federal Reserve
14  examinations, the full scope examination, the target
15  examination, and also was there in 2010, when the Fed came
16  back for the full scope examination.
17      And there was a reference to Mr. Harra not being
18  a numbers guy.  Once again, Mr. Harra is president and in
19  charge of banking for a bank that has $9.2 billion in loans.
20  He's in charge of regional banking.  People report directly
21  to him who are the leaders of the bank relating to the
22  banking.
23      And, ladies and gentlemen, you can't have it
24  both ways.  You can't have the position and then make the
25  argument, well, he didn't have the responsibility that went

6995

1  with that position.  This is an $11 billion bank, a $9
2  billion loan portfolio, $50 billion in assets under
3  management.
4      Mr. Harra is the president and the COO.  So
5  consider that when you hear the argument, or if you hear the
6  argument from counsel that Mr. Harra was not a numbers guy.
7  Mr. Harra signed the MOU.  He was certainly aware of its
8  terms.  We've talked about the specific terms in paragraph
9  15, and there's Mr. Harra's signature along with the other
10  members of the Board of Directors.
11      There's certainly evidence in the record that
12  Mr. Harra was concerned about delinquencies.  The e-mail
13  from September of 2009, where Mr. Harra receives a copy of
14  the August 2009 past due report.  He forwards it to his
15  direct report, Mr. Bailey, who is in charge of the Delaware
16  bank.  He writes, Brian, delinquencies are headed in the
17  wrong direction.  Before you head out today, I hope you can
18  fire up the troops to work on this in view of the pending
19  quarter end.
20      It's important to him.  He is the president of
21  the bank.  The numbers are going to matter to the market and
22  he's telling his direct report to do something about it.
23      We heard from Mr. Conway that Mr. Harra would
24  share the Mid-Atlantic market meeting, and this is the
25  banking meeting where all of the top personnel, Mr. Conway

6996

1  and Mr. Bailey would be present, and they would talk about
2  issues facing the bank.
3      And this is the agenda from December 9th --
4  December 8th of 2009, where Mr. Gibson also made a cameo
5  appearance and talked about capital generation and the
6  general economic view as of year-end 2009.
7      But look at what was specifically discussed at
8  that meeting.  Commercial real estate concentration.
9  Everyone is talking about what is happening with CRE at the
10  time.  And specifically, matured/maturing loans and past due
11  loans.  So all the leaders within the banking function are
12  talking about this issue during a period of time when the
13  bank is engaged in short-term extensions on a mass scale,
14  and also the loan approval process discussed by Mr. North
15  and Mr. Brewer.
16      Like the other defendants, there's evidence that
17  Mr. Harra received a copy of the draft of the MD&A section,
18  the credit risk section.  And this e-mail noted:  Dave, left
19  a few comments on your chair early this morning on the paper
20  copy.  RVAH.
21      If you recall, Ellen Roberts introduced the
22  actual exhibit that have the initials RVAH 2/8, so this is a
23  version of the document, one of the drafts that contained
24  the past due loan information, the rigorous loan
25  underwriting information, the appraisal information that you

6997

1  saw earlier today.
2      Mr. Harra, as we saw earlier, would sign the
3  certification relating to management's report on internal
4  controls over financial reporting.  He also signed the Form
5  10-K as president, COO, and the director of the bank.  In
6  addition, Mr. Harra signed the call report, and there's a
7  similar attestation that Mr. Gibson made where, by his
8  signature, Mr. Harra declared that the reports of condition
9  and income have been examined by us, and to the best of our
10  knowledge and belief, have been prepared in conformance with
11  the instructions issued by the appropriate federal
12  regulatory authority and are true and correct, and the
13  evidence has shown that it was not.
14      Mr. Harra was also aware of the additional
15  short-term extensions of a bunch of loans on the last
16  week end in March of 2010.  And so, in this particular
17  e-mail, Government's Exhibit 543, there is a reference to
18  people coming in and pulling documents on Friday evening
19  and Saturday to get change in terms agreements for 176
20  deals.
21      So think about that.  The date of this e-mail is
22  Sunday, March 28th.  All of these people are at the bank.
23  They are pulling documents together.  It is, in fact, what
24  Mr. North described it as a fire drill, trying to get all of
25  this information pulled together to extend 176 different

6998

1    lending relationships.
2           And that is information that Mr. Harra is aware
3    of. You've seen the matured loan beast e-mail before and
4    the reference to the fire drill from Mr. North. That is an
5    e-mail that goes to Mr. Harra, and then he makes a response
6    thanking the people that came in over the weekend to extend
7    all of those loans.
8           Now, the timing on this is important, because as
9    Mr. Corkery testified, defendant Harra met with the Federal
10   Reserve two days later in Philadelphia and did not mention
11   the second mass extension push let alone the first.
12          He also met in the exit meeting for the target
13   exam on April 6th, so less than a week after all of the
14   loans were extended. Mr. Harra is there, Mr. Gibson is
15   there, meeting with Mr. Corkery and the other examiners and,
16   once again, neither defendant Harra nor defendant Gibson
17   mentions the mass extensions at that meeting either.
18          There are three counts that relate only to
19   defendant Gibson, and that's making false certifications in
20   financial reports. And the Court has provided the
21   instructions in your packet. But as we roll through them,
22   the first is that defendant Gibson was the CFO at Wilmington
23   Trust. There has certainly been evidence introduced into
24   the record about Mr. Gibson's position, and you have seen
25   that reference in documents.

6999

1           The second is that Wilmington Trust Corporation
2    was an issuer of securities regulated by the Securities
3    Exchange Act. And you'll see in your packet of
4    instructions, the Court instructed you as a matter of
5    law relating to Wilmington Trust being an issuer of
6    securities.
7           The third is that Mr. Gibson certified that the
8    information complied with certain securities requirements,
9    and that "fairly presented in all material respects the
10   financial condition, the results of operations of Wilmington
11   Trust Corporation." You'll see in parentheses references to
12   the certifications introduced into evidence, which are
13   Government's Exhibit 1-A, 4-A, 5-A, and Defense
14   Exhibit 4006.
15          The next is that the certification was
16   materially false.
17          And the final is that the defendant knew at the
18   time that the certification was materially false.
19          And with respect to that last element, I would
20   just ask that you take a look at the stipulation marked S-6,
21   which has a specific stipulation relating to the materiality
22   of a false statement.
23          The Section 1350 certifications, this is 1-A,
24   which I just mentioned. This is essentially the charge that
25   Mr. Gibson made a certification that was false and complied

7000

1    with the elements, as the Court read them to you, but the
2    certification here is that what Mr. Gibson is signing fully
3    complied with all of the relevant requirements of the
4    securities and Exchange Act.
5           And this is Defendants' Exhibit 4006, which is
6    the document that I showed a few minutes ago, where
7    Mr. Gibson made certain certifications. And you'll see in
8    paragraph 4 that there's a specific reference to Exchange
9    Act Rules 13-A, and 13-A and 15-D.
10          What didn't the reports fairly present? They
11   did not fairly present accurate 90-day past due loan
12   information.
13          Now, you might hear from counsel for Mr. Gibson
14   a lot of talk about certifications or sub-certifications or
15   sub-sub-certifications or sub-sub-sub-certifications. All
16   of the evidence shows that Mr. Gibson knew the information
17   was false. He didn't need a sub-certification or a
18   sub-sub-certification from another employee to rely upon,
19   something that he could wash his hands of information that
20   he knew about.
21          So ask yourselves, ladies and gentlemen, if that
22   argument is presented to you about sub-certifications and
23   sub-sub-certifications, what did Mr. Mr. Gibson know at the
24   time that he signed these documents? What statements did he
25   make about past due loans and matured loans and when loans

7001

1    were supposed to be reported, and evaluate that against the
2    arguments of down relating to certifications and
3    sub-certifications.
4           The last area to talk about today is conspiracy.
5    And, again, the Court's instructions are going to control,
6    but essentially, conspiracy is an agreement between two or
7    more people to knowingly defraud the United States or commit
8    a specific offense against the United States, and one overt
9    act in furtherance.
10          And the Court read in a number of overt acts
11   that are listed in your jury charge, and those are the
12   specific acts, and the only acts that you can consider
13   relating to the conspiracy.
14          So what is the conspiracy here? It's as simple
15   as this. It's an agreement to keep the reported past due
16   number down.
17          And as the Court instructed you, the Government
18   does not have to prove a formal agreement, that all of the
19   defendants agreed. As you'll see in the instruction, it
20   requires two or more participants. That it was a good plan,
21   or that it was a secret.
22          You heard a lot of talk in opening statements
23   about a requirement that a conspiracy be a secret. What the
24   Court instructs you at the end of the day, that is what
25   controls.

7246

1                      - VOLUME 27 -

2            IN THE UNITED STATES DISTRICT COURT

3            IN AND FOR THE DISTRICT OF DELAWARE

4                        - - -

5     UNITED STATES OF AMERICA,      :    CRIMINAL ACTION
                                     :
6                  Plaintiff,        :
                                     :
7          vs.                       :
                                     :
8     DAVID R. GIBSON, ROBERT        :
      V.A. HARRA, WILLIAM            :
9     NORTH, and KEVYN RAKOWSKI,     :
                                     :
10                                   :
                   Defendants.   :    NO. 15-23-RGA
11

12
                                 - - -
13
                          Wilmington, Delaware
14                        Wednesday, April 25, 2018
                          8:46 o'clock, a.m.
15
                                 - - -
16
      BEFORE:   HONORABLE RICHARD G. ANDREWS, U.S.D.C.J., and a
17    jury

18                        - - -

      APPEARANCES:
19

20            LESLEY F. WOLF, ESQ.,
              ROBERT F. KRAVETZ, ESQ. and
21            JAMIE M. McCALL, ESQ.
              Assistant United States Attorneys
22

23             Counsel for Plaintiff

24                        Valerie J. Gunning
                          Official Court Reporters
25

7299

1 due number to the public, and really, that is why they had
2 been doing it for all of those years.
3          Now, set aside the fact that you saw the actual
4 volume of what that looked like in, say, September 1999, but
5 I would really note this to you, and I want to emphasize
6 this to you. Times change. In October of 2009, everything
7 was different at that bank. The economy was tanking. The
8 Federal Reserve for the first time was in the bank, had just
9 concluded their examination, and had reported to the
10 defendants, Gibson, Harra, North, that there were major
11 problems in the loan portfolio. It was deteriorating. But,
12 more importantly, that the credit practices that the bank
13 were utilizing were struggling, were insufficient. And the
14 final fact that made everything different at this point in
15 time, the volume of matured loans from the riskiest type of
16 loan that the bank could make had skyrocketed to a number
17 that hadn't been seen before.
18          Ladies and gentlemen, at this point in time the
19 defendants could no longer reasonably say to themselves, to
20 the public, to the Fed, that the waiver practice gave an
21 accurate snapshot, picture, representation of the loan
22 portfolio at Wilmington Trust. The waiver practice was now
23 being used to hide the loan portfolio, hide its true
24 condition. And despite what you hear from defense counsel,
25 despite what you hear, this case is about what the

7300

1 defendants knew, when the defendants knew it, and how they
2 used that information.
3          They knew the portfolio was in bad shape. They
4 knew the volume of loans was spiking. Instead of
5 recognizing that problem, instead of owning that problem in
6 their respective roles as the controller, the president of
7 the bank, the CFO, the chief credit officer, they misled the
8 Federal Reserve, they misled the public, and they turned
9 around and raised $287 million off of that lie. They
10 actually told the public that the past due number for
11 90 days or more accruing, year-end 2009 compared to year-end
12 2008, went down, went down. Against all the information
13 they knew, they told everyone that number went down. Is
14 that reasonable? Does that make sense? Does that make
15 common sense given everything you've heard about what was
16 going on at the bank?
17          And when the defendants get that delinquency
18 report in the third quarter of 2009 and they look at the
19 number of loans that's on the delinquency report and they
20 see the number of days past due these loans are, it is no
21 longer business as usual at Wilmington Trust. It simply
22 isn't.
23          The defendants knew there were incomplete credit
24 files, stale appraisals, missing appraisals, missing
25 financial statements. They're on notice at this point from

7301

1 the Fed and their own employees that the ten percent rule
2 has been abused. The Fed told them there were an inordinate
3 number of ten percent rule loans, working capital lines of
4 credit that had been issued. And why is that important?
5 Why is that important?
6          Ladies and gentlemen, in the third quarter of
7 2009, when the defendants received this delinquency report,
8 right, what's the first prong, if you will, of that waiver
9 practice that these loans are current for about? That
10 should be a major warning sign. They should be asking
11 themselves, how are these loans actually current for
12 interest? Everyone is telling us that we're using lending
13 practices that mask the true delinquency level of these
14 loans. What is going on with these loans?
15          You heard from Mr. Hart. He reviewed 38 million
16 pieces of data in that Shaw loan accounting system. With a
17 did he tell you? A hundred million dollars in that quarter
18 were being used to support other loans. That's the bank
19 paying itself, the bank paying itself.
20          The model that you've heard so much about, the
21 relationship banking model, by this point in time, all the
22 defendants were on notice that model had morphed or
23 changed into a culture that seeks to serve the client first
24 rather than emphasizing loan quality.
25          That information was readily available. Look at

7302

1 the number of days past due these loans were in the third
2 and fourth quarter. 270 days past due. That's nine months
3 from its maturity date, nine months. Nothing has happened,
4 nothing has happened against the back of missing appraisals,
5 missing financial statements. The problem was overwhelming
6 at the bank and the defendants knew it.
7          This should have been a time out. This should
8 have been cause for figuring out what is going on with these
9 loans. Instead, instead, what you saw was, after they're
10 ordered by the Fed, now report these past due loans on a
11 monthly basis, defendant Harra tells his employees, work the
12 matured loans, as if that's anywhere close to the magnitude
13 of the problem.
14          Defendant Rakowski tells defendant Gibson, we
15 did pull the waived loans from the third quarter, the first
16 monthly report going to the Federal Reserve.
17          Defendant Rakowski prepares a comparison of past
18 quarters. Mr. Kravetz walked you through that. She goes
19 back and takes the filings that occurred from prior quarters
20 so that she can justify with the other defendants in the
21 monthly regulatory report that's going to the Fed, that the
22 spike that you are seeing, it's not a function of what I
23 just talked about. It's a billing and collection error.
24          Does that sound reasonable? It's not true.
25 It's simply not true. Look at the numbers. The defendants

# EXHIBIT B

Board of Governors of the Federal Reserve System
OMB Number: 7100-0036
Federal Deposit Insurance Corporation
OMB Number: 3064-0052
Office of the Comptroller of the Currency
OMB Number: 1557-0081
Expires May 31, 2012

**Federal Financial Institutions Examination Council**



| 1 |

## Consolidated Reports of Condition and Income for A Bank With Domestic Offices Only—FFIEC 041

### Report at the close of business September 30, 2009

This report is required by law: 12 U.S.C. Section 324 (State member banks); 12 U.S.C. Section 1817 (State nonmember banks); and 12 U.S.C. Section 161 (National banks).

This report form is to be filed by banks with domestic offices only. Banks with foreign offices (as defined in the instructions) must file FFIEC 031.

NOTE: Each bank's board of directors and senior management are responsible for establishing and maintaining an effective system of internal control, including controls over the Reports of Condition and Income. The Reports of Condition and Income are to be prepared in accordance with Federal regulatory authority instructions. The Reports of Condition and Income must be signed by the Chief Financial Officer (CFO) of the reporting bank (or by the individual performing an equivalent function) and attested to by not less than two directors (trustees) for State nonmember banks and three directors for State member and National banks.

I, the undersigned CFO (or equivalent) of the named bank, attest that the Reports of Condition and Income (including the supporting schedules) for this report date have been prepared in conformance with the instructions issued by the appropriate Federal regulatory authority and are true to the best of my knowledge and belief.

_____
Signature of Chief Financial Officer (or Equivalent)

_____
Date of Signature

We, the undersigned directors (trustees), attest to the correctness of the Reports of Condition and Income (including the supporting schedules) for this report date and declare that the Reports of Condition and Income have been examined by us and to the best of our knowledge and belief have been prepared in conformance with the instructions issued by the appropriate Federal regulatory authority and are true and correct.

_____
Director (Trustee)

_____
Director (Trustee)

_____
Director (Trustee)

### Submission of Reports

Each bank must prepare its Reports of Condition and Income (Call Report) data by either:

(a)  Using computer software to prepare its Call Report and then submitting the report data directly to the FFIEC's Central Data Repository (CDR), an Internet-based system for data collection (https://cdr.ffiec.gov/cdr/), or

(b)  Completing its Call Report in paper form and arranging with a software vendor or another party to convert the data into the electronic format that can be processed by the CDR. The software vendor or other party then must electronically submit the bank's data file to the CDR.

For technical assistance with submissions to the CDR, please contact the CDR Help Desk by telephone at (888) CDR-3111, by fax at (301) 495-7864, or by e-mail at CDR.Help@ffiec.gov.

To fulfill the signature and attestation requirement for the Reports of Condition and Income for this report date, attach your bank's completed signature page (or a photocopy or a computer-generated version of this page) to the hard-copy record of the data file submitted to the CDR that your bank must place in its files.

The appearance of your bank's hard-copy record of the submitted data file need not match exactly the appearance of the FFIEC's sample report forms, but should show at least the caption of each Call Report item and the reported amount.

Wilmington Trust Company
Legal Title of Bank (RSSD 9017)

Wilmington
City (RSSD 9130)

DE                                                    19890-
State Abbrev. (RSSD 9200)                            Zip Code (RSSD 9220)

FDIC Certificate Number    00680
(RSSD 9050)

Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency

GOVERNMENT
EXHIBIT
76
Cr. A. No. 15-23-RGA

WTC-USAO-02-0108049

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 10/30/2009 - 03:43 pm

$$\boxed{2}$$

## Contact Information for the Reports of Condition and Income

To facilitate communication between the Agencies and the bank concerning the Reports of Condition and Income, please provide contact information for (1) the Chief Financial Officer (or equivalent) of the bank signing the reports for this quarter and (2) the person at the bank--other than the Chief Financial Officer (or equivalent)--to whom questions about the reports should be directed. If the Chief Financial Officer (or equivalent) is the primary contact for questions about the reports, please provide contact information for another person at the bank who will serve as a secondary contact for communications between the Agencies and the bank concerning the Reports of Condition and Income. Enter 'none' for the contact's e-mail address or fax number if not available. Contact information for the Reports of Condition and Income is for the confidential use of the Agencies and will not be released to the public.

**Chief Financial Officer (or Equivalent) Signing the Reports**

David R. Gibson
Name (TEXT C490)

Executive Vice President and C.F.O.
Title (TEXT C491)

dgibson@wilmingtontrust.com
E-mail Address (TEXT C492)

(302)651-8013
Telephone: Area code/phone number/extension (TEXT C493)

(302)427-4559
FAX: Area code/phone number (TEXT C494)

**Other Person to Whom Questions about the Reports Should be Directed**

Julie Y. Tang
Name (TEXT C495)

Financial Analyst II
Title (TEXT C496)

jtang@wilmingtontrust.com
E-mail Address (TEXT 4086)

(302)651-1892
Telephone: Area code/phone number/extension (TEXT 8902)

(302)427-4501
FAX: Area code/phone number (TEXT 9116)

## Emergency Contact Information

This information is being requested so the Agencies can distribute critical, time sensitive information to emergency contacts at banks. Please provide primary contact information for a senior official of the bank who has decision-making authority. Also provide information for a secondary contact if available. Enter 'none' for the contact's e-mail address or fax number if not available. Emergency contact information is for the confidential use of the Agencies and will not be released to the public.

**Primary Contact**

Robert V. A. Harra, Jr.
Name (TEXT C366)

President and C. O. O.
Title (TEXT C367)

rharra@wilmingtontrust.com
E-mail Address (TEXT C368)

(302)651-1212
Telephone: Area code/phone number/extension (TEXT C369)

(302)427-4559
FAX: Area code/phone number (TEXT C370)

**Secondary Contact**

David R. Gibson
Name (TEXT C371)

Executive Vice President and C.F.O.
Title (TEXT C372)

dgibson@wilmingtontrust.com
E-mail Address (TEXT C373)

(302)651-8013
Telephone: Area code/phone number/extension (TEXT C374)

(302)427-4559
FAX: Area code/phone number (TEXT C375)

WTC-USAO-02-0108050

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                              Printed: 10/30/2009 - 03:43 pm

**3**

### USA PATRIOT Act Section 314(a) Anti-Money Laundering Contact Information

This information is being requested to identify points-of-contact who are in charge of your bank's USA PATRIOT Act Section 314(a) information requests. Bank personnel listed could be contacted by law enforcement officers or the Financial Crimes Enforcement Network (FinCEN) for additional information related to specific Section 314(a) search requests or other anti-terrorist financing and anti-money laundering matters. Communications sent by FinCEN to the bank for purposes other than Section 314(a) notifications will state the intended purpose and should be directed to the appropriate bank personnel for review. Any disclosure of customer records to law enforcement officers or FinCEN must be done in compliance with applicable law, including the Right to Financial Privacy Act (12 U.S.C. 3401 et seq.).

Please provide information for a primary and secondary contact. Information for a third and fourth contact may be provided at the bank's option. Enter "none" for the contact's e-mail address if not available. This contact information is for the confidential use of the Agencies, FinCEN, and law enforcement officers and will not be released to the public.

| **Primary Contact** | **Secondary Contact** |
|---|---|
| Diane M. Sparks | Brian L. Ware |
| Name (TEXT C437) | Name (TEXT C442) |
| Vice President and BSA Officer | Vice President |
| Title (TEXT C438) | Title (TEXT C443) |
| dsparks@wilmingtontrust.com | bware@wilmingtontrust.com |
| E-mail Address (TEXT C439) | E-mail Address (TEXT C444) |
| (302)636-5078 | (302)636-5132 |
| Telephone: Area code/phone number/extension (TEXT C440) | Telephone: Area code/phone number/extension (TEXT C445) |
| **Third Contact** | **Fourth Contact** |
| Calvin R. Jaber | |
| Name (TEXT C870) | Name (TEXT C875) |
| Vice President and Chief Compliance Officer | |
| Title (TEXT C871) | Title (TEXT C876) |
| cjaber@wilmingtontrust.com | |
| E-mail Address (TEXT C872) | E-mail Address (TEXT C877) |
| (302)651-8583 | |
| Telephone: Area code/phone number/extension (TEXT C873) | Telephone: Area code/phone number/extension (TEXT C878) |

WTC-USAO-02-0108051

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 01/30/2010 - 01:16 pm

Schedule RI  **4**

## Consolidated Report of Income
## for the period January 1, 2009 - September 30, 2009

All Report of Income schedules are to be reported on a calendar year-to-date basis in thousands of dollars.

## Schedule RI - Income Statement

| | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| **1. Interest income:** | | | | | |
| a. Interest and fee income on loans: | | | | | |
| (1) Loans secured by real estate: | | | | | |
| (a) Loans secured by 1-4 family residential properties | RIAD4435 | | 41,143 | | 1.a.(1)(a) |
| (b) All other loans secured by real estate | RIAD4436 | | 122,875 | | 1.a.(1)(b) |
| (2) Commercial and industrial loans | RIAD4012 | | 50,857 | | 1.a.(2) |
| (3) Loans to individuals for household, family, and other personal expenditures: | | | | | |
| (a) Credit cards | RIADB485 | | 5,842 | | 1.a.(3)(a) |
| (b) Other (includes single payment, installment, all student loans, and revolving credit plans other than credit cards) | RIADB486 | | 37,602 | | 1.a.(3)(b) |
| (4) Loans to foreign governments and official institutions | RIAD4056 | | 0 | | 1.a.(4) |
| (5) All other loans [1] | RIAD4058 | | 14,469 | | 1.a.(5) |
| (6) Total interest and fee income on loans (sum of items 1.a.(1)(a) through 1.a.(5)) | RIAD4010 | | 272,788 | | 1.a.(6) |
| b. Income from lease financing receivables | RIAD4065 | | 0 | | 1.b. |
| c. Interest income on balances due from depository institutions [2] | RIAD4115 | | 195 | | 1.c. |
| d. Interest and dividend income on securities: | | | | | |
| (1) U.S. Treasury securities and U.S. Government agency obligations (excluding mortgage-backed securities) | RIADB488 | | 3,413 | | 1.d.(1) |
| (2) Mortgage-backed securities | RIADB489 | | 11,278 | | 1.d.(2) |
| (3) All other securities (includes securities issued by states and political subdivisions in the U.S.) | RIAD4060 | | 8,851 | | 1.d.(3) |
| e. Interest income from trading assets | RIAD4069 | | 0 | | 1.e. |
| f. Interest income on federal funds sold and securities purchased under agreements to resell | RIAD4020 | | 131 | | 1.f. |
| g. Other interest income | RIAD4518 | | 382 | | 1.g. |
| h. Total interest income (sum of items 1.a.(6) through 1.g) | RIAD4107 | | 297,038 | | 1.h. |
| **2. Interest expense:** | | | | | |
| a. Interest on deposits: | | | | | |
| (1) Transaction accounts (NOW accounts, ATS accounts, and telephone and preauthorized transfer accounts) | RIAD4508 | | 206 | | 2.a.(1) |
| (2) Nontransaction accounts: | | | | | |
| (a) Savings deposits (**includes MMDAs**) | RIAD0093 | | 8,177 | | 2.a.(2)(a) |
| (b) Time deposits of $100,000 or more | RIADA517 | | 4,754 | | 2.a.(2)(b) |
| (c) Time deposits of less than $100,000 | RIADA518 | | 43,021 | | 2.a.(2)(c) |
| b. Expense of federal funds purchased and securities sold under agreements to repurchase | RIAD4180 | | 1,151 | | 2.b. |
| c. Interest on trading liabilities and other borrowed money | RIAD4185 | | 3,454 | | 2.c. |

(1) Includes interest and fee income on "Loans to depository institutions and acceptances of other banks," "Loans to finance agricultural production and other loans to farmers," "Obligations (other than securities and leases) of states and political subdivisions in the U.S.," and "Other loans."
(2) Includes interest income on time certificates of deposit not held for trading.

WTC-USAO-02-0108052

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 01/30/2010 - 01:16 pm

Schedule RI  **5**

## Schedule RI - Continued

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| d. Interest on subordinated notes and debentures .................................. | RIAD4200 | | | 0 | 2.d. |
| e. Total interest expense (sum of items 2.a through 2.d) ........................... | RIAD4073 | | | **60,763** | 2.e. |
| 3. Net interest income (item 1.h minus 2.e) ....................................... | RIAD4074 | | | **236,275** | 3. |
| 4. Provision for loan and lease losses ............................................ | RIAD4230 | | | 109,817 | 4. |
| 5. Noninterest income: | | | | | |
| a. Income from fiduciary activities (1) ............................................ | RIAD4070 | | | **125,317** | 5.a. |
| b. Service charges on deposit accounts ......................................... | RIAD4080 | | | 21,052 | 5.b. |
| c. Trading revenue (2) ........................................................... | RIADA220 | | | 0 | 5.c. |
| d. | | | | | |
| (1) Fees and commissions from securities brokerage ......................... | RIADC886 | | | 5,499 | 5.d.(1) |
| (2) Investment banking, advisory, and underwriting fees and commissions ....... | RIADC888 | | | 1,458 | 5.d.(2) |
| (3) Fees and commissions from annuity sales .............................. | RIADC887 | | | 2,073 | 5.d.(3) |
| (4) Underwriting income from insurance and reinsurance activities .............. | RIADC386 | | | 0 | 5.d.(4) |
| (5) Income from other insurance activities ................................. | RIADC387 | | | 624 | 5.d.(5) |
| e. Venture capital revenue ..................................................... | RIADB491 | | | (216) | 5.e. |
| f. Net servicing fees ........................................................... | RIADB492 | | | 405 | 5.f. |
| g. Net securitization income ................................................... | RIADB493 | | | 0 | 5.g. |
| h. Not applicable | | | | | |
| i. Net gains (losses) on sales of loans and leases ........................... | RIAD5416 | | | 2,564 | 5.i. |
| j. Net gains (losses) on sales of other real estate owned .................... | RIAD5415 | | | (1,086) | 5.j. |
| k. Net gains (losses) on sales of other assets (excluding securities) ......... | RIADB496 | | | 0 | 5.k. |
| l. Other noninterest income (*) ............................................... | RIADB497 | | | 19,013 | 5.l. |
| m. Total noninterest income (sum of items 5.a. through 5.l) .................. | RIAD4079 | | | **176,703** | 5.m. |
| 6. | | | | | |
| a. Realized gains (losses) on held-to-maturity securities ..................... | RIAD3521 | | | (59,823) | 6.a. |
| b. Realized gains (losses) on available-for-sale securities ................... | RIAD3196 | | | 980 | 6.b. |
| 7. Noninterest expense: | | | | | |
| a. Salaries and employee benefits ........................................... | RIAD4135 | | | 140,830 | 7.a. |
| b. Expenses of premises and fixed assets (net of rental income) (excluding salaries and employee benefits and mortgage interest) ......................................... | RIAD4217 | | | 31,455 | 7.b. |
| c. | | | | | |
| (1) Goodwill impairment losses ........................................... | RIADC216 | | | 0 | 7.c.(1) |
| (2) Amortization expense and impairment losses for other intangible assets ...... | RIADC232 | | | 180 | 7.c.(2) |
| d. Other noninterest expense (*) ............................................. | RIAD4092 | | | 70,705 | 7.d. |
| e. Total noninterest expense (sum of items 7.a. through 7.d) ................. | RIAD4093 | | | **243,170** | 7.e. |
| 8. Income (loss) before income taxes and extraordinary items and other adjustments (item 3 plus or minus items 4, 5.m, 6.a, 6.b, and 7.e.) ................................... | RIAD4301 | | | **1,148** | 8. |
| 9. Applicable income taxes (on item 8) ........................................ | RIAD4302 | | | (7,189) | 9. |
| 10. Income (loss) before extraordinary items and other adjustments (item 8 minus item 9) ...... | RIAD4300 | | | 8,337 | 10. |
| 11. Extraordinary items and other adjustments, net of income taxes (*) ........ | RIAD4320 | | | 0 | 11. |
| **12. Net income (loss) attributable to bank and noncontrolling (minority) interests (sum of items 10 and 11)** ................................................................. | RIADG104 | | | **8,337** | 12. |
| **13. LESS: Net income (loss) attributable to noncontrolling (minority) interests (if net income, report as a positive value; if net loss report as a negative value)** ............. | RIADG103 | | | 0 | 13. |
| 14. Net income (loss) attributable to bank (item 12 minus item 13) ............ | RIAD4340 | | | **8,337** | 14. |

(1) For banks required to complete Schedule RC-T, items 12 through 19, income from fiduciary activities reported in Schedule RI, item 5.a. must equal the amount reported in Schedule RC-T, item 19.

(2) For banks required to complete Schedule RI, Memorandum item 8, trading revenue reported in Schedule RI, item 5.c. must equal the sum of Memorandum items 8.a through 8.e.

