# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**UNITED STATES OF AMERICA**,

v.

**DAVID GIBSON,**
**ROBERT V.A. HARRA,**
**WILLIAM B. NORTH**, and
**KEVYN N. RAKOWSKI**
       Defendants.

Criminal Action No. 15-23-RGA

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' RENEWED POST-TRIAL MOTIONS

Respectfully Submitted,

DAVID C. WEISS
United States Attorney

By: _____/s/_____
Robert F. Kravetz
Lesley F. Wolf
Jamie M. McCall
Assistant United States Attorneys

July 3, 2018

# Table of Contents

STANDARD OF REVIEW .................................................................................................1

I. Rule 29. ...........................................................................................................................1

II. Rule 33.  ..........................................................................................................................3

PROCEDURAL HISTORY..............................................................................................3

ARGUMENT ....................................................................................................................5

*Falsity* .................................................................................................................................5

I. The Court Correctly Determined That "Past Due" Status is Not Ambiguous and the
Defendants' Convictions Did Not Violate Due Process.  ...................................................5

II. The Government Presented Sufficient Evidence That Defendants Knew That the
Bank's Past Due Loan Information Was False.  ..............................................................15

     A. Defendant Rakowski. ................................................................................................20

     B. Defendant Gibson. ....................................................................................................24

     C. Defendant North.   ....................................................................................................26

     D. Defendant Harra. ......................................................................................................27

III. The Defendants' Convictions Do Not Violate Due Process. ....................................30

*Criminal Intent* .............................................................................................................32

*Capital Raise – Scheme to Defraud (Count 2)* ...........................................................39

I. Sufficient Evidence Supports Defendants' Conviction on the Scheme to Defraud
and False and Fraudulent Misrepresentations Theories. .................................................39

II. Sufficient Evidence Supports North's Conviction on Count 2.  ................................43

*Conspiracy* ....................................................................................................................45

I. Legal Standard.  ............................................................................................................46

II. The Government Presented Sufficient Evidence of a Conspiratorial Agreement and
Each Defendant's Criminal Intent to Join That Agreement. ...........................................47

*Accomplice Liability (North)*  .....................................................................................53

*False Certification Convictions (Gibson)* ..................................................................55

I. The Government Produced Sufficient Evidence the Defendant Gibson Knew of the
Requirements of Section 13(a) and 15(d) of the Exchange Act. .....................................59

II. There is Sufficient Evidence that Defendant Gibson Knew That the Section 1350
Certifications Were False. ...............................................................................................61

*Variance* .........................................................................................................................62

I. There Was No Evidence of a Separate Bailey/Terranova "Conspiracy" That Prejudiced
Defendants. .......................................................................................................................63

II. There is No Variance Between the Government's Charged Theory of Falsity
and its Proof at Trial. .......................................................................................................69

III. Defendant North's Miscellaneous Variance Arguments Are Meritless. ................72

CONCLUSION.................................................................................................................74

# TABLE OF AUTHORITIES

**Federal Cases**

*Ali v. Fed. Bur. of Prisons*, 552 U.S. 214 (2008) ........................................................ 11

*Am. Commc'ns Ass'n v. Douds,* 339 U.S. 382 (1950) ................................................... 20

*Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) ....................................... 59

*Berger v. United States*, 295 U.S. 78 (1935) ............................................................... 72

*Bonkowski v. Oberg Industries, Inc.*, 787 F.3d 190 (3d Cir. 2015) ............................. 10

*Bryan v. United States*, 524 U.S. 184 (1998) ............................................................... 16

*Government of Virgin Islands v. Derricks,* 810 F.2d 50 (3d Cir. 1987) ........................ 3

*Griffin v. United States*, 502 U.S. 46 (1991) ................................................................ 40

*Liparota v. United States*, 471 U.S. 419 (1985) ........................................................... 16

*Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001 (3d Cir. 1980) ...... 10

*Musacchio v. United States*, 136 S Ct. 709 (2016) ................................................. 57, 58

*United States v. Andrews*, 681 F.3d 509 (3d Cir. 2012) .............................................. 62

*United States v. Boyer*, 692 F.2d 58 (3d Cir. 1982) .................................................... 33

*United States v. Brennan*, 326 F.3d 176 (3d Cir. 2003) ................................................ 3

*United States v. Brodie*, 403 F.3d 123 (3d Cir. 2005) ........................................ *passim*

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) ............................................ 18, 21

*United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013) (en banc) ...........2

*United States v. Castro*, 776 F.2d 1118 (3d Cir. 1985) ............................................... 62

*United States v. Curran, 20* F.3d 560 (3d Cir. 1994) ................................................... 16

*United States v. Dent*, 149 F.3d 180 (3d Cir. 1998) ......................................................3

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) ................................................ 70

*United States v. Freeman*, 763 F.3d 322 (3d Cir. 2014) .............................................. 63

*United States v. Fumo*, 655 F.3d 288 (3d Cir. 2011) ................................................... 22

*United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018) ................................................. 51

*United States v. Gebbie*, 294 F.3d 540 (3d Cir. 2002) ..................................... 46, 47, 52

*United States v. Haddy*, 134 F.3d 542 (3d Cir. 1998) .................................................... 40

*United States v. Hakim*, 344 F.3d 324 (3d Cir. 2003) .................................................. 68

*United States v. Iafelice,* 978 F.2d 92 (3d Cir. 1992) ......................................................2

*United States v. Iglesias,* 535 F. 3d 150 (3d Cir. 2008) ...................................................2

*United States v. Jannotti,* 673 F. 2d 578 (3d Cir. 1982) ..................................................2

*United States v. Johnson,* 302 F. 3d 139 (3d Cir. 2002) ..................................................3

*United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989) .................................................... 64

*United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007) ...................................... 66, 67, 68

*United States v. Klausner*, 80 F.3d 55 (2d Cir. 1996) .................................................. 20

*United States v. Lanier*, 520 U.S. 259 (1997) ............................................................. 30

*United States v. Mastrangelo*, 172 F.3d 288 (3d Cir. 1999) ....................................... 46

*United States v. McGlory*, 968 F.2d 309 (3d Cir. 1992) .............................................. 46

*United States v. Montani*, 204 F.3d 761 (7th Cir. 2000) ............................................. 66

*United States v. Moyer*, 674 F.3d 192 (3d Cir. 2012) ............................................ 31, 34

*United States v. Pearlstein,*576 F.2d 531 (3d Cir. 1978) .......................................... 50, 51

*United States v. Pressler,*256 F.3d 144 (3d Cir. 2001) ............................................ 50, 51

*United States v. Prigmore*, 243 F.3d 1 (1st Cir. 2001) ..................................... *passim*

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) .................................................. 70

*United States v. Salahuddin*, 765 F.3d 329 (3d Cir. 2014) ............................................2

*United States v. Santos,*20 F.3d 280 (7th Cir. 1994) ......................................................3

*United States v. Smith,* 294 F.3d 473 (3d Cir. 2002) .......................................2, 47, 52

*United States v. Starnes*, 583 F.3d 196 (3d Cir. 2009) ................................... *passim*

*United States v. Syme*, 276 F.3d 131 (3d Cir. 2002) ...................................... *passim*

*United States v. Toll*, 804 F.3d 1344 (11th Cir. 2015) ............................................... 70

*United States v. Tyson*, 653 F.3d 192 (3d Cir. 2010) .............................................. 50, 51

*United States v. Universal Rehab. Servs.* (PA), Inc., 205 F.3d 657 (3d Cir. 2000) .................... 66

*United States v. Wexler*, 838 F.2d 88 (3d Cir. 1988) .................................................. 46

*United States v. Vosburgh*, 602 F.3d 512 (3d Cir. 2010) .............................................................62

**Federal Statutes**

15 U.S.C. § 78m(a) ....................................................................................... *passim*

15 U.S.C. § 78o(d) ....................................................................................... *passim*

18 U.S.C. § 371 ................................................................................................. 16

18 U.S.C. § 1001 ............................................................................................... 16

18 U.S.C. § 1350 ................................................................................. 55, 56, 57

18 U.S.C. § 1348 .................................................................................... 49, 50

18 U.S.C. § 1350(a) ....................................................................... *passim*

**Other**

2A Charles A. Wright, Fed. Prac. & Pro. (Criminal 3d) § 467 (2000) ...........................................2

Federal Rule of Criminal Procedure 29 ...................................................................................1, 2

Federal Rule of Criminal Procedure 33 ..................................................................................... 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| v. | Criminal Action No. 15-23-RGA |
| **DAVID GIBSON,**<br>**ROBERT V.A. HARRA,**<br>**WILLIAM B. NORTH**, and<br>**KEVYN N. RAKOWSKI**<br>Defendants. | |

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' RENEWED POST-TRIAL MOTIONS

The seven-week trial required the jury to resolve factually-intensive, vigorously-contested evidence regarding Defendants' knowledge and criminal intent.  By their verdict, the jury unequivocally resolved these issues in the government's favor.  *See United States v. Syme*, 276 F.3d 131, 147 (3d Cir. 2002) (stating that courts presume that juries are able to resolve highly-disputed issues of fact).  Now, post-trial, Defendants once again ask the Court to invalidate the jury's reasoned conclusion and to reweigh the same trial evidence in Defendants' favor.  But, for the reasons set forth below, their request is unsupported by the facts and controlling law.  Therefore, the government respectfully requests that the Court deny the Motions.

## STANDARD OF REVIEW

**I.    Rule 29.**

Under Federal Rule of Criminal Procedure 29 ("Rule 29"), a defendant may move for "judgment of acquittal of any offense for which the evidence is insufficient to sustain a

conviction." Fed. R. Crim. P. 29(a). In ruling on the motion, the court must "review the record in the light most favorable to the prosecution to determine whether <u>any rational trier of fact</u> could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations and quotations omitted) (emphasis added). The government may defeat a sufficiency of the evidence challenge on circumstantial evidence alone. *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008). A finding of insufficiency is only reserved for cases where "the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002). Therefore, the "burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Salahuddin*, 765 F.3d 329, 348 (3d Cir. 2014).

In performing a Rule 29 analysis, the Third Circuit has instructed district courts to be "ever vigilant" not to "usurp the role of the jury by weighing credibility and assigning weight to the evidence." *Brodie*, 403 F.3d at 133. This is because "we trust jurors to judge the evidence." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (*en banc*). Thus, a district court goes too far by deciding contested issues of fact, or requiring the government's evidence to "foreclose every possibly innocent explanation" for a defendant's conduct. *Brodie*, 403 F.3d at 133; *United States v. Iafelice*, 978 F.2d 92, 97 n.3 (3d Cir. 1992); *United States v. Jannotti*, 673 F.2d 578, 581 (3d Cir. 1982) (en banc) (holding that the trial court usurped jury function by deciding contested issues of fact), *cert. denied*, 457 U.S. 1106 (1982); *see also* 2A Charles A. Wright, Fed. Prac. & Pro. (Criminal 3d) § 467 at 311 (2000) ("A number of familiar rules circumscribe the court in determining whether the evidence is sufficient ... It is not for the court to assess the credibility of witnesses, weigh the evidence or draw inferences of fact from the evidence. These are functions of the jury."). The fact that a defendant may point to

evidence that "also permits a less sinister conclusion is immaterial." *United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998).

## II.     Rule 33.

Federal Rule of Criminal Procedure 33 ("Rule 33") states that the court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Although the Court does not view the evidence under Rule 33 in the light most favorable to the government, relief on the grounds that the jury's verdict was contrary to the weight of the evidence is reserved for limited circumstances.  "A district court can order a new trial on the grounds that the jury's verdict is contrary to the weight of the evidence only if it believes that 'there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.'"  *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). In other words, motions for a new trial on the grounds that the verdict is contrary to the weight of the evidence "are not favored," and "are to be granted sparingly and only in exceptional cases." *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (quoting *Government of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted)).

## PROCEDURAL HISTORY

On August 2, 2016, a federal grand jury returned a nineteen-count Third Superseding Indictment.  D.I. 243 (the "Indictment").  The Indictment charged Defendants and the Wilmington Trust Corporation with an overarching conspiracy offense, in violation of 18 U.S.C. § 371 (Count 1); as well as fifteen additional fraud, false statements, and false entries offenses, in violation of 18 U.S.C. § 1001 (Counts 5 and 11-16), 1005 (Counts 7-10), 1348 (Count 2), and 15 U.S.C. § 78m (Counts 3, 4 and 6), respectively.  The Indictment further charged Defendant

Gibson with making false certifications in financial reports, in violation of 18 U.S.C. § 1350 (Counts 17-19).

Prior to the original trial date, the Court dismissed Wilmington Trust Corporation as a criminal defendant upon the government's motion after it entered into a Settlement Agreement and consented to a forfeiture action.  D.I. 583.  The Court thereafter rescheduled trial to begin against the remaining individual Defendants on March 5, 2018.

Following jury selection, trial commenced on March 12, 2018.  On April 11, 2018, the government rested its case-in-chief.  Each Defendant filed motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a).  *See* D.I. 743 (Defendant North); D.I. 744 (Defendant Rakowski); D.I. 745 (Defendant Harra); D.I. 746 (Defendant Gibson).  On April 15, 2018, the government filed an Omnibus Response.  D.I. 749.  The Court held argument on the motions on April 16, 2018.  The next day, April 17, 2018, the Court concluded that the government presented sufficient evidence as to each of the offenses "other than the mental states of the defendants," stating:

> So first on the Rule 29 motion for acquittal and judgment of acquittal, I'm fairly convinced that the Government has put forth enough evidence **on all relevant issues other than essentially the mental state of the defendants**, which I am – I have not thought about this, and having heard arguments all day yesterday, is incredibly to me a factually complex[] question, and not one that I can definitively resolve in any reasonable amount of time, and unless I were confident that the defendants were right, which I'm not, I really have no choice but to defer ruling on it. So that's what I'm going to do.

Tr. 6348:8-18 (emphasis added).

Trial resumed that same day with a one-day defense case-in-chief.  The government did not present a rebuttal case, and the parties submitted their closing arguments to the jury between

4

April 23-25, 2018.  On May 3, 2018, the jury returned guilty verdicts against Defendants on each count of the Indictment.  *See* D.I. 775 (Verdict Form).[1]

Following trial, Defendants filed a Joint Motion for Judgment of Acquittal pursuant to Rule 29(c) and for a New Trial pursuant to Rule 33.  *See* D.I. 816.  The Court requested briefing on the motion, and Defendants submitted separate briefs (each of which joined the arguments of the other Defendants) on June 8, 2018.  *See* D.I. 824 (Defendant Rakowski); D.I. 825 (Defendant North); D.I. 826 (Defendant Harra); and D.I. 827 and 828 (Defendant Gibson).

## ARGUMENT

Defendants advance a number of arguments in support of their post-trial motions.  To the extent possible, this Omnibus Response addresses overlapping defense arguments collectively – with references as to the sufficiency of the evidence as against each Defendant within each category.[2]  The Omnibus Response further addresses separate sufficiency arguments raised by Defendants North (as to Count 2) and Gibson (as to Counts 17-19).

Because none of the defense arguments merit reversal of the convictions or a new trial, the Motions should be denied.

## Falsity

### I.    The Court Correctly Determined That "Past Due" Status is Not Ambiguous and the Defendants' Convictions Did Not Violate Due Process.

Defendants argue that the past due loan information reported in the Bank's Call Reports and SEC Reports was not objectively false because the reporting requirements for "past due"

---

[1] Because Wilmington Trust Corporation was the only defendant charged in Count 3 of the Indictment, the jury did not consider that count at trial.

[2] Appendix A to this filing consists of the transcript citations, trial exhibits, and other documents referenced herein.  The documents are organized into six different categories and are presented in ascending order, i.e., by exhibit number or transcript page.  The government will submit a hard-copy of the Appendix separately to the Court.

loans for purposes of each Report is ambiguous.  The core issue is whether, as a matter of law, the Court should have instructed the jury that the Government was required to prove that the past due loan information in the Call Reports and SEC Reports was false "in relation to any reasonable interpretation."  *See* Tr. 6579:9-12.  The parties agreed that if "past due" status is unambiguous, there is no basis to instruct the jury on alternate interpretations of the term.  *See* D.I. 719 at 2 (citations in government's Jury Instruction reply brief to defense response).[3]   Here, the Court correctly declined to provide that instruction as to the falsity element because the term "past due" is unambiguous in the context of bank regulatory and securities reporting.  That ruling squared with the government's charging theory in the Indictment that a "past due loan" is "a loan in which the borrower has not made a required interest or principal payment in accordance with the loan's contractual terms."  Indictment ¶ 13.[4]

A brief background of the reporting landscape and past litigation surrounding the question of falsity is helpful to the resolution of this issue.  Prior to trial, the parties litigated how the Court would instruct the jury as to past due status.  Much of that litigation surrounded the definition of "past due" under the Call Report instructions.  The instructions for preparing Schedule RC-N contain a section entitled "Definitions."  *See, e.g.,* GX 86A.  The first definition is entitled "Past Due."  The initial paragraph in the definitional section states:

> Past Due – The past due status of a loan or other asset should be determined in accordance with its contractual repayment terms. For purposes of this schedule, grace periods allowed by the bank after a loan or other asset technically has become past due but before the imposition of late charges are not to be taken into account in determining past due status. Furthermore, loans, leases, debt securities,

---

[3] Nonetheless, and despite the Court's ruling to the contrary, Defendants return to their misplaced reliance on *United States v. Primore*, 243 F.3d 1, 18 (1st Cir. 2001), and a similar line of cases – all of which are inapposite where the relevant regulation is unambiguous.