(*) Describe on Schedule RI-E - Explanations

WTC–USAO–02–0108053

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                          Printed: 01/30/2010 - 01:16 pm

Schedule RI   **6**

## Schedule RI - Continued

Memoranda

| | | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|---|
| 1. | Interest expense incurred to carry tax-exempt securities, loans, and leases acquired after August 7, 1986, that is not deductible for federal income tax purposes .......................... | | RIAD4513 | | | 0 | M.1. |
| | *Memorandum item 2 is to be completed by banks with $1 billion or more in total assets.* [1] | | | | | | |
| 2. | Income from the sale and servicing of mutual funds and annuities (included in Schedule RI, item 8) | | RIAD8431 | | | 3,197 | M.2. |
| 3. | Income on tax-exempt loans and leases to states and political subdivisions in the U.S. (included in Schedule RI, items 1.a and 1.b) ............................................... | | RIAD4313 | | | 1,549 | M.3. |
| 4. | Income on tax-exempt securities issued by states and political subdivisions in the U.S. (included in Schedule RI, item 1.d.(3)) ............................................... | | RIAD4507 | | | 274 | M.4. |
| 5. | Number of full-time equivalent employees at end of current period (round to nearest whole number) | | RIAD4150 | | | 2203 | M.5. |
| 6. | *Memorandum item 6 is to be completed by:* | | | | | | |
| | • *banks with $300 million or more in total assets, and* | | | | | | |
| | • *banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, part I, item 3) exceeding five percent of total loans.* | | | | | | |
| | Interest and fee income on loans to finance agricultural production and other loans to farmers (included in Schedule RI, item 1.a.(5)) [1] ......................................... | | RIAD4024 | | | 989 | M.6. |
| 7. | If the reporting bank has restated its balance sheet as a result of applying push down accounting this calendar year, report the date of the bank's acquisition [2] ........................... | | RIAD9106 | | | | M.7. |
| 8. | Trading revenue (from cash instruments and derivative instruments) (sum of Memorandum items 8.a through 8.e must equal Schedule RI, item 5.c) **(To be completed by banks that reported average trading assets (Schedule RC-K, item 7) of $2 million or more for any quarter of the preceding calendar year.):** | | | | | | |
| a. | Interest rate exposures ................................................................... | | RIAD8757 | | | N/A | M.8.a. |
| b. | Foreign exchange exposures ............................................................ | | RIAD8758 | | | N/A | M.8.b. |
| c. | Equity security and index exposures .................................................... | | RIAD8759 | | | N/A | M.8.c. |
| d. | Commodity and other exposures ........................................................ | | RIAD8760 | | | N/A | M.8.d. |
| e. | Credit exposures ......................................................................... | | RIADF186 | | | N/A | M.8.e. |
| 9. | Net gains (losses) recognized in earnings on credit derivatives that economically hedge credit exposures held outside the trading account: | | | | | | |
| a. | Net gains (losses) on credit derivatives held for trading ................................ | | RIADC889 | | | 0 | M.9.a. |
| b. | Net gains (losses) on credit derivatives held for purposes other than trading ........... | | RIADC890 | | | 0 | M.9.b. |
| 10. | To be completed by banks with $300 million or more in total assets: [1] | | | | | | |
| | Credit losses on derivatives (see instructions) .......................................... | | RIADA251 | | | 0 | M.10. |

| | | | | Yes/No | |
|---|---|---|---|---|---|
| 11. | Does the reporting bank have a Subchapter S election in effect for federal income tax purposes for the current tax year? ......................................................... | | RIADA530 | NO | M.11. |

| | | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|---|
| | *Memorandum item 12 is to be completed by banks that are required to complete Schedule RC-C, part I, Memorandum items 8.b and 8.c* | | | | | | |
| 12. | Noncash income from negative amortization on closed-end loans secured by 1-4 family residential properties (included in Schedule RI, item 1.a.(1)(a)) ................................. | | RIADF228 | | | N/A | M.12. |

(1) The asset size tests and the five percent of total loans test are generally based on the total assets and total loans reported on the June 30, 2008, Report of Condition.
(2) For example, a bank acquired on March 1, 2009 would report 20090301.

WTC-USAO-02-0108054

September 2009  FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                          Printed: 01/30/2010 - 01:16 pm

Schedule RI   | 7 |

## Schedule RI - Continued

Memoranda (continued)

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| *Memorandum item 13 is to be completed by banks that have elected to account for assets and liabilities under a fair value option.* | | | | | |
| 13. Net gains (losses) recognized in earnings on assets and liabilities that are reported at fair value under a fair value option: | | | | | |
| a. Net gains (losses) on assets ............................................................ | RIADF551 | | | N/A | M.13.a. |
| (1) Estimated net gains (losses) on loans attributable to changes in instrument-specific credit risk | RIADF552 | | | N/A | M.13.a.(1) |
| b. Net gains (losses) on liabilities .......................................................... | RIADF553 | | | N/A | M.13.b. |
| (1) Estimated net gains (losses) on liabilities attributable to changes in instrument-specific credit risk ................................................................ | RIADF554 | | | N/A | M.13.b.(1) |

WTC-USAO-02-0108055

Schedule RIA | **8**

## Schedule RI-A - Changes in Bank Equity Capital

**Indicate decreases and losses in parentheses.**

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 1. Total **bank** equity capital most recently reported for the December 31, 2008, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income) .................................... | RIAD3217 | | 867,299 | | 1. |
| 2. Restatements due to corrections of material accounting errors and changes in accounting principles (*) ............................................................................................................................ | RIADB507 | | 44,484 | | 2. |
| 3. Balance end of previous calendar year as restated (sum of items 1 and 2) ................................. | RIADB508 | | **911,783** | | 3. |
| 4. Net income (loss) **attributable to bank** (must equal Schedule RI, item 14) ............................... | RIAD4340 | | **8,337** | | 4. |
| 5. Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions) ..................................................................................................................................... | RIADB509 | | 2,084 | | 5. |
| 6. Treasury stock transactions, net .......................................................................................................... | RIADB510 | | 0 | | 6. |
| 7. Changes incident to business combinations, net ................................................................................ | RIAD4356 | | 0 | | 7. |
| 8. LESS: Cash dividends declared on preferred stock .......................................................................... | RIAD4470 | | 0 | | 8. |
| 9. LESS: Cash dividends declared on common stock ............................................................................ | RIAD4460 | | 0 | | 9. |
| 10. Other comprehensive income (1) ......................................................................................................... | RIADB511 | | (35,018) | | 10. |
| 11. Other transactions with parent holding company (*) (not included in items 5, 6, 8, or 9 above) ............ | RIAD4415 | | 0 | | 11. |
| 12. Total **bank** equity capital end of current period (sum of items 3 through 11) (must equal Schedule RC, item 27.a) .......................................................................................................................................... | RIAD3210 | | 887,186 | | 12. |

(*) Describe on Schedule RI-E - Explanations
(1) Includes changes in net unrealized holding gains (losses) on available-for-sale securities, changes in accumulated net gains (losses) on cash flow hedges, and pension and other postretirement plan-related changes other than net periodic benefit cost.

WTC-USAO-02-0108056

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218   Printed: 11/13/2009 - 04:55 pm

Schedule RIBI **9**

## Schedule RI-B -- Charge-offs and Recoveries on Loans and Leases and Changes in Allowance for Loan and Lease Losses

### Part I. Charge-offs [1] and Recoveries on Loans and Leases

Part I includes charge-offs and recoveries through the allocated transfer risk reserve.

| Dollar Amounts in Thousands | (Column A) Charge-offs: Calendar YTD | | (Column B) Recoveries: Calendar YTD | | |
|---|---|---|---|---|---|
| 1. Loans secured by real estate: | | | | | |
| a. Construction, land development, and other land loans: | | | | | |
| (1) 1-4 family residential construction loans | RIADC891 | 6,090 | RIADC892 | 1 | 1.a.(1) |
| (2) Other construction loans and all land development and other land loans | RIADC893 | 20,588 | RIADC894 | 42 | 1.a.(2) |
| b. Secured by farmland | RIAD3584 | 0 | RIAD3585 | 0 | 1.b. |
| c. Secured by 1-4 family residential properties: | | | | | |
| (1) Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit | RIAD5411 | 2,644 | RIAD5412 | 106 | 1.c.(1) |
| (2) Closed-end loans secured by 1-4 family residential properties: | | | | | |
| (a) Secured by first liens | RIADC234 | 1,071 | RIADC217 | 1 | 1.c.(2)(a) |
| (b) Secured by junior liens | RIADC235 | 2,270 | RIADC218 | 26 | 1.c.(2)(b) |
| d. Secured by multifamily (5 or more) residential properties | RIAD3588 | 0 | RIAD3589 | 0 | 1.d. |
| e. Secured by nonfarm nonresidential properties: | | | | | |
| (1) Loans secured by owner-occupied nonfarm nonresidential properties | RIADC895 | 2,081 | RIADC896 | 57 | 1.e.(1) |
| (2) Loans secured by other nonfarm nonresidential properties | RIADC897 | 2,575 | RIADC898 | 0 | 1.e.(2) |
| 2. Loans to depository institutions and acceptances of other banks | RIAD4481 | 0 | RIAD4482 | 0 | 2. |
| 3. Not applicable | | | | | |
| 4. Commercial and industrial loans | RIAD4638 | 14,838 | RIAD4608 | 452 | 4. |
| 5. Loans to individuals for household, family, and other personal expenditures: | | | | | |
| a. Credit cards | RIADB514 | 2,677 | RIADB515 | 180 | 5.a. |
| b. Other (includes single payment, installment, all student loans, and revolving credit plans other than credit cards) | RIADB516 | 20,182 | RIADB517 | 2,492 | 5.b. |
| 6. Loans to foreign governments and official institutions | RIAD4643 | 0 | RIAD4627 | 0 | 6. |
| 7. All other loans [2] | RIAD4644 | 1,492 | RIAD4628 | 1,492 | 7. |
| 8. Lease financing receivables | RIAD4266 | 0 | RIAD4267 | 0 | 8. |
| 9. Total (sum of items 1 through 8) | RIAD4635 | 76,508 | RIAD4605 | 4,849 | 9. |

[1] Include write-downs arising from transfers of loans to a held-for-sale account.
[2] Includes charge-offs and recoveries on "Loans to finance agricultural production and other loans to farmers," "Obligations (other than securities and leases) of states and political subdivisions in the U.S.," and "Other loans."

WTC-USAO-02-0108057

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                                    Printed: 11/13/2009 - 04:55 pm

Schedule **RI-B**  | 10 |

## Schedule RI-B - Continued

### Part I. Continued

Memoranda

| Dollar Amounts in Thousands | (Column A) Charge-offs: Calendar YTD | | (Column B) Recoveries: Calendar YTD | | |
|---|---|---|---|---|---|
| 1. Loans to finance commercial real estate, construction, and land development activities (**not secured by real estate**) included in Schedule RI-B, part I, items 4 and 7, above ............................. | RIAD5409 | 0 | RIAD5410 | 0 | M.1. |
| 2. *Memoranda items 2.a thru 2.d are to be completed by banks with $300 million or more in total assets:* (2) | | | | | |
| a. Loans secured by real estate to non-U.S. addressees (domicile) (included in Schedule RI-B, part I, item 1, above) ..................... | RIAD4652 | 0 | RIAD4662 | 0 | M.2.a. |
| b. Loans to and acceptances of foreign banks (included in Schedule RI-B, part I, item 2, above) ............................................. | RIAD4654 | 0 | RIAD4664 | 0 | M.2.b. |
| c. Commercial and industrial loans to non-U.S. addressees (domicile) (included in Schedule RI-B, part I, item 4, above) ..................... | RIAD4646 | 0 | RIAD4618 | 0 | M.2.c. |
| d. Leases to individuals for household, family, and other personal expenditures (included in Schedule RI-B, part I, item 8, above) ...... | RIADF185 | 0 | RIADF187 | 0 | M.2.d. |
| 3. *Memorandum item 3 is to be completed by:* (2) • banks with $300 million or more in total assets, and • banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, part I, item 3) exceeding five percent of total loans. Loans to finance agricultural production and other loans to farmers (included in Schedule RI-B, part I, item 7, above) ............................ | RIAD4655 | 0 | RIAD4665 | 0 | M.3. |



| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| *Memorandum item 4 is to be completed by banks that (1) together with affiliated institutions, have outstanding credit card receivables (as defined in the instructions) that exceed $500 million as of the report date or (2) are credit card specialty banks as defined for Uniform Bank Performance Report purposes.* | | | | | |
| 4. Uncollectible retail credit card fees and finance charges reversed against income (i.e., not included in charge-offs against the allowance for loan and lease losses) ......................................................... | RIADC388 | | | N/A | M.4. |



(2) The $300 million asset size test and the five percent of total loans test are generally based on the total assets and total loans reported on the June 30, 2008, Report of Condition.

WTC-USAO-02-0108058

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule RIBII  **11**

## Schedule RI-B - Continued

### Part II. Changes in Allowance for Loan and Lease Losses

| | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| 1. Balance most recently reported for the December 31, 2008, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income) ................................................ | | RIADB522 | | 139,531 | | 1. |
| 2. Recoveries (must equal part I, item 9, column B, above) ................................................ | | RIAD4605 | | 4,849 | | 2. |
| 3. LESS: Charge-offs (must equal part I, item 9, column A, above less Schedule RI-B, part II, item 4) .. | | RIADC079 | | 76,508 | | 3. |
| 4. LESS: Write-downs arising from transfers of loans to a held-for-sale account ................. | | RIAD5523 | | 0 | | 4. |
| 5. Provision for loan and lease losses (must equal Schedule RI, item 4) ................................. | | RIAD4230 | | 109,817 | | 5. |
| 6. Adjustments (see instructions for this schedule)  (*) ................................. | | RIADC233 | | (48,416) | | 6. |
| 7. Balance end of current period (sum of items 1, 2, 5, and 6, less items 3 and 4) (must equal Schedule RC, item 4.c) ................................. | | RIAD3123 | | 129,273 | | 7. |

Memoranda

| | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| 1. Allocated transfer risk reserve included in Schedule RI-B, part II, item 7, above ................. | | RIADC435 | | 0 | | M.1. |
| *Memorandum items 2 and 3 are to be completed by banks that (1) together with affiliated institutions, have outstanding credit card receivables (as defined in the instructions) that exceed $500 million as of the report date or (2) are credit card specialty banks as defined for Uniform Bank Performance Report purposes.* | | | | | | |
| 2. Separate valuation allowance for uncollectible retail credit card fees and finance charges ............. | | RIADC389 | | | N/A | M.2. |
| 3. Amount of allowance for loan and lease losses attributable to retail credit card fees and finance charges ................................. | | RIADC390 | | | N/A | M.3. |
| ***Memorandum item 4 is to be completed by all banks.*** | | | | | | |
| 4. Amount of allowance for post-acquisition losses on purchased impaired loans accounted for in accordance with AICPA Statement of Position 03-3 (included in Schedule RI-B, part II, item 7, above) ................................. | | RIADC781 | | 0 | | M.4. |

(*) Describe on Schedule RI-E - Explanations

WTC-USAO-02-0108059

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule RIE   | 12 |

# Schedule RI-E - Explanations

**Schedule RI-E is to be completed each quarter on a calendar year-to-date basis.**

Detail all adjustments in Schedule RI-A and RI-B, all extraordinary items and other adjustments in Schedule RI,
and all significant items of other noninterest income and other noninterest expense in Schedule RI. (See instructions for details.)

| | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| 1. Other noninterest income (from Schedule RI, item 5.l) | | | | | | |
| Itemize and describe amounts greater than $25,000 that exceed 3% of Schedule RI, item 5.l: | | | | | | |
| a. Income and fees from the printing and sale of checks | | RIADC013 | | | 0 | 1.a. |
| b. Earnings on/increase in value of cash surrender value of life insurance | | RIADC014 | | | 0 | 1.b. |
| c. Income and fees from automated teller machines (ATMs) | | RIADC016 | | | 0 | 1.c. |
| d. Rent and other income from other real estate owned | | RIAD4042 | | | 0 | 1.d. |
| e. Safe deposit box rent | | RIADC015 | | | 823 | 1.e. |
| f. Net change in the fair values of financial instruments accounted for under a fair value option | | RIADF229 | | | 0 | 1.f. |
| g. Bank card and credit card interchange fees | | RIADF555 | | 7,091 | | 1.g. |
| h. | TEXT4461 Loan fees & late charges | RIAD4461 | | 4,576 | | 1.h. |
| i. | TEXT4462 | RIAD4462 | | | 0 | 1.i. |
| j. | TEXT4463 | RIAD4463 | | | 0 | 1.j. |
| 2. Other noninterest expense (from Schedule RI, item 7.d) | | | | | | |
| Itemize and describe amounts greater than $25,000 that exceed 3% of Schedule RI, item 7.d: | | | | | | |
| a. Data processing expenses | | RIADC017 | | | 0 | 2.a. |
| b. Advertising and marketing expenses | | RIAD0497 | | 3,414 | | 2.b. |
| c. Directors' fees | | RIAD4136 | | | 0 | 2.c. |
| d. Printing, stationery, and supplies | | RIADC018 | | 3,391 | | 2.d. |
| e. Postage | | RIAD8403 | | 2,465 | | 2.e. |
| f. Legal fees and expenses | | RIAD4141 | | 2,247 | | 2.f. |
| g. FDIC deposit insurance assessments | | RIAD4146 | | 14,156 | | 2.g. |
| h. Accounting and auditing expenses | | RIADF556 | | 2,588 | | 2.h. |
| i. Consulting and advisory expenses | | RIADF557 | | 13,188 | | 2.i. |
| j. Automated teller machine (ATM) and interchange expenses | | RIADF558 | | | 0 | 2.j. |
| k. Telecommunications expenses | | RIADF559 | | 2,486 | | 2.k. |
| l. | TEXT4464 Originating & processing | RIAD4464 | | 6,882 | | 2.l. |
| m. | TEXT4467 Travel, entertainment & training | RIAD4467 | | 3,288 | | 2.m. |
| n. | TEXT4468 | RIAD4468 | | | | 2.n. |
| 3. Extraordinary items and other adjustments and applicable income tax effect (from Schedule RI, item 11) | | | | | | |
| (itemize and describe all extraordinary items and other adjustments): | | | | | | |
| a. (1) | TEXT4469 | RIAD4469 | | | 0 | 3.a.(1) |
| (2) Applicable income tax effect | | RIAD4486 | | | 0 | 3.a.(2) |
| b. (1) | TEXT4487 | RIAD4487 | | | 0 | 3.b.(1) |
| (2) Applicable income tax effect | | RIAD4488 | | | 0 | 3.b.(2) |
| c. (1) | TEXT4489 | RIAD4489 | | | 0 | 3.c.(1) |
| (2) Applicable income tax effect | | RIAD4491 | | | 0 | 3.c.(2) |

WTC-USAO-02-0108060

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule RIE  **13**

## Schedule RI-E - Continued

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 4. Restatements due to corrections of material accounting errors and changes in accounting principles (from Schedule RI-A, item 2) (itemize and describe all restatements): | | | | | |
| **a. Cumulative effect of the initial application of FSP FAS 115-2 on other-than-temporary impairment** | RIADG894 | | | 44,484 | 4.a. |
| b. TEXTB527 | RIADB527 | | | 0 | 4.b. |
| 5. Other transactions with parent holding company (from Schedule RI-A, item 11) (itemize and describe all such transactions): | | | | | |
| a. TEXT4498 | RIAD4498 | | | 0 | 5.a. |
| b. TEXT4499 | RIAD4499 | | | 0 | 5.b. |
| 6. Adjustments to allowance for loan and lease losses (from Schedule RI-B, part II, item 6) (itemize and describe all adjustments): | | | | | |
| a. TEXT4521 The adjustment reflects a balance transfer from other liabilities to the allowance for | RIAD4521 | | | 1,554 | 6.a. |
| b. TEXT4522 Portion of reserve specific to impaired loans | RIAD4522 | | | (49,970) | 6.b. |

| | | Yes/No | |
|---|---|---|---|
| 7. Other explanations (the space below is provided for the bank to briefly describe, at its option, any other significant items affecting the Report of Income): | | | |
| a. Comments? | RIAD4769 | NO | 7.a. |
| b. Other explanations: | | | |

(TEXT 4769)

September 2009  FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule **RC**  | 14 |

## Consolidated Report of Condition for Insured Commercial and State-Chartered Savings Banks for September 30, 2009

All schedules are to be reported in thousands of dollars. Unless otherwise indicated,
report the amount outstanding as of the last business day of the quarter.

## Schedule RC - Balance Sheet

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| 1. Cash and balances due from depository institutions (from Schedule RC-A): | | | | | |
| a. Noninterest-bearing balances and currency and coin [1] | RCON0081 | | 178,448 | | 1.a. |
| b. Interest-bearing balances [2] | RCON0071 | | 1,129 | | 1.b. |
| 2. Securities: | | | | | |
| a. Held-to-maturity securities (from Schedule RC-B, column A) | RCON1754 | | **114,901** | | 2.a. |
| b. Available-for-sale securities (from Schedule RC-B, column D) | RCON1773 | | 431,868 | | 2.b. |
| 3. Federal funds sold and securities purchased under agreements to resell: | | | | | |
| a. Federal funds sold | RCONB987 | | 0 | | 3.a. |
| b. Securities purchased under agreements to resell [3] | RCONB989 | | 65,919 | | 3.b. |
| 4. Loans and lease financing receivables (from Schedule RC-C): | | | | | |
| a. Loans and leases held for sale | RCON5369 | | 4,241 | | 4.a. |
| b. Loans and leases, net of unearned income | RCONB528 | | 8,239,157 | | 4.b. |
| c. LESS: Allowance for loan and lease losses | RCON3123 | | 129,273 | | 4.c. |
| d. Loans and leases, net of unearned income and allowance (item 4.b minus 4.c) | RCONB529 | | **8,109,884** | | 4.d. |
| 5. Trading assets (from Schedule RC-D) | RCON3545 | | 0 | | 5. |
| 6. Premises and fixed assets (including capitalized leases) | RCON2145 | | 124,821 | | 6. |
| 7. Other real estate owned (from Schedule RC-M) | RCON2150 | | **26,404** | | 7. |
| 8. Investments in unconsolidated subsidiaries and associated companies | RCON2130 | | 1,281 | | 8. |
| 9. **Direct and indirect investments in real estate ventures** | RCON3656 | | 5,345 | | 9. |
| 10. Intangible assets: | | | | | |
| a. Goodwill | RCON3163 | | 1,946 | | 10.a. |
| b. Other intangible assets (from Schedule RC-M) | RCON0426 | | **4,683** | | 10.b. |
| 11. Other assets (from Schedule RC-F) | RCON2160 | | 451,329 | | 11. |
| 12. Total assets (sum of items 1 through 11) | RCON2170 | | **9,522,199** | | 12. |

(1) Includes cash items in process of collection and unposted debits.
(2) Includes time certificates of deposit not held for trading.
(3) Includes all securities resale agreements, regardless of maturity.

WTC-USAO-02-0108062

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                     Printed: 11/13/2009 - 04:55 pm

Schedule RC | **15**

## Schedule RC - Continued

| | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| **LIABILITIES** | | | | | | |
| 13. Deposits: | | | | | | |
| | a. In domestic offices (sum of totals of columns A and C from Schedule RC-E) .......... | RCON2200 | | 6,744,490 | | 13.a. |
| | (1) Noninterest-bearing [1] | RCON6631 | | 1,299,870 | | 13.a.(1) |
| | (2) Interest-bearing .......... | RCON6636 | | 5,444,620 | | 13.a.(2) |
| | b. Not applicable | | | | | | |
| 14. Federal funds purchased and securities sold under agreements to repurchase: | | | | | | |
| | a. Federal funds purchased [2] .......... | RCONB993 | | 718,260 | | 14.a. |
| | b. Securities sold under agreements to repurchase [3] .......... | RCONB995 | | 231,047 | | 14.b. |
| 15. Trading liabilities (from Schedule RC-D) .......... | | RCON3548 | | | 0 | 15. |
| 16. Other borrowed money (includes mortgage indebtedness and obligations under capitalized leases) (from Schedule RC-M) .......... | | RCON3190 | | 654,036 | | 16. |
| 17. Not applicable | | | | | | |
| 18. Not applicable | | | | | | |
| 19. Subordinated notes and debentures [4] .......... | | RCON3200 | | | 0 | 19. |
| 20. Other liabilities (from Schedule RC-G) .......... | | RCON2930 | | 287,180 | | 20. |
| 21. Total liabilities (sum of items 13 through 20) .......... | | RCON2948 | | 8,635,013 | | 21. |
| 22. **Not applicable** | | | | | | |
| **EQUITY CAPITAL** | | | | | | |
| **Bank Equity Capital** | | | | | | |
| 23. Perpetual preferred stock and related surplus .......... | | RCON3838 | | | 0 | 23. |
| 24. Common stock .......... | | RCON3230 | | | 500 | 24. |
| 25. Surplus (exclude all surplus related to preferred stock) .......... | | RCON3839 | | 202,888 | | 25. |
| 26. | | | | | | |
| | a. Retained earnings .......... | RCON3632 | | 807,884 | | 26.a. |
| | b. Accumulated other comprehensive income [5] .......... | RCONB530 | | (124,086) | | 26.b. |
| | c. Other equity capital components [6] .......... | RCONA130 | | | 0 | 26.c. |
| 27. | | | | | | |
| | a. **Total bank equity capital (sum of items 23 through 26.c)** .......... | RCON3210 | | 887,186 | | 27.a. |
| | b. **Noncontrolling (minority) interests in consolidated subsidiaries** .......... | RCON3000 | | | 0 | 27.b. |
| 28. Total equity capital (sum of items 27.a and 27.b) .......... | | RCONG105 | | 887,186 | | 28. |
| 29. Total liabilities and equity capital (sum of items 21 and 28) .......... | | RCON3300 | | 9,522,199 | | 29. |

(1) Includes total demand deposits and noninterest-bearing time and savings deposits.
(2) Report overnight Federal Home Loan Bank advances in Schedule RC, item 16, "Other borrowed money."
(3) Includes all securities repurchase agreements, regardless of maturity.
(4) Includes limited-life preferred stock and related surplus.
(5) Includes net unrealized holding gains (losses) on available-for-sale securities, accumulated net gains (losses) on cash flow hedges, and minimum pension liability adjustments.
(6) Includes treasury stock and unearned Employee Stock Ownership Plan shares.

WTC-USAO-02-0108063

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule RC   **16**

## Schedule RC - Continued

Memoranda
**To be reported with the March Report of Condition.**

| | | Number |
|---|---|---|
| 1. Indicate in the box at the right the number of the statement below that best describes the most comprehensive level of auditing work performed for the bank by independent external auditors as of any date during 2008 ............................................................ | RCON6724 | N/A | M.1.

1 = Independent audit of the bank conducted in accordance with generally accepted auditing standards by a certified public accounting firm which submits a report on the bank

2 = Independent audit of the bank's parent holding company conducted in accordance with generally accepted auditing standards by a certified public accounting firm which submits a report on the consolidated holding company (but not on the bank separately)

3 = Attestation on bank management's assertion on the effectiveness of the bank's internal control over financial reporting by a certified public accounting firm

4 = Directors' examination of the bank conducted in accordance with generally accepted auditing standards by a certified public accounting firm (may be required by state chartering authority)

5 = Directors' examination of the bank performed by other external auditors (may be required by state chartering authority)

6 = Review of the bank's financial statements by external auditors

7 = Compilation of the bank's financial statements by external auditors

8 = Other audit procedures (excluding tax preparation work)

9 = No external audit work

| | | MM/DD |
|---|---|---|
| **To be reported with the March Report of Condition.** | | |
| 2. **Bank's fiscal year-end date** ............................................................... | RCON8678 | N/A | M.2.

WTC-USAO-02-0108064

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule RCA 　**17**

## Schedule RC-A - Cash and Balances Due From Depository Institutions

**Schedule RC-A is to be completed only by banks with $300 million or more in total assets.**
Exclude assets held for trading.

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 1. Cash items in process of collection, unposted debits, and currency and coin: | | | | | |
| a. Cash items in process of collection and unposted debits | RCON0020 | | 82,723 | | 1.a. |
| b. Currency and coin | RCON0080 | | 88,988 | | 1.b. |
| 2. Balances due from depository institutions in the U.S: | | | | | |
| a. U.S. branches and agencies of foreign banks | RCON0083 | | 0 | | 2.a. |
| b. Other commercial banks in the U.S. and other depository institutions in the U.S. | RCON0085 | | 3,982 | | 2.b. |
| 3. Balances due from banks in foreign countries and foreign central banks: | | | | | |
| a. Foreign branches of other U.S. banks | RCON0073 | | 0 | | 3.a. |
| b. Other banks in foreign countries and foreign central banks | RCON0074 | | 0 | | 3.b. |
| 4. Balances due from Federal Reserve Banks | RCON0090 | | 3,884 | | 4. |
| 5. Total (sum of items 1 through 4) (must equal Schedule RC, sum of items 1.a and 1.b) | RCON0010 | | 179,577 | | 5. |

WTC-USAO-02-0108065

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule **RCB**  | 18 |

## Schedule RC-B - Securities

Exclude assets held for trading.

| Dollar Amounts in Thousands | (Column A) Held-to-maturity Amortized Cost | (Column B) Held-to-maturity Fair Value | (Column C) Available-for-sale Amortized Cost | (Column D) Available-for-sale Fair Value | |
|---|---|---|---|---|---|
| 1. U.S. Treasury securities ................................ | RCON0211 | RCON0213 | RCON1286 | RCON1287 | 1. |
| | 0 | 0 | 9,341 | 9,375 | |
| 2. U.S. Government agency obligations (exclude mortgage-backed securities): | | | | | |
| a. Issued by U.S. Government agencies (1) .......................... | RCON1289 | RCON1290 | RCON1291 | RCON1293 | |
| | 0 | 0 | 0 | 0 | 2.a. |
| b. Issued by U.S. Government-sponsored agencies (2) ......... | RCON1294 | RCON1295 | RCON1297 | RCON1298 | |
| | 0 | 0 | 103,997 | 104,621 | 2.b. |
| 3. Securities issued by states and political subdivisions in the U.S. ...................................................... | RCON8496 | RCON8497 | RCON8498 | RCON8499 | 3. |
| | 515 | 549 | 5,185 | 5,230 | |
| 4. Mortgage-backed securities (MBS): | | | | | |
| a. Residential mortgage pass-through securities: | | | | | |
| (1) Guaranteed by GNMA ................................ | RCONG300 | RCONG301 | RCONG302 | RCONG303 | |
| | 0 | 0 | 1,429 | 1,475 | 4.a.(1) |
| (2) Issued by FNMA and FHLMC .......................... | RCONG304 | RCONG305 | RCONG306 | RCONG307 | |
| | 0 | 0 | 205,328 | 214,656 | 4.a.(2) |
| (3) Other pass-through securities ...................... | RCONG308 | RCONG309 | RCONG310 | RCONG311 | |
| | 0 | 0 | 0 | 0 | 4.a.(3) |
| b. Other residential mortgage-backed securities (include CMOs, REMICs, and stripped MBS): | | | | | |
| (1) Issued or guaranteed by FNMA, FHLMC, or GNMA ........ | RCONG312 | RCONG313 | RCONG314 | RCONG315 | |
| | 0 | 0 | 56,364 | 57,864 | 4.b.(1) |
| (2) Collateralized by MBS issued or guaranteed by FNMA, FHLMC, or GNMA ...................................... | RCONG316 | RCONG317 | RCONG318 | RCONG319 | |
| | 0 | 0 | 0 | 0 | 4.b.(2) |
| (3) All other residential MBS .......................... | RCONG320 | RCONG321 | RCONG322 | RCONG323 | |
| | 0 | 0 | 0 | 0 | 4.b.(3) |
| c. Commercial MBS: | | | | | |
| (1) Commercial mortgage pass-through securities ......... | RCONG324 | RCONG325 | RCONG326 | RCONG327 | |
| | 0 | 0 | 0 | 0 | 4.c.(1) |
| (2) Other commercial MBS ................................ | RCONG328 | RCONG329 | RCONG330 | RCONG331 | |
| | 0 | 0 | 0 | 0 | 4.c.(2) |
| 5. Asset-backed securities and structured financial products: | | | | | |
| a. Asset-backed securities (ABS) (from RC-B Memoranda) .... | RCONC026 | RCONC988 | RCONC989 | RCONC027 | |
| | 57,543 | 44,155 | 0 | 0 | 5.a. |
| b. Structured financial products: | | | | | |
| (1) Cash ...................................... | RCONG336 | RCONG337 | RCONG338 | RCONG339 | |
| | 56,343 | 51,724 | 0 | 0 | 5.b.(1) |
| (2) Synthetic ...................................... | RCONG340 | RCONG341 | RCONG342 | RCONG343 | |
| | 0 | 0 | 0 | 0 | 5.b.(2) |
| (3) Hybrid ...................................... | RCONG344 | RCONG345 | RCONG346 | RCONG347 | |
| | 0 | 0 | 0 | 0 | 5.b.(3) |

(1) Includes Small Business Administration "Guaranteed Loan Pool Certificates," U.S. Maritime Administration obligations, and Export-Import Bank participation certificates.
(2) Includes obligations (other than mortgage-backed securities) issued by the Farm Credit System, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, the Financing Corporation, Resolution Funding Corporation, the Student Loan Marketing Association, and the Tennessee Valley Authority.