[4] The government addresses Defendants' variance arguments relating to falsity in the "Variance" section on pages 61-73.

and other assets are to be reported as past due when either interest <u>or</u> principal is
unpaid in the following circumstance:....

GX 86A at 1 (emphasis in original).  The instructions thereafter list five circumstances – one of
which, Circumstance #4, the government asserted applied to the loans at issue:

(4) Single payment notes, debt securities, and other assets providing for the
payment of interest at maturity are to be reported as past due after maturity if
interest <u>or</u> principal remains unpaid for 30 days or more.

*Id*. at 2 (emphasis in original).

Defendants initially sought an order prohibiting the government from asserting or
presenting any evidence relating to Circumstance #4 of the Schedule RC-N instructions, and
requesting that the Court refuse to instruct the jury that Circumstance #4 applies.  D.I. 658.  The
Court denied that Motion and declined, at that time, to rule whether Circumstance #4 applied as a
matter of law.  But the Court stated that the government's position that Circumstance #4
appeared to be "logical and the Defendants' is not."  D.I. 696 at 2 n.2 (noting that "it certainly
appears as though the Government has the better of the argument here").

Following the first week of trial, the government moved for a jury instruction that
Circumstance #4 applied to the case, as well as to exclude the introduction of an archived
webpage from the Office of Thrift Supervision ("OTS").  In its brief, the government argued that
Circumstance No. 4 applied clearly and unambiguously to the loans at issue because "the
Wilmington Trust loan agreements provided for the payment of unpaid interest at maturity and of
interest on the outstanding principal amount *beyond* maturity in the event of default."  D.I. 714 at
8 (emphasis in original).  The government introduced testimony and summary evidence at trial
supporting its position that all of the relevant loans provided for the payment of unpaid interest at
(and continuing beyond) maturity.  *See* Tr. 6019:6-6028:22 (testimony of Special Agent Lo

Piccolo); GX 1038 (summary chart of relevant loans reviewed); GX 1039 (demonstrative of the construction loan agreement and promissory note from "The Bale Group").

Following responsive briefing (D.I. 716 and 719), the Court determined that the term "past due" in the Call Report instructions was unambiguous.  D.I. 740 at 4.  As the Court held:

> I think these instructions are clear in that the "repayment terms" in the loan contract, which, as I understand it, include a maturity date, control in regard to the past due status of that loan. Further, any period of time during which the loan is technically past due, that is, when interest or principal is unpaid in the five circumstances that follow in the instructions, but the bank does not impose late charges, is "not to be taken into account in determining past due status." I am hard pressed to see how these reporting instructions are ambiguous. It is not as though they state only, "Report past due loans," without any instruction as to what a past due loan is. Rather, the instructions specifically tie past due status to the loan contract and to the payment, or lack thereof, of interest or principal.

*Id.* at 4-5.  Thus, past due status was tied directly to the loan contract, and loans that were past due for principal repayment – matured loans – were past due.

The Court attached a Proposed Jury Instruction to its Order.  D.I. 740 at 9.  That instruction would have provided "that a construction loan or a commercial real estate loan that requires interest-only payments due on a regular basis with the principal due at maturity becomes past due when an interest payment is not timely paid or when the principal is not paid at the maturity date."  *Id.*  After the parties submitted proposed jury instructions, however, the Court indicated that it was going to revise the Proposed Jury Instruction to permit defendants to argue which particular Circumstance in the Call Reports applied and whether loans were past due for purposes of SEC reporting:

> And so basically what I intend to do for both the call report and the SEC is to essentially say that these are the documents that define what is called for in the past due, and you will be able to argue to the jury circumstance three, circumstance four for the call reports. You'll be able to argue whether they're contractually past due for the SEC. So that's what I intend to do about that.

Tr. 6582:7-13 (charge conference).  The Court stated that it would provide a jury instruction relating to the defendants' good faith belief and lack of intent that particular loans were past due. Thus, although the Court concluded that the issue of "ambiguity" was inappropriate for the jury to decide (because it had determined that "past due" status was unambiguous and tied to the contractual terms of a loan), it permitted Defendants to argue (1) that reportable loans were not actually past due and/or (2) that defendants acted in good faith or lacked the necessary criminal intent in reporting past due loans.  Tr. 6582:7-6583:17 (charge conference).[5]

The Court ultimately provided jury instructions as to (1) "'Past Due' Defined Under the Call Report Instructions," (2) "'Past Due' Status in the Management's Discussion and Analysis Section in SEC Reports," and (3) "Reporting of Past Due Accounting Policy in Financial Statements."  Jury Instr. at 31-32, 34-35.  The Call Report jury instruction set forth information quoted directly from the General Instructions to the Preparation of the Call Report, as well as the specific instructions for providing past due loan reporting under Schedule RC-N.  The instruction included the Call Report mandate that past due loans "should be determined in accordance with contractual repayment terms;" that "grace periods … are not to be taken into account in

---

[5] During the charge conference, defense counsel requested an instruction that the jury must determine "that the Government has met its burden in proving that statements are false in relation to any reasonable interpretation."  Tr. 6579:9-12 (charge conference).  The jury instructions submitted by defendants contained the "reasonable interpretation" language – both as to falsity <u>and</u> mental states – without specifically requesting an instruction as to what that "reasonable interpretation" might be.  *See, e.g.,* D.I. 675 at 31, 38, 57.  The Court asked defense counsel, "Well, what is any reasonable interpretation that you'd want to have me give in SEC?" Defense counsel did not answer the Court's specific question as to how to instruct the jury on falsity, but he did remark, "to the extent there are multiple reasonable interpretations, that should be taken into account in evaluating good faith, because 20 people could look at the same contract and come away with a different understanding."  Tr. 6579:25-6580:4 (charge conference).  As indicated above and quoted below, the Court agreed to give a good faith instruction allowing defense counsel to argue that any mistake or misunderstanding as to past due status was a "complete defense" to the offenses charged.  Jury Instr. at 28.

determining past due status;" and that loans "are to be reported as past due when either interest or principal is unpaid." Jury Instr. at 32 (emphasis in original). As indicated during the charge conference, the Court quoted from both Circumstances #3 and 4 – thus permitting defendants to argue that the evidence was insufficient to prove that the relevant loans were actually past due, as well as to argue that their purported reasonable interpretation supported a good faith defense. *Id.*

The Court's instruction relating to "past due" status in the MD&A Section of SEC Report explained that SEC Industry Guide 3 addressed the reporting of past due loans, and noted that the "Past Due" section "states that Bank Holding Companies must, as of the end of each reported period, state separately the aggregate of 'Accruing loans which are contractually past due 90 days or more as to principal or interest payments.'" Jury Instr. at 34. And the Court explained that GAAP, which requires securities registrants to provide a summary of significant accounting policies in its financial statements, provided that such a summary shall include "the policy for determining past due or delinquent status (that is, whether past due status is based on how recently payments have been received or contractual terms)." Jury Instr. at 35.

The Court's decision to decline to provide the "reasonable interpretation" language in the context of the falsity instruction was correct. In determining the existence of an ambiguity, the Court will generally consider the specialized context in which terms are used. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980). Thus, "[t]rade terms," "legal terms of art" and "common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results…." *Id.* And in considering the meaning of federal regulations, the Court considers the language of the regulations and the ordinary or dictionary meaning of those terms in reference to the purpose and context of the text. *Bonkowski v. Oberg Industries, Inc.*,

787 F.3d 190, 199-200 (3d Cir. 2015); *see also Ali v. Fed. Bur. of Prisons*, 552 U.S. 214, 234

(stating that "a word must not be read in isolation but instead defined by reference to its statutory

context").

Here, all of the applicable interpretive tools supported the Court's reasoned conclusion

that the term past due was unambiguous in the banking context.  The relevant banking guidance

– the Schedule RC-N Call Report Instructions and the SEC Industry Guide – is in complete

alignment that a loan is past due when the borrower fails to make a payment (for either interest

or principal) in accordance with the loan contract.  In fact, the Call Report Instructions, which

applied to the preparation of Call Reports filed with the Federal Reserve, also governed Call

Reports filed with the other major federal banking regulators – thus evidencing a common

meaning across the banking industry.  *See* GX 86B at 5 (general instructions from 2009

referencing application to Call Reports filed with the Federal Reserve, the OCC, and the FDIC).

Defendant Gibson expressed this same unambiguous meaning of "past due" when speaking to

bank analysis on an earning call, noting that matured loans were reportable as "past due" because

"as a technical matter, a matured loan is past due principal."  GX 104R at 22.   That

understanding of "past due" comports with the ordinary, dictionary definition of "past due"

status.  Merriam-Webster defines "past due" as "late being paid," and further provides a

"financial definition of past due" as: "Past due means overdue.  Typically, a bill is past due if the

borrower is 30 days past the payment deadline."  *See* https://www.merriam-

webster.com/dictionary/past%20due (Merriam-Webster definition of the term "past due")

(Accessed July 3, 2018).  It also squares with the Bank's own loan accounting system, which

tracked the maturity date of a loan based on contractual terms and reflected that a loan was past

due "if the loan is not paid on the maturity date."  *See* Tr. 1282:11-1283:16 (testimony of

Hickman Beckner); GX 33 (SHAW data as of September 30, 2009); Tr. 1841:10 – 1842:22

(testimony of Tosha Styles); GX 53 (September 2009 Delinquency Report); *see also* Tr.

4211:23-4216:21 (testimony of Larry Hart, reconciling past due loan disclosures in public filings

back to the SHAW system).

Defendants seemingly raise two principal arguments in opposition.  First, they contend

that the Court erred in concluding that Circumstance #4 unambiguously applied to matured loans

reported in the Call Report.  But the Court's determination was not erroneous, and Defendants

have not offered any basis for the Court to revisit is prior ruling.  Circumstance #4 governed past

due status for single payment notes "providing for the payment of interest at maturity."  The

government introduced testimony and summary evidence at trial supporting its position that <u>all</u>

of the relevant loans provided for the payment of unpaid interest at and beyond maturity.  *See* Tr.

6019:6-6028:22 (Lo Piccolo); GX 1038; GX 1039.  And, consistent with the Court's legal

determination that "past due" status was unambiguous, it correctly charged the jury that

Circumstance #4 applied *if* the jury made the factual determination that loans were past due for

principal repayment under the terms of the relevant contracts.  Defendants were free to argue that

the applicable loans were not past due for principal repayment under the loan contracts – which

they did.  Tr. 7061:11-24, Tr. 7062:8-18 (Harra closing argument); Tr. 7151:25-7152:5, Tr.

7152:13-14 (Gibson closing argument).[6]

---

[6] Defendant Rakowski's arguments that prior government statements demonstrate an ambiguity
are unavailing.  First, she claims that "past due" status under the Call Report is ambiguous
because the government stated that it was possible that a loan past due for ***the repayment of
interest*** might be reportable under Circumstances #3 and #4 ***if that loan had <u>not</u> yet matured.***
D.I. 824 at 6 (citing D.I. 690 at 7).  But the quoted section of the government's brief simply
asserted that loans were reportable as "past due" under the Call Report if they met ***any*** of the five
circumstances, and it highlighted a point that is consistent with the government's charging theory
– that loans contractually past due for interest <u>or</u> principal must be reported as past due.
Moreover, the loans at issue were alleged to have been past due for principal repayment – and

Second, Defendants claim that the term "past due" is ambiguous in relation to SEC

reporting because "there is no one, unambiguous definition of past due loans for the purpose of

SEC reporting." *See* D.I. 828 at 15-16.[7]   As a result, Defendants assert that they reasonably

interpreted SEC guidelines to permit the non-reporting of certain matured loans as "past due" –

in a manner purportedly consistent with an informal webpage housed on the website of the now-

defunct Office of Thrift Supervision ("OTS").  *Id.* at 17-18.  But that argument ignores the clear

and unambiguous ***requirement*** in Industry Guide 3 for Bank Holding Companies to report all

"Accruing loans which are contractually past due 90 days or more as to principal or interest

_____

the government's consistent argument has been that such contractually past due loans must be
reported as past due because the terms of the applicable contracts required interest payments at
and beyond maturity.  D.I. 690 at 7.  By their verdict, the jury rejected Defendants' arguments
that the loans were not past due or yet matured.

Second, Rakowski claims that there was no "objective" definition of "past due" because
the government "virtually conceded" that falsity was based on "deteriorating market conditions."
D.I. 824 at 7.  Defendant Gibson further asserts that the sentence "fundamentally alter[ed]
Defendants' understanding of the charges against them and the underlying standard for falsity."
D.I. 827 at 7.  But the quoted portion of the government's Omnibus Response had nothing to do
with the standard for falsity.  It was contained within a section of the Omnibus Response entitled
"WILLFULNESS" in response to defense arguments in the various Rule 29 briefs.  D.I. 749 at
21, 23.  The Court correctly recognized this point during oral argument.  Tr. 6259:52-6260:4.  In
its closing arguments, the government did not link changing market conditions to falsity, Tr.
6909:1-2, but rather asserted that the Waiver Practice had always resulted in false past due loan
reporting.  Tr. 6894.

[7] Defendant Gibson further attempts to link the lack of a GAAP definition for "past due" loan,
but he selectively quotes from a GAAP subsection relating to "past due status" and ignores the
context of the subsection that he cites.  As Mr. Walker testified, FASB 310-10-50-6(e) relates to
the Bank's reporting of the significant accounting ***policy*** for determining past due status, Tr.
1335:13-15 – and then requires the Bank to report past due loans in its **Financial Statements** in
accordance with that policy.  The GAAP requirement to set forth the policy has no bearing as to
whether statements in the MD&A section were false.  Regardless, the Bank did not state in its
Form 10-K that it had a different policy for determining past due status other than the contractual
terms of its loan agreements.  *See* GX 1 at 81.  Rather, every reference in the relevant significant
accounting policies sections was to contractual terms.  *Id.* (listing the "contractual lives of the
loans," the "contractual terms of the loan agreement," "contractual payments").

payments." GX 12 at 7. In addition, Guide 3 states that "no loans shall be excluded from the amounts presented." *Id*. at 8. There is no dispute that Industry Guide 3 provides guidance regarding the disclosure of past due loan information in the MD&A Section of a bank's securities filings. Tr. 1325:6-1326:10 (Walker) ("Industry Guide III is the statistical guidance that is required for bank holding companies"). Although there is not a specific "definition" of "past due," the reporting requirement is clear in context and under the interpretive principles set forth above – if a loan is contractually past due for principal repayment it must be reported in the MD&A section as past due. Tr. 1372:9-14; 1373:10-16 (Walker testimony stating that if a Bank includes a Guide 3 disclosure it should be accurate and include loans contractually past due 90 days or more as to principal or interest payments).[8]

Moreover, the Court has already determined that the OTS Q&A did not render the Call Report Instructions ambiguous, finding that it was not a reasonable interpretation of the Call Report instructions. D.I. 740 at 5-6. The Court noted that the Q&A was not tied to any specific language in the Thrift Financial Report ("TFR") instructions, that the applicable Call Report instructions indicated that grace periods should not be taken into account in determining past due status, and that the Bank was required to execute legal documents for the status of a loan to change for past due reporting purposes. *Id.*[9] The inapplicability of the OTS Q&A in creating an

---

[8] Here, each of the specific quantitative false statements relating to the Bank's SEC Reports are each set forth in the MD&A Section of the Bank's SEC Reports for the Third Quarter 2009, the 2009 Annual Report, and the First Quarter 2010. *See* Counts 1, 2, 4-6, 14-16; Bill of Particulars ¶ 1A1, 1A2a, and 1A3; Jury Instr. at 60, 64 and 75 (listing past due loan information from Form 10-K MD&A section); 65 (listing past due loan information from First Quarter 2010 MD&A); and 79 (listing past due loan information from Third Quarter 2009 MD&A).

[9] The latter finding is consistent with a formal policy adopted by **all** of the federal financial regulators, including the OTS, in October 2009, which required loan restructurings to involve "a formal modification in the loan's terms with written and legally enforceable documents." DX 528 at 2 n.2; Tr. 2807:21-2808:6 (Corkery).

ambiguity applies with even greater force to past due loans reported to the SEC.  The OTS was

not a financial regulator, the Q&A referenced a specific OTS reporting form (not an SEC

Report), and the SEC does not promulgate any guidance regarding regulatory reporting.  Tr.

1324:22-1325:2.

    For all of these reasons, the Court was correct in determining that "past due" status was

unambiguous and in declining to instruct the jury that it could consider a separate interpretation

of "past due" to determine falsity.  The government provided substantial evidence of falsity

under that standard.[10]  And the Court properly allowed defendants to argue that the loans were

not false and that they acted in good faith in reporting past due loans.

## II.    The Government Presented Sufficient Evidence That Defendants Knew That the Bank's Past Due Loan Information Was False.