WTC-USAO-02-0108066

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                                Printed: 11/13/2009 - 04:55 pm

Schedule RCB   | 19 |

## Schedule RC-B - Continued

| Dollar Amounts in Thousands | (Column A) Held-to-maturity Amortized Cost | (Column B) Held-to-maturity Fair Value | (Column C) Available-for-sale Amortized Cost | (Column D) Available-for-sale Fair Value | |
|---|---|---|---|---|---|
| 6. Other debt securities: | | | | | |
| a. Other domestic debt securities ............................... | RCON1737 | RCON1738 | RCON1739 | RCON1741 | 6.a. |
| | 0 | 0 | 0 | 0 | |
| b. Foreign debt securities ...................................... | RCON1742 | RCON1743 | RCON1744 | RCON1746 | 6.b. |
| | 500 | 500 | 0 | 0 | |
| 7. Investments in mutual funds and other equity securities with readily determinable fair values [3] ................................ | | | RCONA510 | RCONA511 | 7. |
| | | | 36,385 | 38,647 | |
| 8. total (sum of items 1 through 7) (total of column A must equal Schedule RC, item 2.a) (total of column D must equal Schedule RC, item 2.b.) ................................ | RCON1754 | RCON1771 | RCON1772 | RCON1773 | 8. |
| | **114,901** | **96,928** | **418,029** | **431,868** | |

(3) Report Federal Reserve stock, Federal Home Loan Bank stock, and bankers' bank stock in Schedule RC-F, item 4.

WTC-USAO-02-0108067

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule RCB   **20**

## Schedule RC-B - Continued

Memoranda

| | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| 1. Pledged securities (1) | | RCON0416 | | 419,574 | | M.1. |
| 2. Maturity and repricing data for debt securities (excluding those in nonaccrual status): (1) (2) | | | | | | |
| a. Securities issued by the U.S. Treasury, U.S. Government agencies, and states and political subdivisions in the U.S.; other non-mortgage debt securities; and mortgage pass-through securities other than those backed by closed-end first lien 1-4 family residential mortgages with a remaining maturity or next repricing date of: (3) (4) | | | | | | |
| (1) Three months or less | | RCONA549 | | 170,702 | | M.2.a.(1) |
| (2) Over three months through 12 months | | RCONA550 | | 20,230 | | M.2.a.(2) |
| (3) Over one year through three years | | RCONA551 | | 25,785 | | M.2.a.(3) |
| (4) Over three years through five years | | RCONA552 | | 0 | | M.2.a.(4) |
| (5) Over five years through 15 years | | RCONA553 | | 12,469 | | M.2.a.(5) |
| (6) Over 15 years | | RCONA554 | | 4,942 | | M.2.a.(6) |
| b. Mortgage pass-through securities backed by closed-end first lien 1-4 family residential mortgages with a remaining maturity or next repricing date of: (3) (5) | | | | | | |
| (1) Three months or less | | RCONA555 | | 36 | | M.2.b.(1) |
| (2) Over three months through 12 months | | RCONA556 | | 0 | | M.2.b.(2) |
| (3) Over one year through three years | | RCONA557 | | 15,427 | | M.2.b.(3) |
| (4) Over three years through five years | | RCONA558 | | 13,928 | | M.2.b.(4) |
| (5) Over five years through 15 years | | RCONA559 | | 179,372 | | M.2.b.(5) |
| (6) Over 15 years | | RCONA560 | | 7,367 | | M.2.b.(6) |
| c. Other mortgage-backed securities (include CMOs, REMICs, and stripped MBS; exclude mortgage pass-through securities) with an expected average life of: (6) | | | | | | |
| (1) Three years or less | | RCONA561 | | 2,975 | | M.2.c.(1) |
| (2) Over three years | | RCONA562 | | 54,889 | | M.2.c.(2) |
| d. Debt securities with a REMAINING MATURITY of one year or less (included in Memorandum items 2.a through 2.c above) | | RCONA248 | | 77,045 | | M.2.d. |
| 3. Amortized cost of held-to-maturity securities sold or transferred to available-for-sale or trading securities during the calendar year-to-date (report the amortized cost at date of sale or transfer) | | RCON1778 | | 0 | | M.3. |
| 4. Structured notes (included in the held-to-maturity and available-for-sale accounts in Schedule RC-B, items 2, 3, 5, and 6): | | | | | | |
| a. Amortized cost | | RCON8782 | | 0 | | M.4.a. |
| b. Fair value | | RCON8783 | | 0 | | M.4.b. |

(1) Includes held-to-maturity securities at amortized cost and available-for-sale securities at fair value.
(2) Exclude investments in mutual funds and other equity securities with readily determinable fair values.
(3) Report fixed rate debt securities by remaining maturity and floating rate debt securities by next repricing date.
(4) Sum of Memorandum items 2.a.(1) through 2.a.(6) plus any nonaccrual debt securities in the categories of debt securities reported in Memorandum item 2.a that are included in Schedule RC-N, item 9, column C, must equal Schedule RC-B, sum of items 1, 2, 3, 4.c.(1), 5, and 6, columns A and D, plus residential mortgage pass-through securities other than those backed by closed-end first lien 1-4 family residential mortgages included in Schedule RC-B, item 4.a, columns A and D.
(5) Sum of Memorandum items 2.b.(1) through 2.b.(6) plus any nonaccrual mortgage pass-through securities backed by closed-end first lien 1-4 family residential mortgages included in Schedule RC-N, item 9, column C, must equal Schedule RC-B, item 4.a, sum of columns A and D, less the amount of residential mortgage pass-through securities other than those backed by closed-end first lien 1-4 family residential mortgages included in Schedule RC-B, item 4.a, columns A and D.
(6) Sum of Memorandum items 2.c.(1) and 2.c.(2) plus any nonaccrual "Other mortgage-backed securities" included in Schedule RC-N, item 9, column C, must equal Schedule RC-B, sum of items 4.b. and 4.c.(2), columns A and D.

WTC-USAO-02-0108068

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218          Printed: 11/13/2009 - 04:55 pm

Schedule **RCB** [21]

## Schedule RC-B - Continued

Memoranda (continued)

*Memorandum items 5.a through 5.f are to be completed by banks with $1 billion or more in total assets.*[1]

| Dollar Amounts in Thousands | (Column A) Held-to-maturity Amortized Cost | (Column B) Held-to-maturity Fair Value | (Column C) Available-for-sale Amortized Cost | (Column D) Available-for-sale Fair Value | |
|---|---|---|---|---|---|
| 5. Asset-backed securities (ABS) (for each column, sum of Memorandum items 5.a through 5.f must equal Schedule RC-B, item 5.a): | | | | | |
| a. Credit card receivables | RCONB838 0 | RCONB839 0 | RCONB840 0 | RCONB841 0 | M.5.a. |
| b. Home equity lines | RCONB842 0 | RCONB843 0 | RCONB844 0 | RCONB845 0 | M.5.b. |
| c. Automobile loans | RCONB846 0 | RCONB847 0 | RCONB848 0 | RCONB849 0 | M.5.c. |
| d. Other consumer loans | RCONB850 0 | RCONB851 0 | RCONB852 0 | RCONB853 0 | M.5.d. |
| e. Commercial and industrial loans | RCONB854 0 | RCONB855 0 | RCONB856 0 | RCONB857 0 | M.5.e. |
| f. Other | RCONB858 57,543 | RCONB859 44,155 | RCONB860 0 | RCONB861 0 | M.5.f. |
| 6. Structured financial products by underlying collateral or reference assets (for each column, sum of Memorandum items 6.a through 6.g must equal Schedule RC-B, sum of items 5.b.(1) through (3)): | | | | | |
| a. Trust preferred securities issued by financial institutions | RCONG348 56,343 | RCONG349 51,724 | RCONG350 0 | RCONG351 0 | M.6.a. |
| b. Trust preferred securities issued by real estate investment trusts | RCONG352 0 | RCONG353 0 | RCONG354 0 | RCONG355 0 | M.6.b. |
| c. Corporate and similar loans | RCONG356 0 | RCONG357 0 | RCONG358 0 | RCONG359 0 | M.6.c. |
| d. 1-4 family residential MBS issued or guaranteed by U.S. government-sponsored enterprises (GSEs) | RCONG360 0 | RCONG361 0 | RCONG362 0 | RCONG363 0 | M.6.d. |
| e. 1-4 family residential MBS not issued or guaranteed by GSEs | RCONG364 0 | RCONG365 0 | RCONG366 0 | RCONG367 0 | M.6.e. |
| f. Diversified (mixed) pools of structured financial products | RCONG368 0 | RCONG369 0 | RCONG370 0 | RCONG371 0 | M.6.f. |
| g. Other collateral or reference assets | RCONG372 0 | RCONG373 0 | RCONG374 0 | RCONG375 0 | M.6.g. |

(1) The $1 billion asset size test is generally based on the total assets reported on the June 30, 2008, Report of Condition.

WTC-USAO-02-0108069

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                                    Printed: 11/13/2009 - 04:55 pm

Schedule RCCI | 22

# Schedule RC-C -- Loans and Lease Financing Receivables

## Part I. Loans and Leases

Do not deduct the allowance for loan and lease losses or the allocated transfer risk reserve from amounts reported in this schedule. Report (1) loans and leases held for sale at the lower of cost or market value and (2) loans and leases held for investment, net of unearned income, and (3) loans and leases accounted for at fair value under a fair value option. Exclude assets held for trading and commercial paper.

| Dollar Amounts in Thousands | (Column A) To Be Completed by Banks with $300 Million or More in Total Assets (1) | | (Column B) To Be Completed by All Banks | | |
|---|---|---|---|---|---|
| 1. Loans secured by real estate: | | | | | |
| a. Construction, land development, and other land loans: | | | | | |
| (1) 1-4 family residential construction loans ..................... | | | RCONF158 | 282,445 | 1.a.(1) |
| (2) Other construction loans and all land development and other land loans ..................... | | | RCONF159 | 1,569,315 | 1.a.(2) |
| b. Secured by farmland (incl. farm residential & other improvements) . | | | RCON1420 | 46,693 | 1.b. |
| c. Secured by 1-4 family residential properties: | | | | | |
| (1) Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit ..................... | | | RCON1797 | 435,483 | 1.c.(1) |
| (2) Closed-end loans secured by 1-4 family residential properties: | | | | | |
| (a) Secured by first liens ..................... | | | RCON5367 | 502,944 | 1.c.(2)(a) |
| (b) Secured by junior liens ..................... | | | RCON5368 | 176,490 | 1.c.(2)(b) |
| d. Secured by multifamily (5 or more) residential properties ............. | | | RCON1460 | 76,242 | 1.d. |
| e. Secured by nonfarm nonresidential properties: | | | | | |
| (1) Loans secured by owner-occupied nonfarm nonresidential properties ..................... | | | RCONF160 | 981,506 | 1.e.(1) |
| (2) Loans secured by other nonfarm nonresidential properties ......... | | | RCONF161 | 1,348,915 | 1.e.(2) |
| 2. Loans to depository institutions and acceptances of other banks ...... | | | RCON1288 | 265,000 | 2. |
| a. To commercial banks in the U.S.: | | | | | |
| (1) To U.S. branches and agencies of foreign banks ..................... | RCONB532 | 0 | | | 2.a.(1) |
| (2) To other commercial banks in the U.S. ..................... | RCONB533 | 0 | | | 2.a.(2) |
| b. To other depository institutions in the U.S. ..................... | RCONB534 | 265,000 | | | 2.b. |
| c. To banks in foreign countries: | | | | | |
| (1) To foreign branches of other U.S. banks ..................... | RCONB536 | 0 | | | 2.c.(1) |
| (2) To other banks in foreign countries ..................... | RCONB537 | 0 | | | 2.c.(2) |
| 3. Loans to finance agricultural production and other loans to farmers ... | | | RCON1590 | 38,898 | 3. |
| 4. Commercial and industrial loans ..................... | | | RCON1766 | 1,397,178 | 4. |
| a. To U.S. addressees (domicile) ..................... | RCON1763 | 1,397,178 | | | 4.a. |
| b. To non-U.S. addressees (domicile) ..................... | RCON1764 | 0 | | | 4.b. |
| 5. Not applicable | | | | | |
| 6. Loans to individuals for household, family, and other personal expenditures (i.e., consumer loans) (includes purchased paper): | | | | | |
| a. Credit cards ..................... | | | RCONB538 | 58,712 | 6.a. |
| b. Other revolving credit plans ..................... | | | RCONB539 | 254,947 | 6.b. |
| c. Other consumer loans (includes single payment, installment, and all student loans) ..................... | | | RCON2011 | 578,385 | 6.c. |
| 7. Loans to foreign governments and official institutions (including foreign central banks) ..................... | | | RCON2081 | 0 | 7. |
| 8. Obligations (other than securities and leases) of states and political subdivisions in the U.S. ..................... | | | RCON2107 | 27,022 | 8. |
| 9. Other loans ..................... | | | RCON1563 | 203,216 | 9. |
| a. Loans for purchasing or carrying securities (secured & unsecured) ... | RCON1545 | 5,959 | | | 9.a. |
| b. All other loans (exclude consumer loans) ..................... | RCON1564 | 197,257 | | | 9.b. |

(1) The $300 million asset size test is generally based on the total assets reported on the June 30, 2008, Report of Condition.

WTC-USAO-02-0108070

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule **RCCI** **23**

## Schedule RC-C - Continued

### Part I. Continued

| Dollar Amounts in Thousands | (Column A) To Be Completed by Banks with $300 Million or More in Total Assets (1) | | (Column B) To Be Completed by All Banks | | |
|---|---|---|---|---|---|
| 10. Lease financing receivables (net of unearned income) .................. | | | RCON2165 | 0 | 10. |
| a. Leases to individuals for household, family, and other personal expenditures (i.e., consumer leases) ............................................ | RCONF162 | 0 | | | 10.a. |
| b. All other leases ...................................................................... | RCONF163 | 0 | | | 10.b. |
| 11. LESS:Any unearned income on loans reflected in items 1-9 above .. | | | RCON2123 | 0 | 11. |
| 12. Total loans and leases, net of unearned income (sum of items 1 through 10 minus item 11) (must equal Schedule RC, sum of items 4.a and 4.b) ............................................................................... | | | RCON2122 | 8,243,398 | 12. |

Memoranda

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 1. Loans and leases restructured and in compliance with modified terms (included in Schedule RC-C, part I, and not reported as past due or nonaccrual in Schedule RC-N, Memorandum item 1): (1) | | | | | |
| a. Loans secured by 1-4 family residential properties ......................................... | RCONF576 | | | 1,651 | M.1.a. |
| b. Other loans and all leases (exclude loans to individuals for household, family, and other personal expenditures) ............................................................................................ | RCON1616 | | | 2,193 | M.1.b. |
| 2. Maturity and repricing data for loans and leases (excluding those in nonaccrual status): | | | | | |
| a. Closed-end loans secured by first liens on 1-4 family residential properties (reported in Schedule RC-C, part I, item 1.c.(2)(a), col. B) with a remaining maturity or next repricing date of: (2) (3) | | | | | |
| (1) Three months or less ......................................................................... | RCONA564 | | | 160,521 | M.2.a.(1) |
| (2) Over three months through 12 months ................................................ | RCONA565 | | | 36,358 | M.2.a.(2) |
| (3) Over one year through three years .................................................... | RCONA566 | | | 46,882 | M.2.a.(3) |
| (4) Over three years through five years .................................................. | RCONA567 | | | 26,884 | M.2.a.(4) |
| (5) Over five years through 15 years ...................................................... | RCONA568 | | | 13,571 | M.2.a.(5) |
| (6) Over 15 years ................................................................................. | RCONA569 | | | 190,428 | M.2.a.(6) |
| b. All loans and leases (reported in Schedule RC-C, part I, items 1 through 10, col. B) EXCLUDING closed-end loans secured by first liens on 1-4 family residential properties (reported in Schedule RC-C, part I, item 1.c.(2)(a), col. B) with a remaining maturity or next repricing date of: (2) (4) | | | | | |
| (1) Three months or less ......................................................................... | RCONA570 | | | 6,093,051 | M.2.b.(1) |
| (2) Over three months through 12 months ................................................ | RCONA571 | | | 64,719 | M.2.b.(2) |
| (3) Over one year through three years .................................................... | RCONA572 | | | 492,062 | M.2.b.(3) |
| (4) Over three years through five years .................................................. | RCONA573 | | | 474,787 | M.2.b.(4) |
| (5) Over five years through 15 years ...................................................... | RCONA574 | | | 292,542 | M.2.b.(5) |
| (6) Over 15 years ................................................................................. | RCONA575 | | | 19,708 | M.2.b.(6) |
| c. Loans and leases (reported in Schedule RC-C, part I, items 1 through 10, column B, above) with a REMAINING MATURITY of one year or less (excluding those in nonaccrual status) ..................... | RCONA247 | | | 3,457,604 | M.2.c. |

(1) The $300 million asset size test is generally based on the total assets reported on the June 30, 2008, Report of Condition.
(2) Report fixed rate loans and leases by remaining maturity and floating rate loans by next repricing date.
(3) Sum of Memorandum items 2.a.(1) through 2.a.(6) plus total nonaccrual closed-end loans secured by first liens on 1-4 family residential properties included in Schedule RC-C, part I, item 1.c.(2)(a), column C, must equal total closed-end loans secured by first liens on 1-4 family residential properties from Schedule RC-C, part I, item 1.c.(2)(a), column B.
(4) Sum of Memorandum items 2.b.(1) through 2.b.(6) plus total nonaccrual loans and leases from Schedule RC-N, sum of items 1 through 8, column C, minus nonaccrual closed-end loans secured by first liens on 1-4 family residential properties included in Schedule RC-N, item 1.c.(2)(a), column C, must equal total loans and leases from Schedule RC-C, part I, sum of items 1 through 10, column B, minus total closed-end loans secured by first liens on 1-4 family residential properties from Schedule RC-C, part I, item 1.c.(2)(a), column B.

WTC-USAO-02-0108071

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule **RCCI**  | 24 |

## Schedule RC-C - Continued

### Part I. Continued

Memoranda (continued)

| | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| 3. | Loans to finance commercial real estate, construction, and land development activities (**not secured by real estate**) included in Schedule RC-C, part I, items 4 and 9, column B [5] | RCON2746 | | | 0 | M.3. |
| 4. | Adjustable rate closed-end loans secured by first liens on 1-4 family residential properties (included in Schedule RC-C, part I, item 1.c.(2)(a), column B) | RCON5370 | | | 77,975 | M.4. |
| 5. | *To be completed by banks with $300 million or more in total assets:* Loans secured by real estate to non-U.S. addressees (domicile) (included in Schedule RC-C, part I, items 1.a through 1.e, column B) [6] | RCONB837 | | | 0 | M.5. |
| | *Memorandum item 6 is to be completed by banks that (1) together with affiliated institutions, have outstanding credit card receivables (as defined in the instructions) that exceed $500 million as of the report date or (2) are credit card specialty banks as defined for UBPR purposes.* | | | | | |
| 6. | Outstanding credit card fees and finance charges included in Schedule RC-C, part I, item 6.a | RCONC391 | | | N/A | M.6. |
| | **Memorandum item 7 is to be completed by all banks.** | | | | | |
| 7. | Purchased impaired loans held for investment accounted for in accordance with AICPA Statement of Position 03-3 (exclude loans held for sale): | | | | | |
| a. | Outstanding balance | RCONC779 | | | 0 | M.7.a. |
| b. | Carrying amount included in Schedule RC-C, part I, items 1 through 9 | RCONC780 | | | 0 | M.7.b. |
| 8. | Closed-end loans with negative amortization features secured by 1-4 family residential properties: | | | | | |
| a. | Total carrying amount of closed-end loans with negative amortization features secured by 1-4 family residential properties (included in Schedule RC-C, part I, items 1.c.(2)(a) and (b)) | RCON230 | | | 0 | M.8.a. |
| | *Memorandum items 8.b and 8.c are to be completed by banks that had closed-end loans with negative amortization features secured by 1-4 family residential properties (as reported in Schedule RC-C, part I, Memorandum item 8.a) as of December 31, 2008, that exceeded the lesser of $100 million or 5 percent of total loans and leases, net of unearned income (as reported in Schedule RC-C, part I, item 12, column B).* | | | | | |
| b. | Total maximum remaining amount of negative amortization contractually permitted on closed-end loans secured by 1-4 family residential properties | RCONF231 | | | N/A | M.8.b. |
| c. | Total amount of negative amortization on closed-end loans secured by 1-4 family residential properties included in the carrying amount reported in Memorandum item 8.a above | RCONF232 | | | N/A | M.8.c. |
| 9. | Loans secured by 1-4 family residential properties in process of foreclosure (included in Schedule RC-C, part I, items 1.c.(1), 1.c.(2)(a), and 1.c.(2)(b)) | RCONF577 | | | 4,863 | M.9. |
| | *Memorandum items 10 and 11 are to be completed by banks that have elected to measure loans included in Schedule RC-C, part I, items 1 through 9, at fair value under a fair value option.* | | | | | |
| 10. | Loans measured at fair value (included in Schedule RC-C, part I, items 1 through 9): | | | | | |
| a. | Loans secured by real estate: | | | | | |
| | (1) Construction, land development, and other land loans | RCONF578 | | | N/A | M.10.a.(1) |
| | (2) Secured by farmland (including farm residential and other improvements) | RCONF579 | | | N/A | M.10.a.(2) |
| | (3) Secured by 1-4 family residential properties: | | | | | |
| | (a) Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit | RCONF580 | | | N/A | M.10.a.(3)(a) |
| | (b) Closed-end loans secured by 1-4 family residential properties: | | | | | |
| | (1) Secured by first liens | RCONF581 | | | N/A | M.10.a.(3)(b)(1) |
| | (2) Secured by junior liens | RCONF582 | | | N/A | M.10.a.(3)(b)(2) |
| | (4) Secured by multifamily (5 or more) residential properties | RCONF583 | | | N/A | M.10.a.(4) |
| | (5) Secured by nonfarm nonresidential properties | RCONF584 | | | N/A | M.10.a.(5) |
| b. | Commercial and industrial loans | RCONF585 | | | N/A | M.10.b. |

(5) Exclude loans secured by real estate that are included in Schedule RC-C, part I, items 1.a through 1.e, column B.
(6) The $300 million asset size test is generally based on the total assets reported on the June 30, 2008, Report of Condition.

WTC-USAO-02-0108072

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule **RCCI**  | 25 |

## Schedule RC-C - Continued

### Part I. Continued

Memoranda (continued)

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| c. Loans to individuals for household, family, and other personal expenditures (i.e., consumer loans) (includes purchased paper): | | | | | |
| (1) Credit Cards | RCONF586 | | | N/A | M.10.c.(1) |
| (2) Other revolving credit plans | RCONF587 | | | N/A | M.10.c.(2) |
| (3) Other consumer loans (includes single payment, installment, and all student loans) | RCONF588 | | | N/A | M.10.c.(3) |
| d. Other loans | RCONF589 | | | N/A | M.10.d. |
| 11. Unpaid principal balance of loans measured at fair value (reported in Schedule RC-C, part I, Memorandum item 10): | | | | | |
| a. Loans secured by real estate: | | | | | |
| (1) Construction, land development, and other land loans | RCONF590 | | | N/A | M.11.a.(1) |
| (2) Secured by farmland (including farm residential and other improvements) | RCONF591 | | | N/A | M.11.a.(2) |
| (3) Secured by 1-4 family residential properties: | | | | | |
| (a) Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit | RCONF592 | | | N/A | M.11.a.(3)(a) |
| (b) Closed-end loans secured by 1-4 family residential properties: | | | | | |
| (1) Secured by first liens | RCONF593 | | | N/A | M.11.a.(3)(b)(1) |
| (2) Secured by junior liens | RCONF594 | | | N/A | M.11.a.(3)(b)(2) |
| (4) Secured by multifamily (5 or more) residential properties | RCONF595 | | | N/A | M.11.a.(4) |
| (5) Secured by nonfarm nonresidential properties | RCONF596 | | | N/A | M.11.a.(5) |
| b. Commercial and industrial loans | RCONF597 | | | N/A | M.11.b. |
| c. Loans to individuals for household, family, and other personal expenditures (i.e., consumer loans) (includes purchased paper): | | | | | |
| (1) Credit cards | RCONF598 | | | N/A | M.11.c.(1) |
| (2) Other revolving credit plans | RCONF599 | | | N/A | M.11.c.(2) |
| (3) Other consumer loans (includes single payment, installment, and all student loans) | RCONF600 | | | N/A | M.11.c.(3) |
| d. Other loans | RCONF601 | | | N/A | M.11.d.. |

| Dollar Amounts in Thousands | (Column A) Fair value of acquired loans and leases at acquisition date | | (Column B) Gross contractual amounts receivable at acquisition date | | (Column C) Best estimate at acquisition date of contractual cash flows not expected to be collected | | |
|---|---|---|---|---|---|---|---|
| 12. Loans (not subject to the requirements of AICPA Statement of Position 03-3) and leases held for investment that were acquired in business combinations with acquisition dates in the current calendar year: | | | | | | | |
| a. Loans secured by real estate | RCONG091 | 0 | RCONG092 | 0 | RCONG093 | 0 | M.12.a. |
| b. Commercial and industrial loans | RCONG094 | 0 | RCONG095 | 0 | RCONG096 | 0 | M.12.b. |
| c. Loans to individuals for household, family, and other personal expenditures | RCONG097 | 0 | RCONG098 | 0 | RCONG099 | 0 | M.12.c. |
| d. All other loans and all leases | RCONG100 | 0 | RCONG101 | 0 | RCONG102 | 0 | M.12.d. |

WTC-USAO-02-0108073

Schedule **RCCI**  | 26 |

## Schedule RC-C - Continued

### Part I. Continued

Memoranda (continued)

| | | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| Dollar Amounts in Thousands | | | | | | |
| *Memorandum item 13 is to be completed by banks that had construction, land development, and other land loans (as reported in Schedule RC-C, part I, item 1.a, column B) that exceeded 100 percent of total risk-based capital (as reported in Schedule RC-R, item 21) as of December 31, 2008.* | | | | | | |
| 13. Construction, land development, and other land loans with interest reserves: | | | | | | |
| a. Amount of loans that provide for the use of interest reserves (included in Schedule RC-C, part I, item 1.a, column B) .................................................................. | RCONG376 | | | 536,180 | | M.13.a. |
| b. Amount of interest capitalized from interest reserves on construction, land development, and other land loans that is included in interest and fee income on loans during the quarter (included in Schedule RI, item 1.a.(1)(b)) .................................................................. | RIADG377 | | | 3,159 | | M.13.b. |
| *Memorandum item 14 is to be completed by all banks.* | | | | | | |
| 14. Pledged loans and leases ................................................................................ | RCONG378 | | 3,978,121 | | | M.14. |

WTC-USAO-02-0108074

September 2009  FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule RCCII | **27**

## Schedule RC-C - Continued

### Part II. Loans to Small Businesses and Small Farms

Schedule RC-C, Part II is to be reported only with the June Report of Condition.

Report the number and amount currently outstanding as of June 30 of business loans with "original amounts" of $1,000,000 or less and farm loans with "original amounts" of $500,000 or less. The following guidelines should be used to determine the "original amount" of a loan: (1) For loans drawn down under lines of credit or loan commitments, the "original amount" of the loan is the size of the line of credit or loan commitment when the line of credit or loan commitment was **most recently** approved, extended, or renewed prior to the report date. However, if the amount currently outstanding as of the report date exceeds this size, the "original amount" is the amount currently outstanding on the report date. (2) For loan participations and syndications, the "original amount" of the loan participation or syndication the entire amount of the credit originated by the lead lender. (3) For all other loans, the "original amount" is the total amount of the loan origination or the amount currently outstanding as of the report date, whichever is larger.

### Loans to Small Businesses

|  | Yes/No |  |
|---|---|---|
| 1. Indicate in the appropriate box at the right whether all or substantially all of the dollar volume of your bank's "Loans secured by nonfarm nonresidential properties" reported in Schedule RC-C, part I, items 1.e.(1) and 1.e.(2), **and** all or substantially all of the dollar volume of your bank's "Commercial and industrial loans" reported in Schedule RC-C, part I, item 4, have **original amounts** of $100,000 or less (If your bank has no loans outstanding in **both** of these two loan categories, answer this question "NO.") ........................................................................ | RCON6999  N/A | 1. |

If YES, complete items 2.a and 2.b below, skip items 3 and 4, and go to item 5.
If NO and your bank has loans outstanding in either loan category, skip items 2.a and 2.b, complete items 3 and 4 below, and go to item 5.
If NO and your bank has no loans outstanding in both loan categories, skip items 2 through 4, and go to item 5.

|  | Number |  |
|---|---|---|
| 2. Report the total **number** of loans **currently outstanding** for each of the following Schedule RC-C, part I, loan categories: |  |  |
| a. "Loans secured by nonfarm nonresidential properties" reported in Schedule RC-C, part I, items 1.e.(1) and 1.e.(2) (Note: Sum of items 1.e.(1) and 1.e.(2) divided by the number of loans should NOT exceed $100,000.) ........................................ | RCON5562   N/A | 2.a. |
| b. "Commercial and industrial loans" reported in Schedule RC-C, part I, item 4. [1] (Note: Item 4 [1], divided by the number of loans should NOT exceed $100,000.) ........................ | RCON5563   N/A | 2.b. |

| Dollar Amounts in Thousands | (Column A) Number of Loans | | (Column B) Amount Currently Outstanding | | |
|---|---|---|---|---|---|
| 3. Number and amount **currently outstanding** of "Loans secured by nonfarm nonresidential properties" reported in Schedule RC-C, part I, items 1.e.(1) and 1.e.(2) (sum of items 3.a through 3.c must be less than or equal to Schedule RC-C, part I, sum of items 1.e.(1) and 1.e.(2)): |  |  |  |  |  |
| a. With **original amounts** of $100,000 or less .................................. | RCON5564 | N/A | RCON5565 | N/A | 3.a. |
| b. With **original amounts** of more than $100,000 through $250,000 | RCON5566 | N/A | RCON5567 | N/A | 3.b. |
| c. With **original amounts** of more than $250,000 through $1,000,000 | RCON5568 | N/A | RCON5569 | N/A | 3.c. |
| 4. Number and amount **currently outstanding** of "Commercial and industrial loans" reported in Schedule RC-C, part I, item 4 (sum of items 4.a through 4.c must be less than or equal to Schedule RC-C, part I, item 4): |  |  |  |  |  |
| a. With **original amounts** of $100,000 or less .................................. | RCON5570 | N/A | RCON5571 | N/A | 4.a. |
| b. With **original amounts** of more than $100,000 through $250,000 | RCON5572 | N/A | RCON5573 | N/A | 4.b. |
| c. With **original amounts** of more than $250,000 through $1,000,000 | RCON5574 | N/A | RCON5575 | N/A | 4.c. |

(1) Banks with $300 million or more in total assets should provide the requested information for "Commercial and industrial loans" based on the loans reported in Schedule RC-C, part I, item 4.a, column A, "Commercial and industrial loans to U.S. addressees."