    Each Defendant asserts that there was insufficient evidence that she or he knew that the

Bank's past due loan statements were false.  The Court instructed the jury that a statement is

---

[10] Defendants challenge the legal standard relating to falsity, rather than the sufficiency of evidence under that standard.  The government presented substantial trial evidence to prove that past due loan information in the relevant Call Reports, SEC Reports, and Monthly Regulatory Reports was false – that is, that they did not include all the Bank's contractually past due loans. Tosha Styles testified at length about the impact of waiving loans from the Bank's delinquency reports, including that such loans would not be included in publicly-filed Call Reports and SEC Reports.  *See, e.g.,* Tr. 1868:4-1871:25 (Styles).  Kimberly Strohmeier testified similarly that waived loans were not included in the Bank's final Past Due and Nonperforming Loans report. Tr. 2839:19-2840:6 (Strohmeier).  Larry Hart testified in detail how he reconciled the Bank's past due loan disclosures back to its commercial loan accounting system.  Tr. 4211:23-4216:21 (Hart).  He also quantified the amount of relevant contractually past due loans for each applicable reporting period in the Indictment.  *See, e.g.,* Tr. 4217:23-4221:6 & GX 1010 (testimony and summary chart relating to relevant past due loans for each quarter in 2009); Tr. 4223:20-4225:9 & GX 1010A (testimony and summary chart for October 2009); Tr. 4225:10-4226:13 & GX 1010B (testimony and summary chart for the First Quarter 2010).  And Special Agent Antonino Lo Piccolo testified about his review of standardized contractual language in the Bank's construction and commercial loan agreements, in particular standard provisions requiring payment of "all outstanding principal plus all accrued unpaid interest" on the specified maturity date.  *See* Tr. 6019:6-6028:22 (Lo Piccolo); GX 1038; GX 1039

false "if it is untrue when made and if the person making the statement or causing it to be made

knew it was untrue at the time it was made." *See, e.g.,* Jury Instr. at 63 (Counts 4, 6); Jury Instr.

at 73 (Counts 5, 11-16).  Defendant Rakowski claims that the government did not prove that she

knew that the past due loan statements were false because the government "birthed" its own

definition of "past due," and that she did not know of it during the relevant period given the

ambiguous reporting landscape.  D.I. 824 at 9.  Defendant North asserts that there was no

evidence that he knew of the specific regulatory guidelines making the past due loan statements

false.  D.I. 825 at 36.  Defendant Harra argues similarly that he did not know the applicable

regulations, or that the Bank's reporting was contrary to those regulations.  D.I. 803 at 3-4.  And

Defendant Gibson contends that he did not knowingly make a false statement because there was

no applicable, unambiguous definition of "past due" status.  D.I. 828 at 18-19.

 A necessary threshold determination is whether the government must prove that a

defendant was aware of a specific regulation making her or his conduct unlawful.  In *United*

*States v. Starnes*, the Third Circuit drew a distinction between the terms "knowingly" and

"willfully" in the context of a prosecution under 18 U.S.C. § 1001, finding that "knowingly"

generally requires the government to prove that a criminal defendant had "knowledge of the fact

constituting the offense" – that is, for a false statements offense, that the statement was false.

583 F.3d 196, 210-11 (3d Cir. 2009) (citing *Bryan v. United States*, 524 U.S. 184, 193 (1998);

*United States v. Curran*, 20 F.3d 560, 567 (3d Cir. 1994)).  There is no requirement, even under

the heightened "willfully" standard (addressed in greater detail below) that "the government

prove the defendant had knowledge of the specific regulation governing the conduct engaged in."

*Brodie*, 403 F.3d at 147 (emphasis in original) (citing cases and quoting *Liparota v. United*

*States*, 471 U.S. 419, 434 (1985), in which the Supreme Court explained in the context of

prosecution for acquiring possession of food stamps in a manner unauthorized by statute or regulations that the government need not show "knowledge of specific regulations governing food stamp acquisition or possession").

The Third Circuit's decision in *Syme* is instructive on this point. *Syme* was a Delaware prosecution involving a defendant who owned and operated several ambulance companies. The indictment alleged that the defendant and his companies fraudulently overcharged government health programs "by submitting false bills that stated that the 'home stations' of the ambulance companies were located in Philadelphia, rather than in Delaware or Maryland." *Syme*, 276 F.3d at 142. Although the indictment referenced the term "home station" in the context of Medicare requirements, it did not specifically define the term. Nor did the indictment allege the specific regulation or written instruction by which Medicare providers used an ambulance's "home station" as the governing standard for determining reimbursement rates. *Id.* (quoting from indictment).

On appeal, the defendant argued that the indictment alleged and the district court instructed the jury on a fraud theory that was legally invalid as a matter of law. *Id.* at 136. That is, the defendant claimed "the fraud that the government identified – falsifying the 'home station' of the ambulances – could not have occurred because 'home station' was not authoritatively defined during the relevant period." *Id.* at 143 n.4. The Court, however, determined that "neither the indictment nor the District Court's instructions to the jury relied on erroneous interpretations of the law or contained mistaken descriptions of the relevant legal standards[.]" *Id.* at 146. Although the Court held that the government had to prove that the term "home station" had a generally recognized meaning during the relevant period, and that the defendant

17

understood that meaning, it stated that the term's meaning was not dependent on a particular regulation or written instruction:

> But even if there was no HCFA regulation or written instruction from [the Medicare contractor] on the definition of "home station," and no clear indication that "home station" was the appropriate standard for reimbursement, the prosecution still could have demonstrated that Syme knew that this was the standard and that he knowingly used a Pennsylvania provider number in order to get paid at a higher rate.

*Id*. at 146-47.  Thus, the government's charging theory – that the defendant knowingly misrepresented the location of the ambulance companies performing services – was legally valid.[11]  *See United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011) (holding that the government charged and proved a valid fraud scheme premised on the defendant's knowing misrepresentation that he personally appeared in court to handle social security matters – even where no specific statute or regulation prohibited attorneys from claiming credit for work that they had delegated).

Accordingly, to prove that Defendants knew that the Bank's past due loan information was false, the government must present sufficient evidence that (1) the term "past due" had a specific meaning – that is, that contractually past due loans should be reported as such; and (2) defendants knew that meaning.  *Syme*, 276 F.3d at 147 (stating that the government must demonstrate that the alleged false and fraudulent statement at issue "had a meaning" of which the defendant was aware).

---

[11] Beyond finding that the government charged under an appropriate legal standard and that the court correctly instructed the jury on that standard, the Court in *Syme* did not reach the question of whether the government presented sufficient evidence to support the conviction.  That is because the defendant did not appeal each of the fraud theories charged in the indictment.  *Id*. at 148.  But the Court stated that "the questions whether 'home station' had a meaning, and whether Syme knew that meaning, were highly disputed issues of fact in this trial and were presented to the jury as such."  *Id.* at 147.

Here, the government presented sufficient evidence for the jury to determine that

Defendants knew that the Bank's failure to include matured loans in public reporting was false.

The evidence demonstrated that each Defendant knew the following information:

- The Bank's loan accounting system (SHAW) considered loans to be past due based on their contractual terms.  Thus, loans past due for principal repayment, as set forth in the loan contract, were designated as past due.   Tr. 1290:3-9 (Beckner); 1517:3-11 (Infanti); 1840:10 -1842:22 (Styles); 3828:6 – 3830:4 (Conway); 4076:17-25 (Marley); 5216:6-18 (Brewer); GX 418; GX 472.

- The Bank had a practice of waiving, that is, failing to report in SEC Reports and Call Reports, matured loans that were internally designated as "current for interest" and in the "process of extension."  The impact of the Waiver Practice was that the Bank failed to report loans that were contractually past due for principal repayment.  Tr. 1550:13-1552:12, 1556-67 (Infanti), GX 418; Tr. 3450-55 (Oliver), GX 476-476A; Tr. 6063-69 (Lo Piccolo), GX 524; Tr. 3442-49 (Oliver), GX 527; Tr. 1837:9-1838:15 (Styles); Tr. 2835:13-24, 2839:19-2840:6 (Strohmeier).

- The Bank's internal audit department prepared a December 9, 2009 report directed to Defendants North and Harra entitled "Matured Loans Accounting," which indicated that the Bank was not properly processing and accounting for matured loans.  DX 1010A.  Defendant Rakowski received a copy of the report, which she forwarded to Defendant Gibson with the comment, "Don't think this is a surprise."  GX 525/525A.

- The Waiver Practice was a "decades old issue," "decades old problem," and a "long-standing problem" that would likely be subject to "challenge" by the Bank's external auditor.  GX 418.

- The Bank had 803 matured/maturing loans totaling $1.312 billion as of December 31, 2009, and 450 loans maturing in the First Quarter 2010 totaling $432 million – all of which the Bank was required to "renew[]/extend[] to appropriate new maturity dates." GX 418.

- The Bank ultimately eliminated the Waiver Practice for the purpose of reporting matured loans as past due.  GXs 418, 421, 473, and 588; Tr. 1909:15-23 (Styles).

- None of the Defendants affirmatively disclosed the elimination of the Waiver Practice and the change in reporting to the Federal Reserve or KPMG.  Tr. 2411:18-2412:16 (Corkery); Tr. 3016:1-23 (Fomunyam); Tr. 5496:25-5497:16 (Depman).

From this evidence, the jury could infer that the Defendants were aware that the past due

status of loans was governed by their contractual terms; that the Bank's Waiver Practice was a

longstanding problem that was contrary to its loan accounting system, its internal policies, and would likely be challenged by its external auditors; and that the Bank nonetheless continued to falsely report past due loans through the Second Quarter of 2010.  The jury could infer further that the Bank's elimination of the Waiver Practice to only report loans that were contractually past due reflected Defendants' understanding that matured loans should be reported as past due absent a proper loan extension or modification.  *Starnes*, 583 F.3d at 213 ("[C]ourts and juries every day pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred." ) (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 411 (1950)).

Additional evidence relating to each Defendant is considered in turn.

**A.  Defendant Rakowski.**

Defendant Rakowski dismisses evidence of her accounting knowledge and proficiency as simply proof that she was "performing her duties."  D.I. 824 at 19.  But the jury was permitted to consider it in determining whether she knew the applicable standard for reporting past due loans and knowingly and intentionally made a false statement.  A defendant's background and experience is relevant to her knowledge and intent.  *Starnes,* 583 F.3d at 212 (stating that the defendant's prior experience and familiarity with federal asbestos regulations was relevant to the defendant's knowledge and intent); *see also United States v. Klausner*, 80 F.3d 55, 63 (2d Cir. 1996) (holding that the defendant's "background as a CPA and his extensive business experience-including ... as a professional tax preparer" was relevant to whether defendant "was aware of his duty to report his income taxes").

20

Here, the trial evidence demonstrated that Defendant Rakowski was an experienced certified public accountant and the Bank's controller.  Tr. 3677:1-3; 3679:19-20 (Slijepcevic). In that capacity, she "was in charge of all accounting related matters for the company."  Tr. 3677:15-16; *see also* Tr. 3662:1-12 (Slijepcevic).  She, along with Defendant Gibson, made the final decisions regarding the Bank's financial and regulatory reporting in its SEC Reports and Call Reports.  Tr. 3679:1-3 (Slijepcevic).  Defendants Rakowski and Gibson provided the most input relating to the preparation of the Bank's SEC Reports.  Tr. 3607:8-15 (Roberts).  And under Rakowski's supervision, the Controller's group prepared "in the format of the call report requirement for schedule RC-N . . . the past due and nonaccrual loans schedule."  Tr. 3713:15-20 (Slijepcevic); GX 1040A-1040E.  The Call Report contained instructions for the reporting of particular line items which Rakowski and other members of the Finance Department could consult, and Rakowski communicated with staff members and Gibson regarding the Bank's preparation of the Call Reports.  Tr. 3699:14-20, Tr. 3708:14-3711:1 (Slijepcevic); GX 524; GX 534.

Rakowski also prepared memoranda on a quarterly basis for the Bank's board of directors.  *See* GX 835/835A; GX 740 at 247; GX 741 at 68.  These memoranda provided detailed information regarding SEC and regulatory reporting requirements, including accounting and regulatory reporting changes implemented during the past quarter and expected changes for the next quarter.  *Id.*  She also regularly interacted with the Bank's auditing firm, KPMG, and its lead audit engagement partner, John Depman.  Tr. 5317:1-14 (Depman).  These interactions included frequent meetings and specific conversations regarding the Bank's application of accounting guidance.  Tr. 5407:22-5408:4; 5430:22-5431:5 (Depman).  Such evidence of Defendant Rakowski's overall awareness of reporting requirements is particularly probative to

21

rebut her argument that the governing past due reporting requirements were "vague" or "unclear" – and to show that she did not act in good faith.  *United States v. Fumo*, 655 F.3d 288, 302 (3d Cir. 2011) (permitting introduction of evidence relating to the Pennsylvania Ethics Act to show the knowledge and intent of a former State Senator who had argued that there was no applicable standard).

Against this backdrop, the government introduced sufficient evidence that Defendant Rakowski knew that the Bank did not accurately report all contractually past due loans as past due.  By October 2009, Rakowski learned that the Federal Reserve's 2009 full-scope examination had concluded and that the Bank was required to report its past due loans on a monthly basis as part of a Memorandum of Understanding ("MOU").  Tr. 3727:1-4 (Slijepcevic).  Prior to the first reporting month, Defendant Rakowski directed the Bank's Assistant Controller, Mitch Slijepcevic, to request specific waived loan information for September 2009 from Stephen Cummings.  Tr. 3723:23-3724:6 (Slijepcevic); GX 523.  Cummings responded to the email, which was entitled "Waived loans for past due reporting," with a table depicting a gross waived loans amount of $397 million – $338 million of which was waived as "Matured and zero interest owing."  GX 524.  Slijepcevic forwarded the email to Rakowski.  The government introduced the original email, which was located in Rakowski's desk file with additional handwriting stating: "Calvin debating about only sending > 90 – Regulators asked for Past Due in Call Report, that is everything."  GX 524; Tr. 6068:10-6069:4 (Lo Piccolo).  From that evidence, the jury could conclude that Rakowski, an experienced accounting professional who was responsible for the Bank's regulatory and securities reporting: (1) knew that the standard for reporting past due loans was tied to the Call Report; (2) understood that the Waiver Practice had a direct impact on past due loan reporting (indeed, the title of the email was "Waived loans for past due reporting");

and (3) was aware that the Waiver Practice excluded approximately $338 million in matured loans.

Additional evidence supported the jury's conclusion that Rakowski knew the applicable past due standard and that the Bank's reporting of past due loans was false.  In an email dated November 16, 2009, Rakowski received an electronic copy of the Bank's Delinquency Report for October 2009 that listed over $300 million in relevant waived loans that "were not included" in the Bank's "final numbers."  GX 574 (email), 574A (attachment with waived loans information).  Rakowski forwarded the email to Gibson, stating, "We did **pull** the waived loans from the Past Due Report."  GX 574 (emphasis added).  She explained further that she had not gone back to compare the numbers, but that the "Numbers for October still seem to be higher than I would have expected."  *Id.*  Yet, less than ten days later the Bank transmitted a "comparison" of past due loan information to the Federal Reserve that did not include waived loans for any prior reporting periods and attributed the increase in past due loans in October to "changes in our billing and collection practices."  GX 243

Moreover, less than one week later, on December 1, 2009, Rakowski forwarded via email to Gibson and another bank executive a memorandum from the Bank's Internal Audit Department with the subject "Matured Loans."  GX 525 (email), 525A (attachment).  That document identified a deficiency in the Bank's reporting of matured loans compared to its internal policies – principally that certain loans sampled by Internal Audit were not actually in the process of extension or modification.  GX 525A.  Rakowski wrote in the forwarding email, "Don't think this is a surprise."  GX 525.  In a subsequent email exchange involving Rakowski and the other defendants, which set forth a plan to phase out the Waiver Practice over time, three other Bank employees (including Defendant North) referred to the Waiver Practice as a "decades

23

old issue," "decades old problem," and a "long-standing problem" that would likely be subject to "challenge" by the Bank's external auditor.  GX 418.[12]

From these emails, the jury could infer that Rakowski knew that the Bank deliberately removed matured loans without any underlying justification, and that the Bank's Waiver Practice did not comply with applicable reporting requirements – hence the need to eliminate it.  Indeed, a subsequent version of the Internal Audit document referencing future changes to the Bank's reporting of matured loans listed Rakowski as the point person in the Finance Department responsible "to properly process and account for matured loans."  GX 740 at 156.  The Waiver Practice continued, however, with Rakowski's knowledge, through the Second Quarter of 2010. GX 421 (email dated July 2, 2010 referencing the continued waiver of matured loans); DX 4028 (defense exhibit identifying $83 million in waived loans in the Second Quarter 2010).

### B.  Defendant Gibson.

Like Defendant Rakowski, Defendant Gibson was an experienced accounting professional, and his background and experience are relevant to the jury's assessment of his knowledge.  He held degrees from two prestigious universities, including an undergraduate accounting degree and a Masters in Business Administration.  GX 435.   At the time of the offenses, he had served as the Bank's chief financial officer for over twelve years.  *Id*.  In that position, he "was in charge of all finance functions for Wilmington Trust."  Tr. 3678:8-14

---

[12] In arguing that there was insufficient evidence that Defendant Rakowski knew that the Bank falsely reported past due loans, she argues that the government advanced a "tipping point" theory where the term "past due" was somehow transformed from a legitimate practice into criminal conduct.  As set forth in footnote 6 above, however, she incorrectly cites a portion of the government's Omnibus Response addressing the defendants' intent and lack of good faith. Moreover, defendants' recognition of longstanding problems and the necessity to change the Waiver Practice negates Defendants' "tipping point" argument.  The jury could properly infer that the Bank's reporting of past due loans was always false – and that Defendants knew it.