WTC-USAO-02-0108075

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                     Printed: 11/13/2009 - 04:55 pm

Schedule RCCII  **28**

## Schedule RC-C - Continued

### Part II. Continued

**Agricultural Loans to Small Farms**



| | Yes/No |
|---|---|
| 5. Indicate in the appropriate box at the right whether all or substantially all of the dollar volume of your bank's "Loans secured by farmland (including farm residential and other improvements)" reported in Schedule RC-C, part I, item 1.b, **and** all or substantially all of the dollar volume of your bank's "Loans to finance agricultural production and other loans to farmers" reported in Schedule RC-C, part I, item 3, have **original amounts** of $100,000 or less (if your bank has no loans outstanding in **both** of these two loan categories, answer this question "NO.") ........................................................ RCON6860  N/A | 5. |

If YES, complete items 6.a and 6.b below, and do not complete items 7 and 8.
If NO and your bank has loans outstanding in either loan category, skip items 6.a and 6.b and complete items 7 and 8 below.
If NO and your bank has no loans outstanding in both loan categories, do not complete items 6 through 8.

| | Number |
|---|---|
| 6. Report the total **number** of loans **currently outstanding** for each of the following Schedule RC-C, part I, loan categories: | |
| a. "Loans secured by farmland (including farm residential and other improvements)" reported in Schedule RC-C, part I, item 1.b, (Note: Item 1.b divided by the number of loans should NOT exceed $100,000.) ........................................ RCON5576  N/A | 6.a. |
| b. "Loans to finance agricultural production and other loans to farmers" reported in Schedule RC-C, part I, item 3 (Note: Item 3 divided by the number of loans should NOT exceed $100,000.) ............ RCON5577  N/A | 6.b. |

| Dollar Amounts in Thousands | (Column A) Number of Loans | (Column B) Amount Currently Outstanding | |
|---|---|---|---|
| 7. Number and amount **currently outstanding** of "Loans secured by farmland (including farm residential and other improvements)" reported in Schedule RC-C, part I, item 1.b (sum of items 7.a through 7.c must be less than or equal to Schedule RC-C, part I, item 1.b): | | | |
| a. With **original amounts** of $100,000 or less .................................. RCON5578  N/A | RCON5579  N/A | | 7.a. |
| b. With **original amounts** of more than $100,000 through $250,000  RCON5580  N/A | RCON5581  N/A | | 7.b. |
| c. With **original amounts** of more than $250,000 through $500,000  RCON5582  N/A | RCON5583  N/A | | 7.c. |
| 8. Number and amount **currently outstanding** of "Loans to finance agricultural production and other loans to farmers" reported in Schedule RC-C, part I, item 3 (sum of items 8.a through 8.c must be less than or equal to Schedule RC-C, part I, item 3): | | | |
| a. With **original amounts** of $100,000 or less ................................. RCON5584  N/A | RCON5585  N/A | | 8.a. |
| b. With **original amounts** of more than $100,000 through $250,000  RCON5586  N/A | RCON5587  N/A | | 8.b. |
| c. With **original amounts** of more than $250,000 through $500,000  RCON5588  N/A | RCON5589  N/A | | 8.c. |

WTC-USAO-02-0108076

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218          Printed: 11/13/2009 - 04:55 pm

Schedule RCD  **29**

# Schedule RC-D - Trading Assets and Liabilities

Schedule RC-D is to be completed by banks that reported average trading assets (Schedule RC-K, item 7) of $2 million or more in any of the four preceding calendar quarters.

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| 1. U.S. Treasury securities | RCON3531 | | | N/A | 1. |
| 2. U.S. Government agency obligations (exclude mortgage-backed securities) | RCON3532 | | | N/A | 2. |
| 3. Securities issued by states and political subdivisions in the U.S. | RCON3533 | | | N/A | 3. |
| 4. Mortgage-backed securities (MBS): | | | | | |
| a. Residential mortgage pass-through securities issued or guaranteed by FNMA, FHLMC, or GNMA | RCONG379 | | | N/A | 4.a. |
| b. Other residential MBS issued or guaranteed by FNMA, FHLMC, or GNMA (include CMOs, REMICs, and stripped MBS) | RCONG380 | | | N/A | 4.b. |
| c. All other residential MBS | RCONG381 | | | N/A | 4.c. |
| d. Commercial MBS | RCONG382 | | | N/A | 4.d. |
| 5. Other debt securities | | | | | |
| a. Structured financial products: | | | | | |
| (1) Cash | RCONG383 | | | N/A | 5.a.(1) |
| (2) Synthetic | RCONG384 | | | N/A | 5.a.(2) |
| (3) Hybrid | RCONG385 | | | N/A | 5.a.(3) |
| b. All other debt securities | RCONG386 | | | N/A | 5.b. |
| 6. Loans: | | | | | |
| a. Loans secured by real estate: | | | | | |
| (1) Construction, land development, and other land loans | RCON604 | | | N/A | 6.a.(1) |
| (2) Secured by farmland (including farm residential and other improvements) | RCON605 | | | N/A | 6.a.(2) |
| (3) Secured by 1-4 family residential properties: | | | | | |
| (a) Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit | RCON606 | | | N/A | 6.a.(3)(a) |
| (b) Closed-end loans secured by 1-4 family residential properties: | | | | | |
| (1) Secured by first liens | RCON607 | | | N/A | 6.a.(3)(b)(1) |
| (2) Secured by junior liens | RCONF611 | | | N/A | 6.a.(3)(b)(2) |
| (4) Secured by multifamily (5 or more) residential properties | RCONF612 | | | N/A | 6.a.(4) |
| (5) Secured by nonfarm nonresidential properties | RCONF613 | | | N/A | 6.a.(5) |
| b. Commercial and industrial loans | RCONF614 | | | N/A | 6.b. |
| c. Loans to individuals for household, family, and other personal expenditures (i.e., consumer loans) (includes purchased paper): | | | | | |
| (1) Credit cards | RCONF615 | | | N/A | 6.c.(1) |
| (2) Other revolving credit plans | RCONF616 | | | N/A | 6.c.(2) |
| (3) Other consumer loans (includes single payment, installment, and all student loans) | RCONF617 | | | N/A | 6.c.(3) |
| d. Other loans | RCONF618 | | | N/A | 6.d. |
| 7. Not applicable | | | | | |
| 8. Not applicable | | | | | |
| 9. Other trading assets | RCON3541 | | | N/A | 9. |
| 10. Not applicable | | | | | |
| 11. Derivatives with a positive fair value **(from Schedule RC-Q, item 5.a., column A)** | RCON3543 | | | N/A | 11. |
| 12. Total trading assets (sum of items 1 through 11) (must equal Schedule RC, item 5) | RCON3545 | | | N/A | 12. |
| **LIABILITIES** | | | | | |
| 13. | | | | | |
| a. Liability for short positions | RCON3546 | | | N/A | 13.a. |
| b. Other trading liabilities | RCONF624 | | | N/A | 13.b. |
| 14. Derivatives with a negative fair value **(from Schedule RC-Q, item 10.a., column A)** | RCON3547 | | | N/A | 14. |
| 15. Total trading liabilities (sum of items 13.a. through 14) (must equal Schedule RC, item 15) | RCON3548 | | | N/A | 15. |

WTC-USAO-02-0108077

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule **RCD** | 30 |

## Schedule RC-D - Continued

Memoranda

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 1. Unpaid principal balance of loans measured at fair value (reported in Schedule RC-D, item 6.a.(1) through 6.d): | | | | | |
| a. Loans secured by real estate: | | | | | |
| (1) Construction, land development, and other land loans | RCONF625 | | | N/A | M.1.a.(1) |
| (2) Secured by farmland (including farm residential and other improvements) | RCONF626 | | | N/A | M.1.a.(2) |
| (3) Secured by 1-4 family residential properties: | | | | | |
| (a) Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit | RCONF627 | | | N/A | M.1.a.(3)(a) |
| (b) Closed-end loans secured by 1-4 family residential properties: | | | | | |
| (1) Secured by first liens | RCONF628 | | | N/A | M.1.a.(3)(b)(1) |
| (2) Secured by junior liens | RCONF629 | | | N/A | M.1.a.(3)(b)(2) |
| (4) Secured by multifamily (5 or more) residential properties | RCONF630 | | | N/A | M.1.a.(4) |
| (5) Secured by nonfarm nonresidential properties | RCONF631 | | | N/A | M.1.a.(5) |
| b. Commercial and industrial loans | RCONF632 | | | N/A | M.1.b. |
| c. Loans to individuals for household, family, and other personal expenditures (i.e., consumer loans) (includes purchased paper): | | | | | |
| (1) Credit cards | RCONF633 | | | N/A | M.1.c.(1) |
| (2) Other revolving credit plans | RCONF634 | | | N/A | M.1.c.(2) |
| (3) Other consumer loans (includes single payment, installment, and all student loans) | RCONF635 | | | N/A | M.1.c.(3) |
| d. Other loans | RCONF636 | | | N/A | M.1.d. |
| 2. Loans measured at fair value that are past due 90 days or more: | | | | | |
| a. Fair value | RCONF639 | | | N/A | M.2.a. |
| b. Unpaid principal balance | RCONF640 | | | N/A | M.2.b. |
| 3. Structured financial products by underlying collateral or reference assets (sum of Memorandum items 3.a through 3.g must equal Schedule RC-D, sum of items 5.a.(1) through (3)): | | | | | |
| a. Trust preferred securities issued by financial institutions | RCONG299 | | | N/A | M.3.a. |
| b. Trust preferred securities issued by real estate investment trusts | RCONG332 | | | N/A | M.3.b. |
| c. Corporate and similar loans | RCONG333 | | | N/A | M.3.c. |
| d. 1-4 family residential MBS issued or guaranteed by U.S. government-sponsored enterprises (GSEs) | RCONG334 | | | N/A | M.3.d. |
| e. 1-4 family residential MBS not issued or guaranteed by GSEs | RCONG335 | | | N/A | M.3.e. |
| f. Diversified (mixed) pools of structured financial products | RCONG651 | | | N/A | M.3.f. |
| g. Other collateral or reference assets | RCONG652 | | | N/A | M.3.g. |
| 4. Pledged trading assets: | | | | | |
| a. Pledged securities | RCONG387 | | | N/A | M.4.a. |
| b. Pledged loans | RCONG388 | | | N/A | M.4.b. |
| *Memorandum items 5 through 10 are to be completed by banks that reported average trading assets (Schedule RC-K, item 7) of $1 billion or more in any of the four preceding calendar quarters.* | | | | | |
| 5. Asset-backed securities: | | | | | |
| a. Credit card receivables | RCONF643 | | | N/A | M.5.a. |
| b. Home equity lines | RCONF644 | | | N/A | M.5.b. |
| c. Automobile loans | RCONF645 | | | N/A | M.5.c. |
| d. Other consumer loans | RCONF646 | | | N/A | M.5.d. |
| e. Commercial and industrial loans | RCONF647 | | | N/A | M.5.e. |
| f. Other | RCONF648 | | | N/A | M.5.f. |
| 6. Retained beneficial interests in securitizations (first-loss or equity tranches) | RCONF651 | | | N/A | M.6. |
| 7. Equity securities: | | | | | |
| a. Readily determinable fair values | RCONF652 | | | N/A | M.7.a. |
| b. Other | RCONF653 | | | N/A | M.7.b. |
| 8. Loans pending securitization | RCONF654 | | | N/A | M.8. |

WTC-USAO-02-0108078

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218

Schedule **RCD**  | 31 |

## Schedule RC-D - Continued

Memoranda (continued)

| | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| Dollar Amounts in Thousands | | | | | |
| 9. Other trading assets (itemize and describe amounts included in Schedule RC-D, item 9, that are greater than $25,000 and exceed 25% of the item): | | | | | |
| a. TEXTF655 | RCONF655 | | | N/A | M.9.a. |
| b. TEXTF656 | RCONF656 | | | N/A | M.9.b. |
| c. TEXTF657 | RCONF657 | | | N/A | M.9.c. |
| 10. Other trading liabilities (itemize and describe amounts included in Schedule RC-D, item 13.b, that are greater than $25,000 and exceed 25% of the item): | | | | | |
| a. TEXTF658 | RCONF658 | | | N/A | M.10.a. |
| b. TEXTF659 | RCONF659 | | | N/A | M.10.b. |
| c. TEXTF660 | RCONF660 | | | N/A | M.10.c. |

WTC-USAO-02-0108079

September 2009  FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                  Printed: 11/13/2009 - 04:55 pm

Schedule RCE   **32**

## Schedule RC-E - Deposit Liabilities

| Dollar Amounts in Thousands | (Column A) Total transaction accounts (including total demand deposits) | | (Column B) Memo: Total demand deposits (included in col A) | (Column C) Total nontransaction accounts (including MMDAs) | | |
|---|---|---|---|---|---|---|
| Deposits of: | | | | | | |
| 1. Individuals, partnerships, and corporations (include all certified and official checks) .......... | RCONB549 | 1,255,764 | | RCONB550 | 5,338,453 | 1. |
| 2. U.S. Government .......... | RCON2202 | 195 | | RCON2520 | 56,384 | 2. |
| 3. States and political subdivisions in the U.S. .......... | RCON2203 | 38,752 | | RCON2530 | 12,488 | 3. |
| 4. Commercial banks and other depository institutions in the U.S. ...... | RCONB551 | 42,453 | | RCONB552 | 0 | 4. |
| 5. Banks in foreign countries .......... | RCON2213 | 0 | | RCON2236 | 0 | 5. |
| 6. Foreign governments and official institutions (including foreign central banks) .......... | RCON2216 | 0 | | RCON2377 | 0 | 6. |
| 7. Total (sum of items 1 through 6) (sum of columns A and C must equal Schedule RC, item 13.a) .......... | RCON2215 | 1,337,165 | RCON2210  1,299,870 | RCON2385 | 5,407,325 | 7. |

Memoranda

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 1. Selected components of total deposits (i.e., sum of item 7, columns A and C): | | | | | |
| a. Total Individual Retirement Accounts (IRAs) and Keogh Plan accounts .......... | RCON6835 | | 219,446 | | M.1.a. |
| b. Total brokered deposits .......... | RCON2365 | | 1,178,114 | | M.1.b. |
| c. Fully insured brokered deposits (included in Memorandum item 1.b above): (1) | | | | | |
| (1) Brokered deposits issued in denominations of less than $100,000 .......... | RCON2343 | | 1,128,114 | | M.1.c.(1) |
| (2) Brokered deposits issued in denominations of $100,000 and certain brokered retirement deposit accounts .......... | RCON2344 | | 0 | | M.1.c.(2) |
| d. Maturity data for brokered deposits: | | | | | |
| (1) Brokered deposits issued in denominations of less than $100,000 with a remaining maturity of one year or less (included in Memorandum item 1.c.(1) above) .......... | RCONA243 | | 1,128,114 | | M.1.d.(1) |
| (2) Brokered deposits issued in denominations of $100,000 or more with a remaining maturity of one year or less (included in Memorandum item 1.b above) .......... | RCONA244 | | 50,000 | | M.1.d.(2) |
| e. Preferred deposits (uninsured deposits of states and political subdivisions in the U.S. reported in item 3 above which are secured or collateralized as required under state law) **(to be completed for the December report only)** .......... | RCON5590 | | N/A | | M.1.e. |
| 2. Components of total nontransaction accounts (sum of Memorandum items 2.a through 2.c must equal item 7, column C above): | | | | | |
| a. Savings deposits: | | | | | |
| (1) Money market deposit accounts (MMDAs) .......... | RCON6810 | | 3,058,189 | | M.2.a.(1) |
| (2) Other savings deposits (excludes MMDAs) .......... | RCON0352 | | 274,416 | | M.2.a.(2) |
| b. Total time deposits of less than $100,000 .......... | RCON6648 | | 1,774,150 | | M.2.b. |
| c. Total time deposits of $100,000 or more .......... | RCON2604 | | 300,570 | | M.2.c. |
| (1) Individual Retirement Accounts (IRAs) and Keogh Plan accounts included in Memorandum item 2.c, "Total time deposits of $100,000 or more," above .......... | RCONF233 | | 44,885 | | M.2.c.(1) |

(1) Report brokered retirement deposit accounts eligible for $250,000 in deposit insurance coverage in Memorandum item 1.c.(1) only if they have been issued in denominations of less than $100,000 (see instructions). Report brokered retirement deposit accounts in Memorandum item 1.c.(2) if they have been issued either in denominations of exactly $100,000 through exactly $250,000 or in denominations greater than $250,000 and participated out by the broker in shares of exactly $100,000 through exactly $250,000 or less.

WTC-USAO-02-0108080

Schedule **RCE**  | 33 |

## Schedule RC-E - Continued

Memoranda (continued)

| | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 3. Maturity and repricing data for time deposits of less than $100,000: | | | | | |
|   a. Time deposits of less than $100,000 with a remaining maturity or next repricing | | | | | |
|     date of: [1] [2] | | | | | |
|     (1) Three months or less ............................................ | RCONA579 | | 614,078 | | M.3.a.(1) |
|     (2) Over three months through 12 months ................................ | RCONA580 | | 676,342 | | M.3.a.(2) |
|     (3) Over one year through three years ................................ | RCONA581 | | 382,515 | | M.3.a.(3) |
|     (4) Over three years ............................................ | RCONA582 | | 101,215 | | M.3.a.(4) |
|   b. Time deposits of less than $100,000 with a REMAINING MATURITY of one year or less (included | | | | | |
|     in Memorandum items 3.a.(1) and 3.a.(2) above) [3] ................................ | RCONA241 | 1,290,420 | | | M.3.b. |
| 4. Maturity and repricing data for time deposits of $100,000 or more: | | | | | |
|   a. Time deposits of $100,000 or more with a remaining maturity or next repricing date of: [1] [4] | | | | | |
|     (1) Three months or less ............................................ | RCONA584 | | 64,409 | | M.4.a.(1) |
|     (2) Over three months through 12 months ................................ | RCONA585 | | 130,946 | | M.4.a.(2) |
|     (3) Over one year through three years ................................ | RCONA586 | | 77,674 | | M.4.a.(3) |
|     (4) Over three years ............................................ | RCONA587 | | 27,541 | | M.4.a.(4) |
|   b. Time deposits of $100,000 or more with a REMAINING MATURITY of one year or less (included in | | | | | |
|     Memorandum items 4.a.(1) and 4.a.(2) above) [3] ................................ | RCONA242 | | 195,355 | | M.4.b. |

(1) Report fixed rate time deposits by remaining maturity and floating rate time deposits by next repricing date.
(2) Sum of Memorandum items 3.a.(1) through 3.a.(4) must equal Schedule RC-E, Memorandum item 2.b.
(3) Report both fixed and floating rate time deposits by remaining maturity. Exclude floating rate time deposits with a next repricing date of one year or less
that have a remaining maturity of over one year.
(4) Sum of Memorandum items 4.a.(1) through 4.a.(4) must equal Schedule RC-E, Memorandum item 2.c.

WTC-USAO-02-0108081

September 2009  FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule **RCF**   | 34 |

## Schedule RC-F - Other Assets

|  | Dollar Amounts in Thousands |  | Bil | Mil | Thou |  |
|---|---|---|---|---|---|---|
| 1. Accrued interest receivable (1) | | RCONB556 | | 60,448 | | 1. |
| 2. Net deferred tax assets (2) | | RCON2148 | | 131,304 | | 2. |
| 3. Interest-only strips receivable (not in the form of a security) on: (3) | | | | | | |
| a. Mortgage loans | | RCONA519 | | | 0 | 3.a. |
| b. Other financial assets | | RCONA520 | | | 0 | 3.b. |
| 4. Equity securities that DO NOT have readily determinable fair values (4) | | RCON1752 | | 20,502 | | 4. |
| 5. Life insurance assets | | RCONC009 | | | 0 | 5. |
| 6. All other assets (itemize and describe amounts greater than $25,000 that exceed 25% of this item) . | | RCON2168 | | 239,075 | | 6. |
| a. Prepaid expenses | | RCON2166 | | 9,126 | | 6.a. |
| b. Repossessed personal property (including vehicles) | | RCON1578 | | | 0 | 6.b. |
| c. Derivatives with a positive fair value held for purposes other than trading | | RCONC010 | | 53,386 | | 6.c. |
| d. Retained interests in accrued interest receivable related to securitized credit cards | | RCONC436 | | | 0 | 6.d. |
| e. | TEXT3549 Pension Liability | RCON3549 | | 56,177 | | 6.e. |
| f. | TEXT3550 | RCON3550 | | | 0 | 6.f. |
| g. | TEXT3551 | RCON3551 | | | 0 | 6.g. |
| 7. Total (sum of items 1 through 6) (must equal Schedule RC, item 11) | | RCON2160 | | 451,329 | | 7. |

(1) Includes accrued interest receivable on loans, leases, debt securities, and other interest-bearing assets.
(2) See discussion of deferred income taxes in Glossary entry on "income taxes."
(3) Report interest-only strips receivable in the form of a security as available-for-sale securities in Schedule RC, item 2.b, or as trading assets in Schedule RC, item 5, as appropriate.
(4) Includes Federal Reserve stock, Federal Home Loan Bank stock, and bankers' bank stock.

WTC-USAO-02-0108082

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule **RCG**   | 35 |

## Schedule RC-G - Other Liabilities

| | | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| **1.** Dollar Amounts in Thousands | | | | | | 1. |
| a. Interest accrued and unpaid on deposits (1) | RCON3645 | | | | 26,980 | 1.a. |
| b. Other expenses accrued and unpaid (includes accrued income taxes payable) | RCON3646 | | | | 39,013 | 1.b. |
| 2. Net deferred tax liabilities (2) | RCON3049 | | | | 0 | 2. |
| 3. Allowance for credit losses on off-balance sheet credit exposures | RCONB557 | | | | 0 | 3. |
| 4. All other liabilities (itemize and describe amounts greater than $25,000 that exceed 25% of this item) | RCON2938 | | | | 221,187 | 4. |
| a. Accounts payable | RCON3066 | | | | 0 | 4.a. |
| b. Deferred compensation liabilities | RCONC011 | | | | 0 | 4.b. |
| c. Dividends declared but not yet payable | RCON2932 | | | | 0 | 4.c. |
| d. Derivatives with a negative fair value held for purposes other than trading | RCONC012 | | | | 54,310 | 4.d. |
| e. TEXT3552 OPEB liability | RCON3552 | | | | 30,927 | 4.e. |
| f. TEXT3553 Unearned fee income | RCON3553 | | | | 21,876 | 4.f. |
| g. TEXT3554 Pension accumulated OCI liability | RCON3554 | | | | 92,623 | 4.g. |
| 5. Total (sum of items 1 through 4) (must equal Schedule RC, item 20) | RCON2930 | | | | **287,180** | 5. |

(1) For savings banks, include "dividends" accrued and unpaid on deposits.
(2) See discussion of deferred income taxes in Glossary entry on "income taxes."

WTC-USAO-02-0108083

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 01/30/2010 - 01:16 pm

Schedule RCK  **36** 

# Schedule RC-K - Quarterly Averages [1]

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| 1. Interest-bearing balances due from depository institutions ...................... | RCON3381 | | 90,210 | | 1. |
| 2. U.S. Treasury securities and U.S. Government agency obligations (**excluding mortgage-backed securities**) [2] | RCONB558 | | 121,812 | | 2. |
| 3. Mortgage-backed securities [2] ...................... | RCONB559 | | 281,908 | | 3. |
| 4. All other securities (**includes securities issued by states and political subdivisions in the U.S.**) [2] [3] | RCONB560 | | 175,584 | | 4. |
| 5. Federal funds sold and securities purchased under agreements to resell ...................... | RCON3365 | | 13,829 | | 5. |
| 6. Loans: | | | | | |
| a. Total loans ...................... | RCON3360 | 8,223,046 | | | 6.a. |
| b. Loans secured by real estate: | | | | | |
| (1) Loans secured by 1-4 family residential properties ...................... | RCON3465 | | 1,102,849 | | 6.b.(1) |
| (2) All other loans secured by real estate ...................... | RCON3466 | | 4,310,301 | | 6.b.(2) |
| c. Commercial and industrial loans ...................... | RCON3387 | | 1,425,472 | | 6.c. |
| d. Loans to individuals for household, family, and other personal expenditures: | | | | | |
| (1) Credit cards ...................... | RCONB561 | | 68,559 | | 6.d.(1) |
| (2) Other (includes single payment, installment, all student loans, and revolving credit plans other than credit cards) ...................... | RCONB562 | | 863,208 | | 6.d.(2) |
| 7. *To be completed by banks with $100 million or more in total assets:* Trading assets [4] ...................... | RCON3401 | | 0 | | 7. |
| 8. Lease financing receivables (net of unearned income) ...................... | RCON3484 | | 0 | | 8. |
| 9. Total assets [5] ...................... | RCON3368 | 9,503,955 | | | 9. |
| **LIABILITIES** | | | | | |
| 10. Interest-bearing transaction accounts (NOW accounts, ATS accounts, and telephone and preauthorized transfer accounts) (exclude demand deposits) ...................... | RCON3485 | | 41,424 | | 10. |
| 11. Nontransaction accounts: | | | | | |
| a. Savings deposits (**includes MMDAs**) ...................... | RCONB563 | 3,247,254 | | | 11.a. |
| b. Time deposits of $100,000 or more ...................... | RCONA514 | | 316,141 | | 11.b. |
| c. Time deposits of less than $100,000 ...................... | RCONA529 | 1,836,701 | | | 11.c. |
| 12. Federal funds purchased and securities sold under agreements to repurchase ...................... | RCON3353 | | 774,865 | | 12. |
| 13. *To be completed by banks with $100 million or more in total assets:* Other borrowed money (includes mortgage indebtedness and obligations under capitalized leases) [4] | RCON3355 | | 660,899 | | 13. |

Memorandum

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 1. *Memorandum item 1 is to be completed by:* [4] <br> • *banks with $300 million or more in total assets, and* <br> • *banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, part I, item 3) exceeding five percent of total loans.* <br> Loans to finance agricultural production and other loans to farmers ...................... | RCON3386 | | 39,395 | | M.1. |

(1) For all items, banks have the option of reporting either (1) an average of DAILY figures for the quarter, or (2) an average of WEEKLY figures (i.e., the Wednesday of each week of the quarter).
(2) Quarterly averages for all debt securities should be based on amortized cost.
(3) Quarterly averages for all equity securities should be based on historical cost.
(4) The asset size tests and the five percent of total loans test are generally based on the total assets and total loans reported on the June 30, 2008, Report of Condition.
(5) The quarterly average for total assets should reflect all debt securities (not held for trading) at amortized cost, equity securities with readily determinable fair values at the lower of cost or fair value, and equity securities without readily determinable fair values at historical cost.

WTC-USAO-02-0108084

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                     Printed: 11/13/2009 - 04:55 pm

Schedule RCL **37**

# Schedule RC-L - Derivatives and Off-Balance Sheet Items

Please read carefully the instructions for the preparation of Schedule RC-L. Some of the amounts reported in Schedule RC-L are regarded as volume indicators and not necessarily as measures of risk.

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 1. Unused commitments: | | | | | |
| a. Revolving, open-end lines secured by 1-4 family residential properties, e.g., home equity lines ...... | RCON3814 | | 257,596 | | 1.a. |
| b. Credit card lines ................................................................................................................ | RCON3815 | | 300,598 | | 1.b. |
| c. | | | | | |
| (1) Commitments to fund commercial real estate, construction, and land development loans secured by real estate: | | | | | |
| (a) 1-4 family residential construction loan commitments ............................................... | RCONF164 | | 168,512 | | 1.c.(1)(a) |
| (b) Commercial real estate, other construction loan, and land development loan commitments .... | RCONF165 | | 593,288 | | 1.c.(1)(b) |
| (2) Commitments to fund commercial real estate, construction, and land development loans NOT secured by real estate .......................................................................................... | RCON6550 | | 0 | | 1.c.(2) |
| d. Securities underwriting ........................................................................................................ | RCON3817 | | 0 | | 1.d. |
| e. Other unused commitments .................................................................................................. | RCON3818 | 1,211,060 | | | 1.e. |
| 2. Financial standby letters of credit .............................................................................................. | RCON3819 | | 123,095 | | 2. |
| **Item 2.a is to be completed by banks with $1 billion or more in total assets.** [1] | | | | | |
| a. Amount of financial standby letters of credit conveyed to others ................................. | RCON3820 | | 0 | | 2.a. |
| 3. Performance standby letters of credit ........................................................................................ | RCON3821 | | 154,272 | | 3. |
| **Item 3.a is to be completed by banks with $1 billion or more in total assets.** [1] | | | | | |
| a. Amount of performance standby letters of credit conveyed to others ............................ | RCON3822 | | 0 | | 3.a. |
| 4. Commercial and similar letters of credit .................................................................................... | RCON3411 | | 574 | | 4. |
| 5. Not applicable | | | | | |
| 6. Securities lent (including customers' securities lent where the customer is indemnified against loss by the reporting bank) ................................................................................................................ | RCON3433 | | 0 | | 6. |

| Dollar Amounts in Thousands | (Column A) Sold Protection | | (Column B) Purchased Protection | | | |
|---|---|---|---|---|---|---|
| 7. Credit derivatives: | | | | | | |
| a. Notional amounts: | | | | | | |
| (1) Credit default swaps ..................... | RCONC968 | 0 | RCONC969 | 0 | | 7.a.(1) |
| (2) Total return swaps ........................ | RCONC970 | 0 | RCONC971 | 0 | | 7.a.(2) |
| (3) Credit options ............................... | RCONC972 | 0 | RCONC973 | 0 | | 7.a.(3) |
| (4) Other credit derivatives ................ | RCONC974 | 0 | RCONC975 | 0 | | 7.a.(4) |
| b. Gross fair values: | | | | | | |
| (1) Gross positive fair value ............... | RCONC219 | 0 | RCONC221 | 0 | | 7.b.(1) |
| (2) Gross negative fair value ............. | RCONC220 | 0 | RCONC222 | 0 | | 7.b.(2) |

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| c. **Notional amounts by regulatory capital treatment:** [2] | | | | | |
| (1) **Positions covered under the Market Risk Rule:** | | | | | |
| (a) Sold protection | RCONG401 | | 0 | | 7.c.(1)(a) |
| (b) Purchased protection | RCONG402 | | 0 | | 7.c.(1)(b) |
| (2) **All other positions:** | | | | | |
| (a) Sold protection | RCONG403 | | 0 | | 7.c.(2)(a) |
| (b) Purchased protection that is recognized as a guarantee for regulatory capital purposes ............................................................................................................... | RCONG404 | | 0 | | 7.c.(2)(b) |
| (c) Purchased protection that is not recognized as a guarantee for regualtory capital purposes ............................................................................................................... | RCONG405 | | 0 | | 7.c.(2)(c) |

---

(1) The $1 billion asset size test is generally based on the total assets reported on the June 30, 2008, Report of Condition.
(2) Sum of items 7.c.(1)(a) and 7.c.(2)(a) must equal sum of items 7.a.(1) through (4), column A. Sum of items 7.c.(1)(b), 7.c.(2)(b), and 7.c.(2)(c) must equal sum of items 7.a.(1) through (4), column B.