(Slijepcevic).  He and Defendant Rakowski provided the most input relating to the preparation of the Bank's SEC Reports.  Tr. 3607:8-15 (Roberts).  Ultimately, Gibson made the final decisions relating to financial and regulatory reporting in the SEC Reports and in the Call Reports.  Tr. 3613:24-3614:3 (Roberts); 3678:23-3679:5 (Slijepcevic).

As set forth above, Gibson was aware that the Bank "pulled" the waived loans, knew about the internal audit findings, and understood that the Waiver Practice was a longstanding problem that could be challenged by its auditors.  Additional evidence, however, demonstrated Gibson's further knowledge of the meaning of "past due" and that the Bank submitted false past due loan information.  The most direct evidence comes from Gibson's own statements, including:

- his remarks during an earnings call for the Second Quarter 2010, noting that matured loans were reportable as "past due" because "as a technical matter, a matured loan is past due principal."  GX 104R at 22; and

- his exclamatory response in a July 7, 2010 email that matured loans which had not been extended with proper documentation "are past due!...The maturity dates are known.  These should be done at least 30 days in advance to allow for the documentation process to happen.  We need to discuss accountability."  GX 421.

Gibson's counsel dismisses both of these remarks as a reference to Gibson's understanding of the Bank's reporting of past due loans as of June 2010, after the Bank had changed the Waiver Practice.  D.I. 828 at 10-11.  But the jury could properly infer that the statements represented Gibson's understanding that matured loans were past due, and that he had such an understanding several months earlier when he allowed the Bank to report a contrary past due number.  That inference is supported by the evidence set forth above, as well as recurring communications involving himself and/or Defendants North and Harra relating to the need to report past due loans according to their contractual terms.  *See* GX 473 (email referencing the "game plan" relating to matured loans, including planned reporting changes); GX 476/476A

(March 2010 memo describing reporting changes and future plans).  It is further supported by the

Bank's securities disclosures for the First and Second Quarter of 2010.  GX 5 (First Quarter

2010), GX 6 (Second Quarter 2010).  For example, in the Bank's Form 10-Q for the First

Quarter 2010, the Bank noted that increases in past due loan amounts were attributed to loans

that "have matured but have not paid off, and for which underwriting extensions are underway" –

thus recognizing, as Gibson later stated, that matured loans must be reported as past due.

### C.  Defendant North.

The government further introduced sufficient evidence that Defendant North knew that

matured loans were reportable as "past due."  In addition to the common evidence cited above,

the government introduced several emails drafted by North in 2008 and 2009 demonstrating that

North knew that (1) past due loan information would be reported publicly, *see, e.g.,* GX 487; (2)

his waiver decisions would impact what the Bank reported, *id.*; (3) the Bank's practice of

waiving loans that had not been approved and booked on the system was an issue that caused

him discomfort, GXs 478, 549, 487, and 417; and (4) loan renewals/extensions were necessary to

"allow the system to report a true past due number without a lot of adjustments that could raise

issues for us in the future."  GX 446; Tr. 2036:21-2042:20 (Cummings testimony regarding

North's review and edits of earlier versions of GX 446); *see also* GX 443 (calendar invite from

Rich Conway in October 2009 requesting a meeting to "Discuss process and strategy to eliminate

matured loans by 12/31").  In addition, in an email to Harra in March 2010, North stated directly

that the "needed documentation" to extend a loan on the Bank's SHAW system was "a Change

in Terms for LaserPro deals or some sort of Modification Agreement" – further demonstrating

his knowledge that matured loans without such documents were otherwise past due.  GX 472.

The government also presented testimony from witnesses supporting that North knew matured loans should be reported publicly, including Tosha Styles, who testified that she told North and Gibson that she thought that the Bank's reporting of matured loans was a "concern or a problem." Tr. 1894:5-1895:15 (Styles). Martin Infanti testified relatedly that he told North that by continuing to report matured loans as current, the Bank was overstating earnings – causing North to respond that he was "aware of that" and that "we were working to fix the problem." Tr. 1551:25-1552:12 (Infanti).

Moreover, the evidence showed that North was directly involved in the Bank's deliberative process to finally eliminate the Waiver Practice. He sent emails and drafted a memo demonstrating his role in the Bank's evolution of reporting waived loans, as well as the need for matured loans to be followed up by "the full extension of any required documentation in order to get these loans updated on SHAW." *See* GX 476A (memo); GX 473 (email describing the "game plan" for waiver decisions); GX 418 (email setting forth the historical practice and plans to change it to address the "longstanding problem"). He also received the internal audit report described on page 23, *supra*, and he was later identified as the "Responsible Manager" for complying with internal audit's finding that the Bank needed "to properly process and account for matured loans." GX 741R at 143.

### D. Defendant Harra.

Defendant Harra was the Bank's President and Chief Operating Officer. In a nearly 40-year career at Wilmington Trust, he "specialized in all aspects of commercial and personal financial services." GX 435. As President and COO, Harra "overs[aw] all banking activities for the company." *Id*. From his vantage point as Bank President, Harra had an understanding of the Bank's borrowers and its loan portfolio. Tr. 3661:20-24 (Roberts). Harra was also a member of

the Bank's Board of Directors.  In that capacity, he signed the Bank's SEC Reports. *See, e.g.,*
GX 1 at 142.  And, as set forth in greater detail below, Harra signed and certified each of the
Bank's relevant Call Reports.  GX 77 at 1 (4Q09 Call Report); GX 76 at 1 (3Q09 Call Report;
GX 78 at 1 (1Q10 Call Report).

Harra also signed the Bank's October 2009 MOU that contained the requirement for the
Bank to report past due loans on a monthly basis.  GX 283 at 8.  Shortly thereafter, Harra sent an
email mandating that matured loans "that require extensions need to be worked-on currently **and
kept current and up to date**" – a statement from which the jury could infer Harra's
understanding that matured loans were contractually past due.  GX 492 (emphasis added).  This
email and other communications led Rich Conway to send the calendar invite to discuss making
matured loans "go away."  GX 413.  He testified that the issue had the attention of Harra and
Gibson because "the number was growing."  Tr. 4061:3-9 (Conway).   There was thus the
necessity to "make the loans go away" by getting loans "through the approval process to
generate documents to be signed, to get them back and send them off to loan accounting, make
them go away, off the past due report."  Tr. 3934:3-13 (Conway).  In or around that same time
period, the issue of matured and maturing loans was important to bank leadership and was a
specific topic addressed during a Mid-Atlantic market meeting led by Harra in December 2009.
Tr. 3953:8-3954:17 (Conway); GX 554/554A.

Like the other defendants, Harra was aware that the Bank had longstanding problems
reporting past due loans that intensified in late-2009, and that a two-step process was initiated to
approve and extend the Bank's massive amount of matured loans.  GX 418.  The internal audit
memorandum identifying issues with the Bank's processing and accounting for matured loans
was addressed directly to him.  DX 1010.  Per an email from North in April 2010, Harra was

involved in deciding that the Bank would no longer waive matured loans if "documents were not executed." GX 473 (North email, copying Gibson, Harra and Cecala, and stating that "it was decided that we would not waive….") In response to North's concern relating to the lack of written documentation (signed Change in Terms or modification agreements) surrounding certain loans purportedly extended at year-end 2009, Harra responded: "Ugggh. Got it. No need for elaboration!" GX 472. Harra later sent an email thanking Bank employees who worked over the last weekend in March 2010 (referred to as a "fire drill") to process large-scale temporary loan extensions – in the absence of which loans would have correctly been reported as past due. GX 543 (email); Tr. 5233:13-19, 5234:5-8 (Brewer testimony that he would have hoped that loans not given extensions would have been reported as past due). And when Harra asked North about the increase in reported past due loans in May 2010, North responded that a "a good deal of it is matured/current loans that are in the renewal/extension process" – noting that those loans are past due. GX 588. From these emails and other communications, all of which took place within the charged conspiracy period, the jury could properly infer that Harra knew that a matured loan should have been reported past due.

In addition to all of this evidence, Harra signed a certification in accordance with the Bank's submission of the Call Report for each relevant reporting period, which stated:

> We, the undersigned directors (trustees), attest to the correctness of the Reports and Conditions and Income (including the supporting schedules) for this report date and declare that the Reports of Condition and Income have been examined by us and to the best of our knowledge and belief have been prepared in conformance with the instructions issued by the appropriate Federal regulatory authority are true and correct.

GX 76 at 1. The Call Report forms also listed Harra as the "senior official at the bank who has decision-making authority." *Id*. at 2. The applicable Call Report Instructions, referenced in the certification, clearly state that loans are past due based on their contractual terms (for principal or

interest repayment) without regard to any grace periods.  *See* GX 86A at 1.  And as set forth in the "Falsity" section above, they also unambiguously require matured loans to be reported as past due.  By his certifications, Harra attested that he: (1) actually reviewed the information in the Bank's Call Report; (2) assented to its correctness; and (3) verified that it was prepared in conformance with the instructions issued by the Federal Reserve.

Harra's counsel argues at length that the court should disregard the certification.  D.I. 826 at 5-7.  But the jury, which heard these same arguments at trial as to the import of the certifications, was entitled to reject them in the context of the other trial evidence and conclude that Harra knew that the Bank's reporting of past due loans was false.  *See Starnes*, 583 F.3d at 212 (finding sufficient evidence of the defendant's knowledge of falsity in part based upon his representation that he was "competent in asbestos abatement and 'all the contents of the Code of Federal Regulations as they relate to … [a]sbestos, and the removal procedure and practices for reducing the hazard thereof'").

### III.     The Defendants' Convictions Do Not Violate Due Process.

Defendants further contend that their convictions violated Due Process because they were grounded upon the "novel construction" of the charged conduct to permit convictions where the applicable falsity standard was ambiguous.  *See* D.I. 824 at 12-14 (Rakowski); D.I. 825 at 14-18 (North); D.I. 828 at 18-20 (Gibson).  Each Defendant cites generally to the constitutional principle that a criminal defendant must be provided fair warning that his or her conduct is criminal.  *See, e.g., United States v. Lanier*, 520 U.S. 259, 265 (1997) (rejecting the defense

argument that a defendant is only on "fair notice" of criminal conduct if the constitutional right

the defendant was alleged to have deprived had been previously identified by the courts).[13]

But there is no novel construction of any of the statutes of conviction in this case.  Each

count in the Indictment charged Defendants with making false or fraudulent statements or

banking entries.  As set forth above, the charged falsity standard is unambiguous, and there was

sufficient evidence that each defendant knew that standard but made false statements regardless.

Defendants have not cited any cases holding these generally-applicable statutes to be

unconstitutionally vague.  "Any person of ordinary intelligence" should comprehend that these

statutes clearly and unequivocally criminalize knowingly and intentionally making false or

fraudulent statements.  *United States v. Moyer*, 674 F.3d 192, 211 (3d Cir. 2012) (finding that the

defendant was placed on fair notice that writing a false police report with the intent to impede an

investigation was obstruction of justice").  The "plain text" of the statutes were sufficient to

place Defendants on notice that their conduct was unlawful.  *Id*.  Moreover, the specific intent

requirement incorporated into each statue of conviction "'alleviates vagueness concerns' because

a *mens rea* element makes it less likely that a defendant will be convicted for an action

committed by mistake."  *Id*. (citations omitted).

Accordingly, because the government presented a valid, unambiguous standard of falsity,

and offered sufficient evidence that each Defendant understood that standard, Defendants' Due

Process challenges fail.

---

[13] Defendant North further cites to several decisions relating to the standard for willfulness.  *See* D.I. 825 at 17-18.  The Court previously rejected North's contention that a higher *mens rea* for willfulness applied to the charged conduct and provided the jury with the standard instruction on the meaning of "willfully."  Jury Instr. at 26; Tr. 6703:23-6704:15; 6713:14-6714:15 (charge conference).  An analysis of proof as to Defendants' criminal intent is addressed in the "Criminal Intent" Section  starting on page 31, *infra*.

### *Criminal Intent*

Each Defendant argues that there was insufficient evidence establishing that they acted with criminal intent to support the convictions.  *See* D.I. 824 at 9-11, 14-23 (Rakowski); D.I. 825 at 31-39 (North); D.I. 826 at 10-20 (Harra); and D.I. 828 at 7-13, 20-24 (Gibson).

The Court provided a comprehensive instruction to the jury covering the generally-applicable mental states.  Jury Instr. at 26.  The instruction covered the definitions of "knowingly," "willfully," and "intent to defraud."  The Court further provided a definition of "intent to deceive" in connection with Counts 7-10.  Jury Instr. at 96.  The table below sets forth the applicable mental states for each of the charged offenses, as charged by the Court:

| Count | Description | Mental State |
|-------|-------------|--------------|
| 2 | Securities Fraud | Intent to Defraud |
| 4, 6 | Making False Statements In Securities Documents | Knowingly and Willfully and with Intent to Defraud |
| 5, 11-16 | False Statements | Knowingly and Willfully |
| 7-10 | False Banking Entries | Knowingly with Intent to Deceive |
| 1 | Conspiracy | Intent to Defraud (the "to defraud the United States" and Securities Fraud Objects) |
| | | Knowingly and Willfully (the False Statements Object) |

In assessing Defendants' criminal intent, a necessary starting point is that there is sufficient evidence that Defendants knew that the various charged past due loan statements were false.  Although the "knowledge" evidence addressed previously related to Defendants' knowledge of falsity, it is also highly relevant to whether Defendants acted willfully and/or with

an intent to defraud.[14]   Indeed, a finding of an "intent to defraud" for purposes of Counts 2, 4

and 6 may be based upon a conclusion that that Defendants "made or caused to be made a

material misrepresentation of fact made with reckless disregard for the truth."  Jury Instr. at 57;

see United States v. Boyer, 692 F.2d 58 (3d. Cir 1982) (affirming conviction of mail fraud and

securities fraud and finding it "proper to charge that the specific intent to deceive may be found

from a material misstatement of fact made with the reckless disregard of the facts").   And

recognition that Defendants disregarded reporting requirements supports an inference of an

---

[14] As set forth in Section II of the "Falsity" section above, such evidence includes, but is not limited to, the following:

- North's recognition in early-2009 that waived loans were preventing the Bank from reporting a "true past due" number, GX 445; his awareness by September 2009 that the Bank's Chief Credit Review officer thought that the Bank's reporting of matured loans "could not continue for much longer," GX 442; and his acknowledgment to Defendant Harra that certain matured loans that received short-term extensions were "credit turds" that could not be remedied within a short time-frame.  GX 527.

- The October 2009 email retained in Rakowski's desk file whose handwriting tied the reporting of past due loans to Call Report requirements.  GX 524.

- The December 2009 internal audit memorandum that each Defendant received, which criticized the Bank's non-compliance with policy and reporting requirements relating to matured loans.  DX 1010.

- The January 2010 email involving each Defendant which referred to the Bank's treatment of matured loans as a longstanding issue that its external auditor would likely challenge.  GX 418.

- Gibson's explanation on an earnings call, whose participants rely upon the accuracy of information in the Bank's securities filings, that matured loans are past due.  GX 104R at 22.

- Gibson and Harra's certification of the Call Report as accurate in accordance with the Call Report Instructions.  GX 86A

"intent to deceive" for Counts 7-10, which may be found where there is evidence that a Defendant made a false statement with an intent to mislead or to "cause a person to believe that which is false."  Jury Instr. at 96 (Counts 7-10).

Other evidence establishing Defendants' knowledge of falsity is also relevant to their criminal intent.  For example, each Defendant occupied a high-level position at the Bank and had significant experience in banking and/or accounting matters.  With those positions came significant responsibilities, including, as relevant to their criminal conduct, the following:

- Each Defendant was involved in the Bank's process of reporting past due loans. North approved initial waiver decisions.  The Controller's Group, led by Rakowski, approved the Past Due and Nonperforming Loans Report.

- Gibson, Harra, and Rakowski each signed the Form 10-K.  Prior to its filing, all four Defendants reviewed and approved drafts of the specific section of Form 10-K containing false past due loan information.

- Gibson, Harra, and North participated in the Bank's earnings calls with analysts.

- Rakowski briefed the Bank's Audit Committee on an annual basis relating to new accounting and regulatory pronouncements and their impact on the Bank.

- Gibson and Harra signed and certified the Call Reports.

- All four Defendants participated in the due diligence process in advance of the February 2010 capital raise.

Based upon Defendants' significant professional responsibilities, their substantial banking and/or accounting experience, and their actual conduct, the jury could correctly infer that each Defendant knew that it would be unlawful to knowingly transmit false past due loan information to the public and the Bank's regulators.  *Moyer*, 674 F.3d at 214 (stating that the defendant's position as a police officer supported an inference that he knew that lying to a federal law enforcement officer was unlawful); *Brodie*, 403 F.3d at 150 (finding that the jury was entitled to give "substantial weight" to the defendant's position as company president and to use it as "a

prism through which to assess all of the other circumstantial evidence"); Jury Instr. at 26 (stating

that "willfully" means proof that a defendant "knew his or her conduct was unlawful and

intended to do something that the law forbids").