WTC-USAO-02-0108085

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 11/13/2009 - 04:55 pm

Schedule RCL   **38**

## Schedule RC-L - Continued

| Dollar Amounts in Thousands | (Column A) Remaining Maturity of: One Year or Less | (Column B) Remaining Maturity of: Over One Year Through Five Years | (Column C) Remaining Maturity of: Over Five Years | |
|---|---|---|---|---|
| **d. Notional amounts by remaining maturity:** | | | | |
| (1) Sold credit protection: [1] | | | | |
| (a) **Investment grade** | RCONG406 0 | RCONG407 0 | RCONG408 0 | 7.d.(1)(a) |
| (b) **Subinvestment grade** | RCONG409 0 | RCONG410 0 | RCONG411 0 | 7.d.(1)(b) |
| (2) Purchased credit protection: [2] | | | | |
| (a) **Investment grade** | RCONG412 0 | RCONG413 0 | RCONG414 0 | 7.d.(2)(a) |
| (b) **Subinvestment grade** | RCONG415 0 | RCONG416 0 | RCONG417 0 | 7.d.(2)(b) |

| Dollar Amounts in Thousands | | Bil\|Mil\|Thou | |
|---|---|---|---|
| 8. Spot foreign exchange contracts | RCON8765 | 0 | 8. |
| 9. All other off-balance sheet liabilities (exclude derivatives) (itemize and describe each component of this item over 25% of Schedule RC, item 27.a, "Total **bank** equity capital") | RCON3430 | 0 | 9. |
| a. Securities borrowed | RCON3432 | 0 | 9.a. |
| b. Commitments to purchase when-issued securities | RCON3434 | 0 | 9.b. |
| c. Standby letters of credit issued by a Federal Home Loan Bank on the bank's behalf | RCONC978 | 0 | 9.c. |
| d. TEXT3555 | RCON3555 | 0 | 9.d. |
| e. TEXT3556 | RCON3556 | 0 | 9.e. |
| f. TEXT3557 | RCON3557 | 0 | 9.f. |
| 10. All other off-balance sheet assets (exclude derivatives) (itemize and describe each component of this item over 25% of Schedule RC, item 27.a, "Total **bank** equity capital") | RCON5591 | 0 | 10. |
| a. Commitments to sell when-issued securities | RCON3435 | 0 | 10.a. |
| b. TEXT5592 | RCON5592 | 0 | 10.b. |
| c. TEXT5593 | RCON5593 | 0 | 10.c. |
| d. TEXT5594 | RCON5594 | 0 | 10.d. |
| e. TEXT5595 | RCON5595 | 0 | 10.e. |
| 11. Year-to-date merchant credit card sales volume: | | | |
| a. Sales for which the reporting bank is the acquiring bank | RCONC223 | 0 | 11.a. |
| b. Sales for which the reporting bank is the agent bank with risk | RCONC224 | 0 | 11.b. |

(1) Sum of items 7.d.(1)(a) and (b), columns A through C, must equal sum of items 7.a.(1) through (4), column A.
(2) Sum of items 7.d.(2)(a) and (b), columns A through C, must equal sum of items 7.a.(1) through (4), column B.

WTC-USAO-02-0108086

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule **RCL**   | 39 |

## Schedule RC-L - Continued

| Dollar Amounts in Thousands | (Column A) Interest Rate Contracts | (Column B) Foreign Exchange Contracts | (Column C) Equity Derivative Contracts | (Column D) Commodity and Other Contracts | |
|---|---|---|---|---|---|
| 12. Gross amounts (e.g., notional amounts) (for each column, sum of items 12.a through 12.e must equal sum of items 13 and 14): | | | | | |
| a. Futures contracts ............................ | RCON8693 0 | RCON8694 0 | RCON8695 0 | RCON8696 0 | 12.a. |
| b. Forward contracts ............................ | RCON8697 0 | RCON8698 0 | RCON8699 0 | RCON8700 0 | 12.b. |
| c. Exchange-traded option contracts: | | | | | |
| (1) Written options ............................ | RCON8701 0 | RCON8702 0 | RCON8703 0 | RCON8704 0 | 12.c.(1) |
| (2) Purchased options ............................ | RCON8705 0 | RCON8706 0 | RCON8707 0 | RCON8708 0 | 12.c.(2) |
| d. Over-the-counter option contracts: | | | | | |
| (1) Written options ............................ | RCON8709 0 | RCON8710 0 | RCON8711 0 | RCON8712 0 | 12.d.(1) |
| (2) Purchased options ............................ | RCON8713 0 | RCON8714 0 | RCON8715 0 | RCON8716 0 | 12.d.(2) |
| e. Swaps ............................ | RCON3450 2,018,108 | RCON3826 0 | RCON8719 0 | RCON8720 0 | 12.e. |
| 13. Total gross notional amount of derivative contracts held for trading ............................ | RCONA126 | RCONA127 | RCON8723 | RCON8724 | 13. |
| 14. Total gross notional amount of derivative contracts held for purposes other than trading ............................ | RCON8725 2,018,108 | RCON8726 0 | RCON8727 0 | RCON8728 0 | 14. |
| a. Interest rate swaps where the bank has agreed to pay a fixed rate ............................ | RCONA589 1,009,054 | | | | 14.a. |
| 15. Gross fair values of derivative contracts: | | | | | |
| a. Contracts held for trading: | | | | | |
| (1) Gross positive fair value ............................ | RCON8733 0 | RCON8734 0 | RCON8735 0 | RCON8736 0 | 15.a.(1) |
| (2) Gross negative fair value ............................ | RCON8737 0 | RCON8738 0 | RCON8739 0 | RCON8740 0 | 15.a.(2) |
| b. Contracts held for purposes other than trading: | | | | | |
| (1) Gross positive fair value ............................ | RCON8741 53,386 | RCON8742 0 | RCON8743 0 | RCON8744 0 | 15.b.(1) |
| (2) Gross negative fair value ............................ | RCON8745 54,310 | RCON8746 0 | RCON8747 0 | RCON8748 0 | 15.b.(2) |

WTC-USAO-02-0108087

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                                    Printed: 11/13/2009 - 04:55 pm

Schedule **RCL**  | **40** |

## Schedule RC-L - Continued

Item 16 is to be completed only by banks with total assets of $10 billion or more.[1]

| Dollar Amounts in Thousands | (Column A) Banks and Securities Firms | (Column B) Monoline Financial Guarantors | (Column C) Hedge Funds | (Column D) Sovereign Governments | (Column E) Corporations and All Other Counterparties | |
|---|---|---|---|---|---|---|
| **16. Over-the-counter derivatives:** | | | | | | |
| a. Net current credit exposure ............... | RCONG418 | RCONG419 | RCONG420 | RCONG421 | RCONG422 | |
| | 0 | 0 | 0 | 0 | 0 | 16.a. |
| b. Fair value of collateral: | | | | | | |
| (1) Cash - U.S. dollar ............................. | RCONG423 | RCONG424 | RCONG425 | RCONG426 | RCONG427 | |
| | 0 | 0 | 0 | 0 | 0 | 16.b.(1) |
| (2) Cash - Other currencies ................... | RCONG428 | RCONG429 | RCONG430 | RCONG431 | RCONG432 | |
| | 0 | 0 | 0 | 0 | 0 | 16.b.(2) |
| (3) U.S. Treasury securities ................... | RCONG433 | RCONG434 | RCONG435 | RCONG436 | RCONG437 | |
| | 0 | 0 | 0 | 0 | 0 | 16.b.(3) |
| (4) U.S. Government agency and U.S. Government-sponsored agency debt securities ......................................... | RCONG438 | RCONG439 | RCONG440 | RCONG441 | RCONG442 | |
| | 0 | 0 | 0 | 0 | 0 | 16.b.(4) |
| (5) Corporate bonds ............................. | RCONG443 | RCONG444 | RCONG445 | RCONG446 | RCONG447 | |
| | 0 | 0 | 0 | 0 | 0 | 16.b.(5) |
| (6) Equity securities .............................. | RCONG448 | RCONG449 | RCONG450 | RCONG451 | RCONG452 | |
| | 0 | 0 | 0 | 0 | 0 | 16.b.(6) |
| (7) All other collateral ............................ | RCONG453 | RCONG454 | RCONG455 | RCONG456 | RCONG457 | |
| | 0 | 0 | 0 | 0 | 0 | 16.b.(7) |
| (8) Total fair value of collateral (sum of items 16.b.(1) through (7)) ............... | RCONG458 | RCONG459 | RCONG460 | RCONG461 | RCONG462 | |
| | 0 | 0 | 0 | 0 | 0 | 16.b.(8) |

(1) The $10 billion asset size test is generally based on the total assets reported on the June 30, 2008, Report of Condition.

WTC-USAO-02-0108088

Schedule **RCM**  41

# Schedule RC-M - Memoranda

| | | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|---|
| 1. Extensions of credit by the reporting bank to its executive officers, directors, principal shareholders, and their related interests as of the report date: | | | | | | | |
| a. Aggregate amount of all extensions of credit to all executive officers, directors, principal shareholders, and their related interests ........................ | | | RCON6164 | | | 89,832 | 1.a. |
| b. Number of executive officers, directors, and principal shareholders to whom the amount of all extensions of credit by the reporting bank (including extensions of credit to related interests) equals or exceeds the lesser of $500,000 or 5 percent of total capital as defined for this purpose in agency regulations ........................ | | | RCON6165 | | | 2 | 1.b. |
| 2. Intangible assets other than goodwill: | | | | | | | |
| a. Mortgage servicing assets ........................ | | | RCON3164 | | | 3,586 | 2.a. |
| (1) Estimated fair value of mortgage servicing assets ........................ | | | RCONA590 | | | 3,586 | 2.a.(1) |
| b. Purchased credit card relationships and nonmortgage servicing assets ........................ | | | RCONB026 | | | 0 | 2.b. |
| c. All other identifiable intangible assets ........................ | | | RCON5507 | | | 1,097 | 2.c. |
| d. Total (sum of items 2.a, 2.b, and 2.c) (must equal Schedule RC, item 10.b) ........................ | | | RCON0426 | | | **4,683** | 2.d. |
| 3. Other real estate owned: | | | | | | | |
| a. Construction, land development, and other land ........................ | | | RCON5508 | | | 15,157 | 3.a. |
| b. Farmland ........................ | | | RCON5509 | | | 0 | 3.b. |
| c. 1-4 family residential properties ........................ | | | RCON5510 | | | 1,865 | 3.c. |
| d. Multifamily (5 or more) residential properties ........................ | | | RCON5511 | | | 0 | 3.d. |
| e. Nonfarm nonresidential properties ........................ | | | RCON5512 | | | 9,382 | 3.e. |
| f. Foreclosed properties from "GNMA loans" ........................ | | | RCONC979 | | | 0 | 3.f. |
| g. Total (**sum of items 3.a through 3.f**) (must equal Schedule RC, item 7) ........................ | | | RCON2150 | | | **26,404** | 3.g. |
| 4. Not applicable | | | | | | | |
| 5. Other borrowed money: | | | | | | | |
| a. Federal Home Loan Bank advances: | | | | | | | |
| (1) Advances with a remaining maturity or next repricing date of: (1) | | | | | | | |
| (a) One year or less ........................ | | | RCONF055 | | | 0 | 5.a.(1)(a) |
| (b) Over one year through three years ........................ | | | RCONF056 | | | 28,000 | 5.a.(1)(b) |
| (c) Over three years through five years ........................ | | | RCONF057 | | | 0 | 5.a.(1)(c) |
| (d) Over five years ........................ | | | RCONF058 | | | 0 | 5.a.(1)(d) |
| (2) Advances with a REMAINING MATURITY of one year or less (included in item 5.a.(1)(a) above) (2) ........................ | | | RCON2651 | | | 0 | 5.a.(2) |
| (3) Structured advances (included in items 5.a.(1)(a)-(d) above) ........................ | | | RCONF059 | | | 0 | 5.a.(3) |
| b. Other borrowings: | | | | | | | |
| (1) Other borrowings with a remaining maturity or next repricing date of: (3) | | | | | | | |
| (a) One year or less ........................ | | | RCONF060 | | | 626,036 | 5.b.(1)(a) |
| (b) Over one year through three years ........................ | | | RCONF061 | | | 0 | 5.b.(1)(b) |
| (c) Over three years through five years ........................ | | | RCONF062 | | | 0 | 5.b.(1)(c) |
| (d) Over five years ........................ | | | RCONF063 | | | 0 | 5.b.(1)(d) |
| (2) Other borrowings with a REMAINING MATURITY of one year or less (included in item 5.b.(1)(a) above) (4) ........................ | | | RCONB571 | | | 0 | 5.b.(2) |
| c. Total (sum of items 5.a.(1)(a)-(d) and items 5.b.(1)(a)-(d)) (must equal Schedule RC, item 16) ........................ | | | RCON3190 | | | **654,036** | 5.c. |

(1) Report fixed rate advances by remaining maturity and floating rate advances by next repricing date.
(2) Report both fixed and floating rate advances by remaining maturity. Exclude floating rate advances with a next repricing date of one year or less that have a remaining maturity of over one year.
(3) Report fixed rate other borrowings by remaining maturity and floating rate other borrowings by next repricing date.
(4) Report both fixed and floating rate other borrowings by remaining maturity. Exclude floating rate other borrowings with a next repricing date of one year or less that have a remaining maturity of over one year.

WTC-USAO-02-0108089

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule **RCM**  | 42 |

## Schedule RC-M - Continued

| | | Yes/No | |
|---|---|---|---|
| 6. Does the reporting bank sell private label or third party mutual funds and annuities? | RCONB569 | YES | 6. |

Dollar Amounts in Thousands | | Bil | Mil | Thou |

| | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 7. Assets under the reporting bank's management in proprietary mutual funds and annuities | RCONB570 | | | 0 | 7. |

8. Primary Internet Web site address
of the bank (home page), if any
(Example: www.examplebank.com)

| TEXT4087 | www.wilmingtontrust.com |
|---|---|

8.

| | | Yes/No | |
|---|---|---|---|
| 9. Do any of the bank's Internet Web sites have transactional capability, i.e., allow the bank's customers to execute transactions on their accounts through the Web site? | RCON4088 | YES | 9. |

Dollar Amounts in Thousands | | Bil | Mil | Thou |

| | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 10. Secured liabilities: | | | | | |
| a. Amount of "Federal funds purchased" that are secured (included in Schedule RC, item 14.a) | RCONF064 | | | 0 | 10.a. |
| b. Amount of "Other borrowings" that are secured (included in Schedule RC-M, items 5.b.(1)(a)-(d)) | RCONF065 | | | 0 | 10.b. |

| | | Yes/No | |
|---|---|---|---|
| 11. Does the bank act as trustee or custodian for Individual Retirement Accounts, Health Savings Acounts, and other similar accounts? | RCONG463 | YES | 11. |
| 12. Does the bank provide custody, safekeeping, or other services involving the acceptance of orders for the sale or purchase of securities? | RCONG464 | YES | 12. |

WTC-USAO-02-0108090

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule RCN **43**

## Schedule RC-N - Past Due and Nonaccrual Loans, Leases, and Other Assets

| Dollar Amounts in Thousands | (Column A) Past due 30 through 89 days and still accruing | | (Column B) Past due 90 days or more and still accruing | | (Column C) Nonaccrual | | |
|---|---|---|---|---|---|---|---|
| 1. Loans secured by real estate: | | | | | | | |
| a. Construction, land development, and other land loans: | | | | | | | |
| (1) 1-4 family residential construction loans | RCONF172 | 0 | RCONF174 | 1,051 | RCONF176 | 25,019 | 1.a.(1) |
| (2) Other construction loans and all land development and other land loans | RCONF173 | 5,106 | RCONF175 | 924 | RCONF177 | 158,989 | 1.a.(2) |
| b. Secured by farmland | RCON3493 | 280 | RCON3494 | 0 | RCON3495 | 1,857 | 1.b. |
| c. Secured by 1-4 family residential properties: | | | | | | | |
| (1) Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit | RCON5398 | 2,054 | RCON5399 | 1,452 | RCON5400 | 2,100 | 1.c.(1) |
| (2) Closed-end loans secured by 1-4 family residential properties: | | | | | | | |
| (a) Secured by first liens | RCONC236 | 18,369 | RCONC237 | 6,647 | RCONC229 | 28,300 | 1.c.(2)(a) |
| (b) Secured by junior liens | RCONC238 | 216 | RCONC239 | 495 | RCONC230 | 7,437 | 1.c.(2)(b) |
| d. Secured by multifamily (5 or more) residential properties | RCON3499 | 0 | RCON3500 | 0 | RCON3501 | 0 | 1.d. |
| e. Secured by nonfarm nonresidential properties: | | | | | | | |
| (1) Loans secured by owner-occupied nonfarm nonresidential properties | RCONF178 | 2,009 | RCONF180 | 3,983 | RCONF182 | 40,237 | 1.e.(1) |
| (2) Loans secured by other nonfarm nonresidential properties | RCONF179 | 367 | RCONF181 | 2,733 | RCONF183 | 19,765 | 1.e.(2) |
| 2. Loans to depository institutions and acceptances of other banks | RCONB834 | | RCONB835 | 0 | RCONB836 | 0 | 2. |
| 3. Not applicable | | | | | | | |
| 4. Commercial and industrial loans. | RCON1606 | 1,586 | RCON1607 | 3,461 | RCON1608 | 38,969 | 4. |
| 5. Loans to individuals for household, family, and other personal expenditures: | | | | | | | |
| a. Credit cards | RCONB575 | 1,483 | RCONB576 | 818 | RCONB577 | 0 | 5.a. |
| b. Other (includes single payment, installment, all student loans, and revolving credit plans other than credit cards) | RCONB578 | 26,148 | RCONB579 | 11,882 | RCONB580 | 9,212 | 5.b. |
| 6. Loans to foreign governments and official institutions | RCON5389 | 0 | RCON5390 | 0 | RCON5391 | 0 | 6. |
| 7. All other loans [1] | RCON5459 | 0 | RCON5460 | 0 | RCON5461 | 0 | 7. |
| 8. Lease financing receivables | RCON1226 | 0 | RCON1227 | 0 | RCON1228 | 0 | 8. |
| 9. Debt securities and other assets (exclude other real estate owned and other repossessed assets) | RCON3505 | 0 | RCON3506 | 0 | RCON3507 | 0 | 9. |

(1) Includes past due and nonaccrual "Loans to finance agricultural production and other loans to farmers" "Obligations (other than securities and leases) of states and political subdivisions in the U.S.," and "Other loans."

WTC-USAO-02-0108091

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                         Printed: 11/13/2009 - 04:55 pm

Schedule **RCN**    44

## Schedule RC-N - Continued

Amounts reported in Schedule RC-N, items 1 through 8, above include guaranteed and unguaranteed portions of past due and nonaccrual loans and leases. Report in item 10 below certain guaranteed loans and leases that have already been included in the amounts reported in items 1 through 8.

| Dollar Amounts in Thousands | (Column A) Past due 30 through 89 days and still accruing | | (Column B) Past due 90 days or more and still accruing | | (Column C) Nonaccrual | | |
|---|---|---|---|---|---|---|---|
| 10. Loans and leases reported in items 1 through 8 above which are wholly or partially guaranteed by the U.S. Government ..................... | RCON5612 | 4,473 | RCON5613 | 504 | RCON5614 | 1,025 | 10. |
| a. Guaranteed portion of loans and leases included in item 10 above (exclude rebooked "GNMA loans") | RCON5615 | 4,473 | RCON5616 | 504 | RCON5617 | 1,025 | 10.a. |
| b. Rebooked "GNMA loans" that have been repurchased or are eligible for repurchase included in item 10 ...... | RCONC866 | 0 | RCONC867 | 0 | RCONC868 | 0 | 10.b. |

Memoranda

| Dollar Amounts in Thousands | (Column A) Past due 30 through 89 days and still accruing | | (Column B) Past due 90 days or more and still accruing | | (Column C) Nonaccrual | | |
|---|---|---|---|---|---|---|---|
| 1. Restructured loans and leases included in Schedule RC N, items 1 through 8, above (and not reported in Schedule RC-C, Part I, Memo item 1): | | | | | | | |
| a. Loans secured by 1-4 family residential properties ...................... | RCONF661 | 0 | RCONF662 | 0 | RCONF663 | 0 | M.1.a. |
| b. Other loans and all leases (exclude loans to individuals for household, family, and other personal expenditures) ................................ | RCON1658 | 0 | RCON1659 | 0 | RCON1661 | 0 | M.1.b. |
| 2. Loans to finance commercial real estate, construction, and land development activities (**not secured by real estate**) included in Schedule RC-N, items 4 and 7, above ............. | RCON6558 | 0 | RCON6559 | 0 | RCON6560 | 0 | M.2. |
| 3. *Memo items 3.a. through 3.d are to be completed by banks with $300 million or more in total assets:* [1] | | | | | | | |
| a. Loans secured by real estate to non-U.S. addressees (domicile) (included in Schedule RC-N, item 1, above) ... | RCON1248 | 0 | RCON1249 | 0 | RCON1250 | 0 | M.3.a. |
| b. Loans to and acceptances of foreign banks (included in Schedule RC-N, item 2, above) ................................ | RCON5380 | 0 | RCON5381 | 0 | RCON5382 | 0 | M.3.b. |
| c. Commercial and industrial loans to non-U.S. addressees (domicile) (included in Schedule RC-N, item 4, above) ................................ | RCON1254 | 0 | RCON1255 | 0 | RCON1256 | 0 | M.3.c. |
| d. Leases to individuals for household, family, and other personal expenditures (included in Schedule RC-N, item 8, above) ...................... | RCONF166 | 0 | RCONF167 | 0 | RCONF168 | 0 | M.3.d. |

(1) The $300 million asset size test and the five percent of total loans test are generally based on the total assets and total loans reported on the June 30, 2008, Report of Condition.

WTC-USAO-02-0108092

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule **RCN**   | 45 |

## Schedule RC-N - Continued

Memoranda (continued)

| Dollar Amounts in Thousands | (Column A) Past due 30 through 89 days and still accruing | (Column B) Past due 90 days or more and still accruing | (Column C) Nonaccrual | |
|---|---|---|---|---|
| 4. Memorandum item 4 is to be completed by: [1] • banks with $300 million or more in total assets • banks with less than $300 million in total assets that have loans to finance agricultural production and other loans to farmers (Schedule RC-C, part I, item 3) exceeding five percent of total loans: Loans to finance agricultural production and other loans to farmers (included in Schedule RC-N, item 7, above) [1] ......................... | RCON1594            0 | RCON1597            0 | RCON1583            0 | M.4. |
| 5. Loans and leases held for sale and loans measured at fair value (included in Schedule RC-N, items 1 through 8, above): | | | | |
| a. Loans and leases held for sale ........ | RCONC240            0 | RCONC241            0 | RCONC226            0 | M.5.a. |
| b. Loans measured at fair value: | | | | |
| (1) Fair value .................................. | RCONF664            0 | RCONF665            0 | RCONF666            0 | M.5.b.(1) |
| (2) Unpaid principal balance ............. | RCONF667            0 | RCONF668            0 | RCONF669            0 | M.5.b.(2) |

| Dollar Amounts in Thousands | (Column A) Past due 30 through 89 days | (Column B) Past due 90 days or more | | |
|---|---|---|---|---|
| Memorandum item 6 is to be completed by banks with $300 million or more in total assets: | | | | |
| 6. **Derivative contracts:** Fair value of amounts carried as assets [1] .............. | RCON3529            0 | RCON3530            0 | | M.6. |

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 7. Additions to nonaccrual assets during the quarter ................................................................................. | RCONC410 | | 91,383 | | M.7. |
| 8. Nonaccrual assets sold during the quarter ........................................................................................... | RCONC411 | | 0 | | M.8. |

[1] The $300 million asset size test and the five percent of total loans test are generally based on the total assets and total loans reported on the June 30, 2008, Report of Condition.

WTC-USAO-02-0108093

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 08/19/2010 - 01:48 pm

Schedule RCO

**46**

# Schedule RC-O - Other Data for Deposit Insurance and FICO Assessments

All banks must complete items 1 and 2, **items 7 through 9**, Memorandum item 1, and, if applicable, Memorandum items 2, 3, and 4 each quarter. Each bank that reported $1 billion or more in total assets in its March 31, 2007 Report of Condition must complete items 4 and 5 each quarter. In addition, each bank that reported $1 billion or more in total assets in two consecutive Reports of Condition beginning with its June 30, 2007 report must begin to complete items 4 and 5 each quarter starting six months after the second consecutive quarter in which it reports total assets of $1 billion or more. Each bank that becomes insured by the FDIC on or after April 1, 2007 must complete items 4 and 5 each quarter. Any other bank may choose to complete items 4 and 5, but the bank must then continue to complete items 4 and 5 each quarter thereafter.

|  | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| 1. | Total deposit liabilities before exclusions (gross) as defined in Section 3(l) of the Federal Deposit Insurance Act and FDIC regulations ............................................ | RCONF236 | | 6,936,351 | | 1. |
| 2. | Total allowable exclusions, including interest accrued and unpaid on allowable exclusions .............. | RCONF237 | | | 3,982 | 2. |
| 3. | Not applicable | | | | | |
| 4. | Total daily average of deposit liabilities before exclusions (gross) as defined in Section 3(l) of the Federal Deposit Insurance Act and FDIC regulations ............................................ | RCONF238 | | 6,433,650 | | 4. |
| 5. | Total daily average of allowable exclusions, including interest accrued and unpaid on allowable exclusions ........................................................... | RCONF239 | | | 4,117 | 5. |
| 6. | Not applicable | | | | | |
| 7. | Unsecured "Other borrowings" with a remaining maturity of (sum of items 7.a through 7.d must be less than or equal to Schedule RC-M, items 5.b.(1)(a)-(d) minus item 10.b): | | | | | |
| | a. One year or less ................................................................................... | RCONG465 | | | 0 | 7.a. |
| | b. Over one year through three years ........................................................ | RCONG466 | | | 0 | 7.b. |
| | c. Over three years through five years ...................................................... | RCONG467 | | | 0 | 7.c. |
| | d. Over five years ...................................................................................... | RCONG468 | | | 0 | 7.d. |
| 8. | Subordinated notes and debentures with a remaining maturity of (sum of items 8.a through 8.d must equal Schedule RC, item 19): | | | | | |
| | a. One year or less ................................................................................... | RCONG469 | | | 0 | 8.a. |
| | b. Over one year through three years ........................................................ | RCONG470 | | | 0 | 8.b. |
| | c. Over three years through five years ...................................................... | RCONG471 | | | 0 | 8.c. |
| | d. Over five years ...................................................................................... | RCONG472 | | | 0 | 8.d. |
| 9. | Reciprocal brokered deposits (included in Schedule RC-E, Memorandum item 1.b) .............. | RCONG803 | | | 0 | 9. |

WTC-USAO-02-0108094

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218        Printed: 08/19/2010 - 01:48 pm

Schedule **RCO**   **47**

# Schedule RC-O - Continued

Memoranda

| | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| Dollar Amounts in Thousands | | | | | |
| 1. Total assessable deposits of the bank, including related interest accrued and unpaid (sum of Memorandum items 1.a.(1), 1.b.(1), 1.c.(1), and 1.d.(1) must equal RC-O, item 1 less item 2): | | | | | |
| a. Deposit accounts (excluding retirement accounts) of $250,000 or less: [1] | | | | | |
| (1) *Amount* of deposit accounts (excluding retirement accounts) of $250,000 or less ............. | RCONF049 | | 4,404,867 | | M.1.a.(1) |
| (2) *Number* of deposit accounts (excluding retirement accounts) of $250,000 or less (to be completed for the June report only) .................. | RCONF050 | Number | N/A | | M.1.a.(2) |
| b. Deposit accounts (excluding retirement accounts) of more than $250,000: [1] | | | | | |
| (1) *Amount* of deposit accounts (excluding retirement accounts) of more than $250,000 ....... | RCONF051 | | 2,262,887 | | M.1.b.(1) |
| (2) *Number* of deposit accounts (excluding retirement accounts) of more than $250,000 ........................ | RCONF052 | Number | 2431 | | M.1.b.(2) |
| c. Retirement deposit accounts of $250,000 or less: [1] | | | | | |
| (1) *Amount* of retirement deposit accounts of $250,000 or less ............................. | RCONF045 | | 250,973 | | M.1.c.(1) |
| (2) *Number* of retirement deposit accounts of $250,000 or less (to be completed for the June report only) .......................... | RCONF046 | Number | N/A | | M.1.c.(2) |
| d. Retirement deposit accounts of more than $250,000: [1] | | | | | |
| (1) *Amount* of retirement deposit accounts of more than $250,000 ......................... | RCONF047 | | 13,642 | | M.1.d.(1) |
| (2) *Number* of retirement deposit accounts of more than $250,000 .. | RCONF048 | Number | 34 | | M.1.d.(2) |
| ***Memorandum item 2 is to be completed by banks with $1 billion or more in total assets.*** [2] | | | | | |
| 2. Estimated amount of uninsured assessable deposits, including related interest accrued and unpaid (see instructions) [3] | RCON5597 | | 1,565,226 | | M.2. |
| 3. Has the reporting institution been consolidated with a parent bank or savings association in that parent bank's or parent saving association's Call Report or Thrift Financial Report? If so, report the legal title and FDIC Certificate Number of the parent bank or parent savings association: | | | | | |
| a. Legal title ...................................... | TEXTA545 | | | | M.3.a. |
| b. FDIC Certificate Number ......................................................... | RCONA545 | | 00000 | | M.3.b. |
| ***Memorandum items 4.a and 4.b are to be completed by all banks participating in the FDIC Transaction Account Guarantee Program.*** | | | | | |
| 4. Noninterest-bearing transaction accounts (as defined in Part 370 of the FDIC's regulations) of more than $250,000 (see instructions): | | | | | |
| a. *Amount* of noninterest-bearing transaction accounts of more than $250,000 (including balances swept from noninterest-bearing transaction accounts to noninterest-bearing savings accounts) ..... | RCONG167 | | 1,613,543 | | M.4.a. |
| b. *Number* of noninterest-bearing transaction accounts of more than $250,000 ................ | RCONG168 | | 1156 | | M.4.b. |

(1) The dollar amounts used as the basis for reporting in Memorandum items 1.a and 1.d reflect the deposit insurance limits in effect on the report date.
(2) The $1 billion asset size test is generally based on the total assets reported on the June 30, 2008, Report of Condition.
(3) Uninsured assessable deposits should be estimated based on the deposit insurance limits set forth in Memorandum items 1.a through 1.d without taking into account a bank's participation in the FDIC's Debt Guarantee Program or Transaction Account Guarantee Program.

WTC-USAO-02-0108095

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218        Printed: 11/13/2009 - 04:55 pm

Schedule RCP  **48**

# Schedule RC-P - 1-4 Family Residential Mortgage Banking Activities

Schedule RC-P is to be completed by (1) all banks with $1 billion or more in total assets [1] and (2) banks with less than $1 billion in total assets at which either closed-end (first and junior lien) 1–4 family residential mortgage loan originations and purchases for resale [2] from all sources, loan sales, or quarter-end loans held for sale in domestic offices exceed $10 million for two consecutive quarters.