The economic context in which waiver decisions were made is also probative of

Defendants' intent.  As all Defendants have noted, the Delaware economy was in the midst of the

"Great Recession" with real estate development stalling due to declining home prices and

demand.  *See, e.g.,* GX 937 (Market Data).  Throughout 2009, the Bank's financial position

declined, as it was forced to increase reserves against loan losses, experienced over $260 million

in nonaccrual loans, and reported a net loss of $4.4 million – all *without* disclosing over $300

million in past due loans or accurately factoring those loans into the other reporting metrics.  *See*

GX. 1 at 27, 30, 65; GX 528 (January 2010 email from Karen Thuresson projecting significant

increase in loan reserves as to certain loan relationships that had been mass-extended).  Given

that "investor attention was on asset quality, credit quality" during the period of the charged

conduct, the jury could infer from Defendants' actions their motivation to withhold additional

negative credit quality information from the public.  *See* Tr. 5171:11-16 (Hodgson).  That

inference is strengthened by the sheer amount of undisclosed past due loans, including that

Defendants only disclosed approximately **3.5%** of the Bank's total amount of commercial past

due loans in the Fourth Quarter of 2009.  *See, e.g.,* GX 1010 ($10.9 million past due loans

disclosed versus $303.6 million waived).  Yet, each Defendant nonetheless approved the Bank's

section of its 2009 Form 10-K, which represented that "the amount of loans past due 90 days or

more was lower at year-end 2009 than at year-end 2008."  GX 1 at 55; GX 515 (draft section of

2009 MD&A); GX 558 (draft section approved by Defendant Harra). And the false past due loan

information in the Bank's Form 10-K was incorporated into and relied upon by investors to

35

purchase stock in the $287 million capital raise – a substantial benefit to the Bank given its precarious financial position.

An additional relevant factor as to criminal intent is Defendants' awareness of the Federal Reserve examination findings and requirement that the Bank enter into an MOU.  The Federal Reserve's 2009 full-scope examination report found that the Bank's overall condition was "less than satisfactory" based on "significant deterioration" in the bank's loan portfolio, its failure to identify problem loans, its weak credit administration, and its poor financial performance.  GX 221R at 2-(1). That report noted ominously that there was a "high probability that the level of problem loans will increase." *Id.* at 4-(8).  Due to the Bank's declining financial performance and other criticisms, the Federal Reserve downgraded the Bank's safety and soundness rating to a composite level "three" – which meant that the Bank's overall condition was "less than satisfactory."  GX 221R at 2-(9)-(10); Tr. 2347:11-17 (Corkery) (noting that the "three" rating was a finding that the Bank "may be in significant noncompliance with laws and regulations" and may "require more than normal supervision, which may include formal or informal enforcement actions").  The examination findings included explicit criticisms of certain Bank lending practices – in particular the Bank's use of supplemental financing to support struggling real estate developers, which the Federal Reserve specifically noted had the potential to mask the Bank's reported level of delinquencies.  GX 221R at 4-(8), 4-(10).[15]

---

[15] Federal Reserve examiners relayed these specific lending concerns directly to Defendants North, Gibson, and Harra, either in loan discussions or in examination exit meetings.  Tr. 2334:12-2335:6 (Corkery); Tr. 3053:19-3054:9, 3099:19-3101:9 (Fomunyam); GX 221R at 1-(2) (reference to exit meeting with Harra and Gibson in attendance).  Defendant Rakowski retained in her desk file a letter from the Bank responding to the Federal Reserve's criticisms on the Bank's "use of interest reserves and extensions."  GX 524A at 5-6.  In addition, each Defendant knew that KPMG had warned the Bank in early-2009 that the use of supplemental financing could be a "red flag."  GX 536 (email from Defendant Gibson to all Defendants stating that

The Federal Reserve thereafter required that the Bank enter into an enforcement action known as a Memorandum of Understanding, or MOU.  GX 283.  The MOU mandated the Bank to remedy deficiencies identified during the examination and to provide certain current financial information to the Federal Reserve on a monthly basis.  One of the required monthly submissions was past due loan information.  Tr. 2296:21-2297-5, 2381:15-19, 2382:17-19 (Corkery); GX 283 ¶ 15.  The Federal Reserve undertook its enforcement action and imposed the past due loan reporting requirement *without* knowing about the Bank's failure to report hundreds of millions of dollars in past due loans.  Tr. 2374:18-21, 2803:23 – 2804:5 (Corkery); Tr. 3016:1-23 (Fomunyam); GX 472.

From the evidence, the jury could certainly infer that false past due loan statements in Call Reports, Monthly Regulatory Reports, and in response to examination requests delayed the Federal Reserve from learning the Bank's true financial condition until summer 2010 – well-after the capital raise in February 2010.  *See* Tr. 2381:7-14 (Corkery testimony that it would have been important to have known whether the Bank was withholding past due loan information in making an enforcement decision); Tr. 3071:10-23 (Fomunyam testimony stating that withheld past due loan information would have been particularly important to know given that the Bank was operating under an MOU and "would have triggered a full scope examination").  The jury could further infer that Defendants' knowingly false past due loan statements – made in the midst of significant criticisms from the Federal Reserve and with knowledge of the possibility of further enforcement actions – flowed from a desire to prevent the Bank's regulator from taking more severe enforcement actions until the Bank could remedy deficiencies in its portfolio of

---

KPMG audit partner John Depman had informed him that "any time a second extension is made should be an immediate red flag").

commercial construction loans.  *See* Jury Instr. at 57 (stating that an "intent to defraud" includes

acting out of a desire to bring about a "benefit" to someone else); Tr. 2458-2461 (Corkery

testimony that the Federal Reserve issued the Bank a "Troubled Condition Letter" during the

Third Quarter 2010 and was considering formal action or ordering the Bank to cease and desist

operations).  Such conduct further supports an intent to mislead the Federal Reserve from

uncovering the Bank's true level of past due loans.  *See* Jury Instr. at 96 (defining "intent to

deceive" as acting with an "intent to mislead"); GX 472 (March 2010 email from North to Harra

expressing concern that the "Feds" might see a number of matured loans on the Shaw system

because the Bank failed to obtain executed extension agreements).

Finally, the fact that the Bank undertook efforts to eliminate the Waiver Practice also

supports a strong inference that Defendants knew the Bank's past due loan reporting was

unlawful.  As the government asked the jury in its closing argument:

> If the loans weren't past due, why waive them? There's no reason to waive a loan
> if it's not past due. If the loans weren't past due, why stop waiving them, because
> at some point, the waiver practice ends, finally, the second quarter of 2010. And if
> the loans weren't past due, why mass-extend them? Why would you ever have to
> extend a loan that wasn't past due?

Tr. 6929:12-20 (closing argument).  In answering these questions, the jury could have considered

the context of the Bank's decision to end the Waiver Practice to be of significant importance.

Those efforts did not begin until *after* the Federal Reserve examination and the Bank's entry into

the MOU.  Even then, with Defendants' clear awareness that the Bank's reporting of matured

loans had to change, the Bank did not do so immediately – and certainly not in advance of the

February 2010 capital raise.  Rather, the Bank, with Defendants' full knowledge, temporarily

extended loans with little to no underwriting at year-end 2009 and the end of the First Quarter

2010.  The jury could rightly infer that these actions were undertaken because the "matured loans

beast" had become too massive and too difficult to unwind that the accurate reporting of such

loans would have been catastrophic to the Bank's survival.  Moreover, the jury could infer that

the delayed implementation of a "zero-tolerance" Waiver Policy until *after* the capital raise (and

following the mass, temporary extension of matured loans with "superficial" underwriting)

benefitted the Bank to the detriment of shareholders who invested on the basis of materially

misleading financial information.  *See* GX 526 (Brewer's January 2010 email referencing

Reybold's negative monthly cash flow and P.J. Bale's "speculative development"); GX S-6

(materiality stipulation regarding past due loans).

### *Capital Raise – Scheme to Defraud (Count 2)*

I.      **Sufficient Evidence Supports Defendants' Conviction on the Scheme to
        Defraud and False and Fraudulent Misrepresentations Theories.**

Defendants also challenge their securities fraud conviction (Count 2) on the grounds that

it was "based on scheme liability that was never proven up at trial."  D.I. 828 at 30.  Defendants

assert that the government failed to prove the materiality of certain qualitative disclosures and

was unable to establish a nexus between reported past due loans and other quantitative

disclosures.  *Id*. at 30-31.

As an initial matter, the Court need not consider Defendants' challenge if it determines

that the government presented sufficient evidence on an alternative legal theory supporting the

convictions on Count 2.  At trial, the Court instructed the jury on two separate theories of

criminal liability as to Count 2 – (1) that Defendants executed a scheme to fraudulently obtain

money and property in connection with the Bank's February 2010 capital raise (the "scheme to

defraud" theory); and (2) that Defendants committed securities fraud by "means of false or

fraudulent pretenses, representations, or promises" (the "false or fraudulent representations"

theory).  Jury Instr. at 48-62.  The Court further explained that the two theories were distinct, and

that the jury had to be unanimous as to the particular fraud theory.  *Id.* at 50 ("It is not enough to convict if some of you find that the government has proven securities fraud under (1) … while others of you find that the government has proven securities fraud under (2) with respect to that defendant").  The government tethered criminal liability for the false or fraudulent representations theory to Defendants' knowingly false disclosures relating to the Bank's 90-day past due loans, Tr. 6948:20-6948:12 (closing argument), and the Court instructed the jury that the 90-day past due loan disclosures were the "only" statements that it could consider under the false or fraudulent representations theory of liability.  Jury Instr. at 60.

If the Court agrees that there is sufficient evidence to support the conviction under Count 2 under the false or fraudulent representations theory, the Court must presume that the jury relied upon that theory for its verdict.  *Griffin v. United States*, 502 U.S. 46, 59 (1991) (holding that if the evidence is insufficient to support a conviction on one alternative theory in a count but sufficient to convict on another alternative theory that was charged to the jury in the same count, then a reviewing court should assume that the jury convicted on the factually sufficient theory and should let the jury verdict stand).  The government has explained at length why sufficient evidence supported a finding that Defendants knowingly made or caused to be made false past due loan statements in the Bank's Form 10-K with an intent to defraud.  Thus, the Court should find that there is sufficient evidence to uphold the conviction on Count 2.  *Syme*, 276 F.3d at 148 (declining to resolve sufficiency of the evidence challenge where an "alternative theory of guilt within the same count [was] both legally valid and supported by sufficient evidence").

In any event, Defendants' challenge to the "scheme to defraud" theory fails on the merits. The government's scheme to defraud theory was broader than just a single false statement made in connection with the capital raise.  *See United States v. Haddy*, 134 F.3d 542, 548-49 (3d Cir.

1998) (holding that the allowable unit of prosecution for a securities fraud charge could be the

scheme itself, rather than discrete events); Tr. 6595:1-16 (charge conference).  The scheme to

defraud was Defendants' plan to lie about past due loans in connection with the capital raise.

That past due loan scheme included loans that were falsely unreported due to the Waiver

Practice, *as well as* loans that were not reported due to the mass-extension of hundreds of

millions of dollars in matured loans at year-end 2009 without the "proper or needed level of

underwriting."  GX 418.  The specific qualitative statements challenged in Gibson's brief – that

the Bank did not employ rigorous loan underwriting, that it typically obtained collateral and

personal guarantees from borrowers, and that it regularly reviewed all past-due loans and loans

not being repaid according to contractual terms – are not simply "vague generalizations."  D.I.

828 at 30.  Rather, the government linked them directly to a plan to conceal past due loans

through a sham "extend and pretend" scheme.[16]

To that end, the government focused the jury on the context of the Bank's decision to

mass-extend loans – including information that Defendants knew prior to the capital raise and

their non-disclosure of the Waiver Practice or mass-extension practice to stock analysts, the

Federal Reserve, the Underwriters, or KPMG (despite multiple opportunities to do so).[17]  And, as

---

[16] The government did not reference the quantitative disclosures discussed on page 31 of
Defendant Gibson's brief in its closing argument in relation to Count 2.  But it did present
evidence demonstrating that there was a link between the non-reporting of loans that were
waived/mass-extended and those loans later going on nonaccrual status.  *See* GX 1030A
(summary chart depicting $55,229,189.14 of matured loans waived at year-end 2009 moved to
nonaccrual status by the Third Quarter 2010); *see also* Tr. 3014:8-3015:4; 3070:20-3071:6
(Fomunyam testimony that the Federal Reserve, which reviewed all disclosed 90-day past due
loans for nonaccrual status, would have done the same regarding non-disclosed loans).
Moreover, the government introduced the Bank's Credit Risk Management policy and risk
ratings definitions, which stated that "a loan that is 90 days or more past due should be rated 70
or 80" – that is, substandard.  Tr. 1424 (Infanti); GX 411A (Risk ratings definitions).

[17] *See* GX 1 at 53 (describing the "level of loans past due 90 days or more" as a key measure that
the Bank used to evaluate its exposure to credit risk); GX 637 (Hodgson email to Gibson and

the government argued in its rebuttal closing argument, the Waiver Practice and short-term

extensions were part of an interrelated scheme to lie about the Bank's 90-day past due number:

> They've indicated through their testimony that they knew that this was a
> superficial, or, I'm sorry. Mr. Brewer told you that there were superficial mass
> extensions were going on, that the surge turned into large downgrades. Right.
> And at the same time, go back and look at the 10-K, what they are telling the
> public. Right. This is the key. **The absolute material false statement is that the
> 90-day number, what it is, and that it's actually going down '09 compared to
> '08.** But then look at all the other information that's provided to the public, the
> rigorous loan underwriting, that they regularly reviewed past due loans, that they
> regularly obtained appraisals. Ask yourself, is that in any way, shape or form
> consistent with the information that was going on at the bank at the time that the
> defendants were aware of it?

Tr. 7331:15-25 (rebuttal closing argument) (emphasis added).

Regardless, because Defendants stipulated to the materiality of the 90-day past due loan

information, and because there was sufficient evidence to support the jury's conclusion that the

90-day past due loan information was false, Defendants' arguments that the government failed to

prove the materiality of each statement identified in Gibson's brief are immaterial.  For purposes

of scheme-based liability, the Court provided a specific unanimity instruction that the jury had to

agree "unanimously as to at least one of the material misrepresentations."  Jury Instr. at 51.  The

*only* specific false or fraudulent statements that the Court identified in its instructions were the

---

North asking why the Bank's construction loan balances were not declining); Tr. 5724:9-
5726:24, 5787:7-22, 5763:3-23 (Hodgson testimony referencing his focus and questioning on the
fact that the Bank's "construction land loans didn't decline and they should decline" to which he
never received an answer prior to the capital raise); Tr. 5673:3-23 (Depman testimony that he
was unaware of the Waiver Practice or short-term extensions and would have wanted to know);
Tr. 5829:17-20, 5839:4-6 (Schechter testimony that he did not recall Bank employees disclosing
during the short-term extensions during the underwriting process or in any road-show slides
relating to the capital raise);  Tr. 2793:9-2795:1 (Corkery testimony that neither Defendants nor
any other Bank personnel informed him of mass-extensions while he was on site in January 2010
prior to the capital raise); Tr. 3099:25-3101:6 (Fomunyam testimony that the Federal Reserve
identified unsupported, short-term maturity extensions in the Summer 2010 and informed the
Bank that the practice had the ability to mask delinquencies).

three statements specifically relating to 90-day past due loans.  Jury Instr. at 60.[18]  As the

emphasis in the above block quote makes clear, the government argued that the 90-day past due

loan information was an essential materially false or fraudulent statement under the scheme to

defraud theory.  Since the evidence supported that conclusion, Defendants' challenge to the

insufficiency of evidence on the scheme to defraud theory fails.  *See, e.g., Syme*, 276 F.3d at 144.

## II.      Sufficient Evidence Supports North's Conviction on Count 2

Defendant North separately challenges the sufficiency of proof as to Count 2, asserting

that "there was no evidence that Mr. North played any role in the planning of the capital raise,

the preparation of the Prospectus, or that he signed any documents related to the undertaking."

D.I. 825 at 34.  As an initial matter, whether North planned the capital raise from the outset is not

dispositive.  As the Court instructed the jury, the "government is not required to prove that a

particular defendant originated the scheme to defraud" – just that he or she participated in it with

the necessary criminal intent.  Jury Instr. at 52.

Here, the government presented sufficient evidence to support North's securities fraud

conviction.  From the evidence, the jury could infer that North learned of the capital raise no

later than February 5, 2010, when he received an email entitled "due diligence," which contained

the "due diligence schedule and question list" for a meeting with the underwriters scheduled for

February 11, 2010.  GX 633 (email); GX 633A (attachment); Tr. 5013:19-23 (Brewer testimony

that he must have been aware of the capital raise as of February 5, 2010, when he received the

referenced email).   Additional evidence supports an inference that North was aware of the

capital raise *prior to* the February 11 meeting because he:

---

[18] The Court did not identify any of the statements challenged by Defendants that were
immaterial or lacked a nexus to the offense in the Jury Instructions.  *See* Jury Instr. at 51-52; Tr:
6607:11-6610:21 (Court's explanation of ruling during charge conference).

- received a draft copy of the MD&A section on February 7, 2010.  GX 516; Tr. 3623:13-3633:8 (Roberts); and

- provided specific edits to the MD&A, including in a section relating to past due loans. GX. 433.

North attempts to discount these edits as *de minimus*, but they must be considered in the context of North's knowledge about the Bank's waiver and mass-extension practices at the time and its false reporting of past due loans – addressed in detail, *supra*.  Moreover, the edits occurred *after* he knew that the Bank would be raising capital and with knowledge of the upcoming due diligence meeting with the Bank's underwriters.