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 1. Retail originations during the quarter of 1-4 family residential mortgage loans for sale: [2] | | | | | |
| a. Closed-end first liens | RCONF066 | | | 32,599 | 1.a. |
| b. Closed-end junior liens | RCONF067 | | | 0 | 1.b. |
| c. Open-end loans extended under lines of credit: | | | | | |
| (1) Total commitment under the lines of credit | RCONF670 | | | 0 | 1.c.(1) |
| (2) Principal amount funded under the lines of credit | RCONF671 | | | 0 | 1.c.(2) |
| 2. Wholesale originations and purchases during the quarter of 1-4 family residential mortgage loans for sale: [2] | | | | | |
| a. Closed-end first liens | RCONF068 | | | 0 | 2.a. |
| b. Closed-end junior liens | RCONF069 | | | 0 | 2.b. |
| c. Open-end loans extended under lines of credit: | | | | | |
| (1) Total commitment under the lines of credit | RCONF672 | | | 0 | 2.c.(1) |
| (2) Principal amount funded under the lines of credit | RCONF673 | | | 0 | 2.c.(2) |
| 3. 1-4 family residential mortgage loans sold during the quarter: | | | | | |
| a. Closed-end first liens | RCONF070 | | | 38,682 | 3.a. |
| b. Closed-end junior liens | RCONF071 | | | 0 | 3.b. |
| c. Open-end loans extended under lines of credit: | | | | | |
| (1) Total commitment under the lines of credit | RCONF674 | | | 0 | 3.c.(1) |
| (2) Principal amount funded under the lines of credit | RCONF675 | | | 0 | 3.c.(2) |
| 4. 1-4 family residential mortgage loans held for sale at quarter-end (included in Schedule RC, item 4.a): | | | | | |
| a. Closed-end first liens | RCONF072 | | | 4,241 | 4.a. |
| b. Closed-end junior liens | RCONF073 | | | 0 | 4.b. |
| c. Open-end loans extended under lines of credit: | | | | | |
| (1) Total commitment under the lines of credit | RCONF676 | | | 0 | 4.c.(1) |
| (2) Principal amount funded under the lines of credit | RCONF677 | | | 0 | 4.c.(2) |
| 5. Noninterest income for the quarter from the sale, securitization, and servicing of 1-4 family residential mortgage loans (included in Schedule RI, items 5.f, 5.g, and 5.i): | | | | | |
| a. Closed-end 1-4 family residential mortgage loans | RIADF184 | | | 870 | 5.a. |
| b. Open-end 1-4 family residential mortgage loans extended under lines of credit | RIADF560 | | | | 5.b. |
| 6. Repurchases and indemnifications of 1-4 family residential mortgage loans during the quarter: | | | | | |
| a. Closed-end first liens | RCONF678 | | | 0 | 6.a. |
| b. Closed-end junior liens | RCONF679 | | | 0 | 6.b. |
| c. Open-end loans extended under lines of credit: | | | | | |
| (1) Total commitment under the lines of credit | RCONF680 | | | 0 | 6.c.(1) |
| (2) Principal amount funded under the lines of credit | RCONF681 | | | 0 | 6.c.(2) |

(1) The $1 billion asset size test is generally based on the total assets reported on the June 30, 2008, Report of Condition.
(2) Exclude originations and purchases of closed-end 1-4 family residential mortgage loans that are held for investment.

WTC-USAO-02-0108096

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule RCQ

49

# Schedule RC-Q - Assets and Liabilities Measured at Fair Value on a Recurring Basis

Schedule RC-Q is to be completed by banks that:
(1) Had total assets of $500 million or more as of the beginning of their fiscal year; or
(2) Has total assets of less than $500 million as of the beginning of their fiscal year and either:
   (a) Have elected to report financial instruments or servicing assets and liabilities at fair value under a fair value option with changes in fair value recognized in earnings, or
   (b) Are required to complete Schedule RC-D, Trading Assets and Liabilities.

Dollar Amounts in Thousands

| ASSETS | (Column A) Total Fair Value Reported on Schedule RC | (Column B) LESS: Amounts Netted in the Determination of Total Fair Value | (Column C) Level 1 Fair Value Measurements | (Column D) Level 2 Fair Value Measurements | (Column E) Level 3 Fair Value Measurements | |
|---|---|---|---|---|---|---|
| 1. Available-for-sale securities | RCON1773 431,868 | RCONG474 0 | RCONG475 19,343 | RCONG476 412,525 | RCONG477 0 | 1. |
| 2. Federal funds sold and securities purchased under agreements to resell | RCONG478 0 | RCONG479 0 | RCONG480 0 | RCONG481 0 | RCONG482 0 | 2. |
| 3. Loans and leases held for sale | RCONG483 0 | RCONG484 0 | RCONG485 0 | RCONG486 0 | RCONG487 0 | 3. |
| 4. Loans and leases held for investment | RCONG488 0 | RCONG489 0 | RCONG490 0 | RCONG491 0 | RCONG492 0 | 4. |
| 5. Trading assets: a. Derivative assets | RCON3543 0 | RCONG493 0 | RCONG494 0 | RCONG495 0 | RCONG496 0 | 5.a. |
| b. Other trading assets | RCONG497 0 | RCONG498 0 | RCONG499 0 | RCONG500 0 | RCONG501 0 | 5.b. |
| (1) Nontrading securities at fair value with changes in fair value reported in current earnings (included in Schedule RC-Q, item 5.b, above) | RCONF240 0 | RCONF684 0 | RCONF692 0 | RCONF241 0 | RCONF242 0 | 5.b.(1) |
| 6. All other assets | RCONG391 0 | RCONG392 0 | RCONG395 0 | RCONG396 0 | RCONG804 0 | 6. |
| 7. Total assets measured at fair value on a recurring basis (sum of items 1 through 5.b plus item 6) | RCONG502 431,868 | RCONG503 0 | RCONG504 19,343 | RCONG505 412,525 | RCONG506 0 | 7. |

WTC-USAO-02-0108097

## Schedule RC-Q - Continued

| Dollar Amounts in Thousands | (Column A) Total Fair Value Reported on Schedule RC | (Column B) LESS: Amounts Netted in the Determination of Total Fair Value | (Column C) Level 1 Fair Value Measurements | (Column D) Level 2 Fair Value Measurements | (Column E) Level 3 Fair Value Measurements | |
|---|---|---|---|---|---|---|
| **LIABILITIES** | | | | | | |
| 8. Deposits | RCONF252 0 | RCONF686 0 | RCONF694 0 | RCONF253 0 | RCONF254 0 | 8. |
| 9. Federal funds purchased and securities sold under agreements to repurchase | RCONG507 0 | RCONG508 0 | RCONG509 0 | RCONG510 0 | RCONG511 0 | 9. |
| 10. Trading liabilities: | | | | | | |
| a. Derivative liabilities | RCON3547 0 | RCONG512 0 | RCONG513 0 | RCONG514 0 | RCONG515 0 | 10.a. |
| b. Other trading liabilities | RCONG516 0 | RCONG517 0 | RCONG518 0 | RCONG519 0 | RCONG520 0 | 10.b. |
| 11. Other borrowed money | RCONG521 0 | RCONG522 0 | RCONG523 0 | RCONG524 0 | RCONG525 0 | 11. |
| 12. Subordinated notes and debentures | RCONG526 0 | RCONG527 0 | RCONG528 0 | RCONG529 0 | RCONG530 0 | 12. |
| 13. All other liabilities | RCONG805 0 | RCONG806 0 | RCONG807 0 | RCONG808 0 | RCONG809 0 | 13. |
| 14. Total liabilities measured at fair value on a recurring basis (sum of items 8 through 13) | RCONG531 0 | RCONG532 0 | RCONG533 0 | RCONG534 0 | RCONG535 0 | 14. |

WTC-USAO-02-0108098

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

## Schedule RC-Q - Continued

Schedule RCQ  **51**

| | (Column A) Total Fair Value Reported on Schedule RC | (Column B) LESS: Amounts Netted in the Determination of Total Fair Value | (Column C) Level 1 Fair Value Measurements | (Column D) Level 2 Fair Value Measurements | (Column E) Level 3 Fair Value Measurements | |
|---|---|---|---|---|---|---|
| **Memoranda** | | | | | | |
| 1. All other assets (itemize and describe amounts included in Schedule RC-Q, item 6, that are greater than $25,000 and exceed 25% of item 6): | | | | | | |
| a. Mortgage servicing assets | RCONG536 0 | RCONG537 0 | RCONG538 0 | RCONG539 0 | RCONG540 0 | M.1.a. |
| b. Nontrading derivative assets | RCONG541 0 | RCONG542 0 | RCONG543 0 | RCONG544 0 | RCONG545 0 | M.1.b. |
| c. TEXTG546 | RCONG546 0 | RCONG547 0 | RCONG548 0 | RCONG549 0 | RCONG550 0 | M.1.c. |
| d. TEXTG551 | RCONG551 0 | RCONG552 0 | RCONG553 0 | RCONG554 0 | RCONG555 0 | M.1.d. |
| e. TEXTG556 | RCONG556 0 | RCONG557 0 | RCONG558 0 | RCONG559 0 | RCONG560 0 | M.1.e. |
| f. TEXTG561 | RCONG561 0 | RCONG562 0 | RCONG563 0 | RCONG564 0 | RCONG565 0 | M.1.f. |
| 2. All other liabilities (itemize and describe amounts included in Schedule RC-Q, item 13, that are greater than $25,000 and exceed 25% of item 13): | | | | | | |
| a. Loan commitments (not accounted for as derivatives) | RCONF261 0 | RCONF689 0 | RCONF697 0 | RCONF262 0 | RCONF263 0 | M.2.a. |
| b. Nontrading derivative liabilities | RCONG566 0 | RCONG567 0 | RCONG568 0 | RCONG569 0 | RCONG570 0 | M.2.b. |
| c. TEXTG571 | RCONG571 0 | RCONG572 0 | RCONG573 0 | RCONG574 0 | RCONG575 0 | M.2.c. |
| d. TEXTG576 | RCONG576 0 | RCONG577 0 | RCONG578 0 | RCONG579 0 | RCONG580 0 | M.2.d. |
| e. TEXTG581 | RCONG581 0 | RCONG582 0 | RCONG583 0 | RCONG584 0 | RCONG585 0 | M.2.e. |
| f. TEXTG586 | RCONG586 0 | RCONG587 0 | RCONG588 0 | RCONG589 0 | RCONG590 0 | M.2.f. |

Dollar Amounts in Thousands

WTC-USAO-02-0108099

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                                    Printed: 02/17/2010 - 09:41 am

Schedule RCR   52

## Schedule RC-R - Regulatory Capital

| | Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|---|
| **Tier 1 capital** | | | | | | |
| 1. Total bank equity capital (from Schedule RC, item 27.a) | | RCON3210 | | 887,186 | | 1. |
| 2. LESS: Net unrealized gains (losses) on available-for-sale securities (if gain, report as positive value; if loss, report as negative value) (1) | | RCON8434 | | (69,179) | | 2. |
| 3. LESS: Net unrealized loss on available-for-sale EQUITY securities (report loss as positive value) | | RCONA221 | | 0 | | 3. |
| 4. LESS: Accumulated net gains (losses) on cash flow hedges (if a gain, report as a positive value; if a loss, report as a negative value) | | RCON4336 | | (54,907) | | 4. |
| 5. LESS: Nonqualifying perpetual preferred stock | | RCONB588 | | 0 | | 5. |
| 6. Qualifying noncontrolling (minority) interests in consolidated subsidiaries | | RCONB589 | | 0 | | 6. |
| 7. | | | | | | |
| a. LESS: Disallowed goodwill and other disallowed intangible assets | | RCONB590 | | 2,832 | | 7.a. |
| b. LESS: Cumulative change in fair value of all financial liabilities accounted for under a fair value option that is included in retained earnings and is attributable to changes in the bank's own creditworthiness (if a net gain, report as positive value; if a net loss, report as negative value) | | RCONF264 | | 0 | | 7.b. |
| 8. Subtotal (sum of items 1 and 6, less items 2, 3, 4, 5, 7.a, and 7.b) | | RCONC227 | | 1,008,440 | | 8. |
| 9. | | | | | | |
| a. LESS: Disallowed servicing assets and purchased credit card relationships | | RCON591 | | 359 | | 9.a. |
| b. LESS: Disallowed deferred tax assets | | RCON5610 | | 0 | | 9.b. |
| 10. Other additions to (deductions from) Tier 1 capital | | RCONB592 | | 0 | | 10. |
| 11. Tier 1 capital (sum of items 8 and 10, less items 9.a and 9.b) | | RCONB274 | | 1,008,081 | | 11. |
| **Tier 2 capital** | | | | | | |
| 12. Qualifying subordinated debt and redeemable preferred stock | | RCON5306 | | 0 | | 12. |
| 13. Cumulative perpetual preferred stock includible in Tier 2 capital | | RCONB593 | | 0 | | 13. |
| 14. Allowance for loan and lease losses includible in Tier 2 capital | | RCON5310 | | 123,942 | | 14. |
| 15. Unrealized gains on available-for-sale equity securities includible in Tier 2 capital | | RCON2221 | | 1,018 | | 15. |
| 16. Other Tier 2 capital components | | RCONB594 | | 0 | | 16. |
| 17. Tier 2 capital (sum of items 12 through 16) | | RCON5311 | | 124,960 | | 17. |
| 18. Allowable Tier 2 capital (lesser of item 11 or 17) | | RCONB275 | | 124,960 | | 18. |
| 19. Tier 3 capital allocated for market risk | | RCON1395 | | 0 | | 19. |
| 20. Deductions for total risk-based capital | | RCONB595 | | 0 | | 20. |
| 21. Total risk-based capital (sum of items 11, 18, and 19, less item 20) | | RCON3792 | | 1,133,041 | | 21. |
| **Total assets for leverage ratio** | | | | | | |
| 22. Average total assets (from Schedule RC-K, item 9) | | RCON3368 | | 9,503,955 | | 22. |
| 23. LESS: Disallowed goodwill and other disallowed intangible assets (from item 7.a above) | | RCONB590 | | 2,832 | | 23. |
| 24. LESS: Disallowed servicing assets and purchased credit card relationships (from item 9.a above) | | RCONB591 | | 359 | | 24. |
| 25. LESS: Disallowed deferred tax assets (from item 9.b above) | | RCON5610 | | 0 | | 25. |
| 26. LESS: Other deductions from assets for leverage capital purposes | | RCONB596 | | 0 | | 26. |
| 27. Average total assets for leverage capital purposes (item 22 less items 23 through 26) | | RCONA224 | | 9,500,764 | | 27. |
| **Adjustments for financial subsidiaries** | | | | | | |
| 28. | | | | | | |
| a. Adjustment to Tier 1 capital reported in item 11 | | RCONC228 | | 0 | | 28.a. |
| b. Adjustment to total risk-based capital reported in item 21 | | RCONB503 | | 0 | | 28.b. |
| 29. Adjustment to risk-weighted assets reported in item 62 | | RCONB504 | | 0 | | 29. |
| 30. Adjustment to average total assets reported in item 27 | | RCONB505 | | 0 | | 30. |

(1) Report amount included in Schedule RC, item 26.b, "Accumulated other comprehensive income."

WTC-USAO-02-0108100

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 02/17/2010 - 09:41 am

Schedule RCR | 53

## Schedule RC-R - Continued

**Capital ratios**
(Column B is to be completed by all banks. Column A is to be completed by
banks with financial subsidiaries.)

| | (Column A) Percentage (Banks with Financial Subsidiaries) | | (Column B) Percentage (All Banks) | | |
|---|---|---|---|---|---|
| 31. Tier 1 leverage ratio [2] | RCON7273 | 0 | RCON7204 | 10.61 | 31. |
| 32. Tier 1 risk-based capital ratio [3] | RCON7274 | 0 | RCON7206 | 10.17 | 32. |
| 33. Total risk-based capital ratio [4] | RCON7275 | 0 | RCON7205 | 11.43 | 33. |

(2) The ratio for column B is item 11 divided by item 27. The ratio for column A is item 11 minus item 28.a divided by (item 27 minus item 30).
(3) The ratio for column B is item 11 divided by item 62. The ratio for column A is item 11 minus item 28.a divided by (item 62 minus item 29).
(4) The ratio for column B is item 21 divided by item 62. The ratio for column A is item 21 minus item 28.b divided by (item 62 minus item 29).

WTC-USAO-02-0108101

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 02/17/2010 - 09:41 am

Schedule RCR   **54**

## Schedule RC-R - Continued

Banks are not required to risk-weight each on-balance sheet asset and the credit equivalent amount of each off-balance sheet item that qualifies for a risk weight of less than 100 percent (50 percent for derivatives) at its lower risk weight. When completing items 34 through 54 of Schedule RC-R, each bank should decide for itself how detailed a risk-weight analysis it wishes to perform. In other words, a bank can choose from among its assets and off-balance sheet items that have a risk weight of less than 100 percent which ones to risk-weight at an appropriate lower risk weight, or it can simply risk-weight some or all of these items at a 100 percent risk weight (50 percent for derivatives).

### Balance Sheet Asset Categories

| Dollar Amounts in Thousands | (Column A) Totals (from Schedule RC) | (Column B) Items Not Subject to Risk-Weighting | (Column C) Allocation by Risk Weight Category 0% | (Column D) Allocation by Risk Weight Category 20% | (Column E) Allocation by Risk Weight Category 50% | (Column F) Allocation by Risk Weight Category 100% | |
|---|---|---|---|---|---|---|---|
| 34. Cash and balances due from depository institutions (Column A equals the sum of Schedule RC items 1.a and 1.b) ............... | RCONB010 179,577 | RCONC869 0 | RCONB600 92,872 | RCONB601 86,705 | RCONB602 ▨ | RCONB602 | 34. |
| 35. Held-to-maturity securities ............... | RCON1754 114,901 | RCONB603 (468,295) | RCONB604 0 | RCONB605 2,899 | RCONB606 515 | RCONB607 579,782 | 35. |
| 36. Available-for-sale securities ............... | RCON1773 431,868 | RCONB608 12,821 | RCONB609 35,597 | RCONB610 340,863 | RCONB611 5,185 | RCONB612 37,402 | 36. |
| 37. Federal funds sold and securities purchased under agreements to resell ............... | RCONC225 65,919 | RCONB617 ▨ | RCONC063 0 | RCONC064 ▨ | RCONB620 65,919 | RCONB520 0 | 37. |
| 38. Loans and leases held for sale ............... | RCONB369 4,241 | RCONB617 0 | RCONB618 0 | RCONB619 0 | RCONB620 4,241 | RCONB621 0 | 38. |
| 39. Loans and leases, net of unearned income ............... | RCONB528 8,239,157 | RCONB622 0 | RCONB623 7,758 | RCONB624 44,317 | RCONB625 309,664 | RCONB626 7,877,418 | 39. |
| 40. LESS: Allowance for loan and lease losses ............... | RCON3123 129,273 | RCON3123 129,273 | RCONB628 | RCONB629 | RCONB630 | RCONB631 | 40. |
| 41. Trading assets ............... | RCON3545 0 | RCONB627 0 | RCONB628 0 | RCONB629 0 | RCONB630 0 | RCONB631 0 | 41. |
| 42. All other assets (1) ............... | RCONB639 615,809 | RCONB640 56,758 | RCONB641 6,061 | RCONB642 15,946 | RCONB643 1,198 | RCONB5339 535,846 | 42. |
| 43. Total assets (sum of items 34 through 42) ............... | RCON2170 9,522,199 | RCONB644 (527,989) | RCON5320 142,288 | RCON5327 556,649 | RCON5334 320,803 | RCON5340 9,030,448 | 43. |

(1) Includes premises and fixed assets, other real estate owned, investments in unconsolidated subsidiaries and associated companies, intangible assets, and other assets.

WTC-USAO-02-0108102

September 2009  FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 02/17/2010 - 09:41 am

**55**

Schedule RCR

# Schedule RC-R - Continued

**Derivatives and Off-Balance Sheet Items**

| Dollar Amounts in Thousands | (Column A) Face Value or Notional Amount | Credit Conversion Factor | (Column B) Credit Equivalent Amount (1) | (Column C) Allocation by Risk Weight Category 0% | (Column D) Allocation by Risk Weight Category 20% | (Column E) Allocation by Risk Weight Category 50% | (Column F) Allocation by Risk Weight Category 100% | |
|---|---|---|---|---|---|---|---|---|
| 44. Financial standby letters of credit | RCONB546 123,096 | 1.00 or 12.5 (2) / 1.00 | RCONB547 123,096 | RCONB548 6,264 | RCONB581 0 | RCONB582 0 | RCONB583 116,832 | 44. |
| 45. Performance standby letters of credit | RCONB821 154,272 | .50 | RCONB650 77,136 | RCONB651 1,247 | RCONB652 0 | RCONB653 0 | RCONB654 75,889 | 45. |
| 46. Commercial and similar letters of credit | RCONB411 574 | .20 | RCONB655 115 | RCONB656 20 | RCONB657 0 | RCONB658 0 | RCONB659 95 | 46. |
| 47. Risk participations in bankers acceptances acquired by the reporting institution | RCON3429 0 | 1.00 | RCONB660 0 | RCONB661 0 | RCONB662 0 | | RCONB663 0 | 47. |
| 48. Securities lent | RCON3433 0 | 1.00 | RCONB664 0 | RCONB665 0 | RCONB666 0 | RCONB667 0 | RCONB668 0 | 48. |
| 49. Retained recourse on small business obligations sold with recourse | RCONA250 0 | 1.00 | RCONB669 0 | RCONB670 0 | RCONB671 0 | RCONB672 0 | RCONB673 0 | 49. |
| 50. Recourse and direct credit substitutes (other than financial standby letters of credit) subject to the low-level exposure rule and residual interests subject to a dollar-for-dollar capital requirement | RCONB641 641 | 12.5 (3) / 8.75 | RCONB542 5,610 | | | | RCONB543 5,610 | 50. |
| 51. All other financial assets sold with recourse | RCONB675 0 | 1.00 | RCONB676 0 | RCONB677 0 | RCONB678 0 | RCONB679 0 | RCONB680 0 | 51. |
| 52. All other off-balance sheet liabilities | RCONB681 0 | 1.00 | RCONB682 0 | RCONB683 0 | RCONB684 0 | RCONB685 0 | RCONB686 0 | 52. |
| 53. Unused commitments: a. With an original maturity exceeding one year | RCON3833 766,643 | .50 | RCONB687 383,322 | RCONB688 0 | RCONB689 0 | RCONB690 0 | RCONB691 383,322 | 53.a. |
| b. With an original maturity of one year or less to asset-backed commercial paper conduits | RCONG591 0 | .10 | RCONG592 0 | RCONG593 0 | RCONG594 0 | RCONG595 0 | RCONG596 0 | 53.b. |
| 54. Derivative contracts | | | RCONA167 62,928 | RCONB693 0 | RCONB694 0 | RCONB695 62,928 | RCONB596 0 | 54. |

(1) Column A multiplied by credit conversion factor.
(2) For financial standby letters of credit to which the low-level exposure rule applies, use a credit conversion factor of 12.5 or an institution-specific factor. For other financial standby letters of credit use a credit conversion factor of 1.00. See instructions for further information.
(3) Or institution-specific factor.

WTC-USAO-02-0108103

September 2009 FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218                    Printed: 02/17/2010 - 09:41 am

Schedule RCR  | 56 |



## Schedule RC-R - Continued

| Dollar Amounts in Thousands | (Column C) Allocation by Risk Weight Category 0% | (Column D) Allocation by Risk Weight Category 20% | (Column E) Allocation by Risk Weight Category 50% | (Column F) Allocation by Risk Weight Category 100% | |
|---|---|---|---|---|---|
| 55. Total assets, derivatives, and off-balance sheet items by risk weight category (for each column, sum of items 43 through 54) | RCONB696 149,819 | RCONB697 556,649 | RCONB698 383,731 | RCONB699 9,612,196 | 55. |
| 56. Risk weight factor | x 0% | x 20% | x 50% | x 100% | 56. |
| 57. Risk-weighted assets by risk weight category (for each column, item 55 multiplied by item 56) | RCONB700 0 | RCONB701 111,330 | RCONB702 191,866 | RCONB703 9,612,196 | 57. |
| 58. Market risk equivalent assets | | | | RCON1651 0 | 58. |
| 59. Risk-weighted assets before deductions for excess allowance for loan and lease losses and allocated transfer risk reserve (sum of item 57, columns C through F, and item 58) | | | | RCONB704 9,915,392 | 59. |
| 60. LESS: Excess allowance for loan and lease losses | | | | RCONA222 5,330 | 60. |
| 61. LESS: Allocated transfer risk reserve | | | | RCON3128 0 | 61. |
| 62. Total risk-weighted assets (item 59 minus items 60 and 61) | | | | RCONA223 9,910,062 | 62. |

Memoranda

| Dollar Amounts in Thousands | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| 1. Current credit exposure across all derivative contracts covered by the risk-based capital standards | RCON8764 | | 53,386 | | M.1. |

| Dollar Amounts in Thousands | (Column A) With a remaining maturity of one year of less | | (Column B) With a remaining maturity of over one year through five years | | (Column C) With a remaining maturity of over five years | | |
|---|---|---|---|---|---|---|---|
| 2. Notional principal amounts of derivative contracts: (1) | | | | | | | |
| a. Interest rate contracts | RCON3809 | 755,574 | RCON8766 | 939,558 | RCON8767 | 322,976 | M.2.a. |
| b. Foreign exchange contracts | RCON3812 | 0 | RCON8769 | 0 | RCON8770 | 0 | M.2.b. |
| c. Gold contracts | RCON8771 | 0 | RCON8772 | 0 | RCON8773 | 0 | M.2.c. |
| d. Other precious metals contracts | RCON8774 | 0 | RCON8775 | 0 | RCON8776 | 0 | M.2.d. |
| e. Other commodity contracts | RCON8777 | 0 | RCON8778 | 0 | RCON8779 | 0 | M.2.e. |
| f. Equity derivative contracts | RCONA000 | 0 | RCONA001 | 0 | RCONA002 | 0 | M.2.f. |
| g. Credit derivative contracts: **Purchased credit protection that (a) is a covered position under the market risk rule or (b) is not a covered position under the market risk rule and is not recognized as a guarantee for risk-based capital purposes:** | | | | | | | |
| (1) Investment grade | RCONG597 | 0 | RCONG598 | 0 | RCONG599 | 0 | M.2.g.(1) |
| (2) Subinvestment grade | RCONG600 | 0 | RCONG601 | 0 | RCONG602 | 0 | M.2.g.(2) |

_____

(1) Exclude foreign exchange contracts with an original maturity of 14 days or less and all futures contracts.

WTC-USAO-02-0108104

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule RCS

**57**

# Schedule RC-S - Servicing, Securitization, and Asset Sale Activities

## Bank Securitization Activities

| Dollar Amounts in Thousands | (Column A) 1-4 Family Residential Loans | (Column B) Home Equity Lines | (Column C) Credit Card Receivables | (Column D) Auto Loans | (Column E) Other Consumer Loans | (Column F) Commercial and Industrial Loans | (Column G) All Other Loans, All Leases and All Other Assets | |
|---|---|---|---|---|---|---|---|---|
| 1. Outstanding principal balance of assets sold and securitized by the reporting bank with servicing retained or with recourse or other seller-provided credit enhancements | RCONB705 0 | RCONB706 0 | RCONB707 0 | RCONB708 0 | RCONB709 0 | RCONB710 0 | RCONB711 0 | 1. |
| 2. Maximum amount of credit exposure arising from recourse or other seller-provided credit enhancements provided to structures reported in item 1 in the form of: | | | | | | | | |
| a. Credit-enhancing interest-only strips (included in Schedules RC-B or RC-F or in Schedule RC, item 5) | RCONB712 0 | RCONB713 0 | RCONB714 0 | RCONB715 0 | RCONB716 0 | RCONB717 0 | RCONB718 0 | 2.a. |
| b. Subordinated securities and other residual interests | RCONC393 0 | RCONC394 0 | RCONC395 0 | RCONC396 0 | RCONC397 0 | RCONC398 0 | RCONC399 0 | 2.b. |
| c. Standby letters of credit and other enhancements | RCONC400 0 | RCONC401 0 | RCONC402 0 | RCONC403 0 | RCONC404 0 | RCONC405 0 | RCONC406 0 | 2.c. |
| 3. Reporting bank's unused commitments to provide liquidity to structures reported in item 1 | RCONB726 0 | RCONB727 0 | RCONB728 0 | RCONB729 0 | RCONB730 0 | RCONB731 0 | RCONB732 0 | 3. |
| 4. Past due loan amounts included in item 1: | | | | | | | | |
| a. 30-89 days past due | RCONB733 0 | RCONB734 0 | RCONB735 0 | RCONB736 0 | RCONB737 0 | RCONB738 0 | RCONB739 0 | 4.a. |
| b. 90 days or more past due | RCONB740 0 | RCONB741 0 | RCONB742 0 | RCONB743 0 | RCONB744 0 | RCONB745 0 | RCONB746 0 | 4.b. |
| 5. Charge-offs and recoveries on assets sold and securitized with servicing retained or with recourse or other seller-provided credit enhancements (calendar year-to-date): | | | | | | | | |
| a. Charge-offs | RIADB747 0 | RIADB748 0 | RIADB749 0 | RIADB750 0 | RIADB751 0 | RIADB752 0 | RIADB753 0 | 5.a. |
| b. Recoveries | RIADB754 0 | RIADB755 0 | RIADB756 0 | RIADB757 0 | RIADB758 0 | RIADB759 0 | RIADB760 0 | 5.b. |

WTC-USAO-02-0108105

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule RCS

**58**

## Schedule RC-S - Continued

| Dollar Amounts in Thousands | (Column A) 1-4 Family Residential Loans | (Column B) Home Equity Lines | (Column C) Credit Card Receivables | (Column D) Auto Loans | (Column E) Other Consumer Loans | (Column F) Commercial and Industrial Loans | (Column G) All Other Loans, All Leases and All Other Assets | |
|---|---|---|---|---|---|---|---|---|
| 6. Amount of ownership (or seller's) interests carried as: | | | | | | | | |
| a. Securities (included in Schedule RC-B or in Schedule RC, item 5) | | RCONB761 0 | RCONB762 0 | | | RCONB763 0 | | 6.a. |
| b. Loans (included in Schedule RC-C) | | RCONB500 0 | RCONB501 0 | | | RCONB502 0 | | 6.b. |
| 7. Past due loan amounts included in interests reported in item 6.a: | | | | | | | | |
| a. 30-89 days past due | | RCONB764 0 | RCONB765 0 | | | RCONB766 0 | | 7.a. |
| b. 90 days or more past due | | RCONB767 0 | RCONB768 0 | | | RCONB769 0 | | 7.b. |
| 8. Charge-offs and recoveries on loan amounts included in interests reported in item 6.a (calendar year-to-date): | | | | | | | | |
| a. Charge-offs | | RIADB770 0 | RIADB771 0 | | | RIADB772 0 | | 8.a. |
| b. Recoveries | | RIADB773 0 | RIADB774 0 | | | RIADB775 0 | | 8.b. |
| **For Securitization Facilities Sponsored By or Otherwise Established By Other Institutions** | | | | | | | | |
| 9. Maximum amount of credit exposure arising from credit enhancements provided by the reporting bank to other institutions' securitization structures in the form of standby letters of credit, purchased subordinated securities, and other enhancements | RCONB776 0 | RCONB777 0 | RCONB778 0 | RCONB779 0 | RCONB780 0 | RCONB781 0 | RCONB782 0 | 9. |
| 10. Reporting bank's unused commitments to provide liquidity to other institutions' securitization structures | RCONB783 0 | RCONB784 0 | RCONB785 0 | RCONB786 0 | RCONB787 0 | RCONB788 0 | RCONB789 0 | 10. |
| **Bank Asset Sales** | | | | | | | | |
| 11. Assets sold with recourse or other seller-provided credit enhancements and not securitized by the reporting bank | RCONB790 0 | RCONB791 0 | RCONB792 0 | RCONB793 0 | RCONB794 0 | RCONB795 0 | RCONB796 0 | 11. |
| 12. Maximum amount of credit exposure arising from recourse or other seller-provided credit enhancements provided to assets reported in item 11 | RCONB797 0 | RCONB798 0 | RCONB799 0 | RCONB800 0 | RCONB801 0 | RCONB802 0 | RCONB803 0 | 12. |

WTC-USAO-02-0108106

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                Printed: 11/13/2009 - 04:55 pm

Schedule RCS   **59**

## Schedule RC-S - Continued

Memoranda

| | | Bil | Mil | Thou | |
|---|---|---|---|---|---|
| **Dollar Amounts in Thousands** | | | | | |
| 1. Small business obligations transferred with recourse under Section 208 of the Riegle Community Development and Regulatory Improvement Act of 1994: | | | | | |
| a. Outstanding principal balance | RCONA249 | | | 0 | M.1.a. |
| b. Amount of retained recourse on these obligations as of the report date | RCONA250 | | | 0 | M.1.b. |
| 2. Outstanding principal balance of assets serviced for others: | | | | | |
| a. Closed-end 1-4 family residential mortgages serviced with recourse or other servicer-provided credit enhancements | RCONB804 | | | 0 | M.2.a. |
| b. Closed-end 1-4 family residential mortgages serviced with no recourse or other servicer-provided credit enhancements | RCONB805 | | 792,804 | | M.2.b. |
| c. Other financial assets (includes home equity lines) [1] | RCONA591 | | | 0 | M.2.c. |
| d. 1-4 family residential mortgages serviced for others that are in process of foreclosure at quarter-end (includes closed-end and open-end loans) | RCONF699 | | | 0 | M.2.d. |
| 3. Asset-backed commercial paper conduits: | | | | | |
| a. Maximum amount of credit exposure arising from credit enhancements provided to conduit structures in the form of standby letters of credit, subordinated securities, and other enhancements: | | | | | |
| (1) Conduits sponsored by the bank, a bank affiliate, or the bank's holding company | RCONB806 | | | 0 | M.3.a.(1) |
| (2) Conduits sponsored by other unrelated institutions | RCONB807 | | | 0 | M.3.a.(2) |
| b. Unused commitments to provide liquidity to conduit structures: | | | | | |
| (1) Conduits sponsored by the bank, a bank affiliate, or the bank's holding company | RCONB808 | | | 0 | M.3.b.(1) |
| (2) Conduits sponsored by other unrelated institutions | RCONB809 | | | 0 | M.3.b.(2) |
| 4. Outstanding credit card fees and finance charges included in Schedule RC-S, item 1, col C [2] | RCONC407 | | | N/A | M.4. |

(1) Memorandum item 2.c is to be completed if the principal balance of other financial assets serviced for others is more than $10 million.
(2) Memorandum item 4 is to be completed by banks that (1) together with affiliated institutions, have outstanding credit card receivables (as defined in the instructions) that exceed $500 million as of the report date or (2) are credit card specialty banks as defined for Uniform Bank Performance Report purposes.