The evidence further supports an inference that North participated in the business due diligence meeting for "Loan portfolio and credit quality review," where the following relevant items were addressed: credit underwriting guidelines, loan modification programs, 30-day delinquencies, and the Bank's percentage of construction loans with interest reserves.  GX 436A at 9 (items 4, 6, 7, and 19).  The agenda listed North as participating in the meeting, GX 435 at 26, and Michael Schechter (the J.P. Morgan underwriter) testified that North was present.  Tr. 5826:1-5 (Schechter).  He further testified that the business due diligence meeting covered "all of those items on the due diligence list," and that that they went through the list "[i]tem by item." Tr. 5826:12-20 (Schechter).  According to Mr. Schechter, Defendant North answered most of the questions during the meeting:

> Q. All right. And do you recall, Mr. Schechter, who was answering questions on behalf of Wilmington Trust during their meeting?
>
> A. The questions are generally answered not only by one person, there are different people giving answers, but **that would have been primarily Bill North**.

Tr. 5827:12-17 (Schechter) (emphasis added).  Mr. Schechter stated that the "general tone of the meeting … was that the loan portfolio was in good shape and would be able to, you know,

withstand the credit environment." Tr. 5828:5-10.   Mr. Schechter did not recall any discussion

of the Bank's waiver of past due loans or short-term temporary extensions of matured loans at

year-end 2009.  Tr. 5828:11-5829:20 (Schechter).

Such evidence, in the context of Mr. North's knowledge that the Bank's past due loan

reporting was false, supports an inference that he participated in the securities fraud scheme

and/or caused the Bank to make false misrepresentations relating to past due loans in connection

with the capital raise.

### *Conspiracy*

The jury convicted Defendants on Count One of the Indictment, which charged them with

conspiracy to defraud the United States, to commit securities fraud, and to make false statements

to federal regulators, all in violation of 18 U.S.C. § 371.   In sum, Defendants claim that the

government failed to prove this offense for the following reasons:  (1) no evidence exists of an

overt or implicit illicit agreement; (2) no evidence exists that any Defendant intended to join

such an illicit agreement; and (3) that the Government only presented evidence of a separate

conspiracy between Terranova and Bailey.[19]  D.I.'s 825 at 32; 826 at 10; 828 at 20.  These

claims, however, ignore the reasonable inferences the jury was free to make based on the

evidence presented at trial.  Here, the trial evidence demonstrated that Defendants used their

respective positions at the Bank to conceal the Waiver Practice from the Federal Reserve, the

SEC, and investors, and caused a false past due 90-day number to be reported in its Call Reports,

Monthly Regulatory Reports, and SEC filings.  For the reasons set forth below, the Court should

deny their Motions.

---

[19] The claim that the government only presented evidence of a separate conspiracy is fully
addressed in the "Variance" section starting on page 61.

I.      **Legal Standard.**

Count One of the Indictment charged that Defendants conspired to: (1) defraud the

United States[20]; (2) commit securities fraud, in violation of 18 U.S.C. §§ 1348 and 2 (the

substantive offense charged in Count 2); and (3) make false statements to Federal Regulators,

including either the SEC or Federal Reserve in violation of 18 U.S.C. §§ 1001 and 2 (the

substantive offenses charged in Counts 5 and 11 through 16).   To prove a criminal conspiracy,

the government must prove the following three elements: "(1) an agreement between two or

more persons to commit … [the offense]; (2) the defendant knowingly joined the conspiracy; and

(3) one of the conspirators committed an overt act in furtherance of the conspiracy." *United*

*States v. Gebbie*, 294 F.3d 540, 544 (3d Cir. 2002).   Moreover, the proof necessary to establish

these elements "incorporates a demonstration that a defendant has 'knowledge of the illegal

objective contemplated by the conspiracy.'" *United States v. Mastrangelo,* 172 F.3d 288, 292

(3d Cir. 1999) (citing *United States v. Wexler*, 838 F.2d 88, 90-91 (3d Cir. 1988)).

Because agreements to engage in criminal activity are inherently clandestine direct

evidence is often rare.   *United States v. McGlory*, 968 F.2d 309, 321 (3d Cir. 1992).

Accordingly, the government "does not have to prove the existence of a formal or written

agreement, or an express oral agreement spelling out the details of the understanding."   Model

Criminal Jury Instructions, 3d Circuit, § 6.18.371C.   Rather a conspiracy may be inferred "from

evidence of related facts and circumstances from which it appears as a reasonable inference, that

**the activities of the participants . . . could not have been carried on except as the result of a**

**preconceived scheme or common understanding**." *Id.* at 321-22 (emphasis added) (citation

---

[20] To "defraud the United States" means "to obstruct or interfere with one of the United States
government's lawful functions by deceit, craft, trickery, or dishonest means."   Jury Instr. at 37.

and quotation omitted).  The government may likewise utilize circumstantial evidence to demonstrate a defendant's intent to join a conspiracy and further its goals.   Model Criminal Jury Instructions, 3d Circuit, § 6.18.371E.   For example, "evidence that a defendant derived some benefit from the conspiracy or had some stake in the achievement of the conspiracy's objective," may show that that defendant intended to further that objective.  *Id.*   The government "need not prove that each defendant knew all of the conspiracy's details, goals, or other participants." *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002); Model Criminal Jury Instructions, 3d Circuit, § 6.18.371C  ("The government also does not have to prove that all the members of the conspiracy directly met, or discussed between themselves their unlawful objectives, or agreed to all the details, or agreed to what the means were by which the objectives would be accomplished.").

## II.   The Government Presented Sufficient Evidence of a Conspiratorial Agreement and Each Defendant's Criminal Intent to Join That Agreement.

As established above, the government presented sufficient evidence that each Defendant knew that the Bank's statements regarding past due loans were false.  *See supra* at 15-30.  In addition, there was sufficient evidence that Defendants acted with the underlying criminal intent regarding each object of the conspiracy.  *See supra* at 31-38; Jury Instr. at 42.  Thus, the remaining question is whether the government provided sufficient evidence of a conspiratorial agreement and Defendants' choice to knowingly and intentionally join that agreement.

The trial evidence demonstrated that the charged objects of the conspiracy were the product of a common plan to conceal the Bank's 90-day past due loan number from federal regulators and investors outside the Bank.  Armed with knowledge about the weaknesses in the Bank's commercial loan portfolio, the magnitude of the Waiver Practice in October 2009, the state of the economy, and the financial struggles of the Bank's borrowers, each Defendant used

his or her position at the Bank to execute this scheme to produce a false past due 90-day number.

As the government stated in its closing argument:

> If Mr. North doesn't approve the waivers, the loans don't get waived.  If the controller's group doesn't approve the past due nonperforming loan report, the information isn't submitted publicly.  If Defendants Harra and Gibson or Rakowski don't sign the documents, the information is not transmitted.  So by their knowledge, by their conduct, and by their action, you can infer that Defendants were part of an agreement to keep the reported past due number down.

Tr. 7004 (closing argument).

During trial, the government highlighted specific evidence to prove an agreement to achieve the multiple objects of the conspiracy.  Regarding the conspiracy to defraud the United States, the government demonstrated that each Defendant was aware that the Bank was required to transmit accurate past due loan information to the Federal Reserve – either in quarterly Call Reports, during examinations, and in monthly regulatory submissions under the MOU.  Yet, the evidence showed that Defendants worked together to deceive the Federal Reserve.  For example, the jury could infer the following from the evidence:

- Each Defendant played a role in the submission of false past due loan information in the Bank's Call Reports to the Federal Reserve – North approved the waived loans, Rakowski and Gibson were responsible for the Past Due report and public reporting, and Gibson and Harra certified the accuracy of the information reported in the Call Reports.

- The execution of the Waiver Practice resulted in false past due loan information being submitted to the Federal Reserve during the Target Examination that commenced in January 2010 and concluded in April 2010.  GX 259; Tr. 3269:24-3270:8 (Fomunyam).  Prior to the end of that examination, on March 30, 2010, North informed Harra that the failure of lenders to execute signed change in terms agreements might cause the Federal Reserve to learn about the Bank's large volume of matured loans – to which Harra responded "Ugggh."  GX 472.

- Rakowski, Gibson and North were each involved in the submission of false Monthly Regulatory Report data to the Federal Reserve.  That is, they consciously "pulled" hundreds of millions of dollars in waived loans and further caused the Bank to misrepresent the reasons for the Bank's increased volume of past due loans shortly after the monthly submission requirement was imposed.  *See, e.g.,* GX 524; GX 574,

GX 243; GX 247.  The other Monthly Regulatory Reports submitted by the Bank to the Federal Reserve also contained false past due 90-day information.  *See* Tr. 7010-11 (closing argument).

- Defendants did not inform Federal examiners of the Bank's practice of waiving or mass-extending matured loans, despite multiple opportunities to do so.  Tr. 2793:9-2795:1, Tr. 2411:18 – 2412:16 (Corkery); Tr. 3016:1-23 (Fomunyam).

Through their shared conduct, Defendants obstructed the Federal Reserve's ability to conduct its oversight function into the Bank's safety and soundness with complete and accurate information. Tr. 2381:7-14 (Corkery); 3071:10-23 (Fomunyam).  The shared conduct further delayed the Federal Reserve's learning of the Bank's true condition. Tr. 2458-2461 (Corkery); Tr. 3099:25-3101:6 (Fomunyam).

The jury was free to reach a similar conclusion regarding the remaining objects of the conspiracy.  The evidence demonstrated an agreement to falsely report past due loan information to the public and the Bank's regulators with the requisite criminal intent.   Quite simply, the submission of false past due loan information in connection with the capital raise and via monthly and quarterly public reports to the SEC and/or the Federal Reserve could not have happened without the coordinated efforts of all Defendants.  The government previously submitted an Appendix in connection with its Omnibus Response to the initial Rule 29 motions, in which it summarized evidence of the coordinated actions undertaken by Defendants.  *See* D.I. 749 Ex. B (reproduced in Appendix A).  Broad examples of Defendants' shared conduct to keep the Bank's past due number down include the following (reproduced from pages 33-34):

- Each Defendant was involved in the Bank's process of reporting past due loans. North approved initial waiver decisions.  The Controller's Group, led by Rakowski, approved the Past Due and Nonperforming Loans Report.

- Gibson and Harra signed and certified the accuracy of the Bank's Call Reports. Gibson, Harra, and Rakowski each signed the Form 10-K.

- Gibson, Rakowski, and North participated in providing false information to the Federal Reserve in connection with the October 2009 Monthly Regulatory Report.

- Each Defendant reviewed and approved drafts of the specific section of the Form 10-K containing false past due loan information.

- Gibson, Harra, and North participated in the Bank's earnings calls with analysts where the Bank's past due loan information was discussed.

- Each Defendant participated in the due diligence process in advance of the February 2010 capital raise.

- Gibson, Harra, and North were key decision makers in gradually ending the Bank's Waiver Practice.

Based on this evidence, the jury could reasonably conclude that because each Defendant either approved the Waiver Practice and mass extensions of loans, signed the public filings, met with federal regulators and investors, and/or participated in earnings calls they acted with a unity of purpose to conceal the true past due 90-day number. *Brodie,* 403 F.3d at 151 (upholding government's inference because defendants "owned the entities involved, were active participants in company affairs, and appeared to have communicated to one another on business related issues….").

Defendants, however, continue to argue that no evidence exists of an illicit agreement or that anyone joined such an agreement. Defendants recast the same arguments they made to the jury, including that the Waiver Practice was a longstanding business practice; that numerous Bank employees were aware of the Waiver Practice; and that the Bank repeatedly disclosed these lending practices to the regulators – all arguments that the jury, through its verdict, flatly rejected.

Defendants further rely on a string of cases including *United States v. Tyson*, 653 F.3d 192 (3d Cir. 2010), *United States v. Pressler*, 256 F.3d 144 (3d Cir. 2001), and *United States v. Pearlstein*, 576 F.2d 531 (3d Cir. 1978), to support their claim that the government's evidence

did not prove an agreement between and among Defendants.[21]   These cases, however, are easily distinguishable from the present matter.   In *Tyson*, a weapons trafficking case, the Court found that the overlapping conduct between the defendants lasted no more than a week and that there was no evidence that one defendant interacted with the other, let alone assisted the other in committing the substantive offense.   *See Tyson*, 653 F.3d at 210.   In *Pressler*, a narcotics case, the Court concluded that without any additional evidence of coordination and cooperation between the defendants, the government's evidence only proved a buyer-seller relationship.   *See Pressler*, 256 F.3d at 156.   In *Pearlstein*, a fraud case, the Court noted that the district court correctly dismissed the conspiracy charge against several defendant-salesmen because the government did not prove that these individuals knew the company's underlying product that they sold was inherently fraudulent.   *See Pearlstein*, 576 F.2d at 538.   But while these cases are notable for the slight connections between the various defendants, the jurors in this case were provided emails, testimony, and other documents regarding the extensive interactions between Defendants to carry out the conspiracy's objects.

---

[21] Defendant North also cites *United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018), to argue that the government's sole reliance on inferences is misplaced.  D.I. 825 at 32.  Setting aside that *Ganji* represents non-binding authority, the facts are also distinguishable from the present case.  In *Ganji*, two medical doctors (including Dr. Ganji) were convicted of conspiring to commit a home health care fraud scheme.   *See id*.  In overturning the verdict, the Court found the government's conspiracy evidence amounted to (1) Dr. Ganji receiving a $1,000 monthly check from the health agency who legitimately employed her; (2) the increase in referrals from Dr. Ganji on behalf of the same home health agency; and (3) the fraudulent behavior of Dr. Ganji's co-conspirator.   *See id*. at 768.  The Court further gave great deference to Dr. Ganji's "extensive" testimony, which the Court noted went "unchallenged" by the government.   *See id*. at 771.   Here, unlike *Ganji*, the government offered evidence that showed that Defendants (1) knew the past due 90-day number was false; (2) collectively approved of and used the Waiver Practice and the mass extension of loans to avoid reporting these past due 90-day loans publicly; and (3) made statements about the quality of these loans, the Waiver Practice itself, or the need to ensure regulators did not ask questions about these specific loans.  Finally, none of Defendants in this case testified in their defense and virtually every piece of evidence was highly-contested.  Accordingly, the Court should give very little weight to *Ganji* in deciding this motion.

Here, once the jury concluded that Defendants knew the past due 90-day number was false, it was free to infer that Defendants' coordinated acts allowed the Bank to conceal this information from regulators and the public.  For example, Defendants collectively worked on public filings, like the 2009 Form 10-K, which not only reported a false past due 90-day number, but employed misleading language like "rigorous underwriting" and declared that the past due 90-day number actually decreased from 2008 to 2009.  *Smith*, 294 F.3d at 477 ("the existence of a conspiracy 'can be inferred from the evidence of related facts and circumstances from which it appears a reasonably and logical inference.'").  Additionally, at key moments in time the evidence showed that Defendants discussed giving themselves more time to "allow for the proper/needed level of underwriting required on CRE credits" and not allow regulators "the opportunity" to ask questions about the volume of matured loans in the portfolio.  GX 418; GX 472.

Jurors were also free to reject Defendants' claim that the Waiver Practice was a longstanding practice conducted in good faith, after receiving evidence that showed Defendants and others describe the practice as a "crutch," a "beast," and a "decades long problem."  *Brodie*, 403 F.3d at 134 (stating that it is "it is immaterial that the evidence also permits a "less sinister conclusion" because "the evidence need not be inconsistent with every conclusion save that of guilt.").   Finally, Defendants' collective failure to disclose this practice and the subsequent mass extension of matured loans to any outside group despite regular meetings with regulators, KPMG employees, and underwriters – all of whom possessed a vested interest in knowing the status of these loans – further demonstrated the unity of purpose amongst Defendants. Accordingly, the evidence submitted in this case is much more extensive than the cases cited by

Defendants and the Court should find that the government met its burden in proving the charged conspiracy.

### *Accomplice Liability (North)*

Defendant North claims that there was insufficient evidence to support his substantive convictions for causing the Bank to make false statements or false entries (Counts 4-16) because he had no real involvement in the process of waiving or reporting past due loans.  D.I. 825 at 36-39.  But the government submitted sufficient evidence establishing that North "knowingly did some act for the purpose of aiding, abetting, assisting, or encouraging" in furtherance of the charged offenses.  Jury Instr. at 98-99.[22]

First, contrary to North's arguments at trial and in his briefing, there was sufficient evidence that he approved the Bank's waiver decisions.  Stephen Cummings testified that North approved the waivers, Tr. 2056:21-2057:3 (Cummings); the government introduced evidence corroborating that testimony, GX 504, Tr. 2059:20-23 (Cummings); and the emails set forth on page 26, *supra*, contain language supporting North's responsibilities to make waiver decisions.  *See, e.g.,* GX 487 (setting forth situations in which North would be "OK waiving" versus situations that "are not ones that we should be waiving).  And, as set forth above, there was sufficient evidence that North knew that waivers decisions had a direct impact on public

---

[22] Defendant North does not address *Pinkerton* liability in his brief.  Thus, he does not challenge the sufficiency of the evidence to support a finding that the substantive offenses were "reasonably foreseeable" as part of his membership in the conspiracy.  *See* Jury Instr. at 101-02.  Accordingly, if the Court concludes that the government proved that North knowingly and intentionally joined the conspiracy, there is no basis at this stage of the proceedings to upset the jury's verdict under a *Pinkerton* theory of liability.  *See Syme*, 276 F.3d at 137 (declining to review the sufficiency of the evidence because the defendant declined to challenge the insufficiency of the evidence supporting at least one of the other fraud theories charged in the indictment).

reporting, and that he was directly involved in the Bank's process to change its past due loan reporting.  *See* pages 26-27, *supra.*

In addition, North was involved in the actual preparation of the Bank's securities filings that contained past due loan information.  Ellen Roberts testified that she provided a draft of the MD&A credit risk section to North and the other defendants in advance of securities filings.  Tr. 3490:23-3492:10 (Roberts); GX 433R/433A.  That section contained the past due loan information that the Bank publicly reported which, as the evidence has shown, North knew was false.  North provided edits to that section knowing that it would be part of the Bank's annual report.  Tr. 3493:21-3497:7 (Roberts).  The information in the annual report was directly incorporated into the Bank's proxy statement for the capital raise, GX 3 – the due diligence process for which North directly participated therein.  GX435 at 28, GX 436A at 9.  North also had direct interactions with stock analysts relating to securities filings and the Bank's loan portfolio, including specific questions relating to past due loans.  GX 427 (North email describing August 2009 investor field trip), GX 637 (email from stock analyst to North and Gibson referencing "kicking the can down the curb"), 103R (First Quarter 2010 earnings call, where North answered an analyst question regarding the Bank's reported "90-plus past due" loans).