WTC-USAO-02-0108107

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule **RCT**   60

# Schedule RC-T - Fiduciary and Related Services

|  | | Yes/No |  |
|---|---|---|---|
| 1. Does the institution have fiduciary powers? (If "NO," do not complete Schedule RC-T.) | RCONA345 | YES | 1. |
| 2. Does the institution exercise the fiduciary powers it has been granted? | RCONA346 | YES | 2. |
| 3. Does the institution have any fiduciary or related activity (in the form of assets or accounts) to report in this schedule? (If "NO," do not complete the rest of Schedule RC-T.) | RCONB867 | YES | 3. |

If the answer to item 3 is "YES," complete the applicable items of Schedule RC-T, as follows:

Institutions with total fiduciary assets (item 9, sum of columns A and B) greater than $250 million (as of the preceding December 31) or with gross fiduciary and related services income greater than 10% of revenue (net interest income plus noninterest income) for the preceding calendar year must complete:
• Items 4 through 19 quarterly,
• Items 20 through 23 annually with the December report, and
• Memorandum items 1 through 4 annually with the December report.

Institutions with total fiduciary assets (item 9, sum of columns A and B) greater than $100 million but less than or equal to $250 million (as of the preceding December 31) that do not meet the fiduciary income test for quarterly reporting must complete:
• Items 4 through 23 annually with the December report, and
• Memorandum items 1 through 4 annually with the December report.

Institutions with total fiduciary assets (item 9, sum of columns A and B) of $100 million or less (as of the preceding December 31) that do not meet the fiduciary income test for quarterly reporting must complete:
• Items 4 through 10 annually with the December report, and
• Memorandum items 1 through 3 annually with the December report.

## FIDUCIARY AND RELATED ASSETS

| Dollar Amounts in Thousands | (Column A) Managed Assets | (Column B) Non- Managed Assets | (Column C) Number of Managed Accounts | (Column D) Number of Non- Managed Accounts | |
|---|---|---|---|---|---|
| 4. Personal trust and agency accounts | RCONB868 10,574,783 | RCONB869 8,141,666 | RCONB870 5049 | RCONB871 1714 | 4. |
| 5. Retirement related trust and agency accounts: | | | | | |
| a. Employee benefit - defined contribution | RCONB872 43,789 | RCONB873 19,389,269 | RCONB874 55 | RCONB875 3932 | 5.a. |
| b. Employee benefit - defined benefit | RCONB876 370,763 | RCONB877 1,287,352 | RCONB878 72 | RCONB879 360 | 5.b. |
| c. Other retirement accounts | RCONB880 152,741 | RCONB881 62,847 | RCONB882 381 | RCONB883 43 | 5.c. |
| 6. Corporate trust and agency accounts | RCONB884 900,736 | RCONB885 44,382,970 | RCONC001 154 | RCONC002 17711 | 6. |
| 7. Investment management agency accounts | RCONB886 7,613,245 | | RCONB888 2014 | | 7. |
| 8. Other fiduciary accounts | RCONB890 408,743 | RCONB891 887,953 | RCONB892 40 | RCONB893 331 | 8. |
| 9. Total fiduciary accounts (sum of items 4 through 8) | RCONB894 **20,064,800** | RCONB895 **74,152,257** | RCONB896 **7765** | RCONB897 **24091** | 9. |
| 10. Custody and safekeeping accounts | | RCONB898 49,435,121 | | RCONB899 4107 | 10. |

WTC-USAO-02-0108108

September 2009  FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218            Printed: 11/13/2009 - 04:55 pm

Schedule RCT | 61

## Schedule RC-T - Continued

**FIDUCIARY AND RELATED SERVICES INCOME**

| Dollar Amounts in Thousands | | Bil \| Mil \| Thou | |
|---|---|---|---|
| 11. Not applicable | | | |
| 12. Personal trust and agency accounts | RIADB904 | 36,639 | 12. |
| 13. Retirement related trust and agency accounts: | | | |
| a. Employee benefit - defined contribution | RIADB905 | 8,112 | 13.a. |
| b. Employee benefit - defined benefit | RIADB906 | 1,300 | 13.b. |
| c. Other retirement accounts | RIADB907 | 672 | 13.c. |
| 14. Corporate trust and agency accounts | RIADA479 | 31,535 | 14. |
| 15. Investment management agency accounts | RIADB908 | 13,981 | 15. |
| 16. Other fiduciary accounts | RIADA480 | 2,405 | 16. |
| 17. Custody and safekeeping accounts | RIADB909 | 6,649 | 17. |
| 18. Other fiduciary and related services income | RIADB910 | 24,024 | 18. |
| 19. Total gross fiduciary and related services income (sum of items 12 through 18) (must equal Schedule RI, item 5.a) | RIAD4070 | 125,317 | 19. |
| 20. Less: Expenses | RIADC058 | N/A | 20. |
| 21. Less: Net losses from fiduciary and related services | RIADA488 | N/A | 21. |
| 22. Plus: Intracompany income credits for fiduciary and related services | RIADB911 | N/A | 22. |
| 23. Net fiduciary and related services income | RIADA491 | N/A | 23. |

Memoranda

| Dollar Amounts in Thousands | | Bil \| Mil \| Thou | |
|---|---|---|---|
| 1. Managed assets held in personal trust and agency accounts: | | | |
| a. Noninterest-bearing deposits | RCONB913 | N/A | M.1.a. |
| b. Interest-bearing deposits | RCONB914 | N/A | M.1.b. |
| c. U.S. Treasury and U.S. Government agency obligations | RCONB915 | N/A | M.1.c. |
| d. State, county and municipal obligations | RCONB916 | N/A | M.1.d. |
| e. Money market mutual funds | RCONB917 | N/A | M.1.e. |
| f. Other short-term obligations | RCONB918 | N/A | M.1.f. |
| g. Other notes and bonds | RCONB919 | N/A | M.1.g. |
| h. Common and preferred stocks | RCONB920 | N/A | M.1.h. |
| i. Real estate mortgages | RCONB921 | N/A | M.1.i. |
| j. Real estate | RCONB922 | N/A | M.1.j. |
| k. Miscellaneous assets | RCONB923 | N/A | M.1.k. |
| l. Total managed assets held in personal trust and agency accounts (sum of Memorandum items 1.a through 1.k) (must equal Schedule RC-T, item 4, column A) | RCONB868 | N/A | M.1.l. |

| Dollar Amounts in Thousands | (Column A) Number of Issues | | (Column B) Principal Amount Outstanding | | |
|---|---|---|---|---|---|
| 2. Corporate trust and agency accounts: | | | | | |
| a. Corporate and municipal trusteeships | RCONB927 | N/A | RCONB928 | N/A | M.2.a. |
| b. Transfer agent, registrar, paying agent, and other corporate agency | RCONB929 | N/A | | | M.2.b. |

WTC-USAO-02-0108109

September 2009 FFIEC 041   Wilmington Trust Company - ID RSSD# 0000272218                Printed: 11/13/2009 - 04:55 pm

Schedule RCT   **62**

## Schedule RC-T - Continued

Memoranda (continued)

| Dollar Amounts in Thousands | (Column A) Number of Funds | | (Column B) Market Value of Fund Assets | | |
|---|---|---|---|---|---|
| 3. Collective investment funds and common trust funds: | | | | | |
| a. Domestic equity ................................................ | RCONB931 | N/A | RCONB932 | N/A | M.3.a. |
| b. International/Global equity ................................ | RCONB933 | N/A | RCONB934 | N/A | M.3.b. |
| c. Stock/Bond blend ............................................. | RCONB935 | N/A | RCONB936 | N/A | M.3.c. |
| d. Taxable bond ................................................... | RCONB937 | N/A | RCONB938 | N/A | M.3.d. |
| e. Municipal bond ................................................ | RCONB939 | N/A | RCONB940 | N/A | M.3.e. |
| f. Short term investments/Money market ............... | RCONB941 | N/A | RCONB942 | N/A | M.3.f. |
| g. Specialty/Other ............................................... | RCONB943 | N/A | RCONB944 | N/A | M.3.g. |
| h. Total collective investment funds (sum of Memorandum items 3.a through 3.g) ...................... | RCONB945 | N/A | RCONB946 | N/A | M.3.h. |

| Dollar Amounts in Thousands | (Column A) Gross Losses Managed Accounts | | (Column B) Gross Losses Non- Managed Accounts | | (Column C) Recoveries | | |
|---|---|---|---|---|---|---|---|
| 4. Fiduciary settlements, surcharges, and other losses: | | | | | | | |
| a. Personal trust and agency accounts | RIADB947 | N/A | RIADB948 | N/A | RIADB949 | N/A | M.4.a. |
| b. Retirement related trust and agency accounts ................................................. | RIADB950 | N/A | RIADB951 | N/A | RIADB952 | N/A | M.4.b. |
| c. Investment management agency accounts ................................................. | RIADB953 | N/A | RIADB954 | N/A | RIADB955 | N/A | M.4.c. |
| d. Other fiduciary accounts and related services ............................................... | RIADB956 | N/A | RIADB957 | N/A | RIADB958 | N/A | M.4.d. |
| e. Total fiduciary settlements, surcharges, and other losses (sum of Memorandum items 4.a through 4.d) (sum of columns A and B minus column C must equal Schedule RC-T, item 21) ................................... | RIADB959 | N/A | RIADB960 | N/A | RIADB961 | N/A | M.4.e. |

---

**Person to whom questions about Schedule RC-T - Fiduciary and Related Services should be directed:**

Julie Tang / Financial Analyst II
Name and Title (TEXT B962)

jtang@wilmingtontrust.com
E-mail Address (TEXT B926)

(302)651-1892
Telephone: Area code/phone number/extension (TEXT B963)

(302)427-4501
FAX: Area code/phone number (TEXT B964)

WTC-USAO-02-0108110

September 2009  FFIEC 041    Wilmington Trust Company - ID RSSD# 0000272218

Printed: 11/13/2009 - 04:55 pm

Schedule NARR **63**



### Optional Narrative Statement Concerning the Amounts
### Reported in the Reports of Condition and Income

The management of the reporting bank may, if it wishes, submit a brief narrative statement on the amounts reported in the Reports of Condition and Income. This optional statement will be made available to the public, along with the publicly available data in the individual bank report data. BANKS CHOOSING TO SUBMIT THE NARRATIVE STATEMENT SHOULD ENSURE THAT THE STATEMENT DOES NOT CONTAIN THE NAMES OR OTHER IDENTIFICATIONS OF INDIVIDUAL BANK CUSTOMERS OR ANY OTHER INFORMATION THAT THEY ARE NOT WILLING TO HAVE MADE PUBLIC OR THAT WOULD COMPROMISE THE PRIVACY OF THEIR CUSTOMERS. Banks choosing not to make a statement may check the "No comment" box below and should make no entries of any kind in the space provided for the narrative statement; i.e., DO NOT enter in this space such phrases as "No statement," "Not applicable," "N/A," "No comment," and "None."

The optional statement must be entered on this sheet. The statement should not exceed 100 words. Further, regardless of the number of words, the statement must not exceed 750 characters, including punctuation, indentation, and standard spacing between words and sentences. If any submission should exceed 750 characters, as defined, it will be truncated at 750 characters with no notice to the submitting bank and the truncated statement will appear as the bank's statement both on agency computerized records and in computer-file releases to the public.

All information furnished by the bank in the narrative statement must be accurate and not misleading. Appropriate efforts shall be taken by the submitting bank to ensure the statement's accuracy. The statement must be signed, in the space provided below, by a senior officer of the bank who thereby attests to its accuracy.

If, subsequent to the original submission, material changes are submitted for the data reported in the Reports of Condition and Income, the existing narrative statement will be deleted from the files, and from disclosure; the bank, at its option, may replace it with a statement, under signature, appropriate to the amended data.

The optional narrative statement will appear in agency records and in release to the public exactly as submitted (or amended as described in the preceding paragraph) by the management of the bank (except for the truncation of statements exceeding the 750-character limit described above). THE STATEMENT WILL NOT BE EDITED OR SCREENED IN ANY WAY BY THE SUPERVISORY AGENCIES FOR ACCURACY OR RELEVANCE. DISCLOSURE OF THE STATEMENT SHALL NOT SIGNIFY THAT ANY FEDERAL SUPERVISORY AGENCY HAS VERIFIED OR CONFIRMED THE ACCURACY OF THE INFORMATION CONTAIN THEREIN. A STATEMENT TO THIS EFFECT WILL APPEAR ON ANY PUBLIC RELEASE OF THE OPTIONAL STATEMENT SUBMITTED BY THE MANAGEMENT OF THE REPORTING BANK.

Comments? NO
(RCON 6979)

BANK MANAGEMENT STATEMENT (Please type or print clearly):
(TEXT 6980)

WTC-USAO-02-0108111

# EXHIBIT C

# Controller's Division-June 2007
## External Reporting Section



**DEFENSE EXHIBIT**

2793

1:15cr23 (RGA)

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004361



# Controller's Division–June 2007
## Accounting Operations Section

**Finance Department**
David R. Gibson
CFO & Executive Vice President
Finance Department Manager

Ann M. Godley
Senior Executive Assistant

**Controller's Division**
Kevyn N. Rakowski
Controller

Anita M. Conticello
Admin Assistant II

**Accounting Operations Section**
Leah Grzybowski
Section Manager

Bill Freebery
General Accounting Manager

**Purchasing Unit**
Christopher M. Brosius
Purchasing Manager

Allison Crook
   Accounting Assistant II
Faith Davis
   Accounting Assistant II
Nina Lane
   Accounting Opers Coordinator
Shirley Sleva
   Accts Payable & Purchasing Unit
Linda Vitale
   Accounting Assistant III
Vivian Williams
   Accounting Assistant III

Bonnie Jackson
G/L Control Manager

Barb Betcher
   Fixed Asset Accountant II
Kathy Brooks
   Wire Transfer Recon Analyst
Nancy Kimmey
   GL Supervisor
Michelle Latney
   Acctg/Fin Analyst III - GL
Paul Rapposelli
   General Ledger Control Unit
Beverly Reinholz
   General Ledger Control Unit
Sharon Wissinger
   RECON/Accting Analyst

Geddes Marcano
HRIS

Linda Helle
Wire Transfer Manager

Patricia Moran
Wire Transfer Compliance
/Control Manager

Patricia A. Boulden
   Wire Transfer Ops Manager
Georgianna Calhum   Wire Transfer Sct
Diana Carrasquillo  Wire Transfer Sct
Bonita Davis   Wire Transfer Control Unit Sup
Janet DeSalvatore   Wire Transfer Verification Spc
Tracy Eaton  Wire Transfer Verification Spc
Karen Founds  Wire Transfer Verification Spc
Sabra Grimes   Wire Transfer Verification Spc
Penny Hayward   Wire Transfer Verification Spc
Andrew Lennon   Wire Transfer Verification Spc

Mary Cobourn
Payroll Manager

Barb Cahall
   Payroll Unit
Jazuta Gordy
   Payroll Specialist II
Ray Heller
   Stock Opt Admin/HR Controller
Ruth Hill
   Payroll Analyst II

Confidential Treatment Requested
By Wilmington Trust Corporation

# Controller's Division-June 2007
# Policies & Procedures Section



**Finance Department**
David R. Gibson
CFO & Executive Vice President
Finance Department Manager

Ann M. Godley
Senior Executive Assistant

**Controller's Division**
Kevyn N. Rakowski
Controller

Anita M. Conticello
Admin Assistant II

**Policies & Procedures Section**
Mico Silijepcevic
Section Manager

Kevin Mrozinski
Senior Staff Accountant

Brad Shuts
Staff Accountant

Linda Tacey
Training and Development
Specialist

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004363

# Controller's Division-June 2007
## Management Reporting Section



**Finance Department**
David R. Gibson
CFO & Executive Vice President
Finance Department Manager

Ann M. Godley
Senior Executive Assistant

**Controller's Division**
Kevyn N. Rakowski
Controller

Anita M. Conticello
Admin Assistant II

**Management Reporting Section**
Patrick D. Mangan
Section Manager

Profitability Systems Adm Unit
Debby Almeida
Supervisor

R. Douglas Harder
Business Line Profitability Analyst

**Budget & Corp Analysis Unit**
William I. Shinn
Unit Manager

Adam Kruger
Profitability Support Analyst

Thomas F. Ryan
FICS GL & Budget Supt Analyst

Chris Biordi
General Ledger Systems Analyst

Donald P. Snyder
Activity Based Cost Analyst III

Marianne K. Shaw
Acct/Financial Analyst II

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004364



# Controller's Division–June 2007
## Bank Portfolio Operations/SOX Section

**Finance Department**
David R. Gibson
CFO & Executive Vice President
Finance Department Manager

Ann M. Godley
Senior Executive Assistant

**Controller's Division**
Kevyn N. Rakowski
Controller

Anita M. Conticello
Admin Assistant II

**Bank Port. Ops/SOX Section**
Joan M. Siegle
Section Manager

Bank Portfolio Operations

Debbie Hayden
Sr. Staff Accountant/System
Administrator Investment Accounting

Linda Marey
Bank Portfolio Operations Analyst

Darren McNeil
Security Movement Specialist

SOX Compliance Office

Jackie Pelagatti
SOX Testing Manager

Karen Langston
Senior SOX Testing Analyst

TBD
SOX Testing Analyst II (PT)

TBD
SOX Testing Analyst II (PT)

TBD
Senior IT SOX Testing Analyst

Nandy Bolton
SOX Testing Analyst I

Julien Perret
Senior SOX Compliance Analyst

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004365



Finance Department Organizational Structure – July 2008
Controller's Division

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004366



Finance Department Organizational Structure – July 2008
Controller's Division
Financial Reporting Division

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004367



Finance Department Organizational Structure – July 2008
Controller's Division
Financial Operations Division

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004368



Finance Department Organizational Structure – June 2009
Controller's Division

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004369

# Finance Department
## Organizational Structure - Controller's Division
### June 2010



**Kevyn Rakowski**
Controller & Division Manager

**Heather Szczesiak**
Administrative Assistant

---

**Financial Reporting**
Mitch Stjepcevic
Assistant Controller & Division Manager

**External Reporting**
Martin McDonough Jr.
Section Manager

- **Financial Reporting**
  Daniel F. Roberts
  Section Manager
- **Regulatory Reporting**
  Docorah E. Kelly
  Section Manager

**Management Reporting**
Patrick Mangan
Section Manager

- **R. Douglas Harder**
  Business Line
  Profitability Analyst
- **Budget & Corporate Analysis**
  William I. Shinn
  Unit Manager
- **Profitability Systems Administration**
  Debby Almeida
  Supervisor

**Accounting Policies & Procedures**
Kevin Mrozinski
Section Manager

- **Sushmita Samanta**
  Senior Accountant
- **Brad Shuts**
  Staff Accountant
- **Dawna Bunton**
  Training Specialist

**SEC Reporting**
Jeffrey Kahn
Section Manager

**Tax Reporting**
Walter Doggett
Section Manager

- **Frank Aufiero**
  Tax Compliance Manager
- **James Berry**
  Senior Tax Accountant
- **Erik Feldman**
  Senior Tax Accountant
- **Open Position**
  Senior Tax Accountant

**Financial Operations**
Joan Siegle
Assistant Controller & Division Manager

**Wire Transfer**
Linda Helle
Section Manager

- **Patricia Moran**
  Wire Transfer
  Compliance Control Manager
- **Patricia A. Boudoin**
  Wire Transfer
  Operations Manager

**Accounting Operations**
Leah Grzybowski
Section Manager

- **Accounts Payable**
  Chris Brosius
  General Accounting Manager
- **Donna Cannon**
  General Ledger
  G/L Control Manager
- **Payroll**
  John Mousley
  Manager

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004370



# Finance Department
Organizational Structure – Controller's Division
Financial Operations Division
June 2010

Confidential Treatment Requested
By Wilmington Trust Corporation

WL-0004371



# Finance Department

Organizational Structure – Controller's Division
Financial Reporting Division
June 2010

Kevyn Rakowski
Controller

Heather Szczesiak
Administrative Assistant

Financial Reporting
Mitch Sliepcevic
Assistant Controller & Division Manager

**Accounting Policies & Procedures**
Kevin Mrzinski
Section Manager

Sushmita Samanta
Senior Accountant

Brad Shuts
Staff Accountant

Dawna Bunton
Training Specialist

**Management Reporting**
Patrick Mangan
Section Manager

William Shinn
Budget & Corporate Analysis

R. Douglas Harder
Business Line Profitability Analyst

Debby Almedia
Professional Systems Administration

Marianne K. Shaw
Budget Analyst II

Vonye Hardcitl
Budget Analyst II

Jane Coatz
GL Systems Analyst

Tom Ryan
FICS GL & Budget Support Analyst

Adam Kuyer
Profitability Support Analyst

**Jeffrey Kahn**
SEC Reporting Manager

**External Reporting**
Martin McDonough Jr.
Section Manager

**Financial Reporting**
Daniel F. Roberts
Section Manager

Keith Ross
Acct/Financial Analyst IV

Kimberly Strohmeier
Acct/Financial Analyst III

Bixon Huei Faye Loh
Acct/Financial Analyst III

Nicole Murphy
Acct/Financial Analyst I

**Regulatory Reporting**
Deborah E. Kelly
Section Manager

Irina Watkins
Acct/Financial Analyst II

Li Zhu (Juliet Chen)
Acct/ Financial Analyst II

Julie Tang
Acct/Financial Analyst II

Confidential Treatment Requested
By Wilmington Trust Corporation

# EXHIBIT D



# WILMINGTON TRUST

**Ted T. Cecala**
CEO & Chairman

**Robert V.A. Harra Jr.**
President & COO, Corporate

**Robert V.A. Harra Jr.**
President, Regional Banking

**Mark A. Graham**
EVP, Wealth Advisory Services

**William J. Farrell II**
EVP, Corporate Client Services

**David R. Gibson**
CFO & EVP, Finance

**Michael A. DiGregorio**
EVP, Legal & Risk

---

**William B. North**
CCO, Credit Policy & Administration

**Michael J. Chandler**
Information Technology

**Rebecca A. DePorte**
Personal Financial Services

**Sam Fraundorf**
WTIM

**Jack M. Beeson Jr.**
Corporate Capital Markets

**Kevin J. Conte**
Treasurer

**Jerry A Chamberlain**
Deputy General Counsel

**I. Gail Howard**
Human Resources

**Jack Steil**
Mid-Atlantic Market

**Tony E. Guernsey**
Chief Client Officer

**James A. Combs, Jr.**
Trust & Custody Services

**John C. Evans**
General Services

**Rosemary S. Goodier**
Deputy General Counsel

**Chick L. Pinto**
Marketing

**Roger Hobby**
Northeast Region

**Cynthia L. Corliss**
Risk Management & Operations

**Todd W. Glandon**
Planning & Risk Management

**Ronald K. Pendleton**
Audit Services

**Rita C. Turner**
Client Services

**Christopher Madel**
Investment Implementation

**Donald G. Mackelcan**
Client Development Services

**Kevyn N. Rakowski**
Controller

Credit Risk Management

**Jack Sawyer**
Southeast Region

**Charlie Russella, Jr.**
Retirement & Institutional Services

**Ellen J. Roberts**
Investor Relations

**S. Allen Snook**
Chief Strategy Officer

**Christophe R. Schroeder**
Corporate Client Services Europe

**Jack Steil**
Mid-Atlantic Market

**Kemp C. Stickney**
Family Wealth

**Susan M. Stinson**
Administration/Operations

**DEFENSE EXHIBIT**
**2898**
1:15cr23 (RGA)

Internal Use Only     Rev: 17 March 2010

# EXHIBIT E

WILMINGTON TRUST CORPORATION

30-Sep-2009

PAST DUE AND NONPERFORMING LOANS

**CONFIDENTIAL**

GOVERNMENT
EXHIBIT
64
Cr. A. No. 15-23-RGA

Prepared by : Kimberly Strohmeier

Prepared by: KAS

## SUMMARY
### (000)

| As of September 30, 2009 | PAST DUE | | NONPERFORMING | | |
|---|---|---|---|---|---|
| | 30 - 89 Days | Over 90 Days | Nonaccrual | Other Real Estate Owned | TOTALS |
| COMMERCIAL, FINANCIAL & AGRIC. | 5,204 | 4,205 | 88,588 | 9,498 | 107,495 |
| REAL ESTATE - CONSTRUCTION | 5,105 | 3,993 | 190,727 | 14,929 | 214,754 |
| COMMERCIAL MORTGAGE | 3,689 | 9,188 | 50,849 | 1,390 | 65,116 |
| CONSUMER LOANS (SHAW COMM SYS) | 1,530 | 608 | 21,762 | 0 | 23,900 |
| RESIDENTIAL MORTGAGE | 26,737 | 2,896 | 12,630 | 1,783 | 44,046 |
| OPEN END | 6,296 | 3,869 | 0 | 163 | 10,328 |
| CLOSED END | 28,831 | 13,074 | 0 | 0 | 41,905 |
| SECURED BY INVESTMENT | 0 | 836 | 1,307 | 0 | 2,143 |
| TOTAL | 77,392 | 38,669 | 365,863 | 27,763 | 509,687 |

NOTE: $122 TDR - Integrated Tech, $99 TDR - -Doc  Secur Manag, $1,497 TDR - Adams, Gregory, $1,050 TDR - Thomas Williams, $28 TDR - Jennifer Friend, (000's)
and $447 TDR - Mojo Adventures Inc., $118 TDR-King, $225 TDR-McDougall, $258 TDR- Rombach are not included on this report

### HISTORY

| As of June 30, 2009 | PAST DUE | | NONPERFORMING | | |
|---|---|---|---|---|---|
| | 30 - 89 Days | Over 90 Days | Nonaccrual | Other Real Estate Owned | TOTALS |
| COMMERCIAL, FINANCIAL & AGRIC. | 9,083 | 3,019 | 87,652 | 9,782 | 109,536 |
| REAL ESTATE - CONSTRUCTION | 1,109 | 5,075 | 145,291 | 15,652 | 167,127 |
| COMMERCIAL MORTGAGE | 7,081 | 2,754 | 40,483 | 1,570 | 51,888 |
| CONSUMER LOANS (SHAW COMM SYS) | 77 | 1,230 | 10,105 | 0 | 11,412 |
| RESIDENTIAL MORTGAGE | 17,008 | 2,456 | 13,941 | 569 | 33,974 |
| OPEN END | 3,270 | 2,389 | 0 | 731 | 6,390 |
| CLOSED END | 29,057 | 9,781 | 0 | 0 | 38,838 |
| SECURED BY INVESTMENT | 0 | 25 | 1,309 | 0 | 1,334 |
| TOTAL | 66,685 | 26,729 | 298,781 | 28,304 | 420,499 |

NOTE: $128 TDR - Integrated Tech, $107 TDR - -Doc  Secur Manag, $1,455 TDR - Adams, Gregory, $1,050 TDR - Thomas Williams, $28 TDR - Jennifer Friend, (000's)
and $447 TDR - Mojo Adventures Inc. are not included on this report

### HISTORY

| As of September 30, 2008 | PAST DUE | | NONPERFORMING | | |
|---|---|---|---|---|---|
| | 30 - 89 Days | Over 90 Days | Nonaccrual | Other Real Estate Owned | TOTAL |
| COMMERCIAL, FINANCIAL & AGRIC. | 5,165 | 6,546 | 28,386 | 9,229 | 49,326 |
| REAL ESTATE - CONSTRUCTION | 696 | 5,193 | 41,058 | 5,083 | 52,030 |
| COMMERCIAL MORTGAGE | 6,225 | 2,054 | 8,607 | 0 | 16,886 |
| CONSUMER LOANS (SHAW COMM SYS) | 827 | 259 | 10,071 | 0 | 11,157 |
| RESIDENTIAL MORTGAGE | 15,958 | 1,577 | 7,532 | 0 | 25,067 |
| OPEN END | 3,926 | 2,642 | 0 | 205 | 6,773 |
| CLOSED END | 25,321 | 10,303 | 0 | 0 | 35,624 |
| SECURED WITH LIQUID COLLAT | 442 | 79 | 4,472 | 0 | 4,993 |
| TOTAL | 58,560 | 28,653 | 100,126 | 14,517 | 201,856 |

NOTE: $146 TDR - Integrated Tech are not included on this report (000's)

| | | | |
|---|---|---|---|
| L. Ashton | D. R. Gibson | M. W. Irwin | E. Roberts | T. Towe |
| T. Brewer | T. Glandon | J. Mahoney | V. Saligrama | R. C. Turner |
| R. Conway | M. A. Graham | M. B. McDonough | B. Shuts | B. Wallace |
| S. Cummings | R. V. A. Harra | W. North | D. Talbert | K. Wilkinson |
| A. M. D'Imperio | M. Infanti | K. Rakowski | K. Thuresson | M. Slijepcevic |
| P. Steinkrauss | A. Pavoni | | | |