The government further introduced evidence that Defendant North participated in drafting the Bank's October 2009 past due loan submission to the Federal Reserve.  GX 247 (submissions under the MOU, including the submission dated November 25, 2009).  As referenced above, the government established that the MOU submission (charged as part of the Conspiracy to Defraud the Federal Reserve as part of Count 1 and substantively as Count 16) contained false past due loan information, as well as misleading text as to why past due loan

figures had risen in the month of October 2009.  Defendant North edited the letter and retained it

within an enforcement binder (also including a marked-up version of the paragraph of the MOU

relating to reporting past due loans) that he later provided to Terry Brewer.  Tr. 5102-5103

(Brewer); GX 521.

From all of this evidence, as well as the evidence set forth above, the jury could properly

conclude that North aided and abetted the charged substantive offenses.


### *False Certification Convictions (Gibson)*

Defendant Gibson argues that there was insufficient evidence to support his convictions

on Counts 17-19, which charged him with falsely certifying periodic securities reports, in

violation of 18 U.S.C. § 1350.  Gibson claims that the convictions must be overturned because:

the government failed to present evidence (1) on the requirements of Section 13(a) and 15(d) of

the Exchange Act; (2) that Gibson knew those requirements; and (3) knew that his certifications

were false.  Each argument is unavailing.

As an initial matter, it is necessary to examine the statute of conviction and the elements

of the offense.  Section 1350, the statute upon which the jury convicted Gibson of Counts 17-19,

sets forth the requirement that the chief executive officer and chief financial officer of certain

"issuers of securities" execute a certification in connection with period financial reports.  18

U.S.C. § 1350(a).[23]  The certification requirement applies only to financial statements "filed by

---

[23] Section 1350(a) provides the following:

> (a) **Certification of Periodic Financial Reports** – Each periodic report containing
> financial statements filed by an issuer with the Securities Exchange Commission
> pursuant to section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15
> U.S.C. 78m(a) or 78o(d)) shall be accompanied by a written statement by the
> chief executive officer and chief financial officer (or equivalent thereof) of the
> issuer.

an issuer with the Securities Exchange Commission pursuant to section 13(a) or 15(d) of the

Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d))."  *Id.*  Section 13(a) of the

Securities Exchange Act of 1934 is codified at 15 U.S.C. § 78m(a), and it requires, in relevant

part, that every "issuer of a security" file information and documents required by the Securities

Exchange Commission, including "such annual reports . . . and such quarterly reports . . . as the

Commission may prescribe."  Section 15(d) of the Exchange Act (codified at 15 U.S.C.

§  78o(d)), requires, in relevant part, that each issuer of a security file with the SEC "such

supplementary and period information, documents, and reports as may be required pursuant to"

Section 13(a).  The requirements of Sections 13(a) and 15(d), thus, are that issuers of securities

file the required annual and quarterly reports with the Securities and Exchange Commission.

The required content of the written certification is set forth in Section 1350(b), which

provides the following:

> **(b) Content** – The statement required under subsection (a) shall certify that the
> periodic report containing the financial statements fully complies with the
> requirements of section 13(a) or 15(d) of the Securities Exchange Act [o]f
> 1934 (15 U.S.C. 78m or 78*o*(d)) and that information contained in the periodic
> report fairly presents, in all material respects, the financial condition and
> results of operations of the issuer.

18 U.S.C. § 1350(a), (b).  Section 1350 thus sets forth two certification requirements:  (1) that

the financial statements fully comply with the applicable filing requirements of the Securities

Exchange Act <u>and</u> (2) that the information contained in the periodic report fairly presents the

financial condition and operations of the issuer.

Section 1350(c) sets forth criminal liability relating to the certification.  That section

provides that whoever completes the certification "knowing that the periodic report

accompanying the statements does not comport with **<u>all</u>** the requirements set forth" in

subsections (a) and (b) is subject to criminal penalties.  *Id*. § 1350(c) (emphasis added).  Thus,

the section applies criminal liability if a defendant makes a knowingly false certification as to

any of the information required under § 1350(b).

      The Court instructed the jury as to the general elements of the offense, including the

requirement that the government prove beyond a reasonable doubt that "the certification was

materially false" and that "Mr. Gibson knew at the time the certification was made that the

certification was materially false."  Jury Instr. at 107.  The Court also provided an instruction

that accurately set forth the government's theory of falsity:

> According to the government, the reason why these certifications were false is
> that the periodic reports pertaining to each certification **did not report certain**
> **matured loans that were current for interest payments and in the process of**
> **extension as "past due," which allegedly resulted in Wilmington Trust failing**
> **to fairly present, in all material respects, the financial condition of the Bank**,
> in violation of 18 U.S.C. §  1350.

Jury Instr. at 104 (emphasis added).  Gibson does not reference this instruction in his brief.

Rather, he cites to a subsequent instruction stating that the jury had to find that "the certifications

in Counts 17-19 were false because **loans . . . were required to be reported as 'past due'**

**pursuant to either Section 13(a) or 15(d) of the Securities Exchange Act.**"  Jury Instr. at 112

(emphasis added); *see also* Jury Instr. at 113 (stating that the government had to prove that the

certification "did not comply with the requirements of Section 13(a) or 15(d) of the Securities

Exchange Act of 1934 **and** . . .").  In this respect, the latter jury instructions erroneously required

the jury to find an additional element, linking the "past due" status of a loan to statutory sections

addressing what particular periodic reports that a public company has to file.

      The government contends that the initial falsity instruction was correct.  To the extent

that the latter instruction imposed an additional element, the Court is directed to address the

sufficiency of the evidence "against the element of the charged crime" and not against the

heightened jury instructions. *Musacchio v. United States*, 136 S Ct. 709, 715 (2016).  It is

immaterial whether the government objected to the heightened instruction at trial. *Id.*  That is

because the Court's "[s]ufficiency review essentially addresses whether 'the government's case

was so lacking that it should not have even been submitted to the jury.'" *Id.* (citation omitted).

Due process does not require a testing of the sufficiency of the evidence against the heightened

jury instruction because:

> A reviewing court's limited determination on sufficiency review thus does not
> rest on how the jury was instructed.  When a jury finds guilt after being instructed
> on all elements of the charged crime plus one more element, the jury has made all
> the findings that due process requires. If a jury instruction requires the jury to find
> guilt on the elements of the charged crime, a defendant will have had a
> "meaningful opportunity to defend" against the charge.  And if the jury
> instruction requires the jury to find those elements "beyond a reasonable doubt,"
> the defendant has been accorded the procedure that this Court has required to
> protect the presumption of innocence.  The Government's failure to introduce
> evidence of an additional element does not implicate the principles that
> sufficiency review protects.  All that a defendant is entitled to on a sufficiency
> challenge is for the court to make a "legal" determination whether the evidence
> was strong enough to reach a jury at all.  The Government's failure to object to
> the heightened jury instruction thus does not affect the court's review for
> sufficiency of the evidence.

*Id.*

Accordingly, in assessing the sufficiency of the evidence, the Court should determine

whether the government provided sufficient evidence that Defendant Gibson knew that he falsely

certified that the information provided in the relevant SEC Report, as pertaining to past due

loans, "fairly presents, in all material respects, the financial condition and results of operation of

Wilmington Trust." *See* GX 1A.

## I.     The Government Produced Sufficient Evidence of the Requirements of Section 13(a) and 15(d) of the Exchange Act.

Gibson argues that the government failed to present evidence on the statutory

requirements of Section 13(a) or 15(d).  But that argument fails because the government's trial

evidence specifically referenced the Section 13(a) and 15(d) requirements, and the Court

instructed the jury on those elements as a matter of law.

It is the function of the Court to instruct the jury as to applicable legal requirements.

*Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (holding that district courts hold

a "pivotal role in explaining the law to the jury.")  Here, the Court instructed the jury as a matter

of law that Wilmington Trust "was an issuer with a class of securities . . . that was **required to**

**file reports under Section 15(d) of the Securities Exchange Act of 1934**, during the period set

forth in the Indictment."  Jury Instr. at 55 (emphasis added); *see also id.* at 109; Tr. 6841:15-20

(charge conference).  The Court further instructed the jury that "Wilmington Trust Securities

were registered under a national exchange or required to file reports under the Securities

Exchange Act."  Jury Instr. at 58.  The Court also instructed the jury as a matter of law that SEC

Forms 10-Q and 10-K at issue constituted an "application, report, or document required to be

filed with the Securities Exchange Commission."  Jury Instr. at 69.

In addition to the jury instructions, the government introduced sufficient evidence from

the face of the SEC Reports from which the jury could infer that Defendant Gibson knew of the

"statutory requirements" of Sections 13(a) or 15(d).  For example, the government introduced

evidence that each relevant SEC Report[24] contained a checked box at the top of the document

indicating that it was being filed pursuant to Section 13 or 15(d) of the Exchange Act.  *See, e.g.,*

GX 1 at 1.  A later checked box indicated that the Bank was required to file reports pursuant to

Section 13 or 15(d) of the Act.  *Id.* (checking "no" to the question whether the registrant was

"not required" to file reports).  A subsequent checked box answered "yes" to the question of

---

[24] The Court instructed the jury that the SEC Reports at issue for Counts 17-19 were the Bank's Form 10-Q for the Third Quarter of 2009, Form 10-K for 2009, and Form 10-Q for the First Quarter of 2010.  Jury Instr. at 104.

"whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the

Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that

the registrant was required to file such report(s)), and (2) has been subject to such filing

requirements for the past 90 days." *Id*.

The government further introduced evidence that Defendant Gibson knew of the Section

13(a) and 15(d) requirements that the Bank file periodic reports.  Gibson electronically signed

the Form 10-K "[p]ursuant to the Securities Exchange Act of 1934." *Id*. at 142.  The preface to

the "Signatures" section stated that the report was signed "[p]ursuant to the **requirements of**

**Sections 13 or 15(d)** of the Securities Exchange Act of 1934." *Id.*  (emphasis added).  And, as

quoted below, the Section 1350 certification itself referenced the requirements of Sections 13(a)

of the Securities Exchange Act.  GX 1A.

For these reasons, the government presented sufficient evidence regarding the

requirements of Section 13(a) and 15(d) of the Exchange Act.

## II.    There is Sufficient Evidence that Defendant Gibson Knew That the Section 1350 Certifications Were False.

The government further presented sufficient evidence that Gibson knew that the Section

1350 certifications were false.  At trial, the government introduced specific "Section 1350

Certifications" taken from the Bank's Form 10-K or 10-Q.  *See* GX 1A (2009 Form 10-K); 4A

(3Q09 Form 10-Q); 5A (1Q10 Form 10-Q)).  Those certifications tracked the language of

Section 1350 and stated the following:

> The undersigned certify that, to their knowledge, the [applicable SEC Report] of
> Wilmington Trust Corporation ("Wilmington Trust") for [the applicable reporting
> period] fully complies with the requirements of section 13(a) of the Securities
> Exchange Act of 1934 and that the information contained in that report fairly
> presents, in all material respects, the financial condition and results of operation
> of Wilmington Trust.

GX 1A.

Gibson claims that the government had to prove that he knew that past due loans had to be reported as past due "pursuant to either Section 13(a) or 15(d) of the Exchange Act." D.I. 828 at 26. The falsity standard, however, is not tied to Sections 13(a) or 15(d) which, as described above, identify the types of reports that issuers of securities (like the Bank) are required to file. Rather, for purposes of establishing Gibson's knowledge under Section 1350, the government was required to prove that Gibson falsely certified "that he knew that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of" the Bank. The government presented substantial evidence that Gibson knowingly and intentionally made false statements about the Bank's past due loans, and he stipulated that the government satisfied the materiality element. *See* S-6 (Materiality stipulation).

Gibson argues that "[a]t most, the government established only that Mr. Gibson's good-faith certification to the accuracy of the periodic reports at issue reflected a mistake." D.I. 828 at 28. He further cites evidence that subordinates and other Bank employees executed sub-certifications upon which he relied. *Id.* at 28-29. But if the jury found that he knowingly and intentionally made the materially false underlying statements regarding past due loans, it was free to disregard those certifications as meaningless. It could further infer that he had full "knowledge and belief" upon the false information that he was certifying.

Because there was sufficient evidence underlying Gibson's convictions on Counts 17-19, Gibson's Rule 29 challenge should be denied.

### *Variance*

Defendants present several arguments in support of their request for a new trial on the basis that alleged deviations between the Indictment and the evidence presented at trial

constituted either a constructive amendment or a prejudicial variance.  Their arguments are unavailing.

Constructive amendments occur when "in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant of an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010) (citation omitted).  Amendments "constitute a *per se* violation of the fifth amendment's grand jury clause."  *United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir. 1985).

With variances, "the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment."  *Id.* (finding the variance "did not broaden the bases for conviction, but instead narrowed the scope of the evidence to prove an offense included in the indictment").  A variance results in reversible error only if it prejudices a substantial right of the defendant.  *Vosburgh*, 602 F.3d at 532.  "A variance that sufficiently informs the defendant of the charges against him and allows him to prepare his defense without being misled or surprised at trial does not prejudice the defendant's substantial rights."  *Id; see also United States v. Andrews*, 681 F.3d 509, 529 (3d Cir. 2012) ("If a variance between the indictment and the evidence does not alter the elements of the offense charged, we will focus upon whether or not there has been prejudice to the defendant.").

Defendants appear to make three overarching arguments in support of their constructive amendment/variance position: (1) that the Indictment alleges one conspiracy involving the defendants but the evidence at trial proved a "separate and distinct conspiracy involving Bailey and Terranova" (D.I. 827, at 15); (2) that the government changed and/or broadened its theory of

falsity from what was alleged in the Indictment (D.I. 827, at 6, 10, 12-15; D.I. 825, at 28); and (3) that other government "inconsistencies" resulted in prejudicial variances (D.I. 825, at 26-30). We address each in turn.[25]

## I.    There Was No Evidence of a Separate Bailey/Terranova "Conspiracy" That Prejudiced Defendants.

Defendants claim that Terranova's trial testimony created a "fatal" variance with the charged conspiracy.  D.I. 827 at 1.  Defendants argue that the government failed "to connect the separate and distinct actions of Terranova and Bailey to any criminal conspiracy with Defendants.  As a result, the government impermissibly tainted the jury by introducing highly prejudicial evidence that was wholly irrelevant to the Defendants."  *Id*.  This argument, however, misconstrues both the evidence and the law.  First, separate and apart from the challenged Terranova testimony, the government offered extensive evidence as to Defendants' overarching agreement and their interconnected conduct to commit the charged conspiracy.  *See* "Conspiracy" section *supra* at II, pgs. 47-52.  Second, the government properly offered Terranova's testimony regarding certain lending abuses he committed with Bailey to explain the basis for his guilty plea and allow the jury to judge his credibility – not as substantive evidence against any Defendant.  Moreover, the Court instructed the jury that they were to treat such testimony with "great care and caution" and that they could not use this evidence against any other Defendant.  Finally, Defendants did not suffer any prejudice from this testimony because the government rigorously segmented its proof between these conspiracies, thus ensuring little

---

[25] To the extent the government has not responded to any variance argument by the Defendants that need a response, the government reserves the right to do so at a later time and does not, by its lack of a response here, concede to any point the Defendants make.

chance of prejudice given the limited number of potential conspirators and conspiracies. Accordingly, Defendants' variance claim is meritless and should be denied.

"Where a single conspiracy is alleged in the indictment, there is a variance if the evidence at trial proves *only* the existence of multiple conspiracies." *United States v. Freeman*, 763 F.3d 322, 343 (3d Cir. 2014) (emphasis added). While a conspiracy's "objectives may be numerous and diverse, a single conspiracy exists if there is one overall agreement among the parties to carry out those objectives." *Freeman*, 763 F.3d at 343. Whether a single conspiracy or multiple conspiracies exist is a question for the jury. *Freeman*, 763 F.3d at 343 (holding that defendant's variance argument fails because "the government's evidence permitted a reasonable inference that each act or transaction that occurred during the drug trafficking scheme was in support of the ultimate goal of the drug trafficking organization-to import large quantities of drugs into the United States"). In *United States v. Kelly,* 892 F.2d 255, 259 (3d Cir. 1989), the Third Circuit set forth a three-part test for distinguishing between a single and multiple conspiracies: (1) "whether there was a common goal among the conspirators"; (2) "whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators"; and (3) whether and to what extent "the participants overlap in the various dealings." *Id*.