**Commercial, Financial and Agricultural-30-89 Days**
**As of 9/30/09**

| Customer | Officer | Dollar |
|---|---|---|
| MICHEL INVESTME | CORNFORTH, DOUGLAS | 1,511,443 |
| WORLD CLASS | MCCOMMONS, PAUL | 768,396 |
| **MR. WIZARD** | **BONEV, NEVEN** | **626,617** |
| DORACON | CORNFORTH, DOUGLAS | 471,478 |
| **MORRISON SCOTT** | **WALTER, ROBERT** | **305,388** |
| LEISURE DISPOSA | SB - SOUTHWEST - ATKINS | 280,000 |
| **REGESTER G W** | **BONEV, NEVEN** | **238,512** |
| POCOJO INC | BREDA, JOHN | 165,403 |
| RN PROPERTIES L | SB-DOVER-HUGHES | 157,500 |
| DELA COMM INVST | KIRBY, A. HUGHLETT | 139,401 |
| AFFINITY VENTUR | SB - NORTHWEST - PONZO | 138,527 |
| SUPERIOR SAFETY | SB - CENTRAL - CURRY | 137,575 |
| **Total** | | **4,940,242** |
| | | |
| Other loans less than 100,000 | | 263,895 |
| | | |
| **Grand Total** | | **5,204,137** |

**BOLD -- WTFSB**

**Commercial, Financial, and Agricultural-90+ Days**
**As of 9/30/09**

| Customer | Officer | Dollars |
|---|---|---|
| **DORACON** | CORNFORTH, DOUGLAS | 1,997,175 |
| **JAKE'S HAMBURGE** | SCARPITTI, CHRIS | 669,055 |
| **SUSSEX COUNTY** | LODGE, ARTHUR E | 406,794 |
| **NEWTOWN-SLOCOMB** | MAJOR, WILLIAM | 296,086 |
| **BAY TREE** | BREDA, JOHN | 232,688 |
| **TRUE-PACK LTD** | CARLINO, MARTY | 224,641 |
| **HERR'S SERVICE** | CARLINO, MARTY | 182,799 |
| **Total** | | **4,009,239** |
| | | |
| Other loans less than 100,000 | | 195,777 |
| | | |
| **Grand Total** | | **4,205,016** |

**BOLD -- WTFSB**

Commercial, Financial and Agricultural-Nonaccrual
As of 9/30/09

| Customer | Officer | Dollars |
|---|---|---|
| 20/22 HOLLAND | ROBERTS, SHEILA | 395,061 |
| 2204 LIBERTY | GOULD,JAMES E. | 928,668 |
| ACADEMY LEARN | SBS SMYRNA | 140,430 |
| AMERICAN INVEST | DIGIOVANNI, CARLO | 59,454 |
|  | GOULD,JAMES E. | 325,328 |
| AREA UTILITIES | BIANCHINO, ANDREW | 549,868 |
| AREA UTILITIES, | BIANCHINO, ANDREW | 200,000 |
| ASSET BUILDERS | MATSKO, ROBERT | 207,859 |
| AUDIO VISUAL XP | MAJOR, WILLIAM | 355,000 |
| B B C PROP INC | KENNEY, DAVID | 100,000 |
| BRANDY CTRY CL | SCARPITTI, CHRIS | 319,037 |
| BSM OCEAN CITY | LOAN RECOVERY | 800,000 |
| BUONAMICI ENTER | TERRANOVA, JOSEPH | 182,068 |
| BUSH JOSEPH JR | ROBERTS, SHEILA | 869,888 |
| C R PLAZA II | KENNEY, DAVID | 2,441,262 |
| CARNELL K. DENN | GOULD,JAMES E. | 239,512 |
| CASTELLON RONAL | SB-DOVER-HUGHES | 132,903 |
| CLIFFORD SMITH | GOULD,JAMES E. | 112,000 |
| COMPASS POINTE | KENNEY, DAVID | 519,000 |
| CRAFTEX MILLS | SOUTHWORTH, JEFF | 1,260,000 |
| CUTLER DAVID R | UNASSIGNED (VARGO) | 831,541 |
| DATA CENTER | KENNEY, DAVID | 197,956 |
| DEL PLUMB SUPPL | BIANCHINO, ANDREW | 314,861 |
|  | SB - CENTRAL - CURRY | 100,000 |
| DELAWARE HOME | HOUGH, PHIL | 627,888 |
| DELMARVA RUBBER | MEYERS, CONNIE | 644,246 |
| DELTA ETA CORP | COX, ROBERT | 2,090,573 |
| DEVINCENTIS R E | PELLETIER, MARC | 154,873 |
| DIFELICE EILEEN | TERRANOVA, JOSEPH | 150,000 |
| DIGITAL LEGAL S | MCCOMMONS, PAUL | 100,586 |
| DISAVERIO J G | GOULD,JAMES E. | 191,591 |
| DONATO ALFRED S | GOULD,JAMES E. | 1,356,317 |
| DOWNING BRUCE | KERWIN, ALLISON | 801,735 |
| DOWNING E E INC | PELLETIER, MARC | 700,727 |
| EASTERN SHORE | KENNEY, DAVID | 533,281 |
| EASTSIDE PROPER | KENNEY, DAVID | 239,050 |
| ERICKSON | RICHARDSON, NICHOLAS C. | 1,973,643 |
| ESTATE DEVELOP | PELLETIER, MARC | 419,919 |
| FRESH CUT LAWN | LORE, ROBERT | 250,000 |
| GERACE MICHAEL | GOULD,JAMES E. | 100,000 |
| GOLDEN KEY GROU | GOULD,JAMES E. | 285,069 |
| GOLF ACADEMY DE | COX, ROBERT | 569,024 |
| GRANGER P A SR | BIANCHINO, ANDREW | 487,384 |
| HANRAHAN P J | GAST, MICHAEL | 1,991,000 |
| HANRAHAN PJ | GAST, MICHAEL | 140,380 |
| HARJIT, INC | BONEV, NEVEN | 146,963 |
| HERMAN P A | GOULD,JAMES E. | 440,000 |
| INSTALLED INTER | MEYERS, CONNIE | 220,804 |
| INTERSTATE EQUI | BIANCHINO, ANDREW | 5,417,722 |
| IONSEP CORP | PELLETIER, MARC | 82,190 |
|  | WILKINSON, KATIE | 79,759 |

**Commercial, Financial and Agricultural-Nonaccrual**
**As of 9/30/09**

| | | |
|---|---|---:|
| J & V INVESTMEN | BREDA, JOHN | 150,000 |
| JAMES ROBIN T | MCCOMMONS, PAUL | 398,478 |
| JEFONICO HOLDIN | WARRINGTON, GRAY | 950,000 |
| JENBROOKE INDUS | UNASSIGNED (VARGO) | **1,410,127** |
| K & K MANAGEMEN | TERRANOVA, JOSEPH | 651,477 |
| KJ TANS, LLC | SB - CENTRAL - CURRY | 205,434 |
| KLABE HOMES, IN | TERRANOVA, JOSEPH | 400,000 |
| KLABE WOOD CONC | TERRANOVA, JOSEPH | 747,835 |
| LEONE S J II | KENNEY, DAVID | 199,957 |
| LITTLE CREEK IN | LOAN RECOVERY | 387,135 |
| M.O.T.BUILDERS | TERRANOVA, JOSEPH | 627,755 |
| MALDANIA INC | TERRANOVA, JOHN | 284,293 |
| MARCUS WM & SON | HOUGH, PHIL | 271,571 |
| MARCUS WM H | HOUGH, PHIL | 185,000 |
| MASTERPIECE HOM | **HOWARD, ROBERT** | **244,017** |
| MCKENNA AMERICA | **BIANCHINO, ANDREW** | **2,435,811** |
| MCKENNA T | ABELSON, JEREMY | 169,384 |
| | BIANCHINO, ANDREW | 442,538 |
| MCKENNA TIMOTHY | **ABELSON, JEREMY** | **973,513** |
| MODERN PRECAST | SOUTHWORTH, GEORGE-LV | 6,302,062 |
| MOORE'S LAKE | KENNEY, DAVID | 150,000 |
| MPI MECHANICAL | COX, ROBERT | 997,112 |
| MULHOLLAND-HARP | GAST, MICHAEL | 100,000 |
| NILON J PATRICK | SCARPITTI, CHRIS | 722,244 |
| NORTH DOVER 20, | KENNEY, DAVID | 519,877 |
| OLD CUSTOMS HO | KENNEY, DAVID | 1,187,733 |
| POPPITI M A JR | BIANCHINO, ANDREW | 193,767 |
| PRETTYMAN S C | WARRINGTON, GRAY | 122,760 |
| SAMPSON SIDING | PELLETIER, MARC | 742,025 |
| SEAFORD 36, LLC | KENNEY, DAVID | 647,285 |
| SHOPPES AT FIEL | KENNEY, DAVID | 278,535 |
| SNAVELY DENNIS | HOUGH, PHIL | 462,453 |
| STANLEY BLDRS | HOUGH, PHIL | 373,109 |
| STUART DISCOUNT | **GILLESPIE, TIMOTHY** | **125,317** |
| THOMPSON & ASSO | COX, ROBERT | 174,500 |
| TOUHILL WOODWOR | **LYNAHAN, PAUL** | **139,974** |
| VANESCHAK JON N | SMITH, GREG | 654,032 |
| WOODSIDE PARK | KENNEY, DAVID | 480,000 |
| WRIGHT RM SR | SB - SOUTHWEST - ATKINS | 158,562 |
| WSJS ENTERPRISE | MEYERS, CONNIE | 193,723 |
| WYNSTONE DEVEL | ECKARDT, CHRIS | 2,579,047 |
| ZIM HOTEL LLC | KENNEY, DAVID | 200,000 |
| ZIMMERMAN M A | KENNEY, DAVID | 439,823 |
| MAGNOLIA REALTY | BASS-DANDRIDGE, DELIA | 400,000 |
| FREEDMAN CARL | KWIATEK, SCOTT | 254,750 |
| SATTERFIELD DEV | KIRBY, A. HUGHLETT | 314,840 |
| PARADOCX | SIEK, ROBERT | 100,000 |
| ACTION ENTERPR | TERRANOVA, JOHN | 249,902 |
| **Total** | | **62,174,180** |
| | | |
| Other loans less than 100,000 | | 1,855,244 |
| | | |
| **Grand Total** | | **64,029,424** |

**BOLD -- WTFSB**

**Commercial, Financial and Agricultural-Nonaccrual**
**As of 9/30/09**

FLOOR PLAN

| Customer | Loan Officer | Dollars |
|---|---|---|
| Infiniti of West Chester | Roberts | 7,512,745 |
| Infiniti of Ardmore, Inc. | Roberts | 6,153,479 |
| Thomas Chevrolet Automotive | Roberts | 2,559,336 |
| Thomas Subaru | Roberts | 2,436,262 |
| Thomas Automotive | Roberts | 2,067,025 |
| Thomas Cars of Johnstown | Roberts | 2,417,521 |
| Slicers Travel Trailers | Bradley | 781,102 |
| Thomas Ford of McConnellsburg, LLC. | Roberts | 630,084 |
| Other loans less than 100,000 | | - |
| | | |
| TOTAL | | 24,557,554 |
| | | |
| **TOTAL CF & A and Floor Plan** | | 88,586,978 |

**BOLD -- WTFSB**

**Real Estate Construction-30-89 days**
**As of 9/30/09**

| Customer | Officer Name | Dollars |
|---|---|---|
| CI & S, LLC | WARRINGTON, GRAY | 5,105,768 |
| **Total** | | **5,105,768** |
| Other loans less than 100,000 | | - |
| **Grand Total** | | **5,105,768** |

**BOLD -- WTFSB**

**Real Estate Construction-90+ days**
**As of 9/30/09**

| Customer | Officer Name | Dollars |
|---|---|---|
| **DISABATINO VENT** | KIRBY, A. HUGHLETT | 1,744,818 |
| **FLEMING LINT** | SMITH, GREG | 890,210 |
| **BARROS HARRING** | MATSKO, ROBERT | 675,000 |
| **PARSONS ROAD DE** | **ABELSON, JEREMY** | **273,596** |
| **GEIGER DAVID H** | HOUGH, PHIL | 249,000 |
| **B. G. JOSEPH** | LORE, ROBERT | 160,650 |
| **Total** | | **3,993,274** |
| | | |
| Other loans less than 100,000 | | - |
| | | |
| **Grand Total** | | **3,993,274** |

**BOLD -- WTFSB**

**Real Estate Construction-Nonacrual**
**As of 9/30/09**

| Customer | Officer | Dollars |
|---|---|---|
| SHOPPES AT FIEL | KENNEY, DAVID | 15,354,789 |
| LA GRANGE COMM | HAYES, PETE | 13,227,597 |
| 3 SEASONS, LLC | BAPTISTA, MIGUEL | 10,316,477 |
| BENTLEY HOMES | DIGIOVANNI, CARLO | 9,415,385 |
| ERICKSON | RICHARDSON, NICHOLAS C. | 8,741,905 |
| HKS PROPERTIES, | LODGE, ARTHUR E | 8,520,000 |
| GARRISON/HARRIN | MATSKO, ROBERT | 7,661,971 |
| HERITAGE-COUNTR | HARTIN, GREG | 7,629,295 |
| CS II/CRANE LP | HARTIN, GREG | 7,318,167 |
| COMPASS POINTE | LOAN RECOVERY | 250,561 |
|  | TERRANOVA, JOSEPH | 6,000,000 |
| KLABE HOMES, IN | TERRANOVA, JOSEPH | 6,193,450 |
| EW PARTNERS, LL | SARACO, MICHAEL | 5,914,503 |
| MILLWOOD CROSS | KIRBY, A. HUGHLETT | 5,580,833 |
| CIRCLE J DEVELO | MATSKO, ROBERT | 5,136,930 |
| ASHBURN CAMPUS | RICHARDSON, NICHOLAS C. | 5,087,400 |
| HKS 4, LLC | LODGE, ARTHUR E | 5,065,138 |
| FURST GERALD C | LODGE, ARTHUR E | 4,200,000 |
| CLYMER-RUSH | HARTIN, GREG | 3,408,847 |
| MEARS FARM LLC | MATSKO, ROBERT | 3,394,000 |
| ESTATES OF WILD | MATSKO, ROBERT | 3,265,695 |
| CASCADES LLC | MATSKO, ROBERT | 3,050,000 |
| STAGE ROAD, LLC | LODGE, ARTHUR E | 2,796,708 |
| WESTOVER LLC | HOUGH, PHIL | 2,655,114 |
| ZIM HOTEL LLC | KENNEY, DAVID | 2,500,000 |
| COLUMBUS CAMPUS | RICHARDSON, NICHOLAS C. | 2,483,648 |
| STRATFORD VILLA | KIRBY, A. HUGHLETT | 2,476,500 |
| ZOAR ESTATES | LORE, ROBERT | 2,261,350 |
| COLLEGIAN PLAZA | KENNEY, DAVID | 2,188,826 |
| STANLEY BLDRS | HOUGH, PHIL | 2,142,745 |
| KANSAS CAMPUS | RICHARDSON, NICHOLAS C. | 2,009,739 |
| SOUTH SHORE BUI | TERRANOVA, JOSEPH | 1,786,790 |
| BARON HOME BUIL | **SCARPITTI, CHRIS** | **1,678,847** |
| HKS 2, LLC | LODGE, ARTHUR E | 1,665,183 |
| OFFSHORE VENTUR | LORE, ROBERT | 1,519,700 |
| QSM REAL ESTATE | STILLINGS, MARY | 1,229,964 |
| HERITAGE-COVENT | HARTIN, GREG | 1,224,513 |
| GRANGER P A SR | BIANCHINO, ANDREW | 1,193,137 |
| DATA CENTER | KENNEY, DAVID | 1,157,328 |
| HERITAGE COMMON | **HARTIN, GREG** | **1,055,091** |
| MARCUS WM & SON | HOUGH, PHIL | 1,040,361 |
| ROUTE 30, L.L.C | TERRANOVA, JOSEPH | 1,020,005 |
| C R PLAZA, LLC | KENNEY, DAVID | 1,000,000 |
| EASTSIDE PROPER | KENNEY, DAVID | 963,461 |
| ROSEMARK BUILD | HOUGH, PHIL | 837,076 |
| ROSEMARK DEVELO | HOUGH, PHIL | 835,090 |
| GEFTMAN & ASSOC | **DIGIOVANNI, CARLO** | **800,000** |
| LHID MEARFIELD | MATSKO, ROBERT | 570,474 |
| HARTLY TOWN CEN | KENNEY, DAVID | 545,118 |
| HAMILTON/HARRIN | MATSKO, ROBERT | 544,704 |
| THOMPSON JOHN M | HOWARD, ROBERT | 507,967 |

**Real Estate Construction-Nonacrual**
**As of 9/30/09**

| | | |
|---|---|---:|
| FERRARO JA | SMITH, GREG | 488,733 |
| **MID-ATLANTIC** | **WARRINGTON, GRAY** | **480,026** |
| NORTHGATE | ECKARDT, CHRIS | 390,713 |
| CORNERSTONE CON | BREDA, JOHN | 313,768 |
| **GEFTMAN BARRY** | **C/L RECOVERY** | **280,000** |
| HERITAGE AT RAV | HARTIN, GREG | 265,099 |
| DUFF LETITIA | RESIDENTIAL MORTGAGE | 235,700 |
| A & B BUILDERS | SMITH, GREG | 229,917 |
| J & V INVESTMEN | BREDA, JOHN | 195,506 |
| ASSET BUILDERS | MATSKO, ROBERT | 149,768 |
| K & K MANAGEMEN | TERRANOVA, JOSEPH | 144,440 |
| DEVINCENTIS R E | PELLETIER, MARC | 110,873 |
| **Total** | | **190,706,929** |
| | | |
| Other loans less than 100,000 | | 19,498 |
| | | |
| **Grand Total** | | **190,726,427** |

**BOLD -- WTFSB**

**Commercial Mortage-30-89 days**
**As of 9/30/09**

| Customer | Officer | Dollars |
|---|---|---|
| PJK LLC | BIANCHINO, ANDREW | 1,500,000 |
| **GARY W. REGESTE** | **BONEV, NEVEN** | **849,557** |
| KST, LLC | BIANCHINO, ANDREW | 397,995 |
| ATLANTIC PROPER | COX, ROBERT | 280,485 |
| ROSENBLIT R C | BREDA, JOHN | 248,633 |
| SHANTON, LLC | MAJOR, WILLIAM | 209,637 |
| RENNER'S PAVING | COX, ROBERT | 110,562 |
| Total | | **3,596,869** |
| | | |
| Other loans less than 100,000 | | 92,549 |
| | | |
| Grand Total | | **3,689,418** |

**BOLD -- WTFSB**

**Commerical Mortgage-90+ days**
**As of 9/30/09**

| Customer | Officer | Dollars |
|---|---|---|
| BAY TREE | BREDA, JOHN | 2,186,606 |
| FAM ENTERPRISES | SMITH, GREG | 1,988,858 |
| DORACON | CORNFORTH, DOUGLAS | 1,440,274 |
| SAHM WILLIAM | SIEK, ROBERT | 860,017 |
| REGESTER G W | **BONEV, NEVEN** | **796,557** |
| MOLLANA, LLC | HOUGH, PHIL | 473,723 |
| JOSEPH CONSTR | LORE, ROBERT | 319,605 |
| RESTORATION WO | SB - BRANDYWINE - CARROLL | 311,628 |
| FOGARTY MICHAEL | SMITH, GREG | 227,078 |
| RENNER BRUCE R | COX, ROBERT | 199,358 |
| J.S.F. PROPERTI | BIANCHINO, ANDREW | 195,058 |
| GEMNI, LLC | CARLINO, MARTY | 189,449 |
| **Total** | | **9,188,209** |

Other loans less than 100,000                     -

| **Grand Total** | | **9,188,209** |

**BOLD -- WTFSB**

Commercial Mortgage-Nonaccrual
As of 9/30/09

| Customer | Officer | Dollars |
|---|---|---|
| 306 WEST LANCAS | ROBERTS, SHEILA | 5,000,000 |
| WEST FAMILY | SOUTHWORTH, GEORGE-LV | 4,980,682 |
| BRANDY CTRY CL | SCARPITTI, CHRIS | 4,254,576 |
| J & V INVESTMEN | BREDA, JOHN | 2,934,322 |
| JENBROOKE PROP | **UNASSIGNED (VARGO)** | **2,685,955** |
| THOMAS CHEVROLE | ROBERTS, SHEILA | 2,635,605 |
| JOHNSTOWN DEALE | ROBERTS, SHEILA | 2,472,016 |
| BENTLEY FAMILY | DIGIOVANNI, CARLO | 2,245,231 |
| THOMAS SUBARU O | ROBERTS, SHEILA | 1,851,210 |
| ASSET BUILDERS | MATSKO, ROBERT | 1,842,526 |
| SEAFORD GOLF | WARRINGTON, GRAY | 1,840,735 |
| GRANGER P A SR | BIANCHINO, ANDREW | 1,562,268 |
| FLETCHER RODNEY | MEYERS, CONNIE | 1,325,231 |
| MOORE'S LAKE | KENNEY, DAVID | 1,195,704 |
| HASSAN MALIK | WARRINGTON, GRAY | 950,000 |
| FLINT HILL | SIEK, ROBERT | 873,192 |
| SEAHAWK LLC | HURD, BEN | 865,952 |
| OUTDOORS, INC., | BRADLEY, PAUL | 790,407 |
| KEMBLESVILLE PA | SIEK, ROBERT | 771,013 |
| K & K MANAGEMEN | TERRANOVA, JOSEPH | 705,730 |
| SLICERS CAMPING | BRADLEY, PAUL | 571,391 |
| J&V CO OF OC LL | BREDA, JOHN | 546,688 |
| HASTINGS H S JR | WARRINGTON, GRAY | 528,525 |
| WOODWERX | MATSKO, ROBERT | 525,677 |
| P C SUPPLIES | HOUGH, PHIL | 524,891 |
| TAYLOR E S | COX, ROBERT | 508,269 |
| BREAKWATER LMTD | LORE, ROBERT | 396,206 |
| MANCINI AE REV | BONEV, NEVEN | 370,743 |
| PATTERSON DEBOR | BREDA, JOHN | 367,305 |
| ROCKFORD CARE | HOUGH, PHIL | 358,756 |
| SARITSOGLOU S | **GOULD,JAMES E.** | **320,000** |
| MILLTOWN PLAZA | BASS-DANDRIDGE, DELIA | 294,129 |
| PARADOCX | SIEK, ROBERT | 277,992 |
| BUONAMICI ENTER | **TERRANOVA, JOSEPH** | **273,520** |
| SARITSOGLOU H | **GOULD,JAMES E.** | **250,000** |
| DEL PLUMB SUPPL | LOAN RECOVERY | 250,000 |
| DHARIWAL B LLC | BONEV, NEVEN | 241,314 |
| CARRILLO JOSE A | SB - SOUTHWEST - ATKINS | 202,565 |
| CREEKSIDE HOMES | LORE, ROBERT | 197,737 |
| WHALEY'S SEED | WARRINGTON, GRAY | 194,399 |
| KAISER MACHINE | LYNAHAN, PAUL | 175,337 |
| ARENTZEN AF | **GOULD,JAMES E.** | **175,000** |
| CUSUMANO LUDOVI | SB-DOVER-HUGHES | 4,600 |
|  | WARRINGTON, GRAY | 159,994 |
| ESCARO ROMEO A | C/L - LOAN RECOVERY | 164,339 |
| MURRAY WADE | **GOULD,JAMES E.** | **154,208** |
| WSJS ENTERPRISE | MEYERS, CONNIE | 115,378 |
| FULL CIRCLE CON | CARLINO, MARTY | 113,445 |
| BLM ENTERPRISES | **C/L RECOVERY** | **103,000** |
| AMIRY MOHAMED | BRADLEY, PAUL | 100,000 |
| **Total** |  | **50,247,764** |
| | | |
| Other loans less than 100,000 |  | 600,783 |
| | | |
| **Grand Total** |  | **50,848,547** |

BOLD -- WTFSB

**Consumer(in comm system)-30-89 days**
**As of 9/30/09**

| Customer | Officer | Dollars |
|---|---|---|
| **BROWN MARK B** | SIEK, ROBERT | 800,369 |
| **MOSCHARIS V** | GOULD,JAMES E. | 599,696 |
| **PIZZADILI W** | MATSKO, ROBERT | 129,739 |
| **Total** | | **1,529,804** |
| Other loans less than 100,000 | | - |
| **Grand Total** | | **1,529,804** |

**BOLD -- WTFSB**

**Consumer (in comm system)-90+ days**
**As of 9/30/09**

| Customer | Officer | Dollars |
|---|---|---|
| **SLATER GB** | WARRINGTON, GRAY | 298,894 |
| **HEALY EA** | FL LOAN PORTFOLIO | 236,881 |
| **Total** | | **535,775** |
| Other loans less than 100,000 | | 71,999 |
| **Grand Total** | | **607,774** |

**BOLD -- WTFSB**

Consumer (in comm system)-Nonaccrual
As of 9/30/09

| Customer | Officer | Dollars |
|---|---|---|
| BRESLER C S WTC | WILKINSON, DAVE | 8,975,505 |
| MORELLO T E | GOULD,JAMES E. | 3,701,930 |
| HERMAN P A | GOULD,JAMES E. | 2,000,000 |
| HOFFMAN DAVID F | SIEK, ROBERT | 1,581,519 |
| MANEY C J | CARLINO, MARTY | 966,766 |
| **QUINN JP** | **GOULD,JAMES E.** | **936,299** |
| **GALL STEVEN A** | **GOULD,JAMES E.** | **600,000** |
| **FRUEHLING J** | **GOULD,JAMES E.** | **523,250** |
| **BUSH JOSEPH JR** | **ROBERTS, SHEILA** | **360,000** |
| WEST M E | KENNEY, DAVID | 353,941 |
| **SHERIDAN FE** | **GOULD,JAMES E.** | **319,125** |
| **GEFTMAN BARRY** | **STUART, NICOLE** | **291,179** |
| **SARITSOGLOU H** | **GOULD,JAMES E.** | **175,000** |
| **DISAVERIO J G** | **GOULD,JAMES E.** | **138,866** |
| DIFRANCESCO J T | TERRANOVA, JOSEPH | 124,740 |
| **ROSEN WAYNE J** | **GOULD,JAMES E.** | **118,223** |
| **EMPLOYMENT LOAN** | **HOSTETTER, CARL** | **118,000** |
| **Total** | | **21,284,341** |
| Other loans less than 100,000 | | 477,882 |
| **Grand Total** | | **21,762,223** |

BOLD -- WTFSB

**Secured by Investment-30-89 days**
**As of 9/30/09**

| Customer | Officer | Dollars |
|---|---|---|
| **Total** | | |
| Other loans less than 100,000 | | - |
| **Grand Total** | | - |

**BOLD -- WTFSB**

**Secured by Investment-90+ days**
**As of 9/30/09**

| Customer | Officer | Dollars |
|---|---|---|
| **DUFFY JAMES P** | **STUART, NICOLE** | 835,579 |
| **Total** | | 835,579 |
| Other loans less than 100,000 | | - |
| **Grand Total** | | 835,579 |

**BOLD -- WTFSB**

**Secured by Investment-Nonaccrual**
**As of 9/30/09**

| Customer | Officer | Dollars |
|---|---|---|
| **GEFTMAN BARRY C** | **STUART, NICOLE** | **1,077,172** |
| DATA CENTER | KENNEY, DAVID | 198,440 |
| **Total** | | **1,275,612** |
| Other loans less than 100,000 | | 31,712 |
| **Grand Total** | | **1,307,324** |

**BOLD -- WTFSB**

**Residential Mortgages - 90+ days**
**As of 9/30/09**

| Customer | Dollar | Officer |
|---|---|---|
| **Citimortgage-20511** | **517,196** | **Citimortgage** |
| CUDJOE CA | 304,175 | M. Speary |
| HARKINS JR | 230,841 | D. Byrom |
| **Citimortgage-20510** | **216,225** | **Citimortgage** |
| WILSON SR | 206,223 | M. Speary |
| OWENS C | 180,780 | J. Brittingham |
| BLEYER SM | 166,834 | R. Hoban |
| MURPHY CL | 153,591 | M. Speary |
| WILLIS J | 143,458 | D. Byrom |
| GARNICK L | 132,663 | L. Bernhardt |
| PATTERS M | 106,740 | R. Johnson |
| LAKE L | 106,646 | J. Brittingham |
| | | |
| Other loans less than 100,000 | 431,000 | |
| | | |
| **TOTAL** | **2,896,370** | |

**BOLD -- WTFSB**

**Residential Mortgages - Nonaccrual**
**As of 9/30/09**

| Customer | Dollar | OFFICER |
|---|---|---|
| GEFTMAN BC | 953,166 | E. Challenger |
| Citimortgage-20511 | 829,891 | Citimortgage |
| **SLAGLE GM** | 816,715 | **C. Roe** |
| **COHEN B** | 415,288 | R. Hoban |
| **SCHEETZ MA** | 387,023 | **C. Roe** |
| MORETTO JJ | 325,870 | D. Byrom |
| **BERKAUZ JP** | 307,647 | **R. Hoban** |
| **MENDEK JM** | 291,185 | **R. Hoban** |
| DILLARD L | 281,183 | W. Moore |
| **SCOTT MA** | 255,175 | S. Curran |
| **MORETTO JJ** | 249,662 | **D. Byrom** |
| **REID JR SS** | 240,000 | **R. Johnson** |
| PRICE DE | 235,010 | M. Petroski |
| OLDHAM K | 230,945 | M. Speary |
| PALMER W | 222,122 | R. Hoban |
| O'CONNO JA | 221,036 | D. Byrom |
| CHRZANO JA | 219,547 | R. Hoban |
| ELLERBE CR | 208,105 | R. Hoban |
| MURPHY JM | 196,907 | V. Boyle |
| LEVASSE CA | 191,755 | C. Roe |
| TAYLOR SC | 190,314 | M. Speary |
| MARIANO RA | 189,183 | M. Speary |
| WILLIAM AM | 182,561 | L. Bernhardt |
| WEBER DJ | 182,301 | M. Speary |
| KIDD KE | 179,600 | M. Speary |
| MYERS RE | 167,207 | L. Bernhardt |
| **GORMAN MJ** | 167,069 | **R. Johnson** |
| NGOME M | 163,357 | R. Hoban |
| MOXLEY LL | 163,077 | D. Byrom |
| ANDERSO SL | 159,793 | M. Speary |
| SOTO G | 157,029 | C. Roe |
| TUONI PC | 148,942 | R. Hoban |
| WILLIAM SG | 148,863 | R. Johnson |
| **SHANABE ZS** | 147,608 | **C. Roe** |
| THOMPSO L | 143,736 | D. Byrom |
| WILMORE JW | 143,551 | J. Naachia |
| KING K | 141,091 | W. Johnson |
| WILLIAM MS | 135,360 | L. Bernhardt |
| BERRYMA PM | 123,019 | E. Challenger |
| CLARK TM | 122,904 | P. Feeheley |
| Borders | 121,352 | Wells Fargo |
| LIVELY BA | 119,744 | R. Hoban |
| BUTTS R | 112,112 | G. Frederick |
| BURKE CJ | 102,855 | R. Johnson |
| CHAPMAN G | 101,923 | G. Frederick |
| | | |
| Other loans less than 100,000 | 1,836,998 | |
| | | |
| **TOTAL** | 12,629,781 | |

**BOLD -- WTFSB**