Here, the government's evidence regarding the charged conspiracy to falsely report past due loan information satisfied these criteria. As previously noted, at the start of the charged conspiracy, each Defendant possessed critical information about the condition of the Bank, the economy, and the Waiver Practice's impact past due loan reporting. Tr. 7002-04 (closing argument). The government linked this knowledge to Defendants' subsequent conduct, such as approving the waiver of hundreds of millions of dollars in loans from past due loan reporting;

signing and certifying the accuracy of the Bank's public filings; speaking to stock analysts and regulators about the condition of the Bank; and participating in the due diligence process prior to the capital raise. *See* "Criminal Intent" section *supra* at 32-34.   Ultimately, the government argued (and the jury agreed) that the success of the conspiracy hinged on this interconnected conduct, which required each Defendant to perform particular duties in order for the Bank to report a false past due 90-day loan information to regulators and investors.

The government, however, never argued that Terranova and Bailey's abuse of the Ten Percent Rule constituted substantive evidence of the charged conspiracy.   Terranova testified at trial that his guilty plea arose from him (1) altering a loan document with another Bank customer; (2) abusing the Ten Percent Rule; and (3) improperly extending credit.   Tr. 4323 (Terranova).   Terranova further explained that Bailey sanctioned his improper use of Ten Percent Rule loans to struggling borrowers without Defendants direct knowledge.   Tr. 4330 (Terranova). The government properly admitted this evidence (without any defense objection) as background information so the jury could understand the basis for Terranova's guilty plea and properly judge his credibility.   Tr. 6889 (closing); 7306 (rebuttal closing).   The Court instructed the jury that they should judge such testimony with "great care and caution" and that they "must not consider Mr. Terranova's guilty plea as any evidence of any defendant's guilt."   Jury Instr. at 18; Tr. 7306-07 (rebuttal closing argument) ("you view individuals like Mr. Terranova with great caution" and "it's not about Mr.—Mr. Terranova, yes, he told you what he did with respect to the ten percent rule loan, but what's important here is what they know about Mr. Terranova.   Okay. That's the critical part.   Again, they are put on notice as to these supplemental financing issues with Mr. Terranova….")

Third Circuit precedent permits such testimony from cooperating witnesses.  In *United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665-67 (3d Cir. 2000), the Third Circuit observed that there were at least three reasons to permit the government to adduce evidence of a testifying witness's guilty plea and plea agreement, including: (1) to allow the jury to accurately to assess the credibility of the witness; (2) to eliminate any concern that the jury may harbor regarding whether the government has selectively prosecuted the defendant; and (3) to explain how the witness has first-hand knowledge concerning the events about which the witness was testifying.  *See also United States v. Montani*, 204 F.3d 761, 765 (7th Cir. 2000) ("The well-settled rule in this Circuit allows the government to take the sting out of a defendant's cross-examination by introducing evidence of a co-defendant's plea agreement as part of its case in chief.").  Here, Terranova's testimony allowed the jury to properly assess his credibility and demonstrated a basis for his first-hand knowledge of events and practices that were ongoing at the Bank.[26]   Accordingly, given the careful presentation of this testimony to the jury, combined with the Court's cautionary instruction, the jury was able to properly judge Terranova's testimony.

Nor can Defendants establish they suffered any substantial prejudice based on this evidence.  In *United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007), defendants were convicted of

---

[26] The Terranova testimony was not the only testimony relating to Bank lending abuses tied to past due loan reporting.  As set forth above, Tosha Styles, Martin Infanti, and Terry Brewer testified about lending practices that impacted the Bank's reporting of past due loans. Tr. 1894:5-1895:15 (Styles); 1551:25-1552:12 (Infanti); 5233:13-19, 5234:5-8 (Brewer).  Barbara Marley further testified that the Bank improperly funded advances on matured loans.  Tr. 4071:8-18 (Marley).  And Federal Reserve Examiners Jim Corkery and David Fomunyam testified that the Federal Reserve placed Defendants on notice that the Bank's misuse of supplemental financing and working capital lines of credit had the potential to mask delinquency reporting and other metrics.  Tr. 2352:15-2353:17 (Corkery); Tr. 3049:2-12 (Fomunyam).  Those findings were enshrined in the 2009 examination report, which was also introduced at trial.  GX 221R.

conspiring to commit honest services fraud in relation to a government kick-back scheme.  Like

this case, Defendants challenged their conviction claiming there was a prejudicial variance

between the charge in the Indictment and the proof presented at trial.  *Id*. at 287.  The Third

Circuit explained that "[w]e will only vacate [defendants] convictions, however, if they can show

that the variance prejudiced their substantial rights."  *Id*. at 291.  The Court determined that

while defendants proved a variance existed, they failed to demonstrate they were sufficiently

prejudiced.  *Id*. at 292.  In making this determination, the Court found that (1) the government

"rigorously segmented its proofs and 'never suggested in any way that any piece of evidence

related to [one set of defendants] was relevant to establish [another set of defendants']

participation in the conspiracy; and (2) because "there were five alleged conspirators that make

up three distinct conspiracies" "there is little danger that prejudice inevitably occurred based on

the sheer number of defendants and conspiracies."  *Id*.

Applying this holding to the present case, the government rigorously segmented

Terranova's ten percent rule testimony from its other evidence that it argued proved Defendants

engaged in the charged conspiracy.  In its closing argument, the government did not link

Terranova and Bailey's abuses of the ten percent rule and other misconduct to the charged

conspiracy, but rather specifically defined the agreement as follows:

> [T]he conspiracy was to keep, **it was an agreement to keep the reported past due
> number down.** That's the common scheme or plan that you have to consider, the
> concealment of the bank's true 90-day number, the true past due number from
> regulators and investors outside the bank.

Tr. 7002:14-19 (closing argument) (emphasis added).  The government further argued that

Terranova's lending abuses were known to others at the Bank and should be considered in

assessing Defendants' knowledge and intent.  *See* Tr. 6889:2-16 (closing argument);

6890:6891:6 (closing argument); 7306:16-7307:14 (rebuttal closing argument).  Defendants

similarly argued that they had nothing to do with Terranova's lending abuses.  *See, e.g.,* Tr.

7053:22-7054:2 (Harra closing argument); 7105:7-12 (Gibson closing argument); 7197:8-13

(North closing argument); Tr. 7259:6-13 (Rakowski closing argument). In considering these

arguments, the Court presumes that the jury followed its instructions as to how to consider

evidence of Terranova's criminal conduct.  *United States v. Hakim*, 344 F.3d 324, 326 (3d Cir.

2003).

      Moreover, according to Defendants, the government introduced evidence relating to only

one other conspiracy involving two co-conspirators.  But, as the Court of Appeals noted in

*Kemp*, there is no prejudice where only a limited number of other conspirators and conspiracies

are at issue.  *Kemp*, 500 F.3d at 292.  Because this case involves at most six conspirators and/or

two conspiracies, "there is little danger that prejudice inevitably occurred based on the sheer

number of defendants and conspiracies."  *Id.*

      For these reasons, even if Defendants could establish a variance in the evidence, they

cannot prove they suffered any prejudice of their substantial rights.  Accordingly, Defendants

claim should be denied.

## II.      There is No Variance Between the Government's Charged Theory of Falsity and its Proof at Trial.

      The crux of Defendants' variance argument is that the government failed to present a

consistent theory of falsity from Indictment through proof at trial.  But the Indictment alleged

that "[a] 'past due' loan is a loan in which the borrower has not made a required interest or

principal payment in accordance with the loan's contractual terms."  D.I. 243 ¶ 13.  And as

described in the "Falsity" section, "past due" status as charged in the Indictment is an

unambiguous term and the government's charging theory was legally valid.

Defendants claim that they "begged" the government to identify its theory of falsity during a pretrial hearing in July 2016, suggesting that the government failed to do so.  But the transcript indicates that the government did just that, setting forth the same "past due" theory that it proved up at trial:

> THE COURT: All right. So what you're saying, I think is, on the Call Reports essentially based on these instructions that are provided, that kind of says what is the past due loan, or past due 90 days loan, for purposes of that?
>
> THE GOVERNMENT: Which complies with how we've set forth the definition of a past due loan in the Indictment.
>
> THE COURT: All right. And the -- and just go back to the definition of past due loan in the Indictment is?
>
> THE GOVERNMENT: It's based on contractual terms.
>
> THE COURT: And, so, based on contractual terms, in other words, if the contract between the back and whomever says you owe you us X dollars on a certain day, and if the X dollars was paid, it's not past due. If the X dollars has not been paid, it is past due. And if the bank and the customer essentially supersede the old contract by entering into a new contract, then it's not past due?
>
> THE GOVERNMENT: And we're not talking about just like a few days past due.
>
> THE COURT: Well, I understand we're talking 90 days.
>
> THE GOVERNMENT: 90 days. We're also talking about in excess of a hundred million dollars worth of loans that were more than six months past due. So, as we get to trial, that's again an issue for trial and not in terms of what was pled in the Indictment.
>
> THE COURT: Okay. Thank you, Mr. Kravetz.

Transcript of July 2016 Pretrial Hearing 72:14-73:15; *see also id.* at 130 (denying pretrial motion to dismiss on the finding that the false statements were "very succinctly described" in the Indictment).

Other than rehashing arguments relating to falsity, Defendants do not cite any cases supporting their argument that the government deviated from its theory that a past due loan was

one that was past due 90 days for principal repayment under the loan's contractual terms.[27]

Defendants allege that the government failed to present a specific GAAP standard relating to

"past due" status, but the Court previously concluded that the government was not required to

plead or prove a GAAP violation. Tr. of July 2016 Hrg. at 130:2-4; *see United States v. Toll*,

804 F.3d 1344, 1357 (11th Cir. 2015) (holding that the government was not required to prove

that particular false statements violated GAAP or that the defendant knew they did ); *United*

*States v. Rigas*, 490 F.3d 208, 220-221 (2d Cir. 2007) (holding that even in a securities fraud and

false statements case, where accounting principles spoke to the alleged conduct, there was no

requirement that the government introduce evidence relating to GAAP or financial accounting

standards); *United States v. Ebbers*, 458 F.3d 110, 125-26 (2d Cir. 2006) (finding that an

indictment charging defendant with making false statements to the SEC and securities fraud need

not allege failure to comply with GAAP).  And the instruction as to Circumstance #4 did not

create a variance – it was wholly consistent with the government's longstanding charging theory

and trial proof that matured loans were past due.  *See* page 12 n.6, *supra*.[28]

---

[27] Defendant North suggests separately in his brief that the government had seven "iterations" of falsity.  (D.I. 825 at 21-26).  That statement does not square with the record, which demonstrates that the government grounded its theory of falsity on the Indictment and proved it up at trial.

[28] Defendant Gibson suggests that the Court's "delay" in providing a jury instruction relating to Schedule RC-N resulted in prejudice because Defendants would have otherwise introduced evidence as to the meaning of particular terms under "Circumstance #3."  D.I. 827 at 9-10.  Yet, Defendants omit that they sought and obtained a pre-trial order prohibiting evidence relating to the meaning of Call Report definitions.  D.I. 381 (Brief); D.I. 559 (Order).  Neither party was permitted to introduce evidence of what the Call Report instructions meant, and the Court instructed the jury as to Circumstances #3 and #4 as a matter of law.  Jury Instr. at 31-32.  That instruction was consistent with the government's theory of falsity, as initially set forth in the Indictment – a fact fatal to any defense claims of prejudice.  Moreover, Defendants introduced evidence relating to a standard Wilmington Trust promissory note at trial and asked specific questions about the Bank's underwriting.  Tr. 1665:20-1669:17; 1708:8-1710:2 (Infanti); GX 1603A (promissory note introduced by Defendant North).  That they chose not to introduce additional evidence through government witnesses or their defense case is not evidence of prejudice.

Likewise, Defendants' claims that the government broadened its theory of falsity to include short-term loan extensions are not supported by the record.  As an initial response, several of the charged offenses *pre-dated* the mass-extension practice.  Counts 7 and 11, which charged false statements in the Bank's Third Quarter 2009 Call Report and SEC Report, relate to loans that were waived as of September 30, 2009 – at least a month before Bank employees even began discussing mass, short-term extensions.  Beyond that point, ***none*** of the substantive false statement offenses relied on loan extensions to prove falsity.  Larry Hart testified about the relevant loans that had been waived from past due reporting between 2009 and the First Quarter of 2010.  His testimony, and the resulting charts, focused only on waived loans – not loans that had been mass-extended.  *See* Tr. 4216:23-4226:13 (Hart); GX 1010 (Hart exhibit setting forth waived loans in 2009); 1010A (chart relating to October 2009 Monthly Regulatory Report); 1010B (chart relating to First Quarter 2010).  The government relied upon these waived loan figures in its closing argument to the jury, producing slides that measured the false past due loan amounts ***solely*** in relation to waived loans and referencing the corresponding counts of the Indictment.  Tr. 6929:21-6934:6 (closing argument).  The government's reference to the mass-extension practice prefaced its discussion of Count 2, where it focused on the relationship between short-term extensions and the capital raise.  *See, e.g.,* Tr. 6944:20-6947:3 (closing argument addressing evidence relating to short-term extensions).  Evidence relating to the short-term extensions was thus relevant to the "scheme to defraud" theory of securities fraud.  *See* pages 40-42, *supra*.  It was also relevant to Defendants' criminal intent.  *See* page 38, *supra*.

In short, Defendants' argument that there was a variance relating to falsity is unsupported by the record and should be denied.[29]

## III.     Defendant North's Miscellaneous Variance Arguments Are Meritless.

Defendant North asserts five additional "inconsistencies" that he argues should also be viewed as constructive amendments or prejudicial variances.  D.I. 825, at 26-30.  None of the arguments are availing.

North's first claim is that the government caused a constructive amendment or prejudicial variance by arguing in its closing that the Waiver Practice was always "wrongful."  D.I. 825 at 26.  According to North, this statement broadened the false statement charge beyond the quantity or amounts of past due loans at issue.  But that argument is in inaccurate depiction of the record. The reference to the "wrongfulness" of the Waiver Practice arose in the context of the charged conduct, namely to designate the point in time in which the amount of waived loans was undoubtedly material.  Tr. 6894:1-8 (closing argument).  As the government noted in its closing argument, the prior amount of waived loans in September 1999 and June 2006 (as reflected in two exhibits introduced by defendants) was only $1.08 million and $2.7 million, respectively. Tr. 6895:22-6896:18 (closing argument).  Reference to the "wrongfulness" of the Waiver Practice also supported a finding of criminal intent and rebutted the defense position that the Bank had always been waiving loans in a manner similar to the charged timeframe so as to rebut claims of good faith.  The argument did not deviate from, or broaden its theory of falsity as

---

[29] The citation by Defendant Gibson's counsel to *Berger v. United States*, 295 U.S. 78, 88 (1935), at the end of the variance section of the Rule 29 brief is wholly unjustified.  D.I. 827 at 15.  The casual suggestion that the government ***purposely sought to induce an unjust conviction*** because there was an alleged variance between the Indictment and the proof at trial should not be leveled lightly – particularly where it is unsupported in the record.

alleged in the Indictment.  As set forth on pages 34-35, *supra*, the government argued that loans were past due based upon the quantity of waived loans during the charged time periods.

North next argues that the government improperly presented evidence regarding the mass extensions of matured loans.  D.I. 825 at 28.  The government has previously explained the purpose of its argument relating to the mass extensions in this section, as well as on pages 40-42 relating to the sufficiency of evidence on Count 2.

Third, North argues that the government introduced evidence and argument that the descriptors associated with the Delinquency Report (that loans were "current for interest" and "in the process of extension") yielded a prejudicial variance in proof.  Such evidence, however, did not relate to the falsity of the past due loan figures, but rather supported the government's argument that North knew that the past due loan figures were false and acted with criminal intent.  The evidence was also relevant to North's lack of good faith in approving waived loans.

Fourth, Defendant North's argument that the government's representation of GX 445 (a January 2009 email from North referring to the "true past due" number) set "a new standard for falsity" is without merit.  The government's argument that Defendant North knew that waiving past due loans prevented the Bank from reporting a "true past due" number was fair comment for closing argument.  North's unwillingness to follow the correct standard – that is, to only waive loans *that were actually extended* – informed his knowledge, intent, and lack of good faith.

Finally, the government's reference to the TFR instructions during its presentation *to the grand jury* did not result in a prejudicial variance.  There is no reference to the TFR instructions in the Indictment itself, nor did the mention of the TFR instructions (which define a "past due"

loan in a manner similar to the Call Report) in the grand jury result in a falsity standard different than that charged in the Indictment.[30]

## **CONCLUSION**

For all of the reasons set forth above, the United States respectfully requests that the Court deny Defendants' Post-Trial Rule 29 and Rule 33 Motions.

Respectfully Submitted,

DAVID C. WEISS
United States Attorney

By:           /s/

Robert F. Kravetz
Lesley F. Wolf
Jamie M. McCall
Assistant United States Attorneys

July 3, 2018

---

[30] Defendants presented evidence regarding the TFR instructions (and a separate website Q&A) through their witness, Rachel Ofori.  Tr. 6533:23-6535:15 (Ofori